FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

AUG 0 3 2018

JAMES N. HATTEN, Clerk
By: ~~~~ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* HENRY B. HELLER, | **FILED UNDER SEAL** |
| Plaintiff, | 31 U.S.C. § 3730(b)(2) |
| v. | Civil Action No. |
| GUARDIAN PHARMACY, LLC, and GUARDIAN PHARMACY OF ATLANTA, LLC, | **1:18-CV-3728**<br>Jury Trial Demanded |
| Defendants. | **DO NOT SERVE**<br><br>**DO NOT ENTER ON PACER** |

### RELATOR'S COMPLAINT

The United States of America *ex rel.* Henry B. Heller brings this action

pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §

3730(b), and shows the Court as follows:

### I. Introduction

1.     This action seeks to recover damages and civil penalties on behalf of

the United States of America based upon false claims for payment submitted to the

Medicare Program for prescription medications that resulted from a kickback

1

scheme perpetrated by Defendants Guardian Pharmacy, LLC and Guardian Pharmacy of Atlanta, LLC (collectively, "Guardian").

2.      Guardian is an institutional pharmacy that fills prescription drug orders for residents of assisted living communities, personal care homes, and other long-term care facilities.

3.      Most residents of assisted living facilities and personal care homes are beneficiaries of the Medicare Program, and their prescription medications and supplies are paid for in whole or in part by Medicare.

4.      Guardian knowingly offers and furnishes free and discounted services to entice owners and operators of assisted living communities and personal care homes to select Guardian over its competitors as the "preferred pharmacy" to fill prescription drug orders for their residents. *See* Exhibit A to this Complaint.

5.      Specifically, Guardian employs a team of pharmacists and pharmacy nurses to perform free medication management services (which Guardian refers to as consulting or audit services) for assisted living communities and personal care homes that select Guardian as their "preferred pharmacy," relieving the facilities of the cost of complying with their legal obligations to perform such services for their residents.

2

6. As another inducement, Guardian also offers free installation of the computers and software for electronic medication administration records systems used by assisted living communities and personal care homes that select Guardian as their "preferred" pharmacy. These systems satisfy the legal obligations of assisted living communities and personal care homes to maintain a medication administration record for each resident.

7. Supplying free or discounted goods and services for the purpose of inducing or rewarding a facility that refers its residents to Guardian for prescription drugs and supplies covered by Medicare is a kickback scheme that violates the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the claims for payment that Guardian has submitted and continues to submit to Medicare as a result of its kickback scheme are false claims that violated the False Claims Act, 31 U.S.C. § 3729(a).

8. As a direct and foreseeable result of Guardian's kickback scheme, hundreds of thousands of false claims have been submitted to the Medicare Program, and the Defendants' unlawful conduct continues today.

## II.   Jurisdiction and Venue

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345 (United States as plaintiff) and 28 U.S.C. § 1331 (federal question jurisdiction).

10.     This Court has personal jurisdiction over the Defendants, and venue is proper in the Northern District of Georgia pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391, in that one or more Defendants can be found, resides, or transacts business in this District, and the violations of the False Claims Act described below were carried out in this District.

## III.   The Parties

11.     Relator Henry Bernard Heller, II, is a resident of Georgia.  Mr. Heller is employed as an Account Management Consultant and Sales Representative for Defendant Guardian Pharmacy of Atlanta, LLC.  He brings this action on behalf of the United States of America.

12.     Defendant Guardian Pharmacy, LLC is a registered as a foreign limited liability company and has its principal place of business in this District at 1776 Peachtree Road, N.W., Suite 500, South Tower, Atlanta, GA, 30309.  The registered agent is Registered Agent Solutions, Inc., 900 Old Roswell Lakes Pkwy, Suite 310, Roswell, GA, 30076.

4

13.     Defendant Guardian Pharmacy of Atlanta, LLC, is a domestic limited liability company that does business at 1750 Enterprise Way, Suite 105, Marietta, Georgia, 30067.  Its registered agent is Registered Agent Solutions, Inc., 900 Old Roswell Lakes Pkwy, Suite 310, Roswell, GA, 30076.

14.     Guardian Pharmacy, LLC is a member and majority owner of Guardian Pharmacy of Atlanta, LLC.  The Defendants collectively are referred to in this Complaint as "Guardian."

## IV.    Anti-Kickback Statute

15.     The Anti-Kickback Statute makes it a crime to offer anything of value to an assisted living community or personal care home if one purpose of the arrangement is to induce the facility to refer its residents to a pharmacy to fill prescriptions, or otherwise to arrange for or recommend the pharmacy to furnish prescription drugs and supplies to residents, when the drugs and supplies are paid for in whole or in part by the Medicare Program.  *See* 42 U.S.C. § 1320a-7b(b).

16.     Congress passed the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), in 1972 to curb fraud and abuse in federal health care programs.

17.     The Anti-Kickback Statute creates a felony criminal offense in that,

Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly,

5

overtly or covertly, in cash or in kind to any person to induce such person--

>   (A) To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

>   (B) To purchase, lease, order or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

>   Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2).

18.   "Remuneration" under the Anti-Kickback Statute refers to an exchange of anything of value, including any kickback, bribe, or rebate, whether paid directly or indirectly, overtly or covertly, in cash or in kind. *See* 42 U.S.C. § 1320a-7b(b)(2).

19.   The Anti-Kickback Statute prohibits any arrangement in which at least one purpose of the remuneration is to induce referrals of patients for items or services paid for by federal health care programs.

20.    Congress enacted the Anti-Kickback Statute to ensure that decisions about medical care are based on the best interests of patients, rather than on the influence of payments or other "remuneration" from someone seeking patient referrals. Congress also was concerned that kickbacks create unfair competition in the healthcare market and can drive honest companies out of the market, to the detriment of patients.

21.    In 2010, Congress strengthened the Anti-Kickback Statute by adding a provision to establish that a claim for payment submitted to a federal program such as Medicare that includes "items or services resulting from" a kickback scheme "constitutes a false or fraudulent claim" in violation of the False Claims Act. *See* 42 U.S.C. § 1320a-7b(g).

22.    Accordingly, a claim for payment that results from a kickback scheme is a false claim as a matter of law. *Id.*

23.    Compliance with the Anti-Kickback Statute thus is a material condition of payment of claims submitted to the Medicare Program, as a matter of law.

## V.    False Claims Act

24.    The False Claims Act imposes civil liability on any person who –

A.    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

B.    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

31 U.S.C. § 3729(a)(1)(A)-(B).

25.    A person or an organization that violates the False Claims Act is liable to the United States Government for a civil penalty for each violation, plus three times the amount of damages the Government sustains because of the violation. *See* 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9) (Civil Monetary Penalties Inflation Adjustment).[1]

## VI.    Medicare Prescription Drug Coverage

26.    Most of the prescriptions that Guardian fills are paid for in whole or in part by the Medicare Program.

---

[1] For civil penalties assessed after January 29, 2018, whose associated violations occurred after November 2, 2015, the civil monetary penalties range from a minimum of $11,181 to a maximum of $22,363 for each violation of the False Claims Act. *See* 28 C.F.R. § 85.5. For violations occurring on or before November 2, 2015, the civil penalty ranges from $5,500 to $11,000 for each violation. *See* 28 C.F.R. § 85.3(a)(9).

8

27.     Congress created the Medicare Program in 1965 with the passage of Title XVIII of the Social Security Act, *see* 42 U.S.C. § 426, § 426-1.

28.     Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a component of the United States Department of Health and Human Services.

