# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* HENRY B. HELLER,<br><div align="right">*Plaintiffs,*</div><br>v.<br><br>GUARDIAN PHARMACY, LLC and GUARDIAN PHARMACY OF ATLANTA, LLC,<br><div align="right">*Defendants.*</div> | Civil Action File No.:<br><br>1:18-cv-03728-SDG<br><br>**JURY TRIAL DEMANDED** |

## <u>AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Henry B. Heller ("Relator") brings this action on behalf of the United States of America pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3730(b), and shows the Court as follows:

### I. Introduction

1.     This action seeks to recover damages and civil penalties on behalf of the United States of America based upon false claims for payment submitted to the Medicare and TRICARE Programs for prescription medications that resulted from a kickback scheme perpetrated by Defendants Guardian Pharmacy, LLC and Guardian Pharmacy of Atlanta, LLC (collectively, "Guardian").

2.     Guardian is an institutional pharmacy that fills prescription drug orders for residents of assisted living communities, personal care homes, and other long-term care facilities.

3.     Residents of assisted living communities and personal care homes are typically elderly people experiencing chronic health issues that require ongoing treatment with multiple prescription drugs.  Senior living facilities generally assist residents with taking their medications.  Most residents are beneficiaries of the Medicare Program, and their prescription medications and supplies are paid for in whole or in part by Medicare. Other residents participate in TRICARE, a federal healthcare program for military veterans and families which pays for, in whole or in part, the prescription medications and supplies provided by Guardian.

4.     To protect senior residents, Georgia law imposes certain requirements on assisted living communities and personal care homes that offer medication assistance for their residents.  The facilities must manage the residents' medications in a safe and secure manner, maintain daily records of medication

administration to residents, and conduct staff education and skills certifications, among other duties under Georgia law.[1]

5.     Guardian competes fiercely with local and national pharmacies to profit from the lucrative prescription drug market represented by senior citizens who live in these facilities.  The market is strongly influenced by the owners and operators of the facilities because they customarily steer their residents to a preferred pharmacy to fill prescription drug orders, and residents overwhelmingly use the pharmacy recommended by the facility where they live.

6.     Since 2014, despite its own clear contractual language to the contrary, business as usual for Guardian has been to knowingly offer and furnish kickbacks to induce owners and operators of assisted living communities and personal care homes to select and retain Guardian over its competitors as the "preferred pharmacy" to fill prescription drug orders for their residents, including Medicare and TRICARE beneficiaries.

---

[1] *See, e.g.,* Ga. Comp. R. & Regs. 111-8-63-.20(11)-(12) (medication management in assisted living communities); Ga. Comp. R. & Regs. 111-8-62-.20(7)-(8) (medication management in personal care homes).

7.      Specifically, Guardian employs a team of consulting pharmacists and pharmacy nurses who perform medication management services for customers, on a quarterly basis, for no charge or for charges that are well below fair market value (hereinafter "FMV").  Guardian refers to these services as "consulting" or "audit" services.  By performing such consulting services for free or below FMV, Guardian relieves those assisted living communities and personal care homes that select Guardian as their "preferred pharmacy" of the costs of complying with their legal obligations to perform such services for their residents and otherwise benefits the facilities by reducing their overhead costs.

8.      Guardian's Consulting Department also has furnished legally-required education classes and skills checks for free or below-cost to the staff of facilities that chose Guardian as their preferred pharmacy, again relieving the facilities of the cost of complying with their legal obligations to provide these services for their staff.

9.      As another inducement, Guardian also has offered free installation of the computers and software programs for electronic medication administration records (eMAR) systems used by assisted living communities and personal care homes that select Guardian as their "preferred" pharmacy.  These systems provided at no cost by Guardian assist customers (*i.e.*, senior living facilities) in maintaining

4

a daily medication administration record for each resident, as required by Georgia law.

10.     These improper inducements are central to Guardian's marketing campaign and growth strategy.

11.     One purpose of Guardian's practice of supplying free and below FMV goods and services to senior living facilities was to induce them to refer their residents to Guardian, or arrange for their residents to select Guardian, for prescription drugs and supplies covered by Medicare or TRICARE, all in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).  The claims for payment that Guardian has submitted and continues to submit to Medicare or TRICARE as a result of its kickback scheme are false claims that violate the False Claims Act, 31 U.S.C. § 3729(a).

12.     Representative examples of false claims resulting from Guardian's kickback scheme are identified below.  As a direct and foreseeable result of Guardian's kickback scheme, Guardian has submitted hundreds of thousands of false claims to the Medicare Program and TRICARE Programs, and the Defendants' unlawful conduct continues today.

## II.    Jurisdiction and Venue

13.    This Court has subject matter jurisdiction over this action pursuant to

28 U.S.C. § 1345 (United States as plaintiff) and 28 U.S.C. § 1331 (federal

question jurisdiction).

14.    This Court has personal jurisdiction over the Defendants, and venue is

proper in the Northern District of Georgia pursuant to 31 U.S.C. § 3732(a) and 28

U.S.C. § 1391, in that one or more Defendants can be found, resides, or transacts

business in this District, and the violations of the False Claims Act described

below were carried out in this District.

## III.    The Parties

15.    Relator Henry Bernard Heller II is a resident of Georgia.  Mr. Heller

has been involved in the pharmacy industry for nearly 40 years. For 16 years, he

co-owned Collier's Personal Care Pharmacy, a long-term care pharmacy operating

throughout north Georgia.  In 2017, Guardian Pharmacy of Atlanta acquired

Collier's, and Guardian contracted with Mr. Heller first as an Account

Management Consultant and later added Sales Representative duties to his

responsibilities.  Until October 30, 2018, Mr. Heller participated in sales calls with

Guardian's President, Matthew Hopp, who was responsible for negotiating and

entering into contracts with customers.

6

16.     Defendant Guardian Pharmacy, LLC is registered as a foreign limited liability company and has its principal place of business in this District at 171 17th Street NW, Suite 1400, Atlanta, GA 30363.  Its registered agent is Registered Agent Solutions, Inc., 900 Old Roswell Lakes Pkwy, Suite 310, Roswell, GA, 30076.

17.     Defendant Guardian Pharmacy of Atlanta, LLC (NPI Number 1801180625) is a domestic limited liability company that does business at 171 17th Street NW, Suite 1400, Atlanta, GA 30363.  Its registered agent is Registered Agent Solutions, Inc., 900 Old Roswell Lakes Pkwy, Suite 310, Roswell, GA, 30076.

18.     Guardian Pharmacy, LLC is a member and majority owner of Guardian Pharmacy of Atlanta, LLC.  The Defendants collectively are referred to in this Complaint as "Guardian."

## IV.   Anti-Kickback Statute

19.     The Anti-Kickback Statute makes it a crime to offer anything of value to an assisted living community or personal care home if one purpose of the arrangement is to induce the facility to refer its residents to a pharmacy to fill prescriptions, or otherwise to arrange for or recommend the pharmacy to furnish prescription drugs and supplies to residents, when the drugs and supplies are paid

for in whole or in part by a federal health care program, such as the Medicare

Program or TRICARE.  *See* 42 U.S.C. § 1320a-7b(b).

20.     Congress passed the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b),

in 1972 to curb fraud and abuse in federal health care programs.

21.     The Anti-Kickback Statute creates a felony criminal offense in that,

> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--
>
>> (A) To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>
>> (B) To purchase, lease, order or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2).

22.     "Remuneration" under the Anti-Kickback Statute refers to an

exchange of anything of value, including any kickback, bribe, or rebate, whether

paid directly or indirectly, overtly or covertly, in cash or in kind. *See* 42 U.S.C. §

1320a-7b(b)(2).

23.    Underscoring the breadth of the statutory definition, the United States Department of Health and Human Services, Office of Inspector General ("HHS OIG") Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991), broadly define the term "remuneration" as "anything of value in any form or manner whatsoever."  *See* HHS-OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991); *accord United States ex rel. Fry v. The Health Alliance of Greater Cincinnati*, 2008 U.S. Dist. LEXIS 102411, at *17 (S.D. Ohio Dec. 18, 2008).

24.    As such, unlawful remuneration includes furnishing free services or services for below fair market value ("FMV").  *See, e.g.,* 42 U.S.C. § 1320a-7a(i)(6) (defining "remuneration" for purposes of imposing civil monetary penalties to include "items or services for free or for other than fair market value.").

25.    The Anti-Kickback Statute prohibits any arrangement in which at least one purpose of the remuneration is to induce referrals of patients for items or services paid for by federal health care programs.  *United States v. Borrasi*, 639 F.3d 774 (7th Cir. 2011); *United States v. McClatchey*, 217 F.3d 823 (10th Cir. 2000); *United States v. Davis*, 132 F.3d 1092 (5th Cir. 1998); *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985).

26.     No exceptions or safe harbors to the Anti-Kickback Statute apply to the free and below FMV services provided by Guardian to induce and maintain its customers' referrals of their residents to Guardian.

27.     In fact, as further explained below, conduct similar to Guardian's has been the subject of decades of enforcement actions and guidance published by HHS OIG.

28.     Over a decade ago, HHS OIG expressly cautioned that "consultant pharmacist services under contract with a long-term care pharmacy" that are provided for free or "at non-fair-market-value rates" present a heightened risk of a violation of the Anti-Kickback Statute.[2]

29.     Congress enacted the Anti-Kickback Statute to ensure that decisions about medical care are based on the best interests of patients, rather than on the influence of payments or other "remuneration" from someone seeking patient referrals.  Congress also was concerned that kickbacks create unfair competition in the healthcare market and can drive honest companies out of the market, to the detriment of patients.

---

[2] 73 Fed. Reg. 56832, n.53 (2008).

30.    In 2010, Congress strengthened the Anti-Kickback Statute by adding a provision to establish that a claim for payment submitted to a federal program such as Medicare or TRICARE that includes "items or services resulting from" a kickback scheme "constitutes a false or fraudulent claim" in violation of the False Claims Act. *See* 42 U.S.C. § 1320a-7b(g).

31.    Accordingly, a claim for payment to Medicare or TRICARE that results from a kickback scheme is a false claim as a matter of law.  *Id.*

32.    Compliance with the Anti-Kickback Statute thus is a material condition of payment for claims submitted to the Medicare Program or TRICARE, as a matter of law.

## V.    False Claims Act

33.    The False Claims Act imposes civil liability on any person who –

A.    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

B.    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

…

G.    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(A), (B), (G).

34.    A person or an organization that violates the False Claims Act is liable

to the United States Government for a civil penalty for each violation, plus three

times the amount of damages the Government sustains because of the violation.

*See* 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9) (Civil Monetary Penalties

Inflation Adjustment).[3]

35.    The False Claims Act, 31 U.S.C. § 3729(b) further provides the

following definitions:

 (1) the terms "knowing" and "knowingly" (A) mean that a person, with
respect to information (i) has actual knowledge of the information; (ii)
acts in deliberate ignorance of the truth or falsity of the information; or
(iii) acts in reckless disregard of the truth or falsity of the information;
and (B) require no proof of specific intent to defraud;

(2) the term "claim" (A) means any request or demand, whether under
contract or otherwise, for money or property and whether or not the
United States has title to the money or property, that (i) is presented to
an officer, employee, or agent of the United States; or (ii) is made to a
contractor, grantee, or other recipient, if the money or property is to be
spent or used on the Government's behalf or to advance a Government
program or interest, and if the United States Government (I) provides
or has provided any portion of the money or property requested or
demanded; or (II) will reimburse such contractor, grantee, or other

---

[3] For civil penalties assessed after January 29, 2018, whose associated
violations occurred after November 2, 2015, the civil monetary penalties range
from a minimum of $11,181 to a maximum of $22,363 for each violation of the
False Claims Act.  *See* 28 C.F.R. § 85.5.  For violations occurring on or before
November 2, 2015, the civil penalty ranges from $5,500 to $11,000 for each
violation. *See* 28 C.F.R. § 85.3(a)(9).

recipient for any portion of the money or property which is requested or demanded; . . .

