**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* HENRY B. HELLER, | |
| *Plaintiffs,* | Civil Action File No.: |
| v. | |
| GUARDIAN PHARMACY, LLC, and GUARDIAN PHARMACY OF ATLANTA, LLC, | 1:18-cv-03728-SDG |
| *Defendants.* | |

## DEFENDANT GUARDIAN PHARMACY OF ATLANTA, LLC'S BRIEF IN SUPPORT OF MOTION TO DISMISS

Defendant Guardian Pharmacy of Atlanta, LLC ("Guardian Atlanta") hereby files this Brief in Support of its Motion to Dismiss Relator's Amended Complaint [Doc. 24] pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

## I.    INTRODUCTION AND PROCEDURAL BACKGROUND

This is a False Claims Act ("FCA") case brought under the *qui tam* provisions of the statute, meaning that the case was filed by a relator (sometimes referred to as a whistleblower) rather than directly by the United States. The U.S. Department of Justice ("DOJ") investigated Relator's allegations during the fifteen months that the case was under seal. The DOJ ultimately elected not to intervene, and Relator chose to proceed without the Government, filing an Amended Complaint.[1]

---

[1] Doc. 15 (Notice of the United States of Election to Decline to Intervene); Doc. 24

Defendant Guardian Atlanta is an "institutional" or long-term care pharmacy ("LTCP"), as distinguished from a retail pharmacy. As such, it is not open to the public, but rather serves only residents in assisted living communities ("ALCs") and personal care homes ("PCHs") (collectively, "Communities"). Unlike many LTCPs, Guardian Atlanta does not serve patients in skilled nursing facilities (also known as nursing homes).

Relator is a former principal of Collier's Pharmacy. He joined Guardian Atlanta in 2017, when it acquired Collier's, and left in October 2018.[2]

The gist of Relator's Complaint is that Guardian Atlanta violated the federal Anti-Kickback Statute ("AKS") by furnishing "kickbacks" in exchange for being designated as a "preferred pharmacy" by Communities to fill prescription drug orders for their residents. Relator alleges that any claims billed by Guardian Atlanta to the Medicare program for drugs provided to residents of these Communities were "tainted" by these "kickbacks" and thus were false claims under the FCA.

## II.    RELATOR'S ALLEGATIONS AND SUMMARY OF ARGUMENT

The "kickbacks" alleged by Relator involve services allegedly provided by

---

(Amended Complaint).
[2] Am. Compl. ¶¶ 15, 144.

Guardian Atlanta "free or below FMV" or "free or below cost."[3] The services fall into three buckets. First, Relator alleges that Guardian Atlanta "offered free installation of the computers and software programs for electronic medication administration records ('eMAR') systems" as a kickback to its Community "customers."[4] Second, Relator alleges that Guardian Atlanta provided free "medication management services":

> Guardian employs a team of consulting pharmacists and pharmacy nurses who perform medication management services for *customers*, on a quarterly basis, for no charge or for charges that are well below fair market value … reliev[ing] those assisted living communities and personal care homes that select Guardian as their 'preferred pharmacy' of the costs of complying with their legal obligations to perform such services for their residents and otherwise benefits the facilities by reducing their overhead costs.[5]

Both of the foregoing allegations are premised on a fundamental error. The Communities are not Guardian Atlanta's "customers" in the context of these services. Each *resident* of a Community is allowed by law to choose his or her own pharmacy—including either a retail pharmacy or an LTCP—and Guardian Atlanta's "customer" for medication management and eMAR services is the individual *resident* to whom Guardian Atlanta dispenses medications and with

---

[3] *See, e.g., id.* at ¶ 7.

[4] *Id.* at ¶ 9

[5] *Id.* at ¶ 7 (emphasis added).

whom Guardian Atlanta has a direct patient relationship.[6]

Relator acknowledges in his Complaint that "Guardian bills a monthly fee of $10 to residents whose facilities subscribe to an [eMAR] system."[7] Relator does not allege facts to show that the monthly $10 per patient fees are insufficient to recoup the costs of providing eMAR and medication management services. Indeed, there is nothing in the Complaint to show that Guardian Atlanta does not turn a standalone *profit* on these services. These omissions are fatal to any allegation that Guardian Atlanta provided any illegal "remuneration," as required to establish an AKS violation.

Third, Relator alleges that, prior to 2018, Guardian Atlanta "furnished legally-required education classes and skills checks for free or below-cost."[8] Even beyond the issues that arise from pleading in the disjunctive—*i.e.,* "free *or* below-cost"—Relator's allegations on this point are fatally equivocal and facially inconsistent. While Relator's case is premised on an allegation that Guardian did not charge for these classes at all until 2018,[9] other allegations in his Complaint

---

[6] *Id.* at ¶¶ 133, 130; *see* Ga. Comp. R. & Regs. 111-8-63-.24(f) (referring to the "pharmacy of the resident's choice"). Guardian has requested that the Court take judicial notice of Ga. Comp. R. & Regs. 111-8-63-.24. [Doc. 32, Ex. D].

[7] Am. Compl. ¶ 240.

[8] *Id.* at ¶ 8.

[9] *Id.* at ¶ 231 ("[I]n 2018, Guardian finally stopped its long-time practice of …

acknowledge that Guardian Atlanta *was* charging for this training well before then in the amount of "$50/day, or $100 total per person."[10] And elsewhere, it becomes clear that what Relator really seeks to label as a "kickback" is actually "free" training to only a limited categories of Communities: the "Host community, new communities to Guardian AND newly licensed assisted living communities."[11] Relator does not identify the incremental cost to Guardian Atlanta of allowing first-time-free attendees to participate in the class without charge as compared to revenues from subsequent sessions for which the Community's trainees had to pay. Nor does Relator indicate the reciprocal value to Guardian Atlanta from the "Host community" (that is, the Community hosting

---

providing free education and skills checks.").

[10] *Id*. at ¶¶ 224-25 ("On March 2, 2017, Ms. Newcomb emailed Mr. Hopp and others at Guardian to discuss the upcoming Certified Medication Aid training class Guardian provided on a monthly basis…. In her email, Ms. Newcomb [stated], 'The charge for the class is $50/day, or $100 total per person….'"). The March 2, 2017 email is incorporated by reference into the Complaint, and therefore, the email may be considered on a motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1310, n. 3 (11th Cir. 2019) ("We may consider the full text of the press release because it was incorporated into the amended complaint by reference."). A copy of the March 2, 2017 e-mail is attached as Exhibit A.

