# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* HENRY B. HELLER, <br><br> *Plaintiffs,* <br><br> v. <br> GUARDIAN PHARMACY, LLC and GUARDIAN PHARMACY OF ATLANTA, LLC, <br><br> *Defendants.* | Civil Action File No.: <br><br> 1:18-cv-03728-SDG <br><br><br> **JURY TRIAL DEMANDED** |

## PLAINTIFF-RELATOR'S RESPONSE IN OPPOSITION TO DEFENDANT GUARDIAN PHARMACY OF ATLANTA, LLC'S MOTION TO DISMISS

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................... 1

II.  SUMMARY OF AMENDED COMPLAINT ........................................ 7

    A.  Consulting / Medication Management Services ........................... 8

    B.  Staff Education Classes and Skills Checks ................................. 11

    C.  eMAR Setup ..................................................................... 12

III.  LEGAL STANDARD .......................................................... 13

IV.  ARGUMENT ................................................................... 15

    A.  False Claims Act and Anti-Kickback Statute .............................. 15

    B. Unlawful Remuneration ..................................................... 18

        1.  Remuneration is "anything of value" ................................ 18

        2.  Guardian's cases are inapplicable. .................................. 22

        3.  Free consulting and eMAR installation are not integral

        services ................................................................... 24

    C.  False Claims resulted from Defendants' kickback scheme ........ 30

    D.  Defendants' knowledge of illegality ................................. 36

V.  CONCLUSION .................................................................. 40

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                          **Page(s)**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................................. 14

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................................. 14

*Cook Cnty., Illinois v. United States ex rel. Chandler,*
    538 U.S. 119 (2003) .................................................................................. 15

*Guilfoile v. Shields,*
    913 F.3d 178 (1st Cir. 2019) ........................................................... 16, fn. 3

*Hanlester Network v. Shalala,*
    51 F.3d 1390 (9th Cir. 1995) .................................................................... 37

*Hopper v. Solvay Pharm., Inc.,*
    588 F.3d 1318 (11th Cir. 2009) ............................................................... 30

*Magluta v. Samples,*
    375 F.3d 1269 (11th Cir. 2004) ............................................................... 14

*Page v. Postmaster Gen. and Chief Exec. Officer of the U.S. Postal Serv.,*
    493 F. App'x 994 (11th Cir. 2012) .......................................................... 14

*State of Georgia ex rel. Hunter Labs. v. Quest Diagnostics, Inc.,*
    2014 WL 12543888 (N.D. Ga. Mar. 14, 2014) .............................. 22, fn. 7

*United States v. Charles C. Adams, M.D.,*
    Case No. 4:18-cv-00191-ELR (N.D. Ga. Mar. 8, 2019) ..........Pg. 15, fn. 2

*United States v. Holland,*
    396 F. Supp. 3d 1210 (N.D. Ga. 2019) .................................................... 37

*United States v. HPC Healthcare, Inc.,*
    723 F. App'x 783 (11th Cir. 2018) ..................................................... 30-31

*United States v. McClatchey,*
    217 F.3d 823 (10th Cir. 2000) ............................................................... 37

*United States v. Niefert-White Co.,*
    390 U.S. 228 (1968) ............................................................................ 15-16

*United States v. Starks,*
    157 F.3d 833 (11th Cir. 1998) ............................................................... 36

*United States v. Vernon,*
    723 F.3d 1234 (11th Cir. 2013) ........................................................ 37-38

*United States ex rel. Atkins v. McInteer,*
    470 F.3d 1350 (11th Cir. 2006) ................................................ 14, fn. 1; 30

*United States ex rel. Bawduniak v. Biogen Idec, Inc.,*
    2018 WL 1996829 (D. Mass. Apr. 27, 2018) ......................................... 35

*United States ex rel. Bingham v. HCA, Inc.,*
    783 F. App'x 868 (11th Cir. 2019) ......................................................... 22

*United States ex rel. Clausen v. Lab. Corp. of Am. Inc.,*
    290 F.3d 1301 (11th Cir. 2002) ....................................................... 30, 40

*United States ex rel. Dildine v. Aarti D. Pandya, M.D.,*
    Case No. 1:13-cv-03336-LMM (N.D. Ga. July 9, 2019) .............. 15, fn. 2

*United States ex rel. Escobar v. Universal Health Svcs., Inc.,*
    Case No. 14-1423, Brief of the United States as Amicus Curiae
    (1st Cir. Aug. 22, 2016) ............................................................... 16, fn. 3

*United States ex rel. Fla. Sec'y of Anesthesiologists v. Choudhry,*
    2017 WL 2604930 (M.D. Fla. June 14, 2017) .................................... 35-36

*United States ex rel. Forney v. Medtronic, Inc.,*
2017 WL 2653568 (E.D. Pa. June 19, 2017).......................................28-29

*United States ex rel. Fry v. The Health Alliance of Greater Cincinnati,*
2008 U.S. Dist. LEXIS 102411 (S.D. Ohio Dec. 18, 2008)...........18, fn. 5

*United States ex rel. Galuten v. Emory Healthcare, Inc.,*
Case No. 1:14-cv-02408-LMM (N.D. Ga. May 15, 2018).......15, fn. 2; 31

*United States ex rel. Greenfield v. Medco Health Sol'ns, Inc.,*
880 F.3d 89 (3rd Cir. 2018) ...................................................................... 35

*United States ex rel. Harrison v. Westinghouse Savannah River Co.,*
352 F.3d 908 (4th Cir. 2003) .........................................................16, fn. 3

*United States ex rel. Jamison v. McKesson Corp.,*
2009 WL 3176168 (N.D. Miss. Sept. 29, 2009)...................................... 24

*United States ex rel. Jamison v. McKesson Corp.,*
900 F. Supp. 2d 683 (N.D. Miss. 2012)................................................... 23

*United States ex rel. Litwiller v. Omnicare, Inc.,*
Case No. 1:11-cv-8980, 2014 WL 1458443 (N.D. Ill. Apr. 14, 2014) ... 19

*United States ex rel. Matheny v. Medco Health Sols., Inc.,*
671 F.3d 1217 (11th Cir. 2012) ............................................................... 15

*United States ex rel. McDonough v. Symphony Diagnostics Svcs., Inc.,*
2012 WL 628515 (S.D. Ohio Feb. 27, 2012) .......................................... 24

*United States ex rel. McDonough v. Symphony Diagnostics Svcs., Inc.,*
36 F. Supp. 3d 773 (S.D. Ohio 2014) .................................................23-24

*United States ex rel. McNutt v. Haleyville Med. Supplies,*
423 F.3d 1256 (11th Cir. 2005) ...............................................17-18, 34-36

*United States ex rel. Osheroff v. Tenet Healthcare Corp.,*
2012 WL 2871264 (S.D. Fla. July 12, 2012)...................22; 37; 40, fn. 13

*United States ex rel. Raven and Curtis v. Georgia Cancer Specialists I, P.C.,*
  Case No. 1:11-cv-00994-CAP (N.D. Ga. Apr. 1, 2016)...........15, fn. 2; 38

*United States ex rel. Suarez v. AbbVie, Inc.,*
  2019 WL 4749967 (N.D. Ill. Sept. 30, 2019) ......................................... 29

*United States ex rel. Walker v. R&F Props. of Lake Cty., Inc.,*
  433 F.3d 1349 (11th Cir. 2005) .............................................................. 30

*Ziemba v. Cascade Int'l, Inc.,*
  256 F.3d 1194 (11th Cir. 2001) .............................................................. 15

**Statutes, Rules, Regulations, and Guidance**       **Page(s)**

42 C.F.R. § 423.153(c)(2) ...................................................................26, fn. 10

42 C.F.R. § 483.45(b) ..........................................................................25, fn. 9

CMS Prescription Drug Benefit Manual,
    Chapter 5, § 10.2 ........................................................................... 25

CMS Prescription Drug Benefit Manual,
    Chapter 5, § 50.5.2 ....................................................................24-25

Fed. R. Civ. P. 8(a)(2) ........................................................................ 14

Ga. Comp. R. & Regs. 111-8-62-.20(3)-(4) ................................................ 11

Ga. Comp. R. & Regs. 111-8-62-.20(5) ..................................................... 13

Ga. Comp. R. & Regs. 111-8-62-.20(7)-(8) ................................................. 9

