# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA, *ex rel.*
HENRY B. HELLER,

    *Plaintiffs*,

v.

GUARDIAN PHARMACY, LLC, and
GUARDIAN PHARMACY OF
ATLANTA, LLC,

    *Defendants*.

Civil Action File No.:

1:18-cv-03728-SDG

## DEFENDANT GUARDIAN PHARMACY OF ATLANTA, LLC'S REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS

Relator claims that Guardian Pharmacy of Atlanta, LLC ("Guardian Atlanta")—a long-term care pharmacy ("LTCP")—violated the federal Anti-Kickback Statute ("AKS") and, by extension, the False Claims Act ("FCA"), by furnishing "kickbacks" in exchange for being designated as a "preferred pharmacy" by assisted living communities ("ALCs") and personal care homes ("PCHs") (collectively, "Communities"). The alleged "kickbacks" fall into three buckets: (1) installation of computers and software for electronic medication administration records ("eMAR"); (2) quarterly medication management services;

and (3) training and skills checks for Community staff.

Relator's Opposition often uses the term "consulting" to refer to both medication management and training/skills checks, but they are quite different. Medication management services are patient-specific,[1] and they are provided by Guardian Atlanta *only* to its own patients, not all Community residents.[2] Training and skills checks, on the other hand, are provided to Community staff and benefit the entire Community, not just Guardian Atlanta's patients. Guardian Atlanta also provides eMAR services for the benefit of its own patients. Thus, Guardian Atlanta charges its patients directly for eMAR and medication management, but charges the Communities for training and skills checks.

Relator offers no precedent or Government warning that providing medication management or eMAR services to Community residents without separately charging the Community makes a pharmacy ineligible for Medicare payment. Instead, he relies solely on warnings to *nursing facilities*, which are very different from Communities, and states that he seeks to change industry practice, suggesting that "[t]his case can abruptly halt the race to the bottom for the

---

[1] *See* Doc. 24, ¶ 181 (noting that the medication management services "take approximately 10 minutes onsite from start to finish, per resident per quarter").

[2] Each resident of a Community is allowed by law to choose his or her own pharmacy—including either a retail pharmacy or an LTCP.

prescription drug business in Georgia's senior living market." (Doc. 41 at 6).

Relator does not allege facts to show—and does not outline in his Opposition—that Guardian Atlanta's fees to patients are below fair market value or insufficient to recoup the costs of providing both eMAR and medication management services.[3] Rather, he deflects by characterizing Guardian Atlanta's practice of billing its patients directly for the eMAR and medication management services as "a further scheme under which residents fund Guardian's kickbacks to the facilities, while Guardian misrepresents to owners and operators that its consulting services are 'free.'"[4]

Not only are there no allegations in the Complaint regarding this "further scheme," but the new assertion that Communities were unaware of the $10 fee is contradicted by allegations in the Complaint.[5] This new assertion also ignores the fact that care in ALCs and PCHs is paid for by residents or their families (unlike in nursing homes where care is often paid for by Medicare or Medicaid):

> Because residence fees are paid with the personal assets of residents, small price differences among competing residential facilities can

---

[3] Doc. 32-1 at 4, 11-13. Relator does make a bald assertion that whether "the costs for its 'free' consulting services were recouped from residents is a disputed fact," but he does not explain this position or identify any facts alleged in the Complaint that would support it. (Doc. 41 at 22; Doc. 32-1 at 11-13).

[4] Doc. 41 at 5.

[5] Doc. 24, ¶¶ 99, 128, 214, 219, 240.

> determine a resident's choice of where to live, thus the facilities seek
> to limit their operating costs as much as possible. Facilities also seek
> to limit the costs to their residents as much as possible.[6]

In ALCs and PCHs, whether the pharmacy charges the residents *directly* (as with

Guardian Atlanta's $10/month fees) or *indirectly* (through a fee to the Community

that is passed on to residents), the fees will ultimately be borne by residents.

