**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* HENRY B. HELLER, | |
| *Plaintiffs*, | Civil Action File No.: |
| v. | |
| GUARDIAN PHARMACY, LLC, and GUARDIAN PHARMACY OF ATLANTA, LLC, | 1:18-cv-03728-SDG |
| *Defendants*. | |

**DEFENDANTS' BRIEF IN SUPPORT OF**
**MOTION FOR RULE 11 SANCTIONS**

Defendants Guardian Pharmacy, LLC ("Guardian Pharmacy") and Guardian Pharmacy of Atlanta, LLC ("Guardian Atlanta") file this Brief[1] in support of their Motion for Rule 11 Sanctions.

---

[1] Defendants are filing a supporting memorandum that is narrower than the one served on May 19, 2020. This is, in part, in order to withdraw arguments in connection with positions that it appears Relator is no longer taking based on his Response in Opposition to Defendant Guardian Pharmacy of Atlanta, LLC's Motion to Dismiss (Doc. 41) and his Response in Opposition to Defendant Guardian Pharmacy, LLC's Motion to Dismiss (Doc. 42) after being served with the Rule 11 motion. Defendants have also redacted portions of the supporting declaration to avoid submitting matters that are extraneous to the narrowed supporting memorandum. Defendants will file the original version of the supporting memorandum as well as the unredacted declaration if requested.

## I.   <u>INTRODUCTION</u>

In this action, Relator Henry B. Heller ("Heller") asserts claims against Defendants under the False Claims Act ("FCA"). Heller alleges that they violated the Anti-Kickback Statute ("AKS") and, therefore, submitted false claims in violation of the FCA. The purported AKS violations relate to services designed to ensure the safe administration and management of the drugs that Guardian Atlanta dispenses to its patients residing in Assisted Living Communities ("ALCs") and Personal Care Homes ("PCHs") (collectively "Communities"). Specifically, Heller alleges that Defendants:

> (1)   "perform[ed] medication management services for customers, on a quarterly basis, for no charge or for charges that are well below [FMV]";
>
> (2)   "offered free installation of the computers and software programs for electronic medication administration records (eMAR) systems"; and
>
> (3)   "furnished legally-required education classes and skills checks for

free or below-cost."[2]

Defendants have moved to dismiss Heller's claims because, even accepted as true, his allegations do not set forth plausible AKS violations or otherwise state a plausible claim against Guardian Pharmacy or Guardian Atlanta.[3] Defendants separately move under Rule 11 for two reasons. First, Heller's actions and words demonstrate that he *knows* that the facts he alleges do not state a plausible AKS violation. Both at his current employer—Gayco Healthcare ("Gayco")—and at Collier's Personal Care Pharmacy ("Collier's"), which he co-owned before selling to Guardian Atlanta, Heller provided and offered the same services that his Complaint now labels "kickbacks" at lower fees than Guardian Atlanta charges and sometimes at no charge. Based on his own conduct, Heller cannot possibly believe that his allegations demonstrate violations of the AKS.

Second, Heller pursues this action through factual allegations that have no

---

[2] Amended Complaint, Doc. 24 ("Am. Compl.") ¶¶ 7-9. Relator's Opposition effectively narrowed his allegations regarding "free" classes and skills checks to focus only on training and skills checks offered on a first-time-free basis to new communities to Guardian Atlanta and newly-licensed ALCs; he did not defend, or address, the broader allegations in his Complaint regarding the supposedly "free" provision of all training and skills checks prior to 2018. (Doc. 41 at 2, 3, 11-12.) Relator has not sought leave to file an Amended Complaint to limit his claims with respect to "free" training to the narrower set of allegations that he defends in his Opposition. Nevertheless, Defendants have amended this supporting memorandum to remove those allegations as a basis for sanctions, given that Relator appears to have abandoned them, albeit only implicitly.

[3] Doc. Nos. 32, 34.

evidentiary support, that are demonstrably false, and that, in many cases, Heller knows to be false. These false allegations go the heart of Heller's case that Guardian Atlanta provided "free" medication management, eMAR, and training services.

