IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA *ex rel.*
HENRY B. HELLER,

     Plaintiff,

               v.

GUARDIAN PHARMACY, LLC and
GUARDIAN PHARMACY OF ATLANTA,
LLC,

     Defendants.

Civil Action No.
1:18-cv-03728-SDG

## <u>OPINION AND ORDER</u>

This matter is before the Court on a motion to dismiss filed by Guardian

Pharmacy, LLC (Guardian Pharmacy) [ECF 32]; a motion to dismiss filed by

Guardian Pharmacy of Atlanta, LLC (Guardian Atlanta) [ECF 34]; and a joint

motion for sanctions filed by both Defendants [ECF 50]. For the following reasons,

and with the benefit of oral argument, Guardian Atlanta's motion to dismiss is

**DENIED**; Guardian Pharmacy's motion to dismiss is **GRANTED**; and

Defendants' motion for sanctions is **DENIED**.

## I.    BACKGROUND[1]

Guardian Pharmacy is an institutional, long-term care pharmacy headquartered in Atlanta, Georgia that fills orders for prescription medications exclusively for residents of assisted living communities (ALCs) and personal care homes (PCHs) (collectively, Communities).[2] Guardian Pharmacy owns pharmacies in 37 locations in 18 states.[3] It operates through "Partner Pharmacies," entities for which Guardian Pharmacy is the majority owner and operates jointly

---

[1]    The Court treats the following allegations as true for the purposes of this Order. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006) ("At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff.").

[2]    ECF 24, ¶¶ 2, 121. Assisted living communities and personal care homes differ from nursing homes. Nursing homes primarily focus on delivering healthcare services to patients who are unable to live independently and employ physicians and/or clinicians to furnish healthcare to residents [*id.* ¶ 92]. ALCs and PCHs, on the other hand, are not engaged in delivering healthcare services and generally do not employ licensed physicians [*id.* ¶ 93]. Additionally, while nursing homes are federally regulated because they directly receive funds from federal healthcare insurance programs (*i.e.*, Medicare and TRICARE), ACHs and PCHs are not; the *residents* directly receive these benefits and pay out-of-pocket costs to live in the Communities [*id.* ¶¶ 94–97].

[3]    *Id.* ¶ 122.

with a local management team.[4] One of these Partner Pharmacies is Guardian Atlanta.[5]

Guardian Pharmacy is the majority owner of Guardian Atlanta and, according to Heller, controls much of its overall operations and strategic direction.[6] Guardian Atlanta provides pharmacy services to a swath of Communities throughout northern Georgia, including the metro-Atlanta area.[7] Plaintiff-Relator Henry B. Heller is the former co-owner of Collier's Personal Care Pharmacy (Collier's), a long-term care pharmacy that operated in northern Georgia and that Guardian Atlanta acquired in 2017.[8] After Collier's acquisition, Guardian Atlanta contracted with Heller as an account manager consultant beginning on January 23, 2017.[9] Heller's employment with Guardian Atlanta ended on October 30, 2018.[10]

---

[4]   *Id.* ¶ 123.

[5]   *Id.* ¶¶ 18, 125.

[6]   *Id.* ¶¶ 139–40.

[7]   *Id.* ¶ 140.

[8]   *Id.* ¶¶ 15, 142.

[9]   *Id.* ¶¶ 143, 144.

[10]   *Id.* ¶ 15.

Defendants conduct business in an aggressively competitive field against other institutional and retail pharmacies (such as CVS and Walmart) to fill prescriptions for long-term care residents.[11] According to Heller, in order to gain access to a greater number of residents, Defendants negotiate agreements with the owners and operators of Communities which, in turn, bestow upon Defendants status as the "preferred pharmacy" for their residents.[12] Although the residents retain the ultimate freedom to choose any pharmacy to fill their prescriptions, a Community "steers" its residents to select that Community's preferred pharmacy.[13] Residents overwhelmingly oblige; Heller notes that approximately 80% of residents in Communities under a preferred pharmacy contract with Defendants select them to fill their prescriptions.[14]

To obtain this lucrative preferred pharmacy status, Heller alleges Defendants offer Communities certain inducements to persuade them to select Defendants over their competitors.[15] Specifically, Heller alleges Defendants offer and perform certain services for free, below market value, or below cost to the

---

[11]  *Id*. ¶¶ 5, 130.

[12]  *Id*. ¶ 132.

[13]  *Id*. ¶ 133.

[14]  *Id*. ¶¶ 134–35.

[15]  *Id*. ¶ 148.

Communities that select them as their preferred pharmacy.[16] The services comprising the alleged inducement scheme fall into three general categories: (1) free services for Electronic Medication Administration Records (eMAR) systems, which Communities use to maintain daily medication administration records for each resident (hereafter, eMAR services); (2) free or below fair market value medication management services, referred to by Heller as "consulting" or "audit" services (hereafter, medication management services); and (3) free or below cost education classes and skills checks to the Communities' staff members.[17]

For the first category, Georgia law requires Communities to maintain certain records that track the daily administration of medications to each resident.[18] Many Communities fulfill this obligation by using an eMAR system.[19] Heller alleges Guardian Atlanta offers free eMAR services—namely purchasing user licenses from eMAR companies, supplying the hardware for the eMAR systems, installing and setting up the systems, and providing limited technical

---

[16]   *Id*. ¶¶ 7, 150–55.

[17]   *Id*. ¶¶ 7-9.

[18]   *Id*. ¶¶ 101–03.

[19]   *Id*. ¶¶ 104–05.

support—to the Communities as an inducement to choose Guardian Atlanta as their preferred pharmacy.[20] According to Heller, the setup fees generally charged by eMAR companies range from $499 to $7,000.[21] Although Guardian Atlanta charges some residents of some facilities a $10 monthly fee for eMAR subscription services, Heller contends Guardian Atlanta does not charge any Communities.[22]

For the second category, Heller alleges Guardian Atlanta provides certain medication management services to Communities for free or below fair market value.[23] According to Heller, Guardian Atlanta maintains a "Consulting Department"—comprised of two pharmacists and two pharmacy nurses—whose sole responsibilities are to conduct medication management services at the Communities.[24] For example, the Consulting Department: (1) reviews the medical administration record and stored medications for each resident that uses Guardian Atlanta; (2) audits medication records and medication storage cards; and

---

[20]   *Id.* ¶¶ 8, 237–47.

[21]   *Id.* ¶ 245.

[22]   *Id.* ¶¶ 214 (noting Magnolia Senior Living as an example), 240 ("For most facilities, Guardian bills a monthly fee of $10 to residents whose facilities subscribe to an electronic system for maintaining medication administration records.").

[23]   *Id.* ¶ 7.

[24]   *Id.* ¶ 157.

(3) consults with each Community on drug management, record-keeping, storage, and prescription disposal.[25] Guardian Atlanta provides these services on-site for the Communities.[26] Heller alleges that, beginning in 2014, Guardian Atlanta stopped charging a discounted monthly fee for these services and began providing them for free or below fair market value.[27] The pharmacy consulting services take approximately 10 minutes per resident, per quarter, to perform and have a value of approximately $10 to $20 per resident.[28] Due to the number of hours expended on these services—which are provided for free or below fair market value—Lori Newcomb (a Guardian Atlanta consultant and manager of the Consulting Department) described the Consulting Department as a "black hole" for revenue purposes in a February 2018 email.[29]

The final category of alleged inducements pointed to by Heller are education classes and skills checks provided by Guardian Atlanta to the Communities for free or below cost.[30] Like daily medication tracking, Georgia law

---

[25] *Id.* ¶¶ 157–61.

[26] *Id.* ¶ 164.

[27] *Id.* ¶¶ 166–67.

[28] *Id.* ¶¶ 181, 253.

[29] *Id.* ¶¶ 168–83.

[30] *Id.* ¶¶ 223–32.

requires Communities to provide these services to their staff members.[31] Although

Guardian Atlanta generally charged Communities $50 per day—or $100 total per

person—for these services, Heller alleges Guardian exempted "the host facility,

new Guardian customers, and newly licensed assisted living communities" from

these charges.[32] In January 2018, Guardian Atlanta changed this policy and

announced it would begin charging all Communities for these education classes

and skills checks.[33]

According to Heller, Defendants' actions violated the False Claims Act

(FCA) and Anti-Kickback Statute (AKS) because each payment by a federal

insurance provider for prescriptions filled for residents of Communities under a

preferred pharmacy relationship with Defendants were "tainted" by the kickback

scheme, rendering them false and ineligible for payment.[34] Heller, as the Relator,

initiated this action on August 3, 2018.[35] On November 18, 2019, the United States

---

[31]   *Id*. ¶¶ 114–20, 223. *See also* Ga. Comp. R. & Regs. 111-8-62-.20 (PCHs); Ga. Comp. R. & Regs. 111-8-63-.20 (ALCs).

[32]   *Id*. ¶¶ 225–26.

[33]   *Id*. ¶¶ 228–29.

[34]   *Id*. ¶¶ 137, 232.

[35]   ECF 1.

filed its notice declining to intervene.[36] On December 10, the Court unsealed the initial Complaint.[37] Heller filed an Amended Complaint on March 6, 2020, asserting three claims for violation of the FCA.[38] Count I asserts a claim under 31 U.S.C. § 3729(a)(1)(A), colloquially known as a false presentment claim.[39] Count II alleges a violation of 31 U.S.C. § 3729(a)(1)(B), referred to as a false use claim.[40] Count III contends Defendants violated 31 U.S.C. § 3729(a)(1)(G), referred to as a "reverse" false claim.[41]

On May 5, Guardian Pharmacy and Guardian Atlanta filed separate motions to dismiss.[42] On May 29, Heller filed responses in opposition to both dispositive motions.[43] Defendants filed separate replies on June 19.[44] Seven days later, Defendants filed a joint motion for sanctions against Heller and his legal

---

[36] ECF 15.

[37] ECF 16.

[38] *See generally* ECF 24.

[39] *Id*. ¶¶ 328–34.

[40] *Id*. ¶¶ 335–37.

[41] *Id*. ¶¶ 338–46.

[42] ECF 32; ECF 34.

[43] ECF 41; ECF 42.

[44] ECF 48; ECF 49.

counsel under Federal Rule of Civil Procedure 11.[45] Heller filed a response in opposition to the motion for sanctions on July 10.[46] Defendants filed a reply on July 24.[47] The Court heard oral arguments from the parties on all outstanding motions on August 12.

## II.    LEGAL STANDARD

"At the pleading stage, a complaint alleging violations of the FCA must satisfy two pleading requirements." *United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012). First, Federal Rule of Civil Procedure 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) provides for the dismissal of a complaint that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the

---

[45]   ECF 50.

[46]   ECF 52.

[47]   ECF 54.

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

Second, a FCA complaint "must comply with Rule 9(b)'s heightened pleading standard, which requires a party to 'state with particularity the circumstances constituting fraud or mistake.'" *Matheny*, 671 F.3d at 1222 (quoting Fed. R. Civ. P. 9(b)) (citing *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1308–09 (11th Cir. 2002)). *See also Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1051 (11th Cir. 2015) ("In an action under the [FCA], Rule 8's pleading standard is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b)."). To satisfy Rule 9(b), a plaintiff must plead "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (citing *Clausen*, 290 F.3d at 1308) (punctuation omitted). Of utmost importance, the FCA complaint "must contain some indicia of reliability to satisfy Rule 9(b)." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (citing *Clausen*, 290 F.3d at 1311). *See also Matheny*, 671 F.3d at 1222 ("The purpose of Rule 9(b) is to alert defendants to the precise misconduct with which they are charged and protect defendants against spurious charges.") (brackets and punctuation omitted).

The Court may, however, relax these heightened requirements "in FCA cases where the relator has personal knowledge of the fraudulent conduct or personally participated in it." *United States ex rel. Dildine v. Pandya*, 389 F. Supp. 3d 1214, 1218–19 (N.D. Ga. 2019). *See also Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1276 (11th Cir. 2018) ("[W]e are more tolerant toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct."); *Matheny*, 671 F.3d at 1230 (same); *United States ex rel. Walker v. R & F Props. of Lake Cnty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) (finding allegations that relator participated in and discussed fraudulent billing practices with fellow employee sufficient to satisfy Rule 9(b)).

## III.    DISCUSSION

### A.    The False Claims Act and Anti-Kickback Statute

"The False Claims Act is the primary law on which the federal government relies to recover losses caused by fraud." *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005). The FCA imposes civil liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or

fraudulent claim" to the Government. 31 U.S.C. § 3729(a)(1)(A)–(B). To enforce its provisions, the FCA permits private citizens (identified as the relator or whistleblower) to pursue civil actions on behalf of the Government (known as *qui tam* actions) to recover money paid by the Government. *Id*. at § 3730(b).

Heller asserts three FCA claims arising under separate subsections of the statute. Although the elements of each are similar, they are not identical. For example, to establish a presentment claim under 31 U.S.C. § 3729(a)(1)(A), "a relator must prove three elements: (1) a false or fraudulent claim, (2) which was presented, or caused to be presented, for payment or approval, (3) with the knowledge that the claim was false." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017). For a false use claim under § 3729(a)(2)(B), "a relator must show that: (1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." *Id*. Finally, for a § 3729(a)(1)(G) "reverse" false claim,[48] liability attaches when the relator demonstrates that the defendant:

---

[48] Section 3729(a)(1)(G) "is known as the 'reverse false claim' provision of the FCA because liability results from avoiding the payment of money due to the government, as opposed to submitting to the government a false claim." *United States v. Fulton Cnty., Ga.*, No. 1:14-cv-4071-WSD, 2016 WL 4158392, at *2 (N.D. Ga. Aug. 5, 2016) (citing *Matheny*, 671 F.3d at 1222).

> [1] knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or [2] knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(G).

All of Heller's claims are rooted in Defendants' alleged violation of the Anti-Kickback Statute, 42 U.S.C. § 1320. The AKS "broadly forbids kickbacks, bribes, and rebates in the administration of government healthcare programs." *Carrel*, 898 F.3d at 1272. According to the AKS:

> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony.

42 U.S.C. § 1320(b)(2).

Since noncompliance with the AKS "is a bar to the receipt of Medicare payments," a violation "can form the basis of liability under the [FCA] for past Medicare payments attributable to the violations." *Bingham v. HCA, Inc.*, 783 F. App'x 868, 871 (11th Cir. 2019). *See also* 42 U.S.C. § 1320a–7b(g) ("[A] claim that includes items or services resulting from a violation of [the AKS] constitutes

a false or fraudulent claim."). However, "[m]erely alleging a violation of the [AKS] does not sufficiently state a claim under the FCA," as it "is the submission and payment of a *false* Medicare *claim* and false certification of compliance with the law that creates FCA liability." *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 706 (11th Cir. 2014) (emphasis in original).

Under this theory, the FCA permits a claim for submitting false certifications of records and statements to the Government. Put another way, a claim arises if a defendant "certif[ies] compliance with laws and regulations concerning proper practices for medical providers . . . when in fact those claims are for services that were provided in violation of those rules." *Barker ex rel. United States v. Columbus Reg'l Healthcare Sys., Inc.*, 977 F. Supp. 2d 1341, 1344 (M.D. Ga. 2013) (citing *McNutt*, 432 F.3d at 1259–60)). *See also United States v. AseraCare, Inc.*, 938 F.3d 1278, 1284 (11th Cir. 2019). Claims for government payment that make such assertions or implications are deemed false within the meaning of the FCA. *See Carrel*, 898 F.3d at 1272.

## B.   Guardian Atlanta's Motion to Dismiss

Guardian Atlanta does not distinguish between Heller's specific allegations as to each of the three individual causes of action asserted in the Amended Complaint. Instead, it posits a cavalcade of overarching arguments that, if

meritorious, would eliminate Heller's ability to rely on his constructed theory of an illicit kickback scheme. For example, Guardian Atlanta argues Heller's claims are not cognizable under the FCA because he fails to plead the following with the requisite particularity: "(1) any underlying AKS violation; (2) any claim that includes items or services '*resulting from*' an AKS violation; or (3) that the alleged violations were material to Medicare's decision to pay Guardian Atlanta's claim."[49] The Court addresses these contentions in turn.

### 1.   Heller Sufficiently Alleges Underlying Violations of the AKS.

Guardian Atlanta avers that Heller has failed to state a facially plausible violation of the AKS because: (1) he has not properly alleged unlawful renumeration resulting from the eMAR services, medication management services, or education classes and skills checks; and (2) even if he did, those services cannot—as a matter of law—form the basis of an illicit kickback scheme because they are within the scope of, and integral to, the services Guardian Atlanta provides to the residents of the Communities.

---

[49]   ECF 32-1, at 7 (emphasis in original).

> ### i. Heller Has Adequately Pleaded Unlawful Remuneration Regarding eMAR and Medication Management Services.

An AKS violation requires the offering or payment of "remuneration" to induce a transaction. *Bingham*, 783 F. App'x at 873. The AKS defines remuneration to include "transfers of items or services for free or for other than fair market value." 42 U.S.C. § 1320a-7a(i)(6). Remuneration has been broadly interpreted "to include anything of value in any form whatsoever." *United States ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 805 (S.D.N.Y. 2017), *rev'd on other grounds*, 899 F.3d 163 (2d Cir. 2018) (citing *United States ex rel. Fry v. The Health All. of Greater Cinn.*, No. 03-cv-0167, 2008 WL 5282139, at *7 (S.D. Ohio Dec. 18, 2008); Dep't of Health & Hum. Res. Off. of Inspector Gen. Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (July 29, 1991) ("Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever.")).

Heller alleges Guardian Atlanta violated the AKS by providing the eMAR and medication management services for free or below fair market value. Although not yet addressed by the Eleventh Circuit, a district court in the circuit has found that pleading remuneration based on "a below-fair-market-value exchange . . . must be pled with particularity." *United States ex rel. Osheroff v. Tenet*

*Healthcare Corp.*, No. 09-22253-CIV, 2012 WL 2871264, at *7 (S.D. Fla. July 12, 2012) (citing *United States ex rel. Obert–Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1049 (N.D. Ill. 2002)). According to the *Osheroff* court, a "[r]elator must allege a benchmark of fair market value" to allow the court to infer whether the amount charged for the services "fall[s] sufficiently below the benchmark so as to constitute remuneration." *Id. See also Bingham*, 783 F. App'x at 873 ("In a business transaction like those at issue in this case, the value of a benefit can only be quantified by reference to its fair market value.") (citing *Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 679 (N.D. Ill. 2006) ("Relators cannot prove that the Hospital Defendants received remuneration—something of value—without comparing the contracted rates with fair market value.")); *United States ex rel. Schubert v. All Children's Health Sys., Inc.*, No. 8:11-cv-01687-T-27, 2013 WL 6054803, at *11 (M.D. Fla. Nov. 15, 2013) (finding Rule 9(b) satisfied because "Relator alleges in significant detail a proposed benchmark of fair market value"). *Cf. Georgia ex rel. Hunter Labs., LLC v. Quest Diagnostics Inc.*, No. 1:13-cv-01838-SCJ, 2014 WL 12543888, at *4 (N.D. Ga. Mar. 17, 2014) ("Qui Tam Plaintiffs' kickback scheme claim also fails to provide sufficient particularity to satisfy the pleading standard of Rule 9(b). Specifically . . . the Complaint omits all detail as to when [defendant]

allegedly offered inducements in the form of discounts, what the discounted rates were, and to whom the discounts were offered.").[50]

Guardian Atlanta does not contend the eMAR or medication management services are devoid of value to the Communities. It instead maintains that Heller has not pleaded with sufficient specificity (1) a benchmark value or (2) that it ultimately provided these services below cost or fair market value. Specifically, Guardian Atlanta points to Heller's allegations in the Amended Complaint that "[f]or most facilities, Guardian bills a monthly fee of $10 to **residents** whose facilities subscribe to an electronic system for maintaining medication administration records."[51] Guardian Atlanta avers that, although it admittedly does not charge the **Communities** for these services, the annual sum total of the $10 fee obtained from applicable residents may ultimately exceed the value of the services it provides, thereby undermining Heller's allegations of remuneration.

---

[50] Based on a close read of the case law, the Court notes that whether a relator is required to plead a benchmark in all FCA claims premised on a violation of the AKS through a below fair market value exchange is an open question. There is no Eleventh Circuit opinion directly on point. And *Bingham* and *Osheroff*—Guardian Atlanta's two primary cases—are distinguishable on their facts. Moreover, *Schubert* and *Osheroff* articulated the benchmark requirement in discussing alleged violations of the Stark statute, 42 U.S.C. §§ 1395nn, 1396(s). Nonetheless, even if alleging a fair market benchmark is a prerequisite, the Court believes Heller has satisfied his burden in this case.

[51] ECF 24, ¶ 240 (emphasis added).

This begs the question that permeates much of the briefing: are Guardian Atlanta's "customers" the residents whose prescriptions it fills or the Communities for which it offers and performs services in an effort to become their preferred pharmacy? This is a question of fact—or at least a mixed question of fact and law—that cannot be answered at this preliminary pleading stage. Regardless, the Court need not decide it to resolve this motion to dismiss.

Treating Heller's allegations as true, as the Court must, the Amended Complaint sufficiently alleges unlawful remuneration as to the eMAR and medical management services. Heller expressly alleges pricing benchmarks for these services: between "$499 to $7,000" for eMAR services and "approximately $10 to $20 per resident . . . quarterly each year" for medication management services.[52] Heller also points to his first-hand knowledge of a proposed contract with Magnolia Senior Living as a benchmark, which "stated that 'Additional Consulting' would be billed at $65 an hour for a pharmacist and $55 an hour for a nurse."[53] In "Exhibit A" to the Amended Complaint, Heller provides a list of Communities for which he alleges Guardian Atlanta offers and provides these

---

[52] *Id.* ¶¶ 253, 255.

[53] *Id.* ¶ 206.

services at below cost or fair market value.[54] As part of the kickback scheme, Heller avers, Guardian Atlanta does so to induce the Communities into selecting it as their preferred pharmacy. That Guardian Atlanta may ultimately break even or turn a profit based on the $10 eMAR subscription fee charged to the *residents*— a disputed issue of fact—is not fatal to the inquiry at this stage of whether there was an alleged kickback to the *Communities*. Similarly, Heller augments his allegations regarding the medication management services by referencing emails from Guardian Atlanta's management team that describe the Consulting Department as a "black hole" for revenue purposes due to its practice of giving services away for free.[55] These allegations are enough for Heller to satisfy his pleading burden and plausibly allege unlawful remuneration for the eMAR and medication management services.

> ii. **Heller Sufficiently Alleges that the eMAR and Medication Management Services Provided by Guardian Atlanta Have Independent Value and Are Not Within the Scope of, or Integral to, the Other Services It Provides.**

Guardian Atlanta argues the eMAR and medication management services cannot form an illicit kickback scheme because it is required to perform these

---

[54]  ECF 24-1.

[55]  ECF 24, ¶¶ 173–86.

actions as part of its prescription fulfillment services provided to the residents. According to Guardian Atlanta, it is fully entitled to offer and perform these services at no cost if it so chooses.

Starting with the eMAR services, Guardian Atlanta points to a 2012 advisory opinion from the Department of Health and Human Resources Office of Inspector General (OIG).[56] In the advisory opinion, the OIG answered a hypothetical question posed by an anonymous party—*i.e.*, the Requestor, who "provides pharmacy services to more than 3,400 individuals . . . who reside in community homes"—that gave community homes housing residents who obtain prescriptions from the Requestor free, limited access to certain electronic software.[57] The advisory opinion stated:

> While it remains the OIG's position . . . that free or below-market items and services are suspect, the OIG has distinguished between situations in which a provider offers free items and services that are ***integrally related*** to that provider's services, and those that are not. When the item or service offered can be used only as part of the underlying service being provided, it appears that the free items or services have no independent value apart from the underlying service. Upon review of the additional functions within the second category, we conclude that they would be integrally related to the Requestor's services, such that they would have no

---

[56] ECF 33-1 (Re: OIG Advisory Op. No. 12-19, 2012 WL 7148095 (Nov. 30, 2012)).

[57] *Id.*

> independent value to the Community Homes apart from
> the services the Requestor provides. . . . [T]he particular
> circumstances presented here . . . would be unlikely to
> result in fraud or abuse under the [AKS], and we would
> not seek to impose administrative sanctions.[58]

Relying on the OIG's advisory opinion, Guardian Atlanta argues that providing free eMAR services to the Communities likewise does not constitute an AKS violation.

For the medication management services, Guardian Atlanta relies on mandates from the Centers for Medicare and Medicaid Services (the CMS Manual) issued to long-term care pharmacies. Guardian Atlanta provides a side-by-side comparison between Heller's allegations supporting the kickback scheme and the procedures required by the CMS Manual. Guardian Atlanta argues it simply provides the medication management services at no cost to meet the "minimum performance and service criteria" as outlined in the CMS Manual. On the whole, Guardian Atlanta posits that "[t]he AKS does not punish a provider for providing integrally-related services that enhance the safety or efficacy of the service being purchased."[59]

---

[58] *Id.* at 12–13 (citations omitted) (emphasis added).

[59] ECF 32-1, at 21.

The question of whether the services provided by Guardian Atlanta were "integrally related" is a disputed issue of fact—or at least a mixed question of fact and law—that cannot be resolved at this preliminary pleading stage. The Court must treat Heller's well-pleaded allegations as true and extend all reasonable inferences in his favor. *Garfield*, 466 F.3d at 1261. But even considering Guardian Atlanta's argument, it does not warrant the dismissal of Heller's claims at this stage on "integrally related" grounds. Guardian Atlanta primarily relies on two cases: *United States ex rel. Forney v. Medtronic, Inc.*, No. CV 15-6264, 2017 WL 2653568 (E.D. Pa. June 19, 2017) and *United States ex rel. Suarez v. AbbVie Inc.*, No. 15 C 8928, 2019 WL 4749967 (N.D. Ill. Sept. 30, 2019). Both decisions are distinguishable from the facts alleged in this case.

For example, the *Forney* court found that all the relator had "alleged with particularly about the free services themselves is that Medtronic provided technical product support in connection with the purchase of its products." 2017 WL 2653568, at *4. That court concluded that the relator "must also demonstrate that any independent value to the purchaser was substantial" and that "[s]imply stating that the services generally benefited Medtronic's customers' bottom lines or that physicians used Medtronic's services 'in lieu of having to pay for their own employees' . . . is not sufficiently specific to meet the pleading

requirements of Rule 9(b) without alleging *how* those services substantially benefitted customers' bottom lines." *Id.* (emphasis in original).

Similarly, the *Suarez* court found that the relator failed to "sufficiently explain[ ] how the services provided substantial independent value—as opposed to 'permissible product support'—for physicians." 2019 WL 4749967, at *8. Specifically, the relator's allegations did not "concern free products, but rather product-related support services that OIG guidance characterizes as permissible" and "alleges only in a conclusory manner that the [ ] services eliminated costs that doctors would otherwise have had to cover." *Id.* at *9.

Heller undoubtably alleges that one reason Guardian Atlanta provides the eMAR and medication management services for free or below fair market value is to alleviate certain administrative, financial, and legal burdens on the Communities that would otherwise be required to do it themselves.[60] However, unlike the relators in *Forney* and *Suarez*, Heller also alleges that the services have substantial independent value to the Communities beyond the filling of prescriptions for the residents.[61] Heller's allegations supply benchmarks for these services that extend beyond mere "technical product support" or

---

[60] *E.g.*, ECF 24, ¶¶ 159, 246.

[61] *Id.* ¶¶ 297–99.

"product-related support services." Construing the reasonable inferences from Heller's allegations in a light most favorable to him, the Court concludes that his claims concerning the eMAR and medication management services are sufficiently particularized to satisfy Rule 9(b).

### iii.    Heller Alleges a Facially Plausible Claim as to the Community Staff Training and Skills Checks.

Guardian Atlanta argues Heller fails to state a FCA claim premised on the trainings and skills checks it provides to the Communities. To reiterate, Heller alleges Guardian Atlanta provided these classes and skills checks "for free or below-cost to the staff of facilities that chose Guardian as their preferred pharmacy."[62] Specifically, Heller points to a March 2, 2017 email from Lori Newcomb that acknowledged Guardian Atlanta's usual practice of charging Communities $50 per day—or $100 total per person—for these trainings and classes, but noting: "Our Host Community, **new communities to Guardian** AND newly licensed assisted living communities are **exempt from these charges**."[63] According to Heller, Guardian Atlanta provided this subset of Communities with these free services to induce them into choosing it as their preferred pharmacy.

---

[62]   *Id*. ¶ 8.

[63]   *Id*. ¶ 225 (emphasis in original).

In its motion to dismiss, Guardian Atlanta takes issue with these allegations as "facially inconsistent and sometimes contradictory."[64] It argues Heller's use of the disjunctive "free or below-cost" is too vague to satisfy Rule 9(b). It also argues Heller misconstrues the alleged facts and does not sufficiently allege that the price for these trainings and classes is too low to constitute illegal remuneration. In response, Heller seemingly clarifies and narrows his allegations to only concern the *free* trainings and classes offered to (1) the host Community, (2) new Communities to Guardian, and (3) newly licensed Communities. In reply, Guardian Atlanta reiterates that Heller "does not offer any basis . . . to infer beyond speculation that the purpose of the alleged free trial classes was to induce referrals as opposed to generating future training revenues."[65]

The Court does not agree with Guardian Atlanta's position. Heller plausibly alleges that Guardian Atlanta offered certain Communities free trainings and classes to induce them to choose Guardian Atlanta as their preferred pharmacy.[66] This service is provided as part of the alleged scheme "in exchange for

---

[64]   ECF 32-1, at 22.

[65]   ECF 48, at 16.

[66]   *E.g.*, ECF 24, ¶¶ 8, 10–11, 153, 223–32.

[the Communities'] referral of patients to Guardian for pharmacy services."[67] Moreover, Heller sufficiently alleges a benchmark for these services: $50 per day or $100 total per person. Although Guardian Atlanta is correct that Heller does not identify the "reciprocal value" or "marginal cost" to Guardian Atlanta, the Court concludes that such specific allegations are not necessary. The purpose of Rule 9(b) in the FCA context is to ensure "the allegations of a complaint contain sufficient indicia of reliability"—*United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1358 (11th Cir. 2006)—not raise the bar so high as to require relators to provide exceedingly precise details regarding ancillary issues.

Additionally, although Guardian Atlanta may well have possessed ulterior, business-related motives for offering these trainings and classes for free to certain Communities—a disputed issue of fact—this does not necessarily absolve them of liability. Courts are clear that "an AKS violation exists if *one* purpose of the remuneration was to induce Medicare purchases, even if other legitimate purposes for the remuneration existed." *United States ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*, No. 13-cv-3003-WMW-DTS, 2021 WL 101193, at *8 (D. Minn. Jan. 12, 2021) (citing *United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011) (collecting cases

---

[67]   ECF 24, ¶ 248.

from the Third, Fifth, Ninth, and Tenth Circuits)). *See also United States v. Regeneron Pharm., Inc.*, No. CV 20-11217-FDS, 2020 WL 7130004, at *8 (D. Mass. Dec. 4, 2020) ("A person or company who offers or pays remuneration to a healthcare provider violates the AKS so long as one purpose of the offer or payment is to induce Medicare or Medicaid patient referrals."). At bottom, Heller plausibly alleges that one reason Guardian Atlanta offered to provide certain Communities with staff training and skills checks was to induce them into contracting with Guardian Atlanta as their preferred pharmacy. The Amended Complaint contains enough of the requisite details to provide indicia of reliability: the who, what, when, where, and why. More is not necessary at the pleading stage.

### 2.    Heller Sufficiently Alleges Causation.

Guardian Atlanta next argues that, even if Heller has alleged an underlying violation of the AKS, he has not sufficiently pleaded (1) a specific false claim and (2) that such claims—even if false—resulted from any alleged illegal kickback; *i.e.*, a nexus or link. To state a claim under the FCA, a relator must allege that the defendant presented a false claim to the Government for payment. *Clausen*, 290 F.3d at 1311 ("The submission of a claim is . . . the *sine qua non* of a False Claims Act violation."). *See also Corsello*, 428 F.3d at 1012 ("Liability under the False Claims Act arises from the submission of a fraudulent claim to the

government, not the disregard of government regulations or failure to maintain proper internal policies."); *Osheroff*, 2012 WL 2871264, at *5 ("The general rule is that a claim must actually be submitted to the government in order for there to be actionable damage. The purpose of this requirement is to ensure that the government has actually—not just likely—been paying claims to the Defendant from the public fisc.") (citation omitted).

The submission of a false claim must be alleged with particularity. *Corsello*, 328 F.3d at 1013. To satisfy Rule 9(b), "some indicia of reliability must be given in the complaint to support the allegation of an actual false claim for payment being made to the Government." *Clausen*, 290 F.3d at 1311. *See also United States ex rel. Chase v. HPC Healthcare, Inc.*, 723 F. App'x 783, 789 (11th Cir. 2018) ("The key inquiry is whether the complaint includes some indicia of reliability to support the allegation that an actual false claim was submitted."). Recently, the Northern District of Alabama summarized the landscape of Eleventh Circuit caselaw as follows:

> An FCA claimant can satisfy the indicia of reliability requirement by alleging the details of false claims by providing specific billing information—such as dates, times, and amounts of actual false claims or copies of bills. But since the Eleventh Circuit evaluates indicia of reliability on a case-by-case basis, it is not necessary that a claimant allege all of these details for each claim, or

> even all of these details for a single claim. Rather, the claimant need only allege some of this information for at least some of the claims . . . in order to satisfy Rule 9(b).

*United States ex rel. Wallace v. Exactech, Inc.*, Case No. 2:18-cv-01010-LSC, 2020 WL 4500493, at *13 (N.D. Ala. Aug. 5, 2020) (citations and punctuation omitted). *See also Chase*, 723 App'x at 789 ("In other circumstances, this Court has deemed indicia of reliability sufficient where the relator alleged direct knowledge of the defendants' submission of false claims based on her own experiences and on information she learned in the course of her employment. However, the basis of this direct knowledge must be pled with particularity.").

Guardian Atlanta does not dispute that it offered and performed the at-issue services for the Communities. Rather, it contends that Heller has not sufficiently alleged it ultimately submitted any claims for payment to the Government or a link between the offering of services and a false claim.

### *i.*     **Heller Has Identified Alleged False Claims.**

In the Amended Complaint, Heller points to the attached "Exhibit A" — entitled "Examples of Kickback Scheme" — which lists 49 Communities (26 ALCs and 23 PCHs) to which Guardian Atlanta allegedly provides the at-issue services in exchange for preferred pharmacy status.[68] Heller bases the information in

---

[68]   ECF 24, ¶¶ 248–77; ECF 24-1 (Exhibit A).

Exhibit A on his "observations of [Guardian Atlanta's] practices and the statements of [Guardian Atlanta's] employees."[69] According to Heller, each Community listed in Exhibit A selected Guardian Atlanta as its preferred pharmacy after receiving the at-issue services.[70] Heller estimates the number of residents served and prescriptions filled by Guardian Atlanta at each Community, as well as the annual sales revenue.[71] Heller estimates that, per year, Guardian Atlanta services 1,940 patients, fills 162,960 prescriptions, and accumulates $9,079,200 in revenue paid by federal insurers from Communities that participate in the alleged kickback scheme.[72]

To augment the information listed in Exhibit A, Heller alleges that he possesses "first-hand knowledge that claims submitted by Guardian [Atlanta] for residents" at PCHs owned and operated by Senior Solutions Management Group (Senior Solutions), and ALCs owned and operated by Trinity Lifestyles Management Group (Trinity Lifestyles), are "tainted by its kickback scheme."[73] Regarding Senior Solutions, Heller alleges it owns and operates (1) a 50-bed PCH

---

[69]   ECF 24, ¶ 249.

[70]   *Id*. ¶ 250.

[71]   ECF 24, ¶¶ 251, 257.

[72]   ECF 24-1, at 5.

[73]   ECF 24, ¶¶ 260, 269.

named Country Gardens Senior Living and (2) a 69-bed PCH called Antebellum Grove Senior Living.[74] According to Heller, Matthew Hopp (Guardian Atlanta's President) informed him of a conversation with Jason Andrews—Regional Manager for Senior Solutions—in which the latter informed Hopp that Senior Solutions would not remain Guardian Atlanta's customer unless it waived many of its fees.[75] To keep the business, Heller alleges Guardian Atlanta provided free eMAR and free or below fair market value "consulting" services to facilities owned by Senior Solutions.[76] From March 2017 through August 2018, according to Heller, Guardian Atlanta submitted monthly claims to federal insurers for residents at these facilities.[77]

Regarding Trinity Lifestyles, Heller alleges that it owns and operates an 86-bed ALC and previously was Heller's customer at Collier's.[78] According to Heller, after Guardian Atlanta acquired Collier's, he attended a group meeting at Trinity Lifestyles with Hopp and other members of the Guardian Atlanta management

---

[74] *Id*. ¶¶ 262–64.

[75] *Id*. ¶ 261.

[76] *Id*. ¶ 265.

[77] *Id*. ¶ 267.

[78] *Id*. ¶ 270.

team.[79] Heller alleges Guardian Atlanta and Hopp offered to provide Trinity Lifestyles with free "consulting" services, after which (1) Hopp and Trinity Lifestyles signed a contract, and (2) Guardian Atlanta has submitted monthly claims for residents at Trinity Lifestyles to federal insurers since March 2017.[80]

Heller additionally points to four specific exemplar customers: Patient M.P. (resident of Eagles Landing Senior Living); Patient C.P. (same); Patient E.S. (resident of Oaks at Post Road); and Patient C.S. (resident of Oaks at Braselton).[81] These patients were formerly Heller's customers at Collier's.[82] Heller alleges that "upon information and belief, based on the drug treatment regimen the patient was following while serviced by Collier's," Guardian Atlanta repeatedly submitted claims to federal insurers tainted by the kickback scheme.[83] Heller provides charts listing 20 separate representative claims submitted to federal insurers that includes the name of the Community, as well as the

---

[79]   *Id.* ¶ 271.

[80]   *Id.* ¶ 275.

[81]   *Id.* ¶¶ 278–96.

[82]   *Id.* ¶¶ 283, 284, 292, 295.

[83]   *Id.*

(1) National Drug Code description, (2) date the claim was processed, (3) payment amount, and (4) name of the prescriber.[84]

Guardian Atlanta takes exception to these allegations as Heller feigning personal knowledge, instead characterizing them as "no more than a back-of-the-envelope estimation," "rote math," and "simply guessing."[85] Among the many reasons it disagrees with the information alleged by Heller, Guardian Atlanta argues (1) his math is incorrect; (2) he does not possess the first-hand knowledge he touts, as many allegations are founded on his experience servicing these clients at Collier's or events that occurred after the end of his employment; and (3) his reliance on allegations made "upon information and belief" are insufficient as a matter of law under Rule 9(b) and assume a customer ultimately transitioned its business from Collier's to Guardian Atlanta post-acquisition.[86]

Although Guardian Atlanta may ultimately prevail on these or other factual and legal defenses, the Court concludes that Heller's detailed allegations suffice under Rule 9(b). At this stage, Heller need only "offer some indicia of reliability . . . to support the allegation of *an actual false claim* for payment being

---

[84]   *Id.*

[85]   ECF 32-1, at 27–28.

[86]   *Id.*

made to the government." *Carrel*, 898 F.3d at 1275 (citing *Clausen*, 290 F.3d at 1311) (bracket omitted). Heller meets this standard by providing precise data—including names, dates, amounts, and services rendered—as well as specific exemplar customers and claims. *Mastej*, 591 F. App'x at 704 (citing *Hopper*, 588 F.3d at 1326). *See also Clausen*, 290 F.3d at 1312 n.21. Moreover, Heller sufficiently alleges that Guardian Atlanta employed him in a position to gain first-hand knowledge that false claims were submitted to the Government. This demonstrates Heller's allegations are founded on a requisite indicium of reliability. *Mastej*, 591 F. App'x at 707 (citing *Hopper*, 588 F.3d at 1326; *Walker*, 433 F.3d at 1360).

Guardian Atlanta is correct that some of Heller's specific allegations are made "upon information and belief." Heller also expressly provides estimated raw numbers for Guardian Atlanta's business. In some circumstances, such allegations could be fatal to an FCA complaint under Rule 9(b). *See United States ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 266 (S.D.N.Y. 2014) (holding in the FCA context: "Allegations made on 'information and belief' are inherently speculative."). But there is no defined, bright-line rule rendering such allegations insufficient in all cases as a matter of law. *See United States ex rel. Britton v. Lincare Inc.*, 634 F. App'x 238, 241 (11th Cir. 2015); *Clausen*, 290 F.3d at 1313 n.25 (citing *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899,

903 (5th Cir. 1997)). In fact, the case law is inapposite; the Eleventh Circuit "evaluates whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *Mastej*, 591 F. App'x at 704 (citing *Atkins*, 470 F.3d at 1358).

In this specific case, Guardian Atlanta employed Heller in a management position that gave him access to its internal business practices. Heller was included on emails with Guardian Atlanta's executive team and privy to its discussions and negotiations with Communities. Although the ultimate level of Heller's insider knowledge is a fact question, at this stage, it elevates and reinforces the reliability of his allegations. *Carrel*, 898 F.3d at 1276; *Matheny*, 671 F.3d at 1230. In sum, the Court finds Heller's detailed allegations—coupled with his personal knowledge and industry expertise—elevate the reliability of his claims as to satisfy the purpose of Rule 9(b). *See Clausen*, 290 F.3d at 1313 n. 24 (holding that the "purpose of Rule 9(b)" is to "protect[ ] defendants from frivolous suits, or spurious charges of immoral and fraudulent behavior" and prevent relators from "learn[ing] the complaint's bare essentials through discovery [that] may needlessly harm a defendants' goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements").

### ii. Heller Has Sufficiently Alleged that the Claims Resulted from an Alleged Kickback.

As stated, Heller's FCA claims are premised on Guardian Atlanta's alleged violations of the AKS. In such cases, merely alleging an AKS violation is not enough; a relator must identify "a claim that includes items and services *resulting from* a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g) (emphasis added). Recent cases have required a relator to show "causation, or some 'link' between the payment of remuneration and the submission of false claims" to "establish FCA liability based on an AKS violation." *Wallace*, 2020 WL 4500493, at *19. *See also Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019) ("[D]rawing on the 'resulting from' language of the 2010 amendment, if there is a sufficient causal connection between an AKS violation and a claim submitted to the federal government, that claim is false within the meaning of the FCA."); *Suarez*, 2019 WL 4749967, at *10 ("Where a relator's FCA claim depends on violations of the Anti-Kickback statute, the relator must identify a link between the alleged kickback and a claim for government payment.").

In *United States ex rel. Arnstein v. Teva Pharmaceuticals USA, Inc.*, the district court for the Southern District of New York stated that, although "[t]he law on this issue is not well developed . . . after canvassing the relevant case law, a few guiding

principles emerge." No. 13 CIV. 3702 (CM), 2019 WL 1245656, at *23 (S.D.N.Y. Feb.

27, 2019). In finding that the relators successfully met their burden at the summary

judgment stage, the *Arnstein* court stated:

> First, the FCA does not require the kickback to be the
> "but for" cause of the prescription. . . . Second, and
> relatedly, the Court is mindful that Relators' burden of
> production at this stage [summary judgment] is not
> satisfied by a mere "correlation equals causation"
> argument. . . . To resolve this dilemma, courts have
> articulated a "middle of the road" approach.
> This approach holds that, [a] kickback does not morph
> into a false claim unless a particular patient is exposed to
> an illegal recommendation or referral and a provider
> submits a claim for reimbursement pertaining to that
> patient. A "link" is required, but it is less than showing
> that the bribe succeeded in producing the prescription.
> For a False Claims Act violation, [a relator] must prove
> that at least one of [defendant's] claims sought
> reimbursement for medical care that was provided in
> violation of the Anti-Kickback Statute (as a kickback
> renders a subsequent claim ineligible for payment).

*Id.* (citations and punctuation omitted). *See also United States ex rel. Greenfield v.*

*Medco Health Sols., Inc.*, 880 F.3d 89, 97–100 (3d Cir. 2018); *United States ex rel.*

*Bawduniak v. Biogen Idec, Inc.*, No. 12-cv-10601-IT, 2018 WL 1996829, at *3–*7

(D. Mass. Apr. 27, 2018).[87]

---

[87]   The Court notes that *Arnstein*, *Greenfield*, and *Bawduniak* were all decided at the
summary judgment stage.

Heller essentially alleges a quid pro quo arrangement; Guardian Atlanta offered and performed the at-issue services for the Communities in exchange for a contract bestowing preferred pharmacy status upon it. Heller further points to at least one customer who threatened to pull such status if Guardian Atlanta did not waive its fees.[88] Heller then alleges the Communities under a preferred pharmacy contract with Guardian Atlanta steered their residents to use the latter to fill their prescriptions.[89] Heller specifically points to an agreement between Guardian Atlanta and Magnolia Senior Living.[90] According to Heller, although the residents undoubtedly retained the ultimately authority to choose their pharmacy—Guardian Atlanta or otherwise—residents "overwhelmingly use the pharmacy recommended by the facility where they live."[91]

Focusing on the residents' freedom to choose any pharmacy to fill their prescriptions, Guardian Atlanta declares that Heller has not sufficiently alleged a causal link between the alleged inducement and any claim made to the Government. It additionally argues Heller has not specifically indicated how "any

---

[88]   ECF 24, ¶ 261.

[89]   *Id*. ¶ 133.

[90]   *Id*. ¶ 215.

[91]   *Id*. ¶¶ 5, 134–37.

Community . . . communicated Guardian Atlanta's 'preferred' designation (or its purported meaning) to any resident or otherwise took any action to influence its residents' decisions."[92] The Court does not believe such precise details are necessary to pass the pleading stage. Heller has alleged a quid pro quo arrangement between Guardian Atlanta and the Communities; free or below fair market value services for status as the preferred pharmacy. Residents are then exposed to that remuneration (*i.e.*, status as the preferred pharmacy) by the Communities steering their business toward Guardian Atlanta. Each prescription filled by Guardian Atlanta for a resident in such a Community and payment sent to a federal insurer accompanied by a certification of compliance is thus tainted by the alleged kickback scheme.[93] Further, the Court does not believe it necessary at this stage—or even possible given Heller's position—for him to delineate the precise details of how the Communities internally steered their residents to select Guardian Atlanta. Heller sufficiently alleges the kickback scheme between

---

[92]   ECF 32-1, at 30–31.

[93]   Although the case is not binding, the Court believes Heller's allegations satisfy the causation standard articulated by the Third Circuit in *Greenfield*, 880 F.3d at 100 ("Greenfield insists that the taint of a kickback renders every reimbursement claim false. . . . [W]e disagree. A kickback does not morph into a false claim unless a particular patient is exposed to an illegal recommendation or referral and a provider submits a claim for reimbursement pertaining to that patient.").

Guardian Atlanta and the Communities and pleads the residents were exposed to that quid pro quo arrangement. That is enough to survive the motion to dismiss.

### 3. The Amended Complaint Sufficiently Alleges Guardian Atlanta Acted Knowingly and Willfully.

Guardian Atlanta's third overarching argument attacks Heller's allegations concerning scienter. To violate the AKS, the defendant must act "knowingly and willfully." 42 U.S.C. § 1320a-7b(b). The FCA itself defines "knowing" and "knowingly" to mean the defendant "has actual knowledge of the information"; "acts in deliberate ignorance of the truth or falsity of the information"; or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). A relator need not, however, prove "a specific intent to defraud." § 3729(b)(1)(B). The FCA's scienter requirement is "rigorous." *Universal Health Servs., Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016). "[R]elators proceeding under the false certification theory must allege that the defendant knew or should have known that its conduct violated regulations or statutes." *Wallace*, 2020 WL 4500493, at *16 (citing *Phalp*, 857 F.3d at 1154–55). But even in FCA cases, "[a]t the pleading stage, 'knowledge, and other conditions of a person's mind may be alleged generally.'" *Matheny*, 671 F.3d at 1224 (quoting Fed. R. Civ. P. 9(b)).

Throughout the Amended Complaint, Heller repeatedly alleges Guardian Atlanta knowingly offered kickbacks to the Communities to ultimately induce referrals and made false representations to federal insurers by certifying compliance with federal law, all while concealing the scheme.[94] Heller points to Guardian Atlanta's "executive team [ ] comprised of many experienced healthcare executives" and a prior FCA case that involved somewhat similar alleged inducements.[95] He also describes a PowerPoint presentation given at a 2018 President/Sales/Account Manager Meeting that discussed the providing of free services to ALCs.[96] Further, Heller relies on guidance from the OIG stating that:

> Nursing facilities that receive consultant pharmacist services under contract with a long-term care pharmacy should be mindful that the provision or receipt of free services or services at non-fair-market value rates between actual or potential referral sources present a heightened risk of fraud and abuse.

OIG Supplemental Compliance Program Guidance for Nursing Facilities, 73 FR 56838 n.53 (Sept. 30, 2008). The OIG listed specific examples of "suspect free goods and services arrangement that warrant careful scrutiny." *Id*. at 56843.

---

[94]  *E.g.*, ECF 24, ¶¶ 6, 76, 86, 248, 300–27.

[95]  *Id*. ¶¶ 303, 307.

[96]  *Id*. ¶ 304.

Guardian Atlanta disagrees with Heller's allegations and supporting evidence, claiming it did not knowingly and willfully violate the AKS. At the starting gate, Guardian Atlanta does not contest that it knowingly offered and provided the services underpinning the alleged kickback scheme. It ostensibly argues that Heller has failed to *prove* it knew those actions violated the AKS. But that is not Heller's burden at this stage; he need only plead Guardian Atlanta's knowledge generally. Fed. R. Civ. P. 9(b). In that vein, the Court agrees with some of Guardian Atlanta's characterization of the evidence; the 2008 OIG guidance is not factually synonymous because it concerned *nursing homes*, which differ greatly from the ALCs and PCHs at issue here. And the 2012 OIG advisory opinion expressly differentiated between the risks presented by community homes and skilled nursing facilities. Re: OIG Advisory Op. No. 12-19, 2012 WL 7148095, at *8. But that advisory opinion does not confer blanket immunity on a long-term care pharmacy like Guardian Atlanta. Instead, the OIG reiterated its "longstanding and clear" position that "the provision of free or below-market items or services to actual or potential referral sources [is] suspect and may violate the anti-kickback statute, depending on the circumstances." *Id*. at *5. And the OIG found that the hypothetical was "unlikely to result in fraud or abuse under the anti-kickback statute," not that it never could reach such levels. *Id*. at *7. Treating Heller's

allegations as true, the Court finds he has satisfied his pleading burden of alleging that Guardian Atlanta acted knowingly and willfully.

### 4.   Heller Need Not Further Allege Materiality.

Guardian Atlanta's final argument is that, even if Heller has adequately pleaded violations of the AKS, he has not alleged enough facts to show that such violations were material to the Government's decision to accept the claims and render payment. According to the Supreme Court, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 136 S. Ct. at 2002. The materiality element "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id*. at 2003 (quotations and punctuation omitted). *Escobar* characterizes the materiality standard as "demanding" and "rigorous" because the FCA "is not an all-purpose antifraud statute . . . or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id*.[97]

Heller and Guardian Atlanta agree that materiality is an element of an FCA claim. Their positions diverge, however, as to whether Heller must plead

---

[97]   Notably, *Escobar* did not concern an alleged violation of the AKS, but concerned how the FCA relates to other healthcare rules and statutes.

additional facts—beyond a plausible claim that Guardian Atlanta violated the AKS—in compliance with the *Escobar* standard showing that the Government considered the conduct material as to disqualify Guardian Atlanta from an entitlement to payment. Guardian Atlanta maintains that further factual allegations are required and avers that the Government (1) investigated the case, but chose not to intervene; (2) has continued to pay Guardian Atlanta's claims; and (3) has not demanded or suggested that Guardian Atlanta change its practices. Heller, conversely, contends that "as a matter of law, AKS violations are material to the Government's payment decisions."[98]

Congress amended the AKS in 2010, which in its current form provides that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g). In the wake of the 2010 amendment, many federal courts have concluded that AKS violations are material as a matter of law. For example, in *Guilfoile v. Shields*, the First Circuit held:

> We further read the AKS amendment as obviating the need for a plaintiff to plead materiality—that is, to plead that compliance with the AKS was *material* to the government's decision to pay any specific claim. This construction inescapably follows from the statute's plain

---

[98]   ECF 41, at 24.

> language stating that a claim resulting from a violation
> of the AKS constitutes a false or fraudulent claim. The
> statute's use of the term "constitutes" would be
> meaningless if courts had to engage in a materiality
> analysis—for example, by inquiring into whether the
> entity submitting the claim had certified its compliance
> with the AKS—after establishing that a claim resulted
> from an AKS violation.

913 F.3d at 190 (citations and punctuation omitted) (emphasis in original).

Recent decisions from other federal courts agree with this position.

*See, e.g., Fesenmaier*, 2021 WL 101193, at *10 n.5; *United States ex rel. Goodman v.

Arriva Med., LLC*, 471 F. Supp. 3d 830, 840 (M.D. Tenn. 2020); *United States ex rel.

Strunck v. Mallinckrodt Ard LLC*, No. CV 12-175, 2020 WL 362717, at *4 (E.D. Pa. Jan.

22, 2020); *Arnstein*, 2019 WL 1245656, at *28; *United States ex rel. Lutz v. Berkeley

Heartlab, Inc.*, No. CV 9:14-230-RMG, 2017 WL 6015574, at *2 (D.S.C. Dec. 4, 2017).

To support its construction, Guardian Atlanta points to the Third Circuit's

decision in *Greenfield*, which held that the materiality standard articulated in

*Escobar* applied in an AKS-based FCA case. 880 F.3d at 98 n.8 (affirming grant of

summary judgment in favor of defendant). The Court does not find *Greenfield*

persuasive. The decision concerned claims that predated the 2010 amendment to

the AKS. It also contained sparse analysis as to the 2010 amendment's effect on the

materiality element of the FCA. *See also Guilfoile*, 913 F.3d at 190 ("If a plaintiff must

plead and prove that compliance with the AKS was 'material' to a claim 'resulting

from' an AKS violation, § 1320a-7b(g) would not represent the strengthening of whistleblower actions that Congress intended."); *Goodman*, 471 F. Supp. 3d at 842 (noting that "[i]t would be nonsensical to say that an AKS violation is nevertheless somehow not 'material' to a false or fraudulent claim; one would be saying that an AKS violation is not material to itself"). In sum, the Court agrees with the position taken by the majority of courts to reach the issue and finds that Heller need not allege further facts to establish materiality beyond a facially plausible violation of the AKS.

### C.   Guardian Pharmacy's Motion to Dismiss

Guardian Pharmacy has filed a separate motion to dismiss and argues Heller fails to state a facially plausible claim against it under either Rule 9(b) or Rule 12(b)(6). A complaint alleging a FCA violation "must satisfy Rule 9(b) with respect to each defendant, and some allegation as to each defendant's role in the fraud is part of this requirement." *United States v. Gericare Med. Supply Inc.*, No. CIV.A.99-0366-CB-L, 2000 WL 33156443, at *9 (S.D. Ala. Dec. 11, 2000) (citing *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1381 (11th Cir. 1997)). *See also United States ex rel. Lewis v. Cmty. Health Sys., Inc.*, No. 18-20394-CIV, 2020 WL 3103994, at *18 (S.D. Fla. June 11, 2020) ("In keeping with its purpose of providing 'fair notice,' Rule 9(b) requires plaintiffs to distinguish between

multiple defendants and 'inform each defendant of the nature of his alleged participation in the fraud.'" (quoting *Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007)).

It is equally axiomatic that "merely being a parent corporation of a subsidiary that commits a FCA violation, without some degree of participation by the parent in the claims process, is not enough to support a claim against the parent for the subsidiary's FCA violation." *Lewis*, 2020 WL 3103994, at *20 (quoting *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 59–60 (D.D.C. 2007)). *See also United States ex rel. Schaengold v. Mem'l Health, Inc.*, No. 4:11-CV-58, 2014 WL 6908856, at *12 (S.D. Ga. Dec. 8, 2014). Moreover, "the bare assertion that a corporate defendant operated, directed, and conspired with the hospital does not satisfy Rule 9's particularity standard." *Lewis*, 2020 WL 3103994, at *20 (citing *United States ex rel. Martinez v. KPC Healthcare Inc.*, 8:15-cv-01521-JLSD-FM, 2017 WL 10439030, at *6 (C.D. Cal. June 8, 2017) (brackets and punctuation omitted)). Put another way, a relator can only establish that a parent and associated company are equally liable through (1) "a veil piercing or alter ego theory," or (2) "that it is directly liable for its own role in the submission of false claims." *United States ex rel. Bibby v. Mortg. Inv'rs Corp.*, No. 1:12-cv-4020-AT, 2016 WL 10998850, at *8 (N.D. Ga. Oct. 21, 2016).

It is undisputed that Guardian Pharmacy and Guardian Atlanta are separate corporate entities. Heller, however, directs the overwhelming majority of allegations in the Amended Complaint to "Guardian," referring to both entities collectively without distinguishing the specific actions taken by each. Unlike his allegations concerning Guardian Atlanta, Heller does not (1) identify a single employee or customer of Guardian Pharmacy or (2) allege any specific facts showing Guardian Pharmacy offered or performed any of the at-issue services, became the "preferred pharmacy" for an identified Community, or submitted a single claim to the Government for payment. Furthermore, Heller does not claim to have first-hand, personal knowledge of Guardian Pharmacy's business practices; it is undisputed that Heller only worked for Guardian Atlanta after its acquisition of Collier's.

The only particularized allegation Heller makes regarding Guardian Pharmacy's direct role in the alleged kickback scheme is that it "pressured Mr. Hopp and others to memorialize the agreements with the assisted living communities and personal care homes in written contracts."[99] This sole, broad allegation is too vague to satisfy Rule 9(b)'s heightened pleading requirements.

---

[99]   ECF 24, ¶ 195.

*E.g.*, *Simon v. Healthsouth of Sarasota Ltd. P'ship*, No. 8:12-CV-236-T-33AEP, 2019 WL 11505269, at *2–*3 (M.D. Fla. Dec. 16, 2019) (finding that FCA complaint that "refers to the Defendants as one unit . . . is impermissible"); *United States ex rel. Isabell v. Kindred Healthcare*, No. 8:16-CV-2076-T-27CPT, 2019 WL 4345782, at *3 (M.D. Fla. Sept. 12, 2019) (dismissing FCA complaint because it "impermissibly lumps together all defendants, failing to allege the conduct of each defendant").

Alternatively, Heller submits that the Amended Complaint contains sufficient allegations showing Guardian Pharmacy operated Guardian Atlanta as its alter ego as to impute liability pursuant to a future veil piercing analysis. To clarify, "piercing the corporate veil is not a claim, but is properly understood as a theory by which an individual or parent corporation can be held liable for an alleged violation committed more directly by a (different) corporation." *United States ex rel. Jenkins v. Sanford Cap., LLC*, No. CV 17-239, 2020 WL 5440551, at *7 (D.D.C. Sept. 10, 2020). Heller's burden to establish this theory of liability "is quite high and such findings are considered 'rare.'" *Lewis*, 2020 WL 3103994, at *20 (quoting *Runton v. Brookdale Senior Living, Inc.*, 17-60664-CIV, 2018 WL 1057436, at *7 (S.D. Fla. Feb. 2, 2018)). To pierce the corporate veil, a plaintiff must demonstrate that the defendant "disregarded the corporate entity and made it a mere instrumentality for the transaction of their own affairs, that the corporation

and its owners have such unity of interest and ownership that they lack separate personalities, and that to observe the corporate form would work an injustice or promote fraud." *United States v. Fid. Cap. Corp.*, 920 F.2d 827, 837 (11th Cir. 1991). *See also Lewis*, 2020 WL 3103994, at *20 ("Not only must a party seeking to pierce the corporate veil prove that the subsidiary was a mere instrumentality of the parent, but the party must also show that the parent engaged in improper conduct through its organization or use of the subsidiary.") (punctuation omitted).

Heller alleges Guardian Pharmacy operates through its "Partner Pharmacies" such as Guardian Atlanta.[100] According to Heller, although Guardian Pharmacy is the majority owner and controls the operations of the Partner Pharmacies, it operates them in tandem with a local management team.[101] Guardian Pharmacy's role is to "develop[ ] national and regional sales strategies for the entire company, conduct[ ] training for all sales representatives and other employees, and exert[ ] control over the billing process, contracting finance and legal functions for the Partner Pharmacies."[102] Guardian Pharmacy's executive team, avers Heller, "is focused on growth and profit strategy . . . *i.e.*, the number

---

[100]   ECF 24, ¶ 124.

[101]   *Id*. ¶¶ 123, 125.

[102]   *Id*. ¶ 126.

of patients who fill prescriptions."[103] Treating these allegations as true, they do not provide enough facts to plausibly allege that Guardian Pharmacy may be liable through a veil piercing theory.

At best, Heller's allegations demonstrate Guardian Pharmacy owns a significant portion of Guardian Atlanta and controls its macro-level operations, which are implemented at the local level by a separate team. This level of involvement is simply not enough. *Fidelity Cap.*, 920 F.2d at 837 ("The mere fact that a person owns and controls a corporation will not justify a finding of abuse of the corporate entity, even though that person may have used the corporation to promote his own ends."). Notably absent from the Amended Complaint are any factual allegations of the comingling of assets or abuse of the corporate form. In sum, Heller has not sufficiently alleged Guardian Pharmacy's direct involvement in the kickback scheme or facts justifying liability through veil piercing.

### D.    Defendants' Joint Motion for Sanctions

In a separate motion, Defendants jointly request the Court sanction Heller by striking the Amended Complaint and ordering him pay Defendants attorneys'

---

[103]   *Id*. ¶ 129.

fees and litigation expenses. According to Defendants, Heller should be sanctioned because (1) his "actions and words demonstrate that he knows that the facts he alleges do not state a plausible AKS violation" and (2) he "pursue[d] this action through factual allegations that have no evidentiary support, that are demonstrably false, and that, in many cases, [he] knows to be false."[104]

The purpose of Rule 11 sanctions is to "reduce frivolous claims, defenses, or motions, and to deter costly meritless maneuvers." *Massengale v. Ray*, 267 F.3d 1298, 1302 (11th Cir. 2001). The Court may impose Rule 11 sanctions under a variety of circumstances:

> [W]hen a party files a pleading that (1) has no reasonable factual basis; (2) is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; and (3) is filed in bad faith for an improper purpose.

*Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998). "The standard for testing conduct under amended Rule 11 is reasonableness under the circumstances." *Anderson v. Smithfield Foods, Inc.*, 353 F.3d 912, 915 (11th Cir. 2003). To assess reasonableness, courts in the Eleventh Circuit analyze two factors: "(1) whether the party's claims are objectively frivolous, and (2) whether the person who signed

---

[104]  ECF 50-1, at 3–4.

the pleadings should have been aware that they were frivolous." *Peer v. Lewis*, 606 F.3d 1306, 1311 (11th Cir. 2010).

The Court finds no reasonable basis to sanction Heller. Although Defendants may strongly disagree with the merits, reliability, truth, and evidentiary support of Heller's factual allegations—the strength of which will be borne out through discovery—nothing in the Amended Complaint raises the specter of frivolous or vexatious litigation at this stage. Defendants' motion for sanctions is denied.

## IV.   CONCLUSION

Guardian Atlanta's motion to dismiss [ECF 32] is **DENIED**; Guardian Pharmacy's motion to dismiss [ECF 34] is **GRANTED**; Defendants' joint motion for sanctions [ECF 50] is **DENIED**. Within 14 days of this Order, Guardian Atlanta shall file its Answer to the First Amended Complaint.

**SO ORDERED** this the 10th day of February 2021.

Steven D. Grimberg
United States District Court Judge