IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel* HENRY B. HELLER,<br><br>                    *Plaintiffs,*<br><br>v.<br><br>GUARDIAN PHARMACY, LLC and GUARDIAN PHARMACY OF ATLANTA, LLC,<br><br>                    *Defendants.* | Civil Action File No.:<br><br><br>1:18-cv-03728-SDG<br><br><br>**JURY TRIAL DEMANDED** |

**ANSWER TO AMENDED COMPLAINT**

Defendant Guardian Pharmacy of Atlanta, LLC ("Guardian Atlanta" or Defendant) answers the numbered Paragraphs of Relator's Amended Complaint (ECF 24, the "Complaint") as follows:

## I.     Introduction[1]

1.     This action seeks to recover damages and civil penalties on behalf of the United States of America based upon false claims for payment submitted to

---

[1] For ease of reference, Defendant repeats the headings set forth in Relator's Amended Complaint to simplify comparison of the Amended Complaint and this Answer. In doing so, Defendant makes no admissions regarding the substance of the headings or otherwise. To the extent any headings might be construed as allegations, Defendant specifically denies all such allegations.

the Medicare and TRICARE Programs for prescription medications that resulted from a kickback scheme perpetrated by Defendants Guardian Pharmacy, LLC and Guardian Pharmacy of Atlanta, LLC (collectively, "Guardian").

**ANSWER:** Paragraph 1 sets forth conclusions of law and Relator's statement of the case, which do not require an answer. To the extent that a response is required, Defendant denies the allegations in Paragraph 1. By way of further response, Defendant denies that it submitted any false claims for payment or that it perpetrated a kickback scheme. The Complaint uses "Guardian" to refer to Defendant and to Guardian Pharmacy, LLC; however, Guardian Pharmacy's LLC's Motion to Dismiss [ECF 34] has been granted [ECF 63], and Guardian Pharmacy, LLC is no longer a party. As to any Paragraphs of this Complaint referencing "Guardian," Defendant answers only for itself and not for Guardian Pharmacy LLC or any other entity.

2.     Guardian is an institutional pharmacy that fills prescription drug orders for residents of assisted living communities, personal care homes, and other long-term care facilities.

**ANSWER:** Defendant admits that it is an institutional pharmacy that fills prescription drug orders for residents of assisted living communities ("ALCs"), personal care homes ("PCHs"), and other long-term care facilities.

3.     Residents of assisted living communities and personal care homes are typically elderly people experiencing chronic health issues that require ongoing treatment with multiple prescription drugs. Senior living facilities generally assist residents with taking their medications. Most residents are beneficiaries of the Medicare Program, and their prescription medications and supplies are paid for in whole or in part by Medicare. Other residents participate in TRICARE, a federal healthcare program for military veterans and families which pays for, in whole or in part, the prescription medications and supplies provided by Guardian.

**ANSWER:**  Defendant admits that many residents of ALCs and PCHs (collectively, "Communities") are elderly people experiencing chronic health issues that require ongoing treatment with multiple prescription drugs. Defendant admits that Communities in Georgia may assist residents with the administration or self-administration of medications in accordance with the laws and regulations of the State of Georgia. Defendant lacks sufficient information or knowledge to admit or deny whether most residents of ALCs or PCHs are beneficiaries of the Medicare Program. Defendant admits that, for beneficiaries of the Medicare Program who participate in Medicare Part D, their prescription medications and supplies typically are paid for in whole or in part by Medicare.

Defendant admits that some residents of some Communities participate in TRICARE, a federal healthcare program for military veterans and families which pays for, in whole or in part, prescription medications and supplies provided by Defendant to TRICARE participants. Defendant denies any remaining allegations contained in Paragraph 3.

4.      To protect senior residents, Georgia law imposes certain requirements on assisted living communities and personal care homes that offer medication assistance for their residents. The facilities must manage the residents' medications in a safe and secure manner, maintain daily records of medication administration to residents, and conduct staff education and skills certifications, among other duties under Georgia law.[2]

**ANSWER:**  Defendant admits the allegations contained in the first sentence of Paragraph 4. The remainder of the allegations of Paragraph 4 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies these remaining allegations of Paragraph 4 to the extent they mischaracterize the source's language, meaning, or application, or

---

[2] *See, e.g.*, Ga. Comp. R. & Regs. 111-8-63-.20(11)-(12) (medication management in assisted living communities); Ga. Comp. R. & Regs. 111-8-62-.20(7)-(8) (medication management in personal care homes).

suggest that the requirements for ALCs and PCHs are the same, and further states that the cited source speaks for itself. Defendant denies any remaining allegations contained in Paragraph 4.

5.      Guardian competes fiercely with local and national pharmacies to profit from the lucrative prescription drug market represented by senior citizens who live in these facilities. The market is strongly influenced by the owners and operators of the facilities because they customarily steer their residents to a preferred pharmacy to fill prescription drug orders, and residents overwhelmingly use the pharmacy recommended by the facility where they live.

**ANSWER:**  Defendant admits that it competes with local and national pharmacies to serve residents of ALCs and PCHs in Georgia. Defendant further admits that at many Communities, the majority of residents choose the Community's preferred pharmacy. Defendant denies any remaining allegations contained in Paragraph 5. In further response to Paragraph 5, Defendant denies that facilities "steer" residents and assert that under Georgia law residents of ALCs and PCHs are free to choose any pharmacy.

6.      Since 2014, despite its own clear contractual language to the contrary, business as usual for Guardian has been to knowingly offer and furnish kickbacks to induce owners and operators of assisted living communities and

personal care homes to select and retain Guardian over its competitors as the "preferred pharmacy" to fill prescription drug orders for their residents, including Medicare and TRICARE beneficiaries.

**ANSWER:** Defendant denies the allegations of Paragraph 6.

7.      Specifically, Guardian employs a team of consulting pharmacists and pharmacy nurses who perform medication management services for customers, on a quarterly basis, for no charge or for charges that are well below fair market value (hereinafter "FMV"). Guardian refers to these services as "consulting" or "audit" services. By performing such consulting services for free or below FMV, Guardian relieves those assisted living communities and personal care homes that select Guardian as their "preferred pharmacy" of the costs of complying with their legal obligations to perform such services for their residents and otherwise benefits the facilities by reducing their overhead costs.

**ANSWER:** Defendant admits that a team of consulting pharmacists perform, among other duties, medication management services for patients of Guardian Atlanta who reside at ALCs on a quarterly basis. Defendant admits that a team of pharmacy nurses perform, among other duties, medication management services for patients of Guardian Atlanta who reside at PCHs every four months. Defendant denies the remainder of the allegations contained in

6

Paragraph 7. Defendant further states, upon information and belief, that other pharmacies in Guardian Atlanta's market, including those affiliated with Relator, provide medication management services at least to their own patients residing in ALCs and do not impose separate charges for such services.

8.     Guardian's Consulting Department also has furnished legally-required education classes and skills checks for free or below-cost to the staff of facilities that chose Guardian as their preferred pharmacy, again relieving the facilities of the cost of complying with their legal obligations to provide these services for their staff.

**ANSWER:**  Defendant admits that, from approximately 2017 to 2018, Guardian Atlanta allowed staff of "host Communities" and Communities that were new to Guardian Atlanta or newly licensed as ALCs to attend scheduled certified medication aide (CMA) or proxy caregiver classes at no charge. In lieu of paying for staff to attend the class, host Communities provided space for the classes and provided food and refreshments for attendees (which included staff from other Communities). New Communities to Guardian Atlanta and newly-licensed ALCs were allowed to send a limited number of staff to attend classes at no charge in order to demonstrate the value of the classes and generate future

paid training opportunities for Guardian Atlanta. Defendant denies all remaining allegations contained in Paragraph 8.

9.    As another inducement, Guardian also has offered free installation of the computers and software programs for electronic medication administration records (eMAR) systems used by assisted living communities and personal care homes that select Guardian as their "preferred" pharmacy. These systems provided at no cost by Guardian assist customers (*i.e.*, senior living facilities) in maintaining a daily medication administration record for each resident, as required by Georgia law.

**ANSWER:**  Defendant denies the allegations of Paragraph 9.

10.    These improper inducements are central to Guardian's marketing campaign and growth strategy.

**ANSWER:**  Defendant denies the allegations of Paragraph 10.

11.    One purpose of Guardian's practice of supplying free and below FMV goods and services to senior living facilities was to induce them to refer their residents to Guardian, or arrange for their residents to select Guardian, for prescription drugs and supplies covered by Medicare or TRICARE, all in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). The claims for payment that Guardian has submitted and continues to submit to Medicare or

TRICARE as a result of its kickback scheme are false claims that violate the False Claims Act, 31 U.S.C. § 3729(a).

**ANSWER:** Defendant denies the allegations of Paragraph 11.

12.    Representative examples of false claims resulting from Guardian's kickback scheme are identified below. As a direct and foreseeable result of Guardian's kickback scheme, Guardian has submitted hundreds of thousands of false claims to the Medicare Program and TRICARE Programs, and the Defendants' unlawful conduct continues today.

**ANSWER:** Defendant denies the allegations of Paragraph 12.

## II.    Jurisdiction and Venue

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345 (United States as plaintiff) and 28 U.S.C. § 1331 (federal question jurisdiction).

**ANSWER:** Paragraph 13 sets forth conclusions of law that do not require an answer. To the extent that a response is required, Defendant denies the allegations in Paragraph 13.

14.    This Court has personal jurisdiction over the Defendants, and venue is proper in the Northern District of Georgia pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391, in that one or more Defendants can be found, resides, or

transacts business in this District, and the violations of the False Claims Act described below were carried out in this District.

**ANSWER:**  Paragraph 14 sets forth conclusions of law that do not require an answer. To the extent that a response is required, Defendant denies the allegations in Paragraph 14, except that Defendant admits that it transacts business in this District.

### III.   The Parties

15.    Relator Henry Bernard Heller II is a resident of Georgia. Mr. Heller has been involved in the pharmacy industry for nearly 40 years. For 16 years, he co-owned Collier's Personal Care Pharmacy, a long-term care pharmacy operating throughout north Georgia. In 2017, Guardian Pharmacy of Atlanta acquired Collier's, and Guardian contracted with Mr. Heller first as an Account Management Consultant and later added Sales Representative duties to his responsibilities. Until October 30, 2018, Mr. Heller participated in sales calls with Guardian's President, Matthew Hopp, who was responsible for negotiating and entering into contracts with customers.

**ANSWER:**  Defendant, on information and belief, admits the allegations contained in the first three sentences of Paragraph 15. Defendant admits that Guardian Atlanta acquired Collier's in 2017 and that Guardian Atlanta

contracted with Mr. Heller first as an Account Management Consultant. Defendant admits that Mr. Heller's duties were changed to those of a Sales Representative. Defendant admits that until on or before October 30, 2018, Mr. Heller participated in some sales calls with Guardian Atlanta's President Matthew Hopp. Defendant denies all remaining allegations contained in Paragraph 15.

16.     Defendant Guardian Pharmacy, LLC is registered as a foreign limited liability company and has its principal place of business in this District at 171 17th Street NW, Suite 1400, Atlanta, GA 30363. Its registered agent is Registered Agent Solutions, Inc., 900 Old Roswell Lakes Pkwy, Suite 310, Roswell, GA, 30076.

**ANSWER:**  Defendant states that Guardian Pharmacy, LLC's Motion to Dismiss [ECF 32] was granted [ECF 63]. As this Paragraph does not relate to Defendant, no response is required. To the extent that any allegations in this Paragraph are directed at Defendant, they are denied.

17.     Defendant Guardian Pharmacy of Atlanta, LLC (NPI Number 1801180625) is a domestic limited liability company that does business at 171 17th Street NW, Suite 1400, Atlanta, GA 30363. Its registered agent is Registered

Agent Solutions, Inc., 900 Old Roswell Lakes Pkwy, Suite 310, Roswell, GA, 30076.

**ANSWER:** Defendant denies that it does business at 171 17th Street NW, Suite 1400, Atlanta, GA 30363. Defendant admits the remaining allegations in Paragraph 17.

18.     Guardian Pharmacy, LLC is a member and majority owner of Guardian Pharmacy of Atlanta, LLC. The Defendants collectively are referred to in this Complaint as "Guardian."

**ANSWER:** Defendant admits the first sentence of Paragraph 18. As to second sentence, Defendant notes that Guardian Pharmacy's LLC's Motion to Dismiss [ECF 34] has been granted [ECF 63]. Defendant, therefore, objects to the Relator's use of "Guardian" to refer to Defendant and to Guardian Pharmacy, LLC. As to any Paragraphs of this Complaint referencing "Guardian," Defendant answers only for itself and not for Guardian Pharmacy LLC or any other entity.

### IV.    Anti-Kickback Statute

19.     The Anti-Kickback Statute makes it a crime to offer anything of value to an assisted living community or personal care home if one purpose of the arrangement is to induce the facility to refer its residents to a pharmacy to fill prescriptions, or otherwise to arrange for or recommend the pharmacy to furnish

prescription drugs and supplies to residents, when the drugs and supplies are

paid for in whole or in part by a federal health care program, such as the

Medicare Program or TRICARE. *See* 42 U.S.C. § 1320a-7b(b).

**ANSWER:** The allegations of Paragraph 19 characterize a federal statute,

and therefore, no response is required. To the extent that a response is required,

Defendant denies any characterization of the statute and state that the statute

speaks for itself.

20.     Congress passed the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b),

in 1972 to curb fraud and abuse in federal health care programs.

**ANSWER:** Defendant admits the allegations of Paragraph 20.

21.     The Anti-Kickback Statute creates a felony criminal offense in that,

Whoever knowingly and willfully offers or pays any remuneration
(including any kickback, bribe, or rebate) directly or indirectly,
overtly or covertly, in cash or in kind to any person to induce such
person—

(A) To refer an individual to a person for the furnishing or
arranging for the furnishing of any item or service for which
payment may be made in whole or in part under a Federal
health care program, or

(B) To purchase, lease, order or arrange for or recommend
purchasing, leasing, or ordering any good, facility, service, or
item for which payment may be made in whole or in part
under a Federal health care program,

13

Shall be guilty of a felony and upon conviction thereof, shall be fined
not more than $25,000 or imprisoned for not more than five years, or
both.
42 U.S.C. § 1320a-7b(b)(2).

**ANSWER:**  The allegations of Paragraph 21 recite a portion of a federal

statute, and therefore, no response is required. To the extent that a response is

required, Defendant denies any characterization of the statute and state that the

statute speaks for itself.

22.    "Remuneration" under the Anti-Kickback Statute refers to an

exchange of anything of value, including any kickback, bribe, or rebate, whether

paid directly or indirectly, overtly or covertly, in cash or in kind. See 42 U.S.C. §

1320a-7b(b)(2).

**ANSWER:**  The allegations of Paragraph 22 are a characterization of a

federal statute, and therefore, no response is required. To the extent that a

response is required, Defendant denies any characterization of the statute and

state that the statute speaks for itself. Defendant further states that

"remuneration" does not include, among other things, integrally-related services,

support services, or services provided in exchange for fair market value.

23.    Underscoring the breadth of the statutory definition, the United

States Department of Health and Human Services, Office of Inspector General

("HHS OIG") Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991), broadly define the term "remuneration" as "anything of value in any form or manner whatsoever." See HHS-OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991); *accord United States ex rel. Fry v. The Health Alliance of Greater Cincinnati*, 2008 U.S. Dist. LEXIS 102411, at *17 (S.D. Ohio Dec. 18, 2008).

**ANSWER:**  The allegations of Paragraph 23 reflect a characterization of an HHS-OIG publication and a decision from the Southern District of Ohio to which no response is required. To the extent that a response is required, Defendant denies any characterization of the statute and state that the statute speaks for itself. Defendant further denies that there is a "statutory definition" of "remuneration" as used in the Anti-Kickback Statute. Defendant further states that "remuneration" does not include, among other things, integrally-related services, support services, or services provided in exchange for fair market value.

24.     As such, unlawful remuneration includes furnishing free services or services for below fair market value ("FMV"). *See, e.g.*, 42 U.S.C. § 1320a-7a(i)(6) (defining "remuneration" for purposes of imposing civil monetary penalties to include "items or services for free or for other than fair market value.").

**ANSWER:**  The allegations of Paragraph 24 are a characterization of a federal statute, and therefore, no response is required. To the extent that a

response is required, Defendant denies any characterization of the statute and state that the statute speaks for itself. Defendant further denies that 42 U.S.C. § 1320-7a(i)(6) provides a definition of "remuneration" for the Anti-Kickback Statue. Defendant further states that "remuneration" does not include, among other things, integrally-related services, support services, or services provided in exchange for fair market value.

25.    The Anti-Kickback Statute prohibits any arrangement in which at least one purpose of the remuneration is to induce referrals of patients for items or services paid for by federal health care programs. *United States v. Borrasi*, 639 F.3d 774 (7th Cir. 2011); *United States v. McClatchey*, 217 F.3d 823 (10th Cir. 2000); *United States v. Davis*, 132 F.3d 1092 (5th Cir. 1998); *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985).

**ANSWER:**  The allegations of Paragraph 25 characterize a federal statute, and therefore, no response is required. To the extent that a response is required, Defendant denies any characterization of the statute and state that the statute speaks for itself.

26.    No exceptions or safe harbors to the Anti-Kickback Statute apply to the free and below FMV services provided by Guardian to induce and maintain its customers' referrals of their residents to Guardian.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 26. Defendant further denies that it provides free or below FMV services to induce and maintain customers' referrals. Defendant further denies that its integrally related services, support services, or services provided in exchange for fair market value compensation constitute remuneration.

27.     In fact, as further explained below, conduct similar to Guardian's has been the subject of decades of enforcement actions and guidance published by HHS OIG.

**ANSWER:**  Defendant denies the allegations of Paragraph 27.

28.     Over a decade ago, HHS OIG expressly cautioned that "consultant pharmacist services under contract with a long-term care pharmacy" that are provided for free or "at non-fair-market-value rates" present a heightened risk of a violation of the Anti-Kickback Statute.[3]

**ANSWER:**  The allegations of Paragraph 28 reflect a characterization of an HHS-OIG publication to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 28 to the extent they mischaracterize the HHS-OIG publication's language, meaning, or

---

[3] 73 Fed. Reg. 56832, n.53 (2008).

17

application and further states that the HHS-OIG publication speaks for itself. Defendant further states that Relator's characterization takes out-of-context snippets from an HHS-OIG statement that apply only to pharmacy relationships with skilled nursing facilities ("SNFs") (provider types that were not served by Guardian Atlanta during the relevant time period), not Communities or provider types similar to Communities.

29.     Congress enacted the Anti-Kickback Statute to ensure that decisions about medical care are based on the best interests of patients, rather than on the influence of payments or other "remuneration" from someone seeking patient referrals. Congress also was concerned that kickbacks create unfair competition in the healthcare market and can drive honest companies out of the market, to the detriment of patients.

**ANSWER:** Defendant admits that the reasons identified in Paragraph 29 are some of the reasons underlying the Anti-Kickback Statute. Defendant denies that any of those reasons are implicated in the present case. Specifically, Defendants assert that HHS-OIG has recognized that, in the context of provider types such as Communities, the only concern of the Anti-Kickback Statute that is potentially implicated is "unfair competition." Defendants further assert that

their conduct does not implicate unfair competition. Defendant denies any remaining allegations in Paragraph 29.

30.    In 2010, Congress strengthened the Anti-Kickback Statute by adding a provision to establish that a claim for payment submitted to a federal program such as Medicare or TRICARE that includes "items or services resulting from" a kickback scheme "constitutes a false or fraudulent claim" in violation of the False Claims Act. See 42 U.S.C. § 1320a-7b(g).

**ANSWER:**  Defendant admits that Congress amended the Anti-Kickback Statute in 2010. The remainder of the allegations of Paragraph 30 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies these remaining allegations of Paragraph 30 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

31.    Accordingly, a claim for payment to Medicare or TRICARE that results from a kickback scheme is a false claim as a matter of law. *Id.*

**ANSWER:**  The allegations of Paragraph 31 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 31 to the extent they mischaracterize the

source's language, meaning, or application and further states that the cited source speaks for itself.

32.     Compliance with the Anti-Kickback Statute thus is a material condition of payment for claims submitted to the Medicare Program or TRICARE, as a matter of law.

**ANSWER:**  The allegations of Paragraph 32 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 32.

### V.     False Claims Act

33.     The False Claims Act imposes civil liability on any person who –

A.     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

B.     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] ...

G.     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(A), (B), (G).

**ANSWER:**  The allegations of Paragraph 33 recite a portion of a federal statute, and therefore, no response is required. To the extent that a response is required, Defendant denies any characterization of the statute and state that the statue speaks for itself.

34.     A person or an organization that violates the False Claims Act is liable to the United States Government for a civil penalty for each violation, plus three times the amount of damages the Government sustains because of the violation. See 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9) (Civil Monetary Penalties Inflation Adjustment).[4]

**ANSWER:**  The allegations of Paragraph 34 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 34 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

---

[4] For civil penalties assessed after January 29, 2018, whose associated violations occurred after November 2, 2015, the civil monetary penalties range from a minimum of $11,181 to a maximum of $22,363 for each violation of the False Claims Act. See 28 C.F.R. § 85.5. For violations occurring on or before November 2, 2015, the civil penalty ranges from $5,500 to $11,000 for each violation. *See* 28 C.F.R. § 85.3(a)(9).

35.     The False Claims Act, 31 U.S.C. § 3729(b) further provides the

following definitions:

> (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud;

> (2)     the term "claim" (A) means any request or demand, whether under contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; . . .

> (3) the term "obligation" means an established duty, whether or not fixed, arising from an expressed or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

> (4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

31 U.S.C. § 3729 (2009).

**ANSWER:** The allegations of Paragraph 35 recite a portion of a federal statute, and therefore, no response is required. To the extent that a response is required, Defendant denies any characterization of the statute and state that the statue speaks for itself.

## VI.    Medicare Prescription Drug Coverage

36.     Most of the prescriptions that Guardian fills are paid for in whole or in part by the Medicare Program.

**ANSWER:** Defendant admits the allegations of Paragraph 36.

37.     Congress created the Medicare Program in 1965 with the passage of Title XVIII of the Social Security Act, see 42 U.S.C. § 426, § 426-1.

**ANSWER:** Defendant admits the allegations of Paragraph 37.

38.     Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a component of the United States Department of Health and Human Services.

**ANSWER:** Defendant admits the allegations of Paragraph 38.

39.     Medicare is a federal healthcare program within the meaning of the Anti-Kickback Statute.

**ANSWER:** Defendant admits the allegations of Paragraph 39.

40.     Medicare provides hospital insurance, prescription drug benefits, and other healthcare benefits for people 65 years and older, people with end stage renal disease, and certain people who are disabled. *See id.*

**ANSWER:**  Defendant admits the allegations of Paragraph 40.

41.     Medicare beneficiaries may obtain prescription drug benefits in two ways. Beneficiaries who participate in traditional Medicare insurance for medical services (under Medicare Parts A and B) may enroll in a stand-alone drug plan that covers prescription drugs called Medicare Part D. *See* 42 C.F.R. § 423.30. This is known as a Prescription Drug Plan or "PDP."

**ANSWER:**  The allegations of Paragraph 41 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 41 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

42.     Alternatively, beneficiaries who participate in a Medicare Advantage plan (that is, a managed care plan under Medicare Part C) for their medical benefits may elect to add prescription drug coverage to the basic health plan that covers their medical benefits. This is known as a Medicare Advantage Prescription Drug Plan or "MA-PD." *See* 42 C.F.R. § 422.4(c) & § 423.4.

**ANSWER:** The allegations of Paragraph 42 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 42 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

43.    Medicare Part C and Part D are voluntary insurance programs that are subsidized by federal funds.

**ANSWER:** The allegations of Paragraph 43 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 43 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

**A.    Medicare Part C – Medicare Advantage Prescription Drug Plan**

44.    Medicare Part C creates a managed care option for beneficiaries. *See* 42 U.S.C. § 1395w-21 to § 1395w-29.

**ANSWER:** The allegations of Paragraph 44 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 44 to the extent they mischaracterize the

source's language, meaning, or application and further states that the cited source speaks for itself.

45. CMS contracts with commercial insurance carriers, known as Medicare Advantage Organizations, to offer Medicare Advantage Plans under Medicare Part C. The Plans cover medical services, such as hospital and physician services that are eligible for traditional Medicare coverage, as well as supplemental benefits. *See* 42 C.F.R. § 422.100(c).

**ANSWER:** Defendant admits the allegations in the first sentence of Paragraph 45. The remaining allegations of Paragraph 45 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 45 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

46. Examples of Medicare Advantage Organizations that offer drug benefits as part of Medicare Advantage Plans in Georgia include but are not limited to: Humana, Blue Cross and Blue Shield of Georgia, Cigna-Healthspring, WellCare, and Aetna Medicare.

**ANSWER:** Defendant admits the allegations of Paragraph 46 upon information and belief.

47.     Both types of prescription drug plans – PDP and MA-PD – must comply with the requirements of Medicare Part D, as described next. *See* 42 C.F.R. § 423.104.

**ANSWER:**  The allegations of Paragraph 47 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 47 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

**B.     Medicare Part D – Prescription Drug Benefit Plan**

48.     Part D of the Medicare Program became effective January 1, 2006. Part D was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, to provide prescription drug benefits for Medicare "beneficiaries," meaning individuals who are eligible to receive benefits under the Medicare Program.

**ANSWER:**  The allegations of Paragraph 48 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 48 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

49.     Medicare Part D is a voluntary insurance program that is subsidized by federal funds in the Medicare Prescription Drug Account. *See* 42 U.S.C. § 1395w-101; 42 C.F.R. §423.315(a).

**ANSWER:**  The allegations of Paragraph 49 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 49 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

50.     Private insurance companies known as Part D Sponsors contract with CMS to offer prescription drug benefit plans to Medicare beneficiaries. In Georgia, Aetna Medicare, Humana Insurance Company, Express Scripts Medicare, SilverScript, WellCare, UnitedHealthcare and others are Sponsors offering Part D prescription drug benefit plans.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 50, which relate to entities other than Guardian Atlanta, and Defendant therefore denies those allegations.

51.     CMS pays monthly payments and subsidies from the Medicare Prescription Drug Account, an account within the Federal Supplementary

Medical Insurance Trust Fund, to Part D Sponsors to fund the prescription drug benefit plans they sell. 42 C.F.R. §423.315(a).

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 51, which relate to entities other than Guardian Atlanta, and Defendant therefore denies those allegations.

52.     Part D Sponsors are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 52, which relate to entities other than Guardian Atlanta, and Defendant therefore denies those allegations.

53.     Part D Sponsors frequently contract with Pharmacy Benefit Managers (PBMs) to administer their drug benefit plans. The PBMs typically process claims for payment submitted by pharmacies and beneficiaries, form pharmacy networks, perform audits, and conduct other plan management activities under contracts with Part D Sponsors.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 53, which relate to entities other than Guardian Atlanta, and Defendant therefore denies those allegations.

54.    Part D Sponsors (and PBMs on behalf of Part D Sponsors) enter into reimbursement agreements with pharmacies (such as Guardian) that provide covered drugs and supplies to the Medicare beneficiaries enrolled in the prescription drug benefit plans they sponsor.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 54, to the extent that they relate to entities other than Guardian Atlanta. Defendant admits that Guardian Atlanta has entered into reimbursement agreements with Part D Sponsors and PBMs. Defendant denies any remaining allegations in Paragraph 54.

55.    Generally, when a pharmacy dispenses drugs or supplies to a Medicare beneficiary, the pharmacy collects a portion of the cost from the beneficiary (*e.g.*, a resident of an assisted living community or personal care home) and submits a claim electronically to the beneficiary's Part D Sponsor, its PBM, or to the Medicare Advantage Prescription Drug Plan, all of which are Medicare contractors authorized by CMS to administer drug plans for beneficiaries.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 55, to the extent they relate to entities other than Guardian Atlanta. Defendant admits that when Guardian

30

Atlanta dispenses drugs or supplies to a Medicare beneficiary, it generally collects a portion of the cost from the beneficiary (*e.g.*, a resident of an assisted living community or personal care home) and submits a claim electronically to the beneficiary's Part D Sponsor, its PBM, or to the Medicare Advantage Prescription Drug Plan. Defendant denies any remaining allegations in Paragraph 55.

56.     For covered drugs and supplies, the pharmacy receives reimbursement from the Medicare contractor for the portion of the drug cost not paid for by the beneficiary. The reimbursement amount is negotiated and set forth in the reimbursement agreement between the pharmacy and the Medicare contractor.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 56, to the extent they relate to entities other than Guardian Atlanta. Defendant admits that when Guardian Atlanta dispenses drugs or supplies to a Medicare beneficiary, it generally receives reimbursement in an amount that has been previously negotiated and set forth in an agreement for the portion of the drug cost not paid for by the beneficiary. Defendant denies any remaining allegations in Paragraph 56.

57.     As to each such pharmacy claim, the Part D Sponsor (or other contractor) submits to CMS an electronic statement called a Prescription Drug Event, setting forth information regarding the prescription claim, including the pharmacy that dispensed the drug, the prescriber of the drug, the quantity dispensed, the amount that was paid to the pharmacy, and whether the drug is covered under the Medicare Part D benefit. *See* 42 C.F.R. § 423.322.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 57, which relate to entities other than Guardian Atlanta, and Defendant therefore denies those allegations.

58.     CMS relies upon the Prescription Drug Event data and other factors in an annual reconciliation process to determine the payment amounts made to the Part D Sponsor, and CMS recoups or pays additional funds to the Sponsor as a result of the Prescription Drug Event data.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 58, which relate to entities other than Guardian Atlanta, and Defendant therefore denies those allegations.

59.     Claims for payment submitted by a pharmacy to the patient's Medicare prescription drug plan thus are "claims" within the meaning of the False Claims Act. They are requests for money made to a Government contractor,

the money is to be spent or used to advance a Government program (that is, the Medicare program), and federal funds are used to make the payment to the pharmacy and to reimburse the Government contractor.

**ANSWER:** The allegations of Paragraph 59 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 59 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

60.     In order to receive Part D funds from CMS, Part D sponsors and their contracted pharmacies are required to comply with the Anti-Kickback Statute and all applicable federal laws, regulations, and CMS instructions.

**ANSWER:** The allegations of Paragraph 60 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 60 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

61.     By statute, all contracts between a Part D sponsor and HHS must include a provision whereby the Part D sponsor agrees to comply with the

33

applicable requirements of the Part D program as well as the terms and conditions of payment governing the Part D program. 42 U.S.C. § 1395w-112.

**ANSWER:** The allegations of Paragraph 61 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 61 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

62.     Part D sponsors must also certify in their contracts with HHS that they will agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including the FCA.  42 C.F.R. § 423.505(h)(1).

**ANSWER:** The allegations of Paragraph 62 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 62 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

63.     CMS regulations further require all contracts between Part D Sponsors and pharmacies (such as Guardian) to contain language obligating the pharmacies to comply with all applicable federal laws including the Anti-

Kickback Statute and applicable regulations and CMS instructions. *See* 42 C.F.R. § 423.505(i)(4)(iv).

**ANSWER:** The allegations of Paragraph 63 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 63 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

64. Compliance with the Anti-Kickback Statute thus is a material and essential condition of payment for prescription drug medications and supplies dispensed by pharmacies to Medicare beneficiaries.

**ANSWER:** The allegations of Paragraph 64 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 64 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

65. The Medicare Program and Medicare contractors such as Medicare Advantage Organizations and Part D Sponsors are collectively referred to as "Medicare" in this Complaint.

**ANSWER:** Although Defendants do not object to referring to the Medicare Program and Medicare contractors such as Medicare Advantage Organizations and Part D Sponsors collectively as "Medicare," Defendant denies any implication or inference that these are not separate legal entities with differing responsibilities.

**C.**  **Medicare Claims Submission Process**

66.     Pharmacies, including Defendants, submit claims for payment for prescription drugs in electronic format to Medicare Plans (including Medicare Part D and Medicare Advantage Prescription Drug Plans).

**ANSWER:** Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 66, to the extent that they relate to entities other than Guardian Atlanta. Defendant admits the allegations of Paragraph 66 as to Guardian Atlanta.

67.     Medicare Plans require pharmacies to submit claims in compliance with a universal claim format established by the National Council for Prescription Drug Programs, Inc. (NCPDP), a not-for-profit industry organization recognized by CMS.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 67, which relate to entities other than Guardian Atlanta, and Defendant therefore denies those allegations.

68.     The NCPDP established a pharmacy claim format known as the NCPDP Telecommunication Standard. Each Medicare Plan publishes a form known as a Payer Sheet that tracks the NCPDP Telecommunication Standard and provides specific claim instructions to pharmacies.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 68, which relate to entities other than Guardian Atlanta, and Defendant therefore denies those allegations.

69.     The Payer Sheet includes identifying numbers for each Medicare Plan. Plans are identified with a BIN (Bank Identification Number) and a PCN (Processor Control Number). When a pharmacy receives the patient's plan information, the pharmacy consults the Payer Sheet for that Plan and follows the instructions for submitting claims for payment to the Plan.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 69 and therefore denies the same..

70.     Medicare Plans are identified with unique BIN and PCN numbers, putting the pharmacy on notice when a claim for payment is submitted to Medicare as opposed to a commercial insurance plan. *See* 42 C.F.R. §423.120(c)(4).

**ANSWER:**  Defendant admits that Medicare Plans are identified with unique BIN and PCN numbers. The remainder of the allegations of Paragraph 70 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies these remaining allegations of Paragraph 70 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

71.     A pharmacy claim for payment must contain the BIN and PCN number for the Medicare Plan, as well as the following information, among other things:

- date of service

- patient demographic information including insurance number and type of residence (*e.g.*, assisted living community)

- prescription number, drug and National Drug Code (NDC), dosage, refills, and date of prescription

- pharmacy type (*e.g.*, institutional pharmacy)

- pricing information such as ingredient cost, dispensing fee, sales tax, and gross amount due

- prescriber's name and NPI.

**ANSWER**:  The allegations of Paragraph 71 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies these remaining allegations of Paragraph 71 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

**D.**     **Certifications of Compliance**

72.     Guardian, as a pharmacy that participates in the Medicare program, makes certain express and implied certifications of compliance with the Anti-Kickback Statute and other laws and regulations that are material to the government in making payment decisions on Medicare (and TRICARE) claims.

**ANSWER:**  Defendant admits that Guardian Atlanta is a pharmacy that participates in the Medicare program and has made certain express certifications of compliance with the Anti-Kickback Statute and other laws and regulations. The remaining allegations of Paragraph 72 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 72 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

73.     For example, Guardian, as a contractor with numerous Part D plan sponsors, must "certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement." 42 C.F.R. § 423.505(k)(3).

**ANSWER:**  Defendant admits that Guardian Atlanta contracts with numerous Part D plan sponsors. The remaining allegations of Paragraph 73 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 73 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

74.     Each claim Guardian submitted to Medicare Advantage Organizations and Part D plan sponsors conveyed, among other things, information about the patient, the prescriber, the pharmacy, and the date the prescription was filled. By submitting this information on the claim, Guardian implicitly represented that the decision to dispense the prescription medication was not tainted by inducements prohibited by the Anti-Kickback Statute. By failing to disclose that the referral of the prescription was induced by an illegal kickback, these specific representations on the claim were false and misleading.

**ANSWER:**  Defendant admits the allegations in the first sentence. The remaining allegations of Paragraph 74 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 74 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself. Defendant specifically denies the existence of any illegal kickbacks or any claims tainted by any illegal kickbacks.

75.     Guardian also violated the express representations it made in its contracts with the Part D sponsors to abide by all applicable federal laws including the Anti-Kickback Statute and applicable regulations and CMS instructions by virtue of the conduct alleged below.

**ANSWER:**  Defendant denies the allegations of Paragraph 75.

76.     Guardian knowingly used the false representations in its contracts with the Part D plan sponsors to submit and obtain reimbursement for prescription drugs from Medicare. The Part D plan sponsors relied on the false representations made by Guardian when it submitted Prescription Drug Event data to Medicare. In turn, Medicare relied on the accuracy of this data when it reimbursed the Part D plan sponsors. If Medicare had known about Guardian's

41

false representations, it would not have reimbursed the Part D plan sponsors, which in turn, would not have paid Guardian's claims.

**ANSWER:** Defendant denies the allegations of Paragraph 76.

## VII.   TRICARE Prescription Drug Coverage

77.    TRICARE (formerly known as CHAMPUS) is a federal health care program, as defined in the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, that is administered by Defense Health Agency, a component of the Department of Defense. TRICARE provides health care insurance for active duty military personnel, military retirees, and military dependents.

**ANSWER:** Defendant admits the allegations of Paragraph 77.

78.    TRICARE contracts with Express Scripts, Incorporated (ESI) to administer the prescription drug coverage of the TRICARE program, including the processing and payment of claims for reimbursement from TRICARE for prescription drugs.

**ANSWER:** Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 78, which relate to entities other than Guardian Atlanta, and Defendant therefore denies those allegations.

79.    A pharmacy seeking reimbursement from TRICARE must comply with TRICARE's anti-fraud and abuse provisions. 32 C.F.R. § 199.9(a)(4). The

regulations define fraudulent situations to include kickback arrangements. *Id.* §199.9(c)(12).

**ANSWER:**  The allegations of Paragraph 79 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 79 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

80.     Fraud by a pharmacy may result in the denial of the claim or the exclusion or suspension of the pharmacy from participation in the TRICARE program. 32 C.F.R. § 199.9(b), (f).

**ANSWER:**  The allegations of Paragraph 80 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 80 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

81.     To receive reimbursement from TRICARE for pharmacy claims, a provider such as Guardian must enter into a Provider Agreement with ESI. A Provider Agreement is essential to TRICARE claims submission. Having a valid

Provider Agreement is required in order to submit claims for pharmacy claim reimbursement to TRICARE.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 81, to the extent they relate to entities other than Guardian Atlanta. Defendant admits that it has entered into a Provider Agreement with ESI. Defendant denies the remaining allegations of Paragraph 81.

82.    In the Provider Agreement with ESI, providers, such as Guardian, agree to be bound by and comply with applicable laws, rules, and regulations, including, but not limited to, the fraud and abuse laws.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 82, to the extent they relate to entities other than Guardian Atlanta. Defendant admits that it has entered into a Provider Agreement with ESI and states that the Provider Agreement speaks for itself. Defendant denies the remaining allegations of Paragraph 82 to the extent that the allegations mischaracterize the Provider Agreement, its meaning, or its relevance.

83.    Providers such as Guardian are also required by their Provider Agreement to comply with the ESI Provider Manuals. The Manuals require

providers to be aware of and comply with all state and federal laws "including anti-kickback statutes...." The Manuals warn that "[f]ailure to demonstrate compliance with these laws may result in immediate termination by [ESI]."

**ANSWER:** Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 83, to the extent they relate to entities other than Guardian Atlanta. Defendant admits that Guardian Atlanta entered into a Provider Agreement with ESI and states that the Provider Agreement speaks for itself. Defendant denies the remaining allegations of Paragraph 83 to the extent that the allegations mischaracterize the Provider Agreement, its meaning, or its relevance.

84.     Each claim that Guardian submitted to TRICARE for reimbursement conveyed, among other things, information about the patient, the prescriber, the pharmacy, and the date the prescription was filled. By submitting this information on the claim, Guardian implicitly represented that the decision to dispense the prescription medication was not tainted by inducements prohibited by the Anti-Kickback Statute. By failing to disclose that the referral of the prescription was induced by an illegal kickback, these specific representations on the claim were false and misleading.

45

**ANSWER:** Defendant admits the allegations in the first sentence. The remaining allegations of Paragraph 84 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 84 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself. Defendant specifically denies the existence of any illegal kickbacks or any claims deemed false by reason of any illegal kickbacks.

85.     Guardian violated the express representations it made in its Provider Agreement to abide by fraud and abuse laws by virtue of the conduct alleged below.

**ANSWER:** Defendant denies the allegations of Paragraph 85.

86.     Guardian knowingly used the expressly false representations in its Provider Agreement to submit and obtain reimbursement for prescription drugs from TRICARE. TRICARE relied on the false representations made by Guardian at the time it paid Guardian's claims, and if TRICARE had known that representations in Guardian's Provider Agreement were false, TRICARE would not have paid the claims.

**ANSWER:** Defendant denies the allegations of Paragraph 86.

46

87.     For these reasons, Guardian's Provider Agreement constituted express false statements and/or an express false record used to get false claims paid.

**ANSWER:**  Defendant denies the allegations of Paragraph 87.

88.     In order to obtain reimbursement from TRICARE for dispensing prescription medications, Guardian submitted electronic data claims to ESI. After receiving a claim, ESI adjudicated the claim on behalf of DHA. If the claim was successfully adjudicated, then ESI sent the pharmacy authorization to dispense the drug. ESI also sent DHA a data record of the claim, and after a holding period, ESI paid the pharmacy on the claim from a government-established and government-funded account created for the purpose of paying TRICARE reimbursement claims.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 88, to the extent that they relate to entities other than Guardian Atlanta. Defendant admits that Guardian Atlanta submitted electronic data claims to ESI to obtain reimbursement from TRICARE for dispensing prescription medications and that ESI paid approved claims. Defendant denies any remaining allegations in Paragraph 88.

89.     Such reimbursed claims are therefore claims within the meaning of 31 U.S.C. § 3729(B)(2).

**ANSWER:**  The allegations of Paragraph 89 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies these allegations to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

## VIII.  Georgia State Law Requirements for Assisted Living Communities and Personal Care Homes

90.     Assisted living communities and personal care homes are residential living facilities that provide different levels of personal care services to senior residents, including medication administration and assistance with essential activities of daily living, such as eating and bathing. *See* O.C.G.A. § 31-7-12.2(b) (assisted living communities); O.C.G.A. § 31-7-12 (personal care homes).

**ANSWER:**  Defendant generally admits the allegations of Paragraph 90 as it relates to ALCs and PCHs in Georgia, except to the extent these allegations might be construed to indicate that ALCs and PCHs have the same obligations regarding medication management, which is denied.

91.     Assisted living communities and personal care homes must be licensed by the State of Georgia to operate in Georgia. O.C.G.A. § 31-7-3(d)(1).

**ANSWER:** The allegations of Paragraph 91 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 91 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

92. Assisted living communities and personal care homes are different from nursing homes and skilled nursing homes, which have a primary focus of delivering healthcare services to patients who are unable to live independently. Such nursing facilities employ physicians or other clinicians who furnish healthcare services to residents.

**ANSWER:** Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 92, to the extent that they relate to entities other than Guardian Atlanta. Defendant admits, on information and belief, that ALCs and PCHs are different from nursing homes and skilled nursing homes.

93. By contrast, assisted living communities and personal care homes are not engaged in the delivery of health care services. Their staff may, and in most cases do, assist residents with taking medications prescribed by individual physicians and other providers; however, the staff are not licensed to practice

medicine. They may not write orders for prescription drugs or provide medical treatment to residents.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 93, which relate to entities other than Guardian Atlanta. Defendant generally admits, on information and belief, the allegations in the second and third sentences of Paragraph 93 as they relate to ALCs and PCHs in Georgia. Defendant denies any remaining allegations in Paragraph 93.

94.     Virtually all of the residents of senior living homes are elderly and beneficiaries of the Medicare program who receive prescription drug benefits under Medicare Part D or TRICARE beneficiaries.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 94, which relate to entities other than Guardian Atlanta, and Defendant therefore denies those allegations.

95.     Most residents have chronic health conditions that require them to take multiple prescription medications daily.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 95, which relate to entities other than Guardian Atlanta, and Defendant therefore denies those allegations. In

further response to Paragraph 95, Defendant admits that some residents of ALCs, PCHs, skilled nursing facilities ("SNFs"), and nursing facilities ("NFs") have chronic health conditions that require them to take multiple prescription medications daily. Defendant denies any remaining allegations of Paragraph 95.

96.     A typical assisted living community in Georgia serves about 30 to 70 residents. Personal care homes are smaller, typically with 15 to 25 residents.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 96, which relate to entities other than Guardian Atlanta, and Defendant therefore denies those allegations.

97.     Unlike nursing home residents who often receive Medicaid benefits, residents of assisted living communities and personal care homes typically pay the fees to live in the facilities out of their own pockets or with private insurance. The cost of living in the facility generally is not covered by Medicare or Medicaid.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 97, which relate to entities other than Guardian Atlanta. Defendant admits, on information and belief, that residents of NFs and SNFs that participate in Medicaid and/or Medicare often receive Medicaid and/or Medicare benefits, which may cover some or all of the

services and care provided by the NF or SNF. Defendant further admits, on

information and belief, that, in Georgia, ALCs and PCHs do not participate in the

Medicare program and, on information and belief, typically do not participate in

the Medicaid program and that, therefore, residents of these Communities

typically pay the fees to live in the Communities out of their own pockets or with

private insurance. Further responding, Defendant admits, on information and

belief, that the cost of living in a Georgia-based ALC or PCH generally is not

covered by Medicare or Medicaid. Defendant denies any remaining allegations

contained in Paragraph 97.

98.     The facilities thus compete aggressively to attract residents who

typically pay $2,500 to $7,000 or more per month in residence fees, depending on

the location and types of support services the facilities offer to residents.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit

or deny the allegations contained in Paragraph 98, which relate to entities other

than Guardian Atlanta. Defendant admits, on information and belief, that

Georgia-based ALCs and PCHs compete to attract residents on the basis of price,

as well as on location, facilities, services, quality, and a number of other factors

that are important to prospective residents and their families. Defendant admits,

on information and belief, that the fees charged by Georgia-based ALCs and

PCHs vary depending on, among other factors, location and type of support services offered, though Defendant lacks sufficient information or knowledge concerning the fees typically paid by residents of ALCs or PCHs and therefore denies those allegations. Defendant denies any remaining allegations in Paragraph 98.

99.     Because residence fees are paid with the personal assets of residents, small price differences among competing residential facilities can determine a resident's choice of where to live, thus the facilities seek to limit their operating costs as much as possible. Facilities also seek to limit the costs to their residents as much as possible.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 98, which relate to entities other than Guardian Atlanta. Interpreting the terms "residence fees," "residential facilities," "resident," and "facilities" to relate to Georgia-based ALCs and PCHs, Defendant admits on information and belief that residence fees at Georgia-based ALCs and PCHs typically are paid with the personal assets of residents or their families and the amount of the residence fee charged by a Georgia-based ALC or PCH is one of many factors that can affect a resident's choice of where to live. Defendant further admits, on information and belief, that some facilities try to

limit their own operating costs as well as costs charged directly to their residents. Defendant denies that price differences alone can determine a resident's choice of ALC or PCH. Defendant denies any remaining allegations of Paragraph 99.

100.   These operating costs borne by the facilities are significant as Georgia law imposes strict legal obligations on the facilities related to: (1) Medication Administration Records; (2) Medication Management; and (3) Education and Skills Checks for certain staff.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 100, which relate to entities other than Guardian Atlanta, and therefore denies those allegations. Further responding, on information and belief, Defendant denies that the costs to Georgia-based ALCs and PCHs with respect to (1) forms or software for creating Medication Administration Records, (2) Medication Management, or (3) Education and Skills Checks constitute a significant or meaningful proportion of any Georgia-based ALC's or PCH's overall operating costs. Defendant also denies that ALCs and PCHs have the same obligations with respect to medication administration records, medication management or education and skills checks for staff. Defendant denies any remaining allegations in Paragraph 100.

A.  **Mandatory Medication Records**

101.   Georgia law requires every assisted living community and personal care home that assists residents with their medications or supervises residents who self-administer their medications to maintain a daily medication administration record, also known as a medication assistance record, or "MAR," for each resident. *See* O.C.G.A. § 31-7-12.2(g)(8) (in an assisted living community, a "medication aide shall record in the medication administration record all medications that the medication aide has personally administered to a resident") (emphasis added); Ga Comp. R. & Regs. 111-8-62-.20(5) (when a personal care home "either provides assistance with, or supervision of self-administered medications or health maintenance activities involving medications to residents, the home *must maintain a daily Medication Assistance Record (MAR) for each resident* receiving such service.") (emphasis added).

**ANSWER:**  The allegations of Paragraph 101 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 101 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself. Defendant specifically denies these allegations to the extent they fuse the requirements for ALCs and PCHs.

55

102.    The MAR must document daily information relevant to each resident's prescriptions, including the date and time when the resident took or refused medication, type and dosage, contact information of the healthcare provider, allergies, errors, side effects, and adverse reactions. *See* Ga. Comp. R. & Regs. 111-8-63-.20(9) (medications in assisted living communities); Ga. Comp. R. & Regs. 111-8-62-.20(5) (medications in personal care homes).

**ANSWER:**  The allegations of Paragraph 102 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 102 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself. Defendant specifically denies these allegations to the extent they fuse the requirements for ALCs and PCHs.

103.    The MAR is subject to inspection by the Georgia Department of Community Health, and a failure to comply with MAR requirements can result in a license suspension or revocation for an assisted living community or personal care home. *See* Ga. Comp. R. & Regs. 111-8-63-.33 (assisted living community); Ga. Comp. R. & Regs. 111-8-62-.33 (personal care homes).

**ANSWER:**  The allegations of Paragraph 103 are legal conclusions to which no response is required. To the extent that a response is required,

Defendant denies the allegations of Paragraph 103 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself. Defendant specifically denies these allegations to the extent they fuse the requirements for ALCs and PCHs.

104.    Most assisted living communities and many personal care homes now fulfill their legal obligation to maintain a MAR by purchasing software or online services known as "eMAR", an electronic version of the system.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 104, which relate to entities other than Guardian Atlanta, and therefore denies the same. Further responding, Defendant denies that any Georgia-based ALCs or PCHs "fulfill their legal obligation to maintain a MAR" simply "by purchasing software or online services known as 'eMAR.'" Defendant specifically denies these allegations to the extent they fuse the requirements for ALCs and PCHs. Defendant denies any remaining allegations in Paragraph 104.

105.    More and more facilities are turning to eMARs to satisfy their medical records obligations.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 104, which relate to entities other

than Guardian Atlanta. Defendant admits on information and belief that use of eMAR has generally increased among Georgia-based ALCs and PCHs over time. Defendant denies that simply obtaining an eMAR system "satisf[ies] their medical records obligations." Defendant specifically denies these allegations to the extent they fuse the requirements for ALCs and PCHs. Defendant denies any remaining allegations in Paragraph 105.

**B.**   **Mandatory Medication Management**

106.   In addition to requiring assisted living communities and personal care homes to maintain medication records, Georgia law also sets forth strict requirements for those facilities to manage the medications administered to their residents.

**ANSWER:**  The allegations of Paragraph 106 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 106 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself. Defendant specifically denies these allegations to the extent they fuse the requirements for ALCs and PCHs.

**1.**   *Medication Management Laws*

107.   To protect the residents' safety, Georgia law requires assisted living communities and personal care homes to carefully manage the storage, administration, and disposal of medications for their residents.

**ANSWER:**  The allegations of Paragraph 107 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 107 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself. Defendant specifically denies these allegations to the extent they fuse the requirements for ALCs and PCHs.

108.   Specifically, Georgia law requires that assisted living communities and personal care homes obtain new prescriptions from the pharmacy within 48 hours, store medications in a secure manner, keep medications in their original packaging, and properly dispose of unused and expired medications in accordance with federal guidelines. *See* Ga. Comp. R. & Regs. 111-8-63-.20(11)-(12) (medication management in assisted living communities); Ga. Comp. R. & Regs. 111-8-62-.20(7)-(8) (medication management in personal care homes).

**ANSWER:**  The allegations of Paragraph 108 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 108 to the extent they

mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

**2.** *Special Duties For Assisted Living Communities*

109.    In addition to the requirements explained above, assisted living communities also must satisfy additional requirements for proper medication management under Georgia law. *See* O.C.G.A. § 31-7-12.2(10).

**ANSWER:**  The allegations of Paragraph 109 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 109 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

110.    Specifically, Georgia law states that an assisted living community that utilizes medication aides "*shall secure the services of a licensed pharmacist,*" and the pharmacist must perform the following duties:

(A)    Perform a quarterly review of the drug regimen of each resident of the assisted living community and report any irregularities to the assisted living community administrator;

(B)    Remove for proper disposal any drugs that are expired, discontinued, in a deteriorated condition, or where the resident for whom such drugs were ordered is no longer a resident;

(C)    Establish or review policies and procedures for safe and effective drug therapy, distribution, use, and control; and

(D)    Monitor compliance with established policies and procedures for medication handling and storage.

*See* O.C.G.A. § 31-7-12.2(g)(10) (*emphasis added*).

**ANSWER:** The allegations of Paragraph 110 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 110 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

111.    The assisted living communities' legal obligation to hire a consultant to perform these services at their facilities is separate and distinct from the responsibilities of a pharmacy to perform safety checks and offer patient counseling before *dispensing* medications to a patient. *See*, *e.g.*, O.C.G.A. § 26-4-5(13); O.C.G.A. § 26-4-85 (patient counseling).

**ANSWER:** The allegations of Paragraph 111 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 111 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

112.    Whether or not assisted living communities select a preferred institutional pharmacy, such as Guardian, the assisted living communities are still required to pay for a pharmacist consultant to provide these important drug regimen reviews.

**ANSWER:**  The allegations of Paragraph 112 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 112 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

113.    Compliance with all medication management requirements is subject to inspection by the Georgia Department of Community Health, and a failure to comply can result in a license suspension or revocation for an assisted living community or personal care home. *See* Ga. Comp. R. & Regs. 111-8-63-.33 (assisted living community); Ga. Comp. R. & Regs. 111-8-62-.33 (personal care homes).

**ANSWER:**  The allegations of Paragraph 113 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 113 to the extent they mischaracterize the source's language, meaning, or application and further states

that the cited source speaks for itself. Defendant specifically denies these

allegations to the extent they fuse the requirements for ALCs and PCHs.

**C.    Mandatory Staff Education and Skills Checks**

114.    Assisted living communities offering medication administration

services are also required to employ certified medication aides, at a minimum, to

administer medications. Ga. Comp. R. & Regs. 111-8-63-.20(4).

**ANSWER:**  The allegations of Paragraph 114 are legal conclusions to

which no response is required. To the extent that a response is required,

Defendant denies the allegations of Paragraph 114 to the extent they

mischaracterize the source's language, meaning, or application and further states

that the cited source speaks for itself.

115.    In addition, assisted living communities must administer skills

competency checks of its certified medication aides. Ga. Comp. R. & Regs. 111-8-

63-.20(5)(b). Georgia regulations require the facilities to:

> Determine and document that the medication aides who have been
> certified for more than one year upon hiring, continue to have the
> knowledge and skills necessary to administer medications properly
> for the particular community. The community must use a skills
> competency checklist which meets the requirements contained in the
> standardized clinical skills competency checklist used to certify
> medication aides.

*Id.*

**ANSWER:** The allegations of Paragraph 115 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 115 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

116. Further, assisted living communities must complete annual competency reviews of the certified medication aides. Georgia regulations require the facilities to:

> Complete comprehensive clinical skills competency reviews for each certified medication aide utilizing the skills competency checklist at least, annually after hiring to determine that the aides continue to have the necessary skills to perform the medication tasks assigned competently. Such skills competency checklists must be administered by Georgia-licensed registered nurses, pharmacists or physicians, who indicate in writing that the tasks observed are being performed competently.

Ga. Comp. R. & Regs. 111-8-63-.20(5)(f).

**ANSWER:** The allegations of Paragraph 116 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 116 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

64

117.    If an assisted living community provides a certified medication aide training program, they are required to:

(a)    Utilize the state-approved medication aide training program ensuring that the training is administered by a Georgia-licensed registered nurse, pharmacist, or physician.

(b)    Require the aide to demonstrate the requisite clinical skills to serve as a medication aide before a Georgia-licensed registered nurse, pharmacist or physician utilizing the standardized medication administration checklist developed by the Department.

(c)    Prepare the aide to take the written competency examination to become a certified medication aide.

(d)    Verify that the aide is in good standing on the Georgia certified nurse aide registry.

(e)    Provide information to the aide on the registration and locations for taking the written competency examination.

(f)    Provide the documentation to the Georgia Certified Medication Aide Registry that is necessary to complete the application for placement of the aide's name on the Georgia Certified Medication Aide Registry.

(g)    Not permit the aide to administer medications independently unless the aide is listed on the Georgia certified medication aide registry in good standing.

Ga. Comp. R. & Regs. 111-8-63-.20(6).

**ANSWER:**  The allegations of Paragraph 117 are legal conclusions to which no response is required. To the extent that a response is required,

Defendant denies the allegations of Paragraph 117 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

118.    Even for unlicensed staff who are not certified medication aides but who are providing assistance with or supervision of self-administration of medications to capable residents, assisted living communities are required to "provide and document medication training" and perform medication skills competency determinations at the time of hire and at least annually thereafter. Ga. Comp. R. & Regs. 111-8-63-.20(7)-(8).

**ANSWER:**  The allegations of Paragraph 118 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 118 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

119.    Personal care homes that provide assistance with or supervision of self-administration of medications to capable residents must similarly "provide and document medication training for the unlicensed staff" who are involved. Ga. Comp. R. & Regs. 111-8-62-.20(3).

**ANSWER:**  The allegations of Paragraph 119 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 119 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself. Defendant specifically denies that the requirements for PCHs are necessarily "similar[]" to those of ALCs.

120.    Personal care homes must also perform skills competency determinations of these unlicensed staff members at the time of hire and at least annually thereafter. Ga. Comp. R. & Regs. 111-8-62-.20(4).

**ANSWER:**  The allegations of Paragraph 120 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 120 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

## IX.    Defendants' Pharmacy Operations

**A.    The Home Office**

121.    Defendant Guardian Pharmacy is a private company that was founded in 2004, and has its headquarters in Atlanta, Georgia.

**ANSWER:** This allegation does not relate to Defendant, and Defendant has no obligation to respond to it. Defendant further notes that Guardian Pharmacy's LLC's Motion to Dismiss [ECF 34] has been granted [ECF 63].

122. Guardian Pharmacy owns and operates pharmacies in 37 locations and 18 states in the United States.

**ANSWER:** This allegation does not relate to Defendant, and Defendant has no obligation to respond to it. Defendant further notes that Guardian Pharmacy's LLC's Motion to Dismiss [ECF 34] has been granted [ECF 63].

123. Guardian Pharmacy operates through "Partner Pharmacies," that is, local entities that are operated jointly by Guardian Pharmacy and a local management team.

**ANSWER:** This allegation does not relate to Defendant, and Defendant has no obligation to respond to it. Defendant further notes that Guardian Pharmacy's LLC's Motion to Dismiss [ECF 34] has been granted [ECF 63].

124. Guardian Pharmacy is known as the "Home Office" within the Guardian organization.

**ANSWER:** This allegation does not relate to Defendant, and Defendant has no obligation to respond to it. Defendant further notes that Guardian Pharmacy's LLC's Motion to Dismiss [ECF 34] has been granted [ECF 63].

125.    Guardian Pharmacy is the majority owner of its Partner Pharmacies; as such, Guardian Pharmacy controls the operations of its Partner Pharmacies, including Defendant Guardian Pharmacy of Atlanta.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 125, to the extent that they relate to entities other than Guardian Atlanta. Defendant admits that Guardian Pharmacy is the majority owner of Guardian Atlanta. Defendant denies that Guardian Pharmacy controls its operations. Defendant notes that Guardian Pharmacy's LLC's Motion to Dismiss [ECF 34] has been granted [ECF 63]. Defendant denies any remaining allegations of Paragraph 125.

126.    Specifically, Guardian Pharmacy develops national and regional sales strategies for the entire company, conducts training for all sales representatives and other employees, and exerts control over the billing process, contracting, finance and legal functions for the Partner Pharmacies.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 126, to the extent that they relate to entities other than Guardian Atlanta. Defendant notes that Guardian Pharmacy's LLC's Motion to Dismiss [ECF 34] has been granted [ECF 63].

Defendant denies any allegations of Paragraph 126 to the extent they are meant to refer to Guardian Atlanta.

127.   Guardian is the third-largest institutional pharmacy in the United States, with over $550 million in annual revenues from filling more than 12 million prescriptions for over 100,000 residents of assisted living communities, personal care homes, skilled nursing homes, and other facilities, many of whom are beneficiaries of federal health care programs such as Medicare and TRICARE.

**ANSWER:**  This allegation does not relate to Defendant, and Defendant has no obligation to respond to it. Defendant further notes that Guardian Pharmacy's LLC's Motion to Dismiss [ECF 34] has been granted [ECF 63]. To the extent that "Guardian" in this paragraph is intended to refer to Guardian Atlanta, Defendant denies the allegations of Paragraph 127.

128.   Guardian packages the residents' medications in special multi-dose or unit-dose packaging to facilitate correct medication administration, delivers the medications and supplies to facilities, and bills the residents and their insurance plans (typically, Medicare) for the cost of prescription medications and supplies. Additional service fees may be billed to the residents.

**ANSWER:**  Defendant generally admits that Guardian Atlanta packages ALC and PCH residents' medications in special multi-dose or unit-dose

packaging to facilitate correct medication administration, delivers the

medications and supplies to ALCs and PCHs, and bills the residents and their

insurance plans for the cost of prescription medications and supplies. Defendant

admits that additional service fees may be billed to Guardian Atlanta's patients.

Defendant denies any remaining allegations in Paragraph 128.

129.    The executive team in the Home Office is focused on a growth and

profit strategy, that is, the officers of the company aggressively promote sales

growth to increase the number of residents under contract with Guardian, *i.e.*,

the number of patients who fill prescriptions with Guardian.

**ANSWER:**  This allegation does not relate to Defendant, and Defendant

has no obligation to respond to it. Defendant further notes that Guardian

Pharmacy's LLC's Motion to Dismiss [ECF 34] has been granted [ECF 63].

130.    Guardian aggressively competes with other institutional pharmacies

and retail pharmacy chains such as CVS and Walgreens to fill prescriptions for

long-term care residents.

**ANSWER:**  Defendant admits that Guardian Atlanta competes with other

institutional and retail pharmacy chains to fill prescriptions for ALC and PCH

residents. Defendant denies any remaining allegations in Paragraph 130.

71

131.    While Guardian derives most of its sales revenues from residents who fill prescriptions with Guardian, the company views the facilities where the residents live as its true "customers."

**ANSWER:**  Defendant admits that Guardian Atlanta derives most of its sales revenues from filling its patients' prescriptions and that its patients are mostly residents of ALCs and PCHs. Defendant denies the remaining allegations of Paragraph 131.

132.    To gain access to residents, Guardian often negotiates agreements with the owners and operators of the facilities. These agreements give Guardian the status of being the "preferred pharmacy" for the residents, meaning the owners and operators of the facilities steer their residents to Guardian for their prescription medications and supplies.

**ANSWER:**  Defendant admits that Guardian Atlanta enters into agreements with the owners and operators of ALCs and PCHs and that these agreements often designate Guardian Atlanta as a "preferred provider." Defendant denies the remainder of the allegations contained in Paragraph 132.

133.    While residents have the freedom to choose any pharmacy to fill their prescriptions, the facility steers residents to choose the preferred pharmacy

and to agree to use the particular method for packaging medications that the facility finds most convenient.

**ANSWER:**  Defendant admits that residents of ALCs and PCHs have the freedom to choose any pharmacy to fill their prescriptions and that this freedom remains regardless of whether an ALC or PCH enters into a contract with a pharmacy or designates a "preferred" pharmacy. Defendant further admits, upon information and belief, that to promote uniformity and safe administration of medications, some ALCs and PCHs recommend their residents to use a "preferred" pharmacy. Defendant further admits, upon information and belief, that to promote uniformity and safe administration of medications, some ALCs and PCHs encourage residents to use the facility's preferred method for packaging regardless of whether the resident chooses to use the "preferred" pharmacy. Defendant denies the remaining allegations of Paragraph 133.

134.   Once a preferred pharmacy is selected, most residents of the assisted living community or personal care home use that pharmacy. The percentage of residents who use the preferred pharmacy is known as the "adoption rate."

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in Paragraph 134, to the extent they relate to entities other than Guardian Atlanta. Defendant admits that the percentage of

ALC or PCH residents who choose to use Guardian Atlanta is referred to by Guardian Atlanta as the "adoption rate." Defendant further states that Guardian Atlanta's adoption rate for any particular Community depends on the Community, the needs of each individual resident, and the ability of Guardian Atlanta to meet those needs, among other factors. Designation as a "preferred" pharmacy does not necessarily result in a high adoption rate, particularly in Georgia-based ALCs and PCHs, where residents are free to choose any pharmacy, including retail pharmacies. Defendant denies any remaining allegations of Paragraph 134.

135.   Guardian's adoption rate averages about 80%, meaning 80% of the residents of an assisted living community or personal care home under a "preferred" pharmacy contract with Guardian will select Guardian as their pharmacy to fill medications.

**ANSWER:**  Responding to Paragraph 135, Defendant states that Guardian Atlanta's adoption rate varies widely from Community-to-Community and from time-to-time. Defendant further states that the adoption rate is dependent upon the personal decision of each resident who has the freedom to choose any pharmacy. Defendant denies any remaining allegations of Paragraph 135.

136.   Because most residents consistently fill five to seven prescription drug orders each month, securing a "preferred" pharmacy agreement means Guardian lands a substantial and reliable revenue stream from Medicare and TRICARE as it fills thousands of drug orders generated annually by a typical facility. Therefore, Guardian fiercely competes for this business.

**ANSWER:**  Defendant denies the allegations of Paragraph 136.

137.   Once selected as the "preferred" pharmacy, Guardian also enters into agreements with individual residents, allowing Guardian to fill and dispense medications and supplies prescribed by the residents' healthcare providers, to bill the resident for his or her share of the costs, and to file insurance claims for the resident, who assigns his or her prescription drug benefits to Guardian, allowing it to be paid directly by insurers (typically, Medicare).

**ANSWER:**  Defendant admits that, before Guardian Atlanta fills and dispenses medications and supplies prescribed by a resident's healthcare providers, or bills the resident for his or her share of the costs, or files insurance claims for the resident, Guardian Atlanta enters into an agreement directly with that resident, and that resident becomes a direct patient of Guardian Atlanta. Defendant admits that Guardian Atlanta enters into such individual agreements

with individual residents regardless of whether the resident's Community has designated Guardian Atlanta a "preferred" pharmacy. Defendant further states that residents of Georgia-based Communities have a right to choose any pharmacy and are not required to become a patient of a "preferred" pharmacy. Defendant admits that, in the agreement between Guardian Atlanta and an individual patient choosing to use Guardian Atlanta, the patient typically assigns his or her prescription drug benefits to Guardian Atlanta, allowing Guardian Atlanta to be paid directly by insurers, including Medicare Part D. Defendant denies any remaining allegations of Paragraph 137.

**B.**   **Guardian Pharmacy of Atlanta**

138.   Guardian Pharmacy is a majority owner of Defendant Guardian Pharmacy of Atlanta, one of the largest "Partner Pharmacies" owned by Guardian.

**ANSWER:**  Defendant admits the allegations of Paragraph 138.

139.   Guardian Pharmacy controls the overall operations and strategic direction of Guardian Pharmacy of Atlanta.

**ANSWER:**  Defendant denies the allegations of Paragraph 139.

140.   Guardian Pharmacy of Atlanta provides institutional pharmacy services to approximately 3,800 residents of assisted living communities and

personal care homes in the northern half of the State of Georgia, including the Atlanta metropolitan area. The number of residents under contract with Guardian fluctuates from month to month.

**ANSWER:** Defendant admits the allegations of Paragraph 140.

141.   Guardian Pharmacy of Atlanta generates over $17 million in annual revenues by filling prescriptions and performing ancillary services for residents of assisted living communities and personal care homes, most of whom are Medicare or TRICARE beneficiaries.

**ANSWER:** Defendant admits the allegations of Paragraph 141.

**C.   Guardian's Acquisition of Collier's**

142.   In 2017, Guardian Pharmacy of Atlanta significantly expanded its size by acquiring Collier's Personal Care Pharmacy, which Relator co-owned, and thereby adding approximately 1,700 new residents to its pharmacy service.

**ANSWER:** Defendant admits that, in 2017, Guardian Atlanta acquired Collier's Personal Care Pharmacy, which Relator co-owned. Defendant admits that some of Collier's patients became Guardian Atlanta's patients after the acquisition. Defendant denies the remaining allegations of Paragraph 142.

143.    As part of the transaction, Relator was contracted by Guardian Pharmacy of Atlanta as an account management consultant because of his industry knowledge and success with Collier's pharmacy.

**ANSWER:**  Defendant admits the allegations of Paragraph 143.

144.    Relator agreed to a two-year contract with Guardian Pharmacy of Atlanta beginning on January 23, 2017.

**ANSWER:**  Defendant admits the allegations of Paragraph 144.

145.    The transition of these residents from Collier's to Guardian was not automatic. Instead, Guardian transitioned these residents over time until October 2017. During the transition, Guardian relied on Collier's to continue to service these customers by packaging and delivering their medications, although the claims were submitted to federal health care programs under Guardian's name and provider number.

**ANSWER:**  Defendant admits that the transition of Collier's patients to Guardian Atlanta was not automatic in the sense that patients transferred immediately upon the acquisition of Collier's. The State of Georgia Drugs and Narcotics Agency recommended that the State Board of Pharmacy issue the permit by letter dated January 23, 2017. At some point after that date, Guardian Atlanta began submitting claims for services and medications provided by

Guardian Atlanta at this pharmacy location. Defendant denies the remaining allegations of Paragraph 145.

146.    Relator, therefore, continued to have first-hand knowledge of these customers and claims submitted to federal health care programs on their behalf following the Collier's acquisition.

**ANSWER:**  Defendant denies the allegations of Paragraph 146.

147.    Based on Relator's observations, he estimates that Guardian Pharmacy of Atlanta is now the "preferred pharmacy" for approximately 40 assisted living communities and 65 personal care homes.

**ANSWER:**  Defendant denies the allegations in Paragraph 147.

## X.    Guardian's Kickback Scheme

148.    While working for Guardian, Relator learned that rather than differentiating itself based on the quality of services it provided, Guardian, under the direction of President Matthew Hopp, who had a personal ownership interest in Defendant Guardian Pharmacy of Atlanta LLC, instead offered and continues to offer illegal inducements to attract or retain its customers.

**ANSWER:**  Defendant denies the allegations of Paragraph 148.

149.    Providing illegal inducements was business as usual for Guardian and Mr. Hopp. In fact, when Guardian finally decided in early 2018 to adopt fees

for certain services, Mr. Hopp unequivocally stated, "[W]e have to be VERY careful not to price ourselves out of the market."

**ANSWER:** Defendant denies the first sentence of Paragraph 149. Defendant states that, to the extent the remaining allegations of Paragraph 149 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 149, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

150. Specifically, Relator learned that Guardian was not charging fees for consulting services (also known at Guardian as "audits") provided by Guardian's pharmacists and nurses for the facilities it served, in violation of the Anti-Kickback Statute.

**ANSWER:** Defendant denies the allegations of Paragraph 150.

151. Relator's subsequent observations also revealed that Guardian was providing free education and skills checks for staff at many of Guardian's customers, as well as free installation of electronic medication administration records systems (eMARs) for all assisted living communities and personal care homes that selected Guardian as their preferred pharmacy.

**ANSWER:** Defendant admits that, from approximately 2017 to 2018, Guardian Atlanta allowed staff of "host Communities" and Communities that

80

were new to Guardian Atlanta or newly licensed as ALCs to attend scheduled certified medication aide (CMA) or proxy caregiver classes at no charge. In lieu of paying for staff to attend the class, host Communities provided space for the classes and provided food and refreshments for attendees (which included staff from other Communities). New Communities to Guardian Atlanta and newly-licensed ALCs were allowed to send a limited number of staff to attend classes at no charge in order to demonstrate the value of the classes and generate future paid training opportunities for Guardian Atlanta. Defendant denies any remaining allegations of Paragraph 151.

152.    Relator learned that Guardian, in some instances, also did not charge a monthly subscription fee for ongoing access to the eMAR system, again in violation of the Anti-Kickback Statute.

**ANSWER:**  Defendant denies the allegations of Paragraph 152.

153.    Guardian offers and provides such services to its customers for free, or below FMV, in order to obtain and retain the coveted status of "preferred" pharmacy from owners and operators of the facilities so Guardian can bill federal healthcare programs for the residents' prescription drug medications.

**ANSWER:**  Defendant denies the allegations of Paragraph 153.

154.    Guardian's free services relieve its contracted facilities of the costs they otherwise would incur to comply with Georgia law requirements.

**ANSWER:**  Defendant denies the allegations of Paragraph 154.

155.    Performing such services is not necessary for Guardian to fulfill its role as a pharmacy dispensing prescription medications and supplies to residents; the services are offered as a benefit and inducement to the facilities who thereby avoid the costs of procuring those services on the open market.

**ANSWER:**  Defendant denies the allegations of Paragraph 155.

156.    Upon information and belief, Guardian's practice of providing the illegal inducements described herein began at least as early as late 2014, and they continue through the present.

**ANSWER:**  Defendant denies the allegations of Paragraph 156.

A.    **Free or Below FMV Medication Management**

157.    Guardian of Atlanta maintains a "Consulting Department" that employs two pharmacists and two pharmacy nurses whose sole responsibilities are to conduct pharmacy consulting services, education, and skills checks, which assisted living communities and personal care homes are required by Georgia law to perform.

82

**ANSWER:**  Defendant admits that Guardian Atlanta maintains a Consulting Department that has, at times, employed two pharmacists and two pharmacy nurses. Defendant admits that the Consulting Department's responsibilities include conducting pharmacy consulting services, education, and skills checks. Defendant denies the remaining allegations of Paragraph 157.

158.   For assisted living communities, Guardian's Consulting Department assigns one of its employed, licensed pharmacists to perform drug regimen reviews and other services at the home. *See* O.C.G.A. § 31-7-12.2(g)(10). Specifically, a Guardian consulting pharmacist on a quarterly basis reviews the medication administration record and stored medication as to each resident who uses Guardian as his or her pharmacy.

**ANSWER:**  Defendant admits that, for assisted living communities, Guardian Atlanta's Consulting Department assigns one of its employed, licensed pharmacists to perform drug regimen reviews and other services to Guardian Atlanta's patients at the ALC. Defendant admits that a Guardian Atlanta consulting pharmacist on a quarterly basis reviews the medication administration record and stored medication as to each resident who is a patient of Guardian Atlanta. Defendant denies the remaining allegations of Paragraph 158.

159.    For residents receiving assistance with medication administration in personal care homes, Georgia law does not specify that a pharmacist must perform the medication management duties required by law. Therefore, Guardian's Consulting Department assigns one of its employed pharmacy nurses to each personal care home to "audit" medication records and medication storage carts and to review the facility's compliance with the storage and disposal requirements of Georgia law. *See* Ga. Comp. R. & Regs. 111-8-62-.20(7)-(8). These services are of value to the personal care home as they alleviate the facility's responsibilities for medication management.

**ANSWER:**  The allegations of the first sentence of Paragraph 159 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies these allegations to the extent they mischaracterize applicable law. Defendant admits that Guardian Atlanta's Consulting Department assigns one of its employed pharmacy nurses to "audit" medication records and medication storage carts and to ensure proper storage and disposal of medications for Guardian Atlanta's patients residing in PCHs. Defendant denies the remaining allegations of Paragraph 159.

160.    Guardian's consulting pharmacists and nurses neither dispense medications, nor counsel individual patients. They rarely if ever interact with

84

residents of senior living facilities. Rather, they visit each facility to consult with the operator or staff about drug management, record-keeping, storage, and disposal by the facility. The consultants inspect medication administration records to determine if the facility gave the correct drugs to residents at appropriate intervals, they review medication carts where drugs are centrally stored at the facility, and they look for expired drugs in stock at the facility.

**ANSWER:**  Defendant denies the allegations in the first two sentences of Paragraph 160. Defendant admits that its consulting pharmacists or nurses visit facilities to consult with the operator or staff about drug management, record-keeping, storage, and disposal for Guardian Atlanta's patients. Defendant admits that its consultants inspect medication administration records for Guardian Atlanta patients to determine if the facility gave the correct drugs at appropriate intervals, review medication carts where drugs are centrally stored, and look for expired drugs for Guardian Atlanta patients. Defendants deny any remaining allegations in Paragraph 160.

161.    Proper medication management and administration are legal responsibilities of each senior living facility that offers medication services. As a pharmacy, Guardian is not required by law to advise facilities on how they manage medications for their residents.

**ANSWER:** The allegations of Paragraph 161 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies these allegations to the extent they mischaracterize applicable law.

162.    In contrast to consulting services, Georgia law imposes separate duties on pharmacists with respect to dispensing medications. Before dispensing a drug, for example, a pharmacist must offer patient counseling about drug safety and possible adverse reactions. *See* O.C.G.A. § 26-4-85. Patient counseling generally takes the form of an information sheet provided to the patient; the pharmacist does not charge for patient counseling. The mandatory duties of a dispensing pharmacist are not at issue in this Complaint.

**ANSWER:** The allegations of the first two sentences of Paragraph 162 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies these allegations to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself. Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in the third sentence of Paragraph 162, to the extent that they relate to entities other than Guardian Atlanta. Defendant denies the allegations of the third sentence of Paragraph 162 as they relate to

Guardian Atlanta. The allegations in the fourth sentence of Paragraph 162 are a characterization of the Complaint to which no response is required.

163.   Guardian's consulting services, by contrast, take place onsite at residential facilities, after drug orders have already been filled, and they are provided to the facilities to assist them in fulfilling their duties regarding proper drug administration to residents, drug management and storage, and drug disposal.

**ANSWER:**  Defendant admits that Guardian Atlanta's consulting services take place, in part, onsite at ALCs and PCHs for the benefit of its own patients whose drug orders have been filled. Defendant denies the remaining allegations of Paragraph 163.

164.   Customarily, consulting pharmacists bill facilities for their services. However, Guardian's Consulting Department offers free or below FMV consulting and other services at least one purpose of which is as an inducement to generate referrals for prescription drug orders.

**ANSWER:**  Defendant denies the allegations of Paragraph 164.

1.   *"Discounted Monthly Fee"*

165.   Guardian did not always provide its consulting services for free or below FMV to assisted living communities and personal care homes.

**ANSWER:** Defendant denies providing consulting services for free or below FMV to ALCs or PCHs. Defendant denies any remaining allegations of Paragraph 165.

166.    In or before 2014, according to a presentation made by Guardian to an assisted living community, Guardian charged assisted living communities a "[d]iscounted [m]onthly fee" for the following consulting services:

- Medication Cart Inspection
- Resident Chart Review (Random Selection)
- In-service from list of selected topics (Nursing CE/hour)
- Individual Drug Regimen Review per 10 residents
- Medication Record (MAR)/Documentation Review
- Modified Mock Survey / Report
- Destruction of Discontinued Medications
- Face to Face Team Review of findings / offering of options

**ANSWER:** Defendant states that, to the extent the allegations of Paragraph 166 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 166, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

167.    In 2017, Relator learned that Guardian stopped charging these monthly fees beginning in 2014. In its reckless pursuit of profit, Guardian began offering consulting services to assisted living communities and personal care

homes for free or below FMV as an illegal inducement to the facilities to obtain or retain their residents' prescription drug business.

**ANSWER:** Defendant denies the allegations of Paragraph 167.

**2.**    *"Marketing Points to Remember"*

168.    On January 12, 2018, Lori Newcomb, a Guardian pharmacist consultant and the manager of the Consulting Department, openly discussed this scheme in an email to senior Guardian employees including President Mathew Hopp, the Director of Pharmacy Operations Tim Williams, Relator, and others. While announcing that Guardian was changing its policy and starting to charge for education and skills checks, Ms. Newcomb made clear that Guardian would continue to provide free or below FMV consulting services to its customers.

**ANSWER:** Defendant states that, to the extent the allegations of Paragraph 168 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 168, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

169.    Describing this as a "[m]arketing point to remember," she wrote, assisted living ("AL") communities "get high quality consulting *for free every quarter*, even though this is required by AL rules." (Emphasis added). As to

personal care homes ("PCH"), she continued, "PCH buildings get high quality consulting *for free every quarter*, even though not required by the rules." (Emphasis added).

**ANSWER:** Defendant states that, to the extent the allegations of Paragraph 169 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 169, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

170.   She then announced that Guardian would begin charging "only" for "class room training and skills checks" for both assisted living communities and personal care homes.

**ANSWER:** Defendant states that, to the extent the allegations of Paragraph 170 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 170, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

171.   She described this as "an important, but difficult change to make" and noted that they would "most likely get some negative feedback from our clients." She continued:

However, with the rules as they are in GA for AL and PCH, *we can no longer afford to give everything away for free*. The old adage that 'you get what you pay for' is true. We provide the best consulting in the state as far as I am concerned. Matt has to pay us to do our jobs. We cannot continue to give everything away for free. Plus, the consulting team is worn out. We need more help. Matt can't get us more help unless we generate some income. We already have more consultants per beds than anyone else at Guardian.

(Emphasis added).

**ANSWER:** Defendant states that, to the extent the allegations of Paragraph 171 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 171, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

172.    Ms. Newcomb ended the email acknowledging that facilities may want to stop using Guardian as their preferred pharmacy if they no longer received free or below FMV services: "Don't make a big deal about the changes. Just make them aware of consultant changes and charges when they ask. Immediately give feedback to Matt if you get resistance or threats to leave."

**ANSWER:** Defendant states that, to the extent the allegations of Paragraph 172 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 172, including to the

extent that the allegations mischaracterize the document, its meaning, or its relevance.

**3.**     *"Black Hole"*

173.     One month later in February 2018, Mr. Hopp and Ms. Newcomb continued this discussion of Guardian's improper scheme. In an email, Ms. Newcomb described the Consulting Department as a "black hole" for revenue purposes and summarized a plan to generate revenue for the Department.

**ANSWER:** Defendant denies the allegations of the first sentence of Paragraph 173. Defendant states that, to the extent the remaining allegations of Paragraph 173 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 173, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

174.     Ms. Newcomb said the new fees would "make the Consulting Department a Revenue GENERATING department rather than a black hole." She also explained the new fees by saying Guardian cannot justify how great its consulting services are "IF WE ARE GIVING ALL OF OUR SERVICE AWAY FOR FREE!"

**ANSWER:**  Defendant states that, to the extent the allegations of Paragraph 174 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 174, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

175.    Despite the announced changes, the "Consulting, Training, and Skills Fee Schedule" circulated by Ms. Newcomb with her emails identified new charges only for educational services and skills checks performed by the Consulting Department.

**ANSWER:**  Defendant states that, to the extent the allegations of Paragraph 175 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 175, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

176.    As for consulting services, the Fee Schedule notes that fees now may be "negotiated" for "premium" consulting packages including education services "IF communities would like to pay for all-inclusive service."

**ANSWER:**  Defendant states that, to the extent the allegations of Paragraph 176 reference a document, the referenced document speaks for itself.

Defendant denies the remaining allegations of Paragraph 176, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

177.    But the new Fee Schedule maintained Guardian's policy that "basic consulting services per quarter" are performed for "No charge" for those facilities and residents who select Guardian as their pharmacy.

**ANSWER:**  Defendant states that, to the extent the allegations of Paragraph 177 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 177, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

178.    In response to the new fee schedule, Guardian's leadership expressed concern that new fees might reduce their "leverage" to get more residents to choose Guardian over competitors. Specifically, Ms. Newcomb listed a new $20 charge to perform consulting for residents who had not selected Guardian as their pharmacy. Tim Williams, the Director of Pharmacy Operations, replied, "This worries me a little in that if we start consulting for non-guardian residents, that takes away our leverage to increase penetration in the community."

94

**ANSWER:**  Defendant states that, to the extent the allegations of

Paragraph 178 reference a document, the referenced document speaks for itself.

Defendant denies the remaining allegations of Paragraph 178, including to the

extent that the allegations mischaracterize the document, its meaning, or its

relevance.

179.    Mr. Hopp also replied:

Just keep in mind we're not trying to trap them into fees. The
$20/person was something some of the communities agreed to. I
would not want to start charging communities when they didn't
agree to anything, BUT if we're doing extra work for trade-elsewhere
and the community agrees that's fine.

I'm excited to be getting fee[s] for these items but we have to be VERY
careful not to price ourselves out of the market. We know our competitors
will do a lot of this for free, and if they can save money elsewhere they'll
have incentive to change. So let's just make sure we keep our relationships
strong and focus on our service levels in the pharmacy.

**ANSWER:**  Defendant states that, to the extent the allegations of

Paragraph 179 reference a document, the referenced document speaks for itself.

Defendant denies the remaining allegations of Paragraph 179, including to the

extent that the allegations mischaracterize the document, its meaning, or its

relevance.

180.    Upon information and belief, the salaries and benefits for two pharmacists and two nurses who staff Guardian's Consulting Department amount to approximately $350,000 a year.

**ANSWER:**  Defendant admits the allegations of Paragraph 180.

181.    The pharmacy consulting services that Guardian delivers for "no charge" take approximately 10 minutes onsite from start to finish, per resident per quarter. The pharmacist or nurse also incurs travel time to and from the facility, disposes of expired or unnecessary medications, and prepares a detailed electronic report for the facility addressing each resident's medication history, findings, and recommendations.

**ANSWER:**  Defendant admits that the pharmacist or nurse incurs travel time to and from facilities where they provide consulting services to Guardian Atlanta's patients and that they sometimes dispose of expired or unnecessary medications for Guardian Atlanta's patients, and prepare a report addressing medication history, findings, and recommendations for Guardian Atlanta's patients. Defendant denies the remaining allegations of Paragraph 181.

182.    To conduct pharmacy consulting services for all of Guardian's approximately 3,800 residents in North Georgia on a quarterly basis, the

Consulting Department devotes about 2,500 hours per year by its pharmacists and nurses to consulting activities for its customers.

**ANSWER:**  Defendant lacks sufficient information or knowledge to admit or deny the allegations of Paragraph 182, and therefore denies the same.

183.    As defined by Ms. Newcomb, Guardian's Consulting Department is a "black hole" for revenue purposes because it does not bill for most of the pharmacy consulting services furnished to assisted living communities and personal care homes.

**ANSWER:**  Defendant denies the allegations of Paragraph 183.

184.    Receiving free or below FMV pharmacy consulting services as a kickback from Guardian, instead of having to hire its own pharmacist or nurse to perform these services, holds great appeal for any assisted living community or personal care home that is trying to reduce the costs charged to residents while still complying with the facility's legal requirements under Georgia law for safe medication management.

**ANSWER:**  Defendant denies the allegations of Paragraph 184.

185.    On September 4, 2018, following the implementation of these changes for non-Guardian residents and education classes, Ms. Newcomb stated on a sales team teleconference that she had sent out her first invoice to a facility

for certain fees. She expressed excitement that her efforts to make her Consulting Department a revenue-generating part of the business were having success. Her message was clear – until then, Guardian had not been charging for many of the services her Department provided to Guardian's customers.

**ANSWER:** Defendant lacks sufficient information or knowledge to admit or deny the allegations contained in the first two sentences of Paragraph 185, and therefore denies the same. Defendant denies the remaining allegations of Paragraph 185.

186.    Ms. Newcomb has worked at Guardian since approximately September 2014.

**ANSWER:** Defendant admits the allegations of Paragraph 186.

**4.    *National Sales Meeting***

187.    These emails were not the first time Relator heard Guardian executives discuss providing consulting services for free or below FMV.

**ANSWER:** Defendant denies the allegations of Paragraph 187. Defendant further denies that Guardian executives discussed providing consulting services for free or below FMV.

188.    In fact, shortly following the Collier's acquisition, Relator attended Guardian's national sales meeting in Atlanta on March 23 – 24, 2017. The meeting

was attended by virtually all senior executives and sales representatives employed by Guardian.

**ANSWER:**  Defendant states that Guardian Pharmacy, LLC's Motion to Dismiss [ECF 32] was granted [ECF 63]. As this Paragraph does not relate to Defendant, no response is required. To the extent that any allegations in this Paragraph are directed at Defendant, they are denied.

189.    At the meeting, Relator observed a compliance presentation by Bob Weir, Vice President, Operations & Regulatory Support, for Guardian Pharmacy. Mr. Weir joined Guardian in 2015, and previously held senior management positions with Omnicare and other institutional pharmacies.

**ANSWER:**  Defendant states that Guardian Pharmacy, LLC's Motion to Dismiss [ECF 32] was granted [ECF 63]. As this Paragraph does not relate to Defendant, no response is required. To the extent that any allegations in this Paragraph are directed at Defendant, they are denied.

190.    Mr. Weir discussed pharmacy consulting services in his presentation. He observed that the process of performing a medication audit can take 6 minutes or longer for each resident. In a tongue-in-cheek manner, Mr. Weir then asked, "Now everyone is charging for this, right?," or words to that effect.

**ANSWER:** Defendant states that Guardian Pharmacy, LLC's Motion to Dismiss [ECF 32] was granted [ECF 63]. As this Paragraph does not relate to Defendant, no response is required. To the extent that any allegations in this Paragraph are directed at Defendant, they are denied.

191.    Mr. Weir's demeanor suggested to Relator, and apparently to the rest of the sales force, that his question was rhetorical, for no one in the audience was heard to respond. Mr. Weir said nothing more about billing customers for audits during his presentation.

**ANSWER:** Defendant states that Guardian Pharmacy, LLC's Motion to Dismiss [ECF 32] was granted [ECF 63]. As this Paragraph does not relate to Defendant, no response is required. To the extent that any allegations in this Paragraph are directed at Defendant, they are denied.

192.    During the meeting, around the time of Mr. Weir's presentation, Relator saw Kendall Forbes, Executive Vice President for Sales & Operations of Guardian Pharmacy, in the audience. Relator publicly addressed Mr. Forbes before the audience and stated that federal guidelines require pharmacies to charge for audits.

**ANSWER:** Defendant states that Guardian Pharmacy, LLC's Motion to Dismiss [ECF 32] was granted [ECF 63]. As this Paragraph does not relate to

Defendant, no response is required. To the extent that any allegations in this Paragraph are directed at Defendant, they are denied.

193.   Mr. Forbes acknowledged Relator's remark but made no public comment about the Company's practice of not charging for audits.

**ANSWER:**  Defendant states that Guardian Pharmacy, LLC's Motion to Dismiss [ECF 32] was granted [ECF 63]. As this Paragraph does not relate to Defendant, no response is required. To the extent that any allegations in this Paragraph are directed at Defendant, they are denied.

### 5.   *"Confidential Pricing Terms"*

194.   Relator learned that in some instances the unlawful kickbacks were even memorialized in Guardian's written contracts with assisted living communities and personal care homes, despite language in the contracts prohibiting such inducements.

**ANSWER:**  Defendant denies the allegations in Paragraph 194.

195.   Guardian's Home Office pressured Mr. Hopp and others to memorialize the agreements with the assisted living communities and personal care homes in written contracts.

**ANSWER:**  Defendant  admits that Guardian's Home Office encouraged the use of written agreements with ALCs and PCHs

.

196.   Shortly after Mr. Heller started working with Guardian, he questioned the necessity of asking customers to sign "preferred pharmacy" contracts, something that Collier's pharmacy had not typically done.

**ANSWER:**  Defendant admits that shortly after Mr. Heller started working with Guardian Atlanta, he questioned the necessity of asking customers to sign written contracts. Defendant admits upon information and belief that Collier's Pharmacy did not enter into written contracts with Communities. Upon information and belief, Collier's had entered oral contracts with Communities designating Collier's the preferred pharmacy. Defendant denies any remaining allegations in Paragraph 196.

197.   In response, Mr. Hopp printed out and gave to Relator an undated, blank contract called a "Pharmaceutical Products and Services Agreement," which purported to designate Guardian as the preferred pharmacy for a facility. The Agreement provided that the "Operator" of the facility would use "best efforts" to support Guardian's provision of pharmacy services to the residents of the facility. Mr. Hopp instructed Relator to review the draft contract and become familiar with it.

**ANSWER:** Defendant admits that Mr. Hopp printed out and gave to Relator an undated, blank contract called a "Pharmaceutical Products and Services Agreement," which designated Guardian Atlanta as the preferred provider for a facility. The draft agreement provided that the "Operator" of the facility would use "best efforts" to support Guardian Atlanta's provision of pharmacy services to the residents of the facility. Defendant admits Mr. Hopp instructed Relator to review the draft contract and become familiar with it. Defendant denies the remaining allegations of Paragraph 197.

198.   To his astonishment, Relator observed that the contract contained "Confidential Pricing Terms" which stated that "Pharmacy Consulting Services" would be provided "Quarterly at no charge."

**ANSWER:** Defendant admits that the contract's "Confidential Pricing Terms" stated that "Pharmacy Consulting Services," meaning quarterly medication management services provided by Guardian Atlanta to its own patients (not all Community residents), would be provided "Quarterly at no charge." Defendant further states that Guardian Atlanta patients are typically charged a separate fee that more than covers these services. Defendant further states upon information and belief that other local pharmacies, including Collier's and Relator's current pharmacy employer Gayco Healthcare, do not

charge Communities for providing quarterly medication management services to their own patients. Defendant denies that Relator expressed any "astonishment" by this provision to anyone at Guardian Pharmacy or Guardian Atlanta. To the contrary, Relator complained that Guardian Atlanta's charges were too high relative to what Relator had charged at Collier's. Defendant denies any remaining allegations of Paragraph 198.

199.   An Exhibit to the contract also stated that Guardian would "provide pharmacy consulting services in conjunction with Operator's duties under applicable law."

**ANSWER:**  Defendant states that, to the extent the allegations of Paragraph 199 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 199, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

**6.**   *Negotiations with Magnolia Senior Living*

200.   Relator later observed similar terms in a contract Guardian used to memorialize its relationship with Magnolia Senior Living, a 73-bed personal care home located at 89 Ozora Road, Loganville, Georgia 30052.

**ANSWER:**  Defendant admits that Guardian Atlanta entered into a contract with Magnolia Senior Living and state that the contract speaks for itself. Defendant denies the remaining allegations of Paragraph 200, including to the extent that the allegations mischaracterize the contract, its meaning, or its relevance.

201.   Magnolia Senior Living was previously a client of Collier's, so Relator has firsthand knowledge of the claims submitted by Magnolia Senior Living prior to and after the transition to Guardian. When they were a client of Collier's, Magnolia Senior Living used a multi-dose blister packaging system for its residents' medications called Medicine-on-Time.

**ANSWER:**  Defendant admits that Magnolia Senior Living was previously a client of Collier's. Defendant lacks sufficient information or knowledge regarding whether Relator has firsthand knowledge of claims submitted prior to the transition to Guardian Atlanta, and therefore denies the same. Defendant admits, upon information and belief, that when Magnolia Senior Living was a client of Collier's, Magnolia Senior Living used a multi-dose blister packaging system for its residents' medications called Medicine-on-Time. Defendant denies the remaining allegations of Paragraph 201.

202.   Prior to Relator's arrival at Guardian, Mr. Hopp had spent approximately $250,000 purchasing a different medication packaging system called "strip" packaging from a company named TCGRx. Guardian uses this expensive machine to package the medications it provides to its patients at the facilities.

**ANSWER:**  Defendant admits that before Relator's arrival at Guardian Atlanta, Guardian Atlanta spent approximately $250,000 to purchase a medication packaging system called "strip" packaging from a company named TCGRx. Defendant admits that Guardian Atlanta uses this machine to package the medications it provides to its patients at Communities that choose to receive "strip" packaging. Defendant further states that "strip" packaging is far less labor-intensive and less costly to Guardian Atlanta than other packaging, including the "medicine-on-time" packaging that Collier's had used with many of its Communities. Accordingly, convincing Communities to switch from "medicine-on-time" packaging to "strip" packaging allowed Guardian Atlanta to reduce fees to its patients at those Communities or, alternatively, to deliver additional services to these patients for the same fee that Collier's had charged. Defendant denies any remaining allegations in Paragraph 202.

203.    Mr. Hopp wanted Relator to secure the prescription business at Magnolia Senior Living and to convince the facility to switch to its strip packaging system.

**ANSWER:**  Defendant admits the allegations of Paragraph 203.

204.    Mr. Hopp provided a "Pharmaceutical Products and Services Agreement" for Relator to give to Magnolia Senior Living.

**ANSWER:**  Defendant admits the allegations of Paragraph 204.

205.    The proposed contract likewise contained "Confidential Pricing Terms," and it too stated that "Pharmacy Consulting Services" would be provided to the facility by Guardian "Quarterly at no charge."

**ANSWER:**  Defendant admits that the proposed contract contained "Confidential Pricing Terms" and stated that "Pharmacy Consulting Services," meaning  quarterly medication management services provided by Guardian Atlanta to its own patients (not all Community residents), would be provided to the Community by Guardian Atlanta "Quarterly at no charge." Defendant further states that the proposed contract required patients selecting Guardian Atlanta to pay a $10 per month fee that more than covered all services provided by Guardian Atlanta, including the quarterly medication management services. Defendant further states that the $10 per month fee was greater that the fees that

had been charged by Collier's, and that were charged by Guardian Atlanta's competitors, for the same services. Defendant further states that Relator did not voice any concern or objection to anyone at Guardian Atlanta regarding this proposed contract. Defendant denies any remaining allegations of Paragraph 205.

206.    In contrast to these free pharmacy consulting services, the pricing terms in the Magnolia Senior Living contract (unlike the blank one that Relator had observed) also stated that "Additional Consulting" would be billed at $65 an hour for a pharmacist and $55 an hour for a nurse, demonstrating the fair market value of these services to the facilities.

**ANSWER:**  Defendant admits that the pricing terms in the proposed Magnolia Senior Living contract stated that "Additional Consulting" would be billed at $65 an hour for a pharmacist and $55 an hour for a nurse. Defendant denies the remaining allegations of Paragraph 206.

207.    Further, in the fine print, the Magnolia Senior Living contract included additional contractual language that expressly prohibited Guardian from engaging in the very kickback scheme it was perpetrating.

**ANSWER:**  Defendant denies the allegations of Paragraph 207.

208.    In "Exhibit A – Pharmacy Consulting Services," Guardian agreed to "provide pharmacy consulting services in conjunction with Operator's duties under applicable law." The contract continues, "Such duties may include, as applicable, monthly inspections of each Facility's nursing stations, the drug storage area, and medical records to monitor compliance with pharmacy policies and procedures and state and federal regulations; the provision of a written report regarding the inspections and on the results of the drug regimen review, noting any irregularities or other areas of concern."

**ANSWER:**  Defendant states that the contract speaks for itself. Defendant denies any allegations inconsistent with the terms of the contract.

209.    The contract further states, "Pharmacy will provide up to two in-service programs annually at no additional cost to Operator, specifically for Operator's nursing staff in order to meet all regulatory requirements, related to pharmacy consulting services. The programs can be selected from a current in-service list provided by Pharmacy."

**ANSWER:**  Defendant states that the contract speaks for itself. Defendant denies any allegations inconsistent with the terms of the contract.

210.    The contract expressly describes the "Standards for Consulting Pharmacist Services" as follows: "The parties intend that their contractual

relationship will be compliant in all manners with applicable federal and state laws, including, but not limited to, the Federal Anti-Kickback Statute." The contract lists eight terms which are incorporated into the Agreement by reference, including:

a.   Pharmacy will provide or arrange for, and Operator will pay for, consulting pharmacist services only on terms that account for Pharmacy's costs to do so, and never below those costs. (Emphasis added).

b.   Neither Pharmacy nor Operator will offer, solicit, pay, or receive any remuneration (anything of value) intended to induce referrals of any patient or the purchasing or ordering of any item or service that may be reimbursed, in whole or in part, under a Federal Health Care Program, such as Medicare or Medicaid. (Emphasis added).

**ANSWER:**  Defendant states that the contract speaks for itself. Defendant denies any allegations inconsistent with the terms of the contract.

211.   Mr. Hopp, on behalf of Guardian, and the operator of Magnolia Senior Living signed the contract with an effective date of June 1, 2017.

**ANSWER:**  Defendant admits the allegations of Paragraph 211.

212.   Despite the contract's clear prohibition on providing consulting services below costs, Guardian provided free consulting services pursuant to the Confidential Pricing Terms in the contract to Magnolia Senior Living as an improper inducement in violation of the Anti-Kickback Statute.

**ANSWER:**  Defendant denies the allegations of Paragraph 212.

213.    As further described below, Guardian also paid to install QuickMAR, an EMAR system, for Magnolia Senior Living, yet another inducement to obtain and retain their prescription drug business.

**ANSWER:**  Defendant denies the allegations of Paragraph 213.

214.    As memorialized in the contract, Guardian only charged the residents of Magnolia Senior Living a $10 monthly fee for eMAR subscription services but did not charge the home for installation of the system.

**ANSWER:**  Defendant admits that Guardian Atlanta charged its patients at Magnolia Senior Living a $10 monthly fee that covered eMAR subscription services, equipment and installation in connection with eMAR services, and quarterly medication management services. Defendant admits that Guardian Atlanta did not charge separate fees for these services above the $10 monthly fee. Defendant denies any remaining allegations of Paragraph 214.

215.    In exchange for these kickbacks, Magnolia Senior Living retained Guardian as its preferred pharmacy and steered its residents, many of whom were Medicare or TRICARE beneficiaries, to use Guardian for filling their prescriptions.

**ANSWER:**  Defendant denies the allegations of Paragraph 215.

216.    As a personal care home, Magnolia Senior Living was required under Georgia law to provide medication management services for its residents. *See* Ga Comp. R. & Regs. 111-8-62.20(5). Guardian provided these services for free or below FMV.

**ANSWER:**  The allegations of the first sentence of Paragraph 216 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies these allegations to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself. Defendant denies the remaining allegations of Paragraph 216.

217.    Beginning in June 2017, and continuing month-to-month until today, Guardian submitted and continues to submit claims to Medicare and TRICARE that are tainted by this illegal inducement.

**ANSWER:**  Defendant denies the allegations of Paragraph 217.

218.    Guardian knew claims for payment that it submitted, and continues to submit, to Medicare and TRICARE for prescription drugs provided to residents of Magnolia Senior Living were tainted by its illegal kickback scheme and thus were false claims that were ineligible for payment.

**ANSWER:**  Defendant denies the allegations of Paragraph 218.

112

7.     *Family Night*

219.    As part of Guardian's marketing efforts, on or about January 24,
2018, Relator was preparing to conduct a "Family Night" gathering at
Canterfield of Kennesaw, a 99-bed assisted living community, and drafted a
handout about Guardian's pricing compared to other pharmacies. Family
members of approximately 20 residents and members of the management team
of the assisted living community attended the meeting.

**ANSWER:**  Defendant admits that, as part of Guardian Atlanta's
marketing efforts to residents of Canterfield of Kennesaw, Relator conducted a
"Family Night" gathering at Canterfield of Kennesaw and drafted a handout that
included, among other things, information about Guardian Atlanta's charges to
patients. Defendant admits on information and belief that Canterfield of
Kennesaw is a 99-bed assisted living community. Defendant lacks sufficient
information or knowledge concerning the number of family members and
representatives of Canterfield of Kennesaw who attended the meeting, and
therefore denies those allegations. Defendant denies any remaining allegations in
Paragraph 219.

220.    Based on Relator's understanding of Guardian's practice of
providing free or below FMV consulting services and Mr. Hopp's approach to

sales presentations, the handout listed "Audit fees" and identified "0" to signify there would be no charges for pharmacy consulting services. Mr. Hopp reviewed the handout and allowed Relator to present it during "Family Night."

**ANSWER:**  Defendant admits that Relator prepared a handout that Mr. Hopp reviewed and approved. Defendant lacks sufficient information or knowledge concerning the remaining allegations in of Paragraph 220 and therefore denies the same.

221.    Thereafter, Canterfield of Kennesaw continued to receive free pharmacy consulting services from Guardian for its residents, and Guardian also performed a free installation of its QuickMAR medication records system. *See* Exhibit A.

**ANSWER:**  Defendant denies the allegations of Paragraph 221.

222.    In exchange for these illegal inducements, Canterfield of Kennesaw selected Guardian as its preferred pharmacy. Guardian then submitted tainted claims to Medicare and TRICARE for prescription drugs for Canterfield of Kennesaw's residents.

**ANSWER:**  Defendant denies the allegations of Paragraph 222.

**B.**     **Free Education Services and Skills Checks**

223.   In addition to free or below FMV consulting services, Relator later learned that Guardian provided free education and skills checks that assisted living communities and personal care homes were required by law to provide.

**ANSWER:** Defendant admits that, from approximately 2017 to 2018, Guardian Atlanta allowed staff of "host Communities" and Communities that were new to Guardian Atlanta or newly licensed as ALCs to attend scheduled certified medication aide (CMA) or proxy caregiver classes at no charge. In lieu of paying for staff to attend the class, host Communities provided space for the classes and provided food and refreshments for attendees (which included staff from other Communities). New Communities to Guardian Atlanta and newly-licensed ALCs were allowed to send a limited number of staff to attend classes at no charge in order to demonstrate the value of the classes and generate future paid training opportunities for Guardian Atlanta. Defendant denies any remaining allegations in Paragraph 223.

224.   On March 2, 2017, Ms. Newcomb emailed Mr. Hopp and others at Guardian to discuss the upcoming Certified Medication Aid training class Guardian provided on a monthly basis. Assisted living communities must employ certified medication aids to assist residents with their medications.

**ANSWER:**  Defendant admits that Ms. Newcomb emailed Mr. Hopp and others at Guardian Atlanta to discuss an upcoming Certified Medication Aid training class Guardian Atlanta provided periodically. Defendant admits that assisted living communities must employ certified medication aids to assist residents with their medications. Defendant denies any remaining allegations in Paragraph 224.

225.    In her email, Ms. Newcomb acknowledged Guardian's practice of providing free education classes for new customers and others, "The charge for the class is $50/day, or $100 total per person. Our Host community, **new communities to Guardian** AND newly licensed assisted living communities are **exempt from these charges**." (Emphasis added).

**ANSWER:**  Defendant states that, to the extent the allegations of Paragraph 225 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 225, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

226.    Thus, for the host facility, new Guardian customers, and newly licensed assisted living communities, Guardian offered for free the education classes that the facilities were required by Georgia law to provide.

**ANSWER:**  Defendant admits that, from approximately 2017 to 2018, Guardian Atlanta allowed staff of "host Communities" and Communities that were new to Guardian Atlanta or newly licensed as ALCs to attend scheduled certified medication aide (CMA) or proxy caregiver classes at no charge. In lieu of paying for staff to attend the class, host Communities provided space for the classes and provided food and refreshments for attendees (which included staff from other Communities). New Communities to Guardian Atlanta and newly-licensed ALCs were allowed to send a limited number of staff to attend classes at no charge in order to demonstrate the value of the classes and generate future paid training opportunities for Guardian Atlanta. Defendant denies any remaining allegations in Paragraph 226.

227.    During this time when Ms. Newcomb said new Guardian customers would receive free education classes in March 2017, Guardian was in the process of retaining numerous Collier's facilities as customers, which would have meant they all would have qualified for these free education classes.

**ANSWER:**  Defendant admits that in March 2017 Guardian Atlanta was in the process of retaining facilities whose patients Collier's had served. Defendant denies any remaining allegations in Paragraph 227. Defendant specifically denies that any offer of free education classes was, or was intended to be, an

inducement to select Guardian Atlanta as a "preferred" pharmacy or that such offer was communicated to any Community in connection with any discussions about selecting Guardian Pharmacy as a "preferred" pharmacy.

228.   On January 12, 2018, as noted above, Ms. Newcomb announced that Guardian was changing its policy for education and skills checks and would begin charging for these services.

**ANSWER:**  Defendant states that, to the extent the allegations of Paragraph 228 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 228, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

229.   She announced that Guardian would begin charging for "class room training and skills checks" for both assisted living communities and personal care homes.

**ANSWER:**  Defendant states that, to the extent the allegations of Paragraph 229 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 229, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

230.    She described this as "an important, but difficult change to make" and noted that they would "most likely get some negative feedback from our clients."

**ANSWER:**  Defendant states that, to the extent the allegations of Paragraph 230 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 230, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

231.    Thus, in 2018, Guardian finally stopped its long-time practice of improperly inducing assisted living communities and personal care homes to select Guardian as its preferred pharmacy and refer their patients by providing free education and skills checks.

**ANSWER:**  Defendant denies the allegations of Paragraph 231. Defendant specifically denies that it ever had a practice of improperly inducing assisted living communities and personal care homes to select Guardian as its preferred pharmacy and refer their patients by providing free education and skills checks.

232.    While its free education and skills check kickback scheme was underway, Guardian knew claims for payment that it submitted to Medicare and TRICARE for prescription drugs provided to residents of assisted living

119

communities and personal care homes were tainted by its illegal kickback scheme and thus were false claims that were ineligible for payment.

**ANSWER:** Defendant denies the allegations of Paragraph 232.

## C.    Free eMAR Setup

233.    As described above, Georgia law also requires assisted living communities and personal care homes to maintain medication administration records, and many facilities now use electronic records known as eMARs to comply with the law.

**ANSWER:** The allegations of Paragraph 233 relating requirements of ALCs and PCHs imposed by Georgia law are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 233 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself. Defendant admits that many Communities use electronic records known as eMARs as a tool to maintain medication administration records. Defendant denies any remaining allegations in Paragraph 233.

234.    An eMAR system is a software program or web-based tool that satisfies the record-keeping requirements of Georgia law for daily tracking of

120

medication administered to residents, including adverse events and other aspects of administering medicines.

**ANSWER:**  Defendant admits that an MAR system is a software program or web-based tool where Community staff may track medication administered to residents, including adverse events and other aspects of administering medicines. Defendant denies the remaining allegations of Paragraph 234.

235.    Guardian is not involved in administering medications to patients, nor does it have any responsibility for maintaining records of medication administration.

**ANSWER:**  Defendant admits that it does not administer medications to patients. Defendant denies the remaining allegations of Paragraph 235.

236.    Maintaining medication administration records is a legal obligation of assisted living communities and personal care homes that assist residents with medications, not of the pharmacies that dispense medications for their residents.

**ANSWER:**  The allegations of Paragraph 236 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 236 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

121

237.   Consistent with its practice of giving away inducements to satisfy its customers, Guardian nonetheless purchases user licenses from eMAR companies, obtaining their permission to use and install eMAR systems in assisted living communities and personal care homes, as a kickback to many of the facilities.

**ANSWER:**  Defendant admits that Guardian purchases user licenses from eMAR companies and provides eMAR service for its patients in some ALCs and PCHs in exchange for a fee charged to Guardian Atlanta's patients. Defendant denies the remaining allegations of Paragraph 237.

238.   Guardian purchases user licenses from multiple eMAR companies, including QuickMAR, Extended Care Pro (ECP), PointClickCare (PCC), and Yardi. *See* Exhibit A.

**ANSWER:**  Defendant admits that it obtains access to eMAR from multiple eMAR companies, including QuickMAR, Extended Care Pro (ECP), PointClickCare (PCC), and Yardi. Defendant denies any remaining allegations in Paragraph 238.

239.   The user licenses require Guardian to pay a monthly (or yearly) subscription or "monitoring" fee. Some eMAR companies bill license fees

directly to the facilities, but most bill Guardian, which in turn bills residents (or facilities, depending on the arrangement).

**ANSWER:**  Defendant states that, to the extent the allegations of Paragraph 239 reference various user licenses, the referenced user licenses speak for themselves. Defendant admits upon information and belief that some eMAR companies bill subscription or monitoring fees directly to Communities. Defendant admits that where Guardian Atlanta purchases and provides eMAR services to its patients, it in turn bills its patients for these services. Defendant denies the remaining allegations of Paragraph 239.

240.   For most facilities, Guardian bills a monthly fee of $10 to residents whose facilities subscribe to an electronic system for maintaining medication administration records.

**ANSWER:**  Defendant admits that for most Communities that receive eMAR services from Guardian Atlanta, Guardian Atlanta bills a monthly fee of $10 to each patient selecting Guardian Atlanta. Defendant denies the remaining allegations of Paragraph 240.

241.   Guardian does not rely upon eMAR systems to receive prescriptions from physicians, to fill prescriptions, to deliver medications, or to bill for

medications and supplies. Guardian uses separate pharmacy management programs for its own pharmacy operations.

**ANSWER:**  Defendant admits that it does not rely upon eMAR systems to receive prescriptions from physicians, to fill prescriptions, to deliver medications, or to bill for medications and supplies. Defendant admits that Guardian Atlanta uses separate pharmacy management programs for some of its own pharmacy operations. Defendant further states that, because eMAR systems allow Guardian Atlanta to see patients' administration records rather than just the dispensing record, it relies upon eMAR systems for other aspects of its pharmacy operations, including to streamline audits, to perform audits remotely, to improve patient service, and to communicate with the community. Defendant denies any remaining allegations in Paragraph 241.

242.    However, Guardian installs the eMAR systems as kickbacks at no charge for assisted living communities and personal care homes that select Guardian as their preferred pharmacy.

**ANSWER:**  Defendant denies the allegations of Paragraph 242.

243.    Specifically, Guardian generally supplies as kickbacks, for no charge, the hardware for eMAR systems (computers and peripherals – arms,

mouse), the setup (installation and integration with Guardian's operating system), and limited technical support and expertise.

**ANSWER:**  Defendant denies the allegations of Paragraph 243.

244.   When a facility has questions or issues with an eMAR system, such as technical problems or questions about functionality or features, the facility often contacts Guardian for support, which Guardian provides as a kickback and free of charge.

**ANSWER:**  Defendant admits that Communities that obtain eMAR services from Guardian Atlanta sometimes contact Guardian Atlanta for support with issues such as technical problems or questions about functionality or features. Defendant denies the remaining allegations of Paragraph 244.

245.   The setup fees, sometimes called interface fees, that are charged by eMAR companies range from $499 to $7,000, which Guardian pays for as an inducement and kickback for the benefit of facilities who choose Guardian as a preferred provider.

**ANSWER:**  Defendant denies the allegations of Paragraph 245.

246.   If Guardian did not provide kickbacks in the form of these free eMAR installation services, assisted living communities and personal care homes that wanted electronic (as opposed to paper) medication records would have to

pay eMAR companies directly for such services in order to maintain their records in compliance with Georgia law.

**ANSWER:** Defendant denies the allegations of Paragraph 246.

247.    While its eMAR scheme was underway, Guardian knew claims for payment that it submitted to Medicare and TRICARE for prescription drugs provided to residents of assisted living communities and personal care homes were tainted by its illegal kickback scheme and thus were false claims that were ineligible for payment.

**ANSWER:** Defendant denies the allegations of Paragraph 247.

D.    **Examples of Facilities Receiving Kickbacks (Exhibit A)**

248.    Guardian knowingly and willfully supplied, and continues to supply, free or below FMV services to at least 49 facilities in exchange for their referral of patients to Guardian for pharmacy services. *See* Exhibit A.

**ANSWER:** Defendant denies the allegations of Paragraph 249.

249.    The summary chart attached to this Complaint as Exhibit A sets forth examples of 26 assisted living communities and 23 personal care homes for which Guardian provided free or below FMV services, based upon Relator's observations of Guardian's practices and the statements of Guardian's employees, as set forth herein.

126

**ANSWER:** Defendant denies the allegations of Paragraph 249.

250.   The facilities listed on Exhibit A selected Guardian as their "preferred" pharmacy; in exchange, all received free or below FMV pharmacy consulting services for the residents of those facilities who selected Guardian as their pharmacy.

**ANSWER:** Defendant lacks sufficient information or knowledge to admit or deny that all of the facilities listed on Exhibit A selected Guardian as their "preferred" pharmacy. Defendant admits that at least most of the Communities listed on Exhibit A selected Guardian Atlanta as their "preferred" pharmacy. Defendant denies the remaining allegations of Paragraph 250.

251.   Exhibit A states the estimated number of residents served by Guardian at each facility.

**ANSWER:** Defendant denies the allegations of Paragraph 251.

252.   As shown on Exhibit A, Guardian conducts free or below FMV consulting services (*i.e.*, medication management) for approximately 1,900 of the residents who live in the facilities receiving free services.

**ANSWER:** Defendant denies the allegations of Paragraph 252.

253.   The consulting services that Guardian performs for free or below FMV have a value of approximately $10 to $20 per resident and are performed

quarterly each year, yielding an aggregate value of approximately $75,000 to $150,000 a year in free or below FMV services, all for the benefit of facilities that select Guardian as their preferred pharmacy and thus do not have to pay or otherwise arrange for consulting services to be provided at a cost to their residents.

**ANSWER:**  Defendant denies the allegations of Paragraph 253.

254.    The facilities listed on Exhibit A that use electronic medication records also received free installation of their records systems from Guardian in exchange for selecting Guardian as their "preferred" pharmacy.

**ANSWER:**  Defendant denies the allegations of Paragraph 254.

255.    The eMAR installations that Guardian performs for free have a value that ranges from $499 to $7,000 per facility, yielding an aggregate value of at least $15,000 in services that Guardian furnished for free to the facilities identified on Exhibit A that have eMAR systems.

**ANSWER:**  Defendant denies the allegations of Paragraph 255.

256.    Guardian is paid an average of approximately $390 per month per resident in payments from residents and reimbursement from health plans for prescription medications and supplies dispensed by Guardian.

**ANSWER:** Answering Paragraph 256, Defendant states that the amount of payment varies widely from patient-to-patient, month-to-month, and year-to-year. Defendant denies the remaining allegations of Paragraph 256.

257.   Guardian fills over 160,000 prescriptions each year for residents whose facilities received free services from Guardian, as shown on Exhibit A, and approximately 90% of the prescriptions are paid for in whole or part by Medicare or TRICARE.

**ANSWER:** Defendant denies the allegations of Paragraph 257.

258.   Thus, with respect to residents who are Medicare or TRICARE beneficiaries, Guardian submits over 140,000 prescription claims for payment each year to Medicare or TRICARE for medications and supplies dispensed to residents of facilities who received free or below FMV services from Guardian in exchange for referring residents to Guardian for pharmacy services.

**ANSWER:** Defendant denies the allegations of Paragraph 258.

259.   Since 2014, Guardian has generated over $20 million in Medicare and TRICARE reimbursements and copayments for Medicare and TRICARE beneficiaries who were referred to Guardian by the facilities identified on Exhibit A, which all received free or below FMV services from Guardian in exchange for the designation of being the "preferred" pharmacy of those facilities.

**ANSWER:**  Defendant denies the allegations of Paragraph 259.

1.    *Senior Solutions Management Group*

260.    By way of example, Relator had first-hand knowledge that claims submitted by Guardian for residents at personal care homes owned and operated by the Senior Solutions Management Group were tainted by its kickback scheme.

**ANSWER:**  Defendant denies the allegations of Paragraph 260.

261.    Mr. Hopp told Relator about a conversation he had with Jason Andrews, Regional Manager for Senior Solutions Management Group. During this conversation, Mr. Hopp reported that Mr. Andrews said the facilities owned and operated by Senior Solutions Management Group would not remain customers of Guardian unless Guardian waived many of its fees.

**ANSWER:**  Answering Paragraph 261, Mr. Hopp told Relator about a conversation that he had with Jason Andrews, Regional Manager for Senior Solutions Management Group (SSMG). Collier's had served patients at SSMG. During the time that Collier's was serving patients at SSMG, Collier's paid for SSMG's eMAR and did not charge SSMG or its residents (including those who were Collier's patients) any separate fee for eMAR. Mr. Hopp reported to Relator that Mr. Andrews said that the facilities owned and operated by SSMG would not remain customers of Guardian Atlanta unless Guardian Atlanta waived

many of its fees as Collier's had done. Mr. Hopp relayed his frustration to Relator that he had not informed Guardian Atlanta that Collier's had provided such services to its customers for free. Defendant denies any other allegations of Paragraph 261.

262.    Country Gardens Senior Living is a 50-bed personal care home located at 7175 Lester Road, Union City, Georgia 30291.

**ANSWER:**  Defendant admits the allegations of Paragraph 262 upon information and belief.

263.    Antebellum Grove Senior Living is a 69-bed personal care home located at 1010 Kathryn Ryals Rd, Warner Robins, GA 31088.

**ANSWER:**  Defendant admits the allegations of Paragraph 263 upon information and belief.

264.    Both Country Gardens Senior Living and Antebellum Grove Senior Living are owned and operated by Senior Solutions Management Group.

**ANSWER:**  Defendant admits the allegations of Paragraph 264 upon information and belief.

265.    In order to secure their residents' pharmacy business, Guardian provided Country Gardens Senior Living and Antebellum Grove Senior Living free monthly eMAR services and free or below FMV consulting.

**ANSWER:**  Defendant denies the allegations of Paragraph 265.

266.    As personal care homes, Country Gardens Senior Living and Antebellum Grove Senior Living are required under Georgia law to provide medication management services for their residents. *See* Ga Comp. R. & Regs. 111-8-62.20(5). Guardian provided these services for free or below FMV.

**ANSWER:**  The allegations of the first sentence of Paragraph 266 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 266 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself. Defendant denies the remaining allegations of Paragraph 266.

267.    Beginning in March 2017, and continuing month-to-month until Country Gardens Senior Living and Antebellum Grove Senior Living terminated Guardian in August 2018, Guardian submitted claims to Medicare and TRICARE for residents at Country Gardens Senior Living and Antebellum Grove Senior Living that were tainted by its illegal kickback arrangement.

**ANSWER:**  Defendant denies the allegations of Paragraph 267.

268.    Guardian knew claims for payment that it submitted to Medicare and TRICARE for prescription drugs provided to residents of Country Gardens

and Antebellum Grove were tainted by its illegal kickback scheme and thus were false claims that were ineligible for payment.

**ANSWER:**  Defendant denies the allegations of Paragraph 268.

**2.**    *Trinity Lifestyles Management Group*

269.    By way of further example, Relator had first-hand knowledge that claims submitted by Guardian for residents at assisted living communities owned and operated by the Trinity Lifestyles Management Group were tainted by its kickback scheme.

**ANSWER:**  Defendant denies the allegations of Paragraph 269.

270.    Dogwood Forest of Dunwoody is an 86-bed assisted living community located at 7400 Peachtree Dunwoody Road NE, Atlanta, GA 30328. It is owned and operated by Trinity Lifestyles Management Group. They were previously a customer of Collier's, so Relator has first-hand knowledge of the claims submitted for residents of Dogwood Forest of Dunwoody prior to and after the transition to Guardian.

**ANSWER:**  Defendant admits upon information and belief the allegations contained in the first two sentences of Paragraph 270. Defendant further admits upon information and belief that Dogwood Forest of Dunwoody was previously

a customer of Collier's. Defendant denies the remaining allegations of Paragraph 270.

271.    In early 2017, after Guardian purchased Collier's, Mr. Hopp and Relator attended a group meeting at Trinity Lifestyles Management Group's corporate office in Alpharetta with their management team, including Tina Boatman, Trinity Lifestyles Management Group's Corporate Director of Wellness and Life Services, and Victoria Curl, Trinity Lifestyles Management Group's President and Chief Operating Officer.

**ANSWER:**  Defendant lacks sufficient information or knowledge concerning the allegations in Paragraph 271 and therefore denies the same.

272.    In order to secure their business and to get the facility to switch to strip packaging, Mr. Hopp and Guardian offered the facility free consulting services. After the meeting, Ms. Boatman asked Relator why Guardian was giving away the consulting services for free. When the facility had previously been a customer of Collier's, Relator had charged for these services. Relator could only reply that Guardian has a different approach.

**ANSWER:**  Defendant denies the allegations of the first sentence of Paragraph 272. Defendant lacks sufficient information or knowledge concerning the remaining allegations of Paragraph 272 and therefore denies the same.

134

273.    Mr. Hopp had follow-up discussions with Ms. Boatman and Ms. Curl.

**ANSWER:**  Defendant lacks sufficient information or knowledge concerning the allegations in Paragraph 273 and therefore denies the same.

274.    Upon information and belief, Mr. Hopp signed a contract for one year with Trinity Lifestyles Management Group.

**ANSWER:**  Defendant admits the allegations of Paragraph 274.

275.    As an assisted living community, Dogwood Forest of Dunwoody was required under Georgia law to secure the services of a licensed pharmacist to: perform a quarterly review of the drug regimen of each resident; report irregularities found in the drug regimen review to the assisted living community administrator; remove expired, discontinued, or deteriorated drugs; establish policies and procedures for safe and effective drug therapy, distribution, use, and control; and monitor compliance with policies and procedures for medication handling and storage. *See* O.C.G.A. § 31-7-12.2(g)(10). Guardian provided these required services for free.

**ANSWER:**  The allegations of the first sentence of Paragraph 275 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 275 to the extent they

mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself. Defendant denies the allegations of the final sentence of Paragraph 275.

276.    Beginning in March 2017, and continuing month-to-month until today, Guardian submitted and continues to submit claims to Medicare and TRICARE for residents at Dogwood Forest of Dunwoody that are tainted by its illegal kickback arrangement.

**ANSWER:**  Defendant denies the allegations of Paragraph 276.

277.    Guardian knew claims for payment that it submitted, and continues to submit, to Medicare and TRICARE for prescription drugs provided to residents of Dogwood Forest of Dunwoody were tainted by its illegal kickback scheme and thus were false claims that were ineligible for payment.

**ANSWER:**  Defendant denies the allegations of Paragraph 277.

E.    **Representative Examples of Claims Submitted to Medicare**

1.    *Eagles Landing Senior Living*

278.    By way of further representative example, Relator had first-hand knowledge that claims submitted by Guardian for residents of Eagles Landing Senior Living were tainted by its kickback scheme.

**ANSWER:**  Defendant denies the allegations of Paragraph 278.

279.    Eagles Landing Senior Living is an 81-bed assisted living community located at 475 Country Club Drive, Stockbridge, Georgia 30281. They were previously a customer of Collier's, so Relator has first-hand knowledge of the claims submitted for residents of Eagles Landing Senior Living prior to and after the transition to Guardian.

**ANSWER:**  Defendant admits upon information and belief the allegations contained in the first sentence of Paragraph 279. Defendant further admits upon information and belief that Eagles Landing Senior Living was previously a customer of Collier's. Defendant denies the remaining allegations of Paragraph 279.

280.    Guardian offered Eagles Landing Senior Living free or below FMV consulting services in order to retain their business.

**ANSWER:**  Defendant denies the allegations of Paragraph 280.

281.    As an assisted living community, Eagles Landing Senior Living was required under Georgia law to secure the services of a licensed pharmacist to: perform a quarterly review of the drug regimen of each resident; report irregularities found in the drug regimen review to the assisted living community administrator; remove expired, discontinued, or deteriorated drugs; establish policies and procedures for safe and effective drug therapy, distribution, use,

137

and control; and monitor compliance with policies and procedures for medication handling and storage. *See* O.C.G.A. § 31-7-12.2(g)(10). Guardian provided these required services for free or below FMV.

**ANSWER:** The allegations of the first sentence of Paragraph 281 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 281 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself. Defendant denies the allegations of the final sentence of Paragraph 281.

282.    Beginning in March 2017, and continuing month-to-month until today, Guardian submitted and continues to submit claims to Medicare and TRICARE for residents of Eagles Landing Senior Living that are tainted by its illegal kickback arrangement.

**ANSWER:** Defendant denies the allegations of Paragraph 282.

283.    For example, upon information and belief, based on the drug treatment regimen the patient was following while serviced by Collier's, beginning in May 2017, Guardian submitted claims requesting Medicare payment for prescription drugs once a month to the Humana Medicare Advantage Plan (specifically, "Humana Employers Health Plan of Georgia, Inc.")

138

for patient M.P.'s medications. Patient M.P. was previously a patient of Collier's and became a patient of Guardian's after Eagles Landing Senior Living decided to retain them as the facility's preferred pharmacy following receipt of the inducements described herein. The following tainted claims were reimbursed by Medicare out of government funds:

| NDC Code | NDC Code Description | Date Claim was Processed | Part D Payment Amount | Prescriber |
|---|---|---|---|---|
| 00456342833 | Namenda XR | 05/05/2017 | $43.06 | Ronald Watts |
| 00456342833 | Namenda XR | 06/21/2017 | $39.05 | Ronald Watts |
| 00456342833 | Namenda XR | 07/28/2017 | $40.39 | Ronald Watts |
| 00456342833 | Namenda XR | 08/21/2017 | $191.72 | Ronald Watts |
| 00456342833 | Namenda XR | 09/04/2017 | $359.96 | Ronald Watts |

**ANSWER:**  Defendant lacks sufficient information or knowledge concerning the identity of "Patient M.P." to admit or deny the allegations of Paragraph 283, and therefore denies the same. Defendant specifically denies that it provided any inducements to any Communities or that any claims were "tainted."

284.    By way of further representative example, upon information and belief, based on the drug treatment regimen the patient was following while

serviced by Collier's, beginning in June 2018, Guardian submitted claims requesting Medicare payment for prescription drugs once a month to the Humana Medicare Advantage Plan (specifically, "Humana Insurance Company") for patient C.P.'s medications. Patient C.P. was previously a patient of Collier's and became a patient of Guardian's after Eagles Landing Senior Living decided to retain them as the facility's preferred pharmacy following receipt of the inducements described herein. The following tainted claims were reimbursed by Medicare out of government funds:

| NDC Code | NDC Code Description | Date Claim was Processed | Part D Payment Amount | Prescriber |
|---|---|---|---|---|
| 13668015490 | Esomeprazole Magnesium | 09/04/2018 | $45.12 | DeAnn Bing |
| 13668015490 | Esomeprazole Magnesium | 10/04/2018 | $45.12 | DeAnn Bing |
| 13668015490 | Esomeprazole Magnesium | 11/05/2018 | $45.12 | DeAnn Bing |
| 13668015490 | Esomeprazole Magnesium | 12/04/2018 | $45.12 | DeAnn Bing |
| 13668015490 | Esomeprazole Magnesium | 01/04/2019 | $45.12 | DeAnn Bing |

**ANSWER:**  Defendant lacks sufficient information or knowledge concerning the identity of "Patient C.P." to admit or deny the allegations of Paragraph 284, and therefore denies the same. Defendants specifically denies

that they provided any inducements to any Communities or that any claims were "tainted."

285.   Guardian knew claims for payment that it submitted, and continues to submit, to Medicare and TRICARE for prescription drugs provided to residents of Eagles Landing Senior Living were tainted by its illegal kickback scheme and thus were false claims that were ineligible for payment.

**ANSWER:**  Defendant denies the allegations of Paragraph 285.

### 2.   *Oaks Senior Living Facilities*

286.   By way of further representative example, Relator had first-hand knowledge that claims submitted by Guardian for residents of facilities owned and operated by Oaks Senior Living were tainted by its kickback scheme.

**ANSWER:**  Defendant denies the allegations of Paragraph 286.

287.   Mr. Hopp met with Linda Bennett, the Chief Operating Officer, of the Oaks Senior Living facilities and other senior management in early 2017, shortly after Guardian purchased Collier's.

**ANSWER:**  Defendant lacks sufficient information or knowledge concerning the allegations in Paragraph 287 and therefore denies the same.

288.   Following these discussions, Guardian provided inducements to secure their business. Specifically, Guardian provided free or below FMV

consulting services to the Oaks Senior Living residents when the facilities switched to the preferred strip packaging system. Guardian also charged the residents at the Oaks Senior Living facilities less than fair market value for the monthly eMAR fees.

**ANSWER:** Defendant denies the allegations of Paragraph 288.

289.    As assisted living communities, the Oaks Senior Living facilities were required under Georgia law to secure the services of a licensed pharmacist to: perform a quarterly review of the drug regimen of each resident; report irregularities found in the drug regimen review to the assisted living community administrator; remove expired, discontinued, or deteriorated drugs; establish policies and procedures for safe and effective drug therapy, distribution, use, and control; and monitor compliance with policies and procedures for medication handling and storage. *See* O.C.G.A. § 31-7-12.2(g)(10). Guardian provided these required services for free or below FMV.

**ANSWER:** The allegations of the first sentence of Paragraph 289 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 289 to the extent they mischaracterize the source's language, meaning, or application and further states

that the cited source speaks for itself. Defendant denies the allegations of the final sentence of Paragraph 289.

290.    For example, Oaks at Post Road is a 110-bed assisted living community located at 3875 Post Rd, Cumming, GA 30040. Oaks at Post Road was previously a customer of Collier's, so Relator has first-hand knowledge of the claims submitted for residents of Oaks at Post Road prior to and after the transition to Guardian.

**ANSWER:**  Defendant admits upon information and belief that Oaks at Post Road is a 110-bed assisted living community located at 3875 Post Rd, Cumming, GA 30040. Defendant further admits upon information and belief that Oaks at Post Road was previously a customer of Collier's. Defendant denies the remaining allegations of Paragraph 290.

291.    Beginning in March 2017, and continuing month-to-month until today, Guardian submitted and continues to submit claims to Medicare and TRICARE for residents at Oaks at Post Road that are tainted by its illegal kickback arrangement.

**ANSWER:**  Defendant denies the allegations of Paragraph 291.

292.    For example, upon information and belief, based on the drug treatment regimen the patient was following while serviced by Collier's,

143

beginning in July 2017, Guardian submitted claims requesting Medicare payment for prescription drugs once a month to the Aetna Medicare Advantage Plan (specifically, "Aetna Life Insurance Company") for patient E.S.'s medications. Patient E.S. was previously a patient of Collier's and became a patient of Guardian's after Oaks at Post Road decided to retain them as the facility's preferred pharmacy following receipt of the inducements described herein. The following tainted claims were reimbursed by Medicare out of government funds:

| NDC Code | NDC Code Description | Date Claim was Processed | Part D Payment Amount | Prescriber |
|---|---|---|---|---|
| 47781030503 | Rivastigmine Transdermal | 07/26/2017 | $348.72 | Xiaoqing Guo |
| 47781030503 | Rivastigmine Transdermal | 08/22/2017 | $348.72 | Xiaoqing Guo |
| 47781030503 | Rivastigmine Transdermal | 10/03/2017 | $348.72 | David Cohen |
| 47781030503 | Rivastigmine Transdermal | 11/21/2017 | $348.72 | David Cohen |
| 47781030503 | Rivastigmine Transdermal | 12/19/2017 | $348.72 | David Cohen |

**ANSWER:** Defendant lacks sufficient information or knowledge concerning the identity of "Patient E.S." to admit or deny the allegations of Paragraph 292, and therefore denies the same. Defendants specifically denies

that they provided any inducements to any Communities or that any claims were "tainted."

293.    By way of further example, Oaks at Braselton is a 100-bed assisted living community located at 5373 Thompson Mill Rd, Hoschton, GA 30548. Oaks at Braselton was previously a customer of Collier's, so Relator has first-hand knowledge of the claims submitted for residents of Oaks at Braselton prior to and after the transition to Guardian.

**ANSWER:**  Defendant admits upon information and belief that Oaks at Braselton is a 100-bed assisted living community located at 5373 Thompson Mill Rd, Hoschton, GA 30548. Defendant further admits upon information and belief that Oaks at Braselton was previously a customer of Collier's. Defendant denies the remaining allegations of Paragraph 293.

294.    Beginning in March 2017, and continuing month-to-month until today, Guardian submitted and continues to submit claims to Medicare and TRICARE for residents of Oaks at Braselton that are tainted by its illegal kickback arrangement.

**ANSWER:**  Defendant denies the allegations of Paragraph 294.

295.    For example, upon information and belief, based on the drug treatment regimen the patient was following while serviced by Collier's,

beginning in April 2017, Guardian submitted claims requesting Medicare

payment for prescription drugs once a month to the Aetna Medicare Advantage

Plan (specifically, "Aetna Life Insurance Company") for patient C.S.'s

medications. Patient C.S. was previously a patient of Collier's and became a

patient of Guardian's after Oaks at Braselton decided to retain them as the

facility's preferred pharmacy following receipt of the inducements described

herein. The following tainted claims were reimbursed by Medicare out of

government funds:

| NDC Code | NDC Code Description | Date Claim was Processed | Part D Payment Amount | Prescriber |
|---|---|---|---|---|
| 60505011405 | Gabapentin | 04/12/2017 | $9.91 | Anga-Lee Tipton |
| 60505011405 | Gabapentin | 05/09/2017 | $9.91 | Anga-Lee Tipton |
| 60505011405 | Gabapentin | 06/06/2017 | $9.91 | Anga-Lee Tipton |
| 60505011405 | Gabapentin | 07/04/2017 | $9.91 | Fatimah Manzoor |
| 60505011405 | Gabapentin | 08/02/2017 | $7.66 | Fatimah Manzoor |

**ANSWER:** Defendant lacks sufficient information or knowledge

concerning the identity of "Patient C.S." to admit or deny the allegations of

Paragraph 295, and therefore denies the same. Defendants specifically denies

that they provided any inducements to any Communities or that any claims were "tainted."

296.   Guardian knew claims for payment that it submitted, and continues to submit, to Medicare and TRICARE for prescription drugs provided to residents of the Oaks Senior Living facilities were tainted by its illegal kickback scheme and thus were false claims that were ineligible for payment.

**ANSWER:**  Defendant denies the allegations of Paragraph 296.

**F.**    **Guardian's Free Services Have Independent Value For Facilities**

297.   Guardian's inducements – in the form of free or below FMV pharmacy consulting services, free education and skills checks, and free eMAR setup -- benefit the owners and operators of the assisted living communities and personal care homes by reducing their operating costs to comply with Georgia law and reducing their residents' costs.

**ANSWER:**  Defendant denies the allegations of Paragraph 297.

298.   By facilitating their compliance with requirements for medication administration records and medication management, Guardian provides substantial benefits to facilities that are unrelated to dispensing medications for residents.

**ANSWER:**  Defendant denies the allegations of Paragraph 298.

147

299.    Such services are add-on services that have independent value for facilities. In other words, the free services that Guardian supplies to the facilities are not necessary or integral to Guardian's services as a pharmacy dispensing prescription medications and supplies to residents.

**ANSWER:**  Defendant denies the allegations of Paragraph 299.

### XI.    Guardian Knew Its Kickback Scheme Was Unlawful

300.    Defendants knowingly and willfully participated in a kickback scheme to provide free or below FMV consulting services, free education and skills checks, and free installation of eMAR systems to assisted living communities and personal care homes in exchange for their referring residents to Guardian, and arranging for or recommending Guardian to residents, to fill prescription orders for drugs and supplies paid for by the Medicare Program or TRICARE.

**ANSWER:**  Defendant denies the allegations of Paragraph 300.

301.    At all times relevant to the Complaint, Defendants participated in the kickback scheme knowing that at least one of the purposes of the remuneration (*i.e.*, the free and below FMV services) was to induce and reward referrals of residents to Guardian for prescription drug orders and supplies.

**ANSWER:**  Defendant denies the allegations of Paragraph 301.

302.   Defendants know and have known since the inception of their kickback scheme that compliance with the Anti-Kickback Statute is a material condition of participating in the Medicare and TRICARE Programs as a pharmacy and a prerequisite to receiving reimbursement from the Medicare and TRICARE Programs through their contractors. *See* 42 U.S.C. § 1320a-7b(b).

**ANSWER:**  Defendant denies the allegations of Paragraph 302.

303.   Guardian's executive team is comprised of many experienced healthcare executives with long careers in the pharmacy and long-term care industries who are well aware of the prohibitions of the Anti-Kickback Statute.

**ANSWER:**  Defendant admits that Guardian's executive team includes individuals with experience in the pharmacy and long-term care industries who are generally aware of the prohibitions of the Anti-Kickback Statute. Defendant denies that Guardian executives were aware of Relator's interpretations of the Anti-Kickback Statute, as urged in this lawsuit.

304.   In fact, in a PowerPoint slide presentation given at the President/Sales/Account Manager Meeting in 2018, Guardian criticized retail pharmacies for "lacking in nursing, consulting, eMAR support, technology and education services," thereby promoting the value of these services to the assisted living communities. At the same time, Guardian complained that retail

149

pharmacies "[s]ometimes will provide services at no cost and/or fly under the regulation 'radar screen,'" indicating their awareness that the provision of free services was strictly prohibited.

**ANSWER:** Defendant states that, to the extent the allegations of Paragraph 304 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 304, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

305.   In the presentation, Guardian also falsely claims, "Guardian will not put your company at risk –compliance with safe harbor regulations, absolutely no 'under the radar activities.'" Despite this language, Guardian knowingly offered the inducements described herein.

**ANSWER:** Defendant denies the allegations of Paragraph 305.

**A.**   **OIG Has Cautioned Against Free Services For Decades**

306.   The prohibition on providing free services in exchange for patient referrals for Medicare services or supplies has been the subject of decades of enforcement actions and guidance published by the federal government to assist people seeking to comply with the Anti-Kickback Statute.

**ANSWER:**  Defendant admits that the federal government has pursued enforcement actions and issued guidance regarding prohibitions on providing free services in exchange for patient referrals for Medicare services or supplies. Defendant denies that the federal government has pursued any enforcement action or issued any guidance indicating that the federal government views the conduct alleged in the Complaint as a violation or potential violation of the Anti-Kickback Statute. Defendant denies the allegations of Paragraph 306 to the extent they mischaracterize any guidance's language, meaning, or application and further states that any guidance speaks for itself. Defendant denies the remaining allegations of Paragraph 306.

307.   For example, in November 2009, the Department of Justice announced a $98 million settlement of a False Claims Act case with Omnicare, the largest institutional pharmacy provider, based on allegations that Omnicare supplied unlawful inducements, including free pharmacist consulting services to referring customers.

**ANSWER:**  Defendant admits that in November 2009, the Department of Justice announced a $98 million settlement of a False Claims Act case with Omnicare, the largest institutional pharmacy provider, based in part on allegations that Omnicare supplied unlawful inducements, including among

other things free pharmacist consulting services to skilled nursing facilities. Defendant denies that such settlement has any applicability to Relator's allegations. Defendant denies the allegations of Paragraph 307 to the extent they mischaracterize the announcement's language, meaning, or application and further states that the DOJ's announcement speaks for itself. Defendant denies the remaining allegations of Paragraph 307.

308.    Pursuant to federal law, 42 U.S.C. § 1320a-7d(b), the Secretary of the United States Department of Health and Human Services (HHS), in consultation with the Attorney General, is authorized to issue advisory opinions and other guidance on specific topics, including what constitutes prohibited remuneration under the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and whether any activity or proposed activity could result in the imposition of sanctions or exclusion from participation in Medicare. 42 U.S.C. § 1320a-7d(b)(2).

**ANSWER:** The allegations of Paragraph 308 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 308 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

152

309.   HHS's Office of Inspector General ("OIG") has frequently cautioned against providing free services in exchange for patient referrals in advisory opinions, special fraud alerts, and compliance guidance – all available for the public on the OIG website: https://oig.hhs.gov/compliance/advisory-opinions/index.asp.

**ANSWER:**  The allegations of Paragraph 309 reflect a characterization of unidentified HHS-OIG publications to which no response is required. To the extent that a response is required, Defendant denies any characterization of any HHS-OIG publication and state that these publications speak for themselves. Defendant admits that HHS-OIG has issued guidance regarding the provision of free services in exchange for patient referrals in advisory opinions, special fraud alerts, and compliance guidance that are publicly available. Defendant denies that such guidance indicates that HHS-OIG views the conduct alleged in the Complaint as a violation or potential violation of the Anti-Kickback Statute. Defendant denies any remaining allegations of Paragraph 309.

310.   For example, over twenty years ago, OIG issued a "Special Fraud Alert" in 1998 that described suspected kickback arrangements in circumstances

analogous to those described in this Complaint.[5] The 1998 Special Fraud Alert addressed "instances of potential kickbacks between hospices and nursing homes to influence the referral of patients."[6]

**ANSWER:** Defendant admits that HHS-OIG issued a "Special Fraud Alert" in 1998 titled Fraud And Abuse In Nursing Home Arrangements With Hospices (March 1998), available at

https://oig.hhs.gov/compliance/alerts/index.asp. The remaining allegations of Paragraph 310 reflect a characterization of the Special Fraud Alert to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 310 to the extent they mischaracterize the "Special Fraud Alert's" language, meaning, or application and further states that the "Special Fraud Alert" speaks for itself. Defendant denies that this Special Fraud Alert, which addresses arrangements between hospices and nursing homes, has any applicability to arrangements between pharmacies and Communities. Defendant denies any remaining allegations of Paragraph 310.

---

[5] *See* OIG Special Fraud Alert, Fraud And Abuse In Nursing Home Arrangements With Hospices (March 1998), https://oig.hhs.gov/compliance/alerts/index.asp.

[6] *Id*. at 3.

311.    The operators of nursing homes, like those of assisted living communities and personal care homes, often refer their residents to healthcare providers such as pharmacies and hospice care (end-of-life care). In the 1998 Special Fraud Alert, OIG cited examples of "suspected kickbacks" including "[a] hospice offering free goods or goods at below fair market value to induce a nursing home to refer patients to the hospice."[7]

**ANSWER:**  Defendant denies the allegations of the first sentence of Paragraph 311. The remaining allegations of Paragraph 311 reflect a characterization of the Special Fraud Alert to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 311 to the extent they mischaracterize the "Special Fraud Alert's" language, meaning, or application and further states that the "Special Fraud Alert" speaks for itself. Defendant denies that this Special Fraud Alert, which addresses arrangements between hospices and nursing homes, has any applicability to arrangements between pharmacies and Communities. Defendant denies any remaining allegations of Paragraph 311.

---

[7] *Id.* at 4.

155

312.    Ten years later, in 2008, OIG specifically addressed the kickback

risks associated with "consultant pharmacy services" in the context of nursing

homes.[8] Similar to assisted living communities, nursing homes are required to

hire a pharmacist to conduct medication management services for their

residents.[9]

**ANSWER:**  Defendant admits that in 2008, HHS-OIG issued OIG

Supplemental Compliance Program Guidance for Nursing Facilities, 73 Fed. Reg.

56832 (Sep. 30, 2008). The remaining allegations of Paragraph 312 reflect a

characterization of an HHS-OIG publication to which no response is required. To

the extent that a response is required, Defendant denies the allegations of

Paragraph 312 to the extent they mischaracterize the HHS-OIG publication's

language, meaning, or application and further states that the HHS-OIG

publication speaks for itself. Defendants further assert that Relator's

characterization takes out-of-context snippets from an HHS-OIG statement that

apply only to pharmacy relationships with SNFs (provider types that were not

---

[8]  *See* OIG Supplemental Compliance Program Guidance for Nursing Facilities, 73 Fed. Reg. 56832 (Sep. 30, 2008).

[9]  *See* 42 C.F.R. § 483.45; *See* also Ga. Comp. R. & Regs. 480-24-.05 (duties of consultant pharmacist for nursing homes and other long-term care facilities).

served by Guardian Atlanta during the relevant time period), which are not the same as ALCs or PCHs. Defendant denies that this guidance, which is addressed specifically to nursing facilities, which are not the same as Communities, has any applicability to arrangements between pharmacies and Communities. Defendant denies any remaining allegations of Paragraph 312.

313.   In its 2008 compliance guidance, OIG expressly cautioned that "consultant pharmacist services under contract with a long-term care pharmacy" that are provided for free or "at non-fair-market-value rates" present a heightened risk of a violation of the Anti-Kickback Statute.[10] The OIG described the following conduct as "[e]xamples of suspect . . . arrangements that warrant careful scrutiny" under the Anti-Kickback Statute:

(a)    "Pharmaceutical consultant services, medication management, or supplies offered by a pharmacy;" and

(b)    "Equipment, computers, or software applications that have independent value . . . ."[11]

---

[10] 73 Fed. Reg. 56832, n.53.

[11] 73 Fed. Reg. 56843.

**ANSWER:**  The allegations of Paragraph 313 reflect a characterization of an HHS-OIG publication to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 313 to the extent they mischaracterize the HHS-OIG publication's language, meaning, or application and further states that the HHS-OIG publication speaks for itself. Defendants further assert that Relator's characterization takes out-of-context snippets from an HHS-OIG publication that apply only to pharmacy relationships with SNFs (provider types that were not served by Guardian Atlanta during the relevant time period), which are not the same as ALCs or PCHs. Defendant denies that this guidance, which is addressed specifically to nursing facilities, which are not the same as Communities, has any applicability to arrangements between pharmacies and Communities. Defendant denies any remaining allegations of Paragraph 313.

314.    The OIG bluntly acknowledged in its 2008 guidance that such arrangements for "services and supplies to be provided to residents" of a home by outsiders "such as pharmacies" may disguise kickbacks intended to influence

the home to refer its residents to the outside organization for services covered by federal healthcare programs.[12]

**ANSWER:** The allegations of Paragraph 314 reflect a characterization of an HHS-OIG publication to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 314 to the extent they mischaracterize the HHS-OIG publication's language, meaning, or application and further states that the HHS-OIG publication speaks for itself. Defendants further assert that Relator's characterization takes out-of-context snippets from an HHS-OIG publication that apply only to pharmacy relationships with SNFs (provider types that are not served by Guardian Atlanta), which are not the same as ALCs or PCHs. Defendant denies that this guidance, which is addressed specifically to nursing facilities, which are not the same as Communities, has any applicability to arrangements between pharmacies and Communities. Defendant denies any remaining allegations of Paragraph 314.

315.   The foregoing guidance documents published by the OIG, together with many other similar guidance documents, put Guardian on notice that its

---

[12] *Id.*

conduct was unlawful and that violations of the Anti-Kickback Statute are material to Medicare's payment decisions.

**ANSWER:**  Defendant denies the allegations of Paragraph 315.

B.     **Guardian's Certifications of Compliance**

316.    Most of Defendants' profits come from reimbursement (*i.e.*, payments for prescription drugs and supplies) by the Medicare Program through Medicare Part D Sponsors, PBMs, and Medicare Advantage Prescription Drug Plans.

**ANSWER:**  Defendants admits the allegations of Paragraph 316.

317.    To participate in the prescription drug coverage plans of the Medicare patients, Guardian enters into a reimbursement contract, sometimes known as a Provider Agreement, with each Medicare Part D Sponsor or other Medicare contractor that administers the drug plans for those patients.

**ANSWER:**  Defendant admits the allegations of Paragraph 317.

318.    The Provider Agreements that Guardian enters into with Medicare contractors expressly require Guardian to comply with all applicable federal laws, which includes the Anti-Kickback Statute, and applicable regulations and CMS instructions. *See* 42 C.F.R. § 423.505(i)(4)(iv).

**ANSWER:**  Defendant states that, to the extent the allegations of Paragraph 318 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 318, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

319.    Pursuant to such Provider Agreements, Guardian also is required to train its employees, including but not limited to Matt Hopp, Lori Newcomb, and Tim Williams, on the prohibitions of the Anti-Kickback Statute.

**ANSWER:**  Defendant states that, to the extent the allegations of Paragraph 319 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 199, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

320.    Part D Sponsors and other contractors also publish compliance policies instructing pharmacies about the importance of complying with federal healthcare laws, including specific instructions on the Anti-Kickback Statute.

**ANSWER:**  Defendant states that, to the extent the allegations of Paragraph 320 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 320, including to the

extent that the allegations mischaracterize the document, its meaning, or its relevance.

321.    For example, Guardian has a Provider Agreement with Humana, which sponsors Medicare Part D and MA-PD plans. Humana publishes a Pharmacy Manual stating as follows: "Pharmacy providers are prohibited from having any financial relationship relating to the delivery of or billing for items or services covered under a federal health care program that . . . [w]ould violate the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, if items or services delivered in connection with the relationship were billed to a federal health care program."

**ANSWER:**  Defendant admits the allegations of the first sentence of Paragraph 321. Defendant states that, to the extent the allegations of Paragraph 321 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 321, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

322.    Guardian, having entered into numerous Provider Agreements with Medicare contractors, is well aware that compliance with the Anti-Kickback Statute is a material condition of payment by the Medicare program, including payments by Part D Sponsors MA-PD Plans pursuant to contracts with Medicare.

**ANSWER:**  Defendant states that, to the extent the allegations of Paragraph 322 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 322, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance. Further, the allegations of Paragraph 322 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 322 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

C.    **The Fine Print**

323.    Finally, as described above, Guardian's knowledge of the prohibitions of the Anti-Kickback Statute is apparent in the fine print of the contracts it offers to assisted living communities and personal care homes.

**ANSWER:**  Defendant states that, to the extent the allegations of Paragraph 323 reference a document, the referenced document speaks for itself. Defendant denies the remaining allegations of Paragraph 323, including to the extent that the allegations mischaracterize the document, its meaning, or its relevance.

163

324.    Exhibit A to the contracts between the facilities and Guardian

expressly refers to the Federal Anti-Kickback Statute and states as follows,

among other things:

> "[Guardian] will provide or arrange for, and Operator [of the facility]
> will pay for, consulting pharmacist services only on terms that
> account for [Guardian's] costs to do so, and never below those costs."

> "All arrangements for consulting pharmacist services will be
> established without regard to any referrals."

**ANSWER:**  Defendant states that, to the extent the allegations of

Paragraph 324 reference a document, the referenced document speaks for itself.

Defendant denies the remaining allegations of Paragraph 324, including to the

extent that the allegations mischaracterize the document, its meaning, or its

relevance.

325.    Guardian, however, knowingly ignored the fine print in its own

contracts.

**ANSWER:**  Defendant denies the allegations of Paragraph 325.

326.    Guardian blatantly violated the Anti-Kickback Statute by knowingly

providing free or below FMV consulting, education and skills checks, and eMAR

services for assisted living communities and personal care homes, at least one

purpose of which was to induce the facilities to select Guardian to fill the

pharmacy needs of their residents, most of whom are Medicare or TRICARE beneficiaries.

**ANSWER:** Defendant denies the allegations of Paragraph 326.

327.   Guardian knew the claims for payment that it has submitted, and continues to submit, to Medicare and TRICARE for prescription drugs and supplies provided to residents of the facilities receiving free services from Guardian were tainted by its illegal kickback scheme and thus were false claims that were ineligible for payment by Medicare or TRICARE.

**ANSWER:** Defendant denies the allegations of Paragraph 327.

### Count One
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### (False Claims)

328.   Relator repeats and realleges the allegations paragraphs 1-327 in the Complaint as if fully set forth herein.

**ANSWER:** Defendants incorporate their responses to Paragraphs 1 through 327 above as though fully set forth here in response to Paragraph 328.

329.   As set forth above, Guardian provided kickbacks in the form of free or below FMV pharmacy consulting, education and skills classes, and eMAR services to assisted living communities and personal care homes with the intention and effect of inducing those facilities to designate Guardian as their

"preferred" pharmacy, meaning the facilities agreed to steer their residents to Guardian to fill prescriptions for drugs and supplies, most of which were paid for in whole or part by Medicare and TRICARE, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2).

**ANSWER:**  Defendant denies the allegations of Paragraph 329.

330.    Guardian has submitted and continues to submit claims for payment for prescription drugs and supplies that it dispensed to residents of facilities that received free or below FMV services pursuant to Guardian's kickback scheme.

**ANSWER:**  Defendant denies the allegations of Paragraph 330.

331.    Compliance with the Anti-Kickback Statute is a material condition of receiving reimbursement from the Medicare and TRICARE Programs.

**ANSWER:**  The allegations of Paragraph 331 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 331 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

332.    Guardian's claims for payment for prescriptions tainted by its kickback scheme were false claims and were not eligible for payment by Medicare or TRICARE.

**ANSWER:** Defendant denies the allegations of Paragraph 332.

333.   As a foreseeable result of Guardian's participation in the kickback scheme, Guardian knowingly submitted or caused the submission of hundreds of thousands of false claims to Medicare and TRICARE for payment, in violation of the False Claims Act, 31 U.S.C. § 3729(a).

**ANSWER:** Defendant denies the allegations of Paragraph 333.

334.   By virtue of the false claims the Defendants presented or caused to be presented, the United States has suffered damages in an amount to be determined at trial and is entitled to recover treble damages plus a civil penalty for each false claim.

**ANSWER:** Defendant denies the allegations of Paragraph 334.

**Count Two**
**Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**(False Records and Statements Material to False Claims)**

335.   Relator repeats and realleges the allegations in paragraphs 1-327 the Complaint as if fully set forth herein.

**ANSWER:** Defendants incorporate their responses to Paragraphs 1 through 327 above as though fully set forth here in response to Paragraph 335.

336.   In connection with the kickback-tainted prescription claims that Guardian submitted or caused to be submitted to Medicare and TRICARE,

Guardian knowingly made or used, or caused others (such Medicare Part D

Sponsors, PBMs, MA-PD Plans, and ESI) to make or use, false records or

statements that were material to false or fraudulent claims for payment

submitted to Medicare and TRICARE.

**ANSWER:**  Defendant denies the allegations of Paragraph 336.

337.    By reason of these false records or statements, the United States has

suffered damages in an amount to be determined at trial and is entitled to

recover treble damages plus a civil penalty for each false claim.

**ANSWER:**  Defendant denies the allegations of Paragraph 337.

**Count Three**
**Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G)**
**(Failure to Return Overpayments)**

338.    Relator repeats and realleges the allegations paragraphs 1-327 of the

Complaint as if fully set forth herein.

**ANSWER:**  Defendants incorporate their responses to Paragraphs 1

through 327 above as though fully set forth here in response to Paragraph 338.

339.    By knowingly engaging in the kickback schemes set forth above,

Defendants knew they were ineligible to participate in the Medicare program or

to receive Medicare reimbursement for prescription drug claims.

**ANSWER:**  Defendant denies the allegations of Paragraph 339.

340.   Defendants had a duty under federal law to return excess payments, known as overpayments, to Medicare within 60 days of when the overpayments were identified. *See* 42 U.S.C. § 1320a-7k(d)(2).

**ANSWER:**  The allegations of Paragraph 340 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 340 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

341.   Medicare payments that Defendants received after they knowingly initiated the kickback schemes set forth above were overpayments that Defendants had an affirmative legal obligation to report and return to the Medicare program. Defendants are not entitled to keep federal taxpayer money they were not eligible to receive.

**ANSWER:**  Defendant denies the allegations of Paragraph 341.

342.   An overpayment knowingly retained after 60 days becomes an "obligation" within the meaning of the reverse false claims provision of the False Claims Act. 42 U.S.C. § 1320a-7k(d)(3).

**ANSWER:**  The allegations of Paragraph 342 are legal conclusions to which no response is required. To the extent that a response is required,

Defendant denies the allegations of Paragraph 342 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

343.    A defendant that "knowingly conceals or knowingly and improperly avoids or decreases an obligation" to return funds to federal programs is liable under the False Claims Act. 31 U.S.C. § 3729(a)(1)(G).

**ANSWER:**  The allegations of Paragraph 343 are legal conclusions to which no response is required. To the extent that a response is required, Defendant denies the allegations of Paragraph 343 to the extent they mischaracterize the source's language, meaning, or application and further states that the cited source speaks for itself.

344.    Defendants made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

**ANSWER:**  Defendant denies the allegations of Paragraph 344.

345.    Defendants improperly retained such overpayments with actual knowledge of the legal obligation to return the funds to Medicare, or with

reckless disregard or deliberate ignorance of the legal obligation to return the funds to Medicare because they were not entitled to keep the funds.

**ANSWER:** Defendant denies the allegations of Paragraph 345.

346. By reason of Defendants' knowing and improper retention of the overpayments described herein, the United States has suffered damages in an amount to be determined at trial and is entitled to recover treble damages plus a civil penalty for each false claim.

**ANSWER:** Defendant denies the allegations of Paragraph 346.

## Denial of All Allegations Not Otherwise Admitted

Defendant denies each and every allegation of the Complaint not specifically admitted herein.

## Affirmative and Other Defenses

Defendant sets forth the following affirmative and other defenses to Relator's claims. Matters as to which Relator bears the burden of proof are included as defenses out of an abundance of caution, and their inclusion shall not change the nature of the defense or alter the burden of proof.

As separate and distinct affirmative defenses, Defendant alleges as follows:

1. Relator's Amended Complaint fails in whole or in part to state a claim against Defendant upon which relief can be granted.

2. Relator's claims are barred in whole or in part because Relator failed to plead with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure.

3. Relator's claims fail to the extent they do not identify with specificity (e.g., by dates, patients, persons engaged in allegedly fraudulent conduct, etc.) the alleged false claims.

4. Relator's claims are barred in whole or in part by the affirmative defense of laches.

5. Relator's claims are barred in whole or in part by the affirmative defense of estoppel.

6. Relator's claims are barred in whole or in part by the affirmative defenses of waiver, acquiescence, excuse, or release, and/or by the fault, bad faith, or unclean hands of Relator.

7. Relator's claimed damages are too remote and speculative to form the basis for relief.

8. Any and all actions taken by Defendant with respect to any of the claims alleged in the Amended Complaint were taken in good faith and in accordance with established industry practice, applicable laws, rules, and regulations.

9.    Relator is barred from obtaining relief against Defendant because Defendant's conduct was at all times reasonable, proper, in good faith, and in compliance with applicable law.

10.   At no time did Defendant act with malicious, willful, wanton, or reckless intent to violate any statute or law.

11.   The Complaint is barred because Defendant's actions were taken in good faith and in reasonable reliance upon regulatory interpretations and judgments by the Government and its agents and contractors upon whom Defendants were entitled to rely.

12.   Some or all of the purported claims and allegations in the Amended Complaint are barred to the extent that the government or Relator would be unjustly enriched from any recovery in this case.

13.   Alleged damages, if any, must be offset by the value of the services provided by Defendant and the costs avoided by the United States.

14.   Any award of penalties or treble damages in this case would be a violation of the constitutional safeguards provided under the Constitution of the United States of America; for example, deprivation of property without the due process of law required under the Fifth and Fourteenth Amendments to the United States

Constitution, and it would constitute an unconstitutionally excessive fine under the Eighth Amendment to the United States Constitution if any award is grossly disproportional to the gravity of an offense, if any. *See, e.g., BMW of North America v. Gore*, 517 U.S. 559 (1996).

15.     Relator's claims are barred, in whole or in part, to the extent any alleged injuries or damages were not legally or proximately caused by any acts or omissions of Defendant and/or were caused, if at all, by the intervening or superseding conduct of third parties.

16.     Relator's claims are barred, in whole or in part, to the extent the United States suffered no damages as a result of the matters alleged in the Amended Complaint.

17.     Relator's claims are barred, in whole or in part, to the extent damages sought exceed those permitted under applicable federal statutes, rules, or regulations.

18.     Relator's claims are barred, in whole or in part, because the claims rely on ambiguous provisions of the Federal False Claims Act and the Anti-Kickback Statute and other provisions of law and the rule of lenity requires such ambiguities to be construed in Defendant's favor.

19.     Relator's claims are barred, in whole or in part, because, over the time period alleged in the Amended Complaint, there was no clear, unambiguous, or objective legal standard prohibiting the conduct alleged by Relator to be false or fraudulent.

20.     Relator's claims are barred, in whole or in part, because the claims, allegations, and transactions described in the Amended Complaint were publicly disclosed and Relator was not an original source of information.

21.     Relator's claims are barred, in whole or in part, to the extent Relator seeks to hold Defendant liable for statements made or actions taken by persons or entities other than Defendant and who were not acting as authorized agents of Defendant and to further Defendant's interests.

22.     Relator's claims are barred, in whole or in part, because Defendant lacked the requisite scienter, including knowledge, specific intent, and/or willfulness, necessary to establish fraud.

23.     Relator's claims are barred, in whole or in part, because the government's knowledge of the facts underlying the allegedly false

claims negates the scienter, falsity, and materiality requirements of the False Claims Act.

24. Relator's claims are barred, in whole or in part, to the extent they seek to impose upon Defendant obligations that are inconsistent with, or in excess of, those imposed by existing law.

25. Relator's claims are barred, in whole or in part, to the extent they attempt to hold Defendant liable for any alleged wrongful action taken by any employee or other individual, including Relator, that was taken outside the scope and course of that individual's duties and that was not authorized, condoned, or ratified by Defendant.

26. Defendant reserves the right to amend this Answer to include any additional defense which may become known or available during this litigation.

## **Prayer for Relief**

WHEREFORE, Defendant respectfully requests that Relator's claims be dismissed with prejudice, that judgment be entered in favor of the Defendant and against Relator on those claims, that attorney fees and costs be awarded to Defendant, and that such further relief as this Court deems just and proper be awarded.

## <u>DEMAND FOR JURY TRIAL</u>

Defendant demands a trial by jury on all triable issues.

Respectfully submitted this 24th day of February, 2021.

ARNALL GOLDEN GREGORY LLP


*/s/W. Jerad Rissler*
Glenn P. Hendrix, Esq.
Georgia Bar No. 346590
glenn.hendrix@agg.com
W. Jerad Rissler, Esq.
Georgia Bar No. 142024
jerad.rissler@agg.com


Arnall Golden Gregory LLP
171 17th Street, Suite 2100
Atlanta, Georgia 30363-1031
404.873.8500 (Telephone)
404.873.8501 (Facsimile)

*Attorneys for Defendant*
*Guardian Pharmacy of Atlanta, LLC*

## **CERTIFICATION**

Counsel for Defendant hereby certifies that this pleading has been

prepared with Book Antiqua (13 point) font, which font has been approved

under L.R. 5.1(C).

This 24th day of February, 2021.

*/s/ W. Jerad Rissler*
W. Jerad Rissler, Esq.
Georgia Bar No. 142024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 24, 2021, I electronically filed the

foregoing ANSWER TO AMENDED COMPLAINT with the Clerk of Court using

the Court's CM/ECF system, which will automatically send notification of such

filing to all counsel of record.

*/s/ W. Jerad Rissler*
W. Jerad Rissler
Georgia Bar No. 142024

ARNALL GOLDEN GREGORY LLP
171 17th Street NW
Suite 2100
Atlanta, Georgia 30363-1031
Telephone: 404.873.8500
Facsimile: 404.873.8501