29.     Medicare is a federal healthcare program within the meaning of the Anti-Kickback Statute.

30.     Medicare provides hospital insurance, prescription drug benefits, and other healthcare benefits for people 65 years and older, people with end stage renal disease, and certain people who are disabled. *See id.*

31.     Medicare beneficiaries may obtain prescription drug benefits in two ways.  Beneficiaries who participate in traditional Medicare insurance for medical services (under Medicare Parts A and B) may enroll in a stand-alone drug plan that covers prescription drugs.  *See* 42 C.F.R. § 423.30.  This is known as a Prescription Drug Plan or "PDP."

32.     Alternatively, beneficiaries who participate in a Medicare Advantage plan (that is, a managed care plan under Medicare Part C) for their medical benefits may elect to add prescription drug coverage to the basic health plan that covers

their medical benefits.  This is known as a Medicare Advantage Prescription Drug Plan or "MA-PD." *See* 42 C.F.R. § 422.4(c) & § 423.4.

33.     Medicare Part C and Part D are voluntary insurance programs that are subsidized by federal funds.

34.     Medicare Part C creates a managed care option for beneficiaries. *See* 42 U.S.C. § 1395w-21 to § 1395w-29.

35.     CMS contracts with commercial insurance carriers, known as Medicare Advantage Organizations, to offer Medicare Advantage Plans under Medicare Part C.  The Plans cover medical services, such as hospital and physician services that are eligible for traditional Medicare coverage, as well as supplemental benefits. *See* 42 C.F.R. § 422.100(c).

36.     In Georgia, the following Medicare Advantage Organizations and others offer drug benefits as part of Medicare Advantage Plans: Humana, Blue Cross and Blue Shield of Georgia, Cigna-Healthspring, WellCare, and Aetna Medicare.

37.     Both types of prescription drug plans – PDP and MA-PD – must comply with the requirements of Medicare Part D, as described next. *See* 42 C.F.R. § 423.104.

38.    Part D of the Medicare Program became effective January 1, 2006. Part D was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, to provide prescription drug benefits for Medicare "beneficiaries," meaning individuals who are eligible to receive benefits under the Medicare Program.

39.    Medicare Part D is a voluntary insurance program that is subsidized by federal funds in the Medicare Prescription Drug Account. *See* 42 U.S.C. § 1395w-101; 42 C.F.R. §423.315(a).

40.    Private insurance companies known as Part D Sponsors contract with CMS to offer prescription drug benefit plans to Medicare beneficiaries.  In Georgia, Aetna Medicare, Humana Insurance Company, Express Scripts Medicare, SilverScript, WellCare, UnitedHealthcare and others are Sponsors offering Part D prescription drug benefit plans.

41.    CMS pays monthly payments and subsidies from the Medicare Prescription Drug Account, an account within the Federal Supplementary Medical Insurance Trust Fund, to Part D Sponsors to fund the prescription drug benefit plans they sponsor.

42.    Part D Sponsors are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts.

11

43.    Part D Sponsors frequently contract with Pharmacy Benefit Managers (PBMs) to administer their drug benefit plans.  The PBM typically processes claims for payment submitted by pharmacies and beneficiaries, they form pharmacy networks, they perform audits and conduct other plan management activities under contracts with Part D Sponsors.

44.    Part D Sponsors (and PBMs on behalf of Part D Sponsors) enter into reimbursement agreements with pharmacies (such as Guardian) that provide covered drugs and supplies to the Medicare beneficiaries enrolled in the prescription drug benefit plans they sponsor.

45.    Generally, when a pharmacy dispenses drugs or supplies to a Medicare beneficiary, the pharmacy collects a portion of the cost from the beneficiary (*e.g.*, a resident of an assisted living community or personal care home) and submits a claim electronically to the person's Part D Sponsor, its PBM, or to the Medicare Advantage Prescription Drug Plan.

46.    For covered drugs and supplies, the pharmacy receives reimbursement from the Medicare contractor for the portion of the drug cost not paid for by the beneficiary.  The reimbursement amount is negotiated and set forth in the reimbursement agreement between the pharmacy and the Medicare contractor.

47.    As to each such pharmacy claim, the Part D Sponsor (or other
contractor) submits to CMS an electronic statement called a Prescription Drug
Event, setting forth information regarding the prescription claim, including the
pharmacy that dispensed the drug, the prescriber of the drug, the quantity
dispensed, the amount that was paid to the pharmacy, and whether the drug is
covered under the Medicare Part D benefit. *See* 42 C.F.R. § 423.322.

48.    CMS relies upon the Prescription Drug Event data and other factors in
an annual reconciliation process to determine the payment amounts made to the
Part D Sponsor, and CMS recoups or pays additional funds to the Sponsor as a
result of the Prescription Drug Event data.

49.    Claims for payment submitted by a pharmacy to the patient's
Medicare prescription drug plan thus are "claims" within the meaning of the False
Claims Act. They are requests for money made to a Government contractor, the
money is to be spent or used to advance a Government program (that is, the
Medicare program), and federal funds are used to make the payment to the
pharmacy and to reimburse the Government contractor.

50.    In order to receive Part D funds from CMS, Part D sponsors and their
contracted pharmacies are required to comply with the Anti-Kickback Statute and
all applicable federal laws, regulations, and CMS instructions.

13

51.     All contracts between Part D Sponsors and pharmacies (such as Guardian) must contain language obligating the pharmacies to comply with all applicable federal laws including the Anti-Kickback Statute and applicable regulations and CMS instructions. *See* 42 C.F.R. § 423.505(i)(4)(iv).

52.     Compliance with the Anti-Kickback Statute thus is a material and essential condition of payment for prescription drug medications and supplies dispensed by pharmacies to Medicare beneficiaries.

53.     The Medicare Program and Medicare contractors such as Medicare Advantage Organizations and Part D Sponsors are collectively referred to as "Medicare" in this Complaint.

54.     Guardian, as a pharmacy that participates in the Medicare program, makes certain express and implied certifications of compliance with the Anti-Kickback Statute and other laws and regulations that are a material condition of coverage upon which Medicare relies in making payment decisions.

55.     Claims for prescription drugs and services that result from an illegal kickback scheme are false claims and are not eligible for payment by Medicare.

14

## VII.    Defendants' Pharmacy Operations

## A.    **The Home Office**

56.    Defendant Guardian Pharmacy is a private company that was founded in 2004 and has its headquarters in Atlanta, Georgia.

57.    Guardian Pharmacy owns and operates pharmacies in 34 locations and 24 states in the United States.

58.    Guardian Pharmacy operates through "Partner Pharmacies," that is, local entities that are operated jointly by Guardian Pharmacy and a local management team.

59.    Guardian Pharmacy is known as the "Home Office" within the Guardian organization.

60.    Guardian Pharmacy is the majority owner of its Partner Pharmacies; as such, Guardian Pharmacy controls the operations of its Partner Pharmacies including Defendant Guardian Pharmacy of Atlanta.

61.    Specifically, Guardian Pharmacy develops national and regional sales strategies for the entire company, conducts training for all sales representatives and other employees, and it exerts control over the billing process, contracting, and legal functions for the Partner Pharmacies.

15

62.    Guardian is the third largest institutional pharmacy in the United States, with over $550 million in annual revenues.

63.    With its Partner Pharmacies, Guardian supplies prescription medications to over 100,000 residents of assisted living communities, skilled nursing homes, and other long-term care facilities.  Most of its customers are residents of assisted living communities.

64.    The executive team in the Home Office is focused on a growth strategy, that is, the officers of the company aggressively promote sales growth to increase the number of residents under contract with Guardian, *i.e.*, the number of patients who fill prescriptions with Guardian.

65.    Guardian is an institutional pharmacy, also known as a long-term care pharmacy.  It fills prescriptions and makes daily deliveries of prescription medications and supplies and over-the-counter medications to assisted living communities and similar facilities for their residents.

66.    Guardian packages the residents' medications in special multi-dose or unit-dose packaging to facilitate correct medication administration, delivers the medications and supplies to facilities, and bills the residents and their insurance plans (typically, Medicare) for the cost of prescription medications and supplies.

67.    Guardian competes with other institutional pharmacies and retail pharmacy chains such as CVS and Walgreens to fill prescriptions for long-term care residents.

68.    While Guardian derives most of its sales revenues from residents who fill prescriptions with Guardian, the company views the facilities where the residents live as its true "customers."

69.    To gain access to residents, Guardian generally negotiates agreements with the owners and operators of the facilities.  The agreements give Guardian the status of being the "preferred pharmacy" for the residents, meaning the owners and operators of the facilities steer their residents to Guardian for their prescription medications and supplies.

70.    Guardian then enters into agreements with individual residents, allowing Guardian to fill and dispense medications and supplies prescribed by the residents' healthcare providers, to bill the resident for his or her share of the costs, and to file insurance claims for the resident, who assigns his or her prescription drug benefits to Guardian, allowing it to be paid directly by insurers (typically, Medicare).

71.    Guardian fills more than 12 million prescriptions a year and derives most of its revenues from the Medicare program and Medicare beneficiaries.

17

### B. Guardian Pharmacy of Atlanta

72.     Guardian Pharmacy is a majority owner of Defendant Guardian Pharmacy of Atlanta, one of the largest "Partner Pharmacies" owned by Guardian.

73.     Guardian Pharmacy controls the overall operations and strategic direction of Guardian Pharmacy of Atlanta.

74.     Guardian Pharmacy of Atlanta provides institutional pharmacy services to approximately 3,800 residents of assisted living communities and personal care homes in the northern half of the State of Georgia including the Atlanta metropolitan area.  The number of residents under contract with Guardian fluctuates from month to month.

75.     Guardian Pharmacy of Atlanta generates over $17 million annually in revenues by filling prescriptions for residents of assisted living communities and personal care homes and performing ancillary services.

### C.     Relator's Pharmacy Experience

76.     In 2017, Guardian Pharmacy of Atlanta significantly expanded its size by acquiring a pharmacy business that was partially owned by Relator.

77.     For 16 years, Relator had been a co-owner of Collier's Personal Care Pharmacy, an institutional pharmacy that operated throughout north Georgia.

78.    When Guardian Pharmacy of Atlanta acquired Collier's Personal Care

Pharmacy in 2017, it added about 1700 new residents to its pharmacy service and,

at about the same time, expanded its staff and facilities.

79.    As part of the transaction, Relator became employed by Guardian

Pharmacy of Atlanta as an account management consultant because of his industry

knowledge and success with Collier's pharmacy.

80.    Relator agreed to a two-year contract with Guardian Pharmacy of

Atlanta beginning on January 23, 2017.

81.    As detailed in Section IX below, within weeks of starting his

employment, Relator began to suspect that Guardian was not charging fees for

consulting services (also known at Guardian as "audits") provided by Guardian's

pharmacists and nurses for the facilities it served.

82.    Relator's subsequent observations also revealed that Guardian was

providing free installation of electronic medication administration records systems

for assisted living communities and personal care homes.

83.    Relator learned that Guardian, in some instances, also did not charge a

monthly subscription fee for ongoing access to the electronic medication

administration record system that Guardian installed for free.

84.    Guardian offers and provides such services to its customers for free with the aim of obtaining and preserving the coveted status of "preferred" pharmacy from owners and operators of the facilities.

## VIII.    Assisted Living Communities and Personal Care Homes

85.    Assisted living communities and personal care homes are residential living facilities that provide personal care services to senior residents, including medication administration and assistance with essential activities of daily living, such as eating and bathing.  *See* O.C.G.A. § 31-7-12.2(b) (assisted living communities); O.C.G.A. § 31-7-12 (personal care homes).

86.    Assisted living communities and personal care homes must be licensed by the State of Georgia to operate in Georgia.  O.C.G.A. § 31-7-3(d)(1).

87.    They are different from nursing homes and skilled nursing homes, which have a primary focus of delivering healthcare services to patients who are unable to live independently.

88.    By contrast, assisted living communities and personal care homes are not engaged in the delivery of health care services.  Their staff may assist residents with medications and may request prescription refills; however, the staff are not licensed to practice medicine.  They may not write orders for prescription drugs or provide medical treatment to residents.

20

89.    Virtually all of the residents are beneficiaries of the Medicare program and receive prescription drug benefits under Medicare Part D.

90.    Most residents have chronic health conditions that require them to take seven or more prescription medications daily.

91.    A typical assisted living community in Georgia serves about 30 to 70 residents.  Personal care homes are smaller, typically with 15 to 25 residents.

92.    Unlike nursing home residents who often receive Medicaid benefits, residents of assisted living communities and personal care homes typically pay the fees to live in the facilities out of their own pockets or with private insurance.  The cost of living in the facility is not covered by Medicare or Medicaid.

93.    The facilities thus compete aggressively to attract residents who typically pay $2,500 to $7,000 or more per month in residence fees, depending on the location and types of support services the facilities offer to residents.

94.    Because residence fees are paid with the personal assets of residents, small price differences among competing residential facilities can determine a resident's choice of where to live.

95.    As a result, assisted living communities and personal care homes are reluctant to incur any additional costs that would be passed on to residents, a factor that influences a facility's choice of a preferred pharmacy.

21

## A. Selection of a Preferred Pharmacy

96.     Customarily, an assisted living community or personal care home chooses a single "preferred" pharmacy to fill prescriptions for their residents. While residents have the freedom to choose any pharmacy to fill their prescriptions, the facility steers residents to choose the preferred pharmacy and to agree to use the particular method for packaging medications that the facility finds most convenient.

97.     Once a preferred pharmacy is selected, most residents of the assisted living community or personal care home use that pharmacy. The percentage of residents who use the preferred pharmacy is known as the "adoption rate."

98.     Guardian's adoption rate averages about 80%, meaning 80% of the residents of an assisted living facility under a "preferred" pharmacy contract with Guardian will select Guardian as their pharmacy to fill medications.

99.     Institutional pharmacies compete aggressively among themselves and with local retail pharmacies to curry favor with owners and operators of assisted living communities and personal care homes to be selected for the lucrative designation of being the "preferred pharmacy."

100.   To enhance its competitive position, Guardian offers free services that save money for assisted living communities and personal care homes by fulfilling certain mandatory duties they have under Georgia law.

## B. Mandatory Medication Records

101.   Georgia law requires every assisted living community and personal care home that helps residents with their medications to maintain a daily medication administration record, also known as a medication assistance record, or "MAR," for each resident.  *See* O.C.G.A. § 31-7-12.2(g)(8) (in an assisted living community, a "medication aide *shall record* in the medication administration record all medications that the medication aide has personally administered to a resident") (emphasis added); Ga Comp. R. & Regs. 111-8-62-.20(5) (when a personal care home "either provides assistance with, or supervision of self-administered medications or health maintenance activities involving medications to residents, the home *must maintain a daily Medication Assistance Record (MAR) for each resident* receiving such service.") (emphasis added).

102.   The MAR must document daily information relevant to each resident's prescriptions, including the date and time when the resident took or refused medication, type and dosage, contact information of the healthcare provider, allergies, errors, side effects, and adverse reactions. *See* Ga. Comp. R. &

Regs. 111-8-63-.20(9) (medications in assisted living communities); Ga. Comp. R.

& Regs. 111-8-62-.20(5) (medications in personal care homes).

103.    The MAR is subject to inspection by the Georgia Department of

Community Health, and a failure to comply with MAR requirements can result in a

license suspension or revocation for an assisted living community or personal care

home. *See* Ga. Comp. R. & Regs. 111-8-63-.33 (assisted living community); Ga.

Comp. R. & Regs. 111-8-62-.33 (personal care homes).

104.    Most assisted living communities and many personal care homes now

maintain electronic versions of the MAR by purchasing software or online services

known as "eMAR" systems.

105.    More and more facilities are turning to eMARs to satisfy their medical

records obligations.

**C.    Mandatory Medication Management**

106.    In addition to requiring homes to maintain medication records,

Georgia law also sets forth strict requirements for managing the medications

administered to residents of assisted living communities and personal care homes.

**1.    *Medication Management Laws***

107.    To protect the residents' safety, Georgia law requires assisted living

communities and personal care homes to carefully manage the storage,

24

administration, and disposal of medications for their residents.

108.   Specifically, Georgia law requires that assisted living communities and personal care homes must obtain new prescriptions from the pharmacy within 48 hours, store medications in a secure manner, keep medications in their original packaging, and properly dispose of unused and expired medications in accordance with federal guidelines. *See* Ga. Comp. R. & Regs. 111-8-63-.20(11)-(12) (medication management in assisted living communities); Ga. Comp. R. & Regs. 111-8-62-.20(7)-(8) (medication management in personal care homes).

### 2.    *Special Duties For Assisted Living Communities*

109.   Assisted living communities also must satisfy additional requirements for proper medication management under Georgia law. *See* O.C.G.A. § 31-7-12.2(10).

110.   Specifically, Georgia law states that an assisted living community that uses medication aides "*shall secure the services of a licensed pharmacist*," and the pharmacist must perform the following duties:

(A) *Perform a quarterly review of the drug regimen of each resident* of the assisted living community and report any irregularities to the assisted living community administrator;

25

(B) Remove for proper disposal any drugs that are expired,

discontinued, in a deteriorated condition, or where the resident for

whom such drugs were ordered is no longer a resident;

(C) Establish or review policies and procedures for safe and effective

drug therapy, distribution, use, and control; and

(D) Monitor compliance with established policies and procedures for

medication handling and storage.

*See* O.C.G.A. § 31-7-12.2(g)(10) (emphasis added).

111.    Compliance with all medication management requirements is subject

to inspection by the Georgia Department of Community Health, and a failure to

comply can result in a license suspension or revocation for an assisted living

community or personal care home. *See* Ga. Comp. R. & Regs. 111-8-63-.33

(assisted living community); Ga. Comp. R. & Regs. 111-8-62-.33 (personal care

homes).

## IX.    Guardian's Kickback Scheme

112.    Based on Relator's observations, he estimates that Guardian

Pharmacy of Atlanta is the "preferred pharmacy" for approximately 40 assisted

living communities and 65 personal care homes.

26

113.   Through arrangements with those facilities, Guardian serves as the pharmacy for about 3800 residents.

114.   As described further below, Guardian furnishes free medication management services (which Guardian refers to as "consulting" or "audits") and free installation of electronic records systems to certain assisted living communities and personal care homes as inducements to secure the "preferred" pharmacy designation.

115.   Guardian's free services relieve those facilities of the costs they otherwise would incur to comply with Georgia law requirements to properly manage residents' medications and to maintain medication records.

116.   Performing such services is not necessary for Guardian to fulfill its role as a pharmacy dispensing prescription medications and supplies to residents; the services are offered as a benefit to the facilities who thereby avoid the costs of procuring those services on the open market.

117.   Upon information and belief, Guardian's practice of providing the inducements described herein began at least as early as 2014, and they continue through the present.

A.   **Free Medication Management Services**

118.   Guardian of Atlanta maintains a "Consulting Department" that employs two pharmacists and two pharmacy nurses whose sole responsibilities are to conduct pharmacy consulting services, education, and skills checks as required by Georgia law for assisted living communities and personal care homes.

119.   For assisted living communities, Guardian's Consulting Department assigns one of its employed, licensed *pharmacists* to perform drug regimen reviews and other services for each resident who uses Guardian as his or her pharmacy. *See* O.C.G.A. § 31-7-12.2(g)(10).

120.   For personal care homes, Georgia law does not specify that a pharmacist must perform the medication management duties required by law. Therefore, Guardian's Consulting Department assigns one of its employed pharmacy *nurses* to each personal care home to "audit" the medication regimen for residents who choose Guardian as their pharmacy and to review the facility's compliance with the storage and disposal requirements of Georgia law. *See* Ga. Comp. R. & Regs. 111-8-62-.20(7)-(8).

121.   In January 2017, Relator became a sales management consultant for Guardian and for several days made sales calls on facilities with Matt Hopp, President of Guardian Pharmacy of Atlanta.

122.    When negotiating with facilities to become a preferred pharmacy for their residents, Mr. Hopp placed a priority on convincing facilities to use a medication packaging system known as "strip" packaging because Guardian had invested substantial sums to acquire a strip packaging machine in or about 2014.

### 1.    *"Confidential Pricing Terms"*

123.    Within a few months of his employment, Relator observed an undated, blank contract called a "Pharmaceutical Products and Services Agreement," which designates Guardian as a preferred pharmacy for a facility. The Agreement provides that the "Operator" of the facility will use "best efforts" to support Guardian's provision of pharmacy services to the residents of the facility.

124.    To his astonishment, Relator observed that the contract contained "Confidential Pricing Terms" which stated that "Pharmacy Consulting Services" would be provided "Quarterly at no charge."

125.    An Exhibit to the contract also stated that Guardian would "provide pharmacy consulting services in conjunction with Operator's duties under applicable law."

126.    Shortly thereafter, Relator observed a similar "Pharmaceutical Products and Services Agreement" that Mr. Hopp had proposed to enter into with

an assisted living community called Magnolia Senior Living. The proposed

contract likewise contained "Confidential Pricing Terms," and it too stated that

"Pharmacy Consulting Services" would be provided by Guardian "Quarterly at no

charge."

127.   The pricing terms in the Magnolia Senior Living contract (unlike the

blank one that Relator had observed) also stated that "additional consulting" would

be billed at $65 an hour for a pharmacist and $55 an hour for a nurse.

128.   The draft contract with Magnolia Senior Living stated an effective

date of June 1, 2017, and it was later signed by Mr. Hopp on behalf of Guardian

and by the operator of Magnolia Senior Living.

## 2.   *National Sales Meeting*

129.   In April or May 2017, Relator attended Guardian's national sales

meeting in Atlanta.  The meeting was attended by virtually all senior executives

and sales representatives employed by Guardian.

130.   At the meeting, Relator observed a compliance presentation by Bob

Weir, Vice President, Operations & Regulatory Support, for Guardian Pharmacy.

Mr. Weir joined Guardian in 2015 and previously held senior management

positions with Omnicare and other institutional pharmacy companies.

131.   Mr. Weir discussed pharmacy consulting services in his presentation. He observed that the process of performing a medication audit can take 6 minutes or longer for each resident.  In a tongue-in-cheek manner, Mr. Weir then asked, "Now everyone is charging for this, right?," or words to that effect.

132.   Mr. Weir's demeanor suggested to Relator, and apparently to the rest of the sales force, that his question was rhetorical, for no one in the audience was heard to respond. Mr. Weir said nothing more about billing customers for audits during his presentation.

133.   During the meeting, around the time of Mr. Weir's presentation, Relator saw Kendall Forbes, Executive Vice President for Sales & Operations of Guardian Pharmacy, in the audience.  Relator publicly addressed Mr. Forbes before the audience and observed that federal guidelines require pharmacies to charge for audits.

134.   Mr. Forbes acknowledged Relator's remark but made no public comment about the Company's practice of not charging for audits.

### 3.   *Family Night*

135.   On or about January 24, 2018, Relator was preparing to conduct a "Family Night" gathering at an assisted living community (Canterfield of Kennesaw) and drafted a handout about Guardian's pricing compared to other

31

pharmacies. Family members of residents and members of the management team of the assisted living community attended the meeting.

136. Based on Relator's understanding of Guardian's practices and Mr. Hopp's approach to sales presentations, the handout that Relator prepared listed "Audit fees" and identified "0" to signify there would be no charges for pharmacy consulting services. Mr. Hopp reviewed the handout and allowed Relator to present it during "Family Night."

137. Consequently, Canterfield of Kennesaw receives free pharmacy consulting services from Guardian for each of its 20 residents, and Guardian also performed a free installation of its QuickMAR medication records system. *See* Exhibit A.

### 4. *"Black Hole"*

138. In February 2018, Mr. Hopp and Lori Newcomb, a Guardian pharmacist and the manager of the Consulting Department, announced a new pricing policy. In text messages with Mr. Hopp and Relator, Ms. Newcomb described the Consulting Department as a "black hole" for revenue purposes and summarized a plan to generate revenues for the Department.

139. Ms. Newcomb said the new fees would "make the Consulting Department a Revenue GENERATING department rather than a black hole." She

also explained the new fees by saying Guardian cannot justify how great its services are "IF WE ARE GIVING ALL OF OUR SERVICE AWAY FOR FREE!"

140.   Despite this, the "Consulting, Training, and Skills Fee Schedule" circulated by Ms. Newcomb with her text messages identified new charges only for educational services and skills checks performed by the Consulting Department.

141.   As for consulting services, the Fee Schedule notes that fees now may be "negotiated" for "premium" consulting packages including education services "IF communities would like to pay for all-inclusive service."

142.   But the new Fee Schedule maintained Guardian's policy that "basic consulting services per quarter" are performed for "No charge" for those facilities and residents who select Guardian as their pharmacy.

143.   Upon information and belief, the salaries and benefits for two pharmacists and two nurses who staff Guardian's Consulting Department amount to approximately $350,000 a year.

144.   The pharmacy consulting services that Guardian delivers for "no charge" take approximately 10 minutes from start to finish, per resident per quarter.  The pharmacist or nurse also incurs travel time to and from the facility, reviews medication carts, disposes of expired or unnecessary medications, and

33

prepares a detailed report for the facility addressing each resident's medication history, findings, and recommendations.

145.   To conduct pharmacy consulting services for all of Guardian's approximately 3800 residents in North Georgia on a quarterly basis, the Consulting Department devotes about 2,500 hours per year by its pharmacists and nurses to consulting activities for its customers.

146.   Guardian's Consulting Department is a "black hole" for revenue purposes because it does not bill for most of the pharmacy consulting services furnished to assisted living communities and personal care homes.

147.   Receiving free pharmacy consulting services, instead of hiring a pharmacist or nurse, holds great appeal for any facility that is trying to reduce the costs charged to residents while still complying with Georgia legal requirements for safe medication management.

**B. Free eMAR Setup**

148.   As described above, Georgia law also requires assisted living communities and personal care homes to maintain medication administration records, and many facilities now use electronic records known as eMARs to comply with the law.

34

149.   An eMAR system is a software program or web-based tool that satisfies the record-keeping requirements of Georgia law for tracking medication administered to residents, including adverse events and other aspects of administering medicines.

150.   Guardian is not involved in administering medications to patients or in maintaining records of medication administration.

151.   Maintaining medication administration records is a legal obligation of assisted living communities and personal care homes that assist residents with medications, not of the pharmacies that dispense medications for their residents.

152.   Guardian nonetheless purchases user licenses from eMAR companies, obtaining their permission to use and install eMAR systems in assisted living communities and personal care homes, as a service to the facilities.

153.   Guardian purchases user licenses from multiple eMAR companies, including QuickMAR, Extended Care Pro (ECP), PointClickCare (PCC), and Yardi. *See* Exhibit A.

154.   The user licenses require Guardian to pay a monthly (or yearly) subscription fee. Some eMAR companies bill license fees directly to the facilities, but most bill Guardian, which in turn bills residents (or facilities, depending on the arrangement).

155.  Guardian generally bills a monthly fee of $10 to residents whose facilities subscribe to an electronic system for maintaining medication administration records.

156.  Guardian does not rely upon eMAR systems to receive prescriptions from physicians, to fill prescriptions, to deliver medications, or to bill for medications and supplies.  Guardian uses separate pharmacy management programs for its pharmacy operations.

157.  However, Guardian installs the eMAR systems at no charge for assisted living communities and personal care homes that select Guardian as their preferred pharmacy.

158.  Specifically, Guardian supplies, for no charge, the hardware for eMAR systems (computers and peripherals – arms, mouse), the setup (installation and integration with Guardian's operating system), and limited technical support and expertise.

159.  When a facility has questions or issues with an eMAR system, such as technical problems or questions about functionality or features, the facility often contacts Guardian for support and is not billed.

160.   The setup fees, sometimes called interface fees, that are charged by eMAR companies range from $499 to $7,000, which Guardian pays for the benefit of facilities who choose Guardian as a preferred provider.

161.   If Guardian did not provide the eMAR installation services for free, assisted living communities and personal care homes that wanted electronic (as opposed to paper) medication records would have to pay eMAR companies directly for such services in order to maintain their records in compliance with Georgia law.

## C.  **Examples of Kickbacks (Exhibit A)**

162.   Guardian knowingly and willfully supplied, and continues to supply, free services to at least 49 facilities in exchange for their referral of patients to Guardian for pharmacy services.  *See* Exhibit A.

163.   The summary chart attached to this Complaint as Exhibit A sets forth examples of 26 assisted living communities and 23 personal care homes for which Guardian provided free services, based upon Relator's observations of Guardian's practices and the statements of Guardian's employees, as set forth herein.

164.   The facilities listed on Exhibit A selected Guardian as their "preferred" pharmacy; in exchange, all received free pharmacy consulting services for the residents of those facilities who selected Guardian as their pharmacy.

165.   Exhibit A states the estimated number of residents served by Guardian at each facility.

166.   As shown on Exhibit A, Guardian conducts free consulting services (*i.e.*, medication management) for approximately 1900 of the residents who live in the facilities receiving free services.

167.   The consulting services that Guardian performs for free have a value of approximately $10 to $20 per resident and are performed quarterly each year, yielding an aggregate value of approximately $75,000 to $150,000 a year in free services, all for the benefit of facilities that select Guardian as their preferred pharmacy and thus do not have to pay or otherwise arrange for consulting services to be provided at a cost to their residents.

168.   The facilities listed on Exhibit A that use electronic medication records also received free installation of their records systems from Guardian in exchange for selecting Guardian as their "preferred" pharmacy.

169.   The eMAR installations that Guardian performs for free have a value that ranges from $499 to $7,000 per facility, yielding an aggregate value of at least $15,000 in services that Guardian furnished for free to the facilities identified on Exhibit A that have eMAR systems.

170.   Guardian is paid an average of approximately $390 per month in copayments and reimbursement from health plans for prescription medications and supplies dispensed by Guardian.

171.   Guardian fills over 160,000 prescriptions each year for residents whose facilities received free services from Guardian, as shown on Exhibit A, and approximately 90% of the prescriptions are paid for in whole or part by Medicare.

172.   Thus, with respect to residents who are Medicare beneficiaries, Guardian submits over 140,000 prescription claims for payment each year to Medicare for medications and supplies dispensed to residents of facilities who received free services from Guardian in exchange for referring residents to Guardian for pharmacy services.

173.   Since 2014, Guardian has generated over $20 million in Medicare reimbursements and copayments for Medicare beneficiaries who were referred to Guardian by the facilities identified on Exhibit A, which all received free services from Guardian in exchange for the designation of being the "preferred" pharmacy of those facilities.

## D. **Guardian's Free Services Have Independent Value For Facilities**

174.   Guardian's inducements – in the form of free pharmacy consulting services and free eMAR setup -- benefit the owners and operators of the assisted

39

living communities and personal care homes by reducing their costs to comply with Georgia law.

175. By facilitating their compliance with requirements for medication administration records and medication management, Guardian provides substantial benefits to facilities that are unrelated to dispensing medications for residents.

176. Such services are add-on services that have independent value for facilities. In other words, the free services that Guardian supplies to the facilities are not necessary or integral to Guardian's services as a pharmacy dispensing prescription medications and supplies to residents.

## X.    Guardian Knew Its Kickback Scheme Was Unlawful

177. Defendants knowingly and willfully participated in a kickback scheme to provide free consulting services and free installation of eMAR systems to assisted living communities and personal care homes in exchange for their referring residents to Guardian, and arranging for or recommending Guardian to residents, to fill prescription orders for drugs and supplies paid for by the Medicare Program.

178. At all times relevant to the Complaint, Defendants participated in the kickback scheme knowing that at least one of the purposes of the remuneration

(*i.e.*, the free services) was to induce and reward referrals of residents to Guardian for prescription drug orders and supplies.

179.    Defendants know and have known since the inception of their kickback scheme that compliance with the Anti-Kickback Statute is a material condition of participating in the Medicare Program as a pharmacy and a prerequisite to receiving reimbursement from the Medicare Program through its contractors. *See* 42 U.S.C. § 1320a-7b(b).

180.    Guardian's executive team is comprised of many experienced healthcare executives with long careers in the pharmacy and long-term care industries who are well aware of the prohibitions of the Anti-Kickback Statute.

A.    **OIG Has Cautioned Against Free Services For Decades**

181.    The prohibition on providing free services in exchange for patient referrals for Medicare services or supplies has been the subject of decades of guidance published by the federal government to assist people seeking to comply with the Anti-Kickback Statute.

182.    Pursuant to federal law, 42 U.S.C. § 1320a-7d(b), the Secretary of the United States Department of Health and Human Services (HHS), in consultation with the Attorney General, is authorized to issue advisory opinions and other guidance on specific topics, including what constitutes prohibited remuneration

under the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and whether any activity or proposed activity could result in the imposition of sanctions or exclusion from participation in Medicare. 42 U.S.C. § 1320a-7d(b)(2).

183.    HHS's Office of Inspector General ("OIG") has frequently cautioned against providing free services in exchange for patient referrals in advisory opinions, special fraud alerts, and compliance guidance – all available for the public on the OIG website: https://oig.hhs.gov/compliance/advisory-opinions/index.asp.

184.    For example, over twenty years ago, OIG issued a "Special Fraud Alert" in 1998 that described suspect kickback arrangements in circumstances analogous to those described in this Complaint.[2]  The 1998 Special Fraud Alert addressed "instances of potential kickbacks between hospices and nursing homes to influence the referral of patients."[3]

185.    The operators of nursing homes, like those of assisted living communities and personal care homes, often refer their residents to healthcare providers such as pharmacies and hospice care (end-of-life care).  In the 1998

---

[2] *See* OIG Special Fraud Alert, *Fraud And Abuse In Nursing Home Arrangements With Hospices* (March 1998), https://oig.hhs.gov/compliance/alerts/index.asp.
[3] *Id.* at 3.

Special Fraud Alert, OIG cited examples of "suspected kickbacks" including "[a] hospice offering free goods or goods at below fair market value to induce a nursing home to refer patients to the hospice."[4]

186.    Ten years later, in 2008, OIG specifically addressed the kickback risks associated with "consultant pharmacy services" in the context of nursing homes.[5] Similar to assisted living communities, nursing homes are required to hire a pharmacist to conduct medication management services for their residents.[6]

187.    In its 2008 compliance guidance, OIG expressly cautioned that "consultant pharmacist services under contract with a long-term care pharmacy" that are provided for free or "at non-fair-market-value rates" present a heightened risk of a violation of the Anti-Kickback Statute.[7]  The OIG described the following conduct as "[e]xamples of suspect . . . arrangements that warrant careful scrutiny" under the Anti-Kickback Statute:

> (a) "Pharmaceutical consultant services, medication management, or supplies offered by a pharmacy;" and

---

[4] *Id.* at 4.

[5] *See* OIG Supplemental Compliance Program Guidance for Nursing Facilities, 73 Fed. Reg. 56832 (Sep. 30, 2008).

[6] *See* 42 C.F.R. § 483.45.

[7] 73 Fed. Reg. 56832, n.53.

(b) "Equipment, computers, or software applications that have independent value . . . ."[8]

188.   The OIG bluntly acknowledged in its 2008 guidance that such arrangements for "services and supplies to be provided to residents" of a home by outsiders "such as pharmacies" may disguise kickbacks intended to influence the home to refer its residents to the outside organization for services covered by federal healthcare programs.[9]

189.   In 2012, the OIG also issued an Advisory Opinion concerning circumstances analogous to Guardian's free installation of eMAR systems for assisted living communities and personal care homes.[10]  In Advisory Opinion No. 12-19, the OIG considered whether an institutional pharmacy would violate the Anti-Kickback Statute and face sanctions if it engaged in various arrangements to provide free services to "community homes" for people with disabilities.[11]

190.   The OIG first reiterated its "longstanding and clear" position that arrangements for "the provision of free or below-market items or services to actual

---

[8] 73 Fed. Reg. 56843.

[9] *Id.*

[10] *See* OIG Advisory Opinion No. 12-19 (November 30, 2012).

[11] *Id.* at 1.

44

or potential referral sources. . . are suspect and may violate the anti-kickback statute."[12]

191.    The 2012 Advisory Opinion went on to describe arrangement in which an institutional pharmacy sought to provide free medication administration software for community homes whose residents selected that pharmacy to fill prescriptions.[13] Like the eMAR systems installed by Guardian, the eMAR software that the pharmacy proposed to provide for free was "an eMAR that complies with state regulatory requirements" for the homes to maintain medication administration records.[14]

192.    The OIG concluded in its 2012 Opinion that the arrangement was problematic under the Anti-Kickback Statute because the eMAR systems have independent value for the homes, that is, they confer a benefit upon the homes that is unrelated to the prescription medications that the pharmacy would give residents.[15] The homes would obtain the use of the eMAR systems "without incurring the corresponding costs of obtaining that right," thus creating an

---

[12] *Id.* at 8.
[13] *Id.* at 12 (discussing Arrangement D).
[14] *Id.* at 6.
[15] *Id.* at 12, 14.

45

improper incentive for the homes to steer residents to the donor pharmacy instead of its competitors.[16]

193.   Considering the objectives of the Anti-Kickback Statute, the OIG concluded that providing the eMAR software for free "potentially would give [the donor pharmacy] a significant advantage over its competitors, who may not be in a position to offer a similar benefit but whose direct services to patients may be better."[17]  The arrangement thus would present "a significant risk of unfair competition, which could lead to the selection of a pharmacy that offers the best benefit to the [home], rather than the best direct services to patients," a core concern of the Anti-Kickback Statute.[18]

194.   Analogously, Guardian's free *installation* of eMAR systems (even assuming residents are charged a monthly subscription fees to maintain the service) improperly incentivizes facilities to select Guardian as their preferred pharmacy over competitors who may well provide better pharmacy services for residents but are unable or unwilling to offer free eMAR installation or free consulting services.

---

[16] *Id*. at 12.
[17] *Id*.
[18] *Id*. at 13.

195. The foregoing guidance documents published by the OIG, together with many other similar guidance documents, put Guardian on notice that its conduct was unlawful and that violations of the Anti-Kickback Statute are material to Medicare's payment decisions.

## B.   Contracts with Medicare Contractors

196. Most of Defendants' profits come from reimbursement (*i.e.*, payments for prescription drugs and supplies) by the Medicare Program through Medicare Part D Sponsors, PBMs, and Medicare Advantage Prescription Drug Plans.

197. To participate in the prescription drug coverage plans of the Medicare patients, Guardian enters into a reimbursement contract, sometimes known as a Provider Agreement, with each Medicare Part D Sponsor or other Medicare contractor that administers the drug plans for those patients.

198. The Provider Agreements that Guardian enters into with Medicare contractors expressly require Guardian to comply with all applicable federal laws, which includes the Anti-Kickback Statute, and applicable regulations and CMS instructions. *See* 42 C.F.R. § 423.505(i)(4)(iv).

199. Pursuant to such Provider Agreements, Guardian also is required to train its employees on the prohibitions of the Anti-Kickback Statute.

200.    Part D Sponsors and other contractors also publish compliance policies instructing pharmacies about the importance of complying with federal healthcare laws, including specific instructions on the Anti-Kickback Statute.

201.    For example, Guardian has a Provider Agreements with Humana, which sponsors Medicare Part D and MA-PD plans.  Humana publishes a Pharmacy Manual stating as follows: "Pharmacy providers are prohibited from having any financial relationship relating to the delivery of or billing for items or services covered under a federal health care program that . . . [w]ould violate the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, if items or services delivered in connection with the relationship were billed to a federal health care program."

202.    Guardian, having entered into numerous Provider Agreements with Medicare contractors, is well aware that compliance with the Anti-Kickback Statute is a material condition of payment by the Medicare program, including payments by Part D Sponsors MA-PD Plans pursuant to contracts with Medicare.

## C. **The Fine Print**

203.    Finally, Guardian's knowledge of the prohibitions of the Anti-Kickback Statute is apparent in the fine print of the contracts it offers to assisted living communities and personal care homes.

204.    As noted, Relator has observed Guardian's Pharmaceutical Products and Services Agreement for facilities that select Guardian as their preferred pharmacy.  The "Confidential Pricing Terms" in the contracts state that pharmacy consulting services are provided by Guardian "quarterly at no charge" for such facilities.

205.    An Exhibit to the Agreement used by Guardian, expressly refers to the Federal Anti-Kickback Statute and states as follows, among other things:

"[Guardian] will provide or arrange for, and Operator [of the facility] will pay for, consulting pharmacist services only on terms that account for [Guardian's] costs to do so, and never below those costs."

"All arrangements for consulting pharmacist services will be established without regard to any referrals."

206.    Guardian, however, ignored the fine print in its own contracts.

207.    Guardian blatantly violated the Anti-Kickback Statute by knowingly providing free consulting and eMAR services for assisted living communities and personal care homes, at least one purpose of which was to induce the facilities to select Guardian to fill the pharmacy needs of their residents, most of whom are Medicare beneficiaries.

208.   Guardian knew the claims for payment that it has submitted, and continues to submit, to Medicare for prescription drugs and supplies provided to residents of the facilities receiving free services from Guardian were tainted by its illegal kickback scheme and thus were false claims that were ineligible for payment by Medicare.

## Count One
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### (False Claims)

209.   Relator repeats and realleges the allegations in the Complaint as if fully set forth herein.

210.   As set forth above, Guardian provided kickbacks in the form of free pharmacy consulting and eMAR services to assisted living communities and personal care homes with the intention and effect of inducing those facilities to designate Guardian as their "preferred" pharmacy, meaning the facilities agreed to steer their residents to Guardian to fill prescriptions for drugs and supplies, most of which were paid for in whole or part by Medicare, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2).

211.   Guardian has submitted and continues to submit claims for payment for prescription drugs and supplies that it dispensed to residents of facilities that received free services pursuant to Guardian's kickback scheme.

212.   Compliance with the Anti-Kickback Statute is a material condition of receiving reimbursement from the Medicare Program.

213.   Guardian's claims for payment for prescriptions tainted by its kickback scheme were false claims and were not eligible for payment by Medicare.

214.   As a foreseeable result of Guardian's participation in the kickback scheme, Guardian knowingly submitted or caused the submission of thousands of false claims to Medicare for payment, in violation of the False Claims Act, 31 U.S.C. § 3729(a).

215.   By virtue of the false claims the Defendants presented or caused to be presented, the United States has suffered damages in an amount to be determined at trial and is entitled to recover treble damages plus a civil penalty for each false claim.

## Count Two
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### (False Records and Statements Material to False Claims)

216.   Relator repeats and realleges the allegations in the Complaint as if fully set forth herein.

217.   In connection with the kickback-tainted prescription claims that Guardian submitted or caused to be submitted to Medicare, Guardian knowingly made or used, or caused others (such Medicare Part D Sponsors, PBMs, and MA-

51

PD Plans) to make or use, false records or statements that were material to false or fraudulent claims for payment submitted to Medicare.

218.   By reason of these false records or statements, the United States has suffered damages in an amount to be determined at trial and is entitled to recover treble damages plus a civil penalty for each false claim.

**WHEREFORE**, the United States of America and the State of Georgia, by and through Relator Henry B. Heller, respectfully pray for the entry of judgment awarding the following relief:

For the United States of America

(a) Three times the amount of damages the United States sustains because of each violation of the False Claims Act; and

(b) A civil penalty for each false claim or false statement;

For the Relator

(c) An award of 30% of the judgment amount, settlement, or other remedy arising from this action; and

(d) An assessment against Defendants under the False Claims Act of litigation costs and reasonable attorneys' fees; and

(e) such other and further relief as the Court may deem just and proper.

Respectfully submitted this 3rd day of August, 2018.

s/ Lynn M. Adam
Georgia Bar No. 002319
ladam@khayatlawfirm.com
Robert C. Khayat
Georgia Bar No. 416981
rkhayat@khayatlawfirm.com

**THE KHAYAT LAW FIRM**
75 Fourteenth Street, NE
Suite 2750
Atlanta, Georgia 30309
Tel: (404) 978-2750
Fax: (404) 978-2901

***Attorneys for Relator Henry B. Heller***

*United States ex rel. Heller v. Guardian Pharmacy*
**Complaint - Exhibit A**
**Examples of Kickback Scheme**

| Customer Name | Guardian Code | Type of Pharmacy Consulting Services | Medication Packaging System | eMAR system | Patient Count (est.) | Annual # Scripts (est.) | Annual Sales Revenues (estimate) |
|---|---|---|---|---|---|---|---|
| **Assisted Living Communities - Guardian Provides Free Consulting Services** | | | | | | | |
| Elmcroft Milford Chase | ELMCHA | Pharmacist | Strip | None | 66 | 5,544 | $308,880 |
| Provident Village at Creekside | PRSMYR | Pharmacist | Strip | None | 35 | 2,940 | $163,800 |
| Waterford at Hidden Lake | WATHID | Pharmacist | Strip | None | 38 | 3,192 | $177,840 |
| Waterford at Oakwood | WATERF | Pharmacist | Strip | None | 66 | 5,544 | $308,880 |
| **Assisted Living Communities - Guardian Provides Free Consulting Services & Free Installation of eMAR System** | | | | | | | |
| Addington Place Alpharetta | TBD | Pharmacist | Strip | QuickMAR | 35 | 2,940 | $163,800 |
| Addington Place Johns Creek | TBD | Pharmacist | Strip | QuickMAR | 46 | 3,864 | $215,280 |
| Antebellum Grove (former customer)* | ANTBEL | Pharmacist | MOT | ECP | 44 | 3,696 | $205,920 |
| Canterfield of Kennesaw | TBD | Pharmacist | Strip | QuickMAR | 20 | 1,680 | $93,600 |
| Dogwood Forest Dunwoody | DOGDUN | Pharmacist | Strip | QuickMAR | 46 | 3,864 | $215,280 |
| Dogwood Forest Grayson | DOGGRY | Pharmacist | Strip | QuickMAR | 31 | 2,604 | $145,080 |
| Gardens of Shiloh Point | SHILOH | Pharmacist | Card | QuickMAR | 35 | 2,940 | $163,800 |
| Gracemont | GRACE | Pharmacist | Strip | QuickMAR | 68 | 5,712 | $318,240 |
| Magnolia Senior Living | MAGNOL | Pharmacist | Strip | QuickMAR | 44 | 3,696 | $205,920 |

## *United States ex rel. Heller v. Guardian Pharmacy*
## Complaint - Exhibit A
## Examples of Kickback Scheme

| Customer Name | Guardian Code | Type of Pharmacy Consulting Services | Medication Packaging System | eMAR system | Patient Count (est.) | Annual # Scripts (est.) | Annual Sales Revenues (estimate) |
|---|---|---|---|---|---|---|---|
| Morningside Gainesville | MSGAIN | Pharmacist | Strip | QuickMAR | 30 | 2,520 | $140,400 |
| Northlake Gardens | MSTUCK | Pharmacist | Strip | QuickMAR | 50 | 4,200 | $234,000 |
| Oaks Braselton | OAKBRA | Pharmacist | Strip | QuickMAR | 71 | 5,964 | $332,280 |
| Oaks Hampton | OAKHAM | Pharmacist | Strip | PCC | 70 | 5,880 | $327,600 |
| Oaks Post Road | OAKPST | Pharmacist | Strip | PCC | 74 | 6,216 | $346,320 |
| Oaks Towne Lake | OAKTWN | Pharmacist | Strip | PCC | 34 | 2,856 | $159,120 |
| Orchard at Tucker | ORCHRD | Pharmacist | Strip | QuickMAR | 38 | 3,192 | $177,840 |
| Phoenix Milton | PHXMIL | Pharmacist | Strip | QuickMAR | 41 | 3,444 | $191,880 |
| Rosewood at Fort Ogelthorpe | FTOGLE | Pharmacist | Strip | QuickMAR | 91 | 7,644 | $425,880 |
| St. Ives | STIVES | Pharmacist | Strip | QuickMAR | 38 | 3,192 | $177,840 |
| The Madeline at Decatur (former customer) | TBD | Pharmacist | Strip | Eldermark | 35 | 2,940 | $163,800 |
| Winnwood Retirement | WINWOO | Pharmacist | Strip | QuickMAR | 38 | 3,192 | $177,840 |
| Woodland Ridge | WOODLA | Pharmacist | Strip | QuickMAR | 50 | 4,200 | $234,000 |
| **Personal Care Homes - Guardian Provides Free Consulting Services** | | | | | | | |
| Gardens of Fayetteville | FAYETT | Nurse | Strip | None | 40 | 3,360 | $187,200 |
| Eagles Landing Senior Living | DOGEAG | Nurse | Strip | None | 44 | 3,696 | $205,920 |
| Heritage of Brookstone | BROOKS | Nurse | Strip | None | 30 | 2,520 | $140,400 |

2

*United States ex rel. Heller v. Guardian Pharmacy*
**Complaint - Exhibit A**
**Examples of Kickback Scheme**

| Customer Name | Guardian Code | Type of Pharmacy Consulting Services | Medication Packaging System | eMAR system | Patient Count (est.) | Annual # Scripts (est.) | Annual Sales Revenues (estimate) |
|---|---|---|---|---|---|---|---|
| Heritage of Sandy Plains | SANDYP | Nurse | Strip | None | 49 | 4,116 | $229,320 |
| Ivy Springs Manor | IVYSPR | Nurse | Strip | None | 60 | 5,040 | $280,800 |
| Manchester Court | MANCRT | Nurse | Strip | None | 35 | 2,940 | $163,800 |
| Medlock Gardens | MEDLOC | Nurse | Strip | None | 30 | 2,520 | $140,400 |
| Morningside Alpharetta | DOGALP | Nurse | Strip | None | 61 | 5,124 | $285,480 |
| Mt. Vernon Towers | MTVERN | Nurse | Strip | None | 14 | 1,176 | $65,520 |
| Palms at Lake Spivey | PALMS | Nurse | Strip | None | 17 | 1,428 | $79,560 |
| Parc at Duluth | TBD | Nurse | Strip | None | 20 | 1,680 | $93,600 |
| St. George Village | STGEOR | Nurse | Strip | None | 26 | 2,184 | $121,680 |
| Summer's Landing Bayberry Trace Jonesboro | SLJONE | Nurse | Strip | None | 19 | 1,596 | $88,920 |
| Wesley Woods Towers Personal Care | TBD | Nurse | Strip | None | 28 | 2,352 | $131,040 |
| **Personal Care Homes - Guardian Provides Free Consulting Services & Free Installation of eMAR System** | | | | | | | |
| Azalea House | AHOUSE | Nurse | Strip | QuickMAR | 16 | 1,344 | $74,880 |
| Campbellstone | CMPBEL | Nurse | Strip | QuickMAR | 20 | 1,680 | $93,600 |
| Country Gardens Dunwoody* | CGDUNW | Nurse | MOT | ECP | 33 | 2,772 | $154,440 |
| Eastside Gardens | ESGDN | Nurse | Strip | QuickMAR | 47 | 3,948 | $219,960 |

*United States ex rel. Heller v. Guardian Pharmacy*
**Complaint - Exhibit A**
**Examples of Kickback Scheme**

| Customer Name | Guardian Code | Type of Pharmacy Consulting Services | Medication Packaging System | eMAR system | Patient Count (est.) | Annual # Scripts (est.) | Annual Sales Revenues (estimate) |
|---|---|---|---|---|---|---|---|
| Hollander Senior Living Sandy Springs | HLSNDY | Nurse | Strip | QuickMAR | 33 | 2,772 | $154,440 |
| Magnolia Gardens | TBD | Nurse | Strip | QuickMAR | 30 | 2,520 | $140,400 |
| Villas at Canterfield | VILLAS | Nurse | Strip | QuickMAR | 54 | 4,536 | $252,720 |

| | |
|---|---|
| **Total Patient Count:** | **1,940** |

| | |
|---|---|
| **Total Prescriptions Filled Each Year:** | **162,960** |

| | |
|---|---|
| **Total Annual Sales Revenues:** | **$9,079,200** |

*Upon information and belief, Guardian also provided free monthly eMAR services to Antebellum Grove and Country Gardens of Dunwoody, in addition to providing free consulting services and free installation of eMAR systems for those facilities.

4

## **CERTIFICATION**

Pursuant to N.D. Ga. L.R. 7.1(D), counsel for Plaintiff hereby certifies that this document has been prepared with Times New Roman (14 point) font, which font has been approved under L.R. 5.1(C).

s/ Lynn M. Adam
Georgia Bar No. 002319
ladam@khayatlawfirm.com

*Attorneys for Relator Hank Heller*

**THE KHAYAT LAW FIRM**
75 Fourteenth Street, NE
Suite 2750
Atlanta, Georgia 30309
Tel: (404) 978-2750
Fax: (404) 978-2901