(3) the term "obligation" means an established duty, whether or not fixed, arising from an expressed or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

31 U.S.C. § 3729 (2009).

## VI.   Medicare Prescription Drug Coverage

36.    Most of the prescriptions that Guardian fills are paid for in whole or in part by the Medicare Program.

37.    Congress created the Medicare Program in 1965 with the passage of Title XVIII of the Social Security Act, *see* 42 U.S.C. § 426, § 426-1.

38.    Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a component of the United States Department of Health and Human Services.

39.    Medicare is a federal healthcare program within the meaning of the Anti-Kickback Statute.

40.     Medicare provides hospital insurance, prescription drug benefits, and other healthcare benefits for people 65 years and older, people with end stage renal disease, and certain people who are disabled. *See id.*

41.     Medicare beneficiaries may obtain prescription drug benefits in two ways.  Beneficiaries who participate in traditional Medicare insurance for medical services (under Medicare Parts A and B) may enroll in a stand-alone drug plan that covers prescription drugs called Medicare Part D.  *See* 42 C.F.R. § 423.30.  This is known as a Prescription Drug Plan or "PDP."

42.     Alternatively, beneficiaries who participate in a Medicare Advantage plan (that is, a managed care plan under Medicare Part C) for their medical benefits may elect to add prescription drug coverage to the basic health plan that covers their medical benefits.  This is known as a Medicare Advantage Prescription Drug Plan or "MA-PD." *See* 42 C.F.R. § 422.4(c) & § 423.4.

43.     Medicare Part C and Part D are voluntary insurance programs that are subsidized by federal funds.

**A.    <u>Medicare Part C – Medicare Advantage Prescription Drug Plan</u>**

44.     Medicare Part C creates a managed care option for beneficiaries.  *See* 42 U.S.C. § 1395w-21 to § 1395w-29.

45.     CMS contracts with commercial insurance carriers, known as Medicare Advantage Organizations, to offer Medicare Advantage Plans under Medicare Part C.  The Plans cover medical services, such as hospital and physician services that are eligible for traditional Medicare coverage, as well as supplemental benefits.  *See* 42 C.F.R. § 422.100(c).

46.     Examples of Medicare Advantage Organizations that offer drug benefits as part of Medicare Advantage Plans in Georgia include but are not limited to: Humana, Blue Cross and Blue Shield of Georgia, Cigna-Healthspring, WellCare, and Aetna Medicare.

47.     Both types of prescription drug plans – PDP and MA-PD – must comply with the requirements of Medicare Part D, as described next.  *See* 42 C.F.R. § 423.104.

**B.     Medicare Part D – Prescription Drug Benefit Plan**

48.     Part D of the Medicare Program became effective January 1, 2006. Part D was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, to provide prescription drug benefits for Medicare "beneficiaries," meaning individuals who are eligible to receive benefits under the Medicare Program.

49.     Medicare Part D is a voluntary insurance program that is subsidized by federal funds in the Medicare Prescription Drug Account.  *See* 42 U.S.C. § 1395w-101; 42 C.F.R. §423.315(a).

50.     Private insurance companies known as Part D Sponsors contract with CMS to offer prescription drug benefit plans to Medicare beneficiaries.  In Georgia, Aetna Medicare, Humana Insurance Company, Express Scripts Medicare, SilverScript, WellCare, UnitedHealthcare and others are Sponsors offering Part D prescription drug benefit plans.

51.     CMS pays monthly payments and subsidies from the Medicare Prescription Drug Account, an account within the Federal Supplementary Medical Insurance Trust Fund, to Part D Sponsors to fund the prescription drug benefit plans they sell.  42 C.F.R. §423.315(a).

52.     Part D Sponsors are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts.

53.     Part D Sponsors frequently contract with Pharmacy Benefit Managers (PBMs) to administer their drug benefit plans.  The PBMs typically process claims for payment submitted by pharmacies and beneficiaries, form pharmacy networks, perform audits, and conduct other plan management activities under contracts with Part D Sponsors.

16

54.     Part D Sponsors (and PBMs on behalf of Part D Sponsors) enter into reimbursement agreements with pharmacies (such as Guardian) that provide covered drugs and supplies to the Medicare beneficiaries enrolled in the prescription drug benefit plans they sponsor.

55.     Generally, when a pharmacy dispenses drugs or supplies to a Medicare beneficiary, the pharmacy collects a portion of the cost from the beneficiary (*e.g*., a resident of an assisted living community or personal care home) and submits a claim electronically to the beneficiary's Part D Sponsor, its PBM, or to the Medicare Advantage Prescription Drug Plan, all of which are Medicare contractors authorized by CMS to administer drug plans for beneficiaries.

56.     For covered drugs and supplies, the pharmacy receives reimbursement from the Medicare contractor for the portion of the drug cost not paid for by the beneficiary.  The reimbursement amount is negotiated and set forth in the reimbursement agreement between the pharmacy and the Medicare contractor.

57.     As to each such pharmacy claim, the Part D Sponsor (or other contractor) submits to CMS an electronic statement called a Prescription Drug Event, setting forth information regarding the prescription claim, including the pharmacy that dispensed the drug, the prescriber of the drug, the quantity

dispensed, the amount that was paid to the pharmacy, and whether the drug is covered under the Medicare Part D benefit. *See* 42 C.F.R. § 423.322.

58.    CMS relies upon the Prescription Drug Event data and other factors in an annual reconciliation process to determine the payment amounts made to the Part D Sponsor, and CMS recoups or pays additional funds to the Sponsor as a result of the Prescription Drug Event data.

59.    Claims for payment submitted by a pharmacy to the patient's Medicare prescription drug plan thus are "claims" within the meaning of the False Claims Act.  They are requests for money made to a Government contractor, the money is to be spent or used to advance a Government program (that is, the Medicare program), and federal funds are used to make the payment to the pharmacy and to reimburse the Government contractor.

60.    In order to receive Part D funds from CMS, Part D sponsors and their contracted pharmacies are required to comply with the Anti-Kickback Statute and all applicable federal laws, regulations, and CMS instructions.

61.    By statute, all contracts between a Part D sponsor and HHS must include a provision whereby the Part D sponsor agrees to comply with the applicable requirements of the Part D program as well as the terms and conditions of payment governing the Part D program.  42 U.S.C. § 1395w-112.

18

62.     Part D sponsors must also certify in their contracts with HHS that they will agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including the FCA.  42 C.F.R. § 423.505(h)(1).

63.     CMS regulations further require all contracts between Part D Sponsors and pharmacies (such as Guardian) to contain language obligating the pharmacies to comply with all applicable federal laws including the Anti-Kickback Statute and applicable regulations and CMS instructions. *See* 42 C.F.R. § 423.505(i)(4)(iv).

64.     Compliance with the Anti-Kickback Statute thus is a material and essential condition of payment for prescription drug medications and supplies dispensed by pharmacies to Medicare beneficiaries.

65.     The Medicare Program and Medicare contractors such as Medicare Advantage Organizations and Part D Sponsors are collectively referred to as "Medicare" in this Complaint.

**C.     <u>Medicare Claims Submission Process</u>**

66.     Pharmacies, including Defendants, submit claims for payment for prescription drugs in electronic format to Medicare Plans (including Medicare Part D and Medicare Advantage Prescription Drug Plans).

67.     Medicare Plans require pharmacies to submit claims in compliance with a universal claim format established by the National Council for Prescription Drug Programs, Inc. (NCPDP), a not-for-profit industry organization recognized by CMS.

68.     The NCPDP established a pharmacy claim format known as the NCPDP Telecommunication Standard.  Each Medicare Plan publishes a form known as a Payer Sheet that tracks the NCPDP Telecommunication Standard and provides specific claim instructions to pharmacies.

69.     The Payer Sheet includes identifying numbers for each Medicare Plan. Plans are identified with a BIN (Bank Identification Number) and a PCN (Processor Control Number).  When a pharmacy receives the patient's plan information, the pharmacy consults the Payer Sheet for that Plan and follows the instructions for submitting claims for payment to the Plan.

70.     Medicare Plans are identified with unique BIN and PCN numbers, putting the pharmacy on notice when a claim for payment is submitted to Medicare as opposed to a commercial insurance plan.  *See* 42 C.F.R. §423.120(c)(4).

71.     A pharmacy claim for payment must contain the BIN and PCN number for the Medicare Plan, as well as the following information, among other things:

- date of service
- patient demographic information including insurance number and type of residence (*e.g.*, assisted living community)
- prescription number, drug and National Drug Code (NDC), dosage, refills, and date of prescription
- pharmacy type (*e.g.*, institutional pharmacy)
- pricing information such as ingredient cost, dispensing fee, sales tax, and gross amount due
- prescriber's name and NPI.

## D.   Certifications of Compliance

72.     Guardian, as a pharmacy that participates in the Medicare program, makes certain express and implied certifications of compliance with the Anti-Kickback Statute and other laws and regulations that are material to the government in making payment decisions on Medicare (and TRICARE) claims.

73.     For example, Guardian, as a contractor with numerous Part D plan sponsors, must "certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement."  42 C.F.R. § 423.505(k)(3).

74.     Each claim Guardian submitted to Medicare Advantage Organizations and Part D plan sponsors conveyed, among other things, information about the patient, the prescriber, the pharmacy, and the date the prescription was filled.  By submitting this information on the claim, Guardian implicitly represented that the

decision to dispense the prescription medication was not tainted by inducements prohibited by the Anti-Kickback Statute.  By failing to disclose that the referral of the prescription was induced by an illegal kickback, these specific representations on the claim were false and misleading.

75.    Guardian also violated the express representations it made in its contracts with the Part D sponsors to abide by all applicable federal laws including the Anti-Kickback Statute and applicable regulations and CMS instructions by virtue of the conduct alleged below.

76.    Guardian knowingly used the false representations in its contracts with the Part D plan sponsors to submit and obtain reimbursement for prescription drugs from Medicare.  The Part D plan sponsors relied on the false representations made by Guardian when it submitted Prescription Drug Event data to Medicare.  In turn, Medicare relied on the accuracy of this data when it reimbursed the Part D plan sponsors.  If Medicare had known about Guardian's false representations, it would not have reimbursed the Part D plan sponsors, which in turn, would not have paid Guardian's claims.

## VII.    TRICARE Prescription Drug Coverage

77.    TRICARE (formerly known as CHAMPUS) is a federal health care program, as defined in the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, that is

administered by Defense Health Agency, a component of the Department of Defense.  TRICARE provides health care insurance for active duty military personnel, military retirees, and military dependents.

78.    TRICARE contracts with Express Scripts, Incorporated (ESI) to administer the prescription drug coverage of the TRICARE program, including the processing and payment of claims for reimbursement from TRICARE for prescription drugs.

79.    A pharmacy seeking reimbursement from TRICARE must comply with TRICARE's anti-fraud and abuse provisions.  32 C.F.R. § 199.9(a)(4).  The regulations define fraudulent situations to include kickback arrangements.  *Id.* §199.9(c)(12).

80.    Fraud by a pharmacy may result in the denial of the claim or the exclusion or suspension of the pharmacy from participation in the TRICARE program.  32 C.F.R. § 199.9(b), (f).

81.    To receive reimbursement from TRICARE for pharmacy claims, a provider such as Guardian must enter into a Provider Agreement with ESI.  A Provider Agreement is essential to TRICARE claims submission.  Having a valid Provider Agreement is required in order to submit claims for pharmacy claim reimbursement to TRICARE.

82.     In the Provider Agreement with ESI, providers, such as Guardian,
agree to be bound by and comply with applicable laws, rules, and regulations,
including, but not limited to, the fraud and abuse laws.

83.     Providers such as Guardian are also required by their Provider
Agreement to comply with the ESI Provider Manuals.  The Manuals require
providers to be aware of and comply with all state and federal laws "including anti-
kickback statutes…."  The Manuals warn that "[f]ailure to demonstrate compliance
with these laws may result in immediate termination by [ESI]."

84.     Each claim that Guardian submitted to TRICARE for reimbursement
conveyed, among other things, information about the patient, the prescriber, the
pharmacy, and the date the prescription was filled.  By submitting this information
on the claim, Guardian implicitly represented that the decision to dispense the
prescription medication was not tainted by inducements prohibited by the Anti-
Kickback Statute.  By failing to disclose that the referral of the prescription was
induced by an illegal kickback, these specific representations on the claim were
false and misleading.

85.     Guardian violated the express representations it made in its Provider
Agreement to abide by fraud and abuse laws by virtue of the conduct alleged
below.

86.     Guardian knowingly used the expressly false representations in its Provider Agreement to submit and obtain reimbursement for prescription drugs from TRICARE.  TRICARE relied on the false representations made by Guardian at the time it paid Guardian's claims, and if TRICARE had known that representations in Guardian's Provider Agreement were false, TRICARE would not have paid the claims.

87.     For these reasons, Guardian's Provider Agreement constituted express false statements and/or an express false record used to get false claims paid.

88.     In order to obtain reimbursement from TRICARE for dispensing prescription medications, Guardian submitted electronic data claims to ESI.  After receiving a claim, ESI adjudicated the claim on behalf of DHA.  If the claim was successfully adjudicated, then ESI sent the pharmacy authorization to dispense the drug.  ESI also sent DHA a data record of the claim, and after a holding period, ESI paid the pharmacy on the claim from a government-established and government-funded account created for the purpose of paying TRICARE reimbursement claims.

89.     Such reimbursed claims are therefore claims within the meaning of 31 U.S.C. § 3729(B)(2).

## VIII. Georgia State Law Requirements for Assisted Living Communities and Personal Care Homes

90.     Assisted living communities and personal care homes are residential living facilities that provide different levels of personal care services to senior residents, including medication administration and assistance with essential activities of daily living, such as eating and bathing.  *See* O.C.G.A. § 31-7-12.2(b) (assisted living communities); O.C.G.A. § 31-7-12 (personal care homes).

91.     Assisted living communities and personal care homes must be licensed by the State of Georgia to operate in Georgia.  O.C.G.A. § 31-7-3(d)(1).

92.     Assisted living communities and personal care homes are different from nursing homes and skilled nursing homes, which have a primary focus of delivering healthcare services to patients who are unable to live independently. Such nursing facilities employ physicians or other clinicians who furnish healthcare services to residents.

93.     By contrast, assisted living communities and personal care homes are not engaged in the delivery of health care services.  Their staff may, and in most cases do, assist residents with taking medications prescribed by individual physicians and other providers; however, the staff are not licensed to practice medicine.  They may not write orders for prescription drugs or provide medical treatment to residents.

26

94.     Virtually all of the residents of senior living homes are elderly and beneficiaries of the Medicare program who receive prescription drug benefits under Medicare Part D or TRICARE beneficiaries.

95.     Most residents have chronic health conditions that require them to take multiple prescription medications daily.

96.     A typical assisted living community in Georgia serves about 30 to 70 residents.  Personal care homes are smaller, typically with 15 to 25 residents.

97.     Unlike nursing home residents who often receive Medicaid benefits, residents of assisted living communities and personal care homes typically pay the fees to live in the facilities out of their own pockets or with private insurance.  The cost of living in the facility generally is not covered by Medicare or Medicaid.

98.     The facilities thus compete aggressively to attract residents who typically pay $2,500 to $7,000 or more per month in residence fees, depending on the location and types of support services the facilities offer to residents.

99.     Because residence fees are paid with the personal assets of residents, small price differences among competing residential facilities can determine a resident's choice of where to live, thus the facilities seek to limit their operating costs as much as possible.  Facilities also seek to limit the costs to their residents as much as possible.

27

100.   These operating costs borne by the facilities are significant as Georgia law imposes strict legal obligations on the facilities related to: (1) Medication Administration Records; (2) Medication Management; and (3) Education and Skills Checks for certain staff.

A.   **Mandatory Medication Records**

101.   Georgia law requires every assisted living community and personal care home that assists residents with their medications or supervises residents who self-administer their medications to maintain a daily medication administration record, also known as a medication assistance record, or "MAR," for each resident. *See* O.C.G.A. § 31-7-12.2(g)(8) (in an assisted living community, a "medication aide *shall record* in the medication administration record all medications that the medication aide has personally administered to a resident") (emphasis added); Ga Comp. R. & Regs. 111-8-62-.20(5) (when a personal care home "either provides assistance with, or supervision of self-administered medications or health maintenance activities involving medications to residents, the home *must maintain a daily Medication Assistance Record (MAR) for each resident* receiving such service.") (emphasis added).

102.   The MAR must document daily information relevant to each resident's prescriptions, including the date and time when the resident took or

refused medication, type and dosage, contact information of the healthcare provider, allergies, errors, side effects, and adverse reactions. *See* Ga. Comp. R. & Regs. 111-8-63-.20(9) (medications in assisted living communities); Ga. Comp. R. & Regs. 111-8-62-.20(5) (medications in personal care homes).

103.   The MAR is subject to inspection by the Georgia Department of Community Health, and a failure to comply with MAR requirements can result in a license suspension or revocation for an assisted living community or personal care home. *See* Ga. Comp. R. & Regs. 111-8-63-.33 (assisted living community); Ga. Comp. R. & Regs. 111-8-62-.33 (personal care homes).

104.   Most assisted living communities and many personal care homes now fulfill their legal obligation to maintain a MAR by purchasing software or online services known as "eMAR", an electronic version of the system.

105.   More and more facilities are turning to eMARs to satisfy their medical records obligations.

**B.   <u>Mandatory Medication Management</u>**

106.   In addition to requiring assisted living communities and personal care homes to maintain medication records, Georgia law also sets forth strict requirements for those facilities to manage the medications administered to their residents.

### 1.   *Medication Management Laws*

107.   To protect the residents' safety, Georgia law requires assisted living communities and personal care homes to carefully manage the storage, administration, and disposal of medications for their residents.

108.   Specifically, Georgia law requires that assisted living communities and personal care homes obtain new prescriptions from the pharmacy within 48 hours, store medications in a secure manner, keep medications in their original packaging, and properly dispose of unused and expired medications in accordance with federal guidelines.  *See* Ga. Comp. R. & Regs. 111-8-63-.20(11)-(12) (medication management in assisted living communities); Ga. Comp. R. & Regs. 111-8-62-.20(7)-(8) (medication management in personal care homes).

### 2.   *Special Duties For Assisted Living Communities*

109.   In addition to the requirements explained above, assisted living communities also must satisfy additional requirements for proper medication management under Georgia law.  *See* O.C.G.A. § 31-7-12.2(10).

110.   Specifically, Georgia law states that an assisted living community that utilizes medication aides "*shall secure the services of a licensed pharmacist*," and the pharmacist must perform the following duties:

(A)    Perform a quarterly review of the drug regimen of each resident of the assisted living community and report any irregularities to the assisted living community administrator;

(B)    Remove for proper disposal any drugs that are expired, discontinued, in a deteriorated condition, or where the resident for whom such drugs were ordered is no longer a resident;

(C)    Establish or review policies and procedures for safe and effective drug therapy, distribution, use, and control; and

(D)    Monitor compliance with established policies and procedures for medication handling and storage.

*See* O.C.G.A. § 31-7-12.2(g)(10) (*emphasis added*).

111.    The assisted living communities' legal obligation to hire a consultant to perform these services at their facilities is separate and distinct from the responsibilities of a pharmacy to perform safety checks and offer patient counseling before *dispensing* medications to a patient.  *See, e.g.,* O.C.G.A. § 26-4-5(13); O.C.G.A. § 26-4-85 (patient counseling).

112.    Whether or not assisted living communities select a preferred institutional pharmacy, such as Guardian, the assisted living communities are still required to pay for a pharmacist consultant to provide these important drug regimen reviews.

113.    Compliance with all medication management requirements is subject to inspection by the Georgia Department of Community Health, and a failure to comply can result in a license suspension or revocation for an assisted living

community or personal care home. *See* Ga. Comp. R. & Regs. 111-8-63-.33

(assisted living community); Ga. Comp. R. & Regs. 111-8-62-.33 (personal care

homes).

## C.    Mandatory Staff Education and Skills Checks

114.   Assisted living communities offering medication administration

services are also required to employ certified medication aides, at a minimum, to

administer medications.  Ga. Comp. R. & Regs. 111-8-63-.20(4).

115.   In addition, assisted living communities must administer skills

competency checks of its certified medication aides.  Ga. Comp. R. & Regs. 111-8-

63-.20(5)(b).  Georgia regulations require the facilities to:

> Determine and document that the medication aides who have been
> certified for more than one year upon hiring, continue to have the
> knowledge and skills necessary to administer medications properly for
> the particular community. The community must use a skills
> competency checklist which meets the requirements contained in the
> standardized clinical skills competency checklist used to certify
> medication aides.

*Id*.

116.   Further, assisted living communities must complete annual

competency reviews of the certified medication aides.  Georgia regulations require

the facilities to:

> Complete comprehensive clinical skills competency reviews for each
> certified medication aide utilizing the skills competency checklist at

least, annually after hiring to determine that the aides continue to have the necessary skills to perform the medication tasks assigned competently. Such skills competency checklists must be administered by Georgia-licensed registered nurses, pharmacists or physicians, who indicate in writing that the tasks observed are being performed competently.

Ga. Comp. R. & Regs. 111-8-63-.20(5)(f).

117.   If an assisted living community provides a certified medication aide training program, they are required to:

(a)   Utilize the state-approved medication aide training program ensuring that the training is administered by a Georgia-licensed registered nurse, pharmacist, or physician.

(b)   Require the aide to demonstrate the requisite clinical skills to serve as a medication aide before a Georgia-licensed registered nurse, pharmacist or physician utilizing the standardized medication administration checklist developed by the Department.

(c)   Prepare the aide to take the written competency examination to become a certified medication aide.

(d)   Verify that the aide is in good standing on the Georgia certified nurse aide registry.

(e)   Provide information to the aide on the registration and locations for taking the written competency examination.

(f)   Provide the documentation to the Georgia Certified Medication Aide Registry that is necessary to complete the application for placement of the aide's name on the Georgia Certified Medication Aide Registry.

(g)   Not permit the aide to administer medications independently unless the aide is listed on the Georgia certified medication aide registry in good standing.

Ga. Comp. R. & Regs. 111-8-63-.20(6).

118.   Even for unlicensed staff who are not certified medication aides but who are providing assistance with or supervision of self-administration of medications to capable residents, assisted living communities are required to "provide and document medication training" and perform medication skills competency determinations at the time of hire and at least annually thereafter.  Ga. Comp. R. & Regs. 111-8-63-.20(7)-(8).

119.   Personal care homes that provide assistance with or supervision of self-administration of medications to capable residents must similarly "provide and document medication training for the unlicensed staff" who are involved.  Ga. Comp. R. & Regs. 111-8-62-.20(3).

120.   Personal care homes must also perform skills competency determinations of these unlicensed staff members at the time of hire and at least annually thereafter.  Ga. Comp. R. & Regs. 111-8-62-.20(4).

### IX.    Defendants' Pharmacy Operations

### A.    The Home Office

121.   Defendant Guardian Pharmacy is a private company that was founded in 2004, and has its headquarters in Atlanta, Georgia.

122.   Guardian Pharmacy owns and operates pharmacies in 37 locations and 18 states in the United States.

123.   Guardian Pharmacy operates through "Partner Pharmacies," that is, local entities that are operated jointly by Guardian Pharmacy and a local management team.

124.   Guardian Pharmacy is known as the "Home Office" within the Guardian organization.

125.   Guardian Pharmacy is the majority owner of its Partner Pharmacies; as such, Guardian Pharmacy controls the operations of its Partner Pharmacies, including Defendant Guardian Pharmacy of Atlanta.

126.   Specifically, Guardian Pharmacy develops national and regional sales strategies for the entire company, conducts training for all sales representatives and other employees, and exerts control over the billing process, contracting, finance and legal functions for the Partner Pharmacies.

127.   Guardian is the third-largest institutional pharmacy in the United States, with over $550 million in annual revenues from filling more than 12 million prescriptions for over 100,000 residents of assisted living communities, personal care homes, skilled nursing homes, and other facilities, many of whom are beneficiaries of federal health care programs such as Medicare and TRICARE.

128.   Guardian packages the residents' medications in special multi-dose or unit-dose packaging to facilitate correct medication administration, delivers the medications and supplies to facilities, and bills the residents and their insurance plans (typically, Medicare) for the cost of prescription medications and supplies. Additional service fees may be billed to the residents.

129.   The executive team in the Home Office is focused on a growth and profit strategy, that is, the officers of the company aggressively promote sales growth to increase the number of residents under contract with Guardian, *i.e.*, the number of patients who fill prescriptions with Guardian.

130.   Guardian aggressively competes with other institutional pharmacies and retail pharmacy chains such as CVS and Walgreens to fill prescriptions for long-term care residents.

131.   While Guardian derives most of its sales revenues from residents who fill prescriptions with Guardian, the company views the facilities where the residents live as its true "customers."

132.   To gain access to residents, Guardian often negotiates agreements with the owners and operators of the facilities.  These agreements give Guardian the status of being the "preferred pharmacy" for the residents, meaning the owners

and operators of the facilities steer their residents to Guardian for their prescription medications and supplies.

133.   While residents have the freedom to choose any pharmacy to fill their prescriptions, the facility steers residents to choose the preferred pharmacy and to agree to use the particular method for packaging medications that the facility finds most convenient.

134.   Once a preferred pharmacy is selected, most residents of the assisted living community or personal care home use that pharmacy.  The percentage of residents who use the preferred pharmacy is known as the "adoption rate."

135.   Guardian's adoption rate averages about 80%, meaning 80% of the residents of an assisted living community or personal care home under a "preferred" pharmacy contract with Guardian will select Guardian as their pharmacy to fill medications.

136.   Because most residents consistently fill five to seven prescription drug orders each month, securing a "preferred" pharmacy agreement means Guardian lands a substantial and reliable revenue stream from Medicare and TRICARE as it fills thousands of drug orders generated annually by a typical facility. Therefore, Guardian fiercely competes for this business.

137.   Once selected as the "preferred" pharmacy, Guardian also enters into agreements with individual residents, allowing Guardian to fill and dispense medications and supplies prescribed by the residents' healthcare providers, to bill the resident for his or her share of the costs, and to file insurance claims for the resident, who assigns his or her prescription drug benefits to Guardian, allowing it to be paid directly by insurers (typically, Medicare).

**B.   Guardian Pharmacy of Atlanta**

138.   Guardian Pharmacy is a majority owner of Defendant Guardian Pharmacy of Atlanta, one of the largest "Partner Pharmacies" owned by Guardian.

139.   Guardian Pharmacy controls the overall operations and strategic direction of Guardian Pharmacy of Atlanta.

140.   Guardian Pharmacy of Atlanta provides institutional pharmacy services to approximately 3,800 residents of assisted living communities and personal care homes in the northern half of the State of Georgia, including the Atlanta metropolitan area.  The number of residents under contract with Guardian fluctuates from month to month.

141.   Guardian Pharmacy of Atlanta generates over $17 million in annual revenues by filling prescriptions and performing ancillary services for residents of

assisted living communities and personal care homes, most of whom are Medicare or TRICARE beneficiaries.

### C.   Guardian's Acquisition of Collier's

142.   In 2017, Guardian Pharmacy of Atlanta significantly expanded its size by acquiring Collier's Personal Care Pharmacy, which Relator co-owned, and thereby adding approximately 1,700 new residents to its pharmacy service.

143.   As part of the transaction, Relator was contracted by Guardian Pharmacy of Atlanta as an account management consultant because of his industry knowledge and success with Collier's pharmacy.

144.   Relator agreed to a two-year contract with Guardian Pharmacy of Atlanta beginning on January 23, 2017.

145.   The transition of these residents from Collier's to Guardian was not automatic.  Instead, Guardian transitioned these residents over time until October 2017.  During the transition, Guardian relied on Collier's to continue to service these customers by packaging and delivering their medications, although the claims were submitted to federal health care programs under Guardian's name and provider number.

146.   Relator, therefore, continued to have first-hand knowledge of these customers and claims submitted to federal health care programs on their behalf following the Collier's acquisition.

147.   Based on Relator's observations, he estimates that Guardian Pharmacy of Atlanta is now the "preferred pharmacy" for approximately 40 assisted living communities and 65 personal care homes.

## X.    Guardian's Kickback Scheme

148.   While working for Guardian, Relator learned that rather than differentiating itself based on  the quality of services it provided, Guardian, under the direction of President Matthew Hopp, who had a personal ownership interest in Defendant Guardian Pharmacy of Atlanta LLC, instead offered and continues to offer illegal inducements to attract or retain its customers.

149.   Providing illegal inducements was business as usual for Guardian and Mr. Hopp.  In fact, when Guardian finally decided in early 2018 to adopt fees for certain services, Mr. Hopp unequivocally stated, "[W]e have to be VERY careful not to price ourselves out of the market."

150.   Specifically, Relator learned that Guardian was not charging fees for consulting services (also known at Guardian as "audits") provided by Guardian's

pharmacists and nurses for the facilities it served, in violation of the Anti-Kickback Statute.

151.   Relator's subsequent observations also revealed that Guardian was providing free education and skills checks for staff at many of Guardian's customers, as well as free installation of electronic medication administration records systems (eMARs) for all assisted living communities and personal care homes that selected Guardian as their preferred pharmacy.

152.   Relator learned that Guardian, in some instances, also did not charge a monthly subscription fee for ongoing access to the eMAR system, again in violation of the Anti-Kickback Statute.

153.   Guardian offers and provides such services to its customers for free, or below FMV, in order to obtain and retain the coveted status of "preferred" pharmacy from owners and operators of the facilities so Guardian can bill federal healthcare programs for the residents' prescription drug medications.

154.   Guardian's free services relieve its contracted facilities of the costs they otherwise would incur to comply with Georgia law requirements.

155.   Performing such services is not necessary for Guardian to fulfill its role as a pharmacy dispensing prescription medications and supplies to residents;

the services are offered as a benefit and inducement to the facilities who thereby avoid the costs of procuring those services on the open market.

156.   Upon information and belief, Guardian's practice of providing the illegal inducements described herein began at least as early as late 2014, and they continue through the present.

**A.   Free or Below FMV Medication Management**

157.   Guardian of Atlanta maintains a "Consulting Department" that employs two pharmacists and two pharmacy nurses whose sole responsibilities are to conduct pharmacy consulting services, education, and skills checks, which assisted living communities and personal care homes are required by Georgia law to perform.

158.   For assisted living communities, Guardian's Consulting Department assigns one of its employed, licensed *pharmacists* to perform drug regimen reviews and other services at the home.  *See* O.C.G.A. § 31-7-12.2(g)(10). Specifically, a Guardian consulting pharmacist on a quarterly basis reviews the medication administration record and stored medication as to each resident who uses Guardian as his or her pharmacy.

159.   For residents receiving assistance with medication administration in personal care homes, Georgia law does not specify that a pharmacist must perform

the medication management duties required by law.  Therefore, Guardian's
Consulting Department assigns one of its employed pharmacy *nurses* to each
personal care home to "audit" medication records and medication storage carts and
to review the facility's compliance with the storage and disposal requirements of
Georgia law.  *See* Ga. Comp. R. & Regs. 111-8-62-.20(7)-(8).  These services are
of value to the personal care home as they alleviate the facility's responsibilities
for medication management.

160.   Guardian's consulting pharmacists and nurses neither dispense
medications, nor counsel individual patients.  They rarely if ever interact with
residents of senior living facilities.  Rather, they visit each facility to consult with
the operator or staff about drug management, record-keeping, storage, and disposal
by the facility.  The consultants inspect medication administration records to
determine if the facility gave the correct drugs to residents at appropriate intervals,
they review medication carts where drugs are centrally stored at the facility, and
they look for expired drugs in stock at the facility.

161.   Proper medication management and administration are legal
responsibilities of each senior living facility that offers medication services.  As a
pharmacy, Guardian is not required by law to advise facilities on how they manage
medications for their residents.

162.   In contrast to consulting services, Georgia law imposes separate duties on pharmacists with respect to *dispensing* medications.  Before dispensing a drug, for example, a pharmacist must offer patient counseling about drug safety and possible adverse reactions.  *See* O.C.G.A. § 26-4-85.  Patient counseling generally takes the form of an information sheet provided to the patient; the pharmacist does not charge for patient counseling. The mandatory duties of a dispensing pharmacist are not at issue in this Complaint.

163.   Guardian's consulting services, by contrast, take place onsite at residential facilities, after drug orders have already been filled, and they are provided to the facilities to assist them in fulfilling their duties regarding proper drug administration to residents, drug management and storage, and drug disposal.

164.   Customarily, consulting pharmacists bill facilities for their services. However, Guardian's Consulting Department offers free or below FMV consulting and other services at least one purpose of which is as an inducement to generate referrals for prescription drug orders.

1.     *"Discounted Monthly Fee"*

165.   Guardian did not always provide its consulting services for free or below FMV to assisted living communities and personal care homes.

166.   In or before 2014, according to a presentation made by Guardian to an assisted living community, Guardian charged assisted living communities a "[d]iscounted [m]onthly fee" for the following consulting services:

- Medication Cart Inspection
- Resident Chart Review (Random Selection)
- In-service from list of selected topics (Nursing CE/hour)
- Individual Drug Regimen Review per 10 residents
- Medication Record (MAR)/Documentation Review
- Modified Mock Survey / Report
- Destruction of Discontinued Medications
- Face to Face Team Review of findings / offering of options

167.   In 2017, Relator learned that Guardian stopped charging these monthly fees beginning in 2014.  In its reckless pursuit of profit, Guardian began offering consulting services to assisted living communities and personal care homes for free or below FMV as an illegal inducement to the facilities to obtain or retain their residents' prescription drug business.

**2.     *"Marketing Points to Remember"***

168.   On January 12, 2018, Lori Newcomb, a Guardian pharmacist consultant and the manager of the Consulting Department, openly discussed this scheme in an email to senior Guardian employees including President Mathew Hopp, the Director of Pharmacy Operations Tim Williams, Relator, and others.

45

While announcing that Guardian was changing its policy and starting to charge for education and skills checks, Ms. Newcomb made clear that Guardian would continue to provide free or below FMV consulting services to its customers.

169.   Describing this as a "[m]arketing point to remember," she wrote, assisted living ("AL") communities "get high quality consulting *for free every quarter*, even though this is required by AL rules."  (Emphasis added).  As to personal care homes ("PCH"), she continued, "PCH buildings get high quality consulting *for free every quarter*, even though not required by the rules." (Emphasis added).

170.   She then announced that Guardian would begin charging "only" for "class room training and skills checks" for both assisted living communities and personal care homes.

171.   She described this as "an important, but difficult change to make" and noted that they would "most likely get some negative feedback from our clients." She continued:

> However, with the rules as they are in GA for AL and PCH, *we can no longer afford to give everything away for free.*  The old adage that 'you get what you pay for' is true.  We provide the best consulting in the state as far as I am concerned.  Matt has to pay us to do our jobs. We cannot continue to give everything away for free.  Plus, the consulting team is worn out.  We need more help.  Matt can't get us more help unless we generate some income.  We already have more consultants per beds than anyone else at Guardian.

(Emphasis added).

172.   Ms. Newcomb ended the email acknowledging that facilities may want to stop using Guardian as their preferred pharmacy if they no longer received free or below FMV services: "Don't make a big deal about the changes.  Just make them aware of consultant changes and charges when they ask.  Immediately give feedback to Matt if you get resistance or threats to leave."

**3.    *"Black Hole"***

173.   One month later in February 2018, Mr. Hopp and Ms. Newcomb continued this discussion of Guardian's improper scheme.  In an email, Ms. Newcomb described the Consulting Department as a "black hole" for revenue purposes and summarized a plan to generate revenue for the Department.

174.   Ms. Newcomb said the new fees would "make the Consulting Department a Revenue GENERATING department rather than a black hole."  She also explained the new fees by saying Guardian cannot justify how great its consulting services are "IF WE ARE GIVING ALL OF OUR SERVICE AWAY FOR FREE!"

175.   Despite the announced changes, the "Consulting, Training, and Skills Fee Schedule" circulated by Ms. Newcomb with her emails identified new charges

47

only for educational services and skills checks performed by the Consulting Department.

176.   As for consulting services, the Fee Schedule notes that fees now may be "negotiated" for "premium" consulting packages including education services "IF communities would like to pay for all-inclusive service."

177.   But the new Fee Schedule maintained Guardian's policy that "basic consulting services per quarter" are performed for "No charge" for those facilities and residents who select Guardian as their pharmacy.

178.   In response to the new fee schedule, Guardian's leadership expressed concern that new fees might reduce their "leverage" to get more residents to choose Guardian over competitors.  Specifically, Ms. Newcomb listed a new $20 charge to perform consulting for residents who had not selected Guardian as their pharmacy. Tim Williams, the Director of Pharmacy Operations, replied, "This worries me a little in that if we start consulting for non-guardian residents, that takes away our leverage to increase penetration in the community."

179.   Mr. Hopp also replied:

Just keep in mind we're not trying to trap them into fees.  The $20/person was something some of the communities agreed to. I would not want to start charging communities when they didn't agree to anything, BUT if we're doing extra work for trade-elsewhere and the community agrees that's fine.

48

I'm excited to be getting fee[s] for these items but we have to be VERY careful not to price ourselves out of the market. We know our competitors will do a lot of this for free, and if they can save money elsewhere they'll have incentive to change. So let's just make sure we keep our relationships strong and focus on our service levels in the pharmacy.

180.  Upon information and belief, the salaries and benefits for two pharmacists and two nurses who staff Guardian's Consulting Department amount to approximately $350,000 a year.

181.  The pharmacy consulting services that Guardian delivers for "no charge" take approximately 10 minutes onsite from start to finish, per resident per quarter. The pharmacist or nurse also incurs travel time to and from the facility, disposes of expired or unnecessary medications, and prepares a detailed electronic report for the facility addressing each resident's medication history, findings, and recommendations.

182.  To conduct pharmacy consulting services for all of Guardian's approximately 3,800 residents in North Georgia on a quarterly basis, the Consulting Department devotes about 2,500 hours per year by its pharmacists and nurses to consulting activities for its customers.

183.  As defined by Ms. Newcomb, Guardian's Consulting Department is a "black hole" for revenue purposes because it does not bill for most of the

pharmacy consulting services furnished to assisted living communities and personal care homes.

184.   Receiving free or below FMV pharmacy consulting services as a kickback from Guardian, instead of having to hire its own pharmacist or nurse to perform these services, holds great appeal for any assisted living community or personal care home that is trying to reduce the costs charged to residents while still complying with the facility's legal requirements under Georgia law for safe medication management.

185.   On September 4, 2018, following the implementation of these changes for non-Guardian residents and education classes, Ms. Newcomb stated on a sales team teleconference that she had sent out her first invoice to a facility for certain fees.  She expressed excitement that her efforts to make her Consulting Department a revenue-generating part of the business were having success.  Her message was clear – until then, Guardian had not been charging for many of the services her Department provided to Guardian's customers.

186.   Ms. Newcomb has worked at Guardian since approximately September 2014.

**4.**   *National Sales Meeting*

187.   These emails were not the first time Relator heard Guardian executives discuss providing consulting services for free or below FMV.

188.   In fact, shortly following the Collier's acquisition, Relator attended Guardian's national sales meeting in Atlanta on March 23 – 24, 2017.  The meeting was attended by virtually all senior executives and sales representatives employed by Guardian

189.   At the meeting, Relator observed a compliance presentation by Bob Weir, Vice President, Operations & Regulatory Support, for Guardian Pharmacy. Mr. Weir joined Guardian in 2015, and previously held senior management positions with Omnicare and other institutional pharmacies.

190.   Mr. Weir discussed pharmacy consulting services in his presentation. He observed that the process of performing a medication audit can take 6 minutes or longer for each resident.  In a tongue-in-cheek manner, Mr. Weir then asked, "Now everyone is charging for this, right?," or words to that effect.

191.   Mr. Weir's demeanor suggested to Relator, and apparently to the rest of the sales force, that his question was rhetorical, for no one in the audience was heard to respond. Mr. Weir said nothing more about billing customers for audits during his presentation.

51

192.   During the meeting, around the time of Mr. Weir's presentation, Relator saw Kendall Forbes, Executive Vice President for Sales & Operations of Guardian Pharmacy, in the audience.  Relator publicly addressed Mr. Forbes before the audience and stated that federal guidelines require pharmacies to charge for audits.

193.   Mr. Forbes acknowledged Relator's remark but made no public comment about the Company's practice of not charging for audits.

**5.     *"Confidential Pricing Terms"***

194.   Relator learned that in some instances the unlawful kickbacks were even memorialized in Guardian's written contracts with assisted living communities and personal care homes, despite language in the contracts prohibiting such inducements.

195.   Guardian's Home Office pressured Mr. Hopp and others to memorialize the agreements with the assisted living communities and personal care homes in written contracts.

196.   Shortly after Mr. Heller started working with Guardian, he questioned the necessity of asking customers to sign "preferred pharmacy" contracts, something that Collier's pharmacy had not typically done.

197.   In response, Mr. Hopp printed out and gave to Relator an undated, blank contract called a "Pharmaceutical Products and Services Agreement," which purported to designate Guardian as the preferred pharmacy for a facility.  The Agreement provided that the "Operator" of the facility would use "best efforts" to support Guardian's provision of pharmacy services to the residents of the facility. Mr. Hopp instructed Relator to review the draft contract and become familiar with it.

198.   To his astonishment, Relator observed that the contract contained "Confidential Pricing Terms" which stated that "Pharmacy Consulting Services" would be provided "Quarterly at no charge."

199.   An Exhibit to the contract also stated that Guardian would "provide pharmacy consulting services in conjunction with Operator's duties under applicable law."

**6.    *Negotiations with Magnolia Senior Living***

200.   Relator later observed similar terms in a contract Guardian used to memorialize its relationship with Magnolia Senior Living, a 73-bed personal care home located at 89 Ozora Road, Loganville, Georgia 30052.

201.   Magnolia Senior Living was previously a client of Collier's, so Relator has firsthand knowledge of the claims submitted by Magnolia Senior

53

Living prior to and after the transition to Guardian.  When they were a client of

Collier's, Magnolia Senior Living used a multi-dose blister packaging system for

its residents' medications called Medicine-on-Time.

202.   Prior to Relator's arrival at Guardian, Mr. Hopp had spent

approximately $250,000 purchasing a different medication packaging system

called "strip" packaging from a company named TCGRx.  Guardian uses this

expensive machine to package the medications it provides to its patients at the

facilities.

203.   Mr. Hopp wanted Relator to secure the prescription business at

Magnolia Senior Living and to convince the facility to switch to its strip packaging

system.

204.   Mr. Hopp provided a "Pharmaceutical Products and Services

Agreement" for Relator to give to Magnolia Senior Living.

205.   The proposed contract likewise contained "Confidential Pricing

Terms," and it too stated that "Pharmacy Consulting Services" would be provided

to the facility by Guardian "Quarterly at no charge."

206.   In contrast to these free pharmacy consulting services, the pricing

terms in the Magnolia Senior Living contract (unlike the blank one that Relator had

observed) also stated that "Additional Consulting" would be billed at $65 an hour

for a pharmacist and $55 an hour for a nurse, demonstrating the fair market value of these services to the facilities.

207.   Further, in the fine print, the Magnolia Senior Living contract included additional contractual language that expressly prohibited Guardian from engaging in the very kickback scheme it was perpetrating.

208.   In "Exhibit A – Pharmacy Consulting Services," Guardian agreed to "provide pharmacy consulting services in conjunction with Operator's duties under applicable law."   The contract continues, "Such duties may include, as applicable, monthly inspections of each Facility's nursing stations, the drug storage area, and medical records to monitor compliance with pharmacy policies and procedures and state and federal regulations; the provision of a written report regarding the inspections and on the results of the drug regimen review, noting any irregularities or other areas of concern."

209.   The contract further states, "Pharmacy will provide up to two in-service programs annually at no additional cost to Operator, specifically for Operator's nursing staff in order to meet all regulatory requirements, related to pharmacy consulting services.  The programs can be selected from a current in-service list provided by Pharmacy."

210.   The contract expressly describes the "Standards for Consulting Pharmacist Services" as follows:   "The parties intend that their contractual relationship will be compliant in all manners with applicable federal and state laws, including, but not limited to, the Federal Anti-Kickback Statute."   The contract lists eight terms which are incorporated into the Agreement by reference, including:

a. **Pharmacy will provide or arrange for, and Operator will pay for, consulting pharmacist services only on terms that account for Pharmacy's costs to do so, and never below those costs. (Emphasis added).**

b. **Neither Pharmacy nor Operator will offer, solicit, pay, or receive any remuneration (anything of value) intended to induce referrals of any patient or the purchasing or ordering of any item or service that may be reimbursed, in whole or in part, under a Federal Health Care Program, such as Medicare or Medicaid.  (Emphasis added).**

211.   Mr. Hopp, on behalf of Guardian, and the operator of Magnolia Senior Living signed the contract with an effective date of June 1, 2017.

212.   Despite the contract's clear prohibition on providing consulting services below costs, Guardian provided free consulting services pursuant to the Confidential Pricing Terms in the contract to Magnolia Senior Living as an improper inducement in violation of the Anti-Kickback Statute.

56

213.   As further described below, Guardian also paid to install QuickMAR, an EMAR system, for Magnolia Senior Living, yet another inducement to obtain and retain their prescription drug business.

214.   As memorialized in the contract, Guardian only charged the residents of Magnolia Senior Living a $10 monthly fee for eMAR subscription services but did not charge the home for installation of the system.

215.   In exchange for these kickbacks, Magnolia Senior Living retained Guardian as its preferred pharmacy and steered its residents, many of whom were Medicare or TRICARE beneficiaries, to use Guardian for filling their prescriptions.

216.   As a personal care home, Magnolia Senior Living was required under Georgia law to provide medication management services for its residents.  *See* Ga Comp. R. & Regs. 111-8-62.20(5).  Guardian provided these services for free or below FMV.

217.   Beginning in June 2017, and continuing month-to-month until today, Guardian submitted and continues to submit claims to Medicare and TRICARE that are tainted by this illegal inducement.

218.   Guardian knew claims for payment that it submitted, and continues to submit, to Medicare and TRICARE for prescription drugs provided to residents of

Magnolia Senior Living were tainted by its illegal kickback scheme and thus were false claims that were ineligible for payment.

**7.    *Family Night***

219.   As part of Guardian's marketing efforts, on or about January 24, 2018, Relator was preparing to conduct a "Family Night" gathering at Canterfield of Kennesaw, a 99-bed assisted living community, and drafted a handout about Guardian's pricing compared to other pharmacies.  Family members of approximately 20 residents and members of the management team of the assisted living community attended the meeting.

220.   Based on Relator's understanding of Guardian's practice of providing free or below FMV consulting services and Mr. Hopp's approach to sales presentations, the handout listed "Audit fees" and identified "0" to signify there would be no charges for pharmacy consulting services.  Mr. Hopp reviewed the handout and allowed Relator to present it during "Family Night."

221.   Thereafter, Canterfield of Kennesaw continued to receive free pharmacy consulting services from Guardian for its residents, and Guardian also performed a free installation of its QuickMAR medication records system.  *See* Exhibit A.

222.   In exchange for these illegal inducements, Canterfield of Kennesaw selected Guardian as its preferred pharmacy.  Guardian then submitted tainted claims to Medicare and TRICARE for prescription drugs for Canterfield of Kennesaw's residents.

**B.**   **Free Education Services and Skills Checks**

223.   In addition to free or below FMV consulting services, Relator later learned that Guardian provided free education and skills checks that assisted living communities and personal care homes were required by law to provide.

224.   On March 2, 2017, Ms. Newcomb emailed Mr. Hopp and others at Guardian to discuss the upcoming Certified Medication Aid training class Guardian provided on a monthly basis.  Assisted living communities must employ certified medication aids to assist residents with their medications.

225.   In her email, Ms. Newcomb acknowledged Guardian's practice of providing free education classes for new customers and others, "The charge for the class is $50/day, or $100 total per person.  Our Host community, **new communities to Guardian** AND newly licensed assisted living communities are **exempt from these charges**."  (Emphasis added).

226.   Thus, for the host facility, new Guardian customers, and newly licensed assisted living communities, Guardian offered for free the education classes that the facilities were required by Georgia law to provide.

227.   During this time when Ms. Newcomb said new Guardian customers would receive free education classes in March 2017, Guardian was in the process of retaining numerous Collier's facilities as customers, which would have meant they all would have qualified for these free education classes.

228.   On January 12, 2018, as noted above, Ms. Newcomb announced that Guardian was changing its policy for education and skills checks and would begin charging for these services.

229.   She announced that Guardian would begin charging for "class room training and skills checks" for both assisted living communities and personal care homes.

230.   She described this as "an important, but difficult change to make" and noted that they would "most likely get some negative feedback from our clients."

231.   Thus, in 2018, Guardian finally stopped its long-time practice of improperly inducing assisted living communities and personal care homes to select Guardian as its preferred pharmacy and refer their patients by providing free education and skills checks.

232.   While its free education and skills check kickback scheme was underway, Guardian knew claims for payment that it submitted to Medicare and TRICARE for prescription drugs provided to residents of assisted living communities and personal care homes were tainted by its illegal kickback scheme and thus were false claims that were ineligible for payment.

**C.**     **Free eMAR Setup**

233.   As described above, Georgia law also requires assisted living communities and personal care homes to maintain medication administration records, and many facilities now use electronic records known as eMARs to comply with the law.

234.   An eMAR system is a software program or web-based tool that satisfies the record-keeping requirements of Georgia law for daily tracking of medication administered to residents, including adverse events and other aspects of administering medicines.

235.   Guardian is not involved in administering medications to patients, nor does it have any responsibility for maintaining records of medication administration.

236.   Maintaining medication administration records is a legal obligation of assisted living communities and personal care homes that assist residents with medications, not of the pharmacies that dispense medications for their residents.

237.   Consistent with its practice of giving away inducements to satisfy its customers, Guardian nonetheless purchases user licenses from eMAR companies, obtaining their permission to use and install eMAR systems in assisted living communities and personal care homes, as a kickback to many of the facilities.

238.   Guardian purchases user licenses from multiple eMAR companies, including QuickMAR, Extended Care Pro (ECP), PointClickCare (PCC), and Yardi.  *See* Exhibit A.

239.   The user licenses require Guardian to pay a monthly (or yearly) subscription or "monitoring" fee.  Some eMAR companies bill license fees directly to the facilities, but most bill Guardian, which in turn bills residents (or facilities, depending on the arrangement).

240.   For most facilities, Guardian bills a monthly fee of $10 to residents whose facilities subscribe to an electronic system for maintaining medication administration records.

241.   Guardian does not rely upon eMAR systems to receive prescriptions from physicians, to fill prescriptions, to deliver medications, or to bill for

medications and supplies.  Guardian uses separate pharmacy management programs for its own pharmacy operations.

242.   However, Guardian installs the eMAR systems as kickbacks at no charge for assisted living communities and personal care homes that select Guardian as their preferred pharmacy.

243.   Specifically, Guardian generally supplies as kickbacks, for no charge, the hardware for eMAR systems (computers and peripherals – arms, mouse), the setup (installation and integration with Guardian's operating system), and limited technical support and expertise.

244.   When a facility has questions or issues with an eMAR system, such as technical problems or questions about functionality or features, the facility often contacts Guardian for support, which Guardian provides as a kickback and free of charge.

245.   The setup fees, sometimes called interface fees, that are charged by eMAR companies range from $499 to $7,000, which Guardian pays for as an inducement and kickback for the benefit of facilities who choose Guardian as a preferred provider.

246.   If Guardian did not provide kickbacks in the form of these free eMAR installation services, assisted living communities and personal care homes that

wanted electronic (as opposed to paper) medication records would have to pay

eMAR companies directly for such services in order to maintain their records in

compliance with Georgia law.

247.   While its eMAR scheme was underway, Guardian knew claims for

payment that it submitted to Medicare and TRICARE for prescription drugs

provided to residents of assisted living communities and personal care homes were

tainted by its illegal kickback scheme and thus were false claims that were

ineligible for payment.

**D.    Examples of Facilities Receiving Kickbacks (Exhibit A)**

248.   Guardian knowingly and willfully supplied, and continues to supply,

free or below FMV services to at least 49 facilities in exchange for their referral of

patients to Guardian for pharmacy services.  *See* Exhibit A.

249.   The summary chart attached to this Complaint as Exhibit A sets forth

examples of 26 assisted living communities and 23 personal care homes for which

Guardian provided free or below FMV services, based upon Relator's observations

of Guardian's practices and the statements of Guardian's employees, as set forth

herein.

250.   The facilities listed on Exhibit A selected Guardian as their

"preferred" pharmacy; in exchange, all received free or below FMV pharmacy

consulting services for the residents of those facilities who selected Guardian as their pharmacy.

251.   Exhibit A states the estimated number of residents served by Guardian at each facility.

252.   As shown on Exhibit A, Guardian conducts free or below FMV consulting services (*i.e.*, medication management) for approximately 1,900 of the residents who live in the facilities receiving free services.

253.   The consulting services that Guardian performs for free or below FMV have a value of approximately $10 to $20 per resident and are performed quarterly each year, yielding an aggregate value of approximately $75,000 to $150,000 a year in free or below FMV services, all for the benefit of facilities that select Guardian as their preferred pharmacy and thus do not have to pay or otherwise arrange for consulting services to be provided at a cost to their residents.

254.   The facilities listed on Exhibit A that use electronic medication records also received free installation of their records systems from Guardian in exchange for selecting Guardian as their "preferred" pharmacy.

255.   The eMAR installations that Guardian performs for free have a value that ranges from $499 to $7,000 per facility, yielding an aggregate value of at least

$15,000 in services that Guardian furnished for free to the facilities identified on Exhibit A that have eMAR systems.

256.   Guardian is paid an average of approximately $390 per month per resident in payments from residents and reimbursement from health plans for prescription medications and supplies dispensed by Guardian.

257.   Guardian fills over 160,000 prescriptions each year for residents whose facilities received free services from Guardian, as shown on Exhibit A, and approximately 90% of the prescriptions are paid for in whole or part by Medicare or TRICARE.

258.   Thus, with respect to residents who are Medicare or TRICARE beneficiaries, Guardian submits over 140,000 prescription claims for payment each year to Medicare or TRICARE for medications and supplies dispensed to residents of facilities who received free or below FMV services from Guardian in exchange for referring residents to Guardian for pharmacy services.

259.   Since 2014, Guardian has generated over $20 million in Medicare and TRICARE reimbursements and copayments for Medicare and TRICARE beneficiaries who were referred to Guardian by the facilities identified on Exhibit A, which all received free or below FMV services from Guardian in exchange for the designation of being the "preferred" pharmacy of those facilities.

1.    *Senior Solutions Management Group*

260.   By way of example, Relator had first-hand knowledge that claims submitted by Guardian for residents at personal care homes owned and operated by the Senior Solutions Management Group were tainted by its kickback scheme.

261.   Mr. Hopp told Relator about a conversation he had with Jason Andrews, Regional Manager for Senior Solutions Management Group.  During this conversation, Mr. Hopp reported that Mr. Andrews said the facilities owned and operated by Senior Solutions Management Group would not remain customers of Guardian unless Guardian waived many of its fees.

262.   Country Gardens Senior Living is a 50-bed personal care home located at 7175 Lester Road, Union City, Georgia 30291.

263.   Antebellum Grove Senior Living is a 69-bed personal care home located at 1010 Kathryn Ryals Rd, Warner Robins, GA 31088.

264.   Both Country Gardens Senior Living and Antebellum Grove Senior Living are owned and operated by Senior Solutions Management Group.

265.   In order to secure their residents' pharmacy business, Guardian provided Country Gardens Senior Living and Antebellum Grove Senior Living free monthly eMAR services and free or below FMV consulting.

266.   As personal care homes, Country Gardens Senior Living and Antebellum Grove Senior Living are required under Georgia law to provide medication management services for their residents.  *See* Ga Comp. R. & Regs. 111-8-62.20(5).  Guardian provided these services for free or below FMV.

267.   Beginning in March 2017, and continuing month-to-month until Country Gardens Senior Living and Antebellum Grove Senior Living terminated Guardian in August 2018, Guardian submitted claims to Medicare and TRICARE for residents at Country Gardens Senior Living and Antebellum Grove Senior Living that were tainted by its illegal kickback arrangement.

268.   Guardian knew claims for payment that it submitted to Medicare and TRICARE for prescription drugs provided to residents of Country Gardens and Antebellum Grove were tainted by its illegal kickback scheme and thus were false claims that were ineligible for payment.

### 2. *Trinity Lifestyles Management Group*

269.   By way of further example, Relator had first-hand knowledge that claims submitted by Guardian for residents at assisted living communities owned and operated by the Trinity Lifestyles Management Group were tainted by its kickback scheme.

270.   Dogwood Forest of Dunwoody is an 86-bed assisted living community located at 7400 Peachtree Dunwoody Road NE, Atlanta, GA 30328.  It is owned and operated by Trinity Lifestyles Management Group.  They were previously a customer of Collier's, so Relator has first-hand knowledge of the claims submitted for residents of Dogwood Forest of Dunwoody prior to and after the transition to Guardian.

271.   In early 2017, after Guardian purchased Collier's, Mr. Hopp and Relator attended a group meeting at Trinity Lifestyles Management Group's corporate office in Alpharetta with their management team, including Tina Boatman, Trinity Lifestyles Management Group's Corporate Director of Wellness and Life Services, and Victoria Curl, Trinity Lifestyles Management Group's President and Chief Operating Officer.

272.   In order to secure their business and to get the facility to switch to strip packaging, Mr. Hopp and Guardian offered the facility free consulting services.  After the meeting, Ms. Boatman asked Relator why Guardian was giving away the consulting services for free.  When the facility had previously been a customer of Collier's, Relator had charged for these services.  Relator could only reply that Guardian has a different approach.

273.   Mr. Hopp had follow-up discussions with Ms. Boatman and Ms. Curl.

274.   Upon information and belief, Mr. Hopp signed a contract for one year with Trinity Lifestyles Management Group.

275.   As an assisted living community, Dogwood Forest of Dunwoody was required under Georgia law to secure the services of a licensed pharmacist to: perform a quarterly review of the drug regimen of each resident; report irregularities found in the drug regimen review to the assisted living community administrator; remove expired, discontinued, or deteriorated drugs; establish policies and procedures for safe and effective drug therapy, distribution, use, and control; and monitor compliance with policies and procedures for medication handling and storage.  See O.C.G.A. § 31-7-12.2(g)(10).  Guardian provided these required services for free.

276.   Beginning in March 2017, and continuing month-to-month until today, Guardian submitted and continues to submit claims to Medicare and TRICARE for residents at Dogwood Forest of Dunwoody that are tainted by its illegal kickback arrangement.

277.   Guardian knew claims for payment that it submitted, and continues to submit, to Medicare and TRICARE for prescription drugs provided to residents of Dogwood Forest of Dunwoody were tainted by its illegal kickback scheme and thus were false claims that were ineligible for payment.

70

E.   **Representative Examples of Claims Submitted to Medicare**

1.   *Eagles Landing Senior Living*

278.   By way of further representative example, Relator had first-hand knowledge that claims submitted by Guardian for residents of Eagles Landing Senior Living were tainted by its kickback scheme.

279.   Eagles Landing Senior Living is an 81-bed assisted living community located at 475 Country Club Drive, Stockbridge, Georgia 30281.  They were previously a customer of Collier's, so Relator has first-hand knowledge of the claims submitted for residents of Eagles Landing Senior Living prior to and after the transition to Guardian.

280.   Guardian offered Eagles Landing Senior Living free or below FMV consulting services in order to retain their business.

281.   As an assisted living community, Eagles Landing Senior Living was required under Georgia law to secure the services of a licensed pharmacist to: perform a quarterly review of the drug regimen of each resident; report irregularities found in the drug regimen review to the assisted living community administrator; remove expired, discontinued, or deteriorated drugs; establish policies and procedures for safe and effective drug therapy, distribution, use, and control; and monitor compliance with policies and procedures for medication

71

handling and storage.  *See* O.C.G.A. § 31-7-12.2(g)(10).  Guardian provided these required services for free or below FMV.

282.   Beginning in March 2017, and continuing month-to-month until today, Guardian submitted and continues to submit claims to Medicare and TRICARE for residents of Eagles Landing Senior Living that are tainted by its illegal kickback arrangement.

283.   For example, upon information and belief, based on the drug treatment regimen the patient was following while serviced by Collier's, beginning in May 2017, Guardian submitted claims requesting Medicare payment for prescription drugs once a month to the Humana Medicare Advantage Plan (specifically, "Humana Employers Health Plan of Georgia, Inc.") for patient M.P.'s  medications.  Patient M.P. was previously a patient of Collier's and became a patient of Guardian's after Eagles Landing Senior Living decided to retain them as the facility's preferred pharmacy following receipt of the inducements described herein. The following tainted claims were reimbursed by Medicare out of government funds:

| NDC Code | NDC Code Description | Date Claim was Processed | Part D Payment Amount | Prescriber |
|---|---|---|---|---|
| 00456342833 | Namenda XR | 05/05/2017 | $43.06 | Ronald Watts |

| NDC Code | NDC Code Description | Date Claim was Processed | Part D Payment Amount | Prescriber |
|---|---|---|---|---|
| 00456342833 | Namenda XR | 06/21/2017 | $39.05 | Ronald Watts |
| 00456342833 | Namenda XR | 07/28/2017 | $40.39 | Ronald Watts |
| 00456342833 | Namenda XR | 08/21/2017 | $191.72 | Ronald Watts |
| 00456342833 | Namenda XR | 09/04/2017 | $359.96 | Ronald Watts |

284.   By way of further representative example, upon information and belief, based on the drug treatment regimen the patient was following while serviced by Collier's, beginning in June 2018, Guardian submitted claims requesting Medicare payment for prescription drugs once a month to the Humana Medicare Advantage Plan (specifically, "Humana Insurance Company") for patient C.P.'s  medications.  Patient C.P. was previously a patient of Collier's and became a patient of Guardian's after Eagles Landing Senior Living decided to retain them as the facility's preferred pharmacy following receipt of the inducements described herein. The following tainted claims were reimbursed by Medicare out of government funds:

| NDC Code | NDC Code Description | Date Claim was Processed | Part D Payment Amount | Prescriber |
|---|---|---|---|---|
| 13668015490 | Esomeprazole Magnesium | 09/04/2018 | $45.12 | DeAnn Bing |

| NDC Code | NDC Code Description | Date Claim was Processed | Part D Payment Amount | Prescriber |
|---|---|---|---|---|
| 13668015490 | Esomeprazole Magnesium | 10/04/2018 | $45.12 | DeAnn Bing |
| 13668015490 | Esomeprazole Magnesium | 11/05/2018 | $45.12 | DeAnn Bing |
| 13668015490 | Esomeprazole Magnesium | 12/04/2018 | $45.12 | DeAnn Bing |
| 13668015490 | Esomeprazole Magnesium | 01/04/2019 | $45.12 | DeAnn Bing |

285.   Guardian knew claims for payment that it submitted, and continues to submit, to Medicare and TRICARE for prescription drugs provided to residents of Eagles Landing Senior Living were tainted by its illegal kickback scheme and thus were false claims that were ineligible for payment.

### 2.   *Oaks Senior Living Facilities*

286.   By way of further representative example, Relator had first-hand knowledge that claims submitted by Guardian for residents of facilities owned and operated by Oaks Senior Living were tainted by its kickback scheme.

287.   Mr. Hopp met with Linda Bennett, the Chief Operating Officer, of the Oaks Senior Living facilities and other senior management in early 2017, shortly after Guardian purchased Collier's.

288.   Following these discussions, Guardian provided inducements to secure their business.  Specifically, Guardian provided free or below FMV

consulting services to the Oaks Senior Living residents when the facilities switched to the preferred strip packaging system.  Guardian also charged the residents at the Oaks Senior Living facilities less than fair market value for the monthly eMAR fees.

289.   As assisted living communities, the Oaks Senior Living facilities were required under Georgia law to secure the services of a licensed pharmacist to: perform a quarterly review of the drug regimen of each resident; report irregularities found in the drug regimen review to the assisted living community administrator; remove expired, discontinued, or deteriorated drugs; establish policies and procedures for safe and effective drug therapy, distribution, use, and control; and monitor compliance with policies and procedures for medication handling and storage.  *See* O.C.G.A. § 31-7-12.2(g)(10).  Guardian provided these required services for free or below FMV.

290.   For example, Oaks at Post Road is a 110-bed assisted living community located at 3875 Post Rd, Cumming, GA 30040.  Oaks at Post Road was previously a customer of Collier's, so Relator has first-hand knowledge of the claims submitted for residents of Oaks at Post Road prior to and after the transition to Guardian.

291.   Beginning in March 2017, and continuing month-to-month until today, Guardian submitted and continues to submit claims to Medicare and TRICARE for residents at Oaks at Post Road that are tainted by its illegal kickback arrangement.

292.   For example, upon information and belief, based on the drug treatment regimen the patient was following while serviced by Collier's, beginning in July 2017, Guardian submitted claims requesting Medicare payment for prescription drugs once a month to the Aetna Medicare Advantage Plan (specifically, "Aetna Life Insurance Company") for patient E.S.'s  medications. Patient E.S. was previously a patient of Collier's and became a patient of Guardian's after Oaks at Post Road decided to retain them as the facility's preferred pharmacy following receipt of the inducements described herein. The following tainted claims were reimbursed by Medicare out of government funds:

| NDC Code | NDC Code Description | Date Claim was Processed | Part D Payment Amount | Prescriber |
|---|---|---|---|---|
| 47781030503 | Rivastigmine Transdermal | 07/26/2017 | $348.72 | Xiaoqing Guo |
| 47781030503 | Rivastigmine Transdermal | 08/22/2017 | $348.72 | Xiaoqing Guo |
| 47781030503 | Rivastigmine Transdermal | 10/03/2017 | $348.72 | David Cohen |
| 47781030503 | Rivastigmine Transdermal | 11/21/2017 | $348.72 | David Cohen |

| NDC Code | NDC Code Description | Date Claim was Processed | Part D Payment Amount | Prescriber |
|---|---|---|---|---|
| 47781030503 | Rivastigmine Transdermal | 12/19/2017 | $348.72 | David Cohen |

293.   By way of further example, Oaks at Braselton is a 100-bed assisted living community located at 5373 Thompson Mill Rd, Hoschton, GA 30548.  Oaks at Braselton was previously a customer of Collier's, so Relator has first-hand knowledge of the claims submitted for residents of Oaks at Braselton prior to and after the transition to Guardian.

294.   Beginning in March 2017, and continuing month-to-month until today, Guardian submitted and continues to submit claims to Medicare and TRICARE for residents of Oaks at Braselton that are tainted by its illegal kickback arrangement.

295.   For example, upon information and belief, based on the drug treatment regimen the patient was following while serviced by Collier's, beginning in April 2017, Guardian submitted claims requesting Medicare payment for prescription drugs once a month to the Aetna Medicare Advantage Plan (specifically, "Aetna Life Insurance Company") for patient C.S.'s  medications. Patient C.S. was previously a patient of Collier's and became a patient of Guardian's after Oaks at Braselton decided to retain them as the facility's preferred

pharmacy following receipt of the inducements described herein.  The following

tainted claims were reimbursed by Medicare out of government funds:

| NDC Code | NDC Code Description | Date Claim was Processed | Part D Payment Amount | Prescriber |
|---|---|---|---|---|
| 60505011405 | Gabapentin | 04/12/2017 | $9.91 | Anga-Lee Tipton |
| 60505011405 | Gabapentin | 05/09/2017 | $9.91 | Anga-Lee Tipton |
| 60505011405 | Gabapentin | 06/06/2017 | $9.91 | Anga-Lee Tipton |
| 60505011405 | Gabapentin | 07/04/2017 | $9.91 | Fatimah Manzoor |
| 60505011405 | Gabapentin | 08/02/2017 | $7.66 | Fatimah Manzoor |

296.   Guardian knew claims for payment that it submitted, and continues to

submit, to Medicare and TRICARE for prescription drugs provided to residents of

the Oaks Senior Living facilities were tainted by its illegal kickback scheme and

thus were false claims that were ineligible for payment.

## F.    **Guardian's Free Services Have Independent Value For Facilities**

297.   Guardian's inducements – in the form of free or below FMV

pharmacy consulting services, free education and skills checks, and free eMAR

setup -- benefit the owners and operators of the assisted living communities and

personal care homes by reducing their operating costs to comply with Georgia law

and reducing their residents' costs.

298.   By facilitating their compliance with requirements for medication administration records and medication management, Guardian provides substantial benefits to facilities that are unrelated to dispensing medications for residents.

299.   Such services are add-on services that have independent value for facilities.  In other words, the free services that Guardian supplies to the facilities are not necessary or integral to Guardian's services as a pharmacy dispensing prescription medications and supplies to residents.

### XI.   Guardian Knew Its Kickback Scheme Was Unlawful

300.   Defendants knowingly and willfully participated in a kickback scheme to provide free or below FMV consulting services, free education and skills checks, and free installation of eMAR systems to assisted living communities and personal care homes in exchange for their referring residents to Guardian, and arranging for or recommending Guardian to residents, to fill prescription orders for drugs and supplies paid for by the Medicare Program or TRICARE.

301.   At all times relevant to the Complaint, Defendants participated in the kickback scheme knowing that at least one of the purposes of the remuneration (*i.e.*, the free and below FMV services) was to induce and reward referrals of residents to Guardian for prescription drug orders and supplies.

302.   Defendants know and have known since the inception of their

kickback scheme that compliance with the Anti-Kickback Statute is a material

condition of participating in the Medicare and TRICARE Programs as a pharmacy

and a prerequisite to receiving reimbursement from the Medicare and TRICARE

Programs through their contractors. *See* 42 U.S.C. § 1320a-7b(b).

303.   Guardian's executive team is comprised of many experienced

healthcare executives with long careers in the pharmacy and long-term care

industries who are well aware of the prohibitions of the Anti-Kickback Statute.

304.   In fact, in a PowerPoint slide presentation given at the

President/Sales/Account Manager Meeting in 2018, Guardian criticized retail

pharmacies for "lacking in nursing, consulting, eMAR support, technology and

education services," thereby promoting the value of these services to the assisted

living communities.  At the same time, Guardian complained that retail pharmacies

"[s]ometimes will provide services at no cost and/or fly under the regulation 'radar

screen,'" indicating their awareness that the provision of free services was strictly

prohibited.

305.   In the presentation, Guardian also falsely claims, "Guardian will not

put your company at risk –compliance with safe harbor regulations, absolutely no

'under the radar activities.'"  Despite this language, Guardian knowingly offered the inducements described herein.

A.    **OIG Has Cautioned Against Free Services For Decades**

306.   The prohibition on providing free services in exchange for patient referrals for Medicare services or supplies has been the subject of decades of enforcement actions and guidance published by the federal government to assist people seeking to comply with the Anti-Kickback Statute.

307.   For example, in November 2009, the Department of Justice announced a $98 million settlement of a False Claims Act case with Omnicare, the largest institutional pharmacy provider, based on allegations that Omnicare supplied unlawful inducements, including free pharmacist consulting services to referring customers.

308.   Pursuant to federal law, 42 U.S.C. § 1320a-7d(b), the Secretary of the United States Department of Health and Human Services (HHS), in consultation with the Attorney General, is authorized to issue advisory opinions and other guidance on specific topics, including what constitutes prohibited remuneration under the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and whether any activity or proposed activity could result in the imposition of sanctions or exclusion from participation in Medicare. 42 U.S.C. § 1320a-7d(b)(2).

309.   HHS's Office of Inspector General ("OIG") has frequently cautioned against providing free services in exchange for patient referrals in advisory opinions, special fraud alerts, and compliance guidance – all available for the public on the OIG website: https://oig.hhs.gov/compliance/advisory-opinions/index.asp.

310.   For example, over twenty years ago, OIG issued a "Special Fraud Alert" in 1998 that described suspected kickback arrangements in circumstances analogous to those described in this Complaint.[4]  The 1998 Special Fraud Alert addressed "instances of potential kickbacks between hospices and nursing homes to influence the referral of patients."[5]

311.   The operators of nursing homes, like those of assisted living communities and personal care homes, often refer their residents to healthcare providers such as pharmacies and hospice care (end-of-life care).  In the 1998 Special Fraud Alert, OIG cited examples of "suspected kickbacks" including "[a]

---

[4] *See* OIG Special Fraud Alert, *Fraud And Abuse In Nursing Home Arrangements With Hospices* (March 1998), https://oig.hhs.gov/compliance/alerts/index.asp.

[5] *Id*. at 3.

hospice offering free goods or goods at below fair market value to induce a nursing home to refer patients to the hospice."[6]

312.   Ten years later, in 2008, OIG specifically addressed the kickback risks associated with "consultant pharmacy services" in the context of nursing homes.[7] Similar to assisted living communities, nursing homes are required to hire a pharmacist to conduct medication management services for their residents.[8]

313.   In its 2008 compliance guidance, OIG expressly cautioned that "consultant pharmacist services under contract with a long-term care pharmacy" that are provided for free or "at non-fair-market-value rates" present a heightened risk of a violation of the Anti-Kickback Statute.[9]  The OIG described the following conduct as "[e]xamples of suspect . . . arrangements that warrant careful scrutiny" under the Anti-Kickback Statute:

---

[6] *Id*. at 4.

[7] *See* OIG Supplemental Compliance Program Guidance for Nursing Facilities, 73 Fed. Reg. 56832 (Sep. 30, 2008).

[8] *See* 42 C.F.R. § 483.45; *see also* Ga. Comp. R. & Regs. 480-24-.05 (duties of consultant pharmacist for nursing homes and other long-term care facilities).
.
[9] 73 Fed. Reg. 56832, n.53.

(a) "Pharmaceutical consultant services, medication management, or supplies offered by a pharmacy;" and

(b) "Equipment, computers, or software applications that have independent value . . . ."[10]

314.   The OIG bluntly acknowledged in its 2008 guidance that such arrangements for "services and supplies to be provided to residents" of a home by outsiders "such as pharmacies" may disguise kickbacks intended to influence the home to refer its residents to the outside organization for services covered by federal healthcare programs.[11]

315.   The foregoing guidance documents published by the OIG, together with many other similar guidance documents, put Guardian on notice that its conduct was unlawful and that violations of the Anti-Kickback Statute are material to Medicare's payment decisions.

---

[10] 73 Fed. Reg. 56843.

[11] *Id.*

**B.**    **Guardian's Certifications of Compliance**

316.   Most of Defendants' profits come from reimbursement (*i.e.*, payments for prescription drugs and supplies) by the Medicare Program through Medicare Part D Sponsors, PBMs, and Medicare Advantage Prescription Drug Plans.

317.   To participate in the prescription drug coverage plans of the Medicare patients, Guardian enters into a reimbursement contract, sometimes known as a Provider Agreement, with each Medicare Part D Sponsor or other Medicare contractor that administers the drug plans for those patients.

318.   The Provider Agreements that Guardian enters into with Medicare contractors expressly require Guardian to comply with all applicable federal laws, which includes the Anti-Kickback Statute, and applicable regulations and CMS instructions. *See* 42 C.F.R. § 423.505(i)(4)(iv).

319.   Pursuant to such Provider Agreements, Guardian also is required to train its employees, including but not limited to Matt Hopp, Lori Newcomb, and Tim Williams, on the prohibitions of the Anti-Kickback Statute.

320.   Part D Sponsors and other contractors also publish compliance policies instructing pharmacies about the importance of complying with federal healthcare laws, including specific instructions on the Anti-Kickback Statute.

321.   For example, Guardian has a Provider Agreement with Humana, which sponsors Medicare Part D and MA-PD plans.  Humana publishes a Pharmacy Manual stating as follows: "Pharmacy providers are prohibited from having any financial relationship relating to the delivery of or billing for items or services covered under a federal health care program that . . . [w]ould violate the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, if items or services delivered in connection with the relationship were billed to a federal health care program."

322.   Guardian, having entered into numerous Provider Agreements with Medicare contractors, is well aware that compliance with the Anti-Kickback Statute is a material condition of payment by the Medicare program, including payments by Part D Sponsors MA-PD Plans pursuant to contracts with Medicare.

**C.    <u>The Fine Print</u>**

323.   Finally, as described above, Guardian's knowledge of the prohibitions of the Anti-Kickback Statute is apparent in the fine print of the contracts it offers to assisted living communities and personal care homes.

324.   Exhibit A to the contracts between the facilities and Guardian expressly refers to the Federal Anti-Kickback Statute and states as follows, among other things:

"[Guardian] will provide or arrange for, and Operator [of the facility] will pay for, consulting pharmacist services only on terms that account for [Guardian's] costs to do so, and never below those costs."

"All arrangements for consulting pharmacist services will be established without regard to any referrals."

325.   Guardian, however, knowingly ignored the fine print in its own contracts.

326.   Guardian blatantly violated the Anti-Kickback Statute by knowingly providing free or below FMV consulting, education and skills checks, and eMAR services for assisted living communities and personal care homes, at least one purpose of which was to induce the facilities to select Guardian to fill the pharmacy needs of their residents, most of whom are Medicare or TRICARE beneficiaries.

327.   Guardian knew the claims for payment that it has submitted, and continues to submit, to Medicare and TRICARE for prescription drugs and supplies provided to residents of the facilities receiving free services from Guardian were tainted by its illegal kickback scheme and thus were false claims that were ineligible for payment by Medicare or TRICARE.

**Count One**
**Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**(False Claims)**

328.   Relator repeats and realleges the allegations paragraphs 1-327 in the Complaint as if fully set forth herein.

329.   As set forth above, Guardian provided kickbacks in the form of free or below FMV pharmacy consulting, education and skills classes, and eMAR services to assisted living communities and personal care homes with the intention and effect of inducing those facilities to designate Guardian as their "preferred" pharmacy, meaning the facilities agreed to steer their residents to Guardian to fill prescriptions for drugs and supplies, most of which were paid for in whole or part by Medicare and TRICARE, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2).

330.   Guardian has submitted and continues to submit claims for payment for prescription drugs and supplies that it dispensed to residents of facilities that received free or below FMV services pursuant to Guardian's kickback scheme.

331.   Compliance with the Anti-Kickback Statute is a material condition of receiving reimbursement from the Medicare and TRICARE Programs.

332.   Guardian's claims for payment for prescriptions tainted by its kickback scheme were false claims and were not eligible for payment by Medicare or TRICARE.

333.   As a foreseeable result of Guardian's participation in the kickback scheme, Guardian knowingly submitted or caused the submission of hundreds of thousands of false claims to Medicare and TRICARE for payment, in violation of the False Claims Act, 31 U.S.C. § 3729(a).

334.   By virtue of the false claims the Defendants presented or caused to be presented, the United States has suffered damages in an amount to be determined at trial and is entitled to recover treble damages plus a civil penalty for each false claim.

## Count Two
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### (False Records and Statements Material to False Claims)

335.   Relator repeats and realleges the allegations in paragraphs 1-327 the Complaint as if fully set forth herein.

336.   In connection with the kickback-tainted prescription claims that Guardian submitted or caused to be submitted to Medicare and TRICARE, Guardian knowingly made or used, or caused others (such Medicare Part D Sponsors, PBMs, MA-PD Plans, and ESI) to make or use, false records or

statements that were material to false or fraudulent claims for payment submitted to Medicare and TRICARE.

337.   By reason of these false records or statements, the United States has suffered damages in an amount to be determined at trial and is entitled to recover treble damages plus a civil penalty for each false claim.

<u>**Count Three**</u>
**Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G)**
**(Failure to Return Overpayments)**

338.   Relator repeats and realleges the allegations paragraphs 1-327 of the Complaint as if fully set forth herein.

339.   By knowingly engaging in the kickback schemes set forth above, Defendants knew they were ineligible to participate in the Medicare program or to receive Medicare reimbursement for prescription drug claims.

340.   Defendants had a duty under federal law to return excess payments, known as overpayments, to Medicare within 60 days of when the overpayments were identified.  *See* 42 U.S.C. § 1320a-7k(d)(2).

341.   Medicare payments that Defendants received after they knowingly initiated the kickback schemes set forth above were overpayments that Defendants had an affirmative legal obligation to report and return to the Medicare program.

Defendants are not entitled to keep federal taxpayer money they were not eligible to receive.

342.   An overpayment knowingly retained after 60 days becomes an "obligation" within the meaning of the reverse false claims provision of the False Claims Act.  42 U.S.C. § 1320a-7k(d)(3).

343.   A defendant that "knowingly conceals or knowingly and improperly avoids or decreases an obligation" to return funds to federal programs is liable under the False Claims Act.  31 U.S.C. § 3729(a)(1)(G).

344.   Defendants made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

345.   Defendants improperly retained such overpayments with actual knowledge of the legal obligation to return the funds to Medicare, or with reckless disregard or deliberate ignorance of the legal obligation to return the funds to Medicare because they were not entitled to keep the funds.

346.   By reason of Defendants' knowing and improper retention of the overpayments described herein, the United States has suffered damages in an

amount to be determined at trial and is entitled to recover treble damages plus a civil penalty for each false claim.

**WHEREFORE**, Relator Henry B. Heller respectfully prays for the entry of judgment against Defendants awarding the following relief:

For the United States of America

(a) Three times the amount of damages the United States sustains because of each violation of the False Claims Act; and

(b) A civil penalty for each false claim or false statement;

For the Relator

(c) An award of 30% of the judgment amount, settlement, or other remedy arising from this action; and

(d) An assessment against Defendants under the False Claims Act of litigation costs and reasonable attorneys' fees as provided by 31 U.S.C. §3730(d);

(e) Pre- and post-judgment interest on the awards ordered herein; and

(f) such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Relator respectfully demands a trial by jury on all issues so triable.

Respectfully submitted this 6th day of March, 2020.

s/ Michael J. Moore
MICHAEL J. MOORE
Georgia Bar No. 520109
CHARLES W. BYRD
Georgia Bar No. 100850
ELIZABETH S. WHITE
Georgia Bar No. 258844
CAROLINE G. MCGLAMRY
Georgia Bar No. 230832

**POPE MCGLAMRY**
3391 Peachtree Road, NE, Suite 300
Atlanta, GA 30326
(404) 523-7706
efile@pmkm.com

s/ Lynn M. Adam
LYNN M. ADAM
Georgia Bar No. 002319

**ADAM LAW LLC**
125 Clairemont Avenue
Suite 380
Decatur, Georgia 30030
Tel: (404) 324-3582
ladam@lynnadamlaw.com

*Attorneys for Relator Henry B. Heller*

## **CERTIFICATION**

Pursuant to N.D. Ga. L.R. 7.1(D), counsel for Plaintiff hereby certifies that this document has been prepared with Times New Roman (14 point) font, which font has been approved under L.R. 5.1(C).

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2020, I electronically filed the foregoing

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** with the

Clerk of Court using the Court's CM/ECF system, which will automatically send

notification of such filing to all counsel of record.

GABRIEL A. MENDEL
Assistant U.S. Attorney
United States Attorney's Office
Richard B. Russell Federal Bldg.
75 Ted Turner Drive, S.W., Suite 600
Atlanta, GA 30303
Phone: (404) 581-6000
Fax: (404) 581-6163
Gabriel.Mendel@usdoj.gov

DAVID T. COHEN
Senior Trial Counsel
U.S. Department of Justice
175 N. Street, N.E., Room 9-1314
Washington, D.C. 20002
Phone: (202) 307-0136
david.t.cohen@usdoj.gov


*/s/ Michael J. Moore*
MICHAEL J. MOORE
Pope, McGlamry, Kilpatrick,
Morrison & Norwood, P.C.
3391 Peachtree Road, NE, Suite 300
P.O. Box 19337 (31126-1337)
Atlanta, GA 30326
(404) 523-7706
efile@pmkm.com