[11] Am. Compl. ¶ 225 (emphasis in original).

the training in its space), given that the host community is providing a venue and associated amenities[12] in exchange for the so-called "free" training, and that venue is being used to train not only the host community's own employees, but also employees from other Communities.

Further, with respect to all three AKS theories, Relator fails to plead with any particularity any causal link to any particular Medicare claims. Congress amended the AKS in 2010 to expressly provide that "a claim that includes items and services *resulting from* a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]."[13] Since then, relators have attempted to satisfy the "resulting from" causation requirement by relying on a "taint" theory of causation, alleging that all claims submitted by the provider during an alleged kickback scheme are deemed "tainted" and thus false under the FCA. Relator relies on the same theory here, making only generic allegations that claims were "tainted." But the courts that have addressed this "taint" theory since 2010 have rejected it.[14]

---

[12] Ex. A ("Host community" agreed to "provide a continental breakfast and coffee, juice and water each day for the attendees").

[13] 42 U.S.C. § 1320a-7b(g) (emphasis added).

[14] *See, e.g., United States ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89, 100 (3d Cir. 2018).

In short, Relator's claims must be dismissed because he does not adequately plead: 1) any underlying AKS violation; 2) any claim that includes items or services "*resulting from*" an AKS violation; or 3) that the alleged violations were material to Medicare's decision to pay Guardian Atlanta's claims.

## III.   PLEADING STANDARDS FOR CLAIMS UNDER THE FALSE CLAIMS ACT

### A.   Fed R. Civ. P. 12(b)(6)

To state a claim, the complaint must "plead all facts establishing an entitlement to relief with more than labels and conclusions 'or a formulaic recitation of the elements of a cause of action.'"[15] It is not enough to plead facts that are "merely consistent with" unlawful activity; more is needed to push the complaint across "the line between possibility and plausibility of entitlement to relief."[16]

### B.   Fed. R. Civ P. 9(b)

In addition, an FCA complaint must "state with particularity the circumstances constituting fraud."[17] The complaint must allege "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the

---

[15] *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[16] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and quotation marks omitted).

[17] Fed. R. Civ. P. 9(b); *see U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002).

defendants' allegedly fraudulent acts, when they occurred, and who engaged in them."[18] Further, the complaint "must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result."[19]

## IV.   <u>ARGUMENT</u>

### A.   Relator fails to state a claim as to the alleged medication management services and eMAR kickbacks

Because Relator's FCA claims are premised on an alleged violation of the AKS, he must also plead an underlying AKS violation with particularity.[20] The AKS makes it illegal for a person to "knowingly and willfully offer[] or pay[] any remuneration … to any person to induce such person" to refer, arrange for or recommend business reimbursed by a Federal health care program.[21] Establishing "remuneration" is critical. "An AKS violation … requires that there be 'remuneration' offered or paid in the transaction at issue."[22]

Two separate principles flowing from the remuneration requirement

---

[18] *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (citing *Clausen*, 290 F.3d at 1310).

[19] *U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012).

[20] *U.S. ex rel. Osheroff v. Tenet Healthcare Corp.*, 2012 WL 2871264, at *7 (S.D. Fla. July 12, 2012).

[21] 42 U.S.C. § 1320a-7b(b)(2)(A)-(B).

[22] *Bingham v. HCA, Inc.*, 783 Fed. App'x 868, 873 (11th Cir. July 31, 2019).

preclude any claim that Guardian Atlanta's medication management and eMAR services constituted illegal remuneration:

First, alleged remuneration in the form of "a below-fair-market-value exchange … must be pled with particularity."[23] "To do so, Relator must allege a benchmark of fair market value, [w]ithout [which], it is impossible for the Court to infer whether Defendants' [charges] fall sufficiently below the benchmark so as to constitute remuneration."[24] For an alleged AKS violation, the "critical question … is whether [the referring sources] received anything of value … in excess of the fair market value of their … payments."[25] This showing must be made with respect to particular Communities since it is the individual Communities that are allegedly being induced to refer their residents to Guardian Atlanta.[26] This Court has dismissed FCA cases alleging discounted services as a kickback where, as here, the "the Complaint omits all detail as to *when* [defendant] allegedly offered inducements in the form of discounts, *what* the discounted rates were, and *to whom*

---

[23] *Osheroff*, 2012 WL 2871264, at *7.

[24] *Id*.

[25] *Bingham*, 783 Fed. App'x at 873.

[26] *Id*. at 874 (finding no AKS violation where Relator alleged that a hospital "made free improvements to the offices of certain physician tenants," but Relator did "not tie the improvements to specific physician tenants who were or could be referral sources").

the discounts were offered."[27]

Second, the alleged "remuneration" must be beyond the scope of, and not integral to, Guardian Atlanta's services to its own patients. To determine whether products or services constitute remuneration, courts "assess whether Relator has alleged that [defendant] offered services 'integrally related' to [its product] *in tandem with* another service or program that confers a benefit on a referring provider."[28] In answering the first inquiry, courts inquire as to whether the defendant provides collateral benefits, such as "free meals or travel."[29] As for conferring benefits on a referring provider, courts have recognized that "OIG guidance provides that 'support services' a [defendant] offers 'in connection with the sale of its own products' … do not, on their own, 'implicate the anti-kickback statute.'"[30]

---

[27] *Georgia ex rel. Hunter Labs., LLC v. Quest Diagnostics Inc.*, No. 13-cv-01838 (SCJ), 2014 WL 12543888 (N.D. Ga. Mar. 14, 2014) (punctuation and citations omitted).

[28] *United States ex rel. Suarez v. AbbVie Inc.*, Case No. 15-C-8928, 2019 WL 4749967, *7 (N.D. Ill. Sept. 30, 2019) (citations and quotation marks omitted).

[29] *Id.*

[30] *Id.* at *8 (quoting OIG May 2003 Notice, 68 Fed. Reg. 23731-01, 2003 WL 2010428, at *23735 (citing *United States ex rel. Forney v. Medtronic, Inc.*, Civil Action No. 15-6264, 2017 WL 2653568, at *4 (E.D. Pa. June 19, 2017) (providing technical support with a pharmaceutical product "might induce physicians to purchase [defendant's] products, but only because they are better-supported products than competing products"))).

Applying those principles here, the medication management and eMAR services do not constitute illegal remuneration because: 1) Relator has not adequately alleged an improper discount because he acknowledges that Guardian Atlanta charges a $10 monthly fee to "most patients" (without identifying any specific exceptions) and does not allege that the revenue from these fees fails to cover the cost of the services that he claims were discounted; and 2) eMARs and medication management are integrally related to LTCP services provided to Community residents, and Guardian Atlanta *could,* if it chose (although it does not), provide these integral services at no charge to the Communities without running afoul of the AKS.

### 1. Relator fails to adequately plead that Guardian Atlanta provided medication management or eMAR services below cost or FMV

To constitute a kickback, the costs of eMAR setup and medication management services would have to exceed the revenue from Guardian Atlanta's $10 per patient monthly charges.[31] The allegations in Relator's Complaint fail because Relator does not plead facts beyond speculation to demonstrate that these services were provided below cost or fair market value (FMV).

---

[31] *United States ex rel. Jamison v. McKesson Corp.*, 900 F. Supp. 2d 683, 687-88 (N.D. Miss. 2012); *United States ex rel. McDonough v. Symphony Diagnostics Servs., Inc.*, 36 F. Supp. 3d 773, 775 (S.D. Ohio 2014).

Relator alleges generally that some Communities listed on Exhibit A to the Complaint "received free installation of their eMAR systems" and that the installations "have a value that ranges from $499 to $7,000 per facility."[32] But Relator does not identify a value or cost of the eMAR setup for any individual Community. Where Relator attempts to make allegations with greater specificity—in the paragraphs of the Complaint regarding Magnolia Senior Living, Canterfield of Kennesaw, Country Gardens Senior Living, Antebellum Grove Senior Living, and Oaks Senior Living[33]—the omissions are more telling than the allegations. In each instance, Relator alleges that Guardian Atlanta installed an eMAR system, but omits critical particulars, including the cost to Guardian Atlanta or whether monthly fees collected by Guardian Atlanta exceeded any such cost and, if so, by how much.

For example if the cost to supply eMAR to a Community were on the low end of Relator's range, $499, and if that Community had even just 25 residents who selected Guardian Atlanta for their pharmacy services, the $10 per patient monthly fee would cover the eMAR costs in only two months. This would leave a considerable margin ($100 per patient per year) from the $10 fees, which would be

---

[32] Am. Compl. ¶¶ 254-55.
[33] *Id.* at ¶¶ 213-14, 221, 265, 288.

more than enough to cover Guardian Atlanta's cost of providing quarterly medication management services, even assuming the high end of Relator's estimate that medication management costs run $10 to $20 per patient per quarter, or $40 to $80 per year.[34]

Without the detailed information required by Rule 9(b), it is impossible beyond speculation to conclude that Guardian Atlanta provided eMAR and medication management services below FMV or below cost, let alone to identify which Communities received discounted services. Thus, "it is impossible for the Court to infer whether [Guardian Atlanta's charges] fall sufficiently below the benchmark so as to constitute remuneration."[35]

### 2. eMAR setup is within the scope of, and integral to, Guardian Atlanta's services to its patients

Even setting aside Relator's failure to plead with particularity the costs of any eMAR setup, Relator fails to recognize that Guardian Atlanta could have provided eMAR services, including eMAR setup, without *any* charge because they

---

[34] *Id*. at ¶ 253.

[35] *Osheroff*, 2012 WL 2871264, at *7; *U.S. v. Ctr. For Diagnostic Imaging Inc.*, 787 F. Supp. 2d 1213, 1223 (W.D. Wash. 2011) ("Although plaintiffs contend that defendants offered discounts to induce referrals, they have failed to allege that the discounted services were offered for less than fair market value, which is 'the gauge of value when assessing the remuneration element of the offense.' [cit.] ... [cit.] Without alleging the fair market value of those services, plaintiffs have failed to plausibly allege that the 'discounted' services constituted remuneration.").

are integral to the pharmacy services it provides. Therefore, even if Relator had adequately alleged that Guardian Atlanta provided these services at a discount (which he did not), that could not give rise to an AKS violation where: 1) Guardian Atlanta could have given the services away for free; and 2) there is no assertion (even conclusory) that Guardian Atlanta's eMAR pricing varied in any way based on volume or value of referrals.

In that regard, Relator's Complaint fails to account for a 2012 advisory opinion of the Department of Health and Human Services Office of Inspector General ("OIG"). The advisory opinion (AO 12-19) addressed whether a pharmacy's provision of certain eMAR-related goods and services to a "community home" would give rise to AKS sanctions.[36] (Relator referenced AO 12-19 in in his original Complaint,[37] but tellingly scrubbed that reference from his Amended Complaint.) As alleged by Relator in his original complaint, community homes are "analogous" to ALCs and PCHs in Georgia.[38] One of the arrangements under consideration in AO 12-19 involved a pharmacy that sought to "provide the

---

[36] Doc. 32_, Ex. A.

[37] Doc. 1, ¶ 189.

[38] *Id.* The only distinction seems to be the nature of the resident population. Both community homes and Communities provide non-healthcare oversight in a congregate residential setting, but community homes serve "individuals with intellectual and developmental disabilities" (AO 12-19, at 2), whereas ALCs and PCHs primarily serve elderly individuals.

Community Homes that have residents who obtain prescription medications from the Requestor with free, limited access to [eMAR software] for each resident receiving his or her prescription medications from the [pharmacy]."[39] The OIG concluded that while the arrangement would "reliev[e] the Community Homes of [an] administrative burden," the pharmacy's provision of the eMAR software was "integrally related" to the pharmacy's own services.[40] The OIG thus opined that the arrangement "would be unlikely to result in fraud or abuse under the [AKS] and we would not seek to impose administrative sanctions."[41]

Nevertheless, Relator seeks to draw a distinction between monthly eMAR services and eMAR setup, which Relator describes as "the hardware for eMAR

---

[39] Doc. 32, Ex. A at 5-6, 10-12 (discussing "Arrangement B").

[40] *Id*. at 11.

[41] *Id*. at 11-12. The OIG concluded that one of the four eMAR arrangements under consideration ("Arrangement D") "could" result in an AKS violation, but the aspects of "Arrangement D" that caused the OIG concern have not been pled by Relator here, namely: 1) the software was "not interoperable," meaning that MAR data stored in the software would not be "readily transferable to other systems, resulting in Community Home data lock-in and, thereby, referral lock-in"; and 2) that the pharmacy would provide free access to eMAR software for all residents of the Community, not just its own patients. *Compare id*. at 10 ("Under Proposed Arrangement B, the Requestor would provide the Community Homes that have residents who obtain prescription medications from the Requestor with free, limited access to Software Y for each resident receiving his or her prescription medications from the Requestor") *with, id.* at 12-13 (Under Arrangement D, community homes "would acquire the right to use Software Z for their own use").

systems (computers and peripherals – arms, mouse), the setup (installation and integration with Guardian's operating system), and limited technical support and expertise."[42] However, Relator does *not* allege that these items have any independent value or use for the Community beyond allowing for eMARs. This is a critical omission. As observed by OIG, the provision of computers and other hardware does not give rise to an AKS violation where they "can only be used as part of a particular service that is being provided, for example, printing out the results of laboratory tests."[43] In this situation, "the computer has no independent value apart from the service that is being provided."[44] Likewise, for Guardian Atlanta to provide eMARs for its patients in the Community, there must be an eMAR system. The setup is an integral part of the service and does not constitute a kickback.[45] Relator does not allege any other independent value to the Community because he cannot, and "[i]t is not … proper to assume that the [plaintiff] can prove facts that it has not alleged…."[46]

---

[42] Am. Compl. ¶ 243.

[43] Doc. 32, Ex. F-, 56 Fed. Reg. 35,952, 35,978 (July 29, 1991).

[44] *Id.*

[45] *Suarez*, 2019 WL 4749967, at *7-9.

[46] *Assoc'd Gen. Contrs. v. Cal. State Council of Carpenters,* 459 U.S. 519, 526 (1983).

### 3. Medication management services are within the scope of, and integral to, Guardian Atlanta's services to its own patients

Relator's allegations also ignore that medication management, like eMAR services, is integral to LTCP services and would not constitute a kickback even if Guardian Atlanta did *not* happen to charge separately for the service through its monthly fees. Thus, even if Relator had adequately pled that such services were discounted (which he has not), he would not have stated an AKS violation.

Relator describes medication management services (sometimes also referred to by Relator as "consulting" or "audit" services) as follows:

> The pharmacy consulting services … take approximately 10 minutes onsite from start to finish, per resident per quarter. The pharmacist or nurse … disposes of expired or unnecessary medications, and prepares a detailed electronic report for the facility addressing each resident's medication history, findings, and recommendations.[47]

Recognizing that performing a service that one is obligated to provide cannot constitute illegal "remuneration," Relator alleges that these medication management services are "not necessary or integral to Guardian's services as a pharmacy dispensing prescription medications and supplies to [its patients]."[48] But Relator is wrong as a matter of law. In order to provide covered drugs to Medicare beneficiaries, LTCPs must enter into agreements with Medicare

---

[47] Am. Compl. ¶ 181.
[48] *Id.* at ¶ 299; *see id.* at ¶¶ 161, 235-36, 241.

contractors (Medicare "Part D sponsors").[49] The federal Centers for Medicare and Medicaid Services ("CMS") mandates that Part D sponsors include certain "minimum performance and service criteria" for LTCPs in these contracts.[50] Below is a side-by-side comparison of some of those requirements against the medication management services that Relator alleges to be kickbacks:

| Medication Management Services Alleged to be Kickbacks (Am. Compl. ¶¶160, 181) | Medicare LTCP Requirements (CMS *Prescription Drug Benefit Manual*, Chap. 5, § 50.5.2) |
|---|---|
| "disposes of expired or unnecessary medications" | "responsible for return for destruction and/or disposal of unused" drugs |
| "prepares a detailed electronic report for the facility addressing each resident's medication history, findings, and recommendations."<br><br>"visit each facility to consult with the operator or staff about drug management, record-keeping, storage, and disposal by the facility … [and] … inspect [MARs] to determine if the facility gave the correct drugs to residents at appropriate intervals, they review medication carts where drugs are centrally stored at the facility, and they look for expired drugs in stock at the facility." | "provide reports … necessary for the delivery of quality pharmacy care …. Such reports, forms and prescription ordering supplies may include, but will not necessarily be limited to … monthly management reports to assist the LTC facility in managing orders [and] [MARs] …"<br><br>"performance of drug utilization review … to routinely screen for allergies and drug interactions, identify potential adverse drug reactions, identify inappropriate drug usage in the LTC population, and to promote cost effective therapy …" |

[49] Am. Compl. ¶ 54.

[50] Doc. 32, Ex. B-, *CMS Prescription Drug Manual*, Chap. 5, § 50.5.2.

While the precise words used to describe the services may differ, their substance is the same. In performing the services that are alleged to constitute "kickbacks"—including disposal of unused medications, performing medication utilization reviews, and providing regular reports to promote proper and effective drug therapy—Guardian Atlanta is meeting the "minimum performance and service criteria for [LTCPs]."[51] The AKS does not punish a provider for providing integrally-related services that enhance the safety or efficacy of the service being purchased.[52]

Relator highlights that *ALCs* are obligated under state licensure law to ensure that the full gamut of these services are provided,[53] but *PCHs* are not

---

[51] *Id.*

[52] *Forney*, 2017 WL 2653568, at *4 ("Offering well-supported products might induce physicians to purchase Medtronic products, but only because they are better-supported products than competing products."). The *Suarez* court noted that similar concerns led the DOJ to seek dismissal of a *qui tam* complaint in another case. *Suarez*, 2019 WL 4749967, at *8 ("The United States has expressed concerns similar to this court's in a pending motion to dismiss a *qui tam* action concerning free nurse services and reimbursement support services.… Specifically, in its motion to dismiss, the government stated that 'federal healthcare programs have a strong interest in ensuring that … patients have access to basic product support relating to' appropriately prescribed medication, such as free 'instructions on how to properly inject or store their medication.'") (quoting United States' Mot. to Dismiss Relator's Second Am. Compl., *U.S. ex rel. Health Choice Grp., LLC v. Bayer Corp.*, No. 5:17-CV-126-RWS-CMC, Dkt. No. 116, at 14, 16 (E.D. Tex. Dec. 17, 2018)).
[53] Am. Compl. ¶¶ 109-13 (outlining the "Special Duties for Assisted Living Communities").

required to provide the same range of services. Aside from maintaining MARs, the only medication management licensure mandate for PCHs involving Guardian Atlanta's services at issue here is ensuring that '[u]nused or expired medications [are] properly disposed of."[54] Yet, by Relator's own account, Guardian Atlanta provides the same range of medication management services to its patients in PCHs as in ALCs.[55] It does so because they are integral LTCP services, regardless of whether Georgia's licensure standards for PCHs happen to require them.

Relator alleges that Guardian Atlanta entered into a contract with Magnolia Senior Living (a PCH) in which it agreed to provide "Pharmacy Consulting Services" "Quarterly at no charge."[56] But these are the previously discussed quarterly medication management services that Guardian Atlanta provides to its own patients. While there was "no charge" to *the Community*, Relator acknowledges that Guardian Atlanta was charging *its patients* at Magnolia Senior Living a $10 monthly fee.[57] The Magnolia Senior Living contract also makes clear

---

[54] *See* Doc. 32, Ex. C, Ga. Comp. R. & Regs. 111-8-62-.20(8)(e); *see also* Am. Compl. ¶ 213 (citing only to the MAR requirement in Ga Comp. R. & Regs. 111-8-62.20(5) to support Relator's allegation that a PCH is "required under Georgia law to provide medication management services for its residents").

[55] *See, e.g.*, Am. Compl. ¶¶ 208, 159.

[56] *Id.* at ¶ 205.

[57] *Id.* at ¶ 214.

that if Guardian Atlanta provided services beyond quarterly medication management to its own patients, it would charge the Community for them. Specifically, Relator acknowledges that the contract provides that "Additional Consulting" "would be billed at $65 an hour for a pharmacist and $55 an hour for a nurse."[58]

The AKS does not punish a provider for providing integrally-related services that enhance the safety or efficacy of the service being purchased, and Relator's claims regarding medication management services must fail.[59]

### 4. Relator has failed to plead illegal remuneration

Summarizing the foregoing, the monthly per patient fees charged by Guardian Atlanta exceed the combined cost of any medication management and

---

[58] *Id.* at ¶ 206.

[59] *Forney*, 2017 WL 2653568, at *4 ("Offering well-supported products might induce physicians to purchase Medtronic products, but only because they are better-supported products than competing products."). The *Suarez* court noted that similar concerns led the DOJ to seek dismissal of a *qui tam* complaint in another case. *Suarez*, 2019 WL 4749967, at *8 ("The United States has expressed concerns similar to this court's in a pending motion to dismiss a *qui tam* action concerning free nurse services and reimbursement support services…. Specifically, in its motion to dismiss, the government stated that 'federal healthcare programs have a strong interest in ensuring that ... patients have access to basic product support relating to' appropriately prescribed medication, such as free 'instructions on how to properly inject or store their medication.'") (quoting United States' Mot. to Dismiss Relator's Second Am. Compl., *U.S. ex rel. Health Choice Grp., LLC v. Bayer Corp.*, No. 5:17-CV-126-RWS-CMC, Dkt. No. 116, at 14, 16 (E.D. Tex. Dec. 17, 2018)).

eMAR services (including eMAR setup), and Relator has not satisfied the Rule 9(b) thresholds for pleading the contrary.[60] Further, the medication management and eMAR services alleged by Relator to be kickbacks are an integral component of Guardian Atlanta's services to its own patients that could have been offered at no charge. Even if Relator had demonstrated a discount for services that could have been given away for free (which he did not), that would not give rise to an AKS violation, particularly where Relater does not even suggest (because he could not) that any alleged discounts varied based on volume or value of referrals.

### B.    Relator fails to state a claim as to Community staff training and skills checks allegedly provided for free or below FMV or cost

Relator alleges that Community staff who assist residents with the administration of medications must receive training, certification and periodic skills checks as a condition of ALC or PCH licensure[61] and that Guardian Atlanta provides such training and skill checks "for free or below-cost."[62]

Relator's allegations on this issue are facially inconsistent and sometimes contradictory. Starting with the Relator's disjunctive allegation that training and skill checks are provided "for free *or* below-cost," there is a substantial difference

---

[60] *Hunter Labs., LLC*, 2014 WL 12543888, at *1-*5.

[61] Am. Compl. ¶¶ 114-20.

[62] *Id*. at ¶ 8.

between alleging that something was given away for free and alleging that the price was too low. Relator tries to hedge his bets and have it both ways, using this "free or below" mantra over 30 times in his Complaint. "Such vague, either/or allegations are insufficient under Rule 9(b)'s heightened pleading standard."[63] Even when Relator's "complaint mentions details, there is enough hedging that they cannot be said to have been identified with particularity."[64]

Relator makes other facially inconsistent allegations regarding Guardian Atlanta's charges for training. On the one hand, Relator acknowledges that as of March 2017, Guardian Atlanta was already charging for two-day training sessions in the amount of "$50/day, or $100 total per person."[65] But on the other hand, Relator alleges, based on a January 12, 2018 email, that Guardian Atlanta only *began* charging for such training in 2018.[66] However, Relator misstates the plain language of the January 12, 2018 email. That email indicates that Guardian Atlanta would be "charging for ALL education and ALL skills checks"; "we are only charging [ALCs] for class room training and skills checks, which take so much of

---

[63] *Lincoln Benefit Life Co. v. Grenfell*, No. 16-CV-911-PP, 2019 WL 3308222, at *6 (E.D. Wis. July 23, 2019).

[64] *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 949 (7th Cir. 2013).

[65] Am. Compl. ¶¶ 224-25; Ex. A.

[66] *Id*. at ¶¶ 168, 170, 228, 229, 231. A copy of the January 12, 2018 email is attached as Exhibit B.

the consultants' time"; and "we are charging for classroom training and skills checks for [PCHs] only."[67] None of this, nor any other part of the January 12, 2018 email, indicates that Guardian Atlanta only began charging for training and skills checks in 2018.

Relator does not allege that Guardian Atlanta's charge of $50 per attendee per day for these classes was too low. Relator does not identify the number of paying attendees per class or the cost to Guardian Atlanta of putting on a class. As best can be gleaned from Relator's confusing allegations, it appears that he solely takes issue with Guardian Atlanta's alleged offer of "free" classes to the "Host community, new communities to Guardian AND newly licensed assisted living communities."[68] As to the "host community," Relator does not indicate the reciprocal value to Guardian Atlanta from the host community providing a venue and refreshments for all trainees, including non-host community staff.[69] Further, Relator does not identify the marginal cost to Guardian Atlanta of allowing host community and first-time-free trainees to attend the class. This is no minor omission, given that the primary expense to Guardian Atlanta—the time of the

---

[67] Ex. B.

[68] Am. Compl. ¶ 225.

[69] Ex. A ("Host community" agreed to "provide a continental breakfast and coffee, juice and water each day for the attendees").

instructor—would be substantially the same whether there were empty chairs or the class size was topped off with first-timers whose Communities could be expected to send paying attendees in the future. Relator also does not allege that the free classes were advertised to Communities before they selected Guardian Atlanta as a "preferred" pharmacy or that the offer varied based on the volume or value of referrals. Simply put, Relator does not offer any basis—even at the pleading stage—to infer beyond speculation that the purpose of the alleged free trial classes was to induce referrals as opposed to generating future training revenues.

### C. The Complaint fails to identify any false claims for items or services "resulting from" any AKS violation

Even if Relator were to sufficiently allege an AKS violation, he could only convert that violation into FCA liability by also identifying "a claim that includes items or services *resulting from* a violation of [the AKS]."[70] Relator "must point to at least one claim that covered a patient who was recommended or referred to [the Defendant] by [the entity receiving the alleged kickback]."[71] Relator has failed to

---

[70] 42 U.S.C. § 1320a-7b(g) (emphasis added).

[71] *Greenfield*, 880 F.3d at 99; *Suarez*, 2019 WL 4749967, at *10 ("Where a relator's FCA claim depends on violations of the Anti-Kickback statute, the relator must identify a link between the alleged kickback and a claim for government payment.").

do that here. Relator repeatedly asserts—27 times—in general terms that Guardian Atlanta's claims were "tainted by" the alleged kickback scheme.[72] But Relator fails to adequately plead any particular claim, period, much less plead facts linking any such particular claim to any particular kickback.

### 1.  Relator has failed to allege any specific claims

While Relator attaches an "Exhibit A" to give the veneer of identifying actual false claims, a closer inspection reveals that this Exhibit is no more than a back-of-the-envelope estimation based on averages that are not even Guardian-specific.[73] Rather than provide detailed factual allegations of alleged false claims based on personal knowledge, Relator simply guessed as to the number of Guardian Atlanta patients at each Community and then applied rote math and averages under the apparent assumption that: 1) the daily census (or number of patients selecting Guardian Atlanta) at each Community never changed; 2) at each and every Community, the Annual Number of Scripts was always  7 Scripts per patient * 12 Months, and Annual Revenues were always $390 per patient * 12 Months; and 3) the Communities' census (or number of patients selecting

---

[72] Am. Compl. ¶¶ 217-18, 222, 232, 247, 260, 267-69, 276-78, 282-86, 291-92, 294-96, 327, 332, 336.
[73] *Id*. at ¶ 259.

Guardian Atlanta), number of scripts per patient, and revenues per patient did not change year to year.

Relator purports to have "first-hand knowledge that specific claims submitted by Guardian Atlanta for residents of Eagles Landing Senior Living were 'tainted' by its kickback scheme."[74] But Relator's purported first-hand knowledge is based on the fact that Eagles Landing was "previously a customer of *Collier's*," where Relator formerly worked.[75] And when it comes to identifying actual claims submitted *by Guardian Atlanta*, Relator can only make guesses "*upon information and belief, based on the drug treatment regimen the patient was following while serviced by Collier's.*"[76] Relator assumes that these patients selected Guardian Atlanta following the transition from Collier's, but he does not allege knowledge of that fact. Instead, he simply asserts that each of these patients "became a patient of Guardian's after [their Communities] decided to retain [Guardian Atlanta] as the facility's preferred pharmacy."[77] This assumption is particularly unwarranted because Community residents do not simply "become" patients of an LTCP based

---

[74] *Id*. at ¶ 278; *see id.* at ¶ 286 (containing identical allegation with respect to the Oaks).

[75] *Id*. at ¶ 279; *id.* at ¶ 287 (Oaks).

[76] *Id*. at ¶ 283; *id.* at ¶ 284 (similar allegation for Eagles Landing); ¶292 (same at Oaks Post Road); ¶295 (same at Oaks at Braselton).

[77] *Id*. at ¶¶ 283, 284, 292, 295.

on a decision of the Community; rather, as Relator acknowledges, the patient must affirmatively agree to use the LTCP.[78] Relator further assumes that, if these individuals became patients of Guardian Atlanta, their treatment regimens remained the same following the transition. But he does not allege knowledge of that fact either. And, if there were any doubt that Relator is simply guessing, three of the claims that he purports to allege "upon information and belief" are dated November 5, 2018, December 4, 2018, and January 4, 2019, well after he left Guardian Atlanta on October 30, 2018.[79] Such "information and belief" allegations are insufficient under Rule 9(b).[80]

> **2. Even if Relator were deemed to have alleged claims with particularity, he fails to adequately plead that these claims resulted from any alleged kickback**

"A kickback does not morph into a false claim unless a particular patient is exposed to an illegal recommendation or referral and a provider submits a claim for reimbursement pertaining to that patient."[81] Thus, Relator must plead facts

---

[78] *Id*. at ¶¶ 133 ("residents have the freedom to choose any pharmacy"), 137.

[79] *Id*. at ¶¶ 284, 15.

[80] *Corsello*, 428 F.3d at 1013–14; *see Britton v. Lincare, Inc.*, 634 Fed. App'x. 238, 241 (11th Cir. Dec. 10, 2015) ("Britton claims '[u]pon information and belief' that Lincare wrongly billed Medicare for his services …. [T]his kind of speculation is insufficient to satisfy the pleading standard set by Rule 9(b)."); *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 558 (8th Cir. 2006).

[81] *Greenfield*, 880 F.3d at 100.

"show[ing] a link between the alleged kickbacks and the medical care received by at least one of [Guardian Atlanta's] federally insured patients."[82] "It is not enough … to show temporal proximity between [an] alleged kickback plot and the submission of claims for reimbursement."[83] Nor can a relator rely on a theory that a kickback scheme "taints" every claim during the scheme.[84]

As Relator acknowledges, "residents have the *freedom to choose any pharmacy* to fill their prescriptions," including "other institutional [LTCP] pharmacies and retail pharmacy chains such as CVS and Walgreens." By law, Communities cannot force residents to contract with Guardian Atlanta; and Guardian Atlanta must, therefore, convince each resident of the benefits of using Guardian Atlanta and secure "agreements with individual residents."[85] Nevertheless, Relator alleges generally that Communities designate Guardian Atlanta a "preferred provider" and then "steer" their residents to Guardian Atlanta.[86] But Relator does not allege

---

[82] *Id.*

[83] *Id.*

[84] *Id.* at 99; *see United States ex rel. Fla. Sec'y of Anesthesiologists v. Choudry*, 2017 WL 2604930, *7 (M.D. Fla. June 14, 2017) (dismissing complaint on the basis that "[w]hile the defendants may have presented claims to Medicare, absent allegations that a claim is tied to a kickback, Relator fails to allege a plausible cause of action under [the FCA]"); *United States ex rel. King v. Solvay Pharms., Inc.,* 871 F.3d 318 (5th Cir. 2017).

[85] Am. Compl. ¶¶ 128, 130, 133, 137 (emphasis added).

[86] *Id.* at ¶¶ 5, 6, 132, 133, 215.

how the Communities "steer" residents to Guardian Atlanta. With respect to the only four individual patients specifically identified by Relator, he simply asserts—baldly and without explanation—that each of them "*became* a patient of Guardian's after [the Community] decided to retain them as the facility's preferred pharmacy."[87]

Relator identifies by name only a single Community that allegedly "steered" its residents to use Guardian Atlanta, the previously-mentioned Magnolia Senior Living, a PCH described by Relator as a former "client" of Collier's. But Relator does not indicate how, if at all, any Community (including Magnolia Senior Living) communicated Guardian Atlanta's "preferred" designation (or its purported meaning) to any resident or otherwise took any action to influence its residents' decisions.

Relator alleges that "Guardian was in the process of retaining numerous Collier's facilities as customers, which would have meant they all would have qualified for these free education classes,"[88] but even if first-time-free waivers for these Communities constituted illegal remuneration (and, as previously discussed, they do not), Relator fails to plead the requisite causation. He does not

---

[87] *Id*. at ¶¶ 283, 284, 292, 295 (emphasis added).
[88] *Id*. at ¶ 227.

allege that the "free" training offer was communicated to any particular Community (*i.e.*, that the education classes were, in fact, used as an inducement). Nor does he allege that any particular Community formerly served by Collier's would have encouraged its residents to switch had Guardian Atlanta charged differently for training. To the contrary, Relator alleges that Collier's *did* charge Communities prior being acquired by Guardian Atlanta.[89] This would indicate that such charges were *not* material to whether those Communities would recommend a particular pharmacy to its residents and that to the extent their residents continued with Guardian Atlanta  the successor to Collier's, this was largely a function of continuity of care and simple inertia. Relator does not adequately plead any alternative causation.

In short, Relator's allegation that individuals "became patients of Guardian" fail to plead, even generally (let alone with the requisite particularity), that Guardian Atlanta's alleged kickbacks *caused* any particular Community to refer particular patients to Guardian Atlanta.

### D. The Complaint fails to adequately plead that Guardian Atlanta acted "knowingly and willfully"

To violate the AKS, a Defendant must act "knowingly and willfully."[90]

---

[89] *Id.* at ¶ 272.
[90] 42 U.S.C. § 1320a-7b(b).

"Willfully" has been interpreted to mean that "the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law."[91]

To allege that Guardian Atlanta acted "knowingly and willfully," Relator relies on "enforcement actions and guidance published by the federal government to assist people seeking to comply with the Anti-Kickback Statute."[92] Relator alleges that these "foregoing guidance documents published by the OIG, together with many other similar guidance documents, put Guardian on notice that its conduct was unlawful and that violations of the [AKS] are material to Medicare's payment decisions."[93]

But *none* of the materials cited by Relator address relationships between LTCPs and ALCs or PCHs. Rather, they are focused on relationships with *skilled nursing facilities* (SNFs).[94] However, as Relator acknowledges, ALCs and PCHs differ from SNFs in important ways, including that: "nursing facilities employ physicians or other clinicians who furnish healthcare services to residents," whereas ALCs and PCHs "are not engaged in the delivery of health care services"

---

[91] *United States v. Starks*, 157 F.3d 833 (11th Cir. 1998).
[92] Am. Compl. ¶ 306.
[93] *Id*. at ¶ 315.
[94] *Id*. at ¶¶ 307, 310-15.

and employ "staff [who] are not licensed to practice medicine [and] may not write orders for prescription drugs or provide medical treatment to residents."[95] Moreover, because SNFs provide healthcare services, whereas ALCs and PCHs are prohibited from providing skilled nursing care, the medication management services required of SNFs are far more burdensome and costly than anything required of ALCs and PCHs.[96]

Notably, Relator ignores the OIG guidance most on point—the previously discussed OIG advisory opinion (AO 12-19) regarding eMAR services provided by pharmacies to community homes. That omission was not inadvertent, given that Relator cited AO 12-19 in his original Complaint and noted that the community homes are "analogous" to ALCs and PCHs.[97] In AO 12-19, the OIG considered the "extent to which" proposed arrangements between pharmacies and community homes "present[ed] a risk of any of the harms typically associated with kickbacks—namely, distorted medical decision making, overutilization, increased Federal health care program costs, and unfair competition"—and concluded that these typical AKS risks were reduced, in part because community homes, unlike SNFs, are not healthcare providers:

---

[95]  *Id.* at ¶ 92-93.

[96] *See* 42 C.F.R. § 483.45.

[97] Doc. 1, ¶ 189.

> Community Homes can neither prescribe, nor influence or control the prescription of, any medication. They do not control or influence the decisions of prescribing physicians, and do not set formularies or otherwise limit or influence prescribing physicians' selection of prescription medications. This means that, under these particular facts, the Community Homes are unlikely to be able to increase the number or type of their residents' prescriptions. Accordingly, the risk of distorted medical decision making, overutilization, and increased Federal health care program costs is reduced under Proposed Arrangement A and, in fact, under all the Proposed Arrangements.[98]

These observations with respect to community homes are equally applicable to Georgia ALCs and PCHs, but not SNFs.

In short, the Government agency responsible for enforcing the AKS views pharmacy-community home arrangements differently than pharmacy-SNF arrangements, and Relator's repeated citation to SNF-related guidance is unavailing.

The OIG did observe that community homes may influence the selection of the pharmacy serving their residents and that this may present "a risk of unfair competition" between pharmacies.[99] But OIG concluded that this risk was "mitigated" in all but one of the arrangements under consideration because competitors could offer similar benefits at nominal cost.[100] The OIG also

---

[98] Doc. 32, Ex. A\ at 9.

[99] *Id.*

[100] *Id.*

34

emphasized that the fact that the eMAR services provided by the pharmacy "would likely enhance patient safety and quality of care" must be weighed against the traditional AKS risks.[101]

In pleading that "Guardian knew its kickback scheme was unlawful,"[102] Relator also alleges that:

> [I]n a PowerPoint slide presentation given at the President/Sales/Account Manager Meeting in 2018, Guardian criticized retail pharmacies for "lacking in nursing, consulting, eMAR support, technology and education services," thereby promoting the value of these services to the assisted living communities. At the same time, Guardian complained that retail pharmacies "[s]ometimes will provide services at no cost and/or fly under the regulation 'radar screen,'" indicating their awareness that the provision of free services was strictly prohibited.[103]

This allegation reveals Relator's failure to understand (or, if he does understand, to acknowledge) the obligations of LTCPs under the Medicare program, and how these differ from those of retail pharmacies (such CVS, Walgreens, etc.). As previously noted, Community residents may choose either a retail pharmacy or an LTCP to meet their pharmacy needs,[104] but whereas the role of a retail pharmacy ends once the drug crosses the store counter, LTCPs must also meet certain

---

[101] *Id.* at 10.

[102] Am. Compl., Section XI (¶¶ 300-327).

[103] *Id.* at ¶ 304.

[104] *Id.* at ¶ 130.

"minimum performance and service criteria for pharmacies providing LTC services" outlined in the CMS *Prescription Drug Benefit Manual*, including medication management (sometimes called "consulting") and providing MARs.[105] In addition, Medicare reimbursement—and the resident's corresponding personal coinsurance obligations—are higher for LTCPs than retail pharmacies, meaning that LTCPs must compete for the business of Community residents based on service, rather than price.[106] The PowerPoint cited by Relator says nothing more, and it further supports that the services that Relator alleges to be "kickbacks" are integral to Guardian Atlanta's pharmacy services to its patients and thus do not constitute illegal "remuneration."

---

[105] *Compare* Doc. 32, Ex. E, Georgia Pharmacy Board Rule 480-31-.01(b), (c) (outlining the basic responsibility of all pharmacies, including both retail pharmacies and LTCPs, to perform *prospective* drug review and counseling) *with* Doc. 32, Ex. B, CMS's *Prescription Drug Benefit Manual*, Chap. 5, § 50.5.2 (outlining additional "minimum performance and service criteria" for LTCPs); *see* Avalere Health, *Long-Term Care Pharmacy: the Evolving Marketplace and Emerging Policy Issues,* at 3 (Oct. 2015), *available at* https://seniorcarepharmacies.org/avalere-report/ ("LTC pharmacies also have higher operating costs [than retail pharmacies] due to a myriad of legal and regulatory mandates. In particular, the National Community Pharmacists Association estimates that the cost to dispense for LTC pharmacies is 25 percent more than retail pharmacies.").

[106] The 2018 PowerPoint is incorporated by reference into Relator's Complaint and attached here as Exhibit C. In outlining some of the differences between LTCPs and retail pharmacies, the PowerPoint notes that "Retail co-pays have the appearance of overall lower cost to the resident." (Ex. C, at 4); *see* Am. Compl. ¶ 57.

36

### E.      Relator fails to allege facts demonstrating materiality.

Even if Relator had sufficiently pled noncompliance with the AKS, he failed to plead facts to establish that the alleged violations were material.[107] "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable."[108] The fact that "the Government would have the option to decline to pay if it knew of the defendant's noncompliance," is itself insufficient.[109] Instead, the relator must show through pleaded facts that "the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with" such requirements.[110]

The OIG has indicated that LTCP services to "community homes" do not implicate traditional AKS risks, so long as they do not give rise to unfair competition.[111] Against this, Relator offers no factual allegation that the

---

[107] *Greenfield*, 880 F.3d at 98, n.8 ("Even if Greenfield proves that one of [Defendant's] claims sought reimbursement for medical care that was provided in breach of the [AKS], he must also satisfy the [FCA's] materiality requirement, as falsity and materiality are distinct requirements in this context."); *but see Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019) ("We further read the AKS amendment as obviating the need for a plaintiff to plead materiality.").

[108] *Escobar*, 136 S. Ct. at 2002.

[109] *Id*. at 2003.

[110] *Id*. at 2002-2004.

[111] AO 12-19.

Government views the conduct alleged by Relator as material—*i.e.*, disqualifying Guardian Atlanta's entitlement to payment. Relator has not alleged that the Government has refused to pay claims of Guardian Atlanta or any other LTCP for identical, or similar, conduct involving ALCs or PCHs. Instead, his materiality allegations focus *exclusively* on SNFs.[112]

The Government thoroughly investigated Relator's alleged kickback scheme. Not only did it not intervene in this case, but it has also continued to pay Guardian Atlanta claims; and it has not demanded or even suggested that Guardian Atlanta change any of its practices, despite being aware of Relator's allegations. The Complaint does not—and cannot—allege otherwise. The alleged fraud identified by Relator does not meet the demanding materiality standard.

## V.    CONCLUSION

For the foregoing reasons, Guardian Atlanta requests that its Motion to Dismiss Relator's Complaint be granted.

**[Signature on following page.]**

---

[112] Am. Compl. ¶¶306-15.

Respectfully submitted this 5th day of May, 2020.

ARNALL GOLDEN GREGORY LLP


*/s/ W. Jerad Rissler*
W. Jerad Rissler, Esq.
Georgia Bar No. 142024
jerad.rissler@agg.com
Glenn P. Hendrix, Esq.
Georgia Bar No. 346590
glenn.hendrix@agg.com

Arnall Golden Gregory LLP
171 17th Street, Suite 2100
Atlanta, Georgia 30363-1031
404.873.8500 (Telephone)
404.873.8501 (Facsimile)

*Attorneys for Defendant*
*Guardian Pharmacy of Atlanta, LLC*

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies that this pleading was prepared using Book Antiqua 13-point font in accordance with Local Rule 5.1(C).

This 5th day of May, 2020.

*/s/ W. Jerad Rissler*
W. Jerad Rissler, Esq.
Georgia Bar No. 142024

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2020, I electronically filed the foregoing

**DEFENDANT GUARDIAN PHARMACY OF ATLANTA, LLC'S BRIEF IN**

**SUPPORT OF MOTION TO DISMISS** with the Clerk of Court using the

CM/ECF system which will automatically send email notification of such filing

to all Counsel of Record.

_/s/ W. Jerad Rissler_
W. Jerad Rissler
Georgia Bar No. 142024

ARNALL GOLDEN GREGORY LLP
171 17th Street NW
Suite 2100
Atlanta, Georgia 30363-1031
Telephone: 404.873.8500
Facsimile: 404.873.8501