Ga. Comp. R. & Regs. 111-8-63-.20(4) ..................................................... 11

Ga. Comp. R. & Regs. 111-8-63-.20(5)(b), (f) ............................................ 11

Ga. Comp. R. & Regs. 111-8-63-.20(6)-(8) ................................................ 11

Ga. Comp. R. & Regs. 111-8-63-.20(9) ..................................................... 13

Ga. Comp. R. & Regs. 111-8-63-.20(11)-(12) .............................................. 8

Ga. Comp. R. & Regs. 480-24-.02 ......................................................26, fn. 11

HHS-OIG, Anti-Kickback Provisions,
    56 Fed. Reg. 35952 (1991) .........................................................18, fn. 5

HHS-OIG, Medicare and State Healthcare Programs: Fraud and Abuse,
    Proposed Rule, 84 Fed. Reg. 55694 (Oct. 17, 2019) ......................17, fn. 4

HHS, OIG Advisory Opinion,
   Provisions of Free Goods and Services (July 10, 1997)..............26, fn. 12

HHS, OIG Supplemental Compliance Program Guidance for Nursing Facilities,
   73 Fed. Reg. 56832 (Sept. 30, 2008) ...........................................26, fn. 12

O.C.G.A. § 31-7-12.2(b)..................................................................8-9

O.C.G.A. § 31-7-12.2(g)(8) ........................................................... 13

31 U.S.C. § 3729...................................................................13-14

31 U.S.C. § 3729(b)(1)(A) ............................................................. 37

31 U.S.C. § 3729(b)(1)(B) ............................................................. 37

42 U.S.C. § 1320a-7a(i)(6) ................................................... 18, fn. 5

42 U.S.C. § 1320a-7b(b)(2) .........................................17; 18, fn. 5

42 U.S.C. § 1320a-7b(g) .............................................16; 16, fn. 3

42 U.S.C. § 1320a-7d(a)(2)...............................................17, fn. 4

## I.  INTRODUCTION

Relator Henry B. Heller submits this Response in Opposition to Defendant Guardian Healthcare of Atlanta, LLC's Motion to Dismiss.  Mr. Heller's Amended Complaint plainly sets forth a plausible claim for relief under the False Claims Act based on a kickback scheme engineered and executed by Defendants Guardian Pharmacy, LLC ("Guardian Pharmacy") and Guardian Pharmacy of Atlanta, LLC ("Guardian Atlanta") (collectively, "Guardian" or "Defendants"), and identifies resultant false claims submitted to federal health care programs.

Assisted living communities and personal care homes ("senior living facilities") are obligated to perform services to protect their elderly residents' safety; they must properly manage residents' medications, document when they give medications to residents, and ensure staff compliance with initial and continuing education and skills checks mandates.  *See* Am. Compl., ECF 24 ¶¶ 4, 100-20.  These services are mandatory to maintain licensing.  *Id.* ¶¶ 103, 113.

The federal government imposes medication management and other duties on nursing homes, making them similarly vulnerable to bribes in the form of free services in exchange for referrals.  *Id.* ¶¶ 310-14.  In nursing homes, the government was so troubled by the possibility of a pharmacy furnishing free medication management consulting services in exchange for resident referrals for

1

prescription drug purchases that it publicly warned the industry that such arrangements "warrant careful scrutiny" under the Anti-Kickback Statute.  *See id.* ¶¶ 312-15.  The government has red-flagged similar schemes, and the Department of Justice has settled kickback claims against Guardian rival Omnicare for alleged unlawful inducements, such as free pharmacist consulting services, for nursing homes.  *See id.* ¶¶ 306-14.

Here, Guardian engaged in a nearly identical scheme at senior living facilities.  Guardian must comply with the AKS because it derives virtually all of its revenues from prescription drug claims submitted to Medicare and TRICARE. ECF 24 ¶¶ 141, 257.  To induce senior living facilities to select Guardian as the "preferred provider" of prescription medications for their residents, Defendants provided the following services for free or below-fair market value to the owners and operators of those facilities:  (1) medication management, *i.e.*, consulting services; (2) education classes and skills checks for staff members of "new" Guardian facilities; and (3) installation of electronic medication administration records ("eMAR") systems at some facilities.  *See id.* ¶¶ 157-247.

Guardian knew this scheme was unlawful.  Boilerplate language in Guardian's "preferred pharmacy" facility contracts recites the AKS and states, "Pharmacy will provide or arrange for, ***and Operator will pay for,*** consulting

pharmacist services only on terms that account for Pharmacy's costs to do so, and never below those costs." *Id.* ¶ 210 (emphasis added).  But Guardian used a form face sheet with "Confidential Pricing Terms" promising the opposite:  Guardian furnishes "Pharmacy Consulting Services" "***Quarterly at no charge***." *Id.* ¶ 205 (emphasis added).

Despite Defendants' obfuscation attempts, Relator plausibly alleges that free services were furnished to facility owners and operators who otherwise would have had to pay for them.  Guardian Atlanta Consulting Department Manager Lori Newcomb rang the alarm bell that it was time to stop "GIVING ALL OF OUR SERVICE AWAY FOR FREE!" *Id.* ¶ 174.  Guardian's Exhibits to their Motion to Dismiss further illustrate their scheme:

- Exhibit A, Ms. Newcomb's March 2, 2017 email, explains charges for education classes, but "new communities to Guardian AND newly licensed AL communities are ***exempt from these charges***."  [Emphasis added].  Guardian had just acquired Collier's Pharmacy and was courting numerous senior living facilities where 1,700 residents and their prescriptions were in play; those facilities were "new" to Guardian and "exempt" from charges for education and skills checks.  ECF 32-2, Exh. A; *see also* ECF 24 ¶¶ 142, 227.

3

- Exhibit B, Ms. Newcomb's Jan. 12, 2018 email announced, nearly a year later, that "ALL" education classes will now be billed but reminded the leadership team, as a "Marketing point[] to remember," that assisted living and personal care homes still "***get high quality consulting for free every quarter***." [Emphasis added].  ECF 32-3, Exh. B.

- Exhibit B further cautioned that the new charges for classes may generate "negative feedback from ***our clients***," referring to facility owners. "However, with the rules as they are in GA for [assisted living and personal care homes], ***we can no longer afford to give everything away for free***.  The old adage that 'you get what you pay for' is true." [Emphasis added].  *Id.*

Guardian got what it paid for.  The scheme worked – free consulting, training, skills checks, and eMAR installation services flowed to assisted living and personal care homes, and "preferred provider status" and residents' purchases of prescription medication from Guardian followed.  In return for free services, Guardian secured referrals for thousands of monthly prescriptions and submitted virtually all of the claims for payment for those prescriptions to Medicare or TRICARE.  ECF 24 ¶¶ 141, 257.

Defendants attempt to defend their scheme with nothing more than post hoc

rationalizations.  Guardian's first theory is that monthly fees *paid by residents* to Guardian allegedly "cover the cost of the services" that Guardian furnished to the senior living facilities.  ECF 32-1 at 11.  In other words, Guardian argues that it charges residents for the consulting services that it "give[s] . . . away for free" to assisted living and personal care homes to induce Guardian's selection as a preferred provider.  The Amended Complaint plausibly alleges that Guardian informed facility owners and operators that consulting services were "free." Guardian's alternative explanation, at best, reveals a further scheme under which residents fund Guardian's kickbacks to the facilities, while Guardian misrepresents to owners and operators that its consulting services are "free."

Alternatively, Guardian concedes that the services were free but claims the government allegedly requires the pharmacy to offer consulting as part of the "minimum performance and service criteria."  ECF 32-1 at 18-19.  Guardian is wrong.  Pharmacies' legal responsibilities are to dispense and deliver drugs, while senior living facilities are responsible for onsite medication management services. By "donating" such services to facilities (or worse, secretly charging residents to cover the costs of providing these services without informing the facilities), Guardian violated the AKS, by inducing those facilities to refer their residents to Guardian to obtain their prescription medications.

If just one purpose of Guardian's scheme to furnish free services was to induce referrals from the facilities, they violated the AKS.  Further, if the allegations are sufficient for only one of the three types of kickbacks alleged, Guardian violated the AKS.  Defendants have not pointed to any exception or safe harbor permitting their giveaways.  The 2012 OIG Advisory Opinion, selectively cited by Guardian, provides no escape hatch.  In fact, in the section most analogous to the circumstances presented here, OIG found a potential kickback violation when a pharmacy provided free services to a group home, because the arrangement could create "a significant risk of unfair competition, which could lead to the selection of a pharmacy that offers the best benefit to the [home], rather than the best direct services to patients."  ECF 32-1 at 13.

Guardian once charged facilities for consulting and training but adopted the kickback scheme in or about 2014.  *See* ECF 24 ¶¶ 165-67.  Guardian fears its competitors "provide services at no cost" or "fly under the regulation 'radar screen.'"  (*See* ECF 32-4, Exh. C, "Tips for Selling to a New Account," Oct. 18, 2018, page 5); ECF 24 ¶ 179 ("our competitors will do a lot of this for free").

Congress enacted the AKS due to concerns that kickbacks could set off a race to the bottom.  This case can abruptly halt the race to the bottom for the prescription drug business in Georgia's senior living market.  Offering

inducements for patient referrals, as Guardian has, is an unfair business practice that undermines fair competition and ultimately harms the beneficiaries of federal healthcare programs and the public fisc, in violation of the AKS.

## II.   SUMMARY OF AMENDED COMPLAINT

In early 2017, Relator Hank Heller, a quintessential insider with over 30 years of industry experience, sold Collier's Personal Care Pharmacy, which he co-owned and operated, to Defendant Guardian Atlanta.  ECF 24 ¶¶ 15, 142. Defendants retained Mr. Heller for account management and sales because they recognized his expertise. *Id.* ¶¶ 15, 142-145.

Guardian persuaded the senior living facilities previously served by Collier's to switch to Guardian as their "preferred provider" and to steer their residents to Guardian for their pharmacy services. *Id.* ¶ 132.  Until October 2017, Defendants relied on Collier's to fill prescription medication orders for their new patients, giving Mr. Heller first-hand knowledge of the residents who switched to Guardian when their facilities selected Guardian as their "preferred" pharmacy. *Id.* ¶¶ 145-46.  Mr. Heller continued to work for Defendants, and to observe their operations first-hand, until October 2018. *Id.* ¶ 15.

Guardian Pharmacy controls the overall operations and strategic direction of Guardian Atlanta, one of its largest Partner Pharmacies. *Id.* ¶¶ 138-39.  Guardian

Pharmacy's Home Office insisted that Guardian Atlanta President Mr. Hopp memorialize written agreements with assisted living communities and personal care homes via its standard form contract designating Guardian as the preferred pharmacy for the facility. *Id.* ¶¶ 195-97. That contract includes "Confidential Pricing Terms" such as free consulting services. *Id.* ¶ 198.

Operating as a Guardian Pharmacy "Partner Pharmacy," Guardian Atlanta's "Pharmacy Operations" department dispenses drugs, while its "Consulting Department" provides consulting, education services, and skills checks at senior living facilities. *Id*. ¶¶ 122-41, 157-64. As noted above, since late 2014, Guardian has offered and furnished three types of free services to induce senior living facilities to refer their residents to Guardian to fill prescription drug orders, as discussed in A through C, below. *Id.* ¶¶ 150-52.

### A.  Consulting / Medication Management Services

Georgia law requires both assisted living and personal care homes to obtain new prescriptions from the pharmacy within 48 hours, store medications in a secure manner, keep medications in their original packaging, and properly dispose of unused and expired medications in accordance with federal guidelines. *See* O.C.G.A. § 31-7-12.2(b) (assisted living communities); Ga. Comp. R. & Regs. 111-8-63-.20(11)-(12) (medication management in assisted living communities);

8

Ga. Comp. R. & Regs. 111-8-62-.20(7)-(8) (medication management in personal care homes).

Additionally, assisted living facilities in Georgia must "secure the services of a licensed pharmacist" to fulfill statutorily-required duties, including: performing a quarterly review of each resident's drug regimen; removing expired, discontinued, or deteriorated drugs; establishing policies and procedures for safe and effective drug therapy, distribution, use, and control; and establishing policies and procedures for medication handling and storage. *See* O.C.G.A. § 31-7-12.2(b) (assisted living communities); ECF 24 ¶110.

Guardian provided free consulting services, also known as audits, to fulfill these duties for the benefit of senior living facilities, as plainly documented in, among other things: (1) emails from lead Consulting Pharmacist, Lori Newcomb, and other senior management, referring to "high quality consulting for free every quarter" (ECF 24 ¶¶ 168-86; ECF 32-3, Exh. B to Guardian Atlanta's Mot.); (2) contracts between facilities and Guardian acknowledging consulting services would be provided "quarterly at no charge" (ECF 24 ¶ 195); (3) marketing materials identifying "0" for "audit fees," as approved by Guardian Atlanta President Matt Hopp (*id.* ¶¶ 219-20); and (4) comments joking about charging for consulting services made at Guardian Pharmacy's National Sales Meeting by its

Vice President for Operations & Regulatory Support, a former executive of
Omnicare (which paid substantial amounts to settle kickback allegations relating to
free pharmacy consulting services in 2009).  *Id.* ¶¶ 187-93.

In a January 2018 email, Ms. Newcomb reminded Guardian's leadership
team including Mr. Hopp, for marketing purposes, that senior living facilities "get
high quality consulting for free every quarter," and voiced concerns that "[w]e
cannot continue to give everything away for free."  ECF 24 ¶¶ 168-69; ECF 32-3,
Exh. B.  Ms. Newcomb, in another email, called the Consulting Department a
"black hole" for revenue purposes, again contending it was difficult to justify how
great Guardian's consulting services are "IF WE ARE GIVING ALL OF OUR
SERVICE AWAY FOR FREE!"  Her new Fee Schedule added charges for
education classes, but still "No charge" for "basic consulting services per quarter."
ECF 24 ¶¶ 174-77.

By providing senior living facilities a free pharmacist or nurse consultant for
medication management services, Defendants save facilities the costs of procuring
these services on the open market to satisfy Georgia's legal medication
management requirements.  *Id.* ¶¶ 154-55.  Even if the law did not require the
facilities to procure these services, Guardian's giveaways were valuable
inducements to the facilities.  These services are not cheap, with the fair market

value of hourly consulting services at $55 to $65, or $10 to $20 for each audit of a resident's medications, as supported by Defendants' own documents.  *Id.* ¶¶ 178, 206, 253.

### B.  Staff Education Classes and Skills Checks

Under Georgia law, assisted living facilities offering medication administration services must: employ certified medication aides; administer skills competency checks of these aides; and complete annual competency reviews of the aides.  Ga. Comp. R. & Regs. 111-8-63-.20(4), -.20(5)(b), (f), -20(6)-(8); ECF 24 ¶¶ 114-18.  Similarly, personal care homes must also provide and document medication training for proxy caregivers and perform skills competency checks for unlicensed staff.  Ga. Comp. R. & Regs. 111-8-62-.20(3)-(4); ECF 24 ¶¶ 119-20.

Until early 2018, Defendants provided free staff education classes and skills checks for new customers to induce them to refer their residents to Guardian for their pharmacy services.  ECF 24 ¶¶ 223-32.  In an email dated March 2, 2017, Ms. Newcomb admitted that while Defendants customarily charged facilities $50 a day or $100 per person, new communities to Guardian and newly licensed assisted living facilities were "exempt" and received these services for free.  ECF 24 ¶ 225; ECF 32-3, Exh. B.

When Ms. Newcomb circulated this email to Mr. Hopp and the leadership team, Guardian Atlanta was attempting to persuade the facilities previously served by Collier's to sign on with Guardian as their new preferred pharmacy.  ECF 24 ¶ 227.  Those facilities represented 1,700 residents potentially to fill prescriptions with Guardian.  *Id.* ¶ 142.  As a result, multiple facilities that were "new" to Guardian in 2017 received free education classes and skills checks. By providing these classes and skills checks for free, Guardian relieved "preferred provider" senior living facilities clients of the costs of procuring these services elsewhere.

In January 2018, Mr. Hopp "gave the ok for charging for ALL education and ALL skills checks," but Ms. Newcomb described the new policy as a "difficult change to make."  Even so, Mr. Hopp wanted to be informed "[i]mmediately" of "resistance or threats to leave" from clients, referring to the owners and operators of facilities – not residents.  ECF 24 ¶¶ 228-31; ECF 32-3, Exh. B.

### C.  eMAR Setup

Under Georgia law, senior living facilities that assist residents with their medications or supervise residents who self-administer medications must maintain a daily medication administration record ("MAR"), documenting key information such as the date and time when the resident took the medicine, type and dosage, healthcare provider, allergies, errors, side effects, and adverse reactions.  *See*

O.C.G.A. § 31-7-12.2(g)(8); Ga Comp. R. & Regs. 111-8-62-.20(5) and 111-8-63-.20(9); ECF 24 ¶¶ 101-02.  MARs remain onsite at the senior living facility.

A third type of kickback Defendants provided was the initial installation of electronic systems for those senior living facilities who implemented an electronic MAR ("eMAR").  Guardian purchases user licenses from the eMAR vendor chosen by the facility.  ECF 24 ¶ 237, Exh. A.  As a free service for facilities, Guardian installs the eMAR systems at the facilities; supplies free hardware, including computers and peripherals; pays the set-up fees; and provides free technical support and expertise.  *Id.* ¶¶ 242-44.  The eMAR set-up fees range from $499 - $7,000, demonstrating the value of the benefit conferred and the fair market value for these services.  *Id.* ¶ 245.  If Guardian did not provide eMAR installation services, the senior living facilities would have to procure these services from an eMAR vendor or a third-party vendor on the open market.  *Id.* ¶ 246.

## III.   LEGAL STANDARD

Mr. Heller brings this action on behalf of the United States and asserts three causes of action under the False Claims Act, 31 U.S.C. § 3729.[1]  Guardian:

---

[1] Although the government declined to intervene, declination is not relevant to the merits of an FCA Complaint. "We do not assume that in each instance in which the government declines intervention in an FCA case, it does so because it considers the evidence of wrongdoing insufficient or the qui tam relator's allegations for fraud to be without merit. In any given case, the government may

(1) knowingly submitted false claims for payment for prescription drugs to Medicare and TRICARE, (2) made false statements and false records material to false claims, and (3) failed to return overpayments resulting from the kickback scheme to federal healthcare programs.

On a Rule 12(b)(6) motion, courts accept factual allegations as true and draw all reasonable inferences in the plaintiff's favor.  *See Magluta v. Samples*, 375 F.3d 1269 (11th Cir. 2004).  The Court does not resolve factual disputes at this stage of the proceedings.  *Page v. Postmaster Gen. and Chief Exec. Officer of the U.S. Postal Serv.*, 493 F. App'x 994, 995 (11th Cir. 2012) (existence of disputed material facts precludes granting a motion to dismiss). Fed. R. Civ. P. 8(a)(2) requires only a short and plain statement of the claim giving the defendant fair notice of the basis for relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  A complaint must contain sufficient factual matter, accepted as true, to "state a claim that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 570.  There must be "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the claim. *Twombly*, 550 U.S. at 545.

---

have a host of reasons for not pursuing a claim."  *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006).

A complaint alleging FCA violations also must satisfy Rule 9(b) of the Federal Rules of Civil Procedure requiring allegations of fraud to be plead with particularity. *United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012). Rule 9(b) particularity works with Rule 8 to alert defendants to the precise misconduct charged and protect against spurious charges. *Matheny*, 671 F.3d at 1222; *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

Applying these standards, Courts of the Northern District of Georgia have recently denied motions to dismiss in FCA cases containing particularized allegations such as the Amended Complaint in this case. [2]

## IV.   ARGUMENT

### A.  False Claims Act and Anti-Kickback Statute

As the Supreme Court has explained, in enacting the FCA, "Congress wrote expansively, meaning 'to reach all types of fraud, without qualification, that might result in financial loss to the government.'" *Cook Cnty., Illinois v. United States ex*

---

[2] *See, e.g.*, *United States ex rel. Dildine v. Aarti D. Pandya, M.D.*, Case 1:13-cv-03336-LMM (N.D. Ga. July 9, 2019); *United States v. Charles C. Adams, M.D.*, Case 4:18-cv-00191-ELR (N.D. Ga. Mar. 8, 2019); *United States ex rel. Galuten v. Emory Healthcare, Inc.*, Case 1:14-cv-02408-LMM (N.D. Ga. May 15, 2018); *United States ex rel. Raven and Curtis v. Georgia Cancer Specialists I, P.C.*, Case 1:11-cv-00994-CAP (N.D. Ga. Apr. 1, 2016).

*rel. Chandler,* 538 U.S. 119, 129 (2003) (quoting *United States v. Niefert-White Co.*, 390 U.S. 228, 233 (1968)).

Any claim for payment submitted to a federal healthcare program that includes "items or services resulting from" a kickback scheme "constitutes a false or fraudulent claim" in violation of the False Claims Act. *See* 42 U.S.C. § 1320a-7b(g). Accordingly, as a matter of law, a claim for payment to Medicare or TRICARE that results from a kickback scheme is a false claim under the FCA. *Id.* Also, as a matter of law, AKS violations are material to the Government's payment decisions, as Guardian obliquely acknowledges in footnote 107 of its brief.[3]

Prohibitions against kickbacks are fundamental to the integrity of the federal health care programs. The AKS is a broad statute intended to address Congressional concern that kickbacks distort the healthcare market, create unfair

---

[3] *See Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019) ("We further read the AKS amendment as obviating the need for a plaintiff to plead materiality. This construction inescapably follows from the statute's plain language stating that a claim resulting from a violation of the AKS 'constitutes a false or fraudulent claim.' 42 U.S.C. § 1320a-7b(g).") Nor does the government's failure to stop paying Defendants' claims have any bearing on materiality, as Guardian suggests. In FCA cases, the government has stressed that there are many good reasons to continue paying claims including important public health and safety considerations. *See, e.g., United States ex rel. Escobar v. Universal Health Svcs., Inc.*, Case No. 14-1423, Brief of the United States as Amicus Curiae, at 24 (1st Cir. Aug. 22, 2016) (*citing United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 917 (4th Cir. 2003)).

competition, and reduce beneficiaries' access to high quality, affordable

healthcare.[4]   The AKS prohibits "knowingly and willfully offer[ing] or pay[ing]

any remuneration (including any kickback, bribe, or rebate) directly or indirectly,

overtly or covertly, in cash or in kind to any person to induce such person -- "

> (A) "To *refer an individual* to a person for the furnishing … to any
> item or service for which payment may be made in whole or in part to
> a Federal health care program," or

> (B) "To . . . *arrange for or recommend* purchasing . . . or ordering any
> . . . service, or item for which payment may be made in whole or in
> part under a Federal health care program."

42 U.S.C. § 1320a-7b(b)(2) (emphasis added).

A claim for relief under the FCA is stated when it alleges that the defendant

submitted claims for payment to a federal healthcare program that resulted from an

arrangement in which the defendant knowingly furnished remuneration to induce

the recipient to refer others to the defendant, or to recommend purchasing from the

defendants, items or services covered by a federal healthcare program.  *See, e.g.,*

*United States ex rel. McNutt v. Haleyville Med. Supplies, Inc.,* 423 F.3d 1256, 1260

---

[4] *See, e.g.*, 42 U.S.C. § 1320a-7d(a)(2) (directing OIG to consider
"competition among health care providers" and other factors when considering
safe harbors under the Anti-Kickback Statute; HHS-OIG, Medicare and State
Healthcare Programs: Fraud and Abuse, Proposed Rule, 84 Fed. Reg. 55694,
55696 (Oct. 17, 2019) (identifying "unfair competition" as one of the abuses the
Anti-Kickback Statute was designed to eradicate).

(11th Cir. 2005) (allegations that defendants violated AKS, that compliance with AKS was necessary for Medicare reimbursement, and that defendants submitted claims for reimbursement knowing that they were ineligible for payments demanded in the claims sufficient to state FCA claim for AKS violation).

**B. Unlawful Remuneration**

Remuneration "refers to an exchange of anything of value," including services for free or below cost.[5]  Relator has clearly alleged remuneration as to consulting, training, and eMAR set up provided to facilities. Guardian raises only two counterpoints (1) whether "an improper discount" on its services was adequately alleged under inapplicable caselaw; and (2) contending that the free services were integral to Defendants' services, and thus required.  ECF 32-1 at 9-10.  Both arguments fail.

**1.  Remuneration is "anything of value"**

The type of kickbacks at issue here – free consulting, training, and eMAR

---

[5] 42 U.S.C. § 1320a-7b(b)(2); *see* 42 U.S.C. § 1320a-7a(i)(6) (defining "remuneration" for purposes of imposing civil monetary penalties to include "items or services for free or for other than fair market value."); U.S. Department of Health and Human Services, Office of Inspector General ("HHS OIG") Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991) (remuneration means "anything of value in any form or manner whatsoever"); *accord United States ex rel. Fry v. The Health Alliance of Greater Cincinnati*, 2008 U.S. Dist. LEXIS 102411, at *17 (S.D. Ohio Dec. 18, 2008).

services, have value.  Indeed, similar kickbacks have given rise to the recoupment of substantial taxpayer dollars.  For example, in 2009, the Department of Justice announced a $98 million settlement of an FCA case with Omnicare, an institutional pharmacy provider and Guardian competitor, based on allegations of Omnicare's unlawful inducements, including free pharmacist consulting services for referring customers.  ECF 24 ¶ 307.

Omnicare thereafter instituted a policy of charging nursing homes $65 an hour for consulting services.  *See United States ex rel. Litwiller v. Omnicare, Inc.*, Case 1:11-cv-8980, 2014 WL 1458443, at 4 (N.D. Ill. April 14, 2014).  In 2014, the company was alleged to have again violated the AKS by waiving consulting fees, allegedly because the fees caused a "competitive disadvantage" for Omnicare. *Id*.  In declining to dismiss, the court held:

> Relator has sufficiently pled that Omnicare knowingly set upon a course to develop and implement schemes for the purpose of inducing continued business from the facilities, including some that threatened to terminate their relationships.  Relator has pled that Omnicare … failed to charge the fair market value for services … in exchange for continued business.  At this stage, these allegations (and the reasonable inferences that can be drawn from them) suffice. . . .  Relator, a longtime employee of Omnicare, has laid out the schemes in detail and identified at least some of the major players on Omnicare's end as well as the facilities that were allegedly offered remuneration in exchange for business.  . . . for now, Relator has sufficiently alleged violations of the anti-kickback statutes.

*Id.* at 18-19.

Guardian argues that, for purposes of evaluating the similar kickbacks at issue in this case, its "customers" are the residents and not the senior living facilities that select Guardian as their preferred provider.  ECF 32-1 at 3.  Seizing on a reference to monthly fees that some residents pay Guardian for eMAR access, ECF 24 ¶ 240, Guardian argues that "the monthly per patient fees charged by Guardian Atlanta exceed the combined cost of any medication management and eMAR services (including eMAR setup)."  ECF 32-1 at 21-22.  Guardian thus contends there is no remuneration because the pleading "does not allege that the revenue from these fees fails to cover the cost of the services" furnished to the senior living facilities.  ECF 32-1 at 11.

But this theory ignores that Guardian represented to senior living facilities in their preferred provider contracts that consulting services would be provided "quarterly at no charge."  ECF 24 ¶ 198, 205.  Numerous well-supported factual allegations contend that Guardian marketed "free" consulting to facilities in order to be designated the preferred pharmacy provider for their residents.  *Id*. ¶¶ 197, 212,  215, 222, 272.   The Consulting Department was a "black hole" that gave its services "away for free."  *Id.* ¶¶ 174-77.  Resident fees are not mentioned in those communications.  Relator alleges that Guardian's contracts with residents describes monthly eMAR access fees – *not* fees for quarterly consulting (or

training or eMAR setup) provided to the facilities.  *Id.* ¶¶ 214, 239-40.  That Guardian may have secretly charged residents for the kickbacks Guardian provided to the facilities where they live, to obtain referrals for prescription medication sales to residents, does not alter the fact that the consulting services were provided free of charge *to the facilities* and thus constitute unlawful remuneration.[6]

Guardian clearly believed that their "clients" – at least insofar as the preferred provider contracts and pharmacy consulting services, free training and eMAR installations are concerned – were the facilities.  Guardian's "preferred" pharmacy contracts are signed by the facilities, and their marketing plans, emails, and documents all treat the facilities – not the facilities' residents – as "clients" and "accounts."  *See, e.g.*, ECF 24 ¶¶ 132, 196-97; ECF 32-3, Exh. B (Ms. Newcomb's email repeatedly refers to facilities as "clients"); ECF 32-4, Exh. C (PowerPoint "Selling the Guardian Difference" provides extensive "Tips for Selling to a New Account," referring to facilities).

The evidence belies any indication that Guardian informed facility owners or

---

[6] Guardian acknowledges providing "the same range of medication management services" in personal care homes as it does in assisted living communities, though Georgia law does not require personal care homes to retain a pharmacist for such services.  (ECF 32-1 at 20).  The services constitute valuable remuneration irrespective of whether a personal care home was legally required to procure such services.  *See* ECF 24 ¶¶ 4, 159, 297-99.

operators that it would bill residents for consulting services.  Guardian's defense that there was no "remuneration" because the costs for its "free" consulting services were recouped from residents is a disputed fact, and otherwise logically cannot prevail because, if true, it means Guardian surreptitiously billed patients to pay for kickbacks for the facilities to refer those patients to Guardian.

### 2.  Guardian's cases are inapplicable.

Guardian contends that Relator must allege a benchmark of fair market value for its services for the Court to assess whether the charges were sufficiently under market value to constitute remuneration.  ECF 32-1 at 9.  Guardian relies on *United States ex re. Bingham v. HCA, Inc.*, 783 F. App'x 868 (11th Cir. 2019) and *United States ex rel. Osheroff v. Tenet Healthcare Corp.*, 2012 WL 2871264 (S.D. Fla. July 12, 2012).  Both involved allegations of kickbacks based on below-market rent.  There, "the critical question we must ask is whether physician tenants received anything of value … under or in connection with their leases in excess of their lease payments." *Bingham*, 783 F. App'x at 873.  The fair market value of the leases was essential to determine whether the tenants received "anything of value" in the specific context of below-market rent as "remuneration."[7]

---

[7] Defendants mistakenly rely on *State of Georgia ex rel. Hunter Labs. v. Quest Diagnostics Inc.*, 2014 WL 12543888 (N.D. Ga. Mar. 14, 2014).  But *Hunter Labs* primarily related to the wrongful submission of Medicaid claims for higher

Here, Guardian's services had value to the senior living facilities, and Relator indisputably alleged the fair market value of the services.  Guardian's contract with Magnolia Senior Living sets the rate for consulting services at $65/hour for a pharmacist and $55 an hour for a nurse.  *See* ECF 24 ¶ 206; *see also id.* ¶¶ 178, 253 (fair market value to review one resident's medications is $10-$20). For the staff education classes and skills checks, the standard rate is $50 per day or $100 total per person, and the Complaint alleges eMAR setup fees average $499-$7,000.  *See* ECF 24 ¶¶ 225, 253.[8]

Defendants further rely upon *United States ex rel. Jamison v. McKesson Corp.*, 900 F. Supp. 2d 683 (N.D. Miss. 2012) and *United States ex rel. McDonough v. Symphony Diagnostics Svcs., Inc.*, 36 F. Supp. 3d 773 (S.D. Ohio 2014).  Neither case evaluated whether remuneration was adequately pled or ruled on a motion to dismiss.  *Jamison*'s decision followed a 14-day bench trial, with

---

prices than charged to other payors and, in contrast to Relator's allegations here, "fail[ed] to articulate any specific kickback at issue . . . ."  *Id.*, at *4.

[8] Defendants argue that Relator is required to identify the marginal cost to Guardian of providing these kickbacks, but that is not required by the AKS.  There is no safe harbor for kickbacks of marginal cost to the kickback provider, and such an analysis turns the AKS on its head.  The AKS prohibits offering anything of value to referral sources, regardless of what those kickbacks cost the provider. Relator plausibly alleges the value of Guardian's services, provided gratis to the facilities, in exchange for inducing referrals of residents to use Guardian to supply their prescription medication, paid, in large part, by Medicare and TRICARE.

testimony by twenty-four witnesses, hundreds of exhibits, and post-trial briefing.

In fact, a motion to dismiss was denied three years earlier.  *See United States ex*

*rel. Jamison v. McKesson Corp.*, 2009 WL 3176168 (N.D. Miss. Sept. 29, 2009).

*McDonough* was decided on summary judgment, and a motion to dismiss had

likewise been denied.  *United States ex rel. McDonough v. Symphony Diag. Svcs.,*

*Inc.*, 2012 WL 628515 (S.D. Ohio Feb. 27, 2012).  On that motion, the court held:

> At the pleading stage, prior to discovery, the plaintiff cannot be
> expected to provide complete details of the necessary sensitive
> corporate statistics to support his allegations on issues of costs and
> pricing.  It is sufficient that the Plaintiff's Amended Complaint alleges
> that Mobilex provided its x-ray services to SNFs at below-market and
> below-cost rates, and provides some factual details, which at least on
> their face, support those allegations.

*Id.*, at *6.  In light of these decisions at the pleading stage, Relator Heller more

than sufficiently pled remuneration and an AKS violation.

**3.  Free consulting and eMAR installation are not integral services.**

Defendants next argue that "performing a service that one is obligated to

provide cannot constitute illegal remuneration."  ECF 32-1 at 17.  Thus, Guardian

contends that even if it "did not happen to charge separately" for medication

management services (*i.e.*, consulting), Medicare required these free services.  But

Relator amply alleges that Guardian's services for facilities are independent of, and

not integral to, its duties to dispense and deliver medications to patients.  *See* ECF

24 ¶¶ 161-63, 235-36, 241, 297-99.  Defendants mistakenly contend that, per a CMS Manual, consulting services for senior living facilities are merely part of the "minimum performance and service criteria" for long-term care pharmacies.  ECF 32-1, at 18 (citing CMS Prescription Drug Benefit Manual, Chapter 5, § 50.5.2.).

Guardian is wrong, as a matter of law and fact, and this defense theory does not support dismissal.  Georgia law imposes medication management duties on senior living facilities, not on pharmacies.  Guardian's contracts acknowledge that "Operators" of senior living facilities have "duties under applicable law" to procure pharmacy consulting services, and "Operator[s]" must pay for consultant pharmacist services.  *See* ECF 24 ¶¶ 208, 210.

Likewise, CMS expressly requires nursing homes, not pharmacies, to procure and pay for pharmacist consultant services to be performed in the nursing home.[9]  Care in nursing homes, unlike senior living facilities, is a covered benefit under Medicaid and Medicare and thus subject to federal oversight.  The CMS Manual, Chapter 5 applies only to nursing homes.  *See* CMS Manual, § 10.2 (defining "long-term care (LTC) facility" as a skilled nursing home or nursing

---

[9] *See, e.g.,* 42 C.F.R. § 483.45(b) (each nursing "facility must employ or obtain the services of" a consultant pharmacist to perform prescribed duties at the facility).

home).  The CMS Manual thus does not apply here, as Guardian admits that Guardian Atlanta does not service nursing homes.  *See* ECF 32-1 at 2.

Even if the CMS Manual applied, the "minimum performance and service criteria" that a long-term care pharmacy must perform all take place in the pharmacy *before* medications are dispensed to the patient.[10]  Not surprisingly, any pharmacy, like Guardian, has federal and state law obligations with respect to safely dispensing medications.

*After* the drugs are dispensed and delivered to patients, nursing homes and assisted living facilities are obligated to procure and pay for consultant services.[11] If CMS meant to *require* pharmacies to conduct onsite consulting services *for free* for nursing homes, the OIG would not have warned the nursing home industry about the Anti-Kickback Statute implications of such arrangements.  ECF ¶¶ 312-313.[12]

---

[10] *See* 42 C.F.R. § 423.153(c)(2) (explaining measures a pharmacy must perform "before each prescription is dispensed.").

[11] *See, e.g.,* Ga. Comp. R. & Regs. 480-24-.02 ("A consultant pharmacist . . . is responsible for . . . pharmaceutical services *in the nursing facility*" in contrast to a "vendor pharmacist" who dispenses and delivers drugs "*to a nursing facility.*") (emphasis added).

[12] *See* U.S. Dept. of Health and Human Services, OIG Supplemental Compliance Program Guidance for Nursing Facilities, 73 Fed. Reg. 56832 (Sept. 30, 2008) ("Pharmaceutical consultant services, medication management, or

The Guardian consulting services are simply not integral to the functions of dispensing and delivering drugs.  Guardian's consultants perform services onsite at senior living facilities, long after medications are dispensed.  The consultants consult with staff; they rarely if ever interact with residents.  ECF 24 ¶ 160.  They review the *facilities'* drug management protocols, record-keeping, storage and disposal practices; they inspect the *facilities'* medication administration records to determine if the correct drugs were given at the correct intervals and review the overall drug regimen; and they inspect the *facilities'* medication carts for expired drugs.  *Id.* ¶¶ 101-13, 154-55, 160, 163.

Further, eMAR set up is not integral to Guardian's operations, contrary to Guardian's claim.  Guardian serves many senior living facilities, including some identified in Exhibit A to the Amended Complaint, that use paper records rather than eMAR to document when residents take their medications, and Guardian still dispenses medication to them.  Defendants also do not rely upon the eMAR systems they install for other customers in dispensing medicine; Guardian has its

supplies offered by a pharmacy" to a facility for free or below market rates are "suspect" arrangements); OIG Advisory Opinion, Provisions of Free Goods and Services (July 10, 1997) ("the provision of consultant pharmacists" by pharmacies to "referral sources either for free or at a cost below fair market value" appears to violate the Anti-Kickback Statute when the intention is "to induce or encourage the referral of Federal program business" to the pharmacies), available at https://www.oig.hhs.gov/compliance/alerts/guidance/index.asp.

27

own operating systems to track prescriptions, dispensed medications, and billing. ECF ¶¶ 241-43. The senior living facilities' eMAR systems fulfill the facilities' own legal obligations for record-keeping, and Guardian's free installation is unquestionably of independent value. *Id*. ¶¶ 233-36, 245-46.

Guardian relies on distinguishable, unpublished decisions from district courts outside the Eleventh Circuit. In *United States ex rel. Forney v. Medtronic, Inc.*, 2017 WL 2653568 (E.D. Pa. June 19, 2017), Medtronic sold implantable cardiac devices such as defibrillators and allegedly furnished free services such as device "interrogations" to ensure implants were successful and free advice on billing for the implants. As the court explained, support services "specifically tied to support of the purchased product" standing alone do not implicate the AKS. *Id.*, at *4 (citing OIG guidance). In *Forney*, the pleading, which was dismissed without prejudice to amend, failed to allege with particularity that the support services saved the providers money, that any AKS violations were knowing, and that any specific claims were submitted. *Id.* In contrast, here, Relator has pointed to specific regulations requiring senior living facilities to undertake the services that Guardian offered for free, specified the value of those services, identified specific false claims resulting from the scheme, and alleged facts to show that Guardian knew its scheme violated the AKS. Moreover, unlike Medtronic,

Guardian has not pointed to any regulatory guidance that supports its position; OIG guidance in fact cautions against Guardian's conduct.  ECF ¶¶ 306-15.

Likewise, the free services provided in *United States ex rel. Suarez v. AbbVie Inc.*, 2019 WL 4749967 (N.D. Ill. Sept. 30, 2019), were specifically tied to a patient's use of Defendants' pharmaceutical drug, Humira.  These services included teaching patients how to inject the drug, dispose of the equipment, submit their claims to insurance, and obtain free product during insurance coverage gaps. *Id.*, at *7.

Guardian sells prescription drugs, and services integral to Guardian's business, and analogous to the integral services described in *Forney* and *Suarez*, would be a pharmacist responding to patient questions about their drug, such as how often to take it, side effects, insurance coverage, and so forth.  But the services alleged to be kickbacks, in contrast, revolve around separate administrative functions that senior living facilities must perform to offer medication administration services for their residents.  These functions are not integral to a pharmacy's job of dispensing or delivering prescription medication to the residents.  To provide additional administrative services to facilities that serve as patient referral sources and comply with the AKS, Guardian must charge fair value and Operators must pay for such services, as Guardian's contracts acknowledge.

### C.  False Claims resulted from Defendants' kickback scheme

Guardian next contends that Relator fails to identify false claims resulting from AKS violations.  ECF 32-1 at 26-28.  This argument ignores the well-pled allegations and improperly challenges Mr. Heller's credibility.

Relator satisfied Rule 9(b) by identifying representative false claims and providing sufficient indicia of reliability to support the allegations that Guardian submitted claims that were false because they resulted from a kickback scheme. The Eleventh Circuit has long held that an FCA complaint must only include "some indicia of reliability" to support the allegation that an actual false claim was submitted.  *United States ex rel. Clausen v. Lab. Corp. of Am. Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002).  Mr. Heller satisfies both ways to satisfy this requirement:

> One way to satisfy this requirement is by alleging the details of false claims by providing specific billing information—such as dates, times, and amounts of actual false claims or copies of bills.  *See Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1326 (11th Cir. 2009); *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1358 (11th Cir. 2006).  In other circumstances, this Court has deemed indicia of reliability sufficient where the relator alleged direct knowledge of the defendants' submission of false claims based on her own experiences and on information she learned in the course of her employment.  *See U.S. ex rel. Walker v. R&F Props. of Lake Cty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) (holding that Rule 9(b) was satisfied where the relator was a nurse practitioner in the defendant's employ who was required to bill under a doctor's provider number and whose conversations about the defendant's billing practices with the office manager formed the basis for the relator's belief that fraudulent claims were actually submitted to the government).

*United States v. HPC Healthcare, Inc.,* 723 F. App'x 783, 789 (11th Cir. 2018).

In *United States ex rel. Galuten v. Emory Healthcare, Inc.*, Case 1:14-cv-02408-LMM (N.D. Ga. May 15, 2018), the court held that a relator satisfied Rule 9(b) despite not including exemplar claims (which Mr. Heller has done). Citing the relator's reliance on his personal knowledge and observations gained from working with Defendants, and Relator's identification of specific patients involved in the fraudulent scheme, the *Galuten* court found the allegations sufficient.

Here, Relator Heller alleges direct knowledge of the fraudulent conduct, based on his experience and observations while working with Guardian Atlanta. *See* ECF 24 ¶¶ 15, 142-48, 150-52, 166-67, 194-98, 200-01, 223-25, 260-61, 269-72. Relator offers specific examples of facilities where Guardian delivered free services, procured contracts, and received patient referrals in return. *See* ECF 24 ¶ 200 (Magnolia Senior Living); ¶ 219 (Canterfield of Kennesaw); ¶¶ 260-68 (Country Gardens Senior Living and Antebellum Grove Senior Living); ¶¶ 269-77 (Dogwood Forest of Dunwoody); ¶ 278 (Eagles Landing Senior Living); ¶ 290 (Oaks at Post Road); ¶ 293 (Oaks at Braselton).

Guardian claims the Complaint does not explain whether the facilities "took any action to influence its residents' decisions" and questions whether an offer of

free education classes was even "communicated to any particular Community." ECF 32-1 at 30-31.  Guardian's Exhibit A is a communication about free education classes that was prepared for the facilities.  ECF 32-2, Exh. A*; see also* ECF 24 ¶¶ 224-27.  In this email, Consulting Department Manager Ms. Newcomb directly addresses senior living facilities administrators ("we are trying to help you get your staff CMA certified").  As to charges, she tells administrators that "new communities to Guardian" are "exempt from these charges."  ECF 32-2, Exh. A.

The Amended Complaint alleges multiple specific examples of the links between inducements and referrals.  For example, Relator describes conversations with the Regional Manager for Senior Solutions Management Group, who said they would not remain Defendants' customers unless all consulting fees were waived.  ECF 24 ¶ 261.  Relator alleges Defendants then provided free consulting and eMAR set up for two personal care homes owned by Senior Solutions Management Group and received referrals of residents in return.  *Id*. ¶¶ 267-68.

The inducements worked.  Senior living facilities wield tremendous influence over their elderly residents.  *Id.* ¶¶ 5, 134.  An average of 80% of residents at Guardian-contracted "preferred provider" facilities selected Guardian to provide their prescription medications.  Residents overwhelmingly selected Guardian to provide their prescription medications after Guardian's designation as

the facility's "preferred" pharmacy.  ECF 24 ¶¶ 132-37.

As to Guardian's contentions that Relator is "guessing" as to false claims, ECF 32-1 at 26, Exhibit A to the Amended Complaint identifies 49 facilities that received improper inducements.  The chart is "based upon Relator's observations of Guardian's practices and the statements of Guardian's employees," and his knowledge as an industry expert.  ECF 24 ¶ 249; Exh. A.  It provides the senior living facilities that received inducements, the type of inducement, Guardian's internal abbreviations for the facilities, information about the number of residents who selected Guardian as their pharmacy, prescription counts and revenues derived from each facility. *Id.*

Mr. Heller estimates Guardian Atlanta submitted over 160,000 prescriptions for the senior living facility residents on Exhibit A, 90% of which, or 140,000, were paid for in whole or part by Medicare or TRICARE, generating over $20 million in Medicare and TRICARE reimbursements.  *Id.* at Exh. A, ¶¶ 257-59.

Relator also identifies 20 representative false claims that Guardian submitted to Medicare.  Mr. Heller obtained detailed claims data showing that Guardian submitted claims for payment to Medicare for prescription drug orders that Guardian filled for residents of senior living facilities to which Guardian supplied kickbacks.  *See, e.g.,* ECF 24 ¶¶ 283-84 (Eagles Landing Senior Living); ¶¶ 292,

295 (Oaks Senior Living).  The 20 exemplar claims relate to four residents, previously Collier's Pharmacy customers, so Relator had first-hand knowledge of their monthly maintenance medications.  Claims data shows their selection of Guardian as their pharmacy to continue filling monthly prescriptions for which Guardian submitted claims for payment to Medicare.  *See, e.g.*, ECF 24 ¶ 295.

As to each exemplar claim, Mr. Heller provided the initials of the patient, the prescription medication (identified by NDC Codes and NDC Code Descriptions), the date when Guardian submitted the claim to Medicare, the amount paid, and the prescriber.  ECF 24 at ¶¶ 283, 284, 292, and 295.

Guardian argues "Relator has failed to allege any specific claims," (ECF 32-1 at 26), simply ignoring detailed contentions of false claims Guardian submitted to Medicare, including the following for a patient, identified by initials in the Complaint, at Eagles Landing Senior Living:

| NDC Code | NDC Code Description | Date Claim was Processed | Part D Payment Amount | Prescriber |
|---|---|---|---|---|
| 00456342833 | Namenda XR | 05/05/2017 | $43.06 | Ronald Watts |
| 00456342833 | Namenda XR | 06/21/2017 | $39.05 | Ronald Watts |
| 00456342833 | Namenda XR | 07/28/2017 | $40.39 | Ronald Watts |
| 00456342833 | Namenda XR | 08/21/2017 | $191.72 | Ronald Watts |

| NDC Code | NDC Code Description | Date Claim was Processed | Part D Payment Amount | Prescriber |
|----------|--------------------|-----------------------|---------------------|-----------|
| 00456342833 | Namenda XR | 09/04/2017 | $359.96 | Ronald Watts |

ECF 24 ¶ 283.  This level of specificity is more than sufficient to allege an FCA claim.  *See United States ex rel. McNutt v. Haleyville Med. Supplies*, 423 F.3d 1256, 1259-60 (11th Cir. 2005).

Defendants, again, mistakenly rely on a summary judgment ruling.  *See United States ex rel. Greenfield v. Medco Health Sol'ns, Inc.*, 880 F.3d 89, 100 (3d Cir. 2018).  Further, a district court in Massachusetts after the *Greenfield* decision found allegations showing "that Defendant paid kickbacks to a physician for the purpose of inducing the physician to prescribe specific drugs, and that the physician then prescribed those drugs," sufficient to state a claim, "even if the physician would have prescribed those drugs absent the kickback."  *United States ex rel. Bawduniak v. Biogen Idec, Inc.*, 2018 WL 1996829, at *3 (D. Mass. Apr. 27, 2018).

Defendants also rely on *United States ex rel. Fla. Sec'y of Anesthesiologists v. Choudhry*, 2017 WL 2604930 (M.D. Fla. June 14, 2017), which held that it was not sufficient to "speculate[] that an unlawful kickback scheme exists, and by extension assert[] that all Medicare claims were 'tainted.'"  The *Choudhry* Relator,

however, conceded that it possessed no specific claims or billing data (unlike

Relator Heller) and did not plead any "first-hand knowledge" of Defendants'

billing practices (again unlike Relator Heller).

Defendants' argument contradicts *McNutt*, in which the Eleventh Circuit

held that the District Court correctly denied a motion to dismiss a complaint

alleging providers paid kickbacks to pharmacists for patient referrals.  *See* 423

F.3d at 1259-60 (claim validly alleged through assertions that defendants violated

the AKS, compliance with the AKS is a prerequisite for Medicare reimbursement,

defendants submitted claims knowing that they were ineligible for payment, and by

identifying numerous specific claims defendants made to the federal government).

### D.  Defendants' knowledge of illegality

Defendants' final argument, that Relator insufficiently pled that Guardian

acted "knowingly and willfully," is also wrong.  ECF 32-1 at 32-38.  Under Rule

9(b), "knowledge, and other conditions of a person's mind may be alleged

generally," and Relator's allegations easily meet this standard.  ECF 24 ¶¶ 300-05.

Guardian relies on *United States v. Starks*, in which the Eleventh Circuit observed

that "the giving or taking of kickbacks for medical referrals is hardly the sort of

activity a person might expect to be legal."  157 F.3d 833, 838 (11th Cir. 1998).

The AKS is violated if at least "one purpose" of an inducement is to generate patient referrals for items covered by federal healthcare programs, or to entice someone to arrange for or recommend purchasing items covered by federal healthcare programs, the AKS is violated. *See United States v. Holland*, 396 F. Supp. 3d 1210 (N.D. Ga. 2019) (citing *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000) and noting that every federal appellate court to consider the issue adopted the "one purpose rule").

While "willful" intent is an element of the AKS, it is not an element of a civil claim under the FCA.  Congress expressly declared that "no proof of specific intent to defraud" is required for FCA liability.  31 U.S.C. § 3729(b)(1)(B).  FCA liability is predicated upon a "knowing" violation, meaning actual knowledge, reckless disregard, or deliberate ignorance.  *See* 31 U.S.C. § 3729(b)(1)(A).

To allege "knowing" violations, a Relator is only required to include allegations "demonstrat[ing] an intent to exercise influence over the reason or judgment of another in an effort to cause the referral of program related business." *United States ex rel. Osheroff v. Tenet Healthcare Corp.,* 2012 WL 2871264, at *8 (S.D. Fla. July 12, 2012) (citing *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995)).  Likewise, knowledge and disregard of the law may be inferred from circumstances, such as an individual's executive position.  *See United States*

*v. Vernon*, 723 F.3d 1234, 1254 (11th Cir. 2013) (reasonable jury could have inferred that pharmaceutical company CEO was required to familiarize himself with significant pharmaceutical regulations, including the AKS).  Knowledge may also be inferred from a Defendant's certification of compliance with the AKS. *United States ex rel. Raven and Curtis v. Georgia Cancer Specialists I, P.C.*, Case 1:11-cv-00994-CAP (N.D. Ga. Apr. 1, 2016).

Scienter has been fully alleged under all three theories.  First, Guardian's "preferred pharmacy" contracts contain extensive AKS language, which Defendants blatantly ignored by using face sheets with "confidential" pricing to offer consulting "quarterly at no charge."  ECF 24 ¶ 324.  Guardian's motivation to obtain referrals by delivering free services is further illustrated by its discussions of the Consulting Department's new fee schedule in early 2018.  Guardian Atlanta President Matt Hopp cautioned, "Just keep in mind we're not trying to trap them [facilities] into fees. . . . I'm excited to be getting fee[s] for these items but we have to be VERY careful not to price ourselves out of the market."  *Id.* ¶ 179.

Guardian Atlanta Director of Pharmacy Operations Tim Williams expressed concerns about charging fees that might reduce Guardian's "leverage to increase penetration in the community," or to increase the number of residents selecting Guardian for prescription drugs.  *Id.* ¶ 178.  Ms. Newcomb acknowledged that new

charges (for education classes) might be met with "resistance or threats to leave," and instructed the sales team to notify Mr. Hopp "immediately" if that occurred. *Id*. ¶ 172; ECF 32-3, Exh. B.  She hedged that such new charges "may be revised based on some of our large corporate clients' feedback."  ECF 24 ¶¶ 168-72.

Next, the Complaint alleges that Guardian's executive team is "comprised of experienced healthcare executives with long careers in the pharmacy and long-term care industries who are well aware of the prohibitions of the Anti-Kickback Statute."  *Id*. ¶ 303.  Bob Weir, Guardian's Vice President, Operations & Regulatory Support, was a senior executive for Omnicare until 2015.  *Id.* ¶ 189. The executives were on notice throughout their careers of the AKS based on mandatory compliance training (*id*. ¶¶ 318-320), the Justice Department's well publicized enforcement actions (*id*. ¶ 307), and HHS-OIG's dozens of guidance documents (*id*. ¶¶ 309-315), all alerting healthcare providers to the risks of furnishing free services to referral sources.  Among them is the 2012 OIG Advisory Opinion, which fully supports Relator's allegations.  Its "Arrangement D" describes a pharmacy's improper donation of EHR services to a group home in an arrangement that is closely analogous to Guardian's policy of setting up eMAR systems for its customers for no charge.  ECF 24 ¶¶ 233-55.

Finally, Relator alleges that Defendants repeatedly and falsely certified

39

Guardian's compliance with the AKS in provider agreements with Medicare contractors, knowing they were engaged in a kickback scheme.[13]  *Id*. ¶¶ 72-76, 82-84, 316-23.  Relator plausibly alleges that Guardian acted knowingly because it knew the AKS prohibited kickbacks, yet offered free and below-FMV services to senior living facilities, with at least one purpose being to induce the facilities to refer residents to Guardian for prescription drug orders.

## IV.   CONCLUSION

The Amended Complaint is replete with "facts as to time, place, and substance of the defendant's alleged fraud" and "the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them."  *United States ex rel. Clausen v. Lab. Corp. of Am. Inc.*, 290 F.3d 1301 (11th Cir. 2002).  Thus, the factual allegations, taken as true, establish a plausible FCA claim.  The Motion to Dismiss, therefore, should be denied.  Alternatively, should the Court find any deficiency in Relator's pleading, Relator respectfully requests that any dismissal be without prejudice, with leave to amend.

Respectfully submitted this 29th day of May 2020.

---

[13] *See United States ex rel. Osheroff v. Tenet Healthcare Corp.*, 2012 WL 2871264 at *9 (S.D. Fla. July 12, 2012)(finding certifications of compliance with AKS and Stark sufficient to establish knowledge).

_s/ Michael J. Moore_
MICHAEL J. MOORE
Georgia Bar No. 520109
CHARLES W. BYRD
Georgia Bar No. 100850
JAY F. HIRSCH
Georgia Bar No. 357185
KIMBERLY J. JOHNSON
Georgia Bar No. 687678
CAROLINE G. MCGLAMRY
Georgia Bar No. 230832
ELIZABETH S. WHITE
Georgia Bar No. 258844

**POPE MCGLAMRY**
3391 Peachtree Road, NE, Suite 300
Atlanta, GA 30326
(404) 523-7706
efile@pmkm.com

_s/ Lynn M. Adam_
LYNN M. ADAM
Georgia Bar No. 002319

**ADAM LAW LLC**
125 Clairemont Avenue
Suite 380
Decatur, Georgia 30030
(404) 324-3582
ladam@lynnadamlaw.com

**_Attorneys for Relator Henry B. Heller_**

## **<u>CERTIFICATION</u>**

Pursuant to N.D. Ga. L.R. 7.1(D), counsel for Plaintiff hereby certifies that this document has been prepared with Times New Roman (14 point) font, which font has been approved under L.R. 5.1(C).

*/s/ Michael J. Moore*

MICHAEL J. MOORE

Georgia Bar No. 520109

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 29, 2020, I electronically filed the foregoing

**PLAINTIFF-RELATOR'S OPPOSITION TO DEFENDANT GUARDIAN**

**PHARMACY OF ATLANTA, LLC's MOTION TO DISMISS** with the Clerk

of Court using the Court's CM/ECF system, which will automatically send

notification of such filing to all counsel of record.

> */s/ Michael J. Moore*
> MICHAEL J. MOORE
> Georgia Bar No. 520109
>
> Pope, McGlamry, Kilpatrick,
> Morrison & Norwood, P.C.
> 3391 Peachtree Road, NE
> Suite 300
> P.O. Box 19337 (31126-1337)
> Atlanta, GA 30326
> (404) 523-7706
> efile@pmkm.com

43