With regard to training and skills checks, Relator does not take issue with

Guardian Atlanta's pricing for this service, but complains that prior to January

2018, Guardian Atlanta provided "free" training to "new communities to

Guardian AND newly licensed assisted living communities."[7] Relator's

Opposition utterly fails to address Guardian Atlanta's response to that

allegation—namely, that the Complaint does not plead beyond speculation that

this is an illegal inducement rather than a legal marketing tool to generate future

paid training.[8]

Further, even though the Eleventh Circuit identifies "[t]he submission of a

false claim [as] 'the *sine qua non* of a False Claims Act violation,'"[9] Relator refuses

---

[6] Doc. 24, ¶ 99; Doc. 24, ¶¶ 97-98; *see also* Doc. 41 at 25.

[7] Doc. 24, ¶ 225. Relator originally made more sweeping claims with respect to these training classes in his Complaint, but has backtracked from that position in his Opposition.

[8] Doc. 32-1 at 24-25.

[9] *U.S. ex rel. Chase v. HPC Healthcare, Inc.*, 723 Fed. App'x 783, 789 (11th Cir. 2018) (quoting *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002).

to deal with his failure to plead with particularity any false claims. Specifically, Relator ignores that his Exhibit A is nothing more than a guess at numbers of patients choosing Guardian Atlanta at 49 Communities, followed by rote math based on industry averages.[10] Further, he further ignores that the 20 claims he purports to identify are based on "information and belief" related to his former pharmacy—Collier's.[11] And, finally, he does not address his failure to plead that any of the 20 purported claims were "false" by pleading a causal link between those claims and any alleged kickback.[12]

## I. eMAR and Quarterly Medication Management Services Are Integrally Related to Guardian Atlanta's Services to Its Patients

While the Office of Inspector General of the Department of Health and Human Services ("OIG") views "free or below-market items and services [as] suspect, the OIG has distinguished between situations in which a provider offers free items and services that are integrally related to that provider's services, and those that are not."[13] The OIG has also opined that a pharmacy can provide *free* eMAR services for each resident of a community home receiving his or her prescription medications from the pharmacy. (Doc. 33-1 at 5-6, 10-12 (discussing

---

[10] Doc. 32-1 at 26-27.

[11] Doc. 32-1 at 27-28.

[12] Doc. 32-1 at 28-31.

[13] Doc. 33-1 at 11 (citing 56 Fed. Reg. 35,952, 35,978 (July 29, 1991)).

"Arrangement B")). The OIG noted that even though the arrangement would "reliev[e] the Community Homes of [an] administrative burden," the pharmacy's provision of the eMAR software was "integrally related" to the pharmacy's own services. (*Id*. at 11).

Relator tries to argue in the face of the OIG opinion and the $10 fee that eMAR and medication management services are not "integrally related" to Guardian Atlanta's services. That argument fails as a matter of law.

First, eMAR and medication management services are not merely "integrally related" to Guardian Atlanta's services, they *are* Guardian Atlanta services provided directly to Guardian Atlanta patients, for which Guardian Atlanta charges the patients a fee that exceeds its costs. Relator neither alleges otherwise in his Complaint nor argues otherwise in his Opposition brief. The Relator has not cited any cases in which a service provided to patients at a profit was deemed a kickback.

Relator tries to create some smoke around this issue with selective quotes from emails sent by Lori Newcomb, a Guardian Atlanta pharmacist who was developing new pricing for *training and skills checks*. (Doc. 41 at 3-4). While she incidentally observes that Communities are not charged for medication management, her emails are directed at training and skills checks and eliminating

6

first-time-free fee waivers for new Communities. Her "black hole" comment must be understood in that context. She does not indicate that Guardian Atlanta is losing money on medication management, but rather that Guardian Atlanta is missing out on revenue opportunities in connection with training for new Communities. If anything, Ms. Newcomb's emails demonstrate a keen focus on treating consulting services as a profit center. Moreover, nothing in Ms. Newcomb's emails suggests that Guardian Atlanta's pricing terms vary based on volume or value of referrals. To the contrary, the emails reflect across-the-board practices for all Communities.

Even without the fee, the eMAR and medication management services are integrally related to the provision of medications to residents living in ALCs and PCHs. Most notably, these services enhance the safety of the drugs that Guardian Atlanta provides to its patients. According to an OIG advisory opinion, a pharmacy's provision of eMAR services directly to its own patients is integrally related to the pharmacy's services.[14] Relator dismisses the OIG opinion with the bald assertion that "in the section most analogous to the circumstances presented here, OIG found a potential kickback violation." (Doc. 41 at 6). But OIG differentiated that section ("Arrangement D") from the other arrangements

---

[14] Doc. 33-1 at 11.

because it "presents an increased risk of unfair competition."[15] As discussed in Guardian Atlanta's initial Brief, the aspects of that arrangement that caused the OIG concern have not been pleaded by Relator.[16] Relator's Opposition is devoid of any explanation as to why Arrangement D is "most analogous."

Relator maintains in his Opposition that Guardian Atlanta's services benefit the Community rather than its own patients because the pharmacists interact with Community staff and only rarely interact with individual patients.[17] But as reflected in his Complaint, they actually mostly "interact" with records—*individual patient* records—and also dispose of expired drugs for Guardian Atlanta patients and prepare *patient-specific* reports for Guardian Atlanta patients:

> The pharmacy consulting services that Guardian delivers for "no charge" take approximately 10 minutes onsite from start to finish, *per resident* per quarter. The pharmacist or nurse also incurs travel time to and from the facility, disposes of expired or unnecessary medications, and prepares a detailed electronic report for the facility addressing *each resident's* medication history, findings, and recommendations.[18]

Only Guardian Atlanta's own patients receive this service. And as Relator

---

[15] Doc. 33-1 at 12 (Arrangement D had "a low risk of distorted medical decision making, overutilization, and increased Federal health care program costs").

[16] *See* Doc. 32-1 at 15, n.41.

[17] Doc. 41 at 27.

[18] Doc. 24, ¶ 181 (emphasis added).

acknowledges, they receive this service irrespective of whether they reside in an ALC or a PCH.[19] The undisputed facts that PCHs are *not* required to provide quarterly medication management services—and that Guardian Atlanta nevertheless provides those services to its own patients in PCHs—shows that medication management is integrally related to Guardian Atlanta's own service offering to individual patients.

Relator incorrectly asserts that "CMS Manual, Chapter 5 applies only to nursing homes" because the definition of "long-term care (LTC) facility" is limited to "a skilled nursing home or nursing home."[20] But Relator overlooks that the Manual expressly applies to pharmacies that serve "residents of non-LTC facilities (e.g., assisted living facilities and other forms of congregate residential settings) with the same level of care needs as residents of LTC facilities."[21] Thus, Guardian Atlanta is reimbursed by Medicare as an LTCP, and there is no dispute that medication management services are within the scope of LTCP services under the CMS Manual, meaning that they are integrally related to Guardian

---

[19] Doc. 41 at 21, n.6.

[20] Doc. 41 at 25-26.

[21] Prescription Drug Benefit Manual, Ch. 5, § 20.7, Doc. 33-2 at 22. In his original Complaint, Relator properly acknowledged that Guardian Atlanta is an LTCP. (*See* Doc. 1, ¶ 65). While Relator did not repeat that allegation in his Amended Complaint, he does refer to Collier's Personal Care Pharmacy, which he treats as a predecessor to Guardian Atlanta, as an LTCP. (*See* Doc. 24, ¶ 15).

Atlanta's service to its own patients.

Relator also claims that "[e]ven if the CMS Manual applied, the 'minimum performance and service criteria' that a long-term care pharmacy must perform all take place in the pharmacy *before* medications are dispensed to the patient."[22] That argument is contrary to the provisions of the Manual, which, among other obligations, require an LTCP to perform "drug utilization review … to routinely screen for allergies and drug interactions, identify potential adverse drug reactions, identify inappropriate drug usage in the LTC population, and to promote cost effective therapy …"[23] In the Relator's view, once the medications have been dispensed, responsibility for the medications passes entirely to the Community, and the LTCP need not—indeed, *must not*, lest it subject itself to criminal AKS liability—do anything further with respect to the medications it dispenses, unless it charges the Community. Yet for residents of an ALC or PCH with chronic conditions, "dispensing" is not a "one-and-done" event. Medication management services do not simply occur *after* one dispensing event; they also occur *before* the next dispensing event and promote patient safety. Indeed, the primary benefit of quarterly medication management services is prospective, *i.e.*,

---

[22] Doc. 41 at 26.

[23] Prescription Drug Benefit Manual, Ch. 5, § 50.5.2, Doc. 33-2 at 43.

with respect to medications yet to be dispensed to the patient. In short, the eMAR and medication management services that Guardian Atlanta provides to its own patients make the medications that it dispenses to those patients safer.

Even if Relator were correct that there is some doubt whether LTCPs are strictly required to provide the quarterly medication management or eMAR services at issue here to their patients—whether for a $10 fee or not—Relator's view of "integrally related" services is still narrower than that articulated in any case or OIG opinion that he cites. He seeks to limit "integrally related" services to the bare minimum services specifically mandated by law. (Doc. 41 at 25-29). Relator offers no authority for this exceptionally narrow view of "integrally related" services, which is inconsistent with OIG Advisory Opinion 12-19, where the OIG found that eMAR was integrally related to an LTCP's services without determining either (1) that the LTCP was required to provide the service, or (2) that the community homes did not have overlapping duties with respect to eMAR (and, in fact, the OIG concluded the opposite—that the eMAR services would "reliev[e] the Community Homes of [an] administrative burden").[24]

Relator's narrow view of integrally related services is also contrary to case

---

[24] Doc. 33-1 at 11.

law.[25] For example, in *United States ex rel. Suarez v. AbbVie,* AbbVie's "Ambassadors served patients by training them on how to inject Humira, showing how to dispose of injection equipment, helping obtain insurance coverage for Humira, and helping obtain free Humira during insurance coverage gaps."[26] "Ambassadors served doctors by providing these services to patients, giving doctors' offices pre-completed insurance authorization forms for Humira, and answering Humira patients' administrative questions."[27] These were considered legitimate "support services," not because AbbVie was obligated to provide them or because they had no value to prescribing physicians, but because the services were related to Humira and did not have independent value beyond support for Humira. The *Suarez* court described the relator's allegation "that offering free product support or reimbursement support services could violate the AKS merely because it saves physicians money" as "a premise that appears inconsistent with … OIG guidance."[28]

Relator notes (as did Guardian Atlanta in its initial Brief) that the OIG was

---

[25] *See, e.g., U.S. ex rel. Suarez v. AbbVie Inc.,* Case No. 15-C-8928, 2019 WL 4749967 (N.D. Ill. Sept. 30, 2019); *U.S. ex rel. Forney v. Medtronic, Inc.,* Civil Action No. 15-6264, 2017 WL 2653568 (E.D. Pa. June 19, 2017).

[26] *Suarez,* 2019 WL 4749967, at *7.

[27] *Id.*

[28] *Id.* at *9.

concerned about possible unfair competition among pharmacies serving community homes and invokes the dangers of a "race to the bottom." (Doc. 41 at 6-7).[29] It is difficult to conceive how providing integrally-related, safety-focused services to seniors, at a fair $10 fee, could constitute "an unfair business practice that undermines fair competition and ultimately harms the beneficiaries of federal healthcare programs and the public fisc, in violation of the AKS" or start a "race to the bottom."[30] Any pharmacy could provide the same service for the same fee, and providing superior service to patients is actually a race to the top.

## II.   Relator's Reliance on Nursing Facility Precedents is Misplaced

The *Suarez* court distinguished situations in which the "support services" allowed referral sources to "obtain payouts from government health care programs for services that they did not provide."[31] This is a key element distinguishing the present situation from the nursing facility-pharmacy authorities cited in Relator's Complaint and Opposition. Most residents in

---

[29] Indeed, neither Relator's Complaint nor his Opposition explains why other LTCPs could not compete with Guardian Atlanta on service—*i.e.*, by providing identical or better support services for the same $10 monthly fee. As the principal of an LTCP that competed with Guardian Atlanta, Relator would be well-positioned to explain why other LTCPs cannot compete with Guardian Atlanta's service offering. Yet, his Complaint is silent on this issue.

[30] Doc. 41 at 6-7.

[31] *Suarez*, 2019 WL 4749967, at *9.

nursing facilities are covered by Medicare Part A or Medicaid, and the per diem bundled rate under those programs reimburses the nursing facility for medication management services. (Doc. 24, ¶¶ 97-99). Thus, in *nursing facilities*, a pharmacy's provision of free medication management services would allow the nursing facility to "obtain payouts from government health care programs for services that they did not provide." In *Communities*—which do not receive any government payments—"free" or "discounted" pharmacy services ultimately benefit residents and only benefit the Communities to the extent that it allows them to charge residents less. (Doc. 24, ¶ 99).

The OIG opinion regarding eMAR services in community homes also effectively distinguishes pharmacy-nursing facility relationships, indicating that it is problematic "when a pharmacy provides free or below-market consulting pharmacist services to a *nursing facility* that is required to obtain or provide such services for its residents."[32] It is telling that the OIG referenced "nursing facilities" in an advisory opinion about *community homes*. The OIG could have referred to "those situations when a pharmacy provides free or below-market consulting pharmacist services to a [community home]," but it did not.

---

[32] Doc. 33-2 at 10.

### III.    Guardian Atlanta's $10 Fees to Its Residents Are Not a "Secret"

Relator contends that Guardian Atlanta "may have secretly charged residents for the kickbacks [quarterly medication management and eMAR services Guardian Atlanta] provided to the facilities where they live."[33] But Relator's Complaint does not allege that these fees were "secret." To the contrary, he alleges that "[a]dditional service fees may be billed to the residents," and that Communities "seek to limit the costs to their residents as much as possible."[34] In the one Paragraph where Relator gives an example of a contract—with Magnolia Senior Living, one of the six exemplar Communities highlighted in Relator's Complaint (Doc. 41 at 31)—Relator alleges that "a $10 monthly fee for eMAR subscription services" was "memorialized in the contract." (Doc. 24, ¶ 214).  A fee memorialized in a business contract is no "secret."

The assertion in Relator's Opposition is also contradicted by a paragraph of his Complaint describing Guardian Atlanta's direct marketing efforts to patients:

> As part of Guardian's marketing efforts, on or about January 24, 2018, Relator was preparing to conduct a "Family Night" gathering at Canterfield of Kennesaw, a 99-bed assisted living community, and drafted a handout about Guardian's pricing compared to other pharmacies. Family members of approximately 20 residents and members of the management team of the assisted living community

---

[33] Doc. 41 at 21; Doc. 41 at 22 (asserting that Defendant "surreptitiously billed patients").

[34] Doc. 24, ¶¶ 128, 99.

attended the meeting.

(Doc. 24, ¶ 219). Canterfield is another one of the six exemplar Communities highlighted in Relator's Complaint. (Doc. 41 at 31). Beyond further demonstrating that *individual patients* and their families are Guardian Atlanta's customers, this allegation shows that Guardian Atlanta was discussing pricing with patients while Canterfield's management staff were present. Relator's new theory of a "secret" pricing scheme is defeated by his own Complaint.

Relator's real gripe is not with the disclosure of the fee, but with the label assigned to it. (Doc. 41 at 20-21). Regardless of the label assigned, it was no "secret" that Guardian Atlanta charged its patients $10 per month or that its patients received both eMAR services and quarterly medication management services. As discussed above, Relator does not allege in his Complaint that the $10 fee did not fully cover both eMAR and quarterly medication management services. And Relator does not cite any authority to support his view that the adequacy of the charge turns on its label.

## IV.    Relator Fails to State a Claim as to Staff Training and Skills Checks

Though Relator's Complaint alleged that Guardian Atlanta did not begin charging for staff education and skills checks until January 2018, he has scaled back that allegation significantly in his Opposition. Now, he solely takes issue with

Guardian Atlanta's alleged offer of "free" classes to "new communities to Guardian AND newly licensed assisted living communities." (Doc. 41 at 11-12). With respect to this allegation, Guardian Atlanta argued that "Relator does not offer any basis—even at the pleading stage—to infer beyond speculation that the purpose of the alleged free trial classes was to induce referrals as opposed to generating future training revenues." (Doc. 32-1 at 24-25).

Relator's Opposition does not address this deficiency. Instead, he points to a March 2, 2017 email in which "Consulting Department Manager Ms. Newcomb directly addresses senior living facilities administrators ('we are trying to help you get your staff CMA certified')" and telling them "that 'new communities to Guardian' are 'exempt from these charges.'" (Doc. 41 at 31-32 (quoting Doc. 32-2, Ex. A)). Relator's focus on this email misses the point. The question is not whether Guardian Atlanta offered free trials to new Communities. That allegation must of course be accepted as true at this point. But the closest that Relator comes to connecting the free-first-free training to any Communities is a general allegation that "Collier's facilities . . . would have qualified for these free education classes." (Doc. 24 ¶ 227). This falls far short of an allegation that first-time-free training was offered in exchange for referrals of Government-paid business, as opposed to trying to generate future paid training revenues. In fact, Relator makes allegations

inconsistent with any link to patient referrals, stating that Guardian Atlanta was *already* serving former Collier's patients simply by virtue of having acquired Collier's. (Doc. 24, ¶142).  (Doc. 32-1 at 24-25). Relator's Opposition does not point to any factual allegations to push his free training allegations across "the line between possibility and plausibility of entitlement to relief."[35]

## V. The Complaint Fails to Identify any False Claims "Resulting From" any AKS Violation

Relator "must point to at least one claim that covered a patient who was recommended or referred to [the Defendant] by [the kickback recipient]."[36] Relator has failed to do that here. Indeed, Relator fails to adequately plead any particular claim, much less plead facts linking any claim to any kickback.

### A. Relator Fails to Allege any Specific Claims

Relator mischaracterizes Exhibit A to his Complaint, asserting that it provides "information about the number of residents who selected Guardian as their pharmacy [and] prescription counts and revenues derived from each facility." (Doc. 41 at 33). But as shown in Guardian Atlanta's initial Brief, Exhibit

---

[35] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

[36] *Greenfield*, 880 F.3d at 99; *Suarez*, 2019 WL 4749967, at *10; *Suarez*, 2019 WL 4749967, at *10 ("Where a relator's FCA claim depends on violations of the Anti-Kickback statute, the relator must identify a link between the alleged kickback and a claim for government payment.").

A to Relator's Complaint is actually just a back-of-the-envelope estimate based on averages that are not even Guardian-specific. (Doc. 32-1 at 26).

With respect to the 20 purported representative claims for Relator's four exemplar patients, Guardian Atlanta observed in its initial Brief that Relator merely guesses about each resident's drug treatment regimen "*upon information and belief*" based solely on the drugs they were receiving "*while serviced by Collier's.*" (Doc. 32-1 at 27-28 (quoting Doc. 24, ¶¶ 283, 284, 292, 295)). In response, Relator now claims that he "obtained detailed claims data showing that Guardian submitted claims for payment to Medicare for prescription drug orders that Guardian filled for residents of senior living facilities to which Guardian supplied kickbacks." (Doc. 41 at 33-34 (citing Doc. 24, ¶¶ 283, 284, 292, 295)). While the Court must accept the well-pleaded allegations of the Complaint as true at this stage, it need not accept as true representations in Relator's Opposition that contradict allegations in the Complaint. Aside from trying to change the stated basis for the allegations in Paragraphs 283, 284, 292, and 295, Relator makes no effort to address the prefatory "information and belief" language, the assumption that former Collier's patients simply "became a patient of Guardian's," the purported identification of claims months after Relator left Guardian Atlanta, or any other identified problems with his "information and belief" assertion of

claims. (Doc. 41 at 33-35). Instead his solution was to paste a copy of one of the tables of "claims" — divorced from the prefatory language showing the speculative nature of the table. (Doc. 41 at 34-35).

### B. Relator Fails to Adequately Plead Specific Claims Resulting From any Alleged Kickback

Even ignoring the speculative nature of the twenty purported "claims" on behalf of the four exemplar patients, the Complaint fails to link any purported claim to any alleged kickback — *i.e.*, to show that any of the claims resulted from any alleged kickback. (Doc. 32-1 at 28-31).[37] With respect to the only four individual patients specifically identified by Relator, he simply asserts — baldly and without explanation — that each of them "*became* a patient of Guardian's after [the Community] decided to retain them as the facility's preferred pharmacy." (Doc. 24, ¶¶ 283-84, 292, 295). Given Relator's acknowledgement that residents have free pharmacy choice and his own estimate that about 20% of Community residents choose *not* to use Guardian Atlanta,[38] his assumption that any individual patients simply "became patients of Guardian" fails to plead causation — namely, whether those customers actually did select Guardian Atlanta and, if so, what, if

---

[37] *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1277 (11th Cir. 2018) (finding that the "relator must allege an '*actual false claim* for payment'").

[38] Doc. 24, ¶¶ 133, 135, 137.

anything, the Communities in which these four individuals resided did to steer these patients to Guardian Atlanta.

Relator also claims that two PCHs owned by Senior Solutions "would not remain Defendants' customers unless all consulting fees were waived" and that Guardian Atlanta "provided free consulting and eMAR setup … and received referrals of residents in return."[39] But neither the Opposition nor the Complaint explains what, if anything, these PCHs did to convince residents to select Guardian Atlanta. Nor do they identify any residents of these PCHs who selected Guardian Atlanta, let alone any claims submitted on their behalf.

As to the requisite "resulting from" link between any alleged kickback and patients choosing Guardian Atlanta, Relator offers only a *post hoc ergo propter hoc* ("after this, therefore because of this") fallacy. He ignores his own allegations regarding patient choice (Doc. 24, ¶¶ 128, 130, 133, 137; Doc. 32-1 at 29), and simply assumes that if the four patients—M.P., C.P., E.S., and C.S.—chose Guardian Atlanta as their pharmacy, it must have been due to some influence exerted (but nowhere alleged in the Complaint) by the Communities where they resided.

That assumption is especially problematic because all four of Relator's exemplar patients were "previously Collier's Pharmacy customers." (Doc. 41 at

---

[39] Doc. 41 at 32 (citing Doc. 24, ¶¶ 267-68).

34). As stated in the Complaint, Guardian Atlanta acquired Collier's Pharmacy in 2017, and in Relator's words, "thereby add[ed] approximately 1,700 new residents to its pharmacy service." (Doc. 24, ¶ 142). With this allegation, Relator goes beyond failing to plead a claim "resulting from" a kickback to affirmatively pleading *alternate* causation having nothing to do with a kickback—that Guardian Atlanta simply stepped into the shoes of Collier's, and Collier's patients "thereby" continued as Guardian Atlanta patients following the acquisition.

Relator cites no authority that would allow him to bypass pleading facts showing the requisite link between an alleged AKS violation and actual claims "resulting from" the violation. Relator states that "a district court in Massachusetts after the *Greenfield* decision found allegations showing 'that Defendant paid kickbacks to a physician for the purpose of inducing the physician to prescribe specific drugs, and that the physician then prescribed those drugs,' sufficient to state a claim, 'even if the physician would have prescribed those drugs absent the kickback.'" (Doc. 41 at 35, quoting *United States ex rel. Bawduniak v. Biogen Idec, Inc.,* 2018 WL 1996829, at *3 (D. Mass. Apr. 27, 2018)). Relator puts the cart before the horse. In *Bawduniak*, the existence of referrals was not in question. At issue was a defense that those referrals would have occurred even without a kickback. Here, the issue is that Relator has not adequately alleged the referral—*i.e.*, that the

Communities actually did anything to influence M.P., C.P., E.S., or C.S.'s decision to choose Guardian Atlanta as their pharmacy. Thus, we do not arrive at the issue in *Bawduniak*—whether a referral becomes non-actionable if it would have been made regardless of the kickback.

Relator also relies on *United States ex rel. McNutt v. Haleyville Medical Supplies*, 423 F.3d 1256 (11th Cir. 2005). That case precedes the amendment to the AKS adding the "resulting from" language. Beyond that, the AKS scheme in that case was nothing like the one alleged here, with checks being written in the amount of a percentage received from Medicare in recognition of referrals made.[40] As in *Bawduniak*, there was no question as to the existence of a referral.

Relator relies on speculation and a *post hoc* fallacy, rather than factual allegations, to show claims "resulting from" alleged kickbacks.

## VI. Relator Fails to Allege Facts Demonstrating Materiality

Even if Relator had sufficiently pleaded noncompliance with the AKS, he failed to plead facts to establish that the alleged violations were material. Relator does not engage with the substance of Guardian Atlanta's argument.[41] Instead, Relator claims that Guardian Atlanta concedes that Relator need not plead

---

[40] *Id.* at 1258.
[41] Doc. 32-1 at 37-38.

materiality. Not so. Guardian Atlanta pointed to *Greenfield*, which states that materiality is a requirement of an AKS-based FCA action, while properly acknowledging that another case took a different view.[42] Nothing in the Supreme Court's opinion in *Escobar* indicates that that the FCA's materiality requirement is not applicable to all FCA cases based on regulatory or statutory non-compliance.[43] And this case demonstrates precisely why materiality is an important element. The OIG regularly issues advisory opinions in which it concludes that an arrangement potentially implicates the AKS, but for various policy reasons, it would not impose sanctions. By way of example, Advisory Opinion No. 12-19 states:

> [A]lthough Proposed Arrangement[s A, B, and C] ***could potentially generate prohibited remuneration under the anti-kickback statute*** …, the [OIG] ***would not impose administrative sanctions*** … in connection with [those proposed arrangements].[44]

At base, the materiality inquiry asks whether the defendant knows that the alleged regulatory violation is one that would make services ineligible for payment.[45] Here, the OIG has indicated that LTCP services to "community homes"

---

[42] Doc. 32-1 at 37 (citing *Greenfield*, 880 F.3d at 98, n.8 (noting that in AKS-based FCA claim, relator "must also satisfy the [FCA's] materiality requirement")); *but see Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019) (finding that materiality was not required).

[43] *Universal Health Servs. v. U.S. ex rel. Escobar,* 136 S. Ct. 1989 (2016).

[44] Doc. 33-1 at 2; Doc. 33-1 at 13.

[45] *Escobar*, 136 S. Ct. at 2002-04.

do not implicate traditional AKS risks, so long as they do not give rise to unfair competition. (Doc. 33-2). While the advisory opinion addressed only eMAR services, its reasoning applies equally to medication management. Against this, Relator points only to materials that warn *nursing facilities*—a very different animal than Communities—to be wary in their arrangements with pharmacies. He cites nothing with respect to Communities. Relator's allegations do not satisfy the "demanding" materiality standard set forth in *Escobar*.[46]

## VII.    Conclusion

For the foregoing reasons, Guardian Atlanta requests that its Motion to Dismiss Relator's Complaint be granted.

Respectfully submitted this 19th day of June, 2020.

ARNALL GOLDEN GREGORY LLP


*/s/ W. Jerad Rissler*
W. Jerad Rissler, Esq.
Georgia Bar No. 142024
jerad.rissler@agg.com
Glenn P. Hendrix, Esq.
Georgia Bar No. 346590
glenn.hendrix@agg.com

Arnall Golden Gregory LLP
171 17th Street, Suite 2100
Atlanta, Georgia 30363-1031

---

[46] *Id*. at 2003.

404.873.8500 (Telephone)
404.873.8501 (Facsimile)
*Attorneys for Defendant*
*Guardian Pharmacy of Atlanta, LLC*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this pleading was prepared using Book Antiqua 13-point font in accordance with Local Rule 5.1(C).

This 19th day of June, 2020.

*/s/ W. Jerad Rissler*
W. Jerad Rissler, Esq.
Georgia Bar No. 142024

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2020, I electronically filed the foregoing

**DEFENDANT GUARDIAN PHARMACY OF ATLANTA, LLC'S REPLY**

**BRIEF IN SUPPORT OF MOTION TO DISMISS** with the Clerk of Court using

the CM/ECF system which will automatically send email notification of such

filing to all Counsel of Record.

*/s/ W. Jerad Rissler*
W. Jerad Rissler
Georgia Bar No. 142024

ARNALL GOLDEN GREGORY LLP
171 17th Street NW
Suite 2100
Atlanta, Georgia 30363-1031
Telephone: 404.873.8500
Facsimile: 404.873.8501