"[O]pportunism rather than legitimate whistle-blowing [often] motivate[s] the filing of [*qui tam*] complaint[s]."[4] Consequently, "the [FCA] has been repeatedly amended, representing 'a long history of repeated congressional efforts to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior.'"[5] But Heller's claims go beyond the potential "opportunism" that might be ascribed to any whistleblower. Heller competes with Guardian Atlanta in the marketplace as an employee of Gayco,[6] and a federal lawsuit accusing Guardian Atlanta of fraud, though unlikely to succeed, places Guardian Atlanta at a competitive disadvantage.

Of course, the pursuit of an FCA claim by a *qui tam* whistleblower

---

[4] *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006).

[5] *Id.* at 876 (quoting *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 225 (1st Cir. 2004)); *see also United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 49 n.2 (4th Cir. 1992) ("We note that Congress has twice struck a new balance when it perceived that the qui tam provisions of the False Claims Act were being overused, underused, or misused") (citing *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1497 (11th Cir. 1991)).

[6] Declaration of Matthew Hopp ("Hopp Decl.") ¶ 6. A copy of the Hopp Declaration is attached hereto as **Exhibit A**.

motivated by the desire to injure a competitor is not in itself impermissible. Former employees should bring to light misconduct of which they are aware. And companies should expose unfair and illegal practices of their competitors to "level the playing field." But founding such pursuits, as Heller does, on frivolous claims, unfounded speculation, and false factual allegations unnecessarily wastes the time and resources of defendants, the Government, and the judiciary, contrary to Rule 11. Such deceptive and self-serving behavior should be deterred not just for the benefit of the Defendants in this case, but also to protect the integrity of the FCA's *qui tam* provisions and for the benefit of legitimate whistleblowers, the Government, and the judiciary.

## II.   <u>ARGUMENT AND CITATION OF AUTHORITY</u>

### A.   **Rule 11**

Rule 11 of the Federal Rules of Civil Procedure provides for the imposition of sanctions against parties and their attorneys who make false factual statements in documents submitted to the Court. If, after notice and a reasonable opportunity to respond,[7] the Court determines that Rule 11(b) has been violated, the Court may impose an appropriate sanction on any attorney, law firm, or

---

[7] Defendants provided Heller with the requisite notice by serving Heller's counsel with a copy of the motion and supporting memorandum of law on May 19, 2020, at least 21 days prior to filing this motion as required by Rule 11(c)(2).

party that violated the rule or is responsible for the violation.[8] The Eleventh Circuit has explained that a district court should undertake an analysis to determine if an attorney conducted a reasonable investigation into the factual basis of the claims asserted, as required by Rule 11(b).[9] The Court must determine whether the factual or legal contentions are frivolous. "A factual claim is frivolous if no reasonably competent attorney could conclude that it has a reasonable evidentiary basis. Thus, where no evidence or only 'patently frivolous' evidence is offered to support factual contentions, sanctions must be imposed."[10] The *Thompson* court went on to clarify that:

> Once a court concludes that either the factual or legal contentions are frivolous, the question becomes whether the attorney should have known they were frivolous. We ask what was known or reasonably knowable when the paper was "present[ed] to the court." Fed. R. Civ. P. 11(b). Again, measured objectively, if a reasonable investigation would have revealed the error to a reasonably competent attorney, then sanctions can be imposed; if not, then sanctions cannot be imposed. The reasonableness of the inquiry turns on the totality of the circumstances, including, for example, the time available for investigation and whether the attorney had to rely on the client, another member of the bar, or others.[11]

Even if "the contentions contained in the complaint were not frivolous at

---

[8] Fed. R. Civ. P. 11(c)(1)-(3).

[9] *Thompson v. RelationServe Media, Inc.*, 610 F. 3d 628, 665 (11th Cir. 2010).

[10] *Id.*

[11] *Id.*; *Jones v. Int'l Riding Helmets, Ltd.*, 49 F.3d 692, 695 (11th Cir. 1995) (citing *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1563 (11th Cir. 1992)).

the time it was filed" sanctions may be imposed for "continued advocacy … after it should have been clear that those contentions were no longer tenable."[12]

### B.    Heller's Personal Knowledge Is Limited to Guardian Atlanta Between January 23, 2017 and October 30, 2018

Before turning to Heller's specific allegations, a discussion of Heller's frame of reference for these allegations is in order. Heller's first-hand, insider information is limited to Guardian Atlanta from January 23, 2017 to October 30, 2018.[13] Heller was never employed by, or contracted with, Guardian Pharmacy (which provides corporate home office functions for various "Partner Pharmacies," including Guardian Atlanta). He never worked for any of Guardian Pharmacy's "Partner Pharmacies," other than Guardian Atlanta.[14] And he does not allege any knowledge of the practices at any Partner Pharmacies, other than Guardian Atlanta.[15] Thus, Heller's frame of reference is solely through his work for Guardian Atlanta from January 23, 2017 to October 30, 2018.

This background must be kept in mind in evaluating whether Heller's allegations have any reasonable evidentiary basis. Heller brazenly claims that both Guardian Pharmacy and Guardian Atlanta engaged in kickback schemes from 2014—three years before he joined Guardian Atlanta—until the filing of his

---

[12] *Turner v. Sungard Business Systems, Inc.*, 91 F.3d 1418, 1421-22 (11th Cir. 1996).

[13] Hopp Decl. ¶¶ 4-5; Am. Compl. ¶¶ 15, 144.

[14] Hopp Decl. ¶¶ 3, 5.

[15] Am. Compl.; Hopp Decl. ¶¶ 2, 7-8.

Amended Complaint—sixteen months after he left Guardian Atlanta.[16] Heller's allegations outside that time period are founded on sheer speculation, while his allegations within that time period are based on outright falsehoods.

### C.    Heller's Assertions that Defendants Did Not Sufficiently Charge for Medication Management and eMAR Services Are Frivolous and Lack Evidentiary Support

Heller acknowledges that Guardian Atlanta typically charges a $10 per patient per month fee:

> For most facilities, Guardian bills a monthly fee of $10 to residents whose facilities subscribe to an electronic system for maintaining medication administration records.[17]

The typical margin to Guardian Atlanta on this $10 per month service fee (after accounting for monthly eMAR costs) averages more than $60 per year per patient, which is more than sufficient to cover the costs of two of the three services that Heller alleges to be "kickbacks": 1) medication management services; and 2) eMAR installation and setup.[18] Contrary to Heller's allegations, not all Communities have eMAR systems, and of those that do, not all choose to purchase their eMAR system through Guardian Atlanta. Patients at Communities that do not purchase their eMAR services from Guardian Atlanta

---

[16] Am. Compl. ¶¶ 6, 156.
[17] Am. Compl. ¶ 240.
[18] Hopp Decl. ¶ 10.

typically pay a different fee that covers the cost of medication management.[19]

Nevertheless, Heller claims that he was "astonish[ed]" to learn that Defendants did not charge Communities separately for these services in some amount *in addition to* the $10 per resident per month charge.[20] Regarding eMAR setups, Heller falsely alleges in one place in his Complaint that Defendants installed eMAR "for all assisted living communities and personal care homes that selected Guardian as their preferred pharmacy."[21] But he later acknowledges specific Communities where he claims eMAR is not supplied by Guardian Atlanta.[22] Regardless, Heller does not limit his claims to Communities where there were allegedly no fees. In fact, Heller does not even identify any such Communities in his Complaint. Instead, he broadly and indiscriminately asserts a kickback scheme even where patients paid a $10 per month fee, even going so far as to characterize services provided at such Communities as "free."[23]

Heller's own actions over the course of many years—and in many

---

[19] Hopp Decl. ¶ 10.

[20] Am. Compl. ¶ 198 ("To his astonishment, Relator observed that the contract contained 'Confidential Pricing Terms' which stated that 'Pharmacy Consulting Services' would be provided 'Quarterly at no charge.'").

[21] Am. Compl. ¶ 151.

[22] *Id.*, Ex. A, pp. 1, 3 (identifying several Communities where eMAR system is "None").

[23] Am. Compl. ¶ 214 (acknowledging $10 monthly fee at Magnolia Senior Living); *id.* ¶¶ 205-06, 212 (characterizing the quarterly medication management services at Magnolia Senior Living as "free" despite the $10 fee).

instances, his own words—belie the allegations in his Complaint.[24] For example, in a March 2017 email, Heller stated his belief—contrary to the allegations in his Complaint—that it is "the industry standard" for LTCPs to be billed directly for eMAR fees and to recoup those costs over time through eMAR service charges, just as Guardian Atlanta does through its $10 monthly fee.[25]

Further, Heller sometimes provided the eMAR setup that he now claims to be a "kickback" at no charge or at a lower charge than Guardian Atlanta.[26] One Community whose patients Collier's had formerly served noted in an email that Collier's paid for their eMAR: "*Our agreement with Colliers was that they were picking up that fee and they did pay the $1500 [monthly] fee.*"[27] In that same email, the customer noted that "*historically Colliers was by far the cheapest on the market.*"[28] Heller acknowledged that "[w]hile at Collier's" he had "discussed raising [Collier's] fees" by $7 "to cover [eMAR] fees" but that this eMAR fee never came

---

[24] Hopp Decl. ¶¶ 11-18. Again, none of this is to suggest that Heller was violating the AKS at Collier's. As Guardian Atlanta has noted previously, these services are integrally related to an LTCP's services and could therefore be provided at no charge. (Doc. 32-1 at 13-22.) But it does show that Heller cannot believe that Guardian Atlanta's provision of these services—typically for $10 per patient per month—is an AKS violation.

[25] Hopp Decl. ¶ 16, Ex. D, March 15, 2017 Email from Heller (emphasis added).

[26] Hopp Decl. ¶ 15.

[27] Hopp Decl. ¶ 17, Ex. E, April 25, 2017 email from Community to Heller (emphasis added).

[28] *Id.* (emphasis added).

to fruition.[29] Collier's had been charging a $9 per month fee, which covered eMAR, medication management, *and* expensive Medicine-on-Time (MOT) packaging. Heller suggested that, rather than raise fees to $16 per month, Guardian Atlanta keep the fees at the $9 that Collier's had been charging. To get Guardian Atlanta's approval, he suggested switching the MOT packaging to "strip packaging," which is safer and less expensive than MOT packaging.[30] The cost to Guardian Atlanta of providing the eMAR service was a fraction of the $1500 per month that Collier's had been paying, and that cost was covered by the $9 per month fee, which was ultimately changed to Guardian Atlanta's standard $10 per month fee.[31]  If Heller did not view a $9 fee as too low for eMAR and medication management, *plus* expensive MOT packaging while at Collier's, he cannot view $9 (or $10) as too low for only the eMAR and medication management services (*i.e.,* without MOT packaging) provided by Guardian Atlanta.

Collier's also provided laptops and eMAR setup in a practice that he now claims to be a "kickback." In a November 2017 email in which Heller encouraged Guardian Atlanta to provide another laptop to a Community, Heller noted, "*I*

---

[29] *Id.*, April 25, 2017 email from Heller to Community.
[30] *Id.*; Hopp Decl. ¶¶ 17-18.
[31] Hopp Decl. ¶ 18.

*think the other computers were paid for by Collier's.*"[32] Another former Collier's

customer indicated that they received free laptops from Collier's.[33]

In his Complaint, Heller alleges that "[t]he setup fees, sometimes called

interface fees, that are charged by eMAR companies range from $499 to $7,000,

which Guardian pays for as an inducement and kickback for the benefit of

facilities who choose Guardian as a preferred provider."[34] However, Guardian

Atlanta has never paid anywhere near $7,000 for an interface fee. And on the rare

occasions where Guardian Atlanta has paid *any* interface fee at all, it was where

the Community already had its own contract with an eMAR vendor, and

Guardian Atlanta paid an interface fee to gain access to eMAR for *Guardian*

*Atlanta's patients* in that Community. That fee was separate and distinct from the

interface fee that the Community paid to the eMAR vendor for its own access.[35]

In one instance involving a Community formerly served by Collier's that Heller

described as "our most profitable," Heller encouraged Guardian Atlanta to pay

an eMAR interface fee of $3,000 per year.[36] Guardian Atlanta declined Heller's

---

[32] Hopp Decl. ¶ 19, Ex. F, November 29, 2017 Email from Heller (emphasis added).

[33] Hopp Decl. ¶ 20, Ex. G, Sept. 11, 2017 email from Community to Mr. Hopp.

[34] Am. Compl. ¶ 245.

[35] Hopp Decl. ¶ 21.

[36] Hopp Decl. ¶ 21, Ex. H, March 23, 2017 Email from Heller.

request.[37]

After acquiring Collier's from Heller, Guardian Atlanta received numerous complaints because it was charging fees where Collier's had charged none or less. For example, in August 2017, in response to a complaint that Guardian Atlanta was charging patients monthly fees (whereas Collier's had not), Heller tried to assuage concerns by stating that "*[a]lmost* all of Collier's former customers were charged a fee each month" and expressing his "regret that the circumstances in the pharmacy marketplace require that Guardian charge a $10 per individual packaging fee each month *from here forward*."[38] He indicated further that "this fee will take care of any electronic medication administration record fees that come about."[39]

In another instance, residents and families at a Community where Collier's "did not charge … any fees" were upset because Guardian Atlanta did charge fees.[40] Guardian Atlanta's President, Matthew Hopp, sent an email to Heller stating: "It is disappointing we were not told this up front. There have been

---

[37] Hopp Decl. ¶ 21.

[38] Hopp Decl. ¶ 12, Ex. A, Aug. 21, 2017 email from Heller to Mr. Hopp and others (emphasis added).

[39] Hopp Decl. ¶ 12.

[40] Hopp Decl. ¶ 13, Ex. B ("[T]here were no fees involved with Collier's…. I understand that the fees need to be charged… I let her know…that fees are gonna be charged in the future. She said she may start looking at other pharmacies….I told her that the charges would continue….").

several billing problem over the past month, almost all were due to exceptions at Colliers that we didn't know about."[41] Heller responded that Guardian Atlanta should "credit back the $10 fee for this past month and send out a letter to the Family [of the patient] stating that we apologize that there was no notice given on the fees but in the future there will be fees."[42] In another instance, Heller discounted Guardian Atlanta's monthly fee from $10 to $5.[43] Heller's actions demonstrate that he did not believe that Guardian Atlanta was charging too little for eMAR and medication management.

Even *after* filing his Complaint, Heller sought competitive advantage for himself and his current employer, Gayco, by openly advertising these same supposed "kickback" services at "no charge":

> Contract up for renewal? Talk to us first! . . . *No charge for consulting . . . No charge for E-MAR systems* . . . E-MAR support from in-house IT staff . . . *Hank Heller, Sales* (912) 655-4433.[44]

In a letter to residents, Gayco advertises:

> How do we benefit the resident? . . . There are no added charges for services, packaging, or delivery. . . . We print or provide electronic medication administration records for all of our residents. . . . Our

---

[41] *Id.*, Sept. 22, 2017 email from Mr. Hopp to Heller. Mr. Hopp also suggested to Heller that one way to soften the complaints would be to switch from expensive Medicine-on-Time packaging to less expensive (and safer) strip packaging. *Id.*
[42] *Id.* Sept. 22, 2017 email from Heller to Mr. Hopp.
[43] Hopp Decl. ¶14, Ex. C, Sept. 27, 2017 email from Heller.
[44] Hopp Decl. ¶ 22, Ex. I, Advertisement for Gayco (emphasis added).

pharmacist visits the facility and audits to assure the most appropriate medications, including correct dosage and route of administration, are prescribed for each resident and to assure the community is compliant with state regulations for assisted living.[45]

In its contract Gayco similarly agrees to provide these services:

> The pharmacy shall be responsible for the general supervision of the facility's pharmaceutical services. These services shall include but are not limited to the following:
>
> a.    Reviews of the drug regimen of each patient with reports of any irregularities
>
> b.    Supervising the storage and security of all medications.
>
> c.    Providing in-service education programs for the professional staff
>
> d.    Performing a medication pass survey for CMA's or Proxy Caregivers.[46]

Consistent with its promotional materials, this contract does not identify any fees for the Community or its residents for these services.[47]

A March 2019 email from Gayco's COO, Jon Martin, to a Community states: "We will provide you with laptops so you can use QUICK Mar as well as scanners."[48]

---

[45] Hopp Decl. ¶ 23, Ex. J, Gayco Healthcare Letter to Resident and Family Signed by Jon Martin, Chief Operating Officer.

[46] Hopp Decl. ¶ 24, Ex. K, Primary Pharmaceutical Provider Contract between Gayco Healthcare North and a Community.

[47] *Id.*

[48] Hopp Decl. ¶ 25, Ex. L, March 22, 2019 email from Jon Martin.

Heller cannot, in good faith, allege that an LTCP providing eMAR and medication management services for $10/patient/month—per Guardian Atlanta's practice—violates the AKS when his own former pharmacy sometimes performed the same service at no charge and when his current employer—and Heller personally—openly advertise the exact same services at "no charge." His factual allegations that LTCPs "customarily" charge for these medication management services and that Heller was "astonish[ed]" when he learned that Defendants did not charge (beyond the $10 per resident per month charge) for these services are blatantly false.[49]

### D. Heller's Education and Training-Based Claims are False

Heller alleges that Defendants provide certain training and skill checks "for free or below-cost."[50] Such training is referred to as Certified Medication Aide (CMA) training (for ALC staff who assist with administration of medications) or Proxy Caregiver training (for ALC or PCH staff who assist with or supervise the self-administration of medication).[51] As explained above, Relator's allegations in the Complaint regarding "free" training and skills checks were broader in scope than the allegations that Heller now seems to be pursuing,

---

[49] Am. Compl. ¶¶ 164, 198.
[50] Am. Compl. ¶ 8.
[51] Hopp Decl. ¶ 26.

based on the arguments in his Opposition.[52] Heller now takes issue with the provision of "free" training to "new communities to Guardian AND newly licensed assisted living communities."[53]

In fact, it was *Heller* who suggested bringing back and actually *expanding* the first-time-free model for CMA classes to Communities where Guardian Atlanta was not currently serving patients, thereby allowing them to try out the training service before buying it. In a July 2018 email, Heller stated: "I would recommend strongly that you start allowing people who do not trade with us to attend our proxy caregiving and [CMA] classes. I think this would be a good way for people who don't know us to get to know us and kind of used as a method of trying before buying."[54] Heller's suggestion to provide first-time-free training "as a method of trying before buying" shows that he knows that providing free training as a marketing tool to generate further *training* business is not an improper inducement.

---

[52] *See, supra* n. 2. In his Opposition (which was filed after Relator received the draft Rule 11 motion and brief), Relator did not pursue the argument that Guardian Atlanta did not "begin charging" for training and skills checks until 2018 or assert that it was a violation of the AKS to provide training to "host communities" in exchange for hosting services. Instead, without acknowledging the broader allegations in the Complaint, Relator's Opposition limited his argument solely to the allegation that Guardian Atlanta offered first-time-free training only to new communities to Guardian Atlanta. (Doc. 41 at 2, 3, 11-12.)

[53] Am. Compl. ¶ 225.

[54] Hopp Decl. ¶ 33, Ex. S, July 9, 2018 Email from Heller to Mr. Hopp.

### E.   Rule 11 Sanctions are Appropriate.

Heller's false allegations are central to his claims that the services provided by Guardian Atlanta constitute "kickbacks," and that Guardian Pharmacy shares responsibility for Guardian Atlanta's alleged actions. Here, it is clear that the claims asserted in Heller's Amended Complaint are not warranted by evidence or existing law. They are presented for the improper purpose of harassing Defendants and to obtain a competitive advantage. Thus, Rule 11 sanctions are necessary.

"The selection of the type of sanction to be imposed lies within the district court's sound exercise of discretion."[55] The purpose of sanctions is to "reduce frivolous claims, defenses, or motions, and to deter costly meritless maneuvers."[56] Appropriate sanctions include striking an offending pleading or allegation[57] and awarding attorneys' fees and costs incurred as a result of the Rule 11 violation.[58]

Apparently unconvinced that the true facts would support his Amended Complaint, Heller used demonstrably false factual allegations to prop up his Complaint. In doing so, Heller abused the *qui tam* provisions of the False Claims

---

[55] *Donaldson v. Clark*, 819 F.2d 1551, 1557 (11th Cir. 1987).

[56] *Kaplan v. Daimler Chrysler*, 331 F.3d 1251, 1255 (11th Cir. 2003).

[57] Advisory Committee Notes to Rule 11, 1993 Amendments.

[58] Fed. R. Civ. P. 11(c)(2) & (4).

Act, needlessly expended the Court's time and resources, and cost Defendants and the Government unnecessary trouble and expense. Under these circumstances, severe sanctions are appropriate.[59] Given the egregious nature and volume of the false allegations and the circumstances demonstrating that Heller acted maliciously and intentionally, a serious sanction is warranted in order to send a message that this type of intentional fact-twisting will not be tolerated. The costs to the interest of justice are simply too high to allow anything but the most severe of sanctions so that unscrupulous competitors will be deterred from resorting to such tactics in future litigation. Only a severe sanction will serve to deter such potentially lucrative misconduct.

Because Heller's allegations have no evidentiary support and violate Rule 11, this Court should grant Defendants' Motion for Sanctions, sanction Heller by striking Heller's Amended Complaint and ordering Heller to pay Defendants' attorneys' fees and expenses of litigation that were incurred as a result of his Rule 11 violations.

### III.  <u>CONCLUSION</u>

For all of the reasons set forth above, Defendants respectfully request that this Court GRANT their Motion for Rule 11 Sanctions and order any other relief

---

[59] Fed R. Civ. P. 11 (b)(1).

it deems just and proper.

Respectfully submitted this 26th day of June, 2020.

ARNALL GOLDEN GREGORY LLP

*/s/ Glenn P. Hendrix*
Glenn P. Hendrix, Esq.
Georgia Bar No. 346590
glenn.hendrix@agg.com
W. Jerad Rissler
Georgia Bar No. 142024
jerad.rissler@agg.com

171 17th Street, Suite 2100
Atlanta, Georgia 30363-1031
404.873.8500
glenn.hendrix@agg.com

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that this pleading was prepared using Book

Antiqua 13-point font in accordance with Local Rule 5.1(C).

<u>/s/ Glenn P. Hendrix</u>
Glenn P. Hendrix, Esq.
Georgia Bar No. 346590

This 26th day of June, 2020.

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2020, I electronically filed the foregoing **DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR RULE 11 SANCTIONS** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all Counsel of Record.

*/s/ Glenn P. Hendrix*
Glenn P. Hendrix, Esq.
Georgia Bar No. 346590

ARNALL GOLDEN GREGORY LLP

171 17th Street NW
Suite 2100
Atlanta, Georgia 30363-1031
Telephone: 404.873.8500
Facsimile: 404.873.85