**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**
**Kevin McAnaney on 06/14/2022**

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3     UNITED STATES OF            )
       AMERICA, ex rel. HENRY      )
 4     B. HELLER,                  )
                                   )
 5          Plaintiff,             )
                                   )   Civil Action File No.
 6     vs.                         )   1:18-cv-03728-SDG
                                   )
 7     GUARDIAN PHARMACY OF        )
       ATLANTA, LLC, et al.,       )
 8                                 )
            Defendants.            )
 9                                 )
                                   )
10                                 )

11
                          - - -
12

13        Videotaped Videoconference Deposition of

14                    KEVIN MCANANEY

15                 (Taken by Plaintiff)

16                   Atlanta, Georgia

17                   June 14, 2022

18
       Reported by:   Lynne C. Fulwood
19
                     Certified Court Reporter
20

21

22

23

24

25
```

```
 1   STATE OF GEORGIA

 2   COUNTY OF COBB

 3   VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF KEVIN

 4   MCANANEY

 5

 6            Pursuant to Article 8.B of the RULES AND

 7   REGULATIONS OF THE BOARD OF COURT REPORTING OF THE

 8   JUDICIAL COUNCIL OF GEORGIA, I make the following

 9   disclosure:

10            I am a Georgia Certified Court Reporter.

11   I am here as a representative of Huseby Global

12   Litigation.

13            Huseby Global Litigation was contacted by

14   the offices of KEATING MUETHING AND KLEKAMP, PLL, to

15   provide court reporting services for this deposition.

16   Huseby Global Litigation will not be taking this

17   deposition by O.C.G.A. 15-14-37 (a) and (b).

18

19

20

21

22

23

24

25
```

```
 1    ON BEHALF OF THE PLAINTIFF:

 2              JOSEPH M. CALLOW, JR. - videoconference
                COLLIN RYAN - audio
 3              CARSON MILLER - audio
                Attorneys at Law
 4              Keating Muething & Klekamp, PLL
                1 East 4th Street
 5              Suite 1400
                Cincinnati, Ohio 45202
 6              513-579-6400
                Jcallow@kmklaw.com
 7              Cryan@kmklaw.com

 8              LYNN M. ADAM - audio
                Attorney at Law
 9              Adam Law, LLC
                125 Clairemont Avenue
10              Suite 380
                Decatur, Georgia 30030
11              404-324-3582
                Ladam@lynnadamlaw.com
12
                MICHAEL J. MOORE - videoconference
13              Attorney at Law
                Moore Hall, LLC
14              3630 Peachtree Road, N.E.
                Suite 1025
15              Atlanta, Georgia 30326
                Mjmoore@moorehall.com
16
      ON BEHALF OF THE DEFENDANTS:
17
                JARED RISSLER - videoconference
18              GLENN P. HENDRIX - audio
                Attorneys at Law
19              Arnall Golden Gregory, LLP
                171 17th Street, N.W.
20              Suite 2100
                Atlanta, Georgia 30363-1031
21              Jared.rissler@agg.com
                Glenn.hendrix@agg.com
22

23

24

25
```

 1                    - - -

 2          Videotaped videoconference deposition

 3   of KEVIN MCANANEY, taken by the Plaintiffs,

 4   at 1 East 4th Street, Suite 1400,

 5   Cincinnati, Ohio, on the 14th day of June

 6   2022, at 9:30 a.m., before Lynne C.

 7   Fulwood, Certified Court Reporter.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX TO EXHIBITS

2    Exhibit 387    McAnaney Expert Report          10
     Exhibit 388    Appendix C                       46
3    Exhibit 389    July 1, 1997 Letter of
                    Provision of Free Goods and
4                   Services                         46
     Exhibit 390    October 1997 OIG Letter          53
5    Exhibit 391    OIG Special Fraud Alert          56
     Exhibit 392    73 Fed. Reg. 56832               59
6    Exhibit 393    OIG Advisory Opinion
                    12-19                            62
7    Exhibit 394    2009 Ropes & Gray Article       197
     Exhibit 395    LexisNexis United States ex
8                    Rel. Banigan v. Organon
                     USA Inc.                        203
9    Exhibit 396    Appendix B                       210

10

            INDEX TO PREVIOUSLY MARKED EXHIBITS
11

     Exhibit 39     E-mail from Lori Newcomb to
12                  Matt Hopp, dated January
                    4, 2016                         189
13   Exhibit 46     Pharmacy Report for The
                    Waterford at Oakwood May
14                  2015                            178
     Exhibit 48     Pharmacy Report for The
15                  Waterford at Oakwood
                    December 2016                   185
16   Exhibit 58     Omnicare DOJ Announcement       192
     Exhibit 59     AGG Legal Alert                 193
17   Exhibit 132    Pharmaceutical Products and
                    Services Agreement              88

18

19                 INDEX TO EXAMINATION

20   Examination by Mr. Callow                       7

21

22

23

24

25

 1              P R O C E E D I N G S

 2                    - - -

 3        (Whereupon, the video camera was

 4   turned on.)

 5        THE VIDEOGRAPHER:  This is the

 6   beginning of Media 1, in the deposition of

 7   Kevin McAnaney, in the matter of United

 8   States of America, ex rel., Henry B.

 9   Heller, versus Guardian Pharmacy of

10   Atlanta, LLC.  Today's date is June 14th,

11   2022.  The time is 9:30 a.m.

12        If the attorneys present will please

13   introduce themselves for the record, after

14   which the Court Reporter will swear in the

15   witness.

16        MR. CALLOW:  This is Joe Callow on

17   behalf of the Relator, Mr. Heller.  I have

18   Carson Miller with me in the room and

19   Mr. Ryan, Collin Ryan, is also

20   participating.

21        MS. ADAM:  Good morning.  This is Lynn

22   Adam on behalf of Mr. Heller.

23        MR. MOORE:  Michael Moore on behalf of

24   Mr. Heller.

25        MR. RISSLER:  Good morning.  Jared

1    Rissler on behalf of the defendant.

2         (It was stipulated and agreed by all

3    counsel present, that the Court Reporter is

4    authorized to swear the witness remotely.)

5              KEVIN MCANANEY,

6    having first been duly sworn, was deposed and

7    examined as follows:

8                   EXAMINATION

9    BY MR. CALLOW:

10    Q    Mr. McAnaney, good morning.

11    A    Good morning.

12    Q    My name is Joe Callow.  I'm one of the

13    attorneys representing the Relator, Mr. Heller, in

14    the litigation that brings us here for your

15    deposition.  I know you've been deposed before many

16    times, but let me, for the record, go over a couple

17    of ground rules just to make sure we're on the same

18    page as we get started here.

19         We obviously have the Court Reporter

20    transcribing our conversation.  She'll take down

21    everything that's said, what I ask and how you

22    respond and anything that your attorneys say.  It

23    will help as you know make her job easier if all your

24    answers are verbal.  No shakes of the head, no

25    uh-huh's or huh-uh's.  That way we have a clean

 1   record.

 2              It will make her job easier if only one

 3   of us is talking.  So even though we're doing this by

 4   video, I'm going to ask you to let me finish my

 5   question before you start your answer, and I'm going

 6   to work to make sure that you finish your answer

 7   before I start my next question.  Fair enough?

 8        A    That's fine.

 9        Q    If at anytime you can't hear me or you

10   don't understand me or we have a bad connection, just

11   let me know.  I'll be happy to repeat it or rephrase

12   it.  I can even have the Court Reporter repeat it

13   back.  Obviously, one of the ground rules is that if

14   you answer my question, I will assume that you

15   understood it.  Fair enough?

16        A    Understood.

17        Q    We've got a lot to cover today.  We'll do

18   it as expeditiously as possible, but if at anytime

19   you need to take a break, just let me know.  I'll be

20   happy to accommodate you.  I just don't want to do it

21   while a question is pending.  Okay?

22        A    Yes.

23        Q    We've agreed to do these depos by video,

24   so we're using technology.  You should be able to

25   both see me and then have a share file where I can

1    post documents for you to review.

2               Are you set up that way?

3         A    I'm logged into share file.  I never used

4    it, so I don't know till you post something.

5         Q    So I'm going to post documents that way

6    rather than handing them across the conference room

7    table like in times past.  Sometimes you have to

8    refresh your browser in order for it to show up.  And

9    occasionally, there's a delay that we'll work

10   through.  But the deposition exhibits I use will be

11   in that share file.  You should be able to move up

12   and down and see whatever you want in that share

13   file, and I can point you to certain things that I'll

14   ask you about as well.  If you have any technical

15   issues, we'll take a break and work through them as

16   well.  Okay?

17        A    That's fine.

18        Q    Where exactly are you today for this

19   deposition?

20        A    I'm in Bethesda, Maryland.

21        Q    Okay.  And are you by yourself in the

22   room?

23        A    Yes.

24        Q    Any documents that you have with you in

25   the room?

```
 1        A    No.

 2        Q    Do you have a hard copy of your report?

 3        A    I do not.

 4        Q    Okay.  Any phone, any distractions, any

 5   computers in the room?

 6        A    I've got a phone.  It's on mute.

 7        Q    Perfect.  Sounds good.  I'm going to mark

 8   your report as Exhibit 387, so we'll test the share

 9   file right away here, see if it works.  But

10   Mr. Miller is going to post the document in that

11   share file system.

12             (Whereupon, Exhibit No. 387 was marked

13             for identification by the court reporter.)

14   BY MR. CALLOW:

15        Q    Let's see if it pops up and if you can

16   review it.

17        A    Let's see.  I'm trying to find where I

18   just opened it up and let's see -- no, it's not --

19   okay, let me go back and...

20        Q    It's all right.  Take your time.

21        A    Okay.  Yeah, no.  Let me -- okay.  Let me

22   go to share file.  Oh, yes.  Okay.  Let me click on

23   it.  Okay.  Now I have to download it?  Is that --

24        Q    Correct.  And then once it's downloaded,

25   you open it and you should be able to see it.
```

1          A    Okay.  I'm -- actually, I'm -- let me

2    see, see if my downloads -- yes, it came up.  Wait.

3    It just went backwards.  Let me --

4          **Q    Take your time.  We're good.**

5          A    Expert reports, I don't -- I click on it.

6          **Q    It may take a second to download because**

7    **it's a large document but --**

8          A    No, I think it says it's downloading.  I

9    click on it, and it goes to something called Guardian

10   expert reports.  But in that file, my report's not in

11   there.  I'm not --

12         **Q    What file are you in, sir?**

13         A    Oh, wait a minute.  This is -- it's --

14   well, I'm in my download file.  You know, I -- I --

15   if you'd give me a second, I think I have to go to

16   Google Chrome.  It seems to -- I have trouble -- I

17   have trouble downloading on Safari sometimes.  I

18   mean, I don't know -- let me just try that because I

19   think that will work.

20         **Q    Wait, let's see if you can get it up and**

21   **running.**

22         A    Okay.  Yeah.

23         **Q    Mr. Rissler needs to walk you through it.**

24   **You can look at that to get it set up.**

25                MR. CALLOW:  Let's go off the record,

 1        and let's take care of the technology.

 2              THE VIDEOGRAPHER:  The time is

 3        9:37 a.m.  We're now off the record.

 4              (Whereupon, the video camera was

 5        turned off.)

 6              (Whereupon, a brief recess was taken.)

 7              (Whereupon, the video camera was

 8        turned on.)

 9              THE VIDEOGRAPHER:  The time is

10        9:39 a.m.  We're back on the record.

11   BY MR. CALLOW:

12        Q    Mr. McAnaney, we're back on the record.

13              Do you have Exhibit 387 on your screen

14   now?

15        A    I do.

16        Q    And this appears to be the expert report

17   of Kevin G. McAnaney; is that correct?

18        A    Yes.

19        Q    And you want to scroll down and make sure

20   this is the complete and accurate report that you

21   proffered in this case that your signature is on

22   page 39?

23        A    Yes, it seems to be.

24        Q    Do you know -- I don't see a date.  Do

25   you know when you authored this report or finalized

1  it?

2      A    I do not.  I think it may have been

3  shortly before the due date.

4      Q    Okay.

5      A    I don't know if it was the date it was

6  done or the day before or the day before that,

7  somewhere in that range.

8      Q    Did you write this report?

9      A    Yes, I did.

10     Q    And this report contains a number of

11 opinions.  Does the report contain all the opinions

12 that you intend to offer in this case?

13     A    I think it's -- I think it's a summary of

14 my opinions in the case, yes.  Those are the opinions

15 I intend to offer unless counsel will ask me for more

16 opinions.

17     Q    And the bases for those opinions is also

18 identified in the report and the attachments?

19     A    I'm sorry, I didn't -- I didn't catch

20 that.

21     Q    The bases for your opinions is also

22 contained in the report and the attachments that

23 identify the documents that you reviewed, correct?

24     A    Yes, they're -- they're summarized in the

25 report.

1        Q    Have you done any additional work to form

2    additional opinions since you authored this report?

3        A    Additional matter, I hadn't been asked

4    for any additional opinions that aren't basically

5    already contained, I think, in the report.

6        Q    Or formed any new or different opinions

7    between the time that you authored the report and

8    your deposition here today?

9        A    I don't believe so.

10        Q    Have you changed any of the opinions

11    that's contained in the report, Exhibit 287 [sic]?

12        A    I don't believe so.

13        Q    Have you reviewed any other documents or

14    any other pleadings that relate to this case since

15    you authored the report?

16        A    Yes, I've -- yes, I have.

17        Q    What have you reviewed related to your

18    expert's opinion in the case since you authored this

19    report?

20        A    I reviewed an expert -- a report by

21    Ms. Hoffman, I think.  You were an expert for

22    Mr. Heller.  And then I reviewed the -- some expert

23    reports that were submitted by Guardian as well.

24        Q    Did any of your opinions change based

25    upon those reports that you reviewed?

1     A     No.

2          Q     In preparing the report that we have,

3     Exhibit 387, did you actually talk with anyone at

4     Guardian about any of the opinions or the bases of

5     your opinions?

6          A     Talk to anyone where?

7          Q     Talk to anyone at Guardian.

8               Did you have any discussions with anyone

9     at Guardian related to the opinions or the factual

10    bases for the opinions in your report?

11         A     Yes, I did.

12         Q     Who did you talk to at Guardian?

13         A     I can't recall.

14         Q     Okay.  Do you recall when you talked with

15    someone at Guardian regarding your opinion,

16    Exhibit 387?

17         A     Yes.  It was relatively early in the

18    engagement.

19         Q     Okay.  Did you have more than one

20    discussion with someone at Guardian regarding your

21    expert report, Exhibit 387?

22         A     Not that I recall.  I only recall one

23    conversation.

24         Q     What do you recall about that

25    conversation?

1      A     As I said, it was early in the

2   engagement, and it was basically -- I think there

3   were -- I believe there were several people from

4   Guardian.  I believe one or two, at least.  And it

5   was basically discussing the background of the -- of

6   the -- and the facts regarding the various

7   allegations.

8      Q     Let me be clear.  I don't want to know

9   about your discussions with Mr. Rissler or the law

10  firm.  You're talking about a discussion with someone

11  working for Guardian of Atlanta, correct?

12     A     Yes.

13     Q     Okay.  Why don't you --

14     A     Although I believe Mr. Rissler or --

15  or -- and/or one of the other attorneys was on the

16  call.

17     Q     Okay.  So this initial call had one or

18  two people from Guardian of Atlanta and one or two

19  attorneys from the law firm representing Guardian of

20  Atlanta?

21     A     That's my recollection.

22     Q     And you don't recall who the individuals

23  were at Guardian that were on the phone?

24     A     No, I -- not off my head.  I could make a

25  guess but I don't -- I can't recall.

1      **Q    Did you rely upon any facts that you**

2   **gained from that initial call to form any of the**

3   **opinions that you've authored in Exhibit 387?**

4      A    I didn't rely on them, but I think some

5   helped form the basis.

6      **Q    Okay.  What facts from that initial call**

7   **helped form the basis of the opinions that you're**

8   **offering in Exhibit 387?**

9      A    Well, the one in particular that -- most

10  of the things were general background which were then

11  supported by depositions and exhibits that I read

12  later.  The one that I recall in that conversation

13  was I asked specifically about the allegation about

14  laptop computers on the medication carts.  And I was

15  told that they were stripped down of functionality so

16  that they essentially couldn't be used for much of

17  anything other than the EMR.

18     **Q    You recall being told that by somebody**

19  **during that initial call?**

20     A    Yes.  I specifically asked and -- and was

21  told that.

22     **Q    Any other facts from that initial call**

23  **that helped form the basis of opinions that you're**

24  **offering in Exhibit 387?**

25     A    Not that I recall.

USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.
Kevin McAnaney on 06/14/2022                                    Page 18

```
 1       Q    Did you talk to any of the other experts
 2   retained by the defendant Guardian of Atlanta before
 3   you offered your report, Exhibit 387?
 4       A    No, I did not talk to any of the other
 5   experts.
 6       Q    Did you review any of the other expert
 7   reports prior to finalizing your report, Exhibit 387?
 8       A    Yes.  Mr. Zavalishin.
 9       Q    Zavalishin?
10       A    Zavalishin, okay.
11       Q    Any other reports of any of the other
12   defense experts that you've reviewed prior to
13   finalizing your report, Exhibit 387?
14       A    No.
15       Q    Have you worked with any of these other
16   experts before in litigation, the experts that were
17   retained by the defendants?
18       A    I don't believe so.
19       Q    Have you worked with Arnall Golden
20   Gregory before?
21       A    Yes.
22       Q    When did you work with them before?
23       A    I think I was involved with a matter for
24   them.  We go back to 2008 or something.
25       Q    A legal matter, a litigation matter?
```

1      A    And I don't think I've got anything -- I

2   don't think anything -- I think that's the only time.

3   I also occasionally work with a lawyer who recently

4   joined them who is a -- who I've done some

5   collaborative work with, mutual things.

6      **Q    Have you done any expert work for Arnall**

7   **Golden Gregory before?**

8      A    I don't think so.  In that other matter,

9   I was -- I was not -- I don't believe I was an

10  expert.

11     **Q    Okay.**

12     A    Certainly not -- I was a consulting

13  attorney.

14     **Q    Okay.  Were you giving legal advice as**

15  **part of a consulting attorney?**

16     A    Yes.

17     **Q    And did it relate to the Anti-Kickback**

18  **Statute?**

19     A    Yes.

20     **Q    Did it relate to Guardian of Atlanta or**

21  **Guardian Pharmacy?**

22     A    No.

23     **Q    Have you ever done any consulting or**

24  **legal work for Guardian of Atlanta?**

25     A    No.

1       Q       Have you done any consulting or legal

2    work for Guardian Pharmacy?

3       A       No.

4       Q       Have you done any consulting or legal

5    work for a long-term care pharmacy other than

6    Guardian?

7       A       Yes.

8       Q       What other long-term care pharmacy have

9    you done consulting or legal work for?

10       A       I'm sorry, that got a little jumbled.

11       Q       What is the name of the long-term care

12    pharmacy that you have done consulting or legal work

13    for in the past?

14       A       Omnicare.

15       Q       When did you do work for Omnicare in a

16    consulting or legal role?

17       A       I was -- I was retained by a law firm as

18    an expert consultant in a case involving Omnicare.

19       Q       When was that retention?

20       A       I can't recall.  Maybe 2010, 2011,

21    something like that.  So quite a while ago.

22       Q       Were you a consulting expert or a lawyer

23    legal counsel to them?

24       A       I -- I was an expert.

25       Q       Consulting or testifying expert?

1      A    Testifying.

2      Q    **Did you offer a deposition on behalf of**

3    **Omnicare in the litigation matter?**

4      A    I think -- I gave a report that was

5    requested by Omnicare's attorneys, yes.

6      Q    **Were you deposed on that report?**

7      A    Yes.

8      Q    **Did you testify at trial on that report?**

9      A    There are no trials.

10     Q    **Fair enough.  I'll take that as a no.**

11          **Did you know the name of the Omnicare**

12   **case from this 2010, '11 timeframe?**

13     A    I -- I -- I can't recall.  I can't recall

14   the relator.

15     Q    **Do you recall the name of the law firm**

16   **that retained you?**

17     A    I can't recall, although the attorneys

18   had come from my old firm.

19     Q    **Okay.**

20     A    My firm had dissolved, and this -- I

21   can't -- I can't recall.

22     Q    **Okay.  Do you recall where the case was**

23   **pending?**

24     A    No.  Although if I had to guess, I'd say

25   Massachusetts.

1      Q     Fair enough.

2            Generally, what do you recall the

3     substance of your report was in that case?

4      A     The case involved discounts, and so my --

5     the essence of my report was that the arrangements

6     that were at issue complied with the discount safe

7     harbor.  I believe -- I mean, that's the gist of it.

8     There were several different -- several varieties of

9     discounts over time, but I believe that was the gist.

10     Q     Do you recall if the case involved

11    swapping?

12     A     No.  It did not involve swapping.

13     Q     Do you recall if it involved providing

14    free or discounted services to long-term care

15    facilities or nursing homes?

16     A     No.  My recollection, it didn't involve

17    nursing homes.

18     Q     Do you recall if it was after Omnicare's

19    big settlement of $98 million where they paid federal

20    government in the False Claims Act settlement?

21     A     I -- I don't recall.

22     Q     You're aware that Omnicare has actually

23    had several different settlements with the federal

24    government under False Claim Act and Anti-Kickback

25    Statute, correct?

1        A    It wouldn't surprise me.

2        Q    Any other work that you've done for a

3   long-term care pharmacy either in consulting,

4   expert -- testifying expert or in your legal

5   (inaudible)?

6        A    That's -- that's the -- that's the --

7   that's the only one I can think of.

8        Q    Okay.  Have you done any other expert

9   work or legal work for an assisted living community

10  in Georgia?

11       A    Not to my knowledge.

12       Q    Have you done any expert work or legal

13  work for a personal care home in Georgia?

14       A    Not that I'm aware of.

15       Q    Prior to this case, have you ever offered

16  expert opinions regarding the Georgia regulations for

17  long-term care facilities such as assisted living

18  communities or personal care?

19       A    I don't think I've ever given any opinion

20  on the Georgia regulations.

21       Q    Let me ask you to turn to paragraph ten

22  in your report.  Paragraph ten says:  I've reviewed

23  certain documents that counsel have provided me as

24  specifically set forth in appendix C to this report.

25  I have not undertaken any independent investigation.

1    I've also reviewed the expert report of plaintiff's

2    expert, Gregory S. Kaupp.  I've also reviewed the

3    relevant statutes, regulations, preambles and

4    government guidance related to the AKS and Stark.

5            Did I read that correctly?

6        A    Yes.

7        Q    So the documents that you reviewed are in

8    appendix C.  If you could scroll down, I have a

9    couple questions about appendix C.

10       A    Mine doesn't have appendix C attached on

11   that document.

12       Q    Let me have Mr. Miller put it up.  Hold

13   on.

14       A    How do I -- do I go back to this, I

15   guess?  No.

16       Q    Refresh.

17       A    No.  Where am I?

18       Q    Hold on one second.  There it goes.  See

19   if you refresh and see if you can pop open the next

20   exhibit.

21       A    Okay.  I actually only use Google Chrome

22   so I'm not showing -- where is the refresh button?

23       Q    On mine, it's in the upper left, and it

24   looks like a circle.

25       A    (Inaudible) litigation -- oh, there I see

1  it.  It seems to me I'm not back in the -- do I need

2  to go back to the Huseby Global and sign in again?  I

3  don't seem to be on that.

4        **Q    You don't have to sign in again, no.**

5  **Don't sign in again.  You've already signed in once.**

6  **You should be able to close that document and go back**

7  **to that folder.**

8        A    Okay.  I can -- let's see, close the

9  document.  No, no, it -- now it got me somewhere

10  else.  Okay.  Let me.

11             MR. RISSLER:  Kevin, if you go to the

12        tab where you downloaded the Exhibit 387,

13        at least in mine, there's a blue arrow to

14        the left that's near the top of the page.

15        It will take you back to where the folder

16        is where you can refresh.

17             THE WITNESS:  Okay.  Let me -- I seem

18        to have -- I seem to have gotten out of the

19        whole thing.  So let me -- let me --

20             MR. CALLOW:  Take your time to get

21        back in.  We're good.  We're all learning

22        the ways of this new system the past couple

23        of years, so take your time.  We're good.

24             THE WITNESS:  Okay.  Now I'm back into

25        that.  Okay.  Appendix, unable to download

1       the selected item.  I get a message I can't
2       download it.  Oh, wait a minute.  I see.
3       Never mind.  I've screwed up.  I'm in
4       Safari again.
5              MR. CALLOW:  You're okay, sir.  Take
6       your time.
7              THE WITNESS:  Oh, I know, okay.  Okay.
8       Okay.  Now I've got it.  Sorry.
9              MR. CALLOW:  No problem.
10             THE WITNESS:  Okay.
11  BY MR. CALLOW:
12         Q    So can you see what is attachment C?
13         A    Yes.
14         Q    Okay.  And these are the documents that
15  you reviewed.  Did you put this list together?
16         A    I did.
17         Q    Okay.  And how did this list of documents
18  come about?  How is it that these are the documents
19  that you have in your file for your opinions in this
20  case?
21         A    Well, some of them were given to me
22  initially as I asked for things to review at the
23  beginning.  And then depositions came in as they were
24  done and as I requested them.  I -- and other
25  materials which I requested.

1      Q    Do you recall when you were first

2   retained as an expert in this matter?

3      A    I do not.

4      Q    Do you recall if it was in 2022 or 2021?

5      A    I -- I believe it may be have been late

6   2021 in November, December, something like that.

7   Maybe early 2021.  But I think -- I think -- I think

8   late 2021, not 2022.

9      Q    Are there specific documents that you

10  requested to review to form your opinions in this

11  case?

12     A    Yes.

13     Q    And what documents do you recall

14  specifically requesting?

15     A    I think the depositions and their

16  exhibits.  I think the contracts, the various

17  contracts.  Obviously, the two expert reports and --

18  and the declarations by the homes.

19     Q    Anything else that you recall requesting

20  that you wanted to see to help form the opinions in

21  your report, Exhibit 387?

22     A    You said the declarations as well from

23  the homes, the declarations and the depositions.  I

24  think -- I think those were the -- those were the

25  documents that I specifically requested.

1    Q    You looked at the contracts between

2  Guardian of Atlanta and the communities, correct?

3    A    Yes.  And I -- I think if it's not here,

4  I thought I had one -- one or two of the PBMs, at

5  least one of the PBM contracts I think I took a look

6  at.

7    Q    So one of my questions was:  Did you

8  review the language of the PBM contracts?

9    A    I -- I believe I did.  I don't -- I

10 certainly didn't review them all, but I believe I

11 reviewed one of them or maybe two.

12   Q    I didn't see references to the PBM

13 contract language in your report.

14        Are you relying upon some language in the

15 PBM contract for any of the opinions in your report?

16   A    No, I am not -- I am not -- I am not

17 relying on -- on the -- I'm not relying on the

18 language in the PBM contracts other than I am relying

19 on the expert report of Mr. Zavalishin.

20   Q    So you're not offering any opinions

21 regarding the PBM contracts or the language in the

22 PBM contracts?

23   A    Yes.  No, I'm not.

24   Q    And you've deferred to Mr. Zavalishin on

25 that I think you've said in your report a couple of

1    times?

2        A    Yes.

3        Q    In the course of the work that you did

4    for Guardian of Atlanta, did you review their

5    Anti-Kickback Statute training?

6        A    No.

7        Q    You're aware that they did training on

8    the Anti-Kickback Statute, are you not?

9        A    I did.  And I guess I reviewed it to the

10   extent they were exhibits.

11       Q    Okay.  There were exhibits, and there was

12   discussion about the Anti-Kickback Statute training

13   at Guardian of Atlanta, correct?

14       A    Yes.

15       Q    And you saw that they did training, and

16   they had an annual certification process, correct?

17       A    That's my recollection.

18       Q    There was also training on False Claims

19   Act as well, correct?

20       A    I'm not sure I paid much attention to

21   that.

22       Q    Okay.  You're not offering any opinions

23   on the appropriateness of the Anti-Kickback Statute

24   training at Guardian of Atlanta?

25       A    No.

1       Q     Do you know whether it was adequate or

2  appropriate, or do you believe it was consistent with

3  the Anti-Kickback Statute?

4       A     My recollection was what I reviewed was

5  quite general.

6       Q     Okay.  Is the training at Guardian of

7  Atlanta on the Anti-Kickback Statute relevant to your

8  opinions of whether they violated the Anti-Kickback

9  Statute?

10       A     Not particularly.

11       Q     Why not?

12       A     Because it -- the case is about whether

13  conduct violated the kickback statute.

14       Q     Do you know whether through the training

15  that they conducted on an annual basis whether or not

16  they were warned away from giving free services, free

17  goods, discounted services, discounted goods in the

18  course of their business?

19       A     As I said, it was very general, yes.

20       Q     So do you know whether or not there's

21  anything in the training that's relevant to put

22  Guardian of Atlanta on notice about some of the

23  issues that you identified in your report?

24             MR. RISSLER:  Object to form.

25       A     My recollection is the training was --

1  was fairly general and spoke in terms of may or may

2  not have put particular people on notice as to

3  particular practices.

4  BY MR. CALLOW:

5      **Q    You didn't cite to any of that training**

6  **or any of the training materials or the slide deck or**

7  **the PowerPoint presentation or the certifications in**

8  **your report, correct?**

9      A    Correct.

10     **Q    Going back to your report, it says that**

11 **you did not conduct any independent investigation.**

12 **It's in paragraph ten.**

13          **What do you mean by that?**

14     A    It means I -- I relied on the materials

15 that -- that I had -- the depositions, the exhibits,

16 the contracts.  I did not independently go and

17 interview people or -- or take any steps to

18 investigate whether what they said was accurate or

19 not.

20     **Q    Did you conduct any research regarding**

21 **any of the topics or issues that relate to the**

22 **opinions in your report, Exhibit 387?**

23     A    Well, I -- I read the Lewin report.  I

24 reread, you know, what the OIG guidance says and

25 things, but most of which I know.  So I didn't

1   conduct new.  I knew where to go and to look at it

2   just to refresh it.

3        Q    So the -- you cite to lots of things in

4   your report and we're going to talk about them.

5   Sounds like those are things you knew.

6            Did you go do any new or independent

7   research to help form any of the bases for your

8   opinions in your report, Exhibit 387?

9        A    I think that's accurate.

10       Q    You did not look at anything new.  You

11  relied on stuff that you already had in the

12  (inaudible)?

13       A    Yes, I think that's -- that's the case.

14       Q    The last sentence in paragraph ten says:

15  I've also reviewed the relevant statutes,

16  regulations, preambles and government guidance

17  related to AKS and Stark.  That's all in your report,

18  right?  Anything that relates to a statute,

19  regulation, preamble, is it cited somewhere in your

20  report?

21       A    It -- I mean, well, it may or may -- I

22  reviewed materials that I didn't rely on.  So I

23  wouldn't say everything is -- is in the report that I

24  looked at.

25       Q    Okay.

1      A     I think everything's in the report that I
2   relied on.
3      Q     Fair enough.
4      A     Or close to it.
5      Q     Can you tell me materials that you
6   reviewed that you chose not to rely upon or they're
7   not in your report so I have an example of what we're
8   talking about?
9      A     Well, there's a lot of guide- -- I mean,
10  there are a lot of informal guidance documents that
11  are put out by the OIG that I've not -- that I didn't
12  rely on or that I didn't cite that I -- for one
13  reason or another I didn't think they were relevant.
14  I mean, some of the materials are cited by your --
15  Ms. Hoffman, for example.  I mean, I didn't
16  necessarily cite those.  I know them and I looked at
17  them, but I didn't rely on them.
18     Q     Fair enough.
19           Paragraph seven of your report, sir,
20  says:  Since 2003, I've been in private practice
21  specializing in the Stark law and AKS.  In that
22  capacity, I've had extensive experience counseling
23  healthcare providers and entities on AKS compliance;
24  is that correct?
25     A     Yeah.  So I'm -- I now because I closed

 1  the thing I didn't -- I don't have that up anymore.

 2  So how would I get that up?  I'm now on C.  So if I

 3  hit the refresh it will go back or should I just go

 4  back one?

 5       Q    I think Mr. Rissler is accurate.  There

 6  should be a blue arrow on the right side of your

 7  screen.

 8       A    On the right side, there should be a --

 9  what kind of an arrow?  I'm just...

10       Q    On my screen, it's a white arrow and a

11  blue circle that takes you back to the listing of the

12  documents.

13       A    Let's see.  That's -- and then I go back

14  to the -- okay.  So I should get my report back up,

15  right?

16       Q    Mr. Rissler was accurate.  It probably is

17  open at the bottom of the screen in tab format where

18  you can keep them open and go back between different

19  tabs.

20       A    Okay.  Yeah, I'll -- I'll get the hang of

21  it eventually.  Now I've got it.  So I'm sorry, you

22  cited paragraph?

23       Q    Paragraph seven.

24       A    Paragraph?

25       Q    Seven on page three.

1        A     Okay.  Yes.  Okay.

2        **Q     You've been in private practice since**

3  **2003; is that correct?**

4        A     Yes.

5        **Q     And you specialize in Stark law and the**

6  **Anti-Kickback Statute compliance; is that correct?**

7        A     Yes, that's correct.

8        **Q     So I don't want to get into your actual**

9  **legal advice to clients.  Generally, tell me what**

10  **your practice is.**

11        A     Well, I mean, my practice is -- as I said

12  is basically entirely on those two statutes and their

13  regs.  I don't -- I don't go out and do anything

14  else.  And I -- well, I mean, it's changed over the

15  years.  I mean, most of it was counseling for a long

16  time.  I mean, all kinds of healthcare companies, how

17  to structure various arrangements to comply with the

18  two statutes.

19             And increasingly since -- since the

20  Affordable Care Act and the rise of False Claims Act

21  cases based on Stark and kickback violations, I do a

22  fair bit of consulting and -- and expert testimony

23  dealing with False Claims Act cases.  And so those

24  are the two pieces, consulting really and I then call

25  it litigation related.

1        Q    The litigation-related stuff, is that

2    expert work that you do?

3        A    I mean, it's mostly expert reports.

4    Sometimes it's brought in as a consulting attorney

5    given my specific expertise in these two areas.  And

6    sometimes it's a consulting -- sometimes it's an

7    attorney.  Sometimes it's a consulting expert.

8    Sometimes it's a testifying expert.

9        Q    Are you a litigator where you appear in

10   court to litigate?

11       A    I am not a litigator.

12       Q    Fair enough.

13            The breakdown of your work from

14   litigation related where it's consulting attorney or

15   expert work versus advising a client in a

16   non-litigation component?

17       A    I'm sorry.

18       Q    Yeah.  So trying to figure out the

19   percentage of your work that may be litigation

20   related, whether you're a consulting expert,

21   testifying expert or consulting attorney versus

22   private practice.

23       A    Yeah.  So it's -- I would say

24   historically, it's been 75 consulting, 25 -- I mean,

25   well, very little since I left in 2003.  Prior to I'd

1    say 2010, 2012, there was very little litigation

2    type.  There was some, but it was relatively small.

3    I'd say since then it's probably been on average

4    litigation related 25 to 33 percent.  And I think

5    maybe during COVID, it may have been more because

6    I've been tailing off my practice.  So that's --

7    that's easier to tail off than consulting is.

8         **Q    You've been tailing off your**

9    **(inaudible) --**

10        A    Tail off consulting than the

11   consultants -- I mean, clients want you immediately.

12        **Q    Understand.**

13             **So 25 to 33 percent on average was**

14   **litigation related either as --**

15        A    I'd say since over the last five years.

16        **Q    In your private practice, are you**

17   **creating compliance programs for companies?**

18        A    No, I do not.  I review them

19   occasionally.  I don't -- I don't create them.

20        **Q    Have you done any type of -- have you**

21   **created an Anti-Kickback Statute training program or**

22   **manual or slide presentation on how to comply with**

23   **the Anti-Kickback Statute or the Stark Act?**

24        A    No -- no, I mean, that's -- I do not --

25   I -- I do not do training.

1    Q    Okay.  So if you don't do training or

2    compliance, what type of advising do you do in your

3    private practice with respect to the Anti-Kickback

4    Statute and Stark?

5    A    Mainly structuring arrangements and

6    reviewing them to see if they raise Stark or kickback

7    issues.

8    Q    You provide opinions to companies on

9    whether or not an arrangement is compliant with or

10   violates Anti-Kickback Statute or Stark?

11   A    I provide opinions whether in my opinion

12   it does occasionally, yes.

13   Q    Okay.  Do you provide written opinions or

14   oral opinions or both?

15   A    I would say both.

16   Q    Rather than a compliance program, you're

17   reviewing particular arrangements and offering

18   advice, whether it's compliant or how to make it

19   compliant with the Anti-Kickback Statute or the Stark

20   Act?

21   A    Yes, I think that's -- that's a fair.  I

22   mean, going back to compliance, I mean, I did work on

23   the OIG's compliance guidances, so I have that much.

24   But I know enough there to know that I only can cover

25   a small part of it.

1        Q     Now, talk about your private practice.

2    So when you're looking at arrangements, have you ever

3    offered an opinion in your private practice related

4    to the arrangement of a long-term care pharmacy's

5    contract or contractual arrangement with a skilled

6    nursing facility, assisted living community in any

7    state?

8        A     Not that I recall.

9        Q     So none of your private practice work

10   relates to the factual predicate that brings us here

11   today.  Nothing similar of the long-term care

12   facility -- long-term care pharmacies relationship

13   with an assisted living community or a skilled

14   nursing facility?

15       A     Yes.  I have not had a prior engagement

16   that dealt specifically with this kind of an

17   arrangement.  Certainly in general sort of

18   arrangements involved assisted living facilities, not

19   so much long -- I mean, long-term care pharmacies I

20   can't recall.

21       Q     I thought the only other long-term care

22   pharmacy work you did was as a consulting attorney or

23   consulting expert in the Omnicare matter?

24       A     That's my recollection.

25       Q     And in your private practice -- have you

```
 1   done any work in your private practice for a

 2   long-term care facility since 2003?

 3         A    For a long-term care facility?

 4         Q    Long-term care pharmacy.  My apologies.

 5         A    Oh.  Not that I recall.

 6         Q    Since 2003, have you done work for a

 7   skilled nursing facility and evaluated Stark and

 8   Anti-Kickback Statutes arrangements for a skilled

 9   nursing facility?

10         A    Yes.

11         Q    Okay.  What is the name of the skilled

12   nursing facility?

13         A    I'm not sure.  I can't recall.  I've done

14   a lot of work for a lot of different skilled nursing

15   facilities and chains.  But none of them particularly

16   comes to mind.

17         Q    Do you recall the last skilled nursing

18   facility you did work for, just the name?

19         A    I can't.  I don't recall having done

20   anything in the last several years.

21         Q    Can you tell me approximately the last

22   time you did work for a skilled nursing facility?

23         A    I can't.

24         Q    Can you tell me if you've done work for a

25   congregate home, the term that you used for assisted
```

1    living personal care homes?  Have you advised a

2    congregate home on Stark law or Anti-Kickback

3    Statute?

4         A    I don't recall ever doing work on for --

5    for -- for congregate homes.

6         Q    Let me ask you to turn to paragraph five

7    in your report on page two.  Prior to your private

8    practice in 2003, you were chief of the industry

9    guidance branch of the office of counsel to the

10   inspector general for HHS from 1997 to 2003, correct?

11        A    Yes.

12        Q    And paragraph five you talk about some of

13   the work that you did?

14        A    Yes.

15        Q    And you were responsible for developing

16   the policies and procedures for issuing formal

17   guidance to the regulated community through advisory

18   opinions, fraud alerts and special bulletins,

19   compliance program guidance and regulations related

20   to the fraud and abuse statutes and regulations

21   enforced by OIG including the Anti-Kickback Statute,

22   correct?

23        A    Correct.

24        Q    So let's talk about those different types

25   of guidance.  All those things you list in paragraph

1    five are guidance, correct?

2        A    Yes, they're sub-regulatory guidance I'd

3    say.

4        Q    (Inaudible) forms of guidance that comes

5    from OIG and HHS and the federal government, correct?

6        A    I'm sorry, what -- the different forms?

7        Q    Yes, sir.

8        A    Yes.

9        Q    There's formal guidance which you've

10   identified, right?

11       A    Yes.  I mean I think there's no --

12   there's no term "formal guidance," but there are

13   certain types of guidances that historically the OIG

14   has put out.

15       Q    As you look at paragraph five, there are

16   formal guidance to the regulated community through

17   advisory opinions, right?  There's fraud alerts,

18   right?

19       A    Yes.

20       Q    There's special bulletins?

21       A    Yes.

22       Q    There's compliance program guidance?

23       A    Yes.

24       Q    There's regulations?

25       A    Yes.

1        Q     At times aren't there comments to the

2    regulations as well?

3        A     Well, yes.  When I use regulations, I

4    mean the entire regulatory process.

5        Q     Including the comments and the questions

6    and answers that relate to that as well?

7        A     Yes.

8        Q     Okay.  There's advisory opinions that are

9    issued at times?

10        A     Yes.

11        Q     There are safe harbor regulations?

12        A     Yes.

13        Q     There's occasionally settlements, right?

14    And the settlements --

15        A     Excuse me?

16        Q     Settlements.  False Claim Act,

17    Anti-Kickback statutes that provides guidance as

18    well?

19        A     Well, that's not formal guidance.

20        Q     It's informal guidance?

21        A     Yes.

22        Q     It's relevant to a company's termination

23    of whether or not to comply with the Anti-Kickback

24    Statute or the Stark Act to look at both formal

25    guidance and informal guidance, correct?

```
 1        A    Correct.
 2        Q    You can also ask for an advisory opinion,
 3   right?
 4        A    Yes.
 5        Q    You can get specific guidance if you have
 6   questions or concerns by seeking an advisory opinion
 7   as well?
 8        A    Maybe.
 9        Q    You may or may not get an answer, right,
10   but you can ask?
11        A    Excuse me?  Yes, you can ask.
12        Q    You can ask and you may or may not get an
13   answer in response, but you can ask for formal
14   guidance in respect to particular situations.  If you
15   have a concern, you'd send a letter and you'd get a
16   formal response, correct?
17        A    Yes.
18        Q    You've done that when you were there from
19   '97 to 2003.  You authored responses to inquiries
20   where people asked for guidance, and you provided
21   guidance in response, correct?
22        A    Sometimes.
23        Q    Are you aware in this case of whether
24   Guardian sought an advisory opinion at anytime
25   related to the relationship in this case?
```

1       A     I'm sorry, can you repeat the question?

2       Q     Are you aware of whether or not Guardian

3    sought an advisory opinion related to the

4    relationships at issue in this case?

5       A     No.

6       Q     Are you aware of any legal advice that

7    Guardian of Atlanta obtained related to their

8    Anti-Kickback Statute or Stark law liability related

9    to the arrangements in this case?

10      A     No.

11      Q     You, in your private practice, advise on

12   arrangements.  Companies contact you and you offer

13   assistance with helping them determine whether a

14   relationship is compliant, noncompliant, needs

15   changes to avoid Anti-Kickback Statute and Stark law

16   liability.

17            Do you have any knowledge or information

18   that Guardian of Atlanta did that in this situation?

19      A     I don't know.

20      Q     Do you have any knowledge or information

21   that Guardian of Atlanta consulted with in-house

22   counsel at Guardian Pharmacy regarding any aspect of

23   the relationship that you're opining about in your

24   report, Exhibit 387?

25      A     I don't recall.

1        Q    So in forming your opinion you're not

2    aware that any other lawyer, in-house or outside

3    counsel, offered any advice or opinions or analysis

4    of any of the relationships that you're opining about

5    in your report, Exhibit 387?

6        A    I'm not aware of anything.

7        Q    When you were at OIG and then you

8    authored several opinions -- I'm going to have

9    Mr. Miller put up 388.  Give it a second and then

10   we're going to refresh.

11       A    And we're going to try this and see.

12            (Whereupon, Exhibit No. 388 was marked

13        for identification by the court reporter.)

14   BY MR. CALLOW:

15       Q    We're going to make it work.

16            MR. RISSLER:  I think it's going to be

17        389, Joe.  I think 388 was the Exhibit C to

18        the report.

19            THE WITNESS:  This should get me back.

20        Okay.  Is there another exhibit coming up?

21            MR. CALLOW:  Yes, sir.  It should be

22        Exhibit 389.

23            THE WITNESS:  Okay.

24            MR. CALLOW:  It should be a document

25        dated July 1st, 19- --

```
 1              THE WITNESS:  Yeah, it's up.

 2              (Whereupon, Exhibit No. 389 was marked

 3         for identification by the court reporter.)

 4  BY MR. CALLOW:

 5         Q    So this is a document dated July 1st,

 6  1997.  I believe it's a document that you authored as

 7  chief of industry guidance branch.

 8         A    Yes.

 9         Q    Can you take a moment to review it?  I'm

10  going to ask you some questions with respect to it.

11         A    (Witness complies with request of

12  counsel.)  Yes, I reviewed it.

13         Q    Do you recall this guidance?

14         A    Sort of.

15         Q    This guidance that you authored or you

16  signed?

17         A    Yes.  Yes, I wrote it.

18         Q    And this would be industry guidance,

19  right?  This is one of the guidance documents we

20  talked about as referenced in paragraph five.

21         A    Well, I mean, it's something that comes

22  out of the government, so you look at it.  It's

23  clearly not -- I mean, it's very informal.

24         Q    Understand.  Some company sends a letter

25  concerning the provision of free goods and services
```

1   including a legal opinion as to whether the provision

2   of a free fax machine, the provision of consultant

3   pharmacist for free or at a reduced rate and the

4   provision of gifts to pharmacies to current or

5   prospective nursing home customers implicates

6   Medicare and Medicaid Anti-Kickback Statute, right?

7        A    Yes.

8        Q    And as I read this advisory note, there

9   was a point in the preamble that if a computer can

10  only be used for particular purpose, it has no

11  independent value, then perhaps that computer --

12  providing that computer would not trigger the

13  Anti-Kickback Statute or Stark Act, correct?

14       A    Correct.

15       Q    In contrast, sometimes the computer that

16  is given away is a regular personal computer which

17  the physician is free to use for a variety of

18  purposes in addition to receiving test results.  In

19  that situation, the computer has a definite value to

20  the physician and depending on the circumstances may

21  well constitute an illegal inducement, correct?

22       A    Yes, that's what the letter says.

23       Q    So providing a free computer that can be

24  used for the services provided and some other service

25  would be an inducement under the Anti-Kickback

1   Statute?

2        A    No, not necessarily.

3        Q    Can it be?

4        A    Almost anything can be.

5        Q    Okay.  So when I read in contrast, the

6   computer that is given away where the physician is

7   able to use it for other purposes in addition to

8   receiving test results, may well be an illegal

9   inducement; is that right?

10       A    You read it correctly.

11       Q    You note that you can discern no reason

12  why any different analysis would apply to the

13  question of fax machines, consulting services or

14  gifts given to referral services either for free or

15  at a cost below fair market value where the intent of

16  the parties is to induce or encourage the referral of

17  federal program business, the statute would appear to

18  be violated by such a practice; is that correct?

19       A    I think that's an incorrect statement of

20  law, but it's correct what's written.

21       Q    What do you mean it's an incorrect

22  statement of law but it's correct what's written?

23       A    Well, you read it correctly.  That's what

24  it says.  But that's not an accurate statement of the

25  law.

1    Q    So where the intent of the parties is to
2  induce or encourage the referral of federal program
3  business the statute would appear to be violated by
4  such a practice.  I read that correctly, but you
5  don't believe that's the law?
6    A    No.
7    Q    What's wrong and why is that not the law
8  in your July 1, 1997, OIG advisory opinion?
9    A    I think encouragement is -- is allowed.
10 Inducement is not.  So I think I would just strike
11 the "or encourage."
12   Q    So where the intent of the parties is to
13 induce the referral of federal program business the
14 statute would appear to be violated by such practice?
15   A    Would appear to be assuming one could
16 prove each of those facts.
17   Q    So providing free goods and services,
18 providing free fax machines, the provision of
19 consultant pharmacists for free or reduced rates or
20 providing gifts to induce the referral of a federal
21 program business would appear to be a violation of
22 the act?
23   A    Providing it's nursing homes, yeah, I
24 mean that would be -- that would appear to be.
25   Q    Is it limited to nursing homes, or can it

 1    be any assisted living facility?

 2         A    Well, I think --

 3              MR. RISSLER:  Object to the form.

 4              THE WITNESS:  I think every -- every

 5         case has to -- depends on its own facts and

 6         circumstances.

 7    BY MR. CALLOW:

 8         Q    Is this advisory limited solely to

 9    nursing homes?

10         A    Well, the advisory isn't worth -- it's

11    limited to whom it was sent.  And it specifically

12    references what someone alleged occurred and accepted

13    it as fact.

14         Q    Is it your understanding that this would

15    not apply to situations outside a nursing home

16    context?

17         A    Well, I think it would have to be

18    analyzed on the facts and circumstances that are

19    presented.  That's true of every kickback case.

20         Q    Where the intent of the parties is to

21    induce a referral, the statute's violated whether

22    it's a nursing home, assisted living community,

23    retail, whatever it is, that's the standard?

24         A    Well, if someone is giving somebody

25    something for free and it's obviously for free with

1    the intent to cause them to refer, that's -- that's

2    sort of a classic kickback.  That certainly sounds

3    like a violation, but only a jury can figure it out.

4         **Q    I'm sorry?**

5         A    Only a jury can figure it out.

6         **Q    Free or discounted or reduced rate,**

7    **right, either/or?**

8         A    And let me clarify.  There's -- let me --

9         **Q    Go ahead.**

10        A    Also another problem with the statement

11   of the law in that last sentence, it does not include

12   knowingly and willingly -- knowingly and willfully.

13        **Q    Understand.**

14        A    (Inaudible) has to be proven.

15             THE COURT REPORTER:  Can you give me

16        one second, please?  Can we go off the

17        record?  This is the Court Reporter.

18             THE VIDEOGRAPHER:  The time is

19        10:44 a.m.  We're now off the record.

20             (Whereupon, the video camera was

21        turned off.)

22             (Whereupon, a brief recess was taken.)

23             (Whereupon, the video camera was

24        turned on.)

25             THE VIDEOGRAPHER:  The time is

1      10:49 a.m.  We're back on the record.

2   BY MR. CALLOW:

3      Q    Mr. McAnaney, can you hear me okay?

4      A    Yes.

5      Q    Great.  I'm going to have Mr. Miller put

6   up Exhibit 390.  It's another exhibit.

7           (Whereupon, Exhibit No. 390 was marked

8       for identification by the court reporter.)

9   BY MR. CALLOW:

10     Q    You have it up?

11     A    Not yet.

12     Q    Okay.  Take your time and refresh.  390

13  should be a two-page --

14     A    Okay.

15     Q    October 2nd, 1997.

16     A    Yes.

17     Q    Okay.  This is an October 2nd, 1997,

18  guidance letter that also bears your signature.  If

19  you could take a moment to review this, I'd like to

20  ask you some questions with respect to it.

21     A    (Witness complies with request of

22  counsel.)  Yes, I reviewed it.

23     Q    Can you identify this document?

24     A    It's another informal letter that OIG

25  posted on its website.

1      Q    Letter that you authored?

2      A    Yes.

3      Q    And this is another company seeking

4  advice, and this is the response of OIG, correct?

5      A    Well, it's my response.

6      Q    Okay.

7      A    It's not -- it's not official.

8      Q    Okay.  It's your response?

9      A    Yes.

10     Q    It's not the official position of OIG?

11     A    Well, it has no -- I mean, it has no --

12  it has no precedential value.  It's -- it's my

13  opinion.

14     Q    So guidances don't have precedential

15  value?

16     A    Well, I -- well, actually no, they

17  have -- I mean, under the law, they have no value at

18  all.  It's sub-regulatory guidance.  The Justice

19  Department has said in the last administration you

20  couldn't even cite it in court.  So, I mean, I

21  don't -- but, I mean, it is what it is.  It certainly

22  shows you -- I mean, gives you a prosecutorial view

23  of the scope of the law.

24     Q    Well, paragraph five of your report talks

25  about guidance and you refer to guidance throughout

1   your report as part of the bases for your opinions.

2   Guidance matter or not?

3          A     Well, some matter more.  As I said,

4   this -- this is just a letter from me.  Other things,

5   some of them go through notice and comment rule

6   making.  Others go through review internally and have

7   to be so -- advisory opinions, for example, are

8   reviewed not only by OIG but by CMS and the Justice

9   Department Criminal and Civil Divisions.

10              So obviously, some have more weight

11   than -- I mean, in terms of counseling a client, some

12   are -- there is somewhat of a hierarchy.

13          Q     Okay.  Let's look at 390 and page two of

14   the guidance that you authored.  I see the third

15   paragraph from the bottom starts the provision of

16   services.  Do you see that?

17          A     Yes.

18          Q     The provision of services that the

19   recipient would otherwise be obligated to provide for

20   free or at less than fair market value confers a

21   benefit on the recipient.  This benefit may

22   constitute prohibitive remuneration under the

23   Anti-Kickback Statute.  If one purpose of the

24   remuneration is to secure referrals of federal

25   program business.  Under the circumstances described

1    in your letter, a strong inference is that the

2    clinical laboratories are being asked to provide the

3    free chart review and section called services in

4    exchange for referrals of the nursing home's

5    laboratory business including services payable in

6    whole or in part by a federal program.  We would view

7    such arrangement as highly suspect.

8              Is that what you wrote?

9        A    Yes, that's what I wrote.

10       Q    Is that accurate?

11       A    Well, again, it's -- it's not quite -- it

12   illuminates -- it doesn't mention that it has to be

13   done knowingly and willfully.  But yes, I think

14   it's -- it would be a suspect arrangement.

15              (Whereupon, Exhibit No. 391 was marked

16         for identification by the court reporter.)

17   BY MR. CALLOW:

18       Q    Let me ask Mr. Miller to put up 391.

19   Tell me when you have that up, sir.  391 should be an

20   office of inspector general special fraud alert with

21   a date of March 1998.

22       A    Yes, I've got it up.

23       Q    Are you familiar with this document?

24       A    Yes.

25       Q    And is this guidance from the OIG?

USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.
Kevin McAnaney on 06/14/2022                                    Page 57

1          A    I'm sorry?

2          Q    Is this guidance from OIG?

3          A    Yes.

4          Q    This is dated March of 1998, correct?

5          A    Yes.

6          Q    Now, did you have any involvement with

7     respect to this guidance, Exhibit 391?

8          A    Yes.

9          Q    And what role or involvement did you have

10    as chief of industry guidance branch with respect to

11    this special fraud alert, Exhibit 391?

12         A    I probably was the -- was the principal

13    drafter.

14         Q    Of the special fraud alert?

15         A    Yes.

16         Q    Okay.  Flipping over to page four of this

17    alert you listed specific practices which are

18    suspected kickbacks, right?

19         A    Yes.

20         Q    And on page four, the first bullet point

21    of suspected kickback practices is a hospice offering

22    free goods or goods at below fair market value to

23    induce a nursing home to refer patients to the

24    hospice, correct?

25         A    Correct.

```
 1        Q    Fourth bullet point was a hospice paying
 2   above fair market value for additional noncore
 3   services which Medicaid does not consider to be
 4   included in its room and board payments to a nursing
 5   home, correct?
 6        A    I'm sorry, which -- which --
 7        Q    Guidance.
 8        A    What was that?
 9        Q    Fourth diamond, sir.
10        A    Oh, yes.  That's what it says.
11        Q    Fifth bullet point is a hospice referring
12   its patients to a nursing home to induce the nursing
13   home to refer its patients to the hospice, correct?
14        A    Yes.
15        Q    And these were all situations that you
16   identified as suspected kickback practices, correct?
17        A    Yes.
18        Q    Where does this special fraud alert fall
19   on that hierarchy of guidance that you talked about?
20        A    Well, I mean, I think it's -- it's -- as
21   I said, it's a prosecutor's view of the range -- on
22   the range of the statute, so it's something that you
23   would look at.  A special -- a fraud alert would have
24   gone through -- I think it would have gone -- it was
25   probably reviewed by OIG and Justice and OIG's Office
```

1    of Investigations typically.

2         Q    That would be higher up on the hierarchy?

3         A    Yes.  Although even DHS, the departmental

4    appeals board has said it's not entitled to any legal

5    weight in the proceeding, even an administrative

6    proceeding at HHS.  It's -- it's sub-regulatory

7    guidance.

8         Q    Does it provide notice to the industry?

9         A    I mean, the government alleges.  They

10   always say it does.

11        Q    Okay.

12        A    That's their position.

13        Q    Fair enough.

14             (Whereupon, Exhibit No. 392 was marked

15             for identification by the court reporter.)

16   BY MR. CALLOW:

17        Q    Let me ask you to look at 392, sir.  This

18   is another document that Mr. Miller is going to put

19   up on the screen.  This should be a reference to the

20   Federal Register, September 30, 2008.

21        A    Yes, I see it.  Let me --

22        Q    On the hierarchy this is the top, right?

23   This is notice, comment, regulation.  This is the top

24   of the hierarchy, isn't it?

25        A    No, I wouldn't say so.  This is just a

 1    notice of a government document.  It's not -- but, I

 2    mean, it's -- I mean, it's obviously -- again, it's

 3    important guidance.  It's not rule making.

 4        **Q    It's gone -- this has gone through**

 5    **various reviews by various people in different**

 6    **branches?**

 7        A    Yes.  I mean, I -- I would -- I believe

 8    this would have been reviewed by -- well, OIG, CMS,

 9    HHS, and I'm sure it was run by the justice

10    Department.

11        **Q    All of which would have --**

12        A    Criminal division.

13        **Q    All of which would have reviewed it prior**

14    **to September 30th of 2008, correct?**

15        A    Let me just look.  I think so.

16        **Q    You see Department of Health and Human**

17    **Services, Office of Inspector General, OIG**

18    **supplemental guidance -- (inaudible) program guidance**

19    **for nursing facilities, agency OIG HHS action notice,**

20    **correct?**

21        A    Yes.

22        **Q    Did you review this in forming the**

23    **opinions in this case?**

24        A    I'm aware of it.  I mean, I know the

25    guidance.

```
 1        Q    Okay.  Did you rely upon it or cite to it
 2   in your report?
 3        A    Not that I recall.
 4        Q    Okay.  Let me ask you to turn over to
 5   what's 56837.  Scroll down.
 6        A    56837?
 7        Q    Yes, sir.  Then at that far right column.
 8        A    Yes, okay.
 9        Q    Far right column, you'll see three period
10   medication management in the far right.
11        A    Yes.
12        Q    And then further down in that column, the
13   third paragraph starts:  CMS regulations require that
14   nursing facilities employ or obtain the services of a
15   licensed pharmacist to provide consultation on all
16   aspects of the provision of pharmacy services in the
17   facility.
18             Do you see that?
19        A    Yes.
20        Q    That continues over on to the following
21   page.  And further in that paragraph, there's a
22   statement:  Some of the consultant pharmacists
23   obtained by nursing facilities are employed by
24   long-term care pharmacies that furnish drugs and
25   supplies to nursing facilities.
```

1          Do you see that?

2      A    Yes.

3      Q    Then there's a reference to footnote 53

4  which is at the bottom of that first column.  53

5  notes:  Nursing facilities that receive consultant

6  pharmacist services under contract with the long-term

7  care pharmacy should be mindful that the provision or

8  receipt of free services or services at non-fair

9  market value rates between actual or potential

10 referral sources present a heightened risk of fraud

11 and abuse.  For further discussion of Anti-Kickback

12 Statute service arrangements, see section 3C-1 and

13 3C-2.

14         Do you see that?

15     A    Yes.

16     Q    That's a specific reference to a

17 long-term care pharmacy and concerns with providing

18 consulting services at free or non-fair market value

19 rates, correct?

20     A    Yes.  That applies to long-term care

21 facilities as -- in federal regulations.

22              (Whereupon, Exhibit No. 393 was marked

23         for identification by the court reporter.)

24 BY MR. CALLOW:

25     Q    Ask Mr. Miller to put up Exhibit 393.

```
 1   You can refresh your screen.  It should be another
 2   Office of Inspector General guidance, which is OIG
 3   opinion No. 1219.
 4        A    393.
 5        Q    Yes, sir, 393.
 6        A    (Witness complies with request of
 7   counsel.)  Yes.
 8        Q    Are you familiar with this OIG advisory
 9   opinion No. 1219?
10        A    Yes.
11        Q    Can you tell me what this is?
12        A    It's an advisory opinion.  It was issued
13   by OIG in 2012 addressing proposed arrangement
14   between a pharmacy company and community homes.
15        Q    Where does this advisory opinion rank on
16   that hierarchy that you discussed earlier?
17        A    Well, I mean, I think it's all of them
18   legally are the same.  They're all -- I think this
19   one is with respect to the case here, this is -- this
20   is particularly relevant because it actually deals
21   with assisted living facilities as opposed to
22   long-term care nursing homes and skilled nursing
23   facilities which most of the rest apply to.
24        Q    So this one unfortunately doesn't have
25   Bates numbers, but I'd like you to look over at
```

 1   proposed arrangement A.  You know what, we're going
 2   to put that aside.  Forget about that for the time
 3   being.  Let me go back to your report, sir, which is
 4   the first exhibit.  So take a second to get that
 5   back.
 6        A    Let me see.
 7        Q    Take your time.
 8        A    I've got all these things down on my
 9   screen, but I'm not sure.
10        Q    Mr. Rissler is right.  You should have
11   tabs at the bottom where you can --
12        A    Yeah, I know.  I can get them but I think
13   I -- for some reason I didn't have the report.  So
14   let me just go bring it up again.
15        Q    No rush.  We're good.
16        A    Let me -- let me.  Okay.  Okay.  Okay.
17   I've got my report up.
18        Q    All right.  Let's go to paragraph three,
19   which is on page one.
20        A    Yes.
21        Q    Okay.  So paragraph three, Guardian asked
22   me to opine on the provisions of certain items and
23   services provided in assisted living communities and
24   personal care homes together congregate homes or CHs
25   where Guardian's clients resided and which were used

```
 1    in Guardian's provision of long-term care pharmacy
 2    services to such clients, correct?
 3        A    Correct.
 4        Q    And you combined ALCs and PCHs as
 5    congregate homes.
 6             Have you used that term before?
 7        A    I'm sorry, I didn't catch that.
 8        Q    You combined assisted living facilities
 9    and personal care homes to call them congregate
10    homes.  I've not seen that terminology before.
11             Where do you get that terminology
12    congregate from?
13        A    I was just thinking some homes to that --
14    was covered both and excluded nursing facilities.
15        Q    Okay.  So this is a definition you
16    created for the report.  This isn't a statute or a
17    regulation or a rule or anything?
18        A    No, not that I recall.
19        Q    Okay.  There's no advisory, there's no
20    rule, there's no regulation.  There's nothing that
21    talks about congregate homes.  You've combined two
22    and tried to exclude another and called them
23    congregate homes for your report?
24        A    That's -- I mean, that's correct.
25        Q    And you're excluding skilled nursing
```

1  facilities from your definition of congregate homes?

2      A    Yes, nursing facilities, nursing homes

3  and skilled nursing facilities.

4      Q    Why are skilled nursing facilities or

5  skilled nursing homes different than assisted living

6  communities?

7      A    Well, (inaudible) different.  I don't

8  presume to count them all, but, I mean, probably one

9  of the most important is that they don't receive

10  federal reimbursement for their care.  So the

11  congregate care is living or basically custodial

12  facilities, whereas skilled nursing facilities or

13  nursing facility, nursing homes are -- also provide

14  and required to provide a lot of medical care under

15  the Medicaid program.  So, I mean, that's basic.

16  There's no federal reimbursement for the custodial

17  care at congregate homes.

18      Q    Fair enough.  Your paragraph A under

19  three, whether the alleged conduct of Guardian with

20  respect to its services to or the applicant's client

21  and congregate homes has indicia of unlawful conduct

22  identified by the OIG and guidance is intended to be

23  prohibited by the AKS or other indicia of illegality

24  commonly looked at -- commonly looked to by

25  regulators and experienced healthcare counsel.

1              Did I read that close to correctly, I
2    think?

3        A    Yes.

4        Q    I see this by regulators and experienced
5    healthcare counsel throughout your report.  That's
6    your focus in this report?

7        A    Yes.

8        Q    And you're looking at what regulators or
9    experienced healthcare counsel would review these
10   arrangements?

11       A    I'm sorry, I missed the very end.

12       Q    Your opinions are based on what
13   regulators and experienced healthcare counsel would
14   review these arrangements, correct?

15       A    How they would review and analyze these
16   arrangements, yes.

17       Q    And that's the language and standard I
18   see throughout your 34-page report, correct?

19            MR. CALLOW:  Lost you.

20            THE COURT REPORTER:  He's frozen.

21            THE WITNESS:  My Internet is unstable.

22            MR. CALLOW:  Okay.

23            THE WITNESS:  I'm sorry.

24   BY MR. CALLOW:

25       Q    That's all right.  That's the language

1    and standard I see throughout your 34-page report,

2    this regulators and experienced healthcare counsel

3    standard, correct?

4        A    I believe so.

5        Q    Okay.  Now, I understand quarterly

6    consulting.  I see professional education and skills

7    checks.  I see the eMARs and laptops and I see the

8    medication carts.  So I understand B, C, D and E.

9    But are you looking at any other services in A that

10   are different from B, C, D and E?

11       A    I don't believe so.  I think it was meant

12   to look at them all generally and then specific one

13   by one take them.

14       Q    Okay.  And these are services provided to

15   the assisted living communities and the personal care

16   homes and their residents by Guardian of Atlanta,

17   correct?

18       A    I believe these are the -- these are the

19   services that are alleged by the Relator to violate

20   the Anti-Kickback Statute.  I believe that that's all

21   of them.

22       Q    And that's why your opinions talk about

23   as intended to be prohibited by the Anti-Kickback

24   Statute for A, B, C, D and E, correct?

25       A    Correct.

1    Q    Now, I understand your difference of
2  congregate homes versus skilled nursing facilities
3  and federal reimbursement.  Is the standard for
4  Anti-Kickback Statute liability different for a
5  congregate home versus a skilled nursing facility?
6    A    I mean, the statutory -- I mean, the
7  elements of a violation are the same for both.  The
8  facts and circumstances differ obviously in every
9  case.
10    Q    Understand.  Let me ask you to turn over
11  to paragraph 12.  This is the start of the summary of
12  your opinions?
13    A    Yes.
14    Q    First bullet point you list and then the
15  second bullet point with respect to the specific
16  items and services, you then identify your opinions
17  and talk about at a separate charge or Guardian's
18  charging practices in the four sub-bullet points
19  below that.  Do you see where I am?
20    A    Yes.
21    Q    So the sub-bullet points:  Guardian's
22  provision of quarterly consulting services, including
23  medication reviews and cart audits, for the benefit
24  of its clients without a separate charge to the CHs
25  in which its clients resided, did not have the

1    indicia of unlawful conduct identified by the OIG in

2    guidance as intended to be prohibited by the AKS or

3    other indicia of illegality commonly looked to by

4    regulators and experienced healthcare counsel,

5    correct?

6         A    Correct.

7         Q    So I note here that you say without a

8    separate charge to the CHs for the quarterly

9    consulting services.  Do you see that?

10        A    Yes.

11        Q    Is it your understanding that none of the

12   congregate homes as you defined them paid for

13   quarterly consulting services?

14        A    My recollection is that at least one did.

15   I think there's -- that there was some testimony.  I

16   think some may have.

17        Q    There are multiple contracts and multiple

18   situations where the congregate homes did not pay for

19   the quarterly consultants, correct?

20        A    Where there was no separate charge to the

21   facilities, yes.

22        Q    So when you say without a separate charge

23   to the congregate homes in which its clients resided,

24   is it your understanding that the client's fee for

25   the quarterly consulting services that are the

1  subject of that particular bullet point in your

2  opinion?

3       A    It is -- it is my opinion that the

4  services encompassed by the quarterly consulting

5  services, if that's what we're calling -- were

6  covered by a combination of the dispensing fee and

7  the service fee that were paid by the residents.

8       Q    Your understanding is that the quarterly

9  consulting services -- that Guardian received payment

10  for the quarterly consulting services from both the

11  dispensing fee and a service fee to the residents?

12       A    Some combination.  I mean, between the

13  two of them the services were paid in full.

14       Q    Let me back up.  I should -- I should be

15  more clear.  Your understanding is that Guardian

16  received a payment for the quarterly consulting

17  services partially from the dispensing fee paid by

18  Medicare and partially from monies received from the

19  Medicare beneficiary the resident (inaudible); is

20  that correct?

21       A    My -- my view is that Guardian -- the

22  costs of the quarterly consulting services were

23  covered in full between the dispensing fee that was

24  received and by the residents monthly service fees.

25       Q    And did you do any analysis of what

1    portion of the quarterly consulting was covered by

2    the dispensing fee and which portion was covered by

3    the monthly service fee?

4         A    I did not, although I reviewed the expert

5    report of one of the accountants that showed it

6    was -- it would the have been paid in full by the

7    service fee, and also Mr. Zavalishin said it would

8    have been paid by the dispensing fee.  So between the

9    two of them, I think it was more than covered.

10        Q    So is it your understanding that Guardian

11   intended to receive payment for its costs of the

12   quarterly consulting services identified in your

13   report from both the dispensing fee and the monthly

14   service fee in the 2014 to 2019 timeframe?

15        A    I think it was Guardian's understanding

16   during that time that between the -- between the

17   dispensing fee and the service fee, those costs were

18   being paid for.

19        Q    And you understand it's a monthly service

20   fee to the residents?

21        A    I believe it was a monthly service fee to

22   the residents.

23        Q    Did you see any contract with the

24   residents to understand what that fee was or covered?

25        A    No.  I've seen the -- I've seen the

1    contract with the residents.  It is pretty vague.

2         Q    You've seen the contracts between

3    Guardian of Atlanta and the communities.  You've not

4    seen any contracts between Guardian and a resident;

5    is that right?

6         A    No, that's not right.  I have at least

7    seen a copy of some.  Whether I got it specifically

8    or whether it was in an exhibit in the depositions,

9    but I have reviewed -- I have reviewed the -- what I

10   think is a contract between Guardian and a resident.

11   I think it was a form.  It did not have a specific

12   patient.

13        Q    In that form, there was a reference to a

14   monthly service fee?

15        A    No, there's a reference to charges.

16        Q    Okay.  Did you see a contract or a

17   document that specifically identified a, quote,

18   monthly service fee, closed quote, that Guardian

19   charged its residents at any of the communities?

20        A    I think I've only seen that contract.  I

21   hadn't seen anything else.

22        Q    One that says charges generally but

23   nothing more specific?

24        A    Yeah.  I think it basically says you got

25   to pay the monthly statement at the end of the month,

1   anything that's on there and not covered by

2   insurance.

3        Q    But what those charges are called or how

4   they're described or what they're defined in that

5   agreement between Guardian and the resident you don't

6   know?

7        A    Well, I know that -- I mean, Guardian

8   understood it covered their cost of providing

9   services to the residents.

10       Q    I understand.

11            But do you know how that charge was

12  defined or identified or represented to the resident

13  in the agreement?

14       A    I -- I do not.

15       Q    So if there is a monthly service fee, you

16  don't have any knowledge as you testify here today

17  how that monthly service fee was described or how it

18  was defined or how it was represented to the

19  resident?

20       A    Beyond that, it was for services being

21  provided, no.

22       Q    Similar for an eMAR charge or any other

23  charge or fee that Guardian provided to the resident,

24  you don't have any knowledge of how that term was

25  defined or represented or identified in any agreement

1    between Guardian and its residents as you testify

2    here today?

3         A    I don't have any -- I don't recall seeing

4    anything on how it was presented to the patients.

5    And there's certainly testimony by people at Guardian

6    that they understood it included payment for their

7    services.

8         Q    I understand what Guardian thought.  Do

9    you have any knowledge of what the resident thought

10   or believed based upon the language of the contract

11   or representation or information provided to the

12   resident?

13        A    I do not beyond they were paying a

14   service fee every month.

15        Q    Do you recall that Mr. Hopp testified in

16   his second deposition that the quarterly consulting

17   services were covered by the dispensing fee?

18        A    Yes, I recall that testimony.

19        Q    Do you believe there's a Guardian witness

20   who testified that the quarterly consulting services

21   were paid for by the monthly service fee?

22        A    I -- I -- I believe Mr. Hopp testified to

23   that as well.  I mean, if the testimony was a bit

24   confusing and back and forth, but I think he -- some

25   of it they discussed it being a bundled fee.

1      Q      So you believe Mr. Hopp knowingly and

2   intentionally sought to recover quarterly consulting

3   service costs from both the dispensing fee and the

4   monthly service fee based on his testimony?

5      A      I don't believe there's any evidence that

6   Mr. Hopp thought he was getting paid twice.  He was

7   saying between the two they covered the costs.

8      Q      Well, he must have known he was getting

9   paid from both sources to cover his costs, correct?

10     A      Well, he knew he was getting payment from

11  both sources for some costs.

12     Q      So for the --

13     A      I don't think he necessarily thought they

14  were being paid for the same services.

15     Q      Is there any doubt in your mind having

16  read his deposition testimony that Mr. Hopp knew that

17  the dispensing fee covered quarterly consulting

18  services and that he was also being paid for those

19  quarterly consulting services from charges to

20  residents at the same time?  Any doubt about that

21  from your reading of his testimony?

22     A      I did not read -- I do not recall the

23  deposition testimony being to that effect nor do I

24  particularly think it was very clear.

25     Q      Well, is it clear that Guardian is

1   receiving payment for the quarterly consulting

2   services from both the dispensing fee and the monthly

3   service fee charged to residents?

4        A    It is -- I do not believe that -- that

5   necessarily that there's anything that they were both

6   covering exactly the same services.  There were a

7   number of services being provided during the

8   quarterly consulting fee, and I think it's perfectly

9   understandable that some might be covered by one and

10  some might be covered by the service fee.

11       Q    So your testimony is that the quarterly

12  consulting services that you've identified in your

13  report in this particular paragraph 12 and

14  throughout, some of those services are covered by the

15  dispensing fee, and some of those services are

16  covered by the monthly service fee?

17       A    My testimony is that between the two

18  payments from the dispensing fee and the service fee

19  all the costs of the quarterly medical reviews were

20  covered and then some.

21       Q    And did Guardian know that at the time

22  from 2014 to 2019?

23       A    I believe that's what Guardian's

24  understanding was.

25       Q    The second bullet point says that you

1  **talk about the charging practices for the**

2  **professional education and skills checks.  Do you see**

3  **that?**

4       A    Let me go back.  A split screen would be

5  great.  Okay.  Now, I'm -- yes, I'm on that bullet.

6       **Q    So what do you understand the charging**

7  **practices to be for professional education and skills**

8  **checks?**

9       A    Well, my understanding is that they

10 generally charge for both, that the education was, I

11 think, usually $50 per eight-hour session.  And proxy

12 care I think was one day.  Certified medication

13 system was two days.  And then for the skills check

14 it was I think a flat amount for the CMA.  It seems

15 to me, I think, 125, and for the proxy caregiver, it

16 was on an hourly basis that it took to do it.  So

17 that I think was the -- was the general fee schedule.

18 I mean, sort of -- that was the most common fee that

19 they charged generally.

20           And then I think that in particular,

21 there were two -- well, three practices that were

22 alleged to be improper.  One was free attendance by

23 members of the host community.  The host community

24 for before Guardian had their own classroom that had

25 a host -- and the host community could send a certain

1    number of people free.  New -- new customers to

2    Guardian and newly licensed ALCs could send up to ten

3    attendees.  And then skills checks if they were

4    performed during a quarterly -- during a regular

5    quarterly consulting service was at no charge for up

6    to two people.

7         **Q     The standard of practices existed up**

8    **until 2018 when they were changed, correct?**

9         A     That's my understanding that in -- yes,

10   in January of 2018, I think that they -- they started

11   charging everyone both for the -- the education and

12   for the skills checks.

13        **Q     So that we're in agreement, we're on the**

14   **same page, prior to January of 2018, Guardian would**

15   **conduct training classes at various communities and**

16   **allow those communities to send up to two or three**

17   **people to attend for free; is that correct?**

18        A     I'm not sure if it's prior to 2018.  I

19   mean, it was prior to when they got their own

20   facility for doing it, and sometime between 2014 and

21   some date it was done.

22        **Q     And whoever the host community was sent**

23   **two or three people and did not pay the $50 or $100**

24   **charge for whatever class was provided?**

25        A     The arrangement was that they provided

1   the space and the chairs and I think light

2   refreshments and maybe a -- maybe a continental

3   breakfast or something like that.

4        Q    But the communities did not pay either

5   the $50 a day or $100 for the two-day session for the

6   two to three people that attended?

7        A    That's correct.  The arrangement was they

8   provided the facility, and we'll give you a couple as

9   a quid pro quo.

10       Q    Prior to 2018, new communities -- various

11  communities that signed on with Guardian got to send

12  up to ten people to this class without charge or

13  payment of $50 a day, $100 for a two-day event,

14  correct?

15       A    Yeah, I believe that was the general --

16  that was certainly what was Lori Newcomb's

17  understanding.

18       Q    And did you review the signup sheets for

19  those classes?

20       A    Only insofar as they were exhibits to

21  depositions.

22       Q    Did you go back and see how many

23  different communities got free classes under that

24  arrangement with Guardian and Ms. Newcomb prior to

25  January of 2018?

1        A    No, I did not.

2        Q    **Whatever the arrangement was the**

3   **communities didn't have to pay for that training**

4   **in -- prior to January 2018.**

5        A    I'm sorry, was there a question?

6        Q    **Communities did not have to pay for that**

7   **training for the individuals that they sent to that**

8   **class prior to 2018, correct?**

9             MR. RISSLER:  Object to form.

10       A    Prior to -- I mean, while that policy was

11  in effect, there was a -- call it an introductory

12  discount that you could send them for free the first

13  ten.

14  BY MR. CALLOW:

15       Q    **And is there not a value to saving a**

16  **hundred dollars times ten in the 2014, '15, '16, '17**

17  **timeframe?  Is there no value to the community in**

18  **saving a hundred to a thousand bucks without having**

19  **to pay for training?**

20       A    Well, it's a common discount practice so

21  it's -- I don't -- I mean, yes, it's a value that

22  you're getting something, but it's a very common --

23  it's a common discount arrangement.

24       Q    **We agree it has value to the community**

25  **not to pay a hundred, two hundred, a thousand dollars**

1  to train its staff to be compliant with the Georgia

2  rules?

3      A    It was a discount.  It was clearly a

4  discount.

5      Q    **That had value?**

6      A    (Inaudible).

7      Q    **Right?**

8      A    Excuse me?

9      Q    **It had value to the community, did it**

10 **not?**

11     A    Yes, I mean --

12     Q    **Skills checks that were provided prior to**

13 **January of 2018, my understanding is that if Guardian**

14 **was already at the facility doing other work, it**

15 **would provide up to two skills checks for free**

16 **without charging them 125 for one or 250 for two; is**

17 **this correct?**

18     A    That's correct.

19     Q    **That was up until 2018 as well, correct?**

20     A    Correct.

21     Q    **Does not paying $125 or $255 [sic] for a**

22 **skills check required by Georgia regulation at least**

23 **provide some value to the community?**

24     A    Well, I mean, it was part of the

25 arrangement.  So yes, I mean, that was the price they

1  agreed on.

2      **Q    Well, they didn't have to pay the 125 or**

3  **250 if it was provided as part of some other service.**

4  **They got the skills check for free, right?**

5      A    Well, the arrangement was a skills check

6  is you can pay for this, if you do it at the same

7  time, you don't.  It's not necessarily for free.

8  That's the arrangement.

9      **Q    Well, what else was paid for at the time**

10  **in your review of the documents and information?**

11      A    Well, any other services that were being

12  covered by -- being provided by -- by Guardian,

13  education.

14      **Q    So if the community was paying a hundred**

15  **bucks, two hundred bucks, a thousand bucks, whatever**

16  **the other services were, Guardian would give them the**

17  **value of $125 or $250 for free incidental to the**

18  **other charges they were paying during that visit,**

19  **correct?**

20      A    It's a discount, yes.  Yes, it was an

21  arrangement.  So you do these, and if you get this --

22  these are -- these are not without charge.  So it's a

23  discounted service.

24      **Q    Well, how is that not below market rate**

25  **if it's for free and incidental to something else,**

1    sir?  How is that not -- how is that not a

2    problematic relationship?

3         A    Because --

4              MR. RISSLER:  Object to form.

5         A    Because the kickback statute does not --

6    the kickback statute does not criminalize discounts.

7    BY MR. CALLOW:

8         Q    So your opinion is that giving the $125

9    skills check or $255 [sic] skills check for two

10   people is a discounted service, not a free service if

11   it's incidental to some other payment?

12        A    I think it could be, yes.

13        Q    Well, could be.  Is it?  Do you have an

14   opinion of whether it is or is not a discount or is

15   or is not the providing of a free service to the

16   communities receiving them?

17        A    I'm sorry, can you repeat the question?

18        Q    Yeah.  I'm not asking could be's because

19   you're offering an opinion.

20             Is the providing of $125 value skills

21   check or a $250 valued skills check for two people

22   the providing of a free service incidental to other

23   services as was Guardian's policy prior to January of

24   2018?

25        A    I'm sorry, I still didn't quite -- I

1    didn't quite understand the question.

2        Q    Guardian was providing free skills

3    checks --

4        A    Yes.

5        Q    -- to communities which it internally

6    valued and priced out at $125 for one person or 250

7    for two people, but Guardian did not charge the

8    community for those skills checks if it was already

9    at the community doing other work.

10                Are we in agreement on that?

11       A    Yes, I believe that was the policy.

12       Q    Prior to January of 2018?

13       A    Yes.

14       Q    And how is that not providing a free

15   service incidental to providing other services prior

16   to January of 2018?  It's not discounted, it's free?

17       A    Well, it's part of an ongoing

18   arrangement, so I think it's -- I mean, it's part of

19   the suite of services that are being provided so...

20       Q    It is if they're not charging for those

21   services because they're being paid for other

22   services, correct?

23       A    It is a -- it is a particular discount

24   for this service.  I mean, I...

25       Q    It's discounted to zero; is it not?

1      A    Well, that's a -- that's a discount.

2      Q    **Okay.**

3      A    I mean, it's a discount if they're paying

4   for other services overall.

5      **Q    You talk about whether or not there's a**

6   **separate charge or separate fee for the medication**

7   **cart and the computers, correct?**

8      A    Let me go back and look.  This is the

9   opinion?

10     **Q    Sure.  It's the fourth bullet point under**

11  **paragraph 12.**

12     A    Okay.

13     **Q    It's the last -- it's on page five?**

14     A    It's on five or is it the carryover or

15  the last one?

16     **Q    Yes, sir.  Top of page five, it's a**

17  **carryover open bullet point.**

18     A    Okay.

19     **Q    Guardian's provision of medication carts**

20  **without a separate charge.  Do you see that?**

21     A    Yes.  And yes.

22     **Q    Again, I want to make sure we're on the**

23  **same page.  You understand that Guardian provided**

24  **medication carts to a number of homes on a loan; is**

25  **that right?**

```
 1        A    I missed the very end.  I'm sorry.
 2        Q    It's all right.  You're aware that
 3   Guardian provided medication carts to various
 4   communities as a loan, correct?
 5        A    Yes.
 6        Q    So Guardian kept title to the medication
 7   cart, but it loaned these carts to the community at
 8   no charge?
 9        A    Yes.
10        Q    And so the community?
11        A    My understanding.
12        Q    So the community doesn't have to go buy
13   the medication cart.  It can take the loaned cart
14   from Guardian as long as it enters into the agreement
15   with Guardian, correct?
16        A    Yes.
17        Q    Same with the laptop.  Guardian kept
18   ownership of the laptop, but if the community enters
19   an arrangement with Guardian, Guardian will provide
20   them that free laptop?
21        A    A stripped down laptop that goes with
22   the -- the eMARs.
23        Q    Sir, I'm going to have Mr. Miller pop up
24   132.  See if it pops up on your screen.
25        A    What -- what just happened?
```

```
1          Q    Take your time.

2          A    All of a sudden it went to (inaudible).

3    Let me go -- okay.  Here we go.

4               MR. RISSLER:  I just got kicked off

5         the share file too.  Will you give me a

6         minute, Joe?

7               MR. CALLOW:  Sure.  Take your time.

8         No worries.

9               THE WITNESS:  So Hopp 132?

10              MR. CALLOW:  Yes, sir.  But let me

11        make sure Jerad's in the right place too.

12        Hold on one second, sir.

13              MR. RISSLER:  Thanks, Joe.  I've got

14        it.

15              MR. CALLOW:  Good.

16              MR. RISSLER:  Yep, we're good.

17              (Whereupon, Hopp Exhibit No. 132 was

18         previously marked for identification by the

19         court reporter.)

20    BY MR. CALLOW:

21         Q    Mr. McAnaney, let's go to Hopp 132.  That

22    should be a pharmaceutical products and services

23    agreement between Guardian of Atlanta and Canterfield

24    of Kennesaw.  Do you see that?

25         A    Yes.
```

1    Q    And you looked at a number of contracts

2    in preparing the opinions that you're giving in this

3    case, correct?

4    A    Yes, correct.

5    Q    So I want to look over on the second page

6    of this particular agreement, and I note that there's

7    a reference to pharmacy equipment at the top?

8    A    Let me see, yes.

9    Q    So in this particular case, pharmacy is

10   providing a medication cart and a laptop computer for

11   each cart.  Can you see that?

12   A    Yes.

13   Q    Then it says:  Pharmacy consulting

14   services quarterly at no charge.  Do you see that?

15   A    Yes.

16   Q    And then there's a reference to

17   additional consulting eMAR and proxy CMA classes.  Do

18   you see that?

19   A    Yes.

20   Q    Above these pricing terms, it says

21   confidential pricing terms.  Do you see that?

22   A    Yes.

23   Q    Do you know why the terms are

24   confidential?

25   A    I don't, but in my experience, it's

1    pretty common.

2         Q    For businesses to have confidential

3    pricing?

4         A    Yes.  Most people want to keep their

5    pricing confidential.

6         Q    Not share it with the public or their

7    competitors, right?

8         A    Correct.

9         Q    Okay.  On Exhibit A, standard terms,

10   you'll see there's a reference under 2.1 to preferred

11   provider.  Pharmacy will be the preferred provider of

12   pharmaceutical products and services for each service

13   facility.  Do you see that?

14        A    Yes.

15        Q    That's the language that is part of this

16   agreement.  Guardian is designated the preferred

17   provider for all of the residents of that community,

18   right?

19        A    Well, I don't think that's accurate.  I

20   think it's the preferred provider of the facility.

21        Q    Correct.

22             But the preferred provider of the

23   facility, right?

24        A    Yes.

25        Q    And then the facility then tells the

1    residents that Guardian is the preferred provider of

2    that facility and then Guardian -- excuse me, the

3    residents decide whether to sign up with Guardian or

4    not?

5         A    I think that's the general idea.  Whether

6    that's what happens, I'm not sure.

7         Q    You don't know how that works?

8         A    Well, I suspect it varies from -- from --

9    from facility to facility exactly how it's

10   implemented.

11        Q    All right.  Let me ask you to look at

12   Exhibit B to this agreement which says pharmacy

13   consulting services.

14        A    (Witness complies with request of

15   counsel.)  Yes.

16        Q    And this is an Exhibit B that you saw in

17   a lot of the contracts that you reviewed I'm sure,

18   correct?

19        A    It appears to be.

20        Q    Okay.  In multiple different agreements

21   you have this similar standard language that looks

22   pretty close to Exhibit B, pharmacy consulting

23   services, right?

24        A    I think so, yes.

25        Q    And part of these standard services talks

1    specifically about the Anti-Kickback Statute,

2    correct?

3         A    Yes.

4         Q    So paragraph seven:  The parties intend

5    that their contractual relationship will be compliant

6    in all manners with applicable federal and state laws

7    including, but not limited to, the federal

8    Anti-Kickback Statute.  Accordingly, they agree to

9    the following terms which are hereby incorporated

10   into the agreement by reference for all purposes; is

11   that correct?

12        A    Yes.

13        Q    And then you have paragraphs A through H

14   below, correct?

15        A    Correct.

16        Q    Did you review these paragraphs A through

17   H?

18        A    Yes.

19        Q    Do you agree with paragraphs A through H?

20        A    I'm sorry?

21        Q    Do you agree with the language?

22        A    I mean, I don't disagree with it.

23        Q    Okay.  So --

24        A    I mean, it's -- it's what they agreed to.

25        Q    So when A says pharmacy will provide or

1    arrange for, an operator will pay for consulting

2    pharmacist services only on terms that account for

3    pharmacy's cost to do so and never below those costs,

4    do you see that?

5         A    I do.

6         Q    And what does operator refer to?

7         A    I believe it's the community.

8         Q    Right.

9              So looking at page one, operator is

10   Canterfield of Kennesaw, correct?

11        A    Yes.

12        Q    So this specifically says under the

13   Anti-Kickback Statute language:  Pharmacy will

14   provide for arrange -- excuse me, pharmacy will

15   provide or arrange for and Canterfield of Kennesaw

16   will pay for consulting pharmacy services only on

17   terms that account for pharmacy's cost to do so and

18   never below those costs.  Correct?

19        A    Yes.

20        Q    But in actuality under the contract

21   Canterfield Kennesaw is not paying for any of those

22   consulting services?

23             MR. RISSLER:  Objection.

24             MR. CALLOW:  What's the objection,

25        Jerad?

```
 1              MR. RISSLER:  It misstates the
 2         contract.  There are pricing terms for a
 3         number of the consulting services.
 4    BY MR. CALLOW:
 5         Q    It specifically says here, Mr. McAnaney,
 6    pharmacy will provide or arrange for and Kennesaw --
 7    Canterfield of Kennesaw will pay for consulting
 8    pharmacy services only on terms that account for
 9    pharmacy's costs to do so and never below those
10    costs, correct?
11         A    Yes, that's what it says.
12         Q    A consulting pharmacy services is
13    specifically listed on page two where it says
14    pharmacy consulting services and it says quarterly at
15    no charge, does it not?
16         A    Yes, it says that.
17         Q    So how is Canterfield of Kennesaw paying
18    for the consulting services at or not below
19    Guardian's costs if paragraph A specifically refers
20    to the operator and page two specifically says it's
21    at no cost?
22         A    Well, I believe I mean, it appears that
23    the understanding was that they were talking about
24    additional pharmacist costs which are at $65 an hour.
25         Q    This says -- this says consulting
```

```
 1   pharmacist services in paragraph A and the chart says
 2   pharmacy consulting services quarterly at no charge.
 3   There is a reference to additional consulting.
 4   There's a reference to monthly services.  But
 5   pharmacy consulting services are the exact three
 6   words used in the chart and used in A.  And under
 7   this contract Canterfield of Kennesaw does not pay
 8   for pharmacy consulting services even though this
 9   language specifically says they cannot do so under
10   below market costs?
11              MR. RISSLER:  Objection, misstates the
12         contract.
13      A    I mean, that's not exactly -- the first
14   term at no charge is pharmacy consulting services.
15   Additional consulting is for pharmacists, 55 for a
16   nurse, and this is for -- they pay for consulting
17   pharmacists services and -- consulting pharmacists.
18   BY MR. CALLOW:
19      Q    So --
20      A    And pharmacist services.  So it's pretty
21   clear that they understood it not to include those
22   services.
23      Q    It's --
24      A    And that's what I would say as a lawyer.
25   I mean, plus as you said, it's a boilerplate
```

1    contract.

2         Q    I didn't say it was boilerplate contract,

3    sir.

4         A    Okay.  Well --

5         Q    Are you saying it's boilerplate?  Are you

6    saying compliance with the Anti-Kickback Statute is

7    boilerplate?

8         A    I mean, Exhibit B was -- comes in all of

9    them.  I mean, is it boilerplate?  Yes, it's

10   boilerplate.

11        Q    You would call compliance with the

12   Anti-Kickback statute language boilerplate contract

13   language?

14             MR. RISSLER:  Objection, misstates his

15        testimony.

16        A    I would say that --

17             MR. RISSLER:  Go ahead.

18        A    -- a contract that has a provision that

19   complies with the -- I mean, I think it is -- yes, I

20   think that's typical boilerplate language.  Not that

21   it's not important or enforceable but --

22   BY MR. CALLOW:

23        Q    Do you see any evidence that Canterfield

24   of Kennesaw or any community that has a contract with

25   Guardian knew or had information on whether or not

1    the pharmacy consulting services were at or below

2    cost?

3         A    Well, this is one of the problems with

4    the Anti-Kickback Statute.  They wouldn't.  It's

5    impossible for them.  No one's going to tell them.

6         Q    No one from Guardian is not going to tell

7    them?

8         A    Excuse me?

9         Q    When you say no one's going to tell them,

10   Guardian is not going to tell them, right?

11        A    Well, in -- in any of these Anti-Kickback

12   Statute when they say at or below cost, only the

13   person providing them knows what those costs are.

14   And of course, in this case the expert testimony is

15   the costs were negligible.  The marginal costs of

16   education or skills training were negligible

17   according to the comment.  So I think -- and that's

18   all you have to cover economically to make a profit.

19        Q    Paragraph B said:  All arrangements for

20   consulting pharmacist services will be established

21   without regard to any referrals.  Do you see that?

22        A    Go back.  Yes.

23        Q    Which means that the consulting

24   pharmacists can't hold back or not perform services

25   in exchange for a referral, correct?

1        A     Well, I'm not -- I mean, it -- I think it

2    says what it says.

3        Q     Well, what do you think it says?  You

4    tell me.

5        A     Excuse me?

6        Q     You tell me.  What does it say?

7        A     All arrangements for consulting

8    pharmacist services will be established without

9    regard to any referrals.

10       Q     So can a consulting pharmacist hold back

11   services until it gets referrals of residents?

12       A     I'm not -- it strikes me it depends.

13       Q     Depends on what?

14       A     Well, some of the consulting pharmacist

15   services require a patient.  I mean, if you don't

16   have any patients you're not -- you're not going to

17   provide any services.

18       Q     Do the consultant service providers

19   provide different levels of service whether they have

20   one, ten or 20 patients at a community?

21       A     Yes.

22       Q     They can provide different levels of

23   service and hold out services until they get a larger

24   number of residents to sign up with them?

25       A     I'm -- what I'm saying is a -- a vendor

1  can provide different levels of services to customers

2  depending on the amount of business they have with

3  that customer.  So I mean, that's -- the generic

4  question is sure, people can provide different

5  services based on how many -- how much business they

6  have with a particular facility or customer.

7      **Q    Can a vendor under this Anti-Kickback**

8  **statute in paragraph B tell the community that they**

9  **will provide different or additional services in**

10 **exchange for a referral of residents?**

11     A    Well, first of all, I don't think they're

12 going to say that to a congregate home because a

13 congregate home doesn't make a referral.  So you can

14 start with that.

15     **Q    That wasn't my question at all, sir.  My**

16 **question was:  Can a consulting pharmacy tell the**

17 **community we will provide you different or additional**

18 **services if we get more patients referred to us, yes**

19 **or no?**

20     A    I just think -- as I said, I don't

21 think -- I mean, yes, if that were the case, but

22 those facilities can't refer.  So I think that's not

23 exactly how it works.  If it were a nursing home,

24 yeah, because they can refer the patients.

25     **Q    If a long-term care pharmacy like**

1  Guardian in an assisted living community or personal

2  care home says they will provide different or

3  additional services in exchange for the referral of

4  patients, would you agree with me that that is a

5  violation of the Anti-Kickback Statute if it

6  occurred?

7        A    No.

8        Q    Why not?

9        A    Well, for one thing it has to be knowing

10 and willful.  And another thing it has to be

11 remuneration which isn't clear.  And then it has to

12 be in exchange for or to induce referrals.  So, I

13 mean, you have to look at the specific facts and the

14 specific arrangement.  That's what you have to do

15 with every kickback.

16       Q    Paragraph E:  Neither pharmacy nor

17 operator will offer, solicit, pay or receive any

18 remuneration for anything of value, closed paren,

19 intended to induce referrals of any patient for the

20 purchasing or ordering of any item or services that

21 may be reimbursed in whole or in part under federal

22 healthcare programs such as Medicare or Medicaid.

23            Is that accurate?

24       A    Yes, that's what it says.

25       Q    You agree that's a correct application of

1    the Anti-Kickback Statute?

2         A    Well, no, it's a contract provision.

3         Q    I understand.  Do you agree that A

4    through H are appropriate concerns under the

5    Anti-Kickback Statutes?

6         A    I think A through H are intended to

7    foster compliance with the Anti-Kickback Statute,

8    yes.

9         Q    G in this paragraph -- excuse me, in this

10   page notes that nothing in this addendum will

11   prohibit arrangements that comply with one or more of

12   the Anti-Kickback Statute safe harbors.  Do you see

13   that?

14        A    Yes.

15        Q    Did you do any analysis of whether or not

16   any of these arrangements fit within the

17   Anti-Kickback Statute safe harbor according to CFR

18   1001.952?

19        A    Not -- not in detail.

20        Q    So you're not offering an opinion in this

21   case that this conduct is protected by any

22   Anti-Kickback Statute safe harbor basis; is that

23   right?

24        A    No.

25             MR. CALLOW:  We've been going for a

```
1          couple of hours.  Why don't we take a half
2          hour or 45-minute break for lunch.  Do you
3          want to do half hour or 45 minutes or an
4          hour?  I'll defer to you and Jerad what you
5          want to take.
6                  THE WITNESS:  Up to you, Jerad.
7                  MR. RISSLER:  45 minutes good for you?
8                  THE WITNESS:  Sounds good.
9                  MR. CALLOW:  Come back at ten to 1:00,
10         and we'll pick back up there.  Thanks.
11                 THE VIDEOGRAPHER:  This is the end of
12         Media 1.  The time is 12:04 p.m.  We're now
13         off the record.
14                 (Whereupon, the video camera was
15         turned off.)
16                 (Whereupon, a brief recess was taken.)
17                 (Whereupon, the video camera was
18         turned on.)
19                 THE VIDEOGRAPHER:  This is the
20         beginning of Media 2.  The time is
21         12:51 p.m.  We're back on the record.
22   BY MR. HENDRIX:
23        Q    Mr. McAnaney, can you hear me okay?
24        A    Yes, I can.
25                 MR. CALLOW:  Jerad, are you good?
```

1            MR. RISSLER:  I'm good.

2    BY MR. CALLOW:

3        Q    Okay.  Sir, let's go back to your report

4    and I'd like for you to turn to paragraph 40, which

5    is on page 12.

6        A    (Witness complies with request of

7    counsel.)  Yes.

8        Q    All right.  So page 12 in the middle

9    starts a section B, Georgia regulations of ALC and

10   PCH medication administration.  Do you see that?

11       A    Yes.

12       Q    And you wrote these sections regarding

13   the Georgia regulations?

14       A    Yes.

15       Q    40 says that any ALC in Georgia offering

16   medication administration services to its residents

17   must employ certification medication aids, at a

18   minimum, to administer medications, correct?

19       A    Correct.

20       Q    And just to be clear, that's a

21   requirement on the community.  That's not a

22   requirement of the long-term care facility, correct?

23       A    Right.  That's a requirement --

24            MR. RISSLER:  You mean long-term care

25       pharmacy, Joe?

1            MR. CALLOW:  I apologize.  Long-term

2      care pharmacy.  Thank you, Jared.

3       A    Yes.  I mean, as I -- you read the regs,

4  it says if an ALC is going to offer medication

5  administration services, they have to have a cert --

6  a CMA.

7  BY MR. CALLOW:

8       Q    And the Georgia regulations apply to the

9  communities and the obligations of the communities,

10  correct?

11      A    Yes.

12      Q    So when you list in 40, 41, 42 and 43,

13  when you're talking about the requirements of the

14  Georgia regulations, to be clear, those are

15  regulations that apply to the communities that either

16  need to employ their own people or contract with a

17  pharmacy like Guardian to perform some of those

18  services?

19      A    The regulation requires if they use CMAs,

20  they have to meet these requirements.

21      Q    Okay.  Are you familiar with any other

22  states that have similar requirements to the Georgia

23  regulations you outline in 40 through 43?

24      A    Not really.

25      Q    Okay.  And there is a difference between

1    a personal care home and an assisted living community

2    under Georgia law, correct?

3         A    Yes.

4         Q    There was -- at least there was at the

5    time, right?

6         A    That's my understanding, yes.

7         Q    And let me ask you to look over on

8    paragraph 44.

9         A    (Witness complies with request of

10   counsel.)

11        Q    Talks about designation of a preferred

12   pharmacy status.  Do you see that?

13        A    Yes.

14        Q    (Inaudible) services that long-term care

15   pharmacies provide to their clients, LTC pharmacies

16   generally strive to have a sufficient number of

17   clients in a given congregate home to spread the

18   fixed costs of serving the residents in the home over

19   a number of clients.  Do you see that?

20        A    Yes.

21        Q    You don't have a cite for that.  What's

22   your cite to your basis for that opinion?

23        A    Just my general experience.

24        Q    You don't have any experience in

25   long-term care pharmacies.

1      A    No, but vendors to the long-term care

2   industry.  This is not -- this kind of arrangement is

3   not unusual for different vendors of long-term care

4   facilities.

5      **Q    A long-term care pharmacy's relationship**

6   **with the community is no different than other**

7   **vendors?**

8      A    It's -- well, in terms of congregate care

9   facilities -- I mean, often prefer to have a

10  preferred vendor for a given service.

11     **Q    Is the long-term care pharmacy's**

12  **obligation to the residents any different whether or**

13  **not the long-term care pharmacy services 10 percent**

14  **or 50 percent and 90 percent of the residents in a**

15  **community?**

16     A    I think the -- basically probably not.

17  They deliver the drugs as prescribed.

18     **Q    So the obligations of the long-term care**

19  **pharmacy, whatever those costs are, should not affect**

20  **the service to the residents whether or not the**

21  **long-term care pharmacy service is 10 percent or**

22  **50 percent and 90 percent of the residents in that**

23  **community?**

24     A    I'm not -- I'm not -- I'm not sure about

25  that.  I mean, it's -- it's a pretty vague statement.

1        Q    It's a vague statement.

2             Is a long-term care pharmacy's obligation

3    to a resident who signs an agreement with Guardian to

4    make Guardian it's long-term care pharmacy, do the

5    services provided under that agreement depend in some

6    way on whether the person next door to them signs the

7    same agreement or not?

8        A    I think it could.

9        Q    Okay.  Explain to me how the level of

10   service provided to a resident who signs a contract

11   with a long-term care pharmacy is affected or

12   different whether or not their neighbor next door

13   signs the same contract or not.

14       A    Well, a long-term pharmacy provides a

15   number of services.  I think they -- some are fixed,

16   some are -- some are not necessarily fixed, I think.

17   And depending on the number of customers they have in

18   a facility, then the costs of providing those

19   services will vary.  And so I can easily see how they

20   might provide more services if they have more

21   customers in a given facility.

22       Q    Well --

23       A    Go ahead.

24       Q    Whether the cost of the services vary,

25   does the level of service or the service required by

1  either the Georgia regulations or the federal

2  government dispensing fee vary depending on whether

3  or not a Guardian has a contract with 10 percent,

4  50 percent or 90 percent of the residents in the

5  community?

6      A    Well, obviously, I think that there's a

7  minimum that will not vary.  I think most of those

8  things set a minimum.  I don't know that there can't

9  be services over and above that.

10     Q    You can have additional services or

11 different services depending on the number of people,

12 but the minimum level of service required under the

13 Georgia regulations or required by the CMS

14 regulations does not vary depending on the number of

15 people you have under contract at a particular

16 community, does it?

17     A    Well, I have no idea about what the

18 Georgia long-term care pharmacy regulations require.

19 I haven't actually looked at them.  And but I do

20 think that the dispensing fee sets a minimum.  It

21 doesn't set a maximum.  So the minimum won't change.

22     Q    Regardless of how many residents Guardian

23 services at a particular community?

24     A    I would think that you have to provide

25 the minimum.

1      Q     And do you know if there's any language

2   in the contract that Guardian has with the residents

3   that indicates that we will provide you different or

4   additional services if other residents also sign up

5   with Guardian?

6      A     I don't believe there's any specific

7   language to that effect.

8      Q     You note in paragraph 45 that ALCs and

9   PCHs generally prefer to have their residents served

10  by as few LTC pharmacies as possible.  And then you

11  have a reference to the Lewin report page 16 for

12  support for this paragraph.

13     A     That's -- as I said in my report, these

14  are all illustrative.  They're not the only examples.

15  There's a lot of support for that statement.

16     Q     So the ALCs and PCHs generally prefer to

17  have the residents served by as few LTC pharmacies as

18  possible.

19           What's the source for that statement?

20     A     That's the Lewin report and much of the

21  deposition testimony, the expert reports.  I mean,

22  it's -- it's a basic -- it's a basic safety

23  consideration.

24     Q     Which expert reports did you review that

25  concluded that ALCs and PCHs generally prefer to have

1   their residents served by as few LTC pharmacies as

2   possible?

3        A    I can't remember the names.  We have a

4   pharmacy -- it was a pharmacy expert from Southern

5   Cal or something like that that report -- I think

6   there's testimony by Ms. Newcomb that says that.  I

7   think it's a pretty -- I think it's a pretty

8   established fact.

9        Q    Well, the report from the Southern Cal

10  expert you did not have at the time you authored this

11  report, correct?

12       A    Correct.

13       Q    So that wasn't the source of you writing

14  paragraph 45 because you didn't have that report at

15  the time that you wrote this?

16       A    That's correct.

17       Q    So do you think Ms. Newcomb testified

18  that ALCs and PCHs generally prefer to have their

19  residents served by as few LTC pharmacies as

20  possible?

21       A    I believe virtually all of them that --

22  she among others and the Lewin report as well.

23       Q    As few LTC pharmacies as possible does

24  not mean one pharmacy, does it?  It's as few as

25  possible.

1      A    I think most of them say they want one

2   preferred.  I take as few -- I'm sure less is better

3   than more, and one is probably better than two.

4      Q    So the ALCs and PCHs in your opinion want

5   one LTC or as few LTC pharmacies as possible?

6      A    Generally, that's typical in the

7   industry, yes.

8      Q    You also recognize that the residents

9   have choice and the residents can choose whichever

10  pharmacy they want?

11     A    Yes, in -- in ALFs and in congregate

12  personal care homes.

13     Q    In the Guardian contracts that you looked

14  at, Guardian works to be the preferred pharmacy, not

15  one of few LTC pharmacies as possible.  Guardian

16  wants to be the preferred pharmacy, correct?

17     A    That's correct.

18     Q    And when Guardian is the preferred

19  pharmacy, the community only refers its patients to

20  Guardian?

21     A    I don't believe that's the case at all.

22     Q    Well, does Guardian -- does the community

23  provide a welcome packet to residents with the name

24  of any community -- does the community provide a

25  welcome packet to its residents with the name of a

 1    long-term care pharmacy other than Guardian and

 2    Guardian is the preferred pharmacy?

 3         A    My recollection is the testimony is that

 4    some did that.  It wasn't -- I mean, there wasn't

 5    a -- it was not what Guardian would prefer, but I

 6    believe they said that some do.

 7         Q    That some communities provided the names

 8    of other pharmacies other than Guardian when Guardian

 9    was the preferred pharmacy?

10         A    Yes, I'm sure they all did.  I mean, if

11    asked they were going to provide other pharmacies.

12         Q    Do you believe you have testimony in the

13    records before you that the communities offered the

14    names of more than one pharmacy when Guardian was

15    designated a long-term care pharmacy?

16         A    I believe there's some -- I believe

17    there's -- my recollection is there was some

18    testimony to that effect.  I can't recall it now

19    exactly but --

20         Q    You don't cite that anywhere.  Can you

21    recall where that testimony came from?

22         A    Excuse me?

23         Q    You don't cite there anywhere in your

24    report.

25         A    No, it's not anything I relied on.

1      Q     Well, can you tell me which community you

2    believe provided the name of any other pharmacy after

3    Guardian was determined to be the preferred pharmacy

4    for the community?

5      A     As I told you a minute ago, no, I

6    can't -- I can't recall exactly.  What I said is I

7    have a recollection that there is some testimony to

8    that effect.

9      Q     Do you believe that Guardian prefers to

10   be the only pharmacy that the community listed in its

11   communications in the welcome packet to residents

12   after it signed the contract with the community?

13     A     I believe that they hope and understood

14   that they would be the preferred pharmacy, that their

15   packet would be distributed.

16     Q     And in those situations, the welcome

17   packet would only list Guardian as the long-term care

18   pharmacy preferred choice to the residents?

19     A     I'm not sure I've seen -- I've not

20   actually -- I've seen one set of materials I think

21   that Guardian put out.  I don't know what materials

22   were actually distributed by all the various homes.

23     Q     Have you seen any of the welcome packets

24   where the community designates Guardian as the

25   preferred long-term care pharmacy?

1       A    I've seen what Guardian put together as

2    their welcome packet, yes.

3       **Q    And they're the only one listed when**

4    **their welcome packet is used, correct?**

5       A    I can't recall.  I mean, that wouldn't --

6    I think that's the idea, was they were the preferred

7    pharmacy.

8       **Q    And when they're the preferred pharmacy,**

9    **the community doesn't identify any other pharmacy**

10   **other than Guardian when residents asked about**

11   **long-term care pharmacy services, correct?**

12      A    I don't believe why -- that strikes me as

13   probably not correct, but I don't know.  If someone

14   asks, I'm sure they'll tell them.  The patients have

15   freedom of choice.

16      **Q    So you're sure that if patients ask the**

17   **community, the community will provide Guardian and**

18   **some other long-term care pharmacy names?**

19      A    I believe if residents ask for the names

20   of other long-term care pharmacies that any

21   responsible home would provide them.

22      **Q    If the resident asked the community for**

23   **the name of a long-term care pharmacy provider, is it**

24   **appropriate for the community to only give them the**

25   **name of Guardian when Guardian is the preferred**

1    provider for that community?

2         A    I don't know whether under the law it's

3    required, but I certainly think that they would --

4    that they would.  This is our preferred provider, you

5    know, there are others.

6         Q    Do you have any evidence that a community

7    lists others to assist in the freedom of choice that

8    you've identified in your answer earlier?

9         A    I never said they gave out lists.  I'm

10   not quite sure what the question is aiming at.

11        Q    Well, the question is trying to get at

12   the fact that the long-term care communities when

13   they sign the contract with Guardian only give

14   Guardian's name to their residents when asked and

15   only include Guardian in the welcome packet.

16             Do you not understand that to be the

17   factual basis?

18        A    I do not believe that is -- I've seen no

19   evidence of what you're talking about.  I believe

20   that the contract and the testimony was they were --

21   they were made a preferred provider.  Their welcome

22   packet was given out.  I have seen no evidence that

23   if someone asked about other ones that they would not

24   tell them or that the contract required them to do

25   it.  I find that -- there's no support.  I haven't

1    even seen an allegation of that.

2        Q    Would that trouble you if you learn that

3    the factual record is undisputed in this case that

4    when Guardian is the preferred provider to a

5    community, the community only lists Guardian in the

6    welcome packets and only refers them, residents, to

7    Guardian and not to the anybody else?

8        A    No, it wouldn't -- I mean, it wouldn't

9    surprise -- it would -- it would surprise me.  I

10   don't think it's -- I mean, it surprises me.  I don't

11   think it's -- I mean, it is what it is.

12       Q    Why would it surprise you?

13       A    Because that's not the way I --

14   healthcare facilities and facilities in my experience

15   work, especially when a patient has freedom of

16   choice.  If a patient or their family asks:  Is there

17   anybody else, these people help them.  They're --

18   they say, Well, sure, there's this and this, we

19   prefer these guys because of that.  But the fact that

20   they say, no, I'm not going to tell you anybody else,

21   I find that frankly unbelievable based on my

22   experience.

23       Q    Do you see any testimony in the

24   depositions that you reviewed where communities go to

25   the point of charging a fee to residents if the

1    resident chooses the long-term care pharmacy other

2    than Guardian?

3         A    Well, I saw there is a reference to one

4    that charged a fee to residents if they use somebody

5    else because in that case there were -- unlike

6    Guardian, they would have to make written eMAR and

7    that would take time and they were charging them for

8    the cost of the written medication review.

9         Q    Do you recall the charge to the resident

10   in that community if they chose to use a pharmacy

11   other than Guardian?

12        A    I'm not quite sure on what base it was,

13   but I recall something like $100, $150.

14        Q    So $150 is the charge to a resident if

15   after the community signs an agreement with Guardian

16   for Guardian to be the long-term care pharmacy, the

17   resident in that community has to pay $150 a month if

18   they want to use a different long-term care pharmacy?

19        A    I'm sorry, what was the question?

20        Q    Is that your understanding?

21        A    My understanding was that particular

22   facility at least for some period of time put in --

23   put in a charge for people that were -- for the cost

24   of having -- requiring them to undergo a written

25   medication administration review.  What they charged,

1    I don't know.  I saw no evidence it had anything to

2    do with Guardian so...

3         **Q    You said it was $150 charge, sir.**

4         A    Excuse me?

5         **Q    You said it was $150 charge.  That was**

6    **your recollection.  I'm reading it right here.**

7         A    No, no, that's -- I have no -- I could

8    go -- we could stop, and I could go find the

9    reference.  But I -- it seems like that might have

10    been it.  I don't know what it was.  It was some

11    charge that the facility put in.  They must have

12    thought that's what it cost them.

13         **Q    The facility put in a charge that if a**

14    **resident chose not to use Guardian as their long-term**

15    **care provider, that they had to pay as much as $150 a**

16    **month to use a different long-term care pharmacy**

17    **service, correct?**

18         A    Well, I don't -- as I said, I don't

19    remember what exactly the charge was or how

20    frequently it was.  What I do recall is there was a

21    charge including -- because they had to manually --

22    manually do the medication administration record.

23         **Q    Do you at least agree with me that a**

24    **charge of that size and magnitude impacts the**

25    **resident's choice of which long-term care pharmacy to**

1  use?

2        A    It could.

3        Q    Do you agree with me that if the

4  community only recommends Guardian and only uses

5  Guardian in its welcome packet that that could impact

6  a resident's choice of long-term care pharmacies as

7  well?

8        A    Yes, I -- yes, I think it certainly could

9  or a preferred provider that assuming that there's a

10  reason for it.

11        Q    You recognize that there is a value to

12  Guardian of being designated a preferred pharmacy at

13  a community?

14        A    Yes, I think they thought so.

15        Q    Paragraph 47 in your report, consistent

16  with industry practice, Guardian routinely entered

17  into preferred pharmacy agreements with ALCs and

18  PCHs.

19             What is your knowledge of industry

20  practice?

21        A    Well, I think it summarized very clearly

22  in the -- the Lewin report and also as summarized by

23  the various professionals being deposed.

24        Q    So your understanding is that it was

25  industry practice for long-term care pharmacies to

1    enter into preferred pharmacy agreements with ALCs

2    and PCHs?

3          A    Yes.

4          Q    Is it your understanding that long-term

5    care pharmacies competed in order to be designated

6    the preferred pharmacy at ALCs and PCHs?

7          A    I assume so, yes.

8          Q    And there was a value to being designated

9    preferred pharmacy because if the community only

10   wanted one pharmacy, whoever got that designation got

11   that value in the particular community, correct?

12         A    Yes.  Well, I mean, the person who got

13   the preferred designation got whatever value the

14   preferred designation was worth.

15         Q    So there is competition among long-term

16   care pharmacies to be designated the preferred

17   pharmacy?

18         A    I mean, there's competition among

19   long-term care pharmacies for clients, yes.

20         Q    You note in paragraph 46 given this

21   mutuality of interests ALCs and PCHs often designate

22   one LTC pharmacy as their preferred pharmacy while

23   recognizing and acknowledging that the residents of

24   the home are free to use any pharmacy they choose.

25   Do you see that?

1       A     Yes.

2       Q     So the mutuality of interests as I

3   understand what your opinion is, ALCs and PCHs would

4   prefer one preferred pharmacy for residents?

5       A     Typically safer, yes.

6       Q     And LTC pharmacies would prefer to have

7   the preferred pharmacy designation?

8       A     I think they want as many clients as they

9   can in one facility.

10      Q     So there's a mutuality of interest

11  because the community is looking for one pharmacy and

12  the pharmacy wants to be the only pharmacy that the

13  community recommends to its residents.  That's the

14  mutuality of interest you're talking about here?

15      A     Yes, because the long-term care pharmacy

16  ideally have more patients there and the cost of

17  providing services are cheaper and so probably make

18  more money on the margin.

19      Q     Do you agree with me that given that

20  mutuality of interest, this is heightened opportunity

21  for kickbacks to occur that need to be monitored?

22      A     I wouldn't say it's heightened, but, I

23  mean, there's always an opportunity.

24      Q     Because of the mutuality of interests

25  between those parties the contract exchanged?

1        A    Well, the mutuality -- I mean, the

2   kickback doesn't require mutual.  It just requires

3   one party wanting to get more business.

4        Q    So page 14, paragraph 49, sir, starts

5   your discussion about the quarterly medication

6   reviews that we talked a little bit about before the

7   break.  You see that?

8        A    Yes.

9        Q    And paragraph 50 you note that Guardian's

10  quarterly services largely track the quarterly

11  medication management reviews required for ALC

12  licensure, correct?

13       A    Correct.

14       Q    And ALC is the community that you're

15  referring to, right?

16       A    I'm sorry, I didn't catch that.

17       Q    I want to make sure I understand

18  paragraph 50.  The quarterly medication management

19  reviews on a quarterly basis are required for the ALC

20  licensure, correct?

21       A    Correct.

22       Q    The homes need to have those quarterly

23  services to maintain their licenses under Georgia

24  law?

25       A    They have to provide those services to be

1    in accordance with the regulations.  I'm not sure

2    what the -- what the penalties are.

3         Q    Okay.  So the quarterly services were

4    specific to the Georgia regulations that apply to the

5    communities in Georgia?

6         A    I guess what I'm saying is the quarterly

7    services largely track the same requirements that

8    Georgia regulations had on ALCs.

9         Q    Correct.  So the quarterly reviews

10   largely track the Georgia regulations --

11        A    Yes.

12        Q    -- of what the communities needed to do

13   to keep their licenses?

14        A    Well, what communities had to do if they

15   were going to use certified medication aides to

16   provide -- to administer drugs to their residents.

17        Q    And those requirements applied to ALCs

18   and PCHs but they don't apply to skilled nursing

19   facilities?

20        A    I don't -- well, actually I'm not -- they

21   only -- they only apply to certain ALCs and certain

22   public homes.  I have no idea what the Georgia

23   regulations require for nursing homes or I have some

24   idea what some federal regulations are but not their

25   quarterly services.

1      Q    Well, the regulations that you cited in

2  paragraphs 40 through 44 that you talk here apply to

3  ALCs and some apply to PCHs?

4      A    That's correct.  If they use -- if they

5  provide medication -- medication administration

6  services to their residents.  Many -- many as -- from

7  reading the regs, many of these people

8  self-administer.

9      Q    There are other communities, there are

10  other residents that receive services from Guardian

11  that are not in a long-term care -- that are not in

12  an assisted living care community or personal care

13  home, right?

14      A    I don't know anything about Guardian's

15  services outside of the case and the facilities we're

16  talking about here.

17      Q    Do you know if Guardian -- if Guardian

18  has relationships and engages in any dispensing of

19  pharmacy services or products outside of an assisted

20  living community or personal care home?

21      A    I -- I don't know.  I don't know.

22      Q    The communities required to have those

23  quarterly medication management reviews for residents

24  whether or not the resident is serviced by Guardian

25  or not, correct?

1      A    Yes.  I mean -- I mean, if -- yes, if

2   they're using a certified medication aide to -- to

3   administer, then that applies to any patient that's

4   getting that service.

5      Q    If the community has a hundred patients

6   and 50 or 60 or 90 are serviced by Guardian, the

7   community still has an obligation to get these

8   quarterly medication management reviews for the ten

9   or 40 or 50 residents who are not serviced by

10  Guardian, correct?

11     A    I believe that's correct, yes.

12     Q    And in fact, Guardian offered to do

13  medication management reviews on a quarterly basis

14  for non-Guardian patients for a fee, correct?

15     A    I've seen that.  I think the testimony

16  was it was quite rare, but yes.

17     Q    Then Guardian recognized that it would

18  pay -- Guardian offered a service that it would do

19  the quarterly reviews to help the community with its

20  licensure for residents who were not signed up with

21  Guardian at that particular time.

22     A    Was there a question?

23     Q    Correct?

24     A    Yes, that's my understanding.

25     Q    Do you recall seeing any testimony from

1    **Ms. Newcomb that she complained that Guardian wasn't**

2    **charging for the quarterly services that she and her**

3    **team were providing?**

4         A    I certainly remember she would have --

5    she would have liked her services to be a revenue

6    center.

7         **Q    She wanted to charge the communities for**

8    **consulting but Matt Hopp resisted charging the**

9    **communities for consulting in those cases, correct?**

10        A    I think that's -- I'm not quite sure

11   that's exactly it, but she proposed putting in fees

12   and he -- he said no.  I mean, they put in -- they

13   changed the fee structure to some extent but not for

14   quarterly consulting.

15        **Q    And even after January '18, Guardian did**

16   **not charge the communities for the quarterly**

17   **consulting that Lori and her team were doing?**

18        A    Right.  There was no separate charge to

19   the communities beyond what was already covered in

20   the dispensing fee and in the service fee being paid

21   by the customers.

22        **Q    Paragraph 58 in your report on page 17,**

23   **you talk about MARs and eMARs.**

24        A    Yes.

25        **Q    And can you explain to me the difference**

1    as you understand it between a MAR and an eMAR?

2        A    Well, an eMAR is kind of a MAR, but most

3    MARs were handwritten.  It's a medication

4    administration record, details what they're being --

5    and their conditions.  I mean, eMAR is basically the

6    same thing, but it's inputted through a computer, and

7    then you have a computerized record.

8        Q    What you have reviewed are eMARs safer

9    than MARs?

10        A    Well, I think that -- well, I think it --

11    I think it depends, probably.  If the eMAR is being

12    reviewed by someone who is a resident whose all of

13    their drugs are coming from the same place so they're

14    all there, that's okay.  But I think generally it is

15    considered -- well, it's certainly safer in the sense

16    that everybody's on the same system; it reduces

17    mistakes.  But so I guess that's all I would say.

18        Q    For an individual resident, is it safer

19    for that individual resident to have the long-term

20    care pharmacy use eMARs or MARs?

21        A    I'm not an expert.  I believe the

22    testimony is people in the industry and Ms. Newcomb

23    thought that eMARs were safer.

24        Q    For an individual resident?

25        A    For an individual resident.

1        Q    Regardless of whether one resident or ten

2    residents or 50 residents or a thousand residents

3    used it, for an individual resident eMAR was a safer

4    alternative than MARs?

5             MR. RISSLER:  That's outside the scope

6        of his opinions.

7             Kevin, you can answer.

8        A    I think that's -- I think that conflates

9    to -- I think if, in fact, you're using multiple

10   systems, it raises the risk of medication error for

11   everyone including those that were on the eMARs if

12   they're the only one on the eMARs and everybody else

13   is on a MAR.  I think the chances of a person making

14   a mistake are just increased.  So I think it --

15   it's -- I think it's not that simple.

16   BY MR. CALLOW:

17       Q    For an individual resident who's getting

18   all of their prescriptions from a single long-term

19   care pharmacy, you don't have an opinion of whether

20   eMARs is safer or better than MARs for that

21   individual resident?

22       A    No, I certainly am not an expert on MARs

23   or pharmacy.  I believe the testimony in the case is

24   that, in fact, anytime you have different systems, it

25   increases the chance of an error for both sides.  I

1    mean, the MAR is not what's coming from the pharmacy
2    as I understand it.  It's what's being administered
3    in the home.
4         Q    Well, is there ever a situation where a
5    long-term care pharmacy is going to have a hundred
6    percent of the residents in the community?
7         A    I don't know.  I'm sure it's possible.
8    I'm sure people do.
9         Q    Are you aware of any community in this
10   case where Guardian had one hundred percent all of
11   the residents of a particular community at a given
12   time?
13        A    No.  My recollection is that generally
14   they said that 85 to 90 percent.
15        Q    So freedom of choice most communities are
16   going to have more than one long-term care pharmacy
17   servicing one or more of its residents?
18        A    I don't know that.
19        Q    Do you know whether or not there are
20   multiple long-term care pharmacies servicing one or
21   more residents in almost every community at issue in
22   this case?
23             MR. RISSLER:  Objection, misstates the
24        facts.
25        A    Are you asking me?  I have no idea.

 1   BY MR. CALLOW:

 2        Q    The value of eMAR, then, to remove this

 3   error or inconsistency you can only evaluate that by

 4   looking at the community as a whole and not looking

 5   at how it impacts an individual resident?

 6        A    I would -- I would think that that's for

 7   the safety considerations it's -- it would be both.

 8        Q    So if Guardian has 40 residents out of a

 9   hundred and somebody else has 60 or some group of

10   long-term care pharmacies has 60, is it appropriate

11   for Guardian not to use eMARs for the 40 because it

12   believes eMARs is safer than MARs but it wants to

13   hold out until it gets the majority of the residents?

14        A    I -- I think what determinations Guardian

15   makes as to how and when they want to deploy it is --

16   is basically a decision.  I don't really -- I don't

17   know.  I'm not a professional, and I don't know

18   everything that goes into MARs versus eMARs or what's

19   entailed by switching.

20        Q    So as someone who's testifying about the

21   Anti-Kickback Statute in this case, you can't tell me

22   whether or not it's problematic.  If Guardian

23   indicates it would only go to eMARs versus MARs,

24   which it believes is safer only when it gets a

25   certain percentage of residents to sign on?

1        A    I mean, I don't think that's -- I don't
2    think that's necessarily inappropriate --
3        **Q    So it's okay to tie going from MARs to**
4    **eMARs paper system to a number or a percentage of**
5    **residents signing up with Guardian?**
6        A    First of all, there's -- MARs and eMARs
7    are just two pieces of the same thing.  So they're
8    getting the services that are required and that they
9    have a perfect function.  Whether and when Guardian
10   thinks it makes sense to switch to eMARs as opposed
11   to MARs can very well depend on the number of
12   residents and the cost to them if there were the
13   fixed costs.  If they're not, that happens.  People
14   can provide different levels of services based on
15   their number of customers in a given location.  It
16   happens all the time.
17       **Q    In paragraph 58 of your report, you said**
18   **that historically medication administration records**
19   **are paper records.  Increasingly, MARs are kept**
20   **electronically.  Do you see that?**
21       A    I see that.
22       **Q    The next sentence in your report is that**
23   **Guardian preferred eMARs for its clients because in**
24   **part they were safer for the patient.  You see that?**
25       A    Yes.

1    **Q    So your opinion is that Guardian**
2  **preferred eMARs for safety?**

3    A    In appropriate circumstances, yes.

4    **Q    Is it appropriate for Guardian to hold**
5  **out eMARs versus MARs until the community delivers a**
6  **certain percentage of patients?**

7    A    First of all, there's nothing in here
8  about delivering patients.  It's if a certain number
9  of patients in your facility, then we will -- then at
10  that point we have enough customers that we may
11  switch to an eMAR.  I don't -- there's -- there's
12  safety; it has nothing to do with the kickback
13  statute at that point.

14    **Q    The preference for eMARs safety isn't**
15  **dependent on a number of residents.  The safety of**
16  **eMARs is for every individual resident.**

17    A    We've already --

18        MR. RISSLER:  Objection.

19    A    I don't think that's true.  I already
20  said why it wasn't true.

21  BY MR. HENDRIX:

22    **Q    So for an individual resident, eMARs is**
23  **not safer than MARs for an individual resident?**

24    A    I don't know, but I think it certainly
25  depends on what everybody else is doing.  Quality --

1  quality and quality assurance in healthcare depends

2  on systems, not on necessarily individuals.

3      Q    Paragraph 60, you note that Guardian

4  clients were charged a monthly fee of $10 for a

5  bundle of services that included eMAR.  So the eMAR

6  service populated the eMAR with residents' specific

7  information about dispensed medications is only

8  available for Guardian's clients.  You see that?

9      A    Yes.

10     Q    Do you see any evidence that Guardian was

11 willing to cut the price of that $10 monthly fee if

12 the community referred more patients to Guardian?

13     A    No, I did not see it.

14     Q    Did you see any testimony in the record

15 that Guardian would cut its eMAR fees if more

16 residents would sign up for Guardian?

17     A    Yes.  I saw an e-mail that said -- I

18 think it was somebody was contemplating go someplace

19 else, and they said if we had enough patients, we

20 could cut it.  I would point out that that's not --

21 nothing in that went to the facility.  It was an

22 incentive to the individual customers, the residents.

23 It's sort of an odd -- so, I mean, yes, you said it

24 right.  It's sort of a so what.

25     Q    So what?

1        A     So what.

2        Q     **Guardian tells the community that if**

3    **enough residents will sign up with us, I will cut the**

4    **eMAR fee.**

5        A     To the residents.

6        Q     **To the residents.**

7        A     The community doesn't get anything.

8        Q     **Right.  You don't think --**

9        A     They're not being paid for referrals.

10        Q     **You don't think that was encouragement to**

11    **the community to refer more patients to Guardian?**

12        A     It might have encouraged them to -- to --

13    to tell -- tell residents to do it, but they weren't

14    being paid for it.  They got no remuneration for it.

15    It doesn't implicate the kickback statute.  It's as

16    simple as that.

17        Q     **You recognize that Guardian repeatedly**

18    **encouraged the community to refer patients to**

19    **Guardian through the welcome packet, through**

20    **communications, through the e-mails.  Guardian**

21    **encouraged the community to refer the patients to**

22    **Guardian when there was a contract in a preferred**

23    **pharmacy (inaudible)?**

24        A     A, they don't make referrals.  I mean,

25    I'll say it again.

1        Q    I didn't say referrals.  I said

2    encouraged.

3             MR. RISSLER:  Let him finish his

4        answer, Joe.  Go ahead.

5        A    Clearly, they wanted their -- the homes

6    to recommend them.  I mean, that's why they were the

7    preferred provider.

8    BY MR. CALLOW:

9        Q    So Guardian was encouraging the

10   communities to refer the residents to Guardian for

11   long-term care services?

12       A    Yes.

13       Q    And you agree that took place throughout

14   this entire timeframe.  Guardian was encouraging the

15   communities to do so and then the residents chose

16   what they wanted to do?

17       A    Yes.  I think that's -- that's a --

18   that's generally how it worked.  And I am not sure

19   how much they encouraged beyond the initial welcome

20   packet.

21       Q    You don't know that one way or the other;

22   you haven't read or don't understand what they did

23   beyond the welcome packet?

24       A    Right.  I don't recall -- I don't recall

25   any specific testimony on that by the representatives

1    of the homes.

2         Q    Let's go to paragraph 63 which I think

3    starts the bases of your opinions.  You see where I

4    am?

5         A    Yes.

6         Q    And then in the 65 through 69, I've got

7    paragraphs and bullet points.

8         A    Yes.

9         Q    Where do these bullet points come from?

10        A    My experience.

11        Q    Are they in a document or a guidance or a

12   statute?  Is there something -- there's no footnote

13   to it, so I'm wondering if there's something in here

14   I can cite or rely upon for 65 through 69?

15        A    No, I think 65 is basically -- I could

16   get some things for some of them, but it's -- it's

17   basically based on my experience and with the

18   government and with regulators and prosecutors don't

19   throw in analyzing.

20        Q    Because these bullet points are yours.

21   They don't come from a case or a guidance or a

22   statute or regulation.  I can't find them anywhere

23   other than you created these for your opinions in

24   this case.

25        A    Well, I mean, some.  I mean, I

1   specifically created this list.  I think these things

2   are derived from various -- I mean, most of them are

3   derived from specific things.

4        Q    You haven't footnoted anything here.  I

5   can't track them.

6        A    No, I didn't.  I'm sorry, what was the

7   end of that?

8        Q    You don't have a footnote for any bullet

9   points, for any statement, for any of the language

10  that you have in 65 through 69?

11       A    Correct.

12       Q    So for 65, is the conduct of the crime

13  commonly understood to be unlawful, unethical or

14  otherwise improper?

15       A    Yes.

16       Q    You created that question, but I don't

17  have a statute or regulation, a case, an article?

18       A    I cited -- I mean, that's basically the

19  language from the committee report for the original

20  1977.  I mean, I think I've cited it elsewhere.

21       Q    You cited to the 1977 amendment?

22       A    Yes, the committee report for the 1977

23  amendment.

24       Q    That bullet point refers to a committee

25  report from 1977?

1          A     Yes, when this statute was passed.

2          Q     You've got the report there.  Can you

3     tell me what the citation is for that?  You've got

4     footnotes, and you've got whatever you want to look

5     at.  I'm curious where that comes from.

6          A     So it is Senate report 95483 -- 453,

7     page 11.

8          Q     Page 11?

9          A     That's what I said.  That's what it says

10    here, yeah.

11         Q     My page 11 has four footnotes to the

12    Lewin report.

13         A     This is page 11 of the report, the Senate

14    report I just quoted.  Senate report 95453, page 11

15    of that report.

16         Q     Where is that Senate report cited in your

17    opinion?

18         A     Footnote five.  And I believe I provided

19    you a copy or at least I provided my...

20         Q     So the bullet point on 65 is supported by

21    footnote five on page six, Senate report 95-453,

22    page 11?

23         A     Yes.

24         Q     And you believe that's a 1977 committee

25    report?

```
 1        A     Yes.
 2        Q     The 95-453 doesn't indicate to you it may
 3   be something other than a 1977 report?
 4        A     No, 95 is the Congress.
 5        Q     How about the second bullet point then?
 6   Is the remuneration sufficiently great to be likely
 7   to influence the decision-maker?  Do you have a
 8   source to cite for that?
 9        A     No.  I mean, there's guidance out there
10   that if it's going to be an inducement; it's got to
11   be -- the value is supposed to do it.  It has an
12   obvious impact how much money it is.
13        Q     Let me ask you to turn to 77,
14   paragraph 77 on page 22.
15        A     Yes.
16        Q     Paragraph 77 you write that Guardian's
17   provision of the services does not result in unfair
18   competition.  Unlike the fourth proposed arrangement
19   in AO 12-19 that the OIG declined to protect, the
20   eMARs utilized by Guardian would not lock in any home
21   to Guardian's services.  Nor do the other services
22   provided by Guardian lock any home to Guardian's
23   services.  Moreover, Guardian's competitors offer the
24   same or comparable services on the same or comparable
25   terms.
```

1              Do you see that?

2      A    I do.

3      Q    And then you have a cite to footnote 50

4  where you cite a declaration from a John Martin,

5  correct?

6      A    Yes.

7      Q    Do you know who John Martin is?

8      A    I can't recall.

9      Q    Well, you make the statement that

10 Guardian's competitors offer the same or comparable

11 services on the same or comparable terms.

12             You did not do any independent

13 investigation to prove the accuracy of that

14 statement, did you?

15     A    No.  I relied on the statements and the

16 depositions and the declarations that were in the

17 case.

18     Q    Do you know of any Guardian competitors

19 that charge for the consulting services provided

20 consistent with the Georgia regulations?

21     A    I believe there may have been some.

22     Q    So some competitors charge for the same

23 medication services required by the Georgia

24 regulation for community licensure that Guardian

25 provides to the community for free?

1        A    No.  Guardian also charged some

2   communities for the services if they didn't charge

3   the patients.  In this case, they charged the clients

4   and what wasn't covered was in the dispensing fee.

5   So they charged for the services.  They provided

6   nothing for free.

7        **Q    So you understand that Guardian's**

8   **competitors charged the communities for the**

9   **medication services required by the Georgia**

10  **regulations, that Guardian chooses not to charge the**

11  **community and instead charges the dispensing fee and**

12  **the service fee to the residents?**

13       A    I think the evidence is pretty clear that

14  some long-term care pharmacies may have charged some.

15  I don't think there were many.  But most offered the

16  same services in the same -- same -- on the same

17  basis that these services were included in either or

18  both the dispensing and the service fees they charged

19  to patients.

20       **Q    The competitors --**

21       A    That was a common understanding among the

22  providers.

23       **Q    The competitors who charged the**

24  **communities for the medication management services**

25  **required on a quarterly basis would not be at the**

1   same or comparable terms for the exact same services,

2   were they?

3        A    Well, I don't know what they -- what else

4   they were charging.

5        Q    Right.  But --

6        A    I mean, if they were -- if they weren't

7   charging the individual resident for the fee, then I

8   assume that they are the same.  But it also doesn't

9   establish that what they were charging the facilities

10  was fair market value.

11       Q    Well, it doesn't, but you didn't look at

12  that one way or the other before you made a statement

13  that Guardian's competitors offered same or

14  comparable services on the same or comparable terms.

15  You don't know that to be true?

16       A    I -- I know that that is what the

17  administrators or officials of the various homes,

18  that was what they -- that was their -- generally the

19  gist of their testimony, that they -- all these

20  facilities -- all these long-term care pharmacies

21  provided about the same services, the same prices

22  pretty much, and they based their choices on the

23  quality.

24       Q    Did anyone testify that the long-term

25  care pharmacy charged for the consulting services to

1   the community, that Guardian did not charge the

2   community?

3        A    I'm sorry, what was the question?

4        Q    Yes, sir.  The medication management

5   services requires under the quarterly consulting

6   requirements under Georgia law that you talked about

7   in paragraph 40 through 44, the licensure

8   requirements for the community.  Are we on the same

9   page?

10       A    Yeah, I think so.  I mean, you're talking

11  about the quarterly?

12       Q    Yes.

13            You're aware that Guardian's competitors,

14  some of them charged for those quarterly medication

15  services and some may not have, correct?

16       A    That's my general understanding, that at

17  least one did.  I can't recall how many.

18       Q    But whether Omnicare, one of the largest

19  providers in the country, charged for its services?

20       A    I don't recall any testimony specifically

21  about Omnicare charging for its services and ALCs or

22  congregate facilities.

23       Q    How about PharMerica, another large

24  long-term care facility -- pharmacy?

25       A    Yes.

1      Q    They charged for the same quarterly

2  consulting medication services under the Georgia

3  regulations to the communities?

4      A    If you say so.  I'm not sure I'm aware of

5  that testimony.

6      Q    The ones that did charge for the

7  quarterly consulting services, that's not the same or

8  comparable terms as the ones who didn't charge,

9  correct?

10     A    No, that's not correct.  I don't know.  I

11  mean, it depends on what other charges they were

12  making to the residents.

13     Q    Did you do any independent investigation

14  of that?

15     A    No.

16     Q    Do you know who Guardian of Atlanta's

17  largest competitor is?

18     A    No.

19     Q    Do you know its second largest

20  competitor?

21     A    No.

22     Q    Do you know the size of any of the other

23  companies out there that were referenced in the

24  reports that you were discussing, the depositions?

25     A    I -- I -- my recollection was that during

1    the time in question in the ALF congregate facility,

2    the big players were Guardian, Gayco, Collier, and I

3    think there might have been somebody else.

4         **Q    You understand those were the big**

5    **players?**

6         A    In the Georgia ALF congregate home.

7         **Q    And Omnicare and PharMerica were not?**

8         A    I don't recall testimony as to those

9    particular, no.

10             MR. RISSLER:  If you get to a spot

11        where we could take a five-minute break,

12        I'd appreciate it.

13             MR. CALLOW:  We can do it now.  That's

14        fine.

15             MR. RISSLER:  Thanks.

16             THE VIDEOGRAPHER:  The time is

17        1:56 p.m.  We're now off the record.

18             (Whereupon, the video camera was

19        turned off.)

20             (Whereupon, a brief recess was taken.)

21             (Whereupon, the video camera was

22        turned on.)

23             THE VIDEOGRAPHER:  The time is

24        2:01 p.m.  We're back on the record.

25    BY MR. CALLOW:

1      Q    So let's stick with your report in here,

2  the paragraph 78 which is on page 23.

3      A    Yes.

4      Q    You note that if the practices are

5  commonly thought to be unethical or unlawful, private

6  payors would also object to them.  There is no

7  evidence that commercial payors object to pharmacies

8  providing medication administration related

9  assistance to ALCs and PCHs.  Do you see that?

10     A    Yes.

11     Q    Did you do any independent investigation

12  of what private payors thought or didn't think?

13     A    No.

14     Q    Did you get any information from Guardian

15  on private payors at all?

16     A    No.  I -- I -- I assumed if there was

17  information that they objected, you would have

18  brought it to our attention.

19     Q    You assume that if there was information

20  that I would have brought it to your attention?

21     A    Well, if they had objected, I think you

22  would have used it.  But none -- I saw no evidence

23  that anyone objected to it.

24     Q    Let me back up.

25          Did you investigate that issue?

1       A     I didn't investigate any issue.

2       **Q     Did you ask anyone at Guardian about that**

3   **issue?**

4       A     No, I did not.

5       **Q     Do you know whether Guardian prevented us**

6   **from getting discovery on that topic?**

7       A     No, I do not.

8       **Q     Would it have been helpful if Guardian**

9   **had provided that information to us so I could have**

10  **shown it to you if you thought that was important to**

11  **put in your report?**

12      A     I believe that if the industry had been

13  objecting to it, it would not have been specific to

14  Guardian, it would have been to the industry in

15  general and they would have.

16      **Q     Any evidence to that effect?**

17      A     No.  It's just my experience that this

18  wasn't anything Guardian was doing by itself.

19      **Q     It's relevant to your opinion whether or**

20  **not private payors objected to these charges and**

21  **relationship, correct?**

22      A     Potentially, yes.

23      **Q     And you don't have any evidence of that,**

24  **and Guardian prevented us from getting that evidence**

25  **in discovery.  And you're sitting here testifying**

```
 1    that because I can't show you the document, somehow
 2    you're going to offer an opinion when you didn't
 3    investigate, you don't know anything about it?  Is
 4    that the --
 5            MR. RISSLER:  Objection.
 6    BY MR. CALLOW:
 7        Q    -- (inaudible)?
 8            MR. RISSLER:  Objection, Joe, that
 9        misstates the discovery in this case.  We
10        did not prevent you from obtaining evidence
11        of what payors did with respect to the
12        industry and these practices.
13            MR. CALLOW:  You objected, and we'll
14        take that to the judge.
15    BY MR. CALLOW:
16        Q    Mr. McAnaney, is the source of your
17    opinion 78 that I didn't present something to you of
18    private payors?
19        A    No.
20        Q    What other evidence do you have that
21    other payors didn't object other than Joe Callow
22    didn't provide it to you in this deposition here
23    today?
24        A    I haven't seen any evidence in everything
25    that I've reviewed that showed that there was any
```

1  objection to it, any court cases, anything.

2       Q    So the lack of information provided to

3  you by counsel for Guardian allows you to put in

4  paragraph 78 that you haven't seen anything, but you

5  didn't actually investigate or ask the question of

6  whether private payors had objected to any of this or

7  not?

8       A    I did not do any investigation.  I made

9  that clear at the beginning.

10      Q    Did you ask Guardian whether or not

11  private payors objected to any of these terms?

12      A    I don't recall.

13      Q    You have a citation in paragraph 51,

14  paragraph 80, the key element of the AKS is an intent

15  to induce referrals through the provision of

16  remuneration.  Mere encouragement is not sufficient.

17  And you have a cite in 51 to the Shalala opinion; is

18  that right?

19      A    I'm sorry, what -- what page and footnote

20  are we on?

21      Q    Paragraph 80.

22      A    80.

23      Q    A key element of the AKS is an intent to

24  induce referrals through the provision of

25  remuneration.  Mere encouragement is not sufficient,

1    and you have a citation to the Shalala case from the

2    9th Circuit in 1995, correct?

3         A    Right.

4         Q    Did you add that citation?

5         A    Yes.

6         Q    Are you familiar with that case?

7         A    Yes.

8         Q    Do you believe that it has been overruled

9    or extinguished at any point from 1995 to present?

10        A    Not on that point, no.

11        Q    You don't think mere encouragement is not

12   sufficient as outlined in the Shalala opinion from

13   1995 has been extinguished or overruled by subsequent

14   cases?

15        A    No, it has not.

16        Q    So you would be surprised if I had case

17   law that says it has?

18        A    That says mere encouragement is enough?

19        Q    Yes, sir.

20        A    Yes, I would be surprised.

21        Q    That's not your understanding of the

22   Anti-Kickback Statute?

23        A    I don't believe it's the understanding of

24   the Justice Department either.

25        Q    Is it your understanding?

1        A    No, it is not my understanding.  Mere

2   encouragement is not.

3        Q    Paragraph 81 you note if the provider's

4   competitors are offering the same service, however,

5   the service does not provide any competitive

6   advantage legal or illegal.  Rather the service

7   simply maintains a level playing field.  Do you see

8   that?

9        A    I do.

10       Q    If Guardian's competitors are engaging in

11  conduct that violates the Anti-Kickback Statute, does

12  Guardian get to violate the Anti-Kickback Statute to

13  create a level playing field?

14       A    I believe they wouldn't be violating the

15  Anti-Kickback Statute, then.  You have to satisfy

16  each element of the statute.

17       Q    So if Guardian's competitors are engaging

18  in criminal conduct, Guardian can engage in criminal

19  conduct to level the playing field?

20       A    They can engage in criminal conduct, but

21  the crime is not the Anti-Kickback Statute.  So I

22  don't know -- I mean, that's all I'm saying.

23       Q    Why is the crime not a violation of the

24  Anti-Kickback Statute?

25       A    Because the statute requires you to give

1  remuneration in exchange for or to cause referrals.

2  And if -- if all you're doing is matching exactly

3  what your competitors are doing, that gives you no --

4  no competitive advantage.  That's not going to induce

5  anybody.  It only puts you on the same playing field.

6  That's all.

7          It's a simple matter of -- it's one of

8  the factual evidence that you would put in the trial.

9  It's just -- you don't get an advantage.  It's not

10  going to induce anybody.

11     Q    If Guardian's competitors are giving

12  remuneration in exchange for referrals, which is

13  clearly a violation of the Anti-Kickback Statute as

14  you testified for four hours, can Guardian also give

15  remuneration in exchange for referrals and not

16  violate the Anti-Kickback Statute?

17     A    First of all, I think you

18  mischaracterized my testimony.  I didn't say giving

19  remuneration to induce referrals, violation of

20  kickback statute.  There has to be -- each element

21  has to be satisfied.  It has to be knowing, willful,

22  etcetera.  But I am saying that if, in fact, you are

23  meeting competition, that you're giving the same

24  thing that your competitors are, that that doesn't --

25  as a factual matter that's not going to induce anyone

1   to use your service.  It just puts you on the level

2   playing field with the other people.  The kickback

3   statute -- I mean, it doesn't say you have to commit

4   hari-kari.

5         **Q    If Guardian's competitors are knowingly**

6   **and willfully giving remuneration in exchange for a**

7   **referral in violation of the Anti-Kickback Statute,**

8   **is Guardian excused from liability if it does the**

9   **exact same conduct to create a level playing field?**

10        A    I believe that's exactly what this

11  statute says.  I mean --

12        **Q    So you can violate the law if your**

13  **competitors are violating the law?**

14        A    No, it's -- you only violate the law if

15  what you're giving is causing the people to refer to

16  you.  If you're only giving what everybody else is

17  given, you are not causing that.  I mean, logically

18  it makes no sense.  You're not causing them.  You're

19  only doing exactly what everybody else is doing, so

20  you're all on the same playing field.

21        **Q    And if all of that conduct what everybody**

22  **is doing is violative of the Anti-Kickback Statute,**

23  **you're immune from liability for your individual**

24  **actions because everybody else is doing it?**

25        A    I'm not saying you're immune.  I'm saying

 1    you don't violate the statute.  You don't meet the
 2    elements of the statute.
 3        Q    So if you're doing what everybody else is
 4    doing and everybody is violating the statute, you're
 5    not violative of the Anti-Kickback Statute because
 6    your defense is everybody else is doing it and I'm
 7    creating a level playing field?
 8        A    No.  My defense is I didn't knowingly and
 9    willfully give somebody something to cause them to
10    refer to me.  I was only giving it because it put me
11    on the same playing field as everybody else.
12        Q    And if I knowingly and willingly gave
13    remuneration in exchange for referrals because my
14    competitor was knowingly and willfully giving
15    remuneration in exchange for referrals, have I
16    violated the Anti-Kickback Statute?
17        A    Yes.  If you're giving it -- if you're
18    giving it in exchange, if you have a quid quo pro,
19    that's not -- that's not what the example you used.
20        Q    My example is that my competitor is
21    violating the Anti-Kickback Statute.  My competitor
22    is knowingly and willingly giving remuneration to a
23    community in exchange for referrals.  You've told me
24    that's wrong, right?  That's a violation of the
25    Anti-Kickback Statute?

1       A     It sounds as you phrased it, yes.  It

2   seems to meet all the elements.

3       **Q     So if my competitor is knowingly and**

4   **willfully giving remuneration to a community in**

5   **exchange for referrals which is a violation of the**

6   **Anti-Kickback Statute, is it an excuse for me to do**

7   **the same conduct without also being violative of the**

8   **Anti-Kickback Statute?**

9       A     Well, I think you would be if in fact

10  whatever you're doing is in exchange for referrals.

11  That's not the example that -- I mean, that's the

12  example you give.  Sure, you can have a quid quo pro.

13  But if you're telling -- if in fact you're alleging

14  that you can't do it to induce referrals, then I

15  would just say you're not inducing referrals.

16      **Q     The fact that my competitors are**

17  **violating the law doesn't give me an excuse to also**

18  **violate the law, does it?**

19      A     No.  But you're not violating the law.

20  You don't satisfy the elements of the crime.

21      **Q     Page 24, paragraph 86, sir.**

22      A     Yes.

23      **Q     You have here that in light of the**

24  **widespread open and common practice of providing**

25  **medication administration-related services to ALC and**

 1   PCHs, it is unlikely that Guardian's consulting

 2   services would have given Guardian any improper

 3   advantage in securing new business.

 4          What are you referring to in

 5   paragraph 86?

 6       A    I'm referring to the testimony that the

 7   consulting services were commonly given by their

 8   competitors.  They were open.  I mean, there was

 9   nothing -- it was historical, goes back.  I mean, the

10   Lewin report documented it.  So -- and the testimony

11   of the homes was they all had approximately the same

12   services.

13       Q    So because some competitors provided the

14   same medication management services for free, it's

15   okay for Guardian to provide those medication

16   management services for free?

17       A    Guardian did not provide any medication

18   administration services for free.

19       Q    To the community?  That's what you said.

20       A    To their patients.  I mean, that's who

21   they were providing it to.

22       Q    85 says there's substantial evidence that

23   LTC pharmacies including Guardian's competitors

24   continued to provide such services without charge to

25   CHs, right?

```
 1        A    Yes.
 2        Q    And then you have a citation to a bunch
 3   of stuff in there that you add that supposedly says
 4   that other Guardian competitors continue to provide
 5   services without charge to the community homes,
 6   right?
 7        A    Yes.
 8        Q    And aren't those terms confidential, the
 9   pricing terms that we discussed earlier?
10        A    Well, these were -- these were -- this
11   was the testimony in court.  So I -- I'm relying on
12   these were the people that were buying the services
13   or at least contracting for them.
14        Q    Testimony after the fact in litigation,
15   not testimony that this was known or that this was
16   happening at the time?
17        A    Well --
18        Q    All affidavits or depositions in the
19   case.
20        A    It's consistent with the Lewin report.
21   It's consistent with general descriptions of the
22   industry.
23        Q    But Guardian's pricing is confidential.
24   You said that earlier.
25        A    Right.
```

1       **Q     Any reason to believe that the**
2  **competitors' pricing was not confidential?**
3       A     No.  I have no idea.  I assume it would
4  be as well.
5       **Q     You assume it would be confidential as**
6  **well?**
7       A     As -- as confidential as they can keep
8  it.
9       **Q     Right.**
10          **So all of the competitors were keeping**
11 **their pricing confidential from 2014 to 2018?**
12      A     I'm sorry?
13      **Q     All the competitors as you understood it**
14 **were keeping their pricing confidential and not**
15 **sharing with each other, were they?**
16      A     No, they weren't generally, but I'm
17 sure they -- I mean, you get -- I'm sure they had
18 ideas.
19      **Q     Your phraseology in 86 is "it is unlikely**
20 **that."  Did you form an opinion whether in fact it**
21 **did or did not?**
22      A     I saw no evidence that it gave them any
23 advantage.
24      **Q     So that's different than "it is**
25 **unlikely"?**

1      A    Well, no, I mean, it's -- it's not

2  determinable.  I just...

3      Q    **Are you offering an opinion that the free**

4  **consulting services did not give Guardian an unfair**

5  **advantage or an advantage over its competitors?**

6      A    I said based on the evidence, it does not

7  seem to have given them any advantage based on all

8  the depositions of the operators of the homes.

9      Q    **So you would change your language in 86**

10 **and 87 not to "it is unlikely," but you have an**

11 **opinion that it actually did not is what you're**

12 **telling me?**

13     A    No, I -- I phrased it the way I phrased

14 it.

15     Q    **Oh, I know.  But "it is unlikely"**

16 **isn't -- isn't taking a stand.  It's not saying one**

17 **way or the other.  It either is or is not.**

18     A    Well, it is.  It is a -- based on the

19 evidence, it looks unlikely.  That factors into a

20 decision to the overall review of the facts and

21 circumstances.

22     Q    **I'm going to ask you to look at 88,**

23 **paragraph 88 on page 25.  You have a statement that**

24 **people who are knowingly and willfully engaging in**

25 **criminal acts do not commonly publicize those**

```
 1   activities.  Instead, they tend to conceal their

 2   illegal activities.  Correct?

 3        A    Correct.

 4        Q    You don't have a citation for that,

 5   right?  You're just stating it?

 6        A    That's right.  That's based on my

 7   experience.

 8        Q    Is it your experience that this is a

 9   criminal case or a civil case?

10        A    Well, it's a criminal -- it's a

11   criminal -- it's a civil case, but it's alleging a

12   crime.  So it is both.

13        Q    You can violate the Anti-Kickback Statute

14   only through criminal activity, not civil activity?

15        A    That's correct.

16        Q    Do you recognize that when you say

17   commonly publicized, what are you referring to?  The

18   people that violate the Anti-Kickback Statute and not

19   talk about contracts or talk about their practices

20   and still get caught?

21        A    I'm sorry, I don't understand.

22        Q    Have you ever been involved in an

23   Anti-Kickback Statute where a company was actively

24   telling people its conduct but it still violates the

25   Anti-Kickback Statute?
```

1         A    I'm sorry, I still didn't catch the very

2    beginning.

3         Q    **Have you ever been involved in a case**

4    **where a company violates the Anti-Kickback Statute by**

5    **pricing or policies that are known to third parties?**

6         A    I actually -- I actually don't know of

7    any -- any criminal conviction based on those facts.

8         Q    **I'm not talking a criminal conviction.**

9    **I'm talking about civil liability in the**

10   **Anti-Kickback Statute context.  In your six years of**

11   **working at OIG and your private practice since 2003,**

12   **you're not aware of a single instance where the**

13   **conduct or course of conduct of a company was known**

14   **to a third party that resulted in Anti-Kickback**

15   **Statute liability after the fact?**

16        A    I -- there is no civil Anti-Kickback

17   liability, so I'm really not sure what you're talking

18   about.

19        Q    **Are you aware of any liability under the**

20   **Anti-Kickback Statute in your six years at OIG and**

21   **your private practice since 2003 where the conduct**

22   **was known to a third party prior to settlement and**

23   **prior to conviction?**

24        A    I don't know of any criminal convictions.

25   I just can't think of it.  Are there settlements in

1  cases?  Sure.

2      Q    You're not aware of a single case where a

3  third party knew about the criminal conduct prior to

4  it being disclosed?  Every case you're aware of --

5      A    I'm just --

6      Q    -- involves concealment of all the facts

7  in a criminal case from 2003 to present?

8      A    I'm just trying to think of -- I can't

9  think of -- I mean, I -- first of all, there aren't

10  very many criminal cases.  And I just can't -- I just

11  don't recall the facts of them particularly.

12      Q    Paragraph 93 of your report says that

13  there is also no clear federal guidance addressing

14  the provision of such services by LTC pharmacies to

15  residents of ALCs or PCHs.

16          Is it your opinion that there is no

17  federal guidance related to the conduct at issue in

18  this case?

19      A    What paragraph were you on?  I didn't

20  catch it.

21      Q    92.

22      A    92.  So the question is?

23      Q    Reading paragraph 92 in your first

24  sentence says:  There is no clear federal guidance

25  addressing the provision of such services by LTC

1  pharmacies to residents of ALCs or PCHs.  Your

2  opinion in this case is there is no federal guidance

3  that instructs on the providing of services by LTC

4  pharmacies to residents or assisted living

5  communities or personal care homes?

6      A    I am not aware of any (inaudible) that

7  deals with the provision of these specific services

8  by LTC pharmacies to residents of congregate care

9  homes.  I cite the one -- the only one that

10 specifically discusses it, which is the advisory

11 opinion.

12     Q    So the OIG guidance that we looked at

13 earlier from September 30th, 2008, it specifically

14 says:  Nursing facilities that receive consultant

15 pharmacist services under contract with a long-term

16 care pharmacy should be mindful that the provision or

17 receipt of free services or services at non-fair

18 market value rates between actual or potential

19 referral services presents a heightened risk of fraud

20 and abuse.  That's not federal guidance that's clear

21 on the topic?

22     A    That's not federal guidance that

23 addresses the provision in these (inaudible) of any

24 ALCs or PCHs.

25     Q    It says:  Consulting pharmacists under

1    contract with long-term care pharmacies.  That's not

2    clear federal guidance for learning the heightened

3    issues with respect to (inaudible)?

4         A    It's addressing nursing facilities which

5    are very different.  I mean, does it -- is it

6    generally -- I mean, generally free goods are -- are

7    suspect.  But these are neither free goods nor are

8    they to nursing facilities that are receiving

9    reimbursement from federal coffers for providing

10   those same services they're getting for free.

11        Q    When we looked at the contract between

12   Canterfield of Kennesaw and Guardian, we talked about

13   the standards for consulting pharmacist services.  We

14   looked through paragraphs A through H.

15        A    Yes.

16        Q    Are those clear?

17        A    Not particularly because it says

18   consulting pharmacist services -- consulting

19   pharmacist services will be at cost.  And you read

20   the other provision as saying consulting pharmacist

21   costs are free.  So obviously, it's not particularly

22   clear.  I don't -- I think they're different.

23        Q    You don't think paragraph 7-A through H

24   is clear as to what Guardian can and can't do under

25   the Anti-Kickback Statute?

1        A     Well, as I said before, it's a contract
2    provision.  It has no basis on whether or not they
3    violate the Anti-Kickback Statute.
4        Q     Sir, the section says:  The parties
5    intend that their contractual relationship will be
6    compliant in all manners with applicable federal and
7    state laws including, but not limited to, the federal
8    kickback statute.  Accordingly, they agree to the
9    following terms which are hereby incorporated into
10   the agreement by reference for all purposes.
11             Are you saying that those terms A through
12   H are not clear as to what violates the federal
13   Anti-Kickback Statute?
14       A     Well, I thought we were talking about
15   federal guidance.  Those are contractual provisions.
16   I'm sorry.  I mean, what's your question?
17       Q     Are the contractual terms clear as to
18   what is not allowed under the Anti-Kickback Statute
19   in looking at paragraphs A through H under paragraph
20   seven?
21       A     Let's see.  This doesn't -- I got to go
22   back to that.  I don't -- I'm having trouble pulling
23   up the -- let me -- okay.  That was --
24             MR. RISSLER:  Is this Exhibit 132 of
25        the Canterfield contract?

1           THE WITNESS:  I'm trying to --

2           MR. RISSLER:  Is that what you were

3      reading from, Joe, Exhibit 132?

4           MR. CALLOW:  I told him 132.

5           THE WITNESS:  Oh, yes.  Yes, okay.

6      I've got it.  Sorry about that.  So, I

7      mean, I think they're as clear as most

8      contractual provisions.

9  BY MR. CALLOW:

10      **Q    Your guidance to Guardian on what to do**

11  **and not to do based on A through H under the**

12  **Anti-Kickback Statute language that we see in Exhibit**

13  **(inaudible)?**

14      A    I didn't catch the beginning of that.

15      **Q    A through H are clear?**

16      A    I mean, they're as clear as contract

17  language.  They appear to be reasonably clear.

18      **Q    And it's known to both Guardian and the**

19  **community what they can and cannot do to avoid**

20  **violating the federal Anti-Kickback Statute by**

21  **reading A through H in Exhibit B?**

22      A    Well, I mean, A through H don't establish

23  the parameters of the kickback statute.  I mean,

24  they're -- they're guidance.  I mean -- I mean, what

25  those are probably good practices.

1      Q    Correct.

2           And you see Exhibit B in a vast majority

3    of the contracts between Guardian and its

4    communities, right?

5      A    Yes.

6      Q    And that is guidance for Guardian of how

7    to act to avoid violating the Anti-Kickback Statute

8    by its own terms and by the agreement it signs,

9    correct?

10     A    I mean, it sets out standards for -- for

11   their contractual relationship.

12     Q    Paragraph 115 of your report, sir, is on

13   page 30.

14     A    This doesn't seem...

15     Q    Take your time.  We'll get there.

16     A    I'm sorry, what paragraph?

17     Q    Paragraph 115 on page 30.

18     A    Okay.  Yes.

19     Q    Bona fide discounts are not the type of

20   conduct that Congress intended to prohibit by the

21   AKS.  In fact, discounts are exempted from AKS's

22   prohibitions.  And then you have a citation to a 1977

23   House report from interstate and foreign commerce?

24     A    Yes.

25     Q    That's the citation in support for your

1    paragraph in 115?

2         A    Well, yeah, I mean, that and there's a

3    specific statutory exception in the statute for

4    certain discounts and then there's a safe harbor and

5    I mean -- I mean, generally --

6         **Q    You didn't cite to the safe harbor.  You**

7    **cited to a 1977 report of the interstate and foreign**

8    **commerce?**

9         A    Right.  As I said in the beginning of my

10   report, these were illustrative and not the only

11   bases.

12        **Q    And you told me that you looked and are**

13   **not applying any safe harbor provision that would**

14   **apply to the Anti-Kickback Statute in (inaudible)?**

15        A    Yes, I did.

16        **Q    So whatever discount safe harbor there**

17   **is, that doesn't apply in this case?**

18        A    Well, there's a different -- there's a

19   discount safe harbor which wouldn't apply.  There's a

20   statutory discount exception that potentially

21   applies.

22        **Q    Based on this House report from 1977?**

23        A    Based on the language of the statute.

24        **Q    And then you say in 116:  Free**

25   **introductory samples or teaser-type discounts are**

1  commonplace.

2        A    Yes.

3        Q    And your basis for that is what?  You

4  don't have a cite for that.

5        A    My experience.

6        Q    Your experience in what?  You don't have

7  any --

8        A    My experience --

9        Q    -- in long-term care homes.

10       A    In commerce.  The statute isn't

11  particularly changes healthcare, and there are -- I

12  do cite later on there are a number of advisory

13  opinion.

14       Q    Of your free introductory samples or

15  teaser-type discounts are commonplace; it's based

16  upon your experience in commerce.  It's not based

17  upon the long-term care pharmacy industry.  It's not

18  based upon assisted living communities.  It's not

19  based on personal care homes.  It's based generally

20  on commerce?

21       A    It's basically vendors and customers.

22       Q    Okay.

23       A    Including healthcare industry.

24       Q    Nothing specific to long-term care

25  pharmacies, assisted living communities or personal

1    care homes?

2            A    No, not particularly.

3            Q    **Paragraph 120 you say that there is no**

4    **evidence that the homes receive these introductory**

5    **discounts received anything of value.  You see that?**

6            A    Yes.

7            Q    **The discount the homes did receive, the**

8    **classes that they didn't have to pay for prior to**

9    **2018, correct?**

10           A    Correct.

11           Q    **Communities did receive skills checks at**

12   **times that they didn't have to pay for if they paid**

13   **for other services, correct?**

14           A    Under the terms of this, they didn't pay

15   for these.  They may have paid for other services.

16           Q    **So there is a value to not paying for**

17   **those classes and a value to not paying for the**

18   **skills checks, but they paid other ways?**

19           A    Well, it may not be fair market.  It --

20   despite the fact that these were given for -- it may

21   be very well that their total payments for the

22   educational classes were fair market value including

23   these as I think the economy shows and the marginal

24   costs of this was very, very low.  So unless we know

25   how many courses they took, one can't really

1  ascertain whether it's below fair market value or

2  not.

3       Q    Well, the classes themselves were below

4  fair market value prior to 2018 and the skills checks

5  that were discounted to free had a value prior to

6  2018 in and of themselves, correct?

7       A    No.  I think that the way Guardian

8  understood it was they were offering these for

9  their -- for their -- for homes that were making them

10  preferred providers and that they -- they would give

11  them ten free ones.  There was a lot of turnover and

12  that the cost -- I mean, they would ultimately --

13  they weren't losing money on this even with the ten.

14  So that was fair market value.  It's not -- you look

15  at it as a whole.

16       Q    Well, there's a value to the community in

17  not paying a hundred dollars per class for the ten

18  people, correct?  That has a value?

19       A    But it may not be fair -- that may not be

20  fair market value.  I mean --

21       Q    Because they got it for free so, I mean,

22  it's clearly not fair market value.  They got ten

23  classes for free that had a fair market value of a

24  hundred dollars that the community didn't pay for.

25  That is a value in and of itself, correct?

1          A    No.  There's no evidence in here that $50
2    was fair market value.  It's just what Guardian
3    charged.  And depending on the -- Guardian looked at
4    this as a relationship.  They're looking at the whole
5    of educational services, not one by one.  And so what
6    that they charge a particular customer is based on
7    how many education sales they make.  So the beginning
8    they think we'll get them in and they'll see how good
9    they are and with turnover we'll get a lot.

10         Q    So the fact that they gave classes and
11   allowed ten individuals to attend without any charge,
12   you're not willing to say that that has a value in
13   and of itself?

14         A    I'm -- I think it is -- I think it's a
15   discount.  What I don't know is whether they paid
16   fair market value for it over the course of the
17   relationship.

18         Q    Well, it's a discount because they didn't
19   pay the hundred dollar Guardian charge; it was zero
20   payments for that class?

21         A    That's correct.

22         Q    For ten people?

23         A    You get ten free.  Buy one get one free.

24         Q    And that's a value of a thousand dollars
25   if you send ten people to those classes prior to

1   January 30 of 2018, correct?

2        A    No, I don't think it's necessarily a

3   thousand dollar value.  It's basically -- I mean, A,

4   I don't know what other people were charging but, B,

5   I don't know what the fair market value was.  It

6   didn't cost hardly anything near that.

7        Q    It doesn't matter what it cost Guardian.

8   Guardian was charging attendance at a hundred dollars

9   for a two-day seminar, but it allowed certain

10  communities to send ten people without paying the

11  hundred dollars for the same class that the person

12  sitting next to them was paying a hundred dollars

13  for.

14       A    Right.

15       Q    You're saying that doesn't have any value

16  to the community to send ten people to get certified

17  under the state licensure requirements as you

18  outlined in paragraphs 40 to 44; there's no value in

19  not paying a hundred dollars per head, a thousand

20  dollars for ten people to get their CMT or whatever

21  the license was?

22       A    It has -- it -- it has some value.

23  Whether or not it -- whether or not it is below fair

24  market value can be only ascertained over the course

25  of the relationship, how many other courses they

1  took, what was the amount they paid.

2      **Q    So the Anti-Kickback Statute looks at the**

3  **relationship as a whole and not just individual**

4  **actions that a company takes?**

5      A    It looks -- in terms of discounts it

6  looks at the discount, why it's done, how long it's

7  done, and whether it's time loaded for a specific

8  function.  Whether it's basically a legitimate

9  discount or whether it's in fact a disguised

10  kickback.

11      **Q    So you're saying as you're opining here**

12  **today that we both acknowledge that Guardian provided**

13  **classes, lets certain communities send ten people to**

14  **those classes without incurring payment.  It's a**

15  **thousand dollar value to the community.  But you're**

16  **telling me you don't judge whether that's a kickback**

17  **until you look at the long-term overall relationship**

18  **over time?**

19          MR. RISSLER:  Objection, misstates his

20      prior testimony, asked and answered.

21      A    I believe that when you look at a

22  discount for a continuing service that you look to

23  decide whether or not it is legitimate depends in

24  large part on whether or not it makes business sense,

25  and that that's -- the kickback statute did not

1   criminalize discounts in the healthcare industry.  I

2   think that's just pretty clear.  They get them every

3   day.

4   BY MR. CALLOW:

5        Q    Do you have any evidence of what was paid

6   by communities to Guardian over the relationship?

7        A    No, I do not.

8        Q    So when you say let's look at the total

9   aggregate, you don't know what that is?

10       A    No.

11       Q    So did you evaluate whether or not the

12  total remuneration made up for the fact that it was

13  three classes as outlined in 120?

14       A    No, I did not --

15       Q    You don't know one way or the other?

16       A    Right.  But I know that this is a -- this

17  is a typical normal kind of a discount and it needs

18  to be accumulated.  And I saw no proof provided it

19  wasn't.

20       Q    You say in assessing whether a home

21  actually received improper remuneration one must look

22  at the total aggregate services received and

23  aggregate compensation paid by a community for the

24  classroom instruction to determine if it received any

25  unlawful benefit.

1              You did not do that?

2        A    Neither did you.  That's why -- you're

3    right.  I'm looking at the evidence I reviewed.  I

4    saw no evidence that it didn't.

5        Q    You did not do it in your opinions and

6    your report here --

7        A    No, I did not.

8        Q    -- as outlined in Exhibit 120?

9        A    I'm sorry, what was the question?

10       Q    You said no, I do not.  I'm good with

11   that.

12       A    Okay.

13       Q    Do you know if the discounts were passed

14   on to Medicare by Guardian?  Do you know if they

15   provided the discounts to Medicare in the course of

16   their relationship?

17       A    They wouldn't be paid on to -- they

18   wouldn't be passed on to Medicare because Medicare

19   doesn't pay for it.

20       Q    Well, the discounts on the classes,

21   that's not part of the dispensing fee, it's not part

22   of what Medicare is paying for for the dispensing of

23   the product?

24       A    Well, I think generally if it was -- I

25   mean, in -- I mean, actually, I think it could be

1    part of the dispensing fee and part of the service

2    fee.  And it may have been paid entirely through that

3    even with the discount.  But generally, Medicare does

4    not -- Medicare wouldn't pay for that.  I don't think

5    it would be part of the dispensing fee to the -- to

6    the part D plan.

7         **Q    So the classes for training that were**

8    **done over time are not part of the dispensing fee**

9    **paid by Medicare for the dispensing of the**

10   **pharmaceutical drugs?**

11        A    Well, I'm not -- I don't know.

12   I don't -- I'm not an expert on what's covered by the

13   dispensing fee.  I think they may have been covered

14   at least in part by the service fee paid by the

15   residents.

16        **Q    Do you know whether the skills checks and**

17   **the payments or costs associated with skills checks**

18   **as required by the Georgia regulation is part of the**

19   **dispensing fee paid by the PBMs?**

20        A    Again, I don't know.  I don't know

21   anything about the dispensing fee in general, I mean,

22   besides what I've read in the reports.  I think it

23   could be covered by the service fee.

24        **Q    If the skills check discounts and the**

25   **class discounts are covered by the dispensing fee,**

1  you understand that Guardian needs to report that to

2  the PBMs, do you not?

3      A    Not -- no -- how the -- exactly what gets

4  reported and what doesn't.

5      Q    You don't know that one way or the other?

6      A    No.

7      Q    When you looked at the deposition

8  testimony, did you review any of the pharmacy reports

9  that were provided by Guardian for the quarterly

10  consulting that was done?

11      A    Yes, I looked at some of them, some of

12  the exhibits.  I can't say I read them all carefully.

13      Q    And you know that those pharmacy reports

14  are provided to the community but they're not

15  provided to the resident unless requested, right?

16      A    Yes, not directly.  Yes.

17      Q    And you know the pharmacy reports also

18  are not provided to the PBMs, right?

19      A    I don't know, but I wouldn't think so.

20      Q    Let me ask you to look at 46 which I'm

21  going to put up.

22           (Whereupon, Exhibit No. 46 was previously

23           marked for identification by the court

24           reporter.)

25  BY MR. CALLOW:

1        Q    You have 46 up there, sir?

2        A    I do now, yes.

3        Q    46 is 118295 through 303.  You'll see

4   those Bates stamps in the bottom right corner there.

5        A    So what were the numbers again?

6        Q    The Bates stamps are in the bottom right

7   corner of Exhibit 46.  It should be Guardian 118295

8   through 118303.

9        A    Yep.

10       Q    You have that?

11       A    Yes.

12       Q    This is a pharmacy report that Lori

13  Newcomb prepared for Waterford and Oakwood in May of

14  2015.  Do you see that?

15       A    Yes.

16       Q    In the middle of that first page, there's

17  a paragraph that starts:  Guardian Pharmacy is

18  servicing 57 percent of your residents.

19       A    Yes.

20       Q    That in October of 2014, we had

21  54 percent and in January 52 percent.  We really need

22  to be above 80 percent in order to consider packaging

23  changes, new carts and more accurate data collection.

24            Do you see that?

25       A    Yes.

1      Q    Ms. Newcomb is telling Waterford and

2  Oakwood that they need to be get to 80 percent of the

3  residents in order to get more accurate data

4  collection for servicing the clients.  Do you see

5  that?

6      A    I do.

7      Q    They're already servicing 57 percent

8  which is greater than they had in the months before,

9  and Ms. Newcomb is telling them that for packaging

10  changes, a new cart and more accurate data the

11  community has to get them to 80 percent.  Do you see

12  that?

13      A    I don't think it says that.  I see where

14  you're reading.  I don't think it says what you say.

15      Q    We really need to be above 80 percent in

16  order to consider packaging changes, new carts and

17  more accurate data collection.  That's what Guardian

18  is telling the executive director and wellness

19  director of Waterford and Oakwood, correct?

20      A    Yes.

21      Q    Guardian is not providing packaging

22  changes, new carts or more accurate data collection

23  until they get 80 percent of the residents at that

24  community.

25      A    They said they need 80 percent to

1    consider that.  It doesn't say -- I see nothing

2    asking a community to do anything.  It's just stating

3    a fact.

4        Q    That's stating a fact and not encouraging

5    those communities to get more residents to come to

6    Guardian?

7        A    No.

8        Q    And you think it's appropriate for

9    Guardian to hold out packaging changes, carts and

10   more accurate data collection until it happens to hit

11   80 percent of the residents?

12       A    I certainly think they're -- yes, there

13   are circumstances in which it's perfectly

14   appropriate.  I don't know particularly this facility

15   or this -- but I think it was explained in the

16   depositions.

17       Q    So 57 percent of the residents chose

18   Guardian.  57 percent have contracts with Guardian.

19   But Guardian's not going to provide new packaging,

20   new carts or more accurate data collection until

21   80 percent of the residents sign on?

22       A    It says unless.  Yeah, before they do

23   that.

24       Q    So those 57 residents don't have

25   packaging changes, don't have new carts and don't

1  have accurate data collection until Guardian somehow

2  gets 80 percent, not 57 percent?

3           MR. RISSLER:  Objection, misstates the

4      document.

5      A    I mean, I think what it says is -- I

6  mean, it says -- it says what it says.  As I said,

7  there may be many reasons why you don't.  I think

8  there's testimony about you don't change -- the drug

9  packaging is a big -- has consequences I don't

10  understand.  There's clearly discussions, and I think

11  there's deposition testimony on why you didn't want

12  to switch until there was a lot.  I think there's a

13  lot of safety concerns.  I think the carts actually

14  go with the scripts.  So it goes with the kind of

15  packaging you have.  You have different kinds of

16  packaging.  And I don't know what they're talking

17  about, the data collection.

18           But as I said, it's perfectly -- it's

19  perfectly appropriate for vendors to provide

20  different services depending on how many customers

21  they have in -- from a particular facility, I mean,

22  whether it's long-term care or anything else.

23  BY MR. CALLOW:

24      Q    Just to be clear, sir, when you say

25  "vendor," you're talking about Guardian of Atlanta, a

1   long-term care pharmacy that is handling the

2   medications for a person in an assisted living

3   community.  You're treating them like a FedEx truck

4   by calling them a vendor.

5              MR. RISSLER:  Objection.

6   BY MR. CALLOW:

7        Q    This vendor has obligations under federal

8   and state requirements to ensure the patient safety

9   of the people that sign up for a contract.  And

10  you're telling me that it's okay for Guardian

11  Pharmacy to hold up packaging changes, new carts and

12  more accurate data collection to 57 percent of the

13  residents until somehow it gets to 80 percent of

14  residents.  That's your testimony under oath here

15  today?

16             MR. RISSLER:  Objection, misstates his

17       testimony, misstates the document.

18       A    My testimony under oath is that there is

19  no evidence and I heard no allegations in this that

20  Guardian -- that these particular patients were

21  somehow unsafe or didn't have it better.  They just

22  don't -- they have a different kind of packaging and

23  they have data collection.

24             You're -- you were -- your statement has

25  no basis on what's in the record here.  What they do

1    say is we won't consider certain changes until we

2    have enough people for reasons that they can best

3    explain.

4    BY MR. CALLOW:

5         Q    So you as an Anti-Kickback Statute

6    consulting expert testifying here today find nothing

7    of any significance or concern with Guardian telling

8    the community that servicing 57 percent of the

9    residents is not enough to get packaging changes, new

10   carts and more accurate data collection and they

11   really need to be above 80 percent to do so.  It

12   doesn't bother you at all?  Nothing wrong here at

13   all?  Take a look and move on to your opinion.

14        A    Nothing on its face.  I don't -- first of

15   all, there's no remuneration to the facility.  So the

16   kickback statute as far as I read this isn't even

17   implicated.

18        Q    Because the new cart that they get with

19   80 percent isn't something that the community would

20   have to buy if they don't have it yet?

21        A    We can talk about the cart.  The loan of

22   the cart is perfectly acceptable.

23        Q    But they don't get that new loan cart

24   unless they get to 80 percent?

25        A    I suspect the way this is that they

1   already have a cart.  They're having a different

2   cart.

3        Q    They want a new one.  They want the new

4   cart.  And they don't get the new cart until they get

5   to 80 percent?

6        A    They may very well get the new cart when

7   they have new packaging which requires a different

8   cart.

9        Q    That's your understanding?  The packaging

10  determines the cart?

11       A    I believe there is testimony to that

12  effect.

13            (Whereupon, Exhibit No. 48 was previously

14       marked for identification by the court

15       reporter.)

16  BY MR. CALLOW:

17       Q    Let me ask you to look at Exhibit 48.  48

18  is another pharmacy report from Ms. Newcomb.

19       A    I'm going to take a while here.

20       Q    Okay.

21       A    That's 46.  Is this Exhibit 48?

22       Q    Yes, sir.  Exhibit 48 has a Bates number

23  in the bottom of Guardian 115303 through 311.

24       A    So we skipped 47?

25       Q    Yes.

1        A    Okay.  I've got it in front of me.

2        Q    48 is another Ms. Newcomb report.  This

3    one is to Waterford and Oakwood going to the

4    executive director, the wellness director and the

5    regional QA nurse.  Do you see that?

6        A    Yes.

7        Q    And this one is dated December of 2016,

8    right?

9        A    Yes.

10        Q    I must begin with my biggest concern

11    which is that Guardian is following the servicing on

12    50 percent of your residents.  We were at a highest

13    number of residents, paren, in a long time, closed

14    paren, last quarter, 63 percent.  Please let us know

15    if there is a problem with marketing or our services.

16    There were 11 new residents admitted this quarter and

17    only two of these came to Guardian Pharmacy.

18    Remember that if you fall below 50 percent of

19    residents, the community is at risk of losing

20    services provided by Guardian Pharmacy.

21            Do you see that?

22        A    I do.

23        Q    The community is not referring enough

24    people to Guardian, and if they don't get 50 percent,

25    Ms. Newcomb's going to withhold services.  You don't

1    believe this is in any way encouragement for the

2    community to refer more patients to Guardian?

3        A    Actually, I do not, and I don't think

4    your prefatory statement was accurate.  But no, I

5    think what this shows is that Guardian is concerned

6    that it's going down and they're asking them what can

7    we do about it.

8        Q    The community is at risk of losing

9    services provided by Guardian if the number falls

10   below 50 percent.  Is that what she says?

11       A    Yes.

12       Q    Guardian's going to take away services to

13   the 49 percent of the residents it services unless it

14   gets 50 percent of all the residents.  You see that?

15       A    Yes.

16            MR. RISSLER:  Objection, misstates the

17       document.

18   BY MR. CALLOW:

19       Q    What do those poor 49 percent of

20   residents do that signed up with Guardian that are

21   going to lose services provided by Guardian if other

22   residents choose not to sign up with Guardian?

23            MR. RISSLER:  Objection, misstates the

24       exhibit.

25       A    Well, I -- it is -- certainly they're

 1  still getting the services that they paid for.

 2  There's no indication of that.  Maybe there are

 3  additional -- and the fact is that it's -- we don't

 4  really know what Ms. Newcomb is specifically

 5  referencing.  But I think more importantly it's not

 6  saying get other people up; it's saying let us know

 7  if there are concerns so we can address them.

 8  BY MR. CALLOW:

 9       Q    If you fall below 50 percent of

10  residents, the community is at risk of losing

11  services provided by Guardian Pharmacy.

12            Is that an acceptable statement that you

13  believe a consulting pharmacist at Guardian should

14  make to a community?  Are you fine with that

15  statement?  You're okay with that statement?

16       A    Is the question do I think that violates

17  the kickback statute somehow, or do I think it's just

18  not a good thing to say?

19       Q    Do you think it's a good thing to say?

20  Let's start with that.  Do you think it's a good

21  thing to say in your years of healthcare experience

22  for a consulting pharmacist to tell the community if

23  you fall below 50 percent of residents, I'm cutting

24  your services?  Do you think that's --

25            MR. RISSLER:  Objection, misstates the

1        documents.

2           A     I don't think that's -- I think she's

3    saying you're at risk and we should talk about it.

4    We don't know what services they're talking about.

5    We don't know -- we don't know what exactly she's

6    referencing.

7                 (Whereupon, Exhibit No. 39 was previously

8           marked for identification by the court

9           reporter.)

10   BY MR. CALLOW:

11          Q     Let me ask you to look at Exhibit 39

12   which Mr. Miller will put on the screen.  Take a

13   moment to review that and I'll ask you some questions

14   with respect to it.

15          A     (Witness complies with request of

16   counsel.)

17          Q     39 is a one-page document from one of the

18   depos that you read.  It's Guardian 11720.  Take a

19   moment to review it.  I'll ask you some questions

20   with respect to it.

21                Have you looked at Exhibit 39?

22          A     Yes.

23          Q     39 is an e-mail from Ms. Newcomb

24   internally where she notes that the percentage of

25   residents serviced at Waterford has dropped to

```
 1   57 percent, correct?

 2        A    Yes.

 3        Q    The staff at Waterford wants to convert

 4   us to eMAR and Ms. Newcomb told them that without a

 5   majority of the residents, it was not possible,

 6   correct?

 7        A    Yes.

 8        Q    The community wants the safer strips and

 9   the safer eMAR.  And Ms. Newcomb told them no unless

10   there's 50 percent of the residents signing with

11   Guardian?

12             MR. RISSLER:  Objection, misstates the

13        document.

14   BY MR. CALLOW:

15        Q    And you think this is good business

16   practice as well, nothing wrong here, nothing to see?

17        A    Again, I believe this is a -- Ms. Newcomb

18   addressed this in her deposition that it is basically

19   in their view it is unsafe unless you have a

20   significant majority.

21        Q    That is not what she said in the depo;

22   what she said in the depo at pages 158 and 159:  But

23   as I understand your testimony about this e-mail even

24   if a majority of the residents at Waterford and

25   Oakwood sign an agreement with Guardian Atlanta and
```

1    are willing to pay this conversion to strips and

2    eMAR, Guardian of Atlanta is not going to provide

3    that until you get a super majority of people.

4              The answer:  Yes, because what is the

5    community going to do for the other people and what's

6    going to happen.  How they are -- their meds going to

7    be passed and what kind of packaging are they going

8    to be in.  And it's all about the safety of the

9    residents.

10             So what Yvonne and the staff need to get

11   more people to sign up for Guardian, what do you want

12   them to do?  I don't know and I want them to --

13   that's not my issue.

14             You don't think that was encouraging

15   Yvonne and her staff to get more people to sign up

16   with Guardian so they can get strips and eMAR?

17      A    I think she says she's going to call for

18   a family night.  She wants to increase the -- as I

19   said, it says she's not doing it until they think

20   it's safe.

21             MR. CALLOW:  Why don't we take five

22        minutes and switch to another topic after

23        the break.

24             THE VIDEOGRAPHER:  This is the end of

25        Media 2.  The time is 3:07 p.m.  We're now

 1        off the record.

 2              (Whereupon, the video camera was

 3        turned off.)

 4              (Whereupon, a brief recess was taken.)

 5              (Whereupon, the video camera was

 6        turned on.)

 7              THE VIDEOGRAPHER:  This is the

 8        beginning of Media 3.  The time is

 9        3:17 p.m.  We're back on the record.

10   BY MR. CALLOW:

11        Q    Mr. McAnaney, can you hear me?

12        A    Yes.

13        Q    I'm going to have Mr. Miller put up

14   Exhibit 58.

15              (Whereupon, Exhibit No. 58 was previously

16        marked for identification by the court

17        reporter.)

18   BY MR. CALLOW:

19        Q    Do you have 58 handy?

20        A    Yes.

21        Q    Okay.  58 is a DOJ press release from

22   November 3rd, 2009 relating to the Omnicare and

23   Omnicare settlement.  Do you see that?

24        A    Yes.

25        Q    Are you familiar with this settlement?

1      A    I mean, I -- I've read the press release.

2      Q    **Did you ever write about it, do an**

3   **article or speak about it?**

4      A    Not that I recall.

5      Q    **You'll note that this settlement in the**

6   **middle of the third paragraph says:  The government**

7   **further alleged that Omnicare regularly paid**

8   **kickbacks to nursing homes by providing consultant**

9   **pharmacist services rates below the company's cost**

10  **and below the fair market value of such services in**

11  **order to induce the homes to refer their patients to**

12  **Omnicare for pharmacy services.  Correct?**

13     A    Correct.

14     Q    **That was part of the settlement?**

15     A    Yes, that was -- that was part of the

16  conduct that they settled.

17     Q    **And your work that you told me about for**

18  **Omnicare, was it before after this settlement if you**

19  **know, knowing that this is November 3rd of 2009?**

20     A    As I said, I don't recall.

21          (Whereupon, Exhibit No. 59 was previously

22          marked for identification by the court

23          reporter.)

24  BY MR. CALLOW:

25     Q    **Let me ask you to look at Exhibit 59.**

 1      A    (Witness complies with request of

 2   counsel.)

 3      **Q    Have you seen this document before?**

 4      A    I don't know that I've seen it before.  I

 5   saw it referenced before.

 6      **Q    You saw a reference to it, but you didn't**

 7   **read it before?**

 8      A    I don't -- I don't believe so.

 9      **Q    Okay.  Well, you talk in your report**

10   **about experienced healthcare counsel, correct?**

11      A    Yes.

12      **Q    Experienced healthcare counsel will look**

13   **at developments and write articles, case notes,**

14   **(inaudible), correct?**

15      A    Yes.

16      **Q    Did you read this legal alert?**

17      A    Excuse me?

18      **Q    Have you read this client alert?**

19      A    I haven't read this particular one

20   before.

21      **Q    Take a moment to read it and I'll ask you**

22   **some questions with respect to it.**

23      A    (Witness complies with request of

24   counsel.)  Okay.  I've read it.

25      **Q    Second page of the legal alert you see**

1    the top paragraph:  The Anti-Kickback Statute and its

2    accompanying regulations make it a criminal offense

3    to knowingly and willfully offer, pay, solicit or

4    receive any remuneration to induce or reward

5    referrals of services which may be reimbursable in

6    whole or in part by federal healthcare programs.

7              Do you agree with that statement?

8         A    No.

9         Q    What's wrong with that statement?

10        A    I think it's the phrase "to induce or

11   reward referrals."  I'm not sure it necessarily

12   prohibits one from rewarding referrals if one didn't

13   have any sort of prior arrangement.

14        Q    You would say "to induce," but you would

15   take out "or reward"?

16        A    I think that's what the statute says.

17   The statute doesn't include any language towards a

18   reward.

19        Q    If we take out "or reward," you would

20   agree with that statement?

21        A    I think it's a -- I think it's a fairly

22   generic restatement of the kickback statute, yes.

23        Q    But with "or reward" you disagree with

24   that statement?

25        A    Yeah, I mean, it could, but I don't think

```
 1   it -- certainly not on its face it does.  It would

 2   have to be inducing referrals.  So if you're

 3   rewarding referrals and you're not getting future

 4   referrals from somebody, I don't think you've

 5   violated the kickback statute.

 6        Q    Where remuneration is paid or received

 7   with the intent to induce or reward referrals the

 8   Anti-Kickback Statute can be violated.  Do you agree

 9   with that statement?

10        A    Yes, that it can be violated.  Yeah.

11        Q    The statute has been broadly

12   interpreted --

13        A    Excuse me.  Again, I would take out

14   reward in that statement.

15        Q    So you disagree with the statement as

16   written.  If you take out "or reward," you would

17   agree with the statement?

18        A    I think that's -- yeah, I think that's a

19   generally accurate statement.

20        Q    Statute has been broadly interpreted to

21   cover any arrangement where only one purpose of any

22   number of purposes of the remuneration was to reward

23   the referral of services to induce further referrals.

24   Do you agree with that statement?

25        A    No.  Again, I would take out the reward.
```

1  I think it's -- where one of the purposes -- and

2  again, I mean, it covers it.  That doesn't -- it's

3  not solely a violation, but it's where one purpose is

4  to induce referrals.

5      Q    So the statement as written you disagree

6  with.  You would change "reward" to "induce" and then

7  you would agree with the statement?

8      A    Yes.  I think that's a -- that's a

9  statement of --

10            (Whereupon, Exhibit No. 394 was marked

11        for identification by the court reporter.)

12  BY MR. CALLOW:

13      Q    Sir, I'm going to have Mr. Miller put up

14  394.  394 is going to be a three-page document from a

15  legal advisor called Buyer Beware.  If you would take

16  a moment to review it.  I'll ask you some questions

17  with respect to it.

18      A    59 or is that -- that was just what I

19  saw, right?

20      Q    394, sir.

21      A    Oh, I'm sorry.

22      Q    That's all right.  No problem.

23      A    I go to the bottom of the list.

24      Q    It's okay.  It's okay.  Take your time.

25      A    Okay.  I've got it in front of me.

1       Q     Have you seen this legal advisor alert

2    from Ropes & Gray before?

3       A     No.

4       Q     Do you know who Ropes & Gray is?

5       A     Yes.

6       Q     When you talk about experienced

7    healthcare counsel, I assume Ropes & Gray would fit

8    that bill, would they not?

9       A     Yes.

10      Q     So this is another legal alert talking

11   about the Omnicare settlement.  Do you see that?

12      A     Yes.

13      Q     And the settlement in the first paragraph

14   specifically talks about the fact that they relied

15   upon the OIG supplemental compliance program guidance

16   for nursing facilities, which is a document we looked

17   at earlier, right, September 30th, 2008, guidance

18   that was 392, right?

19      A     I'm sorry, I thought you said they relied

20   on it.  I don't see anything here that says they

21   relied on it.

22      Q     So let's look at that first paragraph.

23   The settlement came one year after the Department of

24   Health and Human Services Office of Inspector

25   General, paren, OIG, closed paren, published its

1    supplemental compliance program guidance for nursing

2    facilities, closed -- quotation marks, cautioning

3    that free goods and service arrangements, such as

4    pharmaceutical consultant services, medication

5    management or supplies offered by a pharmacy are

6    suspect and warrant careful review.  Right?

7        A    Yes.

8        Q    And that is what we looked at earlier in

9    392 which had the footnote we talked about that says

10   in the long-term care space, that consulting

11   relationship is suspect or can be, right?

12       A    I think it said that.

13       Q    And then on page two of the legal alert,

14   third full paragraph, first column, citing OIG's 2008

15   guidance, the settlement agreement stated that the,

16   quote, consultant pharmacist services contracts

17   between Omnicare and nursing homes implicated the

18   Anti-Kickback Statute because, inter alia, bracket,

19   among other things, closed bracket, they involved the

20   provision of services at below cost and/or below fair

21   market value.  Correct?

22       A    Yes, that's what it says.

23       Q    This legal alert certainly isn't saying

24   that Omnicare only applies to skilled nursing

25   facilities.  They're talking about applying to

```
 1   long-term care facilities and the relationships
 2   between long-term care facilities and pharmacy
 3   providers, correct?
 4        A    I'm not sure what the -- I think they're
 5   talking about nursing homes.
 6        Q    Well, back on page one, Heightened
 7   Scrutiny:  The Omnicare settlement and the OIG
 8   guidance suggests that the relationships between
 9   long-term care facilities and pharmacy providers will
10   likely be subject to increased government oversight
11   and enforcement in the near future, resulting in a
12   need to revisit pricing structures.  Correct?
13        A    Yes.
14        Q    It says long-term care facilities, not
15   skilled nursing facilities, right?
16        A    I think it's nursing homes and skilled
17   nursing facilities.
18        Q    Including long-term care facilities,
19   right?
20        A    I don't think people -- I mean, I
21   generally don't -- long-term care facility generally
22   means nursing homes.  I don't think it necessarily --
23   I mean -- I mean, as opposed to personal care homes
24   or assisted living.
25        Q    So reading this legal alert, you wouldn't
```

1  think that assisted living communities in Georgia

2  would note that they were in a long-term care

3  facility when they read this legal alert?

4      A    I think they -- I mean, I think the

5  settlement and the guidance is specific to nursing

6  homes.  Do I think they wouldn't take note of it?

7  Sure.

8      Q    You think the guidance is specific to

9  nursing homes?  You don't think it advises or helps

10 guide the relationship between Guardian and long-term

11 care facilities in Georgia that are not skilled

12 nursing homes?

13     A    I think it -- it's only as applicable as

14 it's applicable.  And I think there are differences

15 between -- there are differences between those types

16 of facilities.

17     Q    So you would in your practice not use the

18 Omnicare settlement of these legal alerts in advising

19 a long-term care pharmacy or an assisted living

20 community about the Anti-Kickback Statute, what's

21 appropriate or not appropriate?

22     A    No, I would take it into consideration

23 for what it's worth.

24     Q    In your private practice, do you ever

25 conclude that a relationship is inappropriate and

1    violates the Anti-Kickback Statute?

2        A    Well, I never conclude that something

3    violates the Anti-Kickback Statute.  I say this is --

4    this is highly risky, and that this is probably not

5    where you want to go.  And generally -- I mean,

6    generally, I say there's a risk that it would be --

7    if brought -- I mean, if it comes to someone's

8    attention or a Relator that the statute would be --

9    incur a lot of costs and potential liability.

10       **Q    So from 2003 to present, you've never**

11   **advised a client that you think an arrangement or**

12   **relationship violates the Anti-Kickback Statute?**

13       A    I do not -- I generally do not -- I mean,

14   I think things are very problematic but do I --

15   that's a jury -- only a jury decides whether

16   something violates the kickback statute.  And I

17   very -- I never have access to the facts of what one

18   would look for for knowing and willfully.

19       **Q    In advising your clients in your private**

20   **practice, you don't have access to the facts to make**

21   **a determination of knowing or willful?**

22       A    Not all the facts, not all the e-mail.  I

23   mean, I'm not going to do discovery.

24       **Q    Do you ask --**

25       A    I rely on what they tell me.

1       Q     So you never ask your clients about

2    information that help you evaluate the knowing and

3    willful component?

4       A     Of course I ask them.  I'm just saying I

5    have no guarantee I get it, and I'm not going to --

6    the Anti-Kickback Statute is a criminal statute,

7    requires knowing and willful intent, the highest

8    criminal standard possible.  And it's highly factual

9    in circumstances.  So no, I'm a sole practitioner.

10   People advise me on structures and arrangements.

11   It's usually enough to know it's going to be

12   problematic.

13              (Whereupon, Exhibit No. 395 was marked

14        for identification by the court reporter.)

15   BY MR. CALLOW:

16       Q     All right, sir.  We're going to put up

17   Exhibit 395.  395 is a Lexis printout of a decision

18   issued in the United States, ex rel., Banigan versus

19   Organon USA, Inc.

20              Are you familiar with that decision?

21       A     Yes, that's the -- that's the -- that's

22   the case I was thinking about.

23       Q     Okay.  This is the case where you were an

24   expert?

25       A     Yes.  I believe so.  Let me get it up

1    because my memory --

2        Q    Do you recall that your expert opinion

3    was Dauberted out and ruled inadmissible?

4        A    Excuse me?

5        Q    Do you recall that your opinion was ruled

6    inadmissible under Daubert?

7        A    In part.

8        Q    In part.  Most of your opinion was

9    knocked out where you were not qualified as an expert

10   to offer the opinions.  Do you recall that?

11       A    Yes.  However, I was allowed to testify

12   as to the guidance and what people would have relied

13   on.

14       Q    You were allowed to testify to guidance

15   but you were not allowed to apply -- testify

16   regarding its application in the healthcare field

17   because the court said that there could be little

18   doubt that Mr. McAnaney is an experienced healthcare

19   lawyer, but what is lacking from his background is

20   direct experience in the pharmaceutical industry.

21            Mr. McAnaney has not worked for a

22   pharmaceutical company nor any other company in the

23   healthcare industry, paren, save his one-year stint

24   as a junior lawyer handling general claims of a

25   hospital around 1980, closed paren, period.  This

1    hardly makes him qualified to testify about what

2    companies in the healthcare industry would have

3    reasonably believed as he seeks to do in topics

4    three, four and five of his report.

5              It also renders him ill-suited to testify

6    about what is common, usual and customary in the

7    pharmaceutical industry as he seeks to do in the

8    first topic.

9              Is that accurate?

10   A    I mean, if you say so.

11   Q    Well, do you have it up, sir?

12   A    Yes.

13   Q    So take a look at -- it starts on the

14   bottom of three of six, column?

15   A    Yes.

16   Q    There's a paragraph there can be little

17   doubt that Mr. McAnaney is an experienced healthcare

18   lawyer.

19   A    Yes.

20   Q    But what is lacking from his background

21   is direct experience in the pharmaceutical industry.

22   A    Yes.

23   Q    Right?

24   A    Yes.

25   Q    He has not worked for a pharmaceutical

1    company nor any other company in the healthcare

2    industry, save his one-year stint as a junior lawyer

3    handling general claims in a hospital around 1980.

4    This hardly makes him qualified to testify about what

5    companies in the healthcare industry would have

6    reasonably believed as he seeks to do on topics

7    three, four and five of his report, right?

8        A    Yes.

9        Q    Then it goes on to talk that you had

10   opinions on what questions would be addressed and

11   what would have been considered in determining

12   whether the discounts violated the Anti-Kickback

13   Statute and notes that your opinions are paradigmatic

14   examples of improper speculation.

15           Do you see that in the second column --

16       A    I do.

17       Q    -- (inaudible) paragraph?

18           The next page notes on page five in the

19   first column:  Mr. McAnaney offers opinions on what

20   experienced healthcare attorneys and regulators would

21   have reasonably believed about the discounts and

22   rebates during the relevant time period.  As a

23   threshold matter, what experienced healthcare

24   attorneys would have believed is not relevant to

25   whether Omnicare knew it was contravening the AKS.

```
 1   Omnicare's own views of course are the most relevant
 2   to that inquiry.
 3             In other companies' reviews and
 4   regulators' reviews may provide circumstantial
 5   evidence of what Omnicare knew, but the views of
 6   experienced healthcare attorneys are less probative
 7   of Omnicare's knowledge.  These attorneys' views are
 8   likely derivative of their clients' views and their
 9   expectations of the regulators' views, so they have
10   little probative value on their own.  And even if
11   other attorneys' views can be deemed relevant, the
12   reliability of Mr. McAnaney's methodology and
13   offering his opinions on these views is suspect under
14   Daubert.
15             Correct?
16      A    That's what the -- that's what the
17   opinion says.
18      Q    Further on the second column on page
19   five:  Mr. McAnaney's opinions about what the
20   regulators would have reasonably believed also failed
21   under the Daubert standard.  He does nothing more
22   than rely on his prior employment at OIG to review
23   the facts of this case and speculate about how
24   regulators would have reacted to that evidence.  He
25   uses no testable methodology to arrive at his
```

1   conclusions as to what regulators might have

2   reasonably believed.  He does not explain how his

3   experience leads to the conclusions that he reaches,

4   why his experience offers him sufficient basis for

5   his opinions or how his experience can reliably be

6   applied to the facts here.

7            Did I read that correctly?

8       A    I assume so.

9       Q    Mr. McAnaney's opinions about what

10  regulators might have believed are supported only by

11  his ipse dixit and are not sufficiently reliable to

12  be admissible expert testimony.

13           You see that in page five as well?

14      A    Yes.

15      Q    So your opinion was rejected on topics

16  one and three through five.  And with respect to

17  topic two, you were limited in what you could testify

18  about; is that correct?

19      A    Yes.

20      Q    Have you been Dauberted in other

21  situations, sir?  Have your expert opinions been

22  rejected in other cases that you've testified in?

23      A    They've been limited in part in some.

24  I've been Dauberted in virtually every case, but most

25  of them never comes to a decision.

1      Q     What other cases have your opinions been

2    limited or stricken that you can recall?

3      A     I can't recall off the top of my head.

4      Q     But they have been limited or stricken in

5    other cases?

6      A     I think in at least one other case it was

7    limited somewhat.

8      Q     So in your Exhibit B to your report you

9    cite to Comprehensive Neurosurgical, PC, et al.,

10   versus The Valley Hospital, case pending in Bergen

11   County.  You've given a deposition in that case?

12     A     I must have done a deposition because

13   it's -- because it's on the list.

14     Q     And who were you retained by in that

15   case?

16     A     Well, let me go call up my --

17     Q     It's Exhibit B to your report, so take

18   your time and get to it.

19           MR. RISSLER:  Do we have Exhibit B up

20       as an exhibit, Joe?

21           MR. CALLOW:  I'm sorry.

22           MR. RISSLER:  We just have the report

23       and appendix A.

24           MR. CALLOW:  You're right.  My fault,

25       Jared.  Let me fix that.  Hold on one

1        second, Mr. McAnaney.

2              THE WITNESS:  I remember it's not on

3        my --

4              MR. CALLOW:  Hold on.  So it should be

5        up now, sir.  See if you can open

6        Exhibit B.  And it may be at the top or

7        bottom of that list depending on how your

8        system deals with it.

9              THE WITNESS:  Appendix C.  Appendix B,

10       okay.  Let me just...

11             (Whereupon, Exhibit No. 396 was marked

12        for identification by the court reporter.)

13   BY MR. CALLOW:

14       **Q    So appendix B were the cases that you**

15   **listed over the last four years.**

16       A    Yes, it's where I've given testimony on.

17   So in that case, I was pending expert opinion

18   proffered by Valley Hospital.

19       **Q    Generally, what do you recall the**

20   **substance of your deposition or your expert report in**

21   **that case to revolve around?**

22       A    It -- it -- it dealt with a combination

23   of an exclusive contract between Valley Hospital and

24   Comprehensive Neurosurgical, PC.  And I'm not -- I

25   think it may have involved both Stark and kickback

 1   issues.
 2        Q    Okay.  Do you know whether you are the
 3   subject of a Daubert motion in that case yet?
 4        A    I do not.
 5        Q    Do you know whether that's the case where
 6   you may have had your opinions limited or stricken?
 7        A    I do not believe they were limited or
 8   stricken in that case.
 9        Q    Second case is U.S., ex rel., Garrett
10   versus Roach Diagnostics Corp.  Have you given a
11   deposition in that case?
12        A    I obviously did.
13        Q    Do you recall when you gave a deposition
14   in that case?
15        A    No.
16        Q    Do you recall who you testified for in
17   that case?
18        A    Well, my opinion was offered -- to tell
19   you the truth, I don't remember the case at all.
20        Q    Okay.  Do you know if that's the case
21   where your opinion was stricken or limited in any
22   respect?
23        A    No.  It was not restricted in that case.
24        Q    U.S., ex rel., Maggie versus Heart
25   Hospital?

```
 1        A     Yes.
 2        Q     Do you recall which -- or who you were
 3   retained by in that case?
 4        A     I was retained by McGee --
 5        Q     Okay.
 6        A     -- I believe it was and --
 7        Q     What do you recall the substance of that
 8   case being about?
 9        A     Yes, I was -- I mean, there was a
10   specialty heart hospital that was basically
11   terminating partners who didn't refer enough to the
12   Heart Hospital.
13        Q     And you testified for the Relator in that
14   case?
15        A     Yes.
16        Q     And were your opinions in that case
17   related to what?
18        A     That the -- certain of the conduct of
19   Heart Hospital had all the red flags of a violation
20   of Stark and kickback.
21        Q     Is that the case where your opinion was
22   stricken or excluded?
23        A     No.
24        Q     Next case you have listed is Hebrew Homes
25   versus Greenberg Traurig?
```

1      A    Yes.

2      **Q    Do you recall who retained you in that**

3   **case?**

4      A    My opinion was offered on behalf of he

5   Hebrew Homes.

6      **Q    And do you recall if that was the case**

7   **where you were -- your opinions were stricken or**

8   **excluded?**

9      A    No, there was no --

10     **Q    Generally, do you recall the topic of**

11  **your expert testimony in the Hebrew Homes matter?**

12     A    Well, the case was a legal malpractice

13  case and it dealt -- I testified as to what the

14  standard would need for professional services and

15  opining on the kickback or -- it dealt with specific

16  facts and whether Greenberg's failure to investigate

17  or the length of investigation, the amount of the

18  investigation complied with standards of care and how

19  it --

20     **Q    (Inaudible) malpractice case versus**

21  **Anti-Kickback and Stark?**

22     A    Yes.  It was a malpractice case that was

23  based on a failure to investigate a kickback or a

24  potential kickback matter appropriately.

25     **Q    Okay.  United States of America and**

1    several states through ex rel., Chris Purcell and

2    Kimberly Groome versus Gilead Science.  Do you recall

3    who retained you in that case?

4         A    Yes.  The attorneys for Gilead Science.

5         Q    And what do you recall the substance of

6    your testimony was in that case?

7         A    That case dealt with -- I'm trying to

8    think of the -- basically I'm trying to think -- I

9    can't remember the terms, but basically meals and

10   dinners, so medical lectures to physicians in the

11   community offered by speaker -- speaker programs.

12   That's it.  It was a pharmaceutical speaker program

13   case.

14        Q    You testified for Gilead in that case?

15        A    Yes.

16        Q    And was your opinion stricken or excluded

17   in that case?

18        A    No.

19        Q    Does going through these five help you in

20   any way to refresh your recollection of what case was

21   other than the Banigan case were your opinions

22   stricken or excluded?

23        A    No.  I can't -- I can't recall.  It may

24   have been involving McKesson, but I can't -- I can't

25   quite -- and it was basically allowed but they --

 1   there was some constraints.  But in fact, the case

 2   settled.

 3        **Q    Were you an expert for McKesson in the**

 4   **opioids litigation?**

 5        A    Excuse me?

 6        **Q    Were you an expert for McKesson in the**

 7   **opioids litigation relating to opioids distribution?**

 8        A    No.

 9             MR. CALLOW:  Sir, we may be close to

10        done.  I'd like to take ten minutes and

11        talk to my cocounsel.  Let's come back at

12        4:00 o'clock.  But we're either done or

13        we're very close to done today.  So just

14        give me a couple more minutes, and we'll

15        see what we have.  All right?

16             THE WITNESS:  That's fine with me.

17        4:00 o'clock?

18             THE VIDEOGRAPHER:  The time is

19        3:52 p.m.  We're now off the record.

20             (Whereupon, the video camera was

21        turned off.)

22             (Whereupon, a brief recess was taken.)

23             (Whereupon, the video camera was

24        turned on.)

25             THE VIDEOGRAPHER:  The time is

1    4:01 p.m.  We're back on the record.

2          MR. CALLOW:  Sir, that's all the

3    questions I have for you today.  I

4    appreciate your time and your patience, but

5    I think we're done.  Thank you.

6          THE WITNESS:  Thank you.

7          MR. RISSLER:  Thanks, everybody.

8          THE VIDEOGRAPHER:  This concludes the

9    deposition.  The time is 4:01 p.m.  We're

10   now off the record.

11          (Whereupon, the video camera was turned

12    off.)

13                    - - -

14     (Deposition concluded at 4:01 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                 E R R A T A   S H E E T

 2
            Pursuant to Rule 30(7)(e) of the Federal
 3     Rules of Civil Procedure and/or Georgia Code
       Annotated 81A-130(B)(6)(e), any changes in form
 4     or substance which you desire to make to your
       deposition testimony shall be entered upon the
 5     deposition with  a statement of the reasons given
       for making them.
 6
            To assist you in making any such corrections,
 7     please use the form below.  If supplemental or
       additional pages are necessary, please furnish
 8     same and attach them to this errata sheet.

 9                         - - -

10        I, the undersigned, KEVIN MCANANEY, do hereby
       certify that I have read the foregoing deposition
11     and that to the best of my knowledge said
       deposition is true and accurate (with the
12     exception of the following corrections listed
       below).

13

14

15     Page_____ Line_____should read:_____

16     Reason for change:_____

17

18     Page_____ Line_____should

19     read:_____

20     Reason for change:_____

21

22     Page_____ Line_____should

23     read:_____

24     Reason for change:_____

25
```

```
 1   Page_____ Line_____should

 2   read:_____

 3   Reason for

 4   change:_____

 5

 6   Page_____ Line_____should

 7   read:_____

 8   Reason for

 9   change:_____

10

11   Page_____ Line_____should

12   read:_____

13   Reason for

14   change:_____

15

16   Page_____ Line_____should

17   read:_____

18   Reason for

19   change:_____

20

21   Page_____ Line_____should

22   read:_____

23   Reason for

24   change:_____

25
```

 1   Page_____ Line_____should

 2   read:_____ Reason for

 3   change:_____

 4

 5   Page_____ Line_____should

 6   read:_____ Reason for

 7   change:_____

 8

 9   _____

10   Signature

11   Sworn to and Subscribed before me

12   _____, Notary Public.

13   This_____day of _____, 2022.

14   My Commission Expires:

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2    STATE OF GEORGIA:

3    COUNTY OF COBB:

4

5          I hereby certify that the foregoing

6    transcript was taken down as stated in the

7    caption and the questions and answers thereto

8    were reduced to typewriting under my direction,

9    that the foregoing pages 1 through 219 represent

10   a true, complete and correct transcript of the

11   evidence given upon said hearing, and I further

12   certify that I'm not of kin or counsel to the

13   parties in the case; am not in the regular employ

14   of counsel of any of said parties; nor am I in

15   anywise interested in the result of said case.

16         This 23rd day of Jume 2022.

17

18                        *Lynne C. Fulwood*

19

20                        LYNNE C. FULWOOD,
                          Certified Court Reporter
21                        State of Georgia
                          License No. B-1075
22

23

24

25

**Exhibits**

**McAnaneyK-39**
  5:11
  189:7,11,
  21

**McAnaneyK-46**
  5:13
  178:22
  179:7

**McAnaneyK-48**
  5:14
  185:13,17,
  21,22

**McAnaneyK-58**
  5:16
  192:14,15

**McAnaneyK-59**
  5:16
  193:21,25

**McAnaneyK-132**
  5:17 88:17
  165:24
  166:3

**McAnaneyK-387**
  5:2 10:8,
  12 12:13
  15:3,16,21
  17:3,8,24
  18:3,7,13
  25:12
  27:21
  31:22 32:8
  45:24 46:5

**McAnaneyK-388**

  5:2 46:12

**McAnaneyK-389**
  5:3 46:22
  47:2

**McAnaneyK-390**
  5:4 53:6,7

**McAnaneyK-391**
  5:5 56:15
  57:7,11

**McAnaneyK-392**
  5:5 59:14

**McAnaneyK-393**
  5:6 62:22,
  25

**McAnaneyK-394**
  5:7 197:10

**McAnaneyK-395**
  5:7
  203:13,17

**McAnaneyK-396**
  5:9 210:11

─────────────

**$**
─────────────

**$10**   133:4,
  11

**$100**   79:23
  80:5,13
  117:13

**$125**   82:21
  83:17
  84:8,20
  85:6

**$150**

117:13,14,
  17 118:3,
  5,15

**$250**   83:17
  84:21

**$255**   82:21
  84:9

**$50**   78:11
  79:23
  80:5,13
  172:1

**$65**   94:24

**$98**   22:19

─────────────

**1**
─────────────

**1**   6:6 50:8
  102:12

**10**   106:13,
  21 108:3

**1001.952**
  101:18

**10:44**   52:19

**10:49**   53:1

**11**   21:12
  138:7,8,
  11,13,14,
  22 186:16

**115**   167:12,
  17 168:1

**115303**
  185:23

**116**   168:24

**11720**   189:18

**118295**
  179:3,7

**118303**   179:8

**12**   69:11
  77:13
  86:11
  103:5,8

**12-19**   139:19

**120**   170:3
  175:13
  176:8

**1219**   63:3,9

**125**   78:15
  82:16 83:2

**12:04**   102:12

**12:51**   102:21

**132**   87:24
  88:9,17,21
  165:24
  166:3,4

**14**   122:4

**14th**   6:10

**15**   81:16

**158**   190:22

**159**   190:22

**16**   81:16
  109:11

**17**   81:16
  126:22

**18**   126:15

**19-** 46:25

**1977**
137:20,21,
22,25
138:24
139:3
167:22
168:7,22

**1980** 204:25
206:3

**1995** 150:2,
9,13

**1997** 41:10
47:6 50:8
53:15,17

**1998** 56:21
57:4

**1:00** 102:9

**1:56** 145:17

**1st** 46:25
47:5

---
**2**
---

**2** 102:20
191:25

**2.1** 90:10

**20** 98:20

**2003** 33:20
35:3 36:25
40:2,6
41:8,10
44:19
161:11,21

162:7
202:10

**2008** 18:24
59:20
60:14
163:13
198:17
199:14

**2009** 192:22
193:19

**2010** 20:20
21:12 37:1

**2011** 20:20

**2012** 37:1
63:13

**2014** 72:14
77:22
79:20
81:16
158:11
179:20

**2015** 179:14

**2016** 186:7

**2018** 79:8,
10,14,18
80:10,25
81:4,8
82:13,19
84:24
85:12,16
158:11
170:9
171:4,6
173:1

**2019** 72:14
77:22

**2021** 27:4,
6,7,8

**2022** 6:11
27:4,8

**22** 139:14

**23** 146:2

**24** 155:21

**25** 36:24
37:4,13
159:23

**250** 82:16
83:3 85:6

**287** 14:11

**2:01** 145:24

**2nd** 53:15,
17

---
**3**
---

**3** 192:8

**30** 59:20
167:13,17
173:1

**303** 179:3

**30th** 60:14
163:13
198:17

**311** 185:23

**33** 37:4,13

**34-page**

67:18 68:1

**387** 10:8,12
12:13
15:3,16,21
17:3,8,24
18:3,7,13
25:12
27:21
31:22 32:8
45:24 46:5

**388** 46:9,
12,17

**389** 46:17,
22 47:2

**39** 12:22
189:7,11,
17,21,23

**390** 53:6,7,
12 55:13

**391** 56:15,
18,19
57:7,11

**392** 59:14,
17 198:18
199:9

**393** 62:22,
25 63:4,5

**394** 197:10,
14,20

**395** 203:13,
17

**396** 210:11

**3:07** 191:25

**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**
Kevin McAnaney on 06/14/2022　　　　　Index: 3:17..95-453

**3:17**  192:9

**3:52**  215:19

**3C-1**  62:12

**3C-2**  62:13

**3rd**  192:22
 193:19

─────────

**4**
─────────

**40**  103:4,15
 104:12,23
 124:2
 125:9
 130:8,11
 143:7
 173:18

**41**  104:12

**42**  104:12

**43**  104:12,
 23

**44**  105:8
 124:2
 143:7
 173:18

**45**  102:3,7
 109:8
 110:14

**45-minute**
 102:2

**453**  138:6

**46**  120:20
 178:20,22
 179:1,3,7
 185:21

**47**  119:15
 185:24

**48**  185:13,
 17,21,22
 186:2

**49**  122:4
 187:13,19

**4:00**
 215:12,17

**4:01**  216:1,
 9,14

─────────

**5**
─────────

**50**  106:14,
 22 108:4
 122:9,18
 125:6,9
 128:2
 140:3
 186:12,18,
 24 187:10,
 14 188:9,
 23 190:10

**51**  149:13,
 17

**52**  179:21

**53**  62:3,4

**54**  179:21

**55**  95:15

**56837**  61:5,6

**57**  179:18
 180:7
 181:17,18,

**24** 182:2
 183:12
 184:8
 190:1

**58**  126:22
 131:17
 192:14,15,
 19,21

**59**  193:21,
 25 197:18

─────────

**6**
─────────

**60**  125:6
 130:9,10
 133:3

**63**  136:2
 186:14

**65**  136:6,
 14,15
 137:10,12
 138:20

**69**  136:6,14
 137:10

─────────

**7**
─────────

**7-A**  164:23

**75**  36:24

**77**  139:13,
 14,16

**78**  146:2
 148:17
 149:4

─────────

**8**
─────────

**80**  149:14,
 21,22
 179:22
 180:2,11,
 15,23,25
 181:11,21
 182:2
 183:13
 184:11,19,
 24 185:5

**81**  151:3

**85**  129:14
 156:22

**86**  155:21
 156:5
 158:19
 159:9

**87**  159:10

**88**  159:22,
 23

─────────

**9**
─────────

**90**  106:14,
 22 108:4
 125:6
 129:14

**92**  162:21,
 22,23

**93**  162:12

**95**  139:4

**95-453**

Case 1:18-cv-03728-SDG    Document 140-10    Filed 09/09/22    Page 224 of 286

USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.
Kevin McAnaney on 06/14/2022    Index: 95453..administration-relat

138:21
139:2

95453  138:14

95483  138:6

97  44:19

9:30  6:11

9:37  12:3

9:39  12:10

9th  150:2

——————

A

——————

a.m.  6:11
  12:3,10
  52:19 53:1

abuse  41:20
  62:11
  163:20

acceptable
  184:22
  188:12

accepted
  51:12

access
  202:17,20

accommodate
  8:20

accompanying
  195:2

accordance
  123:1

account
  93:2,17

94:8

accountants
  72:5

accumulated
  175:18

accuracy
  140:13

accurate
  12:20
  31:18 32:9
  34:5,16
  49:24
  56:10
  90:19
  100:23
  179:23
  180:3,10,
  17,22
  181:10,20
  182:1
  183:12
  184:10
  187:4
  196:19
  205:9

acknowledge
  174:12

acknowledging
  120:23

act  22:20,
  24 29:19
  35:20,23
  37:23
  38:20
  43:16,24
  48:13

50:22
  167:7

action  60:19

actions
  153:24
  174:4

actively
  160:23

activities
  160:1,2

activity
  160:14

acts  159:25

actual  35:8
  62:9
  163:18

actuality
  93:20

Adam  6:21,
  22

add  150:4
  157:3

addendum
  101:10

addition
  48:18 49:7

additional
  14:1,2,3,4
  58:2 89:17
  94:24
  95:3,15
  99:9,17
  100:3

108:10
  109:4
  188:3

address
  188:7

addressed
  190:18
  206:10

addresses
  163:23

addressing
  63:13
  162:13,25
  164:4

adequate
  30:1

administer
  103:18
  123:16
  125:3

administered
  129:2

administration
  54:19
  103:10,16
  104:5
  117:25
  118:22
  124:5
  127:4
  131:18
  146:8
  156:18

administration
-related

Case 1:18-cv-03728-SDG    Document 140-10    Filed 09/09/22    Page 225 of 286

USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.
Kevin McAnaney on 06/14/2022    Index: administrative..alia

155:25

**administrative**
59:5

**administrators**
142:17

**admissible**
208:12

**admitted**
186:16

**advantage**
151:6
152:4,9
156:3
158:23
159:5,7

**advice** 19:14
35:9 38:18
45:6 46:3
54:4

**advise** 45:11
203:10

**advised** 41:1
202:11

**advises**
201:9

**advising**
36:15 38:2
201:18
202:19

**advisor**
197:15
198:1

**advisory**
41:17

42:17 43:8
44:2,6,24
45:3 48:8
50:8 51:8,
10 55:7
63:8,12,15
65:19
163:10
169:12

**affect**
106:19

**affected**
107:11

**affidavits**
157:18

**Affordable**
35:20

**agency** 60:19

**aggregate**
175:9,22,
23

**agree** 81:24
92:8,19,21
100:4,25
101:3
118:23
119:3
121:19
135:13
165:8
195:7,20
196:8,17,
24 197:7

**agreed** 7:2
8:23 83:1

92:24

**agreement**
74:5,13,25
79:13
85:10
87:14
88:23 89:6
90:16
91:12
92:10
107:3,5,7
117:15
165:10
167:8
190:25
199:15

**agreements**
91:20
119:17
120:1

**ahead** 52:9
96:17
107:23
135:4

**aide** 125:2

**aides** 123:15

**aids** 103:17

**aiming**
115:10

**AKS** 24:4
32:17
33:21,23
66:23 70:2
149:14,23
167:21

206:25

**AKS's** 167:21

**ALC** 103:9,
15 104:4
122:11,14,
19 155:25

**ALCS** 65:4
79:2
109:8,16,
25 110:18
111:4
119:17
120:1,6,21
121:3
123:8,17,
21 124:3
143:21
146:9
162:15
163:1,24

**alert** 56:20
57:11,14,
17 58:18,
23 194:16,
18,25
198:1,10
199:13,23
200:25
201:3

**alerts** 41:18
42:17
201:18

**ALF** 145:1,6

**ALFS** 111:11

**alia** 199:18

allegation
 17:13
 116:1

allegations
 16:7
 183:19

alleged
 51:12
 66:19
 68:19
 78:22
 193:7

alleges  59:9

alleging
 155:13
 160:11

allowed  50:9
 165:18
 172:11
 173:9
 204:11,14,
 15 214:25

alternative
 128:4

amendment
 137:21,23

America  6:8
 213:25

amount  78:14
 99:2 174:1
 213:17

analysis
 46:3 49:12
 71:25

101:15

analyze
 67:15

analyzed
 51:18

analyzing
 136:19

and/or  16:15
 199:20

annual  29:16
 30:15

answers  7:24
 43:6

Anti-kickback
 19:17
 22:24
 29:5,8,12,
 23 30:3,7,
 8 35:6
 37:21,23
 38:3,10,19
 40:8 41:2,
 21 43:17,
 23 45:8,15
 48:6,13,25
 55:23
 62:11
 68:20,23
 69:4 92:1,
 8 93:13
 96:6,12
 97:4,11
 99:7 100:5
 101:1,5,7,
 12,17,22

130:21
150:22
151:11,12,
15,21,24
152:13,16
153:7,22
154:5,16,
21,25
155:6,8
160:13,18,
23,25
161:4,10,
14,16,20
164:25
165:3,13,
18 166:12,
20 167:7
168:14
174:2
184:5
195:1
196:8
199:18
201:20
202:1,3,12
203:6
206:12
213:21

anymore  34:1

anytime  8:9,
 18 44:24
 128:24

AO  139:19

apologies
 40:4

apologize

104:1

appeals  59:4

appears
 12:16
 91:19
 94:22

appendix
 23:24
 24:8,9,10
 25:25
 209:23
 210:9,14

applicable
 92:6 165:6
 201:13,14

applicant's
 66:20

application
 100:25
 204:16

applied
 123:17
 208:6

applies
 62:20
 125:3
 168:21
 199:24

apply  49:12
 51:15
 63:23
 104:8,15
 123:4,18,
 21 124:2,3
 168:14,17,

19 204:15

applying
  168:13
  199:25

appropriately
  213:24

appropriatenes
s  29:23

approximately
  40:21
  156:11

areas  36:5

Arnall  18:19
  19:6

arrange
  93:1,14,15
  94:6

arrangement
  38:9 39:4,
  5,17 56:7,
  14 63:13
  64:1 79:25
  80:7,24
  81:2,23
  82:25
  83:5,8,21
  85:18
  87:19
  100:14
  106:2
  139:18
  195:13
  196:21
  202:11

arrangements

22:5 35:17
38:5,17
39:2,18
40:8 45:9,
12 62:12
67:10,14,
16 97:19
98:7
101:11,16
199:3
203:10

arrive
  207:25

arrow  25:13
  34:6,9,10

article
  137:17
  193:3

articles
  194:13

ascertain
  171:1

ascertained
  173:24

asks  114:14
  116:16

aspect  45:22

aspects
  61:16

assessing
  175:20

assist  115:7

assistance
  45:13

146:9

assisted
  23:9,17
  39:6,13,18
  40:25
  51:1,22
  63:21
  64:23 65:8
  66:5 68:15
  100:1
  105:1
  124:12,19
  163:4
  169:18,25
  183:2
  200:24
  201:1,19

assume  8:14
  120:7
  142:8
  146:19
  158:3,5
  198:7
  208:8

assumed
  146:16

assuming
  50:15
  119:9

assurance
  133:1

Atlanta  6:10
  16:11,18,
  20 18:2
  19:20,24
  28:2 29:4,

13,24
30:7,22
45:7,18,21
68:16 73:3
88:23
182:25
190:25
191:2

Atlanta's
  144:16

attached
  24:10

attachment
  26:12

attachments
  13:18,22

attend  79:17
  172:11

attendance
  78:22
  173:8

attended
  80:6

attendees
  79:3

attention
  29:20
  146:18,20
  202:8

attorney
  19:13,15
  36:4,7,14,
  21 39:22

attorneys

Case 1:18-cv-03728-SDG    Document 140-10    Filed 09/09/22    Page 228 of 286

USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.
Kevin McAnaney on 06/14/2022    Index: attorneys'..beginning

6:12 7:13,
22 16:15,
19 21:5,17
206:20,24
207:6
214:4

**attorneys'**
207:7,11

**audits**  69:23

**authored**
12:25
14:2,7,15,
18 17:3
44:19 46:8
47:6,15
54:1 55:14
110:10

**authorized**
7:4

**average**
37:3,13

**avoid**  45:15
166:19
167:7

**aware**  22:22
23:14 29:7
44:23
45:2,6
46:2,6
60:24 87:2
129:9
143:13
144:4
161:12,19
162:2,4

163:6

_____

**B**
_____

**back**  8:13
10:19
12:10,12
18:24
24:14
25:1,2,6,
15,21,24
31:10
34:3,4,11,
13,14,18
38:22
46:19 53:1
64:3,5
71:14
75:24 78:4
80:22 86:8
97:22,24
98:10
102:9,10,
21 103:3
145:24
146:24
156:9
165:22
192:9
200:6
215:11
216:1

**background**
16:5 17:10
204:19
205:20

**backwards**

11:3

**bad**  8:10

**Banigan**
203:18
214:21

**base**  117:12

**based**  14:24
35:21
67:12
75:10 76:4
99:5
116:21
131:14
136:17
142:22
159:6,7,18
160:6
161:7
166:11
168:22,23
169:15,16,
18,19
172:6
213:23

**bases**  13:17,
21 15:4,10
32:7 55:1
136:3
168:11

**basic**  66:15
109:22

**basically**
14:4 16:2,
5 35:12
66:11
73:24

106:16
127:5
130:16
136:15,17
137:18
169:21
173:3
174:8
190:18
212:10
214:8,9,25

**basis**  17:5,
7,23 30:15
78:16
101:22
105:22
115:17
122:19
125:13
141:17,25
165:2
169:3
183:25
208:4

**Bates**  63:25
179:4,6
185:22

**be's**  84:18

**bears**  53:18

**begin**  186:10

**beginning**
6:6 26:23
102:20
149:9
161:2
166:14

168:9
172:7
192:8

**behalf** 6:17,
22,23 7:1
21:2 213:4

**believed**
75:10
205:3
206:6,21,
24 207:20
208:2,10

**believes**
130:12,24

**beneficiary**
71:19

**benefit**
55:21
69:23
175:25

**Bergen**
209:10

**Bethesda**
9:20

**Beware**
197:15

**big** 22:19
145:2,4
182:9

**biggest**
186:10

**bill** 198:8

**bit** 35:22
75:23

122:6

**blue** 25:13
34:6,11

**board** 58:4
59:4

**boilerplate**
95:25
96:2,5,7,
9,10,12,20

**Bona** 167:19

**bother**
184:12

**bottom** 34:17
55:15 62:4
64:11
179:4,6
185:23
197:23
205:14
210:7

**bracket**
199:18,19

**branch** 41:9
47:7 57:10

**branches**
60:6

**break** 8:19
9:15 102:2
122:7
145:11
191:23

**breakdown**
36:13

**breakfast**
80:3

**bring** 64:14

**brings** 7:14
39:10

**broadly**
196:11,20

**brought** 36:4
146:18,20
202:7

**browser** 9:8

**bucks** 81:18
83:15

**bullet** 57:20
58:1,11
69:14,15
71:1 77:25
78:5
86:10,17
136:7,9,20
137:8,24
138:20
139:5

**bulletins**
41:18
42:20

**bunch** 157:2

**bundle** 133:5

**bundled**
75:25

**business**
30:18
49:17
50:3,13,21

55:25 56:5
99:2,5
122:3
156:3
174:24
190:15

**businesses**
90:2

**button** 24:22

**buy** 87:12
172:23
184:20

**Buyer** 197:15

**buying**
157:12

---

**C**

---

**Cal** 110:5,9

**call** 16:16,
17 17:2,6,
19,22
35:24 65:9
81:11
96:11
191:17
209:16

**called** 11:9
56:3 65:22
74:3
197:15

**calling** 71:5
183:4

**Callow** 6:16
7:9,12

**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**
Kevin McAnaney on 06/14/2022                Index: camera..carts

10:14
11:25
12:11
25:20
26:5,9,11
31:4
46:14,21,
24 47:4
51:7 53:2,
9 56:17
59:16
62:24
67:19,22,
24 81:14
84:7 88:7,
10,15,20
93:24 94:4
95:18
96:22
101:25
102:9,25
103:2
104:1,7
128:16
130:1
135:8
145:13,25
148:6,13,
15,21
166:4,9
175:4
178:25
182:23
183:6
184:4
185:16
187:18
188:8

189:10
190:14
191:21
192:10,18
193:24
197:12
203:15
209:21,24
210:4,13
215:9
216:2

camera   6:3
12:4,7
52:20,23
102:14,17
145:18,21
192:2,5
215:20,23
216:11

Canterfield
88:23
93:10,15,
21 94:7,17
95:7 96:23
164:12
165:25

capacity
33:22

care   12:1
20:5,8,11
22:14
23:3,13,
17,18
35:20
39:4,11,
12,19,21
40:2,3,4

41:1 61:24
62:7,17,20
63:22
64:24
65:1,9
66:10,11,
14,17
68:15
78:12
99:25
100:2
103:22,24
104:2
105:1,14,
25 106:1,
3,5,8,11,
13,18,21
107:2,4,11
108:18
111:12
112:1,15
113:17,25
114:11,18,
20,23
115:12
117:1,16,
18 118:15,
16,25
119:6,25
120:5,16,
19 121:15
124:11,12,
20 127:20
128:19
129:5,16,
20 130:10
135:11
141:14

142:20,25
143:24
163:5,8,16
164:1
169:9,17,
19,24
170:1
182:22
183:1
199:10
200:1,2,9,
14,18,21,
23 201:2,
11,19
213:18

careful
199:6

carefully
178:12

caregiver
78:15

carryover
86:14,17

Carson   6:18

cart   69:23
86:7 87:7,
13 89:10,
11 180:10
184:18,21,
22,23
185:1,2,4,
6,8,10

carts   17:14
68:8
86:19,24

87:3,7
179:23
180:16,22
181:9,20,
25 182:13
183:11
184:10

case    12:21
13:12,14
14:14,18
20:18
21:12,22
22:3,4,10
23:15
26:20
27:11
30:12
32:13
44:23,25
45:4,9
51:5,19
60:23
63:19 69:9
89:3,9
97:14
99:21
101:21
111:21
116:3
117:5
124:15
128:23
129:10,22
130:21
136:21,24
137:17
140:17
141:3

148:9
150:1,6,16
157:19
160:9,11
161:3
162:2,4,7,
18 163:2
168:17
194:13
203:22,23
207:23
208:24
209:6,10,
11,15
210:17,21
211:3,5,8,
9,11,14,
17,19,20,
23 212:3,
8,14,16,
21,24
213:3,6,
12,13,20,
22 214:3,
6,7,13,14,
17,20,21
215:1

cases    35:21,
23 126:9
149:1
150:14
162:1,10
208:22
209:1,5
210:14

catch    13:19
65:7

122:16
161:1
162:20
166:14

caught
160:20

causing
153:15,17,
18

cautioning
199:2

center    126:6

cert    104:5

certification
29:16
103:17

certifications
31:7

certified
78:12
123:15
125:2
173:16

CFR    101:17

chains    40:15

chairs    80:1

chance
128:25

chances
128:13

change    14:24
108:21
159:9

182:8
197:6

changed
14:10
35:14 79:8
126:13

charge
69:17,24
70:8,20,22
74:11,22,
23 78:10
79:5,24
80:12
83:22 85:7
86:6,20
87:8 89:14
94:15
95:2,14
117:9,14,
23 118:3,
5,11,13,
19,21,24
126:7,16,
18 140:19,
22 141:2,
10 143:1
144:6,8
156:24
157:5
172:6,11,
19

charged
73:19 77:3
78:19
117:4,25
133:4
141:1,3,5,

Case 1:18-cv-03728-SDG    Document 140-10    Filed 09/09/22    Page 232 of 286

**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**
Kevin McAnaney on 06/14/2022                Index: charges..classes

8,14,18,23
142:25
143:14,19
144:1
172:3

charges
73:15,22
74:3 76:19
83:18
141:11
144:11
147:20

charging
69:18
78:1,6
79:11
82:16
85:20
116:25
117:7
126:2,8
142:4,7,9
143:21
173:4,8

chart 56:3
95:1,6

cheaper
121:17

check 78:13
82:22
83:4,5
84:9,21
177:24

checks 68:7
78:2,8
79:3,12

82:12,15
85:3,8
170:11,18
171:4
177:16,17

chief 41:8
47:7 57:10

choice 111:9
113:18
114:15
115:7
116:16
118:25
119:6
129:15

choices
142:22

choose 111:9
120:24
187:22

chooses
117:1
141:10

chose 33:6
117:10
118:14
135:15
181:17

Chris 214:1

Chrome 11:16
24:21

CHS 64:24
69:24 70:8
156:25

circle 24:24
34:11

Circuit
150:2

circumstances
48:20
51:6,18
55:25 69:8
132:3
159:21
181:13
203:9

circumstantial
207:4

citation
138:3
149:13
150:1,4
157:2
160:4
167:22,25

cite 31:5
32:3
33:12,16
54:20 61:1
105:21,22
112:20,23
136:14
139:8
140:3,4
149:17
163:9
168:6
169:4,12
209:9

cited 32:19

33:14
34:22
124:1
137:18,20,
21 138:16
168:7

citing
199:14

civil 55:9
160:9,11,
14 161:9,
16

Claim 22:24
43:16

claims 22:20
29:18
35:20,23
204:24
206:3

clarify 52:8

class 79:24
80:12 81:8
171:17
172:20
173:11
177:25

classes
79:15
80:19,23
89:17
170:8,17,
22 171:3,
23 172:10,
25 174:13,
14 175:13

**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**
Kevin McAnaney on 06/14/2022    Index: classic..communities

176:20
177:7

classic    52:2

classroom
78:24
175:24

clean    7:25

clear    16:8
71:15
76:24,25
95:21
100:11
103:20
104:14
141:13
149:9
162:13,24
163:20
164:2,16,
22,24
165:12,17
166:7,15,
16,17
175:2
182:24

click    10:22
11:5,9

client    36:15
55:11
66:20
194:18
202:11

client's
70:24

clients    35:9

37:11
64:25 65:2
69:24,25
70:23
105:15,17,
19 120:19
121:8
131:23
133:4,8
141:3
180:4
202:19
203:1

clients'
207:8

clinical
56:2

close    25:6,8
33:4 67:1
91:22
215:9,13

closed    33:25
73:18
100:18
186:13
198:25
199:2,19
204:25

CMA    78:14
89:17
104:6

CMAS    104:19

CMS    55:8
60:8 61:13
108:13

CMT    173:20

cocounsel
215:11

coffers
164:9

collaborative
19:5

collection
179:23
180:4,17,
22 181:10,
20 182:1,
17 183:12,
23 184:10

Collier
145:2

Collin    6:19

column    61:7,
9,12 62:4
199:14
205:14
206:15,19
207:18

combination
71:6,12
210:22

combined
65:4,8,21

comment    55:5
59:23
97:17

comments
43:1,5

commerce
167:23
168:8
169:10,16,
20

commercial
146:7

commit    153:3

committee
137:19,22,
24 138:24

common    78:18
81:20,22,
23 90:1
141:21
155:24
205:6

commonly
66:24 70:3
137:13
146:5
156:7
159:25
160:17

commonplace
169:1,15

communications
113:11
134:20

communities
23:18 28:2
64:23 66:6
68:15
73:3,19
79:15,16

80:4,10,
11,23
81:3,6
84:16 85:5
87:4
104:9,15
112:7,13
115:12
116:24
123:5,12,
14 124:9,
22 126:7,
9,16,19
129:15
135:10,15
141:2,8,24
144:3
163:5
167:4
169:18,25
170:11
173:10
174:13
175:6
181:5
201:1

community
23:9 39:6,
13 41:17
42:16
51:22
63:14
78:23,25
79:22
81:17,24
82:9,23
83:14
85:8,9

87:7,10,
12,18
90:17 93:7
96:24
98:20
99:8,17
100:1
103:21
105:1
106:6,15,
23 108:5,
16,23
111:19,22,
24 113:1,
4,10,12,24
114:9,17,
22,24
115:1,6
116:5
117:10,15,
17 119:4,
13 120:9,
11 121:11,
13 122:14
124:12,20
125:5,7,19
129:6,9,
11,21
130:4
132:5
133:12
134:2,7,
11,18,21
140:24,25
141:11
143:1,2,8
154:23
155:4

156:19
157:5
166:19
171:16,24
173:16
174:15
175:23
178:14
180:11,24
181:2
183:3
184:8,19
186:19,23
187:2,8
188:10,14,
22 190:8
191:5
201:20
214:11

companies
35:16
37:17 38:8
45:12
144:23
205:2
206:5

companies'
207:3

company
47:24 54:3
63:14
160:23
161:4,13
174:4
204:22
206:1

company's
43:22
193:9

comparable
139:24
140:10,11
142:1,14
144:8

compensation
175:23

competed
120:5

competition
120:15,18
139:18
152:23

competitive
151:5
152:4

competitor
144:17,20
154:14,20,
21 155:3

competitors
90:7
139:23
140:10,18,
22 141:8,
20,23
142:13
143:13
151:4,10,
17 152:3,
11,24
153:5,13

Case 1:18-cv-03728-SDG    Document 140-10    Filed 09/09/22    Page 235 of 286

USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.
Kevin McAnaney on 06/14/2022    Index: competitors'..Congress

155:16
156:8,13,
23 157:4
158:10,13
159:5

competitors'
158:2

complained
126:1

complete
12:20

compliance
33:23 35:6
37:17
38:2,16,
22,23
41:19
42:22
96:6,11
101:7
198:15
199:1

compliant
38:9,18,19
45:14 82:1
92:5 165:6

complied
22:6
213:18

complies
47:11
53:21 63:6
91:14
96:19
103:6
105:9

189:15
194:1,23

comply  35:17
37:22
43:23
101:11

component
36:16
203:3

Comprehensive
209:9
210:24

computer
48:9,11,
12,15,16,
19,23 49:6
89:10
127:6

computerized
127:7

computers
10:5 17:14
86:7

conceal
160:1

concealment
162:6

concern
44:15
184:7
186:10

concerned
187:5

concerns

44:6 62:17
101:4
182:13
188:7

conclude
201:25
202:2

concluded
109:25
216:14

concludes
216:8

conclusions
208:1,3

conditions
127:5

conduct
30:13
31:11,20
32:1
66:19,21
70:1 79:15
101:21
137:12
151:11,18,
19,20
153:9,21
155:7
160:24
161:13,21
162:3,17
167:20
193:16
212:18

conducted

30:15

conference
9:6

confers
55:20

confidential
89:21,24
90:2,5
157:8,23
158:2,5,7,
11,14

conflates
128:8

confusing
75:24

congregate
40:25
41:2,5
64:24
65:5,9,12,
21,23
66:1,11,
17,21
69:2,5
70:12,18,
23 99:12,
13 105:17
106:8
111:11
143:22
145:1,6
163:8

Congress
139:4
167:20

Case 1:18-cv-03728-SDG    Document 140-10    Filed 09/09/22    Page 236 of 286

**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**
Kevin McAnaney on 06/14/2022    Index: connection..contracts

connection
 8:10

consequences
 182:9

consideration
 109:23
 201:22

considerations
 130:7

considered
 127:15
 206:11

consistent
 30:2
 119:15
 140:20
 157:20,21

constitute
 48:21
 55:22

constraints
 215:1

consultant
 20:18 48:2
 50:19
 61:22 62:5
 98:18
 163:14
 193:8
 199:4,16

consultants
 37:11
 70:19

consultation

61:15

consulted
 45:21

consulting
 19:12,15,
 23 20:1,4,
 9,12,16,
 22,25 23:3
 35:22,24
 36:4,6,7,
 14,20,21,
 24 37:7,10
 39:22,23
 49:13
 62:18 68:6
 69:22
 70:9,13,25
 71:4,9,10,
 16,22
 72:1,12
 75:16,20
 76:2,17,19
 77:1,8,12
 79:5
 89:13,17
 91:13,22
 93:1,16,22
 94:3,7,12,
 14,18,25
 95:2,3,5,
 8,14,15,
 16,17
 97:1,20,23
 98:7,10,14
 99:16
 126:8,9,
 14,17

140:19
 142:25
 143:5
 144:2,7
 156:1,7
 159:4
 163:25
 164:13,18,
 20 178:10
 184:6
 188:13,22
 199:10

contact
 45:12

contained
 13:22
 14:5,11

contemplating
 133:18

context
 51:16
 161:10

continental
 80:2

continue
 157:4

continued
 156:24

continues
 61:20

continuing
 174:22

contract
 28:13,15

39:5 62:6
 72:23
 73:1,10,
 16,20
 75:10
 93:20 94:2
 95:7,12
 96:1,2,12,
 18,24
 101:2
 104:16
 107:10,13
 108:3,15
 109:2
 113:12
 115:13,20,
 24 121:25
 134:22
 163:15
 164:1,11
 165:1,25
 166:16
 183:9
 210:23

contracting
 157:13

contracts
 27:16,17
 28:1,5,8,
 18,21,22
 31:16
 70:17
 73:2,4
 89:1 91:17
 111:13
 160:19
 167:3

Case 1:18-cv-03728-SDG    Document 140-10    Filed 09/09/22    Page 237 of 286

USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.
Kevin McAnaney on 06/14/2022    Index: contractual..counsel

181:18
199:16

contractual
39:5 92:5
165:5,15,
17 166:8
167:11

contrast
48:15 49:5

contravening
206:25

conversation
7:20
15:23,25
17:12

conversion
191:1

convert
190:3

conviction
161:7,8,23

convictions
161:24

copy 10:2
73:7
138:19

corner
179:4,7

Corp 211:10

correct
10:24
12:17
13:23
16:11

22:25 28:2
29:13,16,
19 31:8,9
33:24
35:3,6,7
41:10,22,
23 42:1,5
43:25
44:1,16,21
48:13,14,
21 49:18,
20,22 54:4
57:4,24,25
58:5,13,16
60:14,20
62:19
65:2,3,24
67:14,18
68:3,17,
24,25
70:5,6,19
71:20 76:9
79:8,17
80:7,14
81:8
82:17,18,
19,20
83:19
85:22 86:7
87:4,15
89:3,4
90:8,21
91:18
92:2,11,
14,15
93:10,18
94:10
97:25

100:25
103:18,19,
22 104:10
105:2
110:11,12,
16 111:16,
17 114:4,
11,13
118:17
120:11
122:12,13,
20,21
123:9
124:4,25
125:10,11,
14,23
126:9
137:11
140:5
143:15
144:9,10
147:21
150:2
160:2,3,15
167:1,9
170:9,10,
13 171:6,
18,25
172:21
173:1
180:19
190:1,6
193:12,13
194:10,14
199:21
200:3,12
207:15
208:18

correctly
24:5
49:10,23
50:4 67:1
208:7

cost 49:15
74:8 93:3,
17 94:21
97:2,12
107:24
117:8,23
118:12
121:16
131:12
164:19
171:12
173:6,7
193:9
199:20

costs 71:22
72:11,17
76:3,7,9,
11 77:19
93:3,18
94:9,10,
19,24
95:10
97:13,15
105:18
106:19
107:18
131:13
164:21
170:24
177:17
202:9

counsel 7:3

13:15
20:23
23:23 41:9
45:22 46:3
47:12
53:22 63:7
66:25
67:5,9,13
68:2 70:4
91:15
103:7
105:10
149:3
189:16
194:2,10,
12,24
198:7

**counseling**
33:22
35:15
55:11

**count** 66:8

**country**
143:19

**County**
209:11

**couple** 7:16
24:9 25:22
28:25 80:8
102:1
215:14

**courses**
170:25
173:25

**court** 6:14

7:3,19
8:12 10:13
36:10
46:13 47:3
52:15,17
53:8 54:20
56:16
59:15
62:23
67:20
88:19
149:1
157:11
178:23
185:14
189:8
192:16
193:22
197:11
203:14
204:17
210:12

**cover** 8:17
38:24 76:9
97:18
196:21

**covered**
65:14
71:6,23
72:1,2,9,
24 74:1,8
75:17
76:7,17
77:9,10,
14,16,20
83:12
126:19

141:4
177:12,13,
23,25

**covering**
77:6

**covers** 197:2

**COVID** 37:5

**create** 37:19
151:13
153:9

**created**
37:21
65:16
136:23
137:1,16

**creating**
37:17
154:7

**crime** 137:12
151:21,23
155:20
160:12

**criminal**
55:9 60:12
151:18,20
159:25
160:9,10,
11,14
161:7,8,24
162:3,7,10
195:2
203:6,8

**criminalize**
84:6 175:1

**curious**
138:5

**current** 48:4

**custodial**
66:11,16

**customary**
205:6

**customer**
99:3,6
172:6

**customers**
48:5 79:1
99:1
107:17,21
126:21
131:15
132:10
133:22
169:21
182:20

**cut** 133:11,
15,20
134:3

**cutting**
188:23

_____

D

**data** 179:23
180:3,10,
17,22
181:10,20
182:1,17
183:12,23
184:10

date 6:10
  12:24
  13:3,5
  56:21
  79:21

dated 46:25
  47:5 57:4
  186:7

Daubert
  204:6
  207:14,21
  211:3

Dauberted
  204:3
  208:20,24

day 13:6
  78:12
  80:5,13
  175:3

days 78:13

dealing
  35:23

deals 63:20
  163:7
  210:8

dealt 39:16
  210:22
  213:13,15
  214:7

December
  27:6 186:7

decide 91:3
  174:23

decides

202:15

decision
  130:16
  159:20
  203:17,20
  208:25

decision-maker
  139:7

deck 31:6

declaration
  140:4

declarations
  27:18,22,
  23 140:16

declined
  139:19

deemed
  207:11

defendant
  7:1 18:2

defendants
  18:17

defense
  18:12
  154:6,8

defer 102:4

deferred
  28:24

defined
  70:12
  74:4,12,
  18,25

definite

48:19

definition
  65:15 66:1

delay 9:9

deliver
  106:17

delivering
  132:8

delivers
  132:5

Department
  54:19 55:9
  60:10,16
  150:24
  198:23

departmental
  59:3

depend 107:5
  131:11

dependent
  132:15

depending
  48:20 99:2
  107:17
  108:2,11,
  14 172:3
  182:20
  210:7

depends 51:5
  98:12,13
  127:11
  132:25
  133:1
  144:11

174:23

deploy
  130:15

depo
  190:21,22

depos 8:23
  189:18

deposed 7:6,
  15 21:6
  119:23

deposition
  6:6 7:15
  9:10,19
  14:8 21:2
  75:16
  76:16,23
  109:21
  148:22
  178:7
  182:11
  190:18
  209:11,12
  210:20
  211:11,13
  216:9,14

depositions
  17:11
  26:23
  27:15,23
  31:15 73:8
  80:21
  116:24
  140:16
  144:24
  157:18
  159:8

**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**
Kevin McAnaney on 06/14/2022      Index: derivative..dispensing

181:16

**derivative**
  207:8

**derived**
  137:2,3

**descriptions**
  157:21

**designate**
  120:21

**designated**
  90:16
  112:15
  119:12
  120:5,8,16

**designates**
  113:24

**designation**
  105:11
  120:10,13,
  14  121:7

**detail**
  101:19

**details**
  127:4

**determinable**
  159:2

**determination**
  202:21

**determinations**
  130:14

**determine**
  45:13
  175:24

**determined**
  113:3

**determines**
  185:10

**determining**
  206:11

**developing**
  41:15

**developments**
  194:13

**DHS**  59:3

**Diagnostics**
  211:10

**diamond**  58:9

**differ**  69:8

**difference**
  69:1
  104:25
  126:25

**differences**
  201:14,15

**dinners**
  214:10

**direct**
  204:20
  205:21

**directly**
  178:16

**director**
  180:18,19
  186:4

**disagree**
  92:22

195:23
196:15
197:5

**discern**
  49:11

**disclosed**
  162:4

**discount**
  22:6
  81:12,20,
  23  82:3,4
  83:20
  84:14
  85:23
  86:1,3
  168:16,19,
  20  170:7
  172:15,18
  174:6,9,22
  175:17
  177:3

**discounted**
  22:14
  30:17  52:6
  83:23
  84:10
  85:16,25
  171:5

**discounts**
  22:4,9
  84:6
  167:19,21
  168:4,25
  169:15
  170:5
  174:5

175:1
176:13,15,
20  177:24,
25  206:12,
21

**discovery**
  147:6,25
  148:9
  202:23

**discussed**
  63:16
  75:25
  157:9

**discusses**
  163:10

**discussing**
  16:5
  144:24

**discussion**
  15:20
  16:10
  29:12
  62:11
  122:5

**discussions**
  15:8  16:9
  182:10

**disguised**
  174:9

**dispensed**
  133:7

**dispensing**
  71:6,11,
  17,23
  72:2,8,13,

17 75:17
76:3,17
77:2,15,18
108:2,20
124:18
126:20
141:4,11,
18 176:21,
22 177:1,
5,8,9,13,
19,21,25

**dissolved**
21:20

**distractions**
10:4

**distributed**
113:15,22

**distribution**
215:7

**division**
60:12

**Divisions**
55:9

**dixit** 208:11

**document**
10:10 11:7
24:11
25:6,9
46:24
47:5,6
53:23
56:23
59:18 60:1
73:17
136:11

148:1
182:4
183:17
187:17
189:17
190:13
194:3
197:14
198:16

**documented**
156:10

**documents**
9:1,5,24
13:23
14:13
23:23 24:7
26:14,17,
18 27:9,
13,25
33:10
34:12
47:19
83:10
189:1

**DOJ** 192:21

**dollar**
172:19
173:3
174:15

**dollars**
81:16,25
171:17,24
172:24
173:8,11,
12,19,20

**door** 107:6,

12

**doubt** 76:15,
20 204:18
205:17

**download**
10:23
11:6,14
25:25 26:2

**downloaded**
10:24
25:12

**downloading**
11:8,17

**downloads**
11:2

**drafter**
57:13

**dropped**
189:25

**drug** 182:8

**drugs** 61:24
106:17
123:16
127:13
177:10

**due** 13:3

**duly** 7:6

──────────
E
──────────

**e-mail**
133:17
189:23
190:23

202:22

**e-mails**
134:20

**earlier**
63:16
115:8
157:9,24
163:13
198:17
199:8

**early** 15:17
16:1 27:7

**easier** 7:23
8:2 37:7

**easily**
107:19

**economically**
97:18

**economy**
170:23

**education**
68:6 78:2,
7,10 79:11
83:13
97:16
172:7

**educational**
170:22
172:5

**effect** 76:23
81:11
109:7
112:18
113:8

Case 1:18-cv-03728-SDG    Document 140-10    Filed 09/09/22    Page 242 of 286

USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.
Kevin McAnaney on 06/14/2022    Index: eight-hour..evidence

147:16
185:12

eight-hour
78:11

either/or
52:7

electronically
131:20

element
149:14,23
151:16
152:20

elements
69:7 154:2
155:2,20

emar 74:22
89:17
117:6
127:1,2,5,
11 128:3
130:2
132:11
133:5,6,15
134:4
190:4,9
191:2,16

emars 68:7
87:22
126:23
127:8,20,
23 128:11,
12,20
130:11,12,
18,23
131:4,6,
10,23

132:2,5,
14,16,22
139:20

employ 61:14
103:17
104:16

employed
61:23

employment
207:22

EMR 17:17

encompassed
71:4

encourage
49:16
50:2,11

encouraged
134:12,18,
21 135:2,
19

encouragement
50:9
134:10
149:16,25
150:11,18
151:2
187:1

encouraging
135:9,14
181:4
191:14

end 67:11
73:25 87:1
102:11

137:7
191:24

enforceable
96:21

enforced
41:21

enforcement
200:11

engage
151:18,20

engagement
15:18 16:2
39:15

engages
124:18

engaging
151:10,17
159:24

ensure 183:8

entailed
130:19

enter 120:1

entered
119:16

enters
87:14,18

entire 43:4
135:14

entities
33:23

entitled
59:4

equipment
89:7

error
128:10,25
130:3

essence 22:5

essentially
17:16

establish
142:9
166:22

established
97:20 98:8
110:8

et al 209:9

etcetera
152:22

evaluate
130:3
175:11
203:2

evaluated
40:7

event 80:13

eventually
34:21

everybody's
127:16

everything's
33:1

evidence
76:5 96:23
115:6,19,

**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**
Kevin McAnaney on 06/14/2022        Index: exact..experienced

22 118:1
133:10
141:13
146:7,22
147:16,23,
24 148:10,
20,24
152:8
156:22
158:22
159:6,19
170:4
172:1
175:5
176:3,4
183:19
207:5,24

exact   95:5
142:1
153:9

EXAMINATION
7:8

examined   7:7

examples
109:14
206:14

exception
168:3,20

exchange
56:4 97:25
99:10
100:3,12
152:1,12,
15 153:6
154:13,15,
18,23

155:5,10

exchanged
121:25

exclude
65:22

excluded
65:14
212:22
213:8
214:16,22

excluding
65:25

exclusive
210:23

excuse   43:15
44:11 82:8
91:2 93:14
97:8 98:5
101:9
112:22
118:4
155:6,17
194:17
196:13
204:4
215:5

excused
153:8

executive
180:18
186:4

exempted
167:21

exhibit

10:8,12
12:13
14:11
15:3,16,21
17:3,8,24
18:3,7,13
24:20
25:12
27:21
31:22 32:8
45:24
46:5,12,
17,20,22
47:2 53:6,
7 56:15
57:7,11
59:14
62:22,25
64:4 73:8
88:17 90:9
91:12,16,
22 96:8
165:24
166:3,12,
21 167:2
176:8
178:22
179:7
185:13,17,
21,22
187:24
189:7,11,
21 192:14,
15 193:21,
25 197:10
203:13,17
209:8,17,
19,20

210:6,11

exhibits
9:10 17:11
27:16
29:10,11
31:15
80:20
178:12

existed   79:7

expectations
207:9

expeditiously
8:18

experience
33:22
89:25
105:23,24
116:14,22
136:10,17
147:17
160:7,8
169:5,6,8,
16 188:21
204:20
205:21
208:3,4,5

experienced
66:25
67:4,9,13
68:2 70:4
194:10,12
198:6
204:18
205:17
206:20,23
207:6

expert   11:5,
10 12:16
14:20,21,
22 15:21
18:6 19:6,
10 20:18,
22,24,25
23:4,8,12,
16 24:1,2
27:2,17
28:19
35:22
36:2,3,7,
8,15,20,21
39:23 72:4
97:14
109:21,24
110:4,10
127:21
128:22
177:12
184:6
203:24
204:2,9
208:12,21
210:17,20
213:11
215:3,6

expert's
14:18

expertise
36:5

experts
18:1,5,12,
16

explain
107:9

126:25
184:3
208:2

explained
181:15

extensive
33:22

extent   29:10
126:13

extinguished
150:9,13

_____

F

face   184:14
196:1

facilities
22:15
23:17
39:18
40:15
60:19
61:14,23,
25 62:5,21
63:21,23
65:8,14
66:1,2,3,
4,12 69:2
70:21
99:22
106:4,9
116:14
123:19
124:15
142:9,20
143:22

163:14
164:4,8
198:16
199:2,25
200:1,2,9,
14,15,17,
18 201:11,
16

facility
39:6,12,14
40:2,3,7,
9,12,18,22
51:1 61:17
66:13 69:5
79:20 80:8
82:14
90:13,20,
23,25
91:2,9
99:6
103:22
107:18,21
117:22
118:11,13
121:9
132:9
133:21
143:24
145:1
181:14
182:21
184:15
200:21
201:3

fact   51:13
110:8
115:12

116:19
125:12
128:9,24
152:22
155:9,13,
16 157:14
158:20
161:15
167:21
170:20
172:10
174:9
175:12
181:3,4
188:3
198:14
215:1

factors
159:19

facts   16:6
17:1,6,22
50:16
51:5,18
69:8
100:13
129:24
159:20
161:7
162:6,11
202:17,20,
22 207:23
208:6
213:16

factual   15:9
39:10
115:17
116:3

152:8,25
203:8

**failed**
207:20

**failure**
213:16,23

**fair** 8:7,15
21:10 22:1
33:3,18
35:22
36:12
38:21
49:15
55:20
57:22 58:2
59:13
66:18
142:10
170:19,22
171:1,4,
14,19,20,
22,23
172:2,16
173:5,23
193:10
199:20

**fairly** 31:1
195:21

**fall** 58:18
186:18
188:9,23

**falls** 187:9

**False** 22:20,
24 29:18
35:20,23
43:16

**familiar**
56:23 63:8
104:21
150:6
192:25
203:20

**family**
116:16
191:18

**fault** 209:24

**fax** 48:2
49:13
50:18

**federal**
22:19,23
42:5 49:17
50:2,13,20
55:24 56:6
59:20
62:21
66:10,16
69:3 92:6,
7 100:21
108:1
123:24
162:13,17,
24 163:2,
20,22
164:2,9
165:6,7,
12,15
166:20
183:7
195:6

**Fedex** 183:3

**fee** 70:24

71:6,7,11,
17,23
72:2,3,7,
8,13,14,
17,20,21,
24 73:14,
18 74:15,
17,23
75:14,17,
21,25
76:3,4,17
77:2,3,8,
10,15,16,
18 78:17,
18 86:6
108:2,20
116:25
117:4
125:14
126:13,20
133:4,11
134:4
141:4,11,
12 142:7
176:21
177:1,2,5,
8,13,14,
19,21,23,
25

**fees** 71:24
126:11
133:15
141:18

**fide** 167:19

**field** 151:7,
13,19
152:5

153:2,9,20
154:7,11
204:16

**figure** 36:18
52:3,5

**file** 8:25
9:3,11,13
10:9,11,22
11:10,12,
14 26:19
88:5

**finalized**
12:25

**finalizing**
18:7,13

**find** 10:17
115:25
116:21
118:8
136:22
184:6

**fine** 8:8
9:17
145:14
188:14
215:16

**finish** 8:4,6
135:3

**firm** 16:10,
19 20:17
21:15,18,
20

**fit** 101:16
198:7

five-minute
  145:11

fix   209:25

fixed   105:18
  107:15,16
  131:13

flags   212:19

flat   78:14

Flipping
  57:16

focus   67:6

folder   25:7,
  15

footnote
  62:3
  136:12
  137:8
  138:18,21
  140:3
  149:19
  199:9

footnoted
  137:4

footnotes
  138:4,11

foreign
  167:23
  168:7

Forget   64:2

form   14:1
  17:2,5,7,
  23 27:10,
  20 30:24

32:7 51:3
73:11,13
81:9 84:4
158:20

formal   41:16
  42:9,12,16
  43:19,24
  44:13,16

format   34:17

formed   14:6

forming   46:1
  60:22

forms   42:4,6

foster   101:7

fourth   58:1,
  9 86:10
  139:18

frankly
  116:21

fraud   41:18,
  20 42:17
  56:20
  57:11,14
  58:18,23
  62:10
  163:19

free   22:14
  30:16
  47:25
  48:2,3,17,
  23 49:14
  50:17,18,
  19 51:25
  52:6 55:20

56:3 57:22
62:8,18
78:22
79:1,17
80:23
81:12
82:15
83:4,7,17,
  25 84:10,
  15,22
85:2,14,16
87:20
120:24
140:25
141:6
156:14,16,
  18 159:3
163:17
164:6,7,
  10,21
168:24
169:14
171:5,11,
  21,23
172:23
199:3

freedom
  114:15
  115:7
  116:15
  129:15

frequently
  118:20

front   186:1
  197:25

frozen   67:20

full   71:13,
  23 72:6
  199:14

function
  131:9
  174:8

functionality
  17:15

furnish
  61:24

future   196:3
  200:11

―――――――――

G

gained   17:2

Garrett
  211:9

gave   21:4
  115:9
  154:12
  158:22
  172:10
  211:13

Gayco   145:2

general
  17:10
  30:5,19
  31:1 39:17
  41:10
  56:20
  60:17 63:2
  78:17
  80:15 91:5
  105:23

143:16
147:15
157:21
177:21
198:25
204:24
206:3

generally
22:2 35:9
68:12
73:22
78:10,19
105:16
109:9,16,
25 110:18
111:6
127:14
129:13
135:18
142:18
158:16
164:6
168:5
169:19
176:24
177:3
196:19
200:21
202:5,6,13
210:19
213:10

generic  99:3
195:22

Georgia
23:10,13,
16,20
82:1,22

103:9,13,
15 104:8,
14,22
105:2
108:1,13,
18 122:23
123:4,5,8,
10,22
140:20,23
141:9
143:6
144:2
145:6
177:18
201:1,11

gifts  48:4
49:14
50:20

Gilead
214:2,4,14

gist  22:7,9
142:19

give  11:15
46:9 52:15
80:8 83:16
88:5
114:24
115:13
151:25
152:14
154:9
155:12,17
159:4
171:10
215:14

giving  19:14

30:16
51:24 84:8
89:2
152:11,18,
23 153:6,
15,16
154:10,14,
17,18,22
155:4

Global  25:2

Golden  18:19
19:7

good  6:21,
25 7:10,11
10:7 11:4
25:21,23
64:15
88:15,16
102:7,8,25
103:1
166:25
172:8
176:10
188:18,19,
20 190:15

goods  30:17
47:25
50:17
57:22
164:6,7
199:3

Google  11:16
24:21

government
22:20,24
24:4 32:16

42:5 47:22
59:9 60:1
108:2
136:18
193:6
200:10

Gray  198:2,
4,7

great  53:5
78:5 139:6

greater
180:8

Greenberg
212:25

Greenberg's
213:16

Gregory
18:20 19:7
24:2

Groome  214:2

ground  7:17
8:13

group  130:9

guarantee
203:5

Guardian  6:9
11:9 14:23
15:4,7,9,
12,15,20
16:4,11,
18,19,23
18:2
19:20,21,
24 20:2,6

28:2 29:4,
13,24
30:6,22
44:24
45:2,7,18,
21,22
64:21
66:19
68:16
71:9,15,21
72:10
73:3,4,10,
18 74:5,7,
23 75:1,5,
8,19 76:25
77:21
78:24
79:2,14
80:11,24
82:13
83:12,16
85:2,7
86:23
87:3,6,14,
15,17,19
88:23
90:16
91:1,2,3
96:25
97:6,10
100:1
104:17
107:3,4
108:3,22
109:2,5
111:13,14,
15,18,20,
22 112:1,

2,5,8,14
113:3,9,
17,21,24
114:1,10,
17,25
115:13,15
116:4,5,7
117:2,6,
11,15,16
118:2,14
119:4,5,
12,16
124:10,17,
24 125:6,
10,12,17,
18,21
126:1,15
129:10
130:8,11,
14,22
131:5,9,23
132:1,4
133:3,10,
12,15,16
134:2,11,
17,19,20,
22 135:9,
10,14
139:20,22
140:18,24
141:1,10
143:1
144:16
145:2
146:14
147:2,5,8,
14,18,24
149:3,10

151:12,18
152:14
153:8
156:2,15,
17 157:4
159:4
164:12,24
166:10,18
167:3,6
171:7
172:2,3,19
173:7,8
174:12
175:6
176:14
178:1,9
179:7,17
180:17,21
181:6,9,18
182:1,25
183:10,20
184:7
185:23
186:11,17,
20,24
187:2,5,9,
20,21,22
188:11,13
189:18
190:11,25
191:2,11,
16 201:10

Guardian's
64:25 65:1
69:17,21
72:15
77:23
84:23

86:19
94:19
115:14
122:9
124:14
133:8
139:16,21,
22,23
140:10
141:7
142:13
143:13
151:10,17
152:11
153:5
156:1,23
157:23
181:19
187:12

guess  16:25
21:24
24:15 29:9
123:6
127:17

guidance
24:4 31:24
32:16
33:10
41:9,17,
19,25
42:1,2,4,
9,12,16,22
43:17,19,
20,25
44:5,14,
20,21
47:7,13,

Case 1:18-cv-03728-SDG    Document 140-10    Filed 09/09/22    Page 249 of 286

**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**
Kevin McAnaney on 06/14/2022    Index: guidances..historically

15,18,19
53:18
54:18,25
55:2,14
56:25
57:2,7,10
58:7,19
59:7 60:3,
18,25 63:2
66:22 70:2
136:11,21
139:9
162:13,17,
24 163:2,
12,20,22
164:2
165:15
166:10,24
167:6
198:15,17
199:1,15
200:8
201:5,8
204:12,14

guidances
38:23
42:13
54:14

guide  201:10

guide-  33:9

guys  116:19

—————————

H

—————————

half  102:1,
3

handing  9:6

handling
183:1
204:24
206:3

handwritten
127:3

handy  192:19

hang  34:20

happen  191:6

happened
87:25

happening
157:16

happy  8:11,
20

harbor  22:7
43:11
101:17,22
168:4,6,
13,16,19

harbors
101:12

hard  10:2

hari-kari
153:4

head  7:24
16:24
173:19
209:3

Health  60:16
198:24

healthcare
33:23
35:16
66:25
67:5,9,13
68:2 70:4
100:22
116:14
133:1
169:11,23
175:1
188:21
194:10,12
195:6
198:7
204:16,18,
23 205:2,
17 206:1,
5,20,23
207:6

hear  8:9
53:3
102:23
192:11

heard  183:19

heart  211:24
212:10,12,
19

Hebrew
212:24
213:5,11

heightened
62:10
121:20,22
163:19
164:2

200:6

Heller  6:9,
17,22,24
7:13 14:22

helped  17:5,
7,23

helpful
147:8

helping
45:13

helps  201:9

HENDRIX
102:22
132:21

Henry  6:8

HHS  41:10
42:5 59:6
60:9,19

hierarchy
55:12
58:19
59:2,22,24
63:16

higher  59:2

highest
186:12
203:7

highly  56:7
202:4
203:8

historical
156:9

historically

36:24
42:13
131:18

hit 34:3
181:10

Hoffman
14:21
33:15

hold 24:12,
18 88:12
97:24
98:10,23
130:13
132:4
181:9
183:11
209:25
210:4

home 23:13
40:25 41:2
48:5
51:15,22
57:23
58:5,12,13
69:5
99:12,13,
23 100:2
105:1,17,
18 114:21
120:24
124:13,20
129:3
139:20,22
145:6
175:20

home's 56:4

homes 22:15,
17 27:18,
23 41:1,5
50:23,25
51:9
63:14,22
64:24
65:5,9,10,
13,21,23
66:1,2,5,
13,17,21
68:16 69:2
70:12,18,
23 86:24
111:12
113:22
122:22
123:22,23
135:5
136:1
142:17
156:11
157:5
159:8
163:5,9
169:9,19
170:1,4,7
171:9
193:8,11
199:17
200:5,16,
22,23
201:6,9,12
212:24
213:5,11

hope 113:13

Hopp 75:15,

22 76:1,6,
16 88:9,
17,21
126:8

hospice
57:21,24
58:1,11,13

hospital
204:25
206:3
209:10
210:18,23
211:25
212:10,12,
19

host 78:23,
25 79:22

hour 94:24
102:2,3,4

hourly 78:16

hours 102:1
152:14

House 167:23
168:22

huh-uh's
7:25

Human 60:16
198:24

hundred
81:16,18,
25 83:14,
15 125:5
129:5,10
130:9

171:17,24
172:19
173:8,11,
12,19

Huseby 25:2

_____

I

idea 91:5
108:17
114:6
123:22,24
129:25
158:3

ideally
121:16

ideas 158:18

identification
10:13
46:13 47:3
53:8 56:16
59:15
62:23
88:18
178:23
185:14
189:8
192:16
193:22
197:11
203:14
210:12

identified
13:18
30:23
42:10

Case 1:18-cv-03728-SDG    Document 140-10    Filed 09/09/22    Page 251 of 286

USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.
Kevin McAnaney on 06/14/2022        Index: identify..indication

58:16
66:22 70:1
72:12
73:17
74:12,25
77:12
115:8

identify
13:23
53:23
69:16
114:9

ill-suited
205:5

illegal
48:21 49:8
151:6
160:2

illegality
66:23 70:3

illuminates
56:12

illustrative
109:14
168:10

immediately
37:11

immune
153:23,25

impact   119:5
139:12

impacts
118:24
130:5

implemented
91:10

implicate
134:15

implicated
184:17
199:17

implicates
48:5

important
60:3 66:9
96:21
147:10

importantly
188:5

impossible
97:5

improper
78:22
137:14
156:2
175:21
206:14

in-house
45:21 46:2

inadmissible
204:3,6

inappropriate
131:2
201:25

inaudible
23:5 24:25
32:12 37:9
42:4 52:14

60:18 66:7
71:19 82:6
88:2
105:14
134:23
148:7
163:6,23
164:3
166:13
168:14
194:14
206:17
213:20

incentive
133:22

incidental
83:17,25
84:11,22
85:15

include
52:11
95:21
115:15
195:17

included
58:4 75:6
133:5
141:17

including
41:21 43:5
48:1 56:5
69:22 92:7
118:21
128:11
156:23
165:7

169:23
170:22
200:18

inconsistency
130:3

incorporated
92:9 165:9

incorrect
49:19,21

increase
191:18

increased
128:14
200:10

increases
128:25

increasingly
35:19
131:19

incur   202:9

incurring
174:14

independent
23:25
31:11 32:6
48:11
140:12
144:13
146:11

independently
31:16

indication
188:2

indicia
  66:21,23
  70:1,3

individual
  127:18,19,
  24,25
  128:3,17,
  21 130:5
  132:16,22,
  23 133:22
  142:7
  153:23
  174:3

individuals
  16:22 81:7
  133:2
  172:11

induce  49:16
  50:2,13,20
  51:21
  57:23
  58:12
  100:12,19
  149:15,24
  152:4,10,
  19,25
  155:14
  193:11
  195:4,10,
  14 196:7,
  23 197:4,6

inducement
  48:21,25
  49:9 50:10
  139:10

inducing

155:15
196:2

industry
  41:8 47:7,
  18 57:10
  59:8 106:2
  111:7
  119:16,19,
  25 127:22
  147:12,14
  148:12
  157:22
  169:17,23
  175:1
  204:20,23
  205:2,7,21
  206:2,5

inference
  56:1

influence
  139:7

informal
  33:10
  43:20,25
  47:23
  53:24

information
  45:17,20
  75:11
  83:10
  96:25
  133:7
  146:14,17,
  19 147:9
  149:2
  203:2

initial
  16:17
  17:2,6,19,
  22 135:19

initially
  26:22

inputted
  127:6

inquiries
  44:19

inquiry
  207:2

inspector
  41:10
  56:20
  60:17 63:2
  198:24

instance
  161:12

instruction
  175:24

instructs
  163:3

insurance
  74:2

intend
  13:12,15
  92:4 165:5

intended
  66:22
  68:23 70:2
  72:11
  100:19
  101:6

167:20

intent  49:15
  50:1,12
  51:20 52:1
  149:14,23
  196:7
  203:7

intentionally
  76:2

inter  199:18

interest
  121:10,14,
  20

interests
  120:21
  121:2,24

internally
  55:6 85:5
  189:24

Internet
  67:21

interpreted
  196:12,20

interstate
  167:23
  168:7

interview
  31:17

introduce
  6:13

introductory
  81:11
  168:25
  169:14

Case 1:18-cv-03728-SDG    Document 140-10    Filed 09/09/22    Page 253 of 286

**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**
Kevin McAnaney on 06/14/2022    Index: investigate..kickback

170:4

**investigate**
31:18
146:25
147:1
148:3
149:5
213:16,23

**investigation**
23:25
31:11
140:13
144:13
146:11
149:8
213:17,18

**Investigations**
59:1

**involve**
22:12,16

**involved**
18:23
22:4,10,13
39:18
160:22
161:3
199:19
210:25

**involvement**
57:6,9

**involves**
162:6

**involving**
20:18
214:24

**ipse**  208:11

**issue**  22:6
45:4
129:21
146:25
147:1,3
162:17
191:13

**issued**  43:9
63:12
203:18

**issues**  9:15
30:23
31:21  38:7
164:3
211:1

**issuing**
41:16

**item**  26:1
100:20

**items**  64:22
69:16

———————————
**J**
———————————

**January**
79:10,14
80:25  81:4
82:13
84:23
85:12,16
126:15
173:1
179:21

**Jared**  6:25
104:2

209:25

**Jerad**  93:25
102:4,6,25

**Jerad's**
88:11

**job**  7:23
8:2

**Joe**  6:16
7:12  46:17
88:6,13
103:25
135:4
148:8,21
166:3
209:20

**John**  140:4,
7

**joined**  19:4

**judge**  148:14
174:16

**July**  46:25
47:5  50:8

**jumbled**
20:10

**June**  6:10

**junior**
204:24
206:2

**jury**  52:3,5
202:15

**justice**
54:18  55:8
58:25  60:9

150:24

———————————
**K**
———————————

**Kaupp**  24:2

**keeping**
158:10,14

**Kennesaw**
88:24
93:10,15,
21  94:6,7,
17  95:7
96:24
164:12

**Kevin**  6:7
7:5  12:17
25:11
128:7

**key**  149:14,
23

**kickback**
30:13
35:21  38:6
51:19  52:2
57:21
58:16
84:5,6
100:15
122:2
132:12
134:15
152:20
153:2
165:8
166:23
174:10,16,

Case 1:18-cv-03728-SDG    Document 140-10    Filed 09/09/22    Page 254 of 286

**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**
Kevin McAnaney on 06/14/2022          Index: kickbacks..legal

25 184:16
188:17
195:22
196:5
202:16
210:25
212:20
213:15,23,
24

**kickbacks**
57:18
121:21
193:8

**kicked** 88:4

**Kimberly**
214:2

**kind** 34:9
39:16
106:2
127:2
175:17
182:14
183:22
191:7

**kinds** 35:16
182:15

**knew** 32:1,5
76:10,16
96:25
162:3
206:25
207:5

**knocked**
204:9

**knowing**

100:9
152:21
193:19
202:18,21
203:2,7

**knowingly**
52:12
56:13 76:1
153:5
154:8,12,
14,22
155:3
159:24
195:3

**knowledge**
23:11
45:17,20
74:16,24
75:9
119:19
207:7

_____
        **L**
_____

**laboratories**
56:2

**laboratory**
56:5

**lack** 149:2

**lacking**
204:19
205:20

**language**
28:8,13,
14,18,21
67:17,25

75:10
90:15
91:21
92:21
93:13 95:9
96:12,13,
20 109:1,7
137:9,19
159:9
166:12,17
168:23
195:17

**laptop** 17:14
87:17,18,
20,21
89:10

**laptops** 68:7

**large** 11:7
143:23
174:24

**largely**
122:10
123:7,10

**larger** 98:23

**largest**
143:18
144:17,19

**late** 27:5,8

**law** 16:9,19
20:17
21:15
33:21 35:5
41:2 45:8,
15 49:20,
22,25

50:5,7
52:11
54:17,23
105:2
115:2
122:24
143:6
150:17
153:12,13,
14 155:17,
18,19

**laws** 92:6
165:7

**lawyer** 19:3
20:22 46:2
95:24
204:19,24
205:18
206:2

**leads** 208:3

**learn** 116:2

**learning**
25:21
164:2

**lectures**
214:10

**left** 24:23
25:14
36:25

**legal** 18:25
19:14,24
20:1,4,9,
12,16,23
23:4,9,12
35:9 45:6

48:1 59:4
151:6
194:16,25
197:15
198:1,10
199:13,23
200:25
201:3,18
213:12

**legally**
63:18

**legitimate**
174:8,23

**length**
213:17

**lets** 174:13

**letter** 44:15
47:24
48:22
53:18,24
54:1 55:4
56:1

**level** 107:9,
25 108:12
151:7,13,
19 153:1,9
154:7

**levels**
98:19,22
99:1
131:14

**Lewin** 31:23
109:11,20
110:22
119:22

138:12
156:10
157:20

**Lexis** 203:17

**liability**
45:8,16
69:4
153:8,23
161:9,15,
17,19
202:9

**license**
173:21

**licensed**
61:15 79:2

**licenses**
122:23
123:13

**licensure**
122:12,20
125:20
140:24
143:7
173:17

**light** 80:1
155:23

**limited**
50:25
51:8,11
92:7 165:7
208:17,23
209:2,4,7
211:6,7,21

**list** 26:15,
17 41:25

69:14
104:12
113:17
137:1
197:23
209:13
210:7

**listed** 57:17
94:13
113:10
114:3
210:15
212:24

**listing**
34:11

**lists** 115:7,
9 116:5

**litigate**
36:10

**litigation**
7:14
18:16,25
21:3 24:25
35:25
36:14,19
37:1,4,14
157:14
215:4,7

**litigation-related** 36:1

**litigator**
36:9,11

**living** 23:9,
17 39:6,
13,18 41:1

51:1,22
63:21
64:23 65:8
66:5,11
68:15
100:1
105:1
124:12,20
163:4
169:18,25
183:2
200:24
201:1,19

**LLC** 6:10

**loaded** 174:7

**loan** 86:24
87:4
184:21,23

**loaned** 87:7,
13

**location**
131:15

**lock**
139:20,22

**logged** 9:3

**logically**
153:17

**long** 35:15
39:19
87:14
174:6
186:13

**long-term**
20:5,8,11

22:14
23:3,17
39:4,11,
12,19,21
40:2,3,4
61:24
62:6,17,20
63:22 65:1
99:25
103:22,24
104:1
105:14,25
106:1,3,5,
11,13,18,
21 107:2,
4,11,14
108:18
112:1,15
113:17,25
114:11,18,
20,23
115:12
117:1,16,
18 118:14,
16,25
119:6,25
120:4,15,
19 121:15
124:11
127:19
128:18
129:5,16,
20 130:10
135:11
141:14
142:20,24
143:24
163:15

164:1
169:9,17,
24 174:17
182:22
183:1
199:10
200:1,2,9,
14,18,21
201:2,10,
19

looked   28:1
32:24
33:16
66:24 70:3
89:1
108:19
111:13
163:12
164:11,14
168:12
172:3
178:7,11
189:21
198:16
199:8

Lori   80:16
126:17
179:12

lose   187:21

losing
171:13
186:19
187:8
188:10

Lost   67:19

lot   8:17

33:9,10
40:14
66:14
91:17
109:15
171:11
172:9
182:12,13
202:9

lots   32:3

low   170:24

LTC   105:15
109:10,17
110:1,19,
23 111:5,
15 120:22
121:6
156:23
162:14,25
163:3,8

lunch   102:2

Lynn   6:21

——————————
M
——————————

machine   48:2

machines
49:13
50:18

made   115:21
142:12
149:8
175:12

Maggie
211:24

magnitude
118:24

maintain
122:23

maintains
151:7

majority
130:13
167:2
190:5,20,
24 191:3

make   7:17,
23 8:2,6
12:19
16:24
38:18
46:15
86:22
88:11
97:18
99:13
107:4
117:6
121:17
122:17
134:24
140:9
172:7
188:14
195:2
202:20

makes   130:15
131:10
153:18
174:24
205:1

206:4

**making** 55:6
60:3
128:13
144:12
171:9

**malpractice**
213:12,20,
22

**management**
61:10
122:11,18
124:23
125:8,13
141:24
143:4
156:14,16
199:5

**manners** 92:6
165:6

**manual** 37:22

**manually**
118:21,22

**MAR** 127:1,2
128:13
129:1

**March** 56:21
57:4

**margin**
121:18

**marginal**
97:15
170:23

**mark** 10:7

**marked** 10:12
46:12 47:2
53:7 56:15
59:14
62:22
88:18
178:23
185:14
189:8
192:16
193:22
197:10
203:13
210:11

**market** 49:15
55:20
57:22 58:2
62:9,18
83:24
95:10
142:10
163:18
170:19,22
171:1,4,
14,20,22,
23 172:2,
16 173:5,
24 193:10
199:21

**marketing**
186:15

**marks** 199:2

**MARS** 126:23
127:3,9,20
128:4,20,
22 130:12,
18,23

131:3,6,
11,19
132:5,23

**Martin**
140:4,7

**Maryland**
9:20

**Massachusetts**
21:25

**matching**
152:2

**materials**
26:25
31:6,14
32:22
33:5,14
113:20,21

**Matt** 126:8

**matter** 6:7
14:3
18:23,25
19:8 21:3
27:2 39:23
55:2,3
152:7,25
173:7
206:23
213:11,24

**maximum**
108:21

**Mcananey** 6:7
7:5,10
12:12,17
53:3 88:21
94:5

102:23
148:16
192:11
204:18,21
205:17
206:19
210:1

**Mcananey's**
207:12,19
208:9

**Mcgee** 212:4

**Mckesson**
214:24
215:3,6

**meals** 214:9

**means** 31:14
97:23
200:22

**meant** 68:11

**Media** 6:6
102:12,20
191:25
192:8

**Medicaid**
48:6 58:3
66:15
100:22

**medical**
66:14
77:19
214:10

**Medicare**
48:6
71:18,19

100:22
176:14,15,
18,22
177:3,4,9

**medication**
17:14
61:10 68:8
69:23
78:12
86:6,19,24
87:3,6,13
89:10
103:10,16,
17 104:4
117:8,25
118:22
122:5,11,
18 123:15
124:5,23
125:2,8,13
127:3
128:10
131:18
140:23
141:9,24
143:4,14
144:2
146:8
155:25
156:14,15,
17 199:4

**medications**
103:18
133:7
183:2

**meds** 191:6

**meet** 104:20
154:1

**meet all**
155:2

**meeting**
152:23

**members**
78:23

**memory** 204:1

**mention**
56:12

**mere**
149:16,25
150:11,18
151:1

**message** 26:1

**methodology**
207:12,25

**Michael** 6:23

**middle** 103:8
179:16
193:6

**Miller** 6:18
10:10
24:12 46:9
53:5 56:18
59:18
62:25
87:23
189:12
192:13
197:13

**million**
22:19

**mind** 26:3
40:16
76:15

**mindful** 62:7
163:16

**mine** 24:10,
23 25:13

**minimum**
103:18
108:7,8,
12,20,21,
25

**minute** 11:13
26:2 88:6
113:5

**minutes**
102:3,7
191:22
215:10,14

**mischaracteriz
ed** 152:18

**missed** 67:11
87:1

**misstates**
94:1 95:11
96:14
129:23
148:9
174:19
182:3
183:16,17
187:16,23
188:25
190:12

**mistake**

128:14

**mistakes**
127:17

**moment** 47:9
53:19
189:13,19
194:21
197:16

**money** 121:18
139:12
171:13

**monies** 71:18

**monitored**
121:21

**month** 73:25
75:14
117:17
118:16

**monthly**
71:24
72:3,13,
19,21
73:14,18,
25 74:15,
17 75:21
76:4 77:2,
16 95:4
133:4,11

**months** 180:8

**Moore** 6:23

**morning**
6:21,25
7:10,11

**motion** 211:3

move  9:11
  184:13

multiple
  70:17
  91:20
  128:9
  129:20

mute  10:6

mutual  19:5
  122:2

mutuality
  120:21
  121:2,10,
  14,20,24
  122:1

――――――――――

         N
――――――――――

names  110:3
  112:7,14
  114:18,19

necessarily
  33:16 49:2
  76:13 77:5
  83:7
  107:16
  131:2
  133:2
  173:2
  195:11
  200:22

needed
  123:12

negligible
  97:15,16

neighbor
  107:12

Neurosurgical
  209:9
  210:24

Newcomb
  80:24
  110:6,17
  126:1
  127:22
  179:13
  180:1,9
  185:18
  186:2
  188:4
  189:23
  190:4,9,17

Newcomb's
  80:16
  186:25

newly  79:2

night  191:18

non-fair
  62:8,18
  163:17

non-guardian
  125:14

non-litigation
  36:16

noncompliant
  45:14

noncore  58:2

normal
  175:17

note  48:8
  49:11 70:7
  89:6 109:8
  120:20
  122:9
  133:3
  146:4
  151:3
  193:5
  201:2,6

notes  62:5
  101:10
  189:24
  194:13
  206:13,18

notice  30:22
  31:2 55:5
  59:8,23
  60:1,19

November
  27:6
  192:22
  193:19

number  13:10
  77:7 79:1
  86:24 89:1
  94:3 98:24
  105:16,19
  107:15,17
  108:11,14
  131:4,11,
  15 132:8,
  15 169:12
  185:22
  186:13
  187:9
  196:22

numbers
  63:25
  179:5

nurse  95:16
  186:5

nursing
  22:15,17
  39:6,14
  40:7,9,12,
  14,17,22
  48:5
  50:23,25
  51:9,15,22
  56:4 57:23
  58:4,12
  60:19
  61:14,23,
  25 62:5
  63:22
  65:14,25
  66:2,3,4,
  5,12,13
  69:2,5
  99:23
  123:18,23
  163:14
  164:4,8
  193:8
  198:16
  199:1,17,
  24 200:5,
  15,16,17,
  22 201:5,
  9,12

O

**Oakwood**
179:13
180:2,19
186:3
190:25

**oath**
183:14,18

**object**  30:24
51:3 81:9
84:4
146:6,7
148:21

**objected**
146:17,21,
23 147:20
148:13
149:6,11

**objecting**
147:13

**objection**
93:23,24
95:11
96:14
129:23
132:18
148:5,8
149:1
174:19
182:3
183:5,16
187:16,23
188:25
190:12

**obligated**
55:19

**obligation**
106:12
107:2
125:7

**obligations**
104:9
106:18
183:7

**obtain**  61:14

**obtained**
45:7 61:23

**obtaining**
148:10

**obvious**
139:12

**occasionally**
9:9 19:3
37:19
38:12
43:13

**occur**  121:21

**occurred**
51:12
100:6

**October**
53:15,17
179:20

**odd**  133:23

**offense**
195:2

**offer**  13:12,

15 21:2
45:12
100:17
104:4
139:23
140:10
148:2
195:3
204:10

**offered**  18:3
23:15 39:3
46:3
112:13
125:12,18
141:15
142:13
199:5
211:18
213:4
214:11

**offering**
17:8,24
28:20
29:22
38:17
57:21
84:19
101:20
103:15
151:4
159:3
171:8
207:13

**offers**
206:19
208:4

**office**  41:9
56:20
58:25
60:17 63:2
198:24

**official**
54:7,10

**officials**
142:17

**OIG**  31:24
33:11
41:21
42:5,13
46:7 50:8
53:24
54:4,10
55:8 56:25
57:2 58:25
60:8,17,19
63:2,8,13
66:22 70:1
139:19
161:11,20
163:12
198:15,25
200:7
207:22

**OIG's**  38:23
58:25
199:14

**Omnicare**
20:14,15,
18 21:3,11
22:22
39:23
143:18,21

Case 1:18-cv-03728-SDG   Document 140-10   Filed 09/09/22   Page 261 of 286

USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.
Kevin McAnaney on 06/14/2022   Index: Omnicare's..oversight

145:7
192:22,23
193:7,12,
18 198:11
199:17,24
200:7
201:18
206:25
207:5

**Omnicare's**
21:5 22:18
207:1,7

**one's** 97:5,9

**one-page**
189:17

**one-year**
204:23
206:2

**ongoing**
85:17

**open** 10:25
24:19
34:17,18
86:17
155:24
156:8
210:5

**opened** 10:18

**operator**
93:1,6,9
94:20
100:17

**operators**
159:8

**opine** 64:22

**opining**
45:23 46:4
174:11
213:15

**opinion**
14:18
15:15
23:19
38:11 39:3
44:2,6,24
45:3 46:1
48:1 50:8
54:13
63:3,9,12,
15 71:2,3
84:8,14,19
86:9
101:20
105:22
111:4
121:3
128:19
132:1
138:17
147:19
148:2,17
149:17
150:12
158:20
159:3,11
162:16
163:2,11
169:13
184:13
204:2,5,8
207:17

208:15
210:17
211:18,21
212:21
213:4
214:16

**opinions**
13:11,14,
16,17,21
14:2,4,6,
10,24
15:4,5,9,
10 17:3,7,
23 23:16
26:19
27:10,20
28:15,20
29:22 30:8
31:22 32:8
38:8,11,
13,14
41:18
42:17 43:8
46:3,8
55:1,7
60:23
67:12
68:22
69:12,16
89:2 128:6
136:3,23
176:5
204:10
206:10,13,
19 207:13,
19 208:5,
9,21 209:1
211:6

212:16
213:7
214:21

**opioids**
215:4,7

**opportunity**
121:20,23

**opposed**
63:21
131:10
200:23

**oral** 38:14

**order** 9:8
120:5
179:22
180:3,16
193:11

**ordering**
100:20

**Organon**
203:19

**original**
137:19

**outline**
104:23

**outlined**
150:12
173:18
175:13
176:8

**overruled**
150:8,13

**oversight**
200:10

**ownership**
87:18

**P**

**p.m.**
102:12,21
145:17,24
191:25
192:9
215:19
216:1,9,14

**packaging**
179:22
180:9,16,
21 181:9,
19,25
182:9,15,
16 183:11,
22 184:9
185:7,9
191:7

**packet**
111:23,25
113:11,15,
17 114:2,4
115:15,22
119:5
134:19
135:20,23

**packets**
113:23
116:6

**pages** 190:22

**paid** 22:19
29:20

70:12
71:7,13,17
72:6,8,18
75:21
76:6,9,14,
18 83:9
85:21
126:20
134:9,14
170:12,15,
18 172:15
174:1
175:5,23
176:17
177:2,9,
14,19
188:1
193:7
196:6

**paper** 131:4,
19

**paradigmatic**
206:13

**paragraph**
23:21,22
31:12
32:14
33:19
34:22,23,
24 41:6,
12,25
42:15
47:20
54:24
55:15
61:13,21
64:18,21

66:18
69:11
77:13
86:11 92:4
94:19 95:1
97:19 99:8
100:16
101:9
103:4
105:8
109:8,12
110:14
119:15
120:20
122:4,9,18
126:22
131:17
133:3
136:2
139:14,16
143:7
146:2
149:4,13,
14,21
151:3
155:21
156:5
159:23
162:12,19,
23 164:23
165:19
167:12,16,
17 168:1
170:3
179:17
193:6
195:1
198:13,22

199:14
205:16
206:17

**paragraphs**
92:13,16,
19 124:2
136:7
164:14
165:19
173:18

**parameters**
166:23

**paren** 100:18
186:13,14
198:25
204:23,25

**part** 19:15
38:25 55:1
56:6 82:24
83:3
85:17,18
90:15
91:25
100:21
131:24
174:24
176:21
177:1,5,6,
8,14,18
193:14,15
195:6
204:7,8
208:23

**partially**
71:17,18

**participating**

6:20

parties
  49:16
  50:1,12
  51:20 92:4
  121:25
  161:5
  165:4

partners
  212:11

party  122:3
  161:14,22
  162:3

passed  138:1
  176:13,18
  191:7

past  9:7
  20:13
  25:22

patience
  216:4

patient
  73:12
  98:15
  100:19
  116:15,16
  125:3
  131:24
  183:8

patients
  57:23
  58:12,13
  75:4
  98:16,20
  99:18,24

100:4
111:19
114:14,16
121:16
125:5,14
132:6,8,9
133:12,19
134:11,18,
21 141:3,
19 156:20
183:20
187:2
193:11

pay  70:18
73:25
79:23 80:4
81:3,6,19,
25 83:2,6
93:1,16
94:7 95:7,
16 100:17
117:17
118:15
125:18
170:8,12,
14 171:24
172:19
176:19
177:4
191:1
195:3

payable  56:5

paying  58:1
75:13
82:21
83:14,18
86:3 93:21

94:17
170:16,17
171:17
173:10,12,
19 176:22

payment
  71:9,16
  72:11 75:6
  76:10 77:1
  80:13
  84:11
  174:14

payments
  58:4 77:18
  170:21
  172:20
  177:17

payors
  146:6,7,
  12,15
  147:20
  148:11,18,
  21 149:6,
  11

PBM  28:5,8,
  12,15,18,
  21,22

PBMS  28:4
  177:19
  178:2,18

PC  209:9
  210:24

PCH  103:10

PCHS  65:4
  109:9,16,

25 110:18
111:4
119:18
120:2,6,21
121:3
123:18
124:3
146:9
156:1
162:15
163:1,24

penalties
  123:2

pending  8:21
  21:23
  209:10
  210:17

people  16:3,
  18 31:2,17
  44:20 60:5
  75:5 79:1,
  6,17,23
  80:6,12
  84:10,21
  85:7 90:4
  99:4
  104:16
  108:11,15
  116:17
  117:23
  124:7
  127:22
  129:8
  131:13
  153:2,15
  157:12
  159:24

**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**

160:18,24
171:18
172:22,25
173:4,10,
16,20
174:13
183:9
184:2
186:24
188:6
191:3,5,
11,15
200:20
203:10
204:12

**percent**
37:4,13
106:13,14,
21,22
108:3,4
129:6,10,
14 179:18,
21,22
180:2,7,
11,15,23,
25 181:11,
17,18,21
182:2
183:12,13
184:8,11,
19,24
185:5
186:12,14,
18,24
187:10,13,
14,19
188:9,23
190:1,10

**percentage**
36:19
130:25
131:4
132:6
189:24

**perfect** 10:7
131:9

**perfectly**
77:8
181:13
182:18,19
184:22

**perform**
97:24
104:17

**performed**
79:4

**period** 61:9
117:22
204:25
206:22

**person** 85:6
97:13
107:6
120:12
128:13
173:11
183:2

**personal**
23:13,18
41:1 48:16
64:24 65:9
68:15
100:1

105:1
111:12
124:12,20
163:5
169:19,25
200:23

**pharmaceutical**
88:22
90:12
177:10
199:4
204:20,22
205:7,21,
25 214:12

**pharmacies**
39:12,19
48:4 61:24
105:15,25
109:10,17
110:1,19,
23 111:5,
15 112:8,
11 114:20
119:6,25
120:5,16,
19 121:6
129:20
130:10
141:14
142:20
146:7
156:23
162:14
163:1,4,8
164:1
169:25

**pharmacist**

48:3 61:15
62:6 93:2
94:24
95:1,20
97:20
98:8,10,14
163:15
164:13,18,
19,20
188:13,22
193:9
199:16

**pharmacists**
50:19
61:22
95:15,17
97:24
163:25

**pharmacy** 6:9
19:21
20:2,5,8,
12 23:3
39:22 40:4
45:22
61:16
62:7,17
63:14 65:1
89:7,9,13
90:11
91:12,22
92:25
93:13,14,
16 94:6,8,
12,14
95:2,5,8,
14 97:1
99:16,25

Case 1:18-cv-03728-SDG    Document 140-10    Filed 09/09/22    Page 265 of 286

USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.
Kevin McAnaney on 06/14/2022    Index: pharmacy's..practice

100:16
103:25
104:2,17
105:12
106:13,19,
21 107:4,
11,14
108:18
110:4,24
111:10,14,
16,19
112:1,2,9,
14,15
113:2,3,
10,14,18,
25 114:7,
8,9,11,18,
23 117:1,
10,16,18
118:16,25
119:12,17
120:1,6,9,
10,17,22,
24 121:4,
7,11,12,15
124:19
127:20
128:19,23
129:1,5,16
134:23
142:25
143:24
163:16
169:17
178:8,13,
17 179:12,
17 183:1,
11 185:18

186:17,20
188:11
193:12
199:5
200:2,9
201:19

**pharmacy's**
39:4 93:3,
17 94:9
106:5,11
107:2

**Pharmerica**
143:23
145:7

**phone** 10:4,6
16:23

**phrase**
195:10

**phrased**
155:1
159:13

**phraseology**
158:19

**physician**
48:17,20
49:6

**physicians**
214:10

**pick** 102:10

**pieces** 35:24
131:7

**place** 88:11
127:13
135:13

**plaintiff's**
24:1

**plan** 177:6

**players**
145:2,5

**playing**
151:7,13,
19 152:5
153:2,9,20
154:7,11

**pleadings**
14:14

**point** 9:13
48:9 57:20
58:1,11
69:14,15
71:1 77:25
86:10,17
116:25
132:10,13
133:20
137:24
138:20
139:5
150:9,10

**points**
69:18,21
136:7,9,20
137:9

**policies**
41:16
161:5

**policy** 81:10
84:23
85:11

**poor** 187:19

**pop** 24:19
87:23

**pops** 10:15
87:24

**populated**
133:6

**portion**
72:1,2

**position**
54:10
59:12

**post** 9:1,4,
5 10:10

**posted** 53:25

**potential**
62:9
163:18
202:9
213:24

**potentially**
147:22
168:20

**Powerpoint**
31:7

**practice**
33:20
35:2,10,11
36:22
37:6,16
38:3 39:1,
3,9,25
40:1 41:8
45:11

49:18
50:4,14
81:20
119:16,20,
25 155:24
161:11,21
190:16
201:17,24
202:20

practices
31:3
57:17,21
58:16
69:18
78:1,7,21
79:7 146:4
148:12
160:19
166:25

practitioner
203:9

preamble
32:19 48:9

preambles
24:3 32:16

precedential
54:12,14

predicate
39:10

prefatory
187:4

prefer 106:9
109:9,16,
25 110:18
112:5

116:19
121:4,6

preference
132:14

preferred
90:10,11,
16,20,22
91:1
105:11
106:10
111:2,14,
16,18
112:2,9
113:3,14,
18,25
114:6,8,25
115:4,21
116:4
119:9,12,
17 120:1,
6,9,13,14,
16,22
121:4,7
131:23
132:2
134:22
135:7
171:10

prefers
113:9

prepared
179:13

preparing
15:2 89:2

prescribed
106:17

prescriptions
128:18

present 6:12
7:3 62:10
148:17
150:9
162:7
202:10

presentation
31:7 37:22

presented
51:19 75:4

presents
163:19

press 192:21
193:1

presume 66:8

pretty 73:1
90:1 91:22
95:20
106:25
110:7
141:13
142:22
175:2

prevent
148:10

prevented
147:5,24

previously
88:18
178:22
185:13
189:7

192:15
193:21

price 82:25
133:11

priced 85:6

prices
142:21

pricing
89:20,21
90:3,5
94:2
157:9,23
158:2,11,
14 161:5
200:12

principal
57:12

printout
203:17

prior 18:7,
12 23:15
36:25
39:15 41:7
60:13
79:14,18,
19 80:10,
24 81:4,8,
10 82:12
84:23
85:12,15
161:22,23
162:3
170:8
171:4,5
172:25

174:20
195:13
207:22

private
33:20 35:2
36:22
37:16 38:3
39:1,3,9,
25 40:1
41:7 45:11
146:5,12,
15 147:20
148:18
149:6,11
161:11,21
201:24
202:19

pro 80:9
154:18
155:12

probative
207:6,10

problem 26:9
52:10
186:15
197:22

problematic
84:2
130:22
202:14
203:12

problems
97:3

procedures
41:16

proceeding
59:5,6

process
29:16 43:4

product
176:23

products
88:22
90:12
124:19

professional
68:6 78:2,
7 130:17
213:14

professionals
119:23

proffered
12:21
210:18

profit 97:18

program
37:21
38:16
41:19
42:22
49:17
50:2,13,21
55:25 56:6
60:18
66:15
198:15
199:1
214:12

programs
37:17

100:22
195:6
214:11

prohibit
101:11
167:20

prohibited
66:23
68:23 70:2

prohibitions
167:22

prohibitive
55:22

prohibits
195:12

proof 175:18

proposed
63:13 64:1
126:11
139:18

prosecutor's
58:21

prosecutorial
54:22

prosecutors
136:18

prospective
48:5

protect
139:19

protected
101:21

prove 50:16

140:13

proven 52:14

provide
38:8,11,13
55:19 56:2
59:8 61:15
66:13,14
82:15,23
87:19
92:25
93:14,15
94:6
98:17,19,
22 99:1,4,
9,17 100:2
105:15
107:20
108:24
109:3
111:23,24
112:11
114:17,21
122:25
123:16
124:5
131:14
148:22
151:5
156:15,17,
24 157:4
181:19
182:19
191:2
207:4

provided
23:23
44:20

**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**
Kevin McAnaney on 06/14/2022    Index: provider..putting

48:24
64:23
68:14
74:21,23
75:11 77:7
79:24,25
80:8 82:12
83:3,12
85:19
86:23 87:3
107:5,10
112:7
113:2
138:18,19
139:22
140:19
141:5
142:21
147:9
149:2
156:13
174:12
175:18
176:15
178:9,14,
15,18
186:20
187:9,21
188:11

provider
90:11,17,
20,22 91:1
114:23
115:1,4,21
116:4
118:15
119:9
135:7

provider's
151:3

providers
33:23
98:18
141:22
143:19
171:10
200:3,9

providing
22:13
48:12,23
50:17,18,
20,23
62:17 74:8
84:15,20,
22 85:2,
14,15
89:10
97:13
107:18
121:17
126:3
146:8
155:24
156:21
163:3
164:9
180:21
193:8

provision
47:25
48:1,2,4
50:18
55:15,18
61:16 62:7
65:1 69:22

86:19
96:18
101:2
139:17
149:15,24
162:14,25
163:7,16,
23 164:20
165:2
168:13
199:20

provisions
64:22
165:15
166:8

proxy 78:11,
15 89:17

public 90:6
123:22

publicize
159:25

publicized
160:17

published
198:25

pulling
165:22

Purcell
214:1

purchasing
100:20

purpose
48:10
55:23

196:21
197:3

purposes
48:18 49:7
92:10
165:10
196:22
197:1

put 24:12
26:15
30:21 31:2
33:11
42:14 46:9
53:5 56:18
59:18
62:25 64:2
113:21
114:1
117:22,23
118:11,13
126:12
147:11
149:3
152:8
154:10
178:21
189:12
192:13
197:13
203:16

puts 152:5
153:1

putting
126:11

**Q**

QA    186:5

qualified
  204:9
  205:1
  206:4

quality
  132:25
  133:1
  142:23

quarter
  186:14,16

quarterly
  68:5 69:22
  70:8,13,
  19,25
  71:4,8,10,
  16,22
  72:1,12
  75:16,20
  76:2,17,19
  77:1,8,11,
  19 79:4,5
  89:14
  94:14 95:2
  122:5,10,
  18,19,22
  123:3,6,9,
  25 124:23
  125:8,13,
  19 126:2,
  14,16
  141:25
  143:5,11,
  14 144:1,7

178:9

question
  8:5,7,14,
  21 45:1
  49:13 81:5
  84:17 85:1
  99:4,15,16
  115:10,11
  117:19
  125:22
  137:16
  143:3
  145:1
  149:5
  162:22
  165:16
  176:9
  188:16

questions
  24:9 28:7
  43:5 44:6
  47:10
  53:20
  189:13,19
  194:22
  197:16
  206:10
  216:3

quid    80:9
  154:18
  155:12

quo    80:9
  154:18
  155:12

quotation
  199:2

quote    73:17,
  18 199:16

quoted
  138:14

**R**

raise    38:6

raises
  128:10

range    13:7
  58:21,22

rank    63:15

rare    125:16

rate    48:3
  52:6 83:24

rates    50:19
  62:9,19
  163:18
  193:9

reaches
  208:3

reacted
  207:24

read    17:11
  24:5 31:23
  48:8 49:5,
  10,23 50:4
  67:1
  76:16,22
  104:3
  135:22
  164:19
  177:22
  178:12

184:16
189:18
193:1
194:7,16,
18,19,21,
24 201:3
208:7

reading
  76:21
  118:6
  124:7
  162:23
  166:3,21
  180:14
  200:25

reason    33:13
  49:11
  64:13
  119:10
  158:1

reasons
  182:7
  184:2

rebates
  206:22

recall
  15:13,14,
  22,24
  16:22,25
  17:12,18,
  25 20:20
  21:13,15,
  17,21,22
  22:2,10,
  13,18,21
  27:1,4,13,

**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**
Kevin McAnaney on 06/14/2022        Index: receipt..referencing

19 39:8,20
40:5,13,
17,19 41:4
45:25
47:13 61:3
65:18
75:3,15,18
76:22
112:18,21
113:6
114:5
117:9,13
118:20
125:25
135:24
140:8
143:17,20
145:8
149:12
162:11
193:4,20
204:2,5,10
209:2,3
210:19
211:13,16
212:2,7
213:2,6,10
214:2,5,23

**receipt** 62:8
163:17

**receive** 62:5
66:9 72:11
100:17
124:10
163:14
170:4,7,11
195:4

**received**
71:9,16,
18,24
170:5
175:21,22,
24 196:6

**receiving**
48:18 49:8
77:1 84:16
164:8

**recently**
19:3

**recess** 12:6
52:22
102:16
145:20
192:4
215:22

**recipient**
55:19,21

**recognize**
111:8
119:11
134:17
160:16

**recognized**
125:17

**recognizing**
120:23

**recollection**
16:21
22:16
29:17
30:4,25
39:24

70:14
112:3,17
113:7
118:6
129:13
144:25
214:20

**recommend**
135:6

**recommends**
119:4
121:13

**record** 6:13
7:16 8:1
11:25
12:3,10,12
52:17,19
53:1
102:13,21
116:3
118:22
127:4,7
133:14
145:17,24
183:25
192:1,9
215:19
216:1,10

**records**
112:13
131:18,19

**recover** 76:2

**red** 212:19

**reduced** 48:3
50:19 52:6

**reduces**
127:16

**refer** 52:1
54:25
57:23
58:13 93:6
99:22,24
134:11,18,
21 135:10
153:15
154:10
187:2
193:11
212:11

**reference**
59:19
62:3,16
73:13,15
89:7,16
90:10
92:10
95:3,4
109:11
117:3
118:9
165:10
194:6

**referenced**
47:20
144:23
194:5

**references**
28:12
51:12

**referencing**
188:5

**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**
Kevin McAnaney on 06/14/2022                    Index: referral..relating

189:6

**referral**
49:14,16
50:2,13,20
51:21
62:10
97:25
99:10,13
100:3
153:7
163:19
196:23

**referrals**
55:24 56:4
97:21
98:9,11
100:12,19
134:9,24
135:1
149:15,24
152:1,12,
15,19
154:13,15,
23 155:5,
10,14,15
195:5,11,
12 196:2,
3,4,7,23
197:4

**referred**
99:18
133:12

**referring**
58:11
122:15
156:4,6
160:17

186:23

**refers** 94:19
111:19
116:6
137:24

**refresh** 9:8
24:16,19,
22 25:16
32:2 34:3
46:10
53:12 63:1
214:20

**refreshments**
80:2

**regard** 97:21
98:9

**regional**
186:5

**Register**
59:20

**regs** 35:13
104:3
124:7

**regular**
48:16 79:4

**regularly**
193:7

**regulated**
41:17
42:16

**regulation**
32:19
59:23
65:17,20

82:22
104:19
136:22
137:17
140:24
177:18

**regulations**
23:16,20
24:3 32:16
41:19,20
42:24
43:2,3,11
61:13
62:21
103:9,13
104:8,14,
15,23
108:1,13,
14,18
123:1,4,8,
10,23,24
124:1
140:20
141:10
144:3
195:2

**regulators**
66:25
67:4,8,13
68:2 70:4
136:18
206:20
207:20,24
208:1,10

**regulators'**
207:4,9

**regulatory**
43:4

**reimbursable**
195:5

**reimbursed**
100:21

**reimbursement**
66:10,16
69:3 164:9

**rejected**
208:15,22

**rel** 6:8
203:18
211:9,24
214:1

**relate** 14:14
19:17,20
31:21 43:6

**related**
14:17 15:9
24:4 32:17
35:25
36:14,20
37:4,14
39:3 41:19
44:25
45:3,7,8
146:8
162:17
212:17

**relates**
32:18
39:10

**relating**
192:22

Case 1:18-cv-03728-SDG    Document 140-10    Filed 09/09/22    Page 272 of 286

USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.
Kevin McAnaney on 06/14/2022    Index: relationship..report

215:7

**relationship**
39:12
44:25
45:14,23
84:2 92:5
106:5
147:21
165:5
167:11
172:4,17
173:25
174:3,17
175:6
176:16
199:11
201:10,25
202:12

**relationships**
45:4 46:4
124:18
200:1,8

**relator** 6:17
7:13 21:14
68:19
202:8
212:13

**release**
192:21
193:1

**relevant**
24:3 30:7,
21 32:15
33:13
43:22
63:20

147:19
206:22,24
207:1,11

**reliability**
207:12

**reliable**
208:11

**reliably**
208:5

**relied** 31:14
32:11 33:2
112:25
140:15
198:14,19,
21 204:12

**rely** 17:1,4
32:22
33:6,12,17
61:1
136:14
202:25
207:22

**relying**
28:14,17,
18 157:11

**remember**
110:3
118:19
126:4
186:18
210:2
211:19
214:9

**remotely** 7:4

**remove** 130:2

**remuneration**
55:22,24
100:11,18
134:14
139:6
149:16,25
152:1,12,
15,19
153:6
154:13,15,
22 155:4
175:12,21
184:15
195:4
196:6,22

**renders**
205:5

**repeat** 8:11,
12 45:1
84:17

**repeatedly**
134:17

**rephrase**
8:11

**report** 10:2,
8 12:16,
20,25
13:8,10,
11,18,22,
25 14:2,5,
7,11,15,
19,20
15:2,10,21
18:3,7,13
21:4,6,8
22:3,5

23:22,24
24:1 27:21
28:13,15,
19,25
30:23
31:8,10,
22,23
32:4,8,17,
20,23
33:1,7,19
34:14 41:7
45:24
46:5,18
54:24 55:1
61:2 64:3,
13,17
65:16,23
67:5,6,18
68:1 72:5,
13 77:13
103:3
109:11,13,
20 110:5,
9,11,14,22
112:24
119:15,22
126:22
131:17,22
137:19,22,
25 138:2,
6,12,13,
14,15,16,
21,25
139:3
146:1
147:11
156:10
157:20

162:12
167:12,23
168:7,10,
22 176:6
178:1
179:12
185:18
186:2
194:9
205:4
206:7
209:8,17,
22 210:20

**report's**
11:10

**reported**
178:4

**reporter**
6:14 7:3,
19 8:12
10:13
46:13 47:3
52:15,17
53:8 56:16
59:15
62:23
67:20
88:19
178:24
185:15
189:9
192:17
193:23
197:11
203:14
210:12

**reports**
11:5,10
14:23,25
18:7,11
27:17 36:3
109:21,24
144:24
177:22
178:8,13,
17

**representation**
75:11

**representatives** 135:25

**represented**
74:12,18,
25

**representing**
7:13 16:19

**request**
47:11
53:21 63:6
91:14
103:6
105:9
189:15
194:1,23

**requested**
21:5
26:24,25
27:10,25
178:15

**requesting**
27:14,19

**require**

61:13
98:15
108:18
122:2
123:23

**required**
66:14
82:22
107:25
108:12,13
115:3,24
122:11,19
124:22
131:8
140:23
141:9,25
177:18

**requirement**
103:21,22,
23

**requirements**
104:13,20,
22 123:7,
17 143:6,8
173:17
183:8

**requires**
104:19
122:2
143:5
151:25
185:7
203:7

**requiring**
117:24

**reread** 31:24

**research**
31:20 32:7

**resided**
64:25
69:25
70:23

**resident**
71:19
73:4,10
74:5,12,
19,23
75:9,12
107:3,10
114:22
117:1,9,
14,17
118:14
124:24
127:12,18,
19,24,25
128:1,3,
17,21
130:5
132:16,22,
23 142:7
178:15

**resident's**
118:25
119:6

**residents**
68:16
71:7,11,24
72:20,22,
24 73:1,19
74:9 75:1
76:20 77:3
90:17

Case 1:18-cv-03728-SDG   Document 140-10   Filed 09/09/22   Page 274 of 286

USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.
Kevin McAnaney on 06/14/2022      Index: residents'..reviewed

91:1,3
98:11,24
99:10
103:16
105:18
106:12,14,
20,22
108:4,22
109:2,4,9,
17 110:1,
19 111:8,
9,23,25
113:11,18
114:10,19
115:14
116:6,25
117:4
120:23
121:4,13
123:16
124:6,10,
23 125:9,
20 128:2
129:6,11,
17,21
130:8,13,
25 131:5,
12 132:15
133:16,22
134:3,5,6,
13 135:10,
15 141:12
144:12
162:15
163:1,4,8
177:15
179:18
180:3,23

181:5,11,
17,21,24
183:13,14
184:9
186:12,13,
16,19
187:13,14,
20,22
188:10,23
189:25
190:5,10,
24 191:9

**residents'**
133:6

**resisted**
126:8

**respect**   38:3
44:14
47:10
53:20
57:7,10
63:19
66:20
69:15
148:11
164:3
189:14,20
194:22
197:17
208:16
211:22

**respond**   7:22

**response**
44:13,16,
21 54:4,5,
8

**responses**
44:19

**responsible**
41:15
114:21

**rest**   63:23

**restatement**
195:22

**restricted**
211:23

**result**
139:17

**resulted**
161:14

**resulting**
200:11

**results**
48:18 49:8

**retail**   51:23

**retained**
18:2,17
20:17
21:16 27:2
209:14
212:3,4
213:2
214:3

**retention**
20:19

**revenue**
126:5

**review**   9:1
10:16 18:6

26:22
27:10
28:8,10
29:4 37:18
47:9 53:19
55:6 56:3
60:22
67:9,14,15
80:18
83:10
92:16
109:24
117:8,25
159:20
178:8
189:13,19
197:16
199:6
207:22

**reviewed**
13:23
14:13,17,
20,22,25
18:12
23:22
24:1,2,7
26:15
28:11 29:9
30:4
32:15,22
33:6 47:12
53:22 55:8
58:25
60:8,13
72:4 73:9
91:17
116:24
127:8,12

148:25
176:3

**reviewing**
38:6,17

**reviews**  60:5
69:23
77:19
122:6,11,
19 123:9
124:23
125:8,13,
19 207:3,4

**revisit**
200:12

**revolve**
210:21

**reward**
195:4,11,
15,18,19,
23 196:7,
14,16,22,
25 197:6

**rewarding**
195:12
196:3

**rise**  35:20

**risk**  62:10
128:10
163:19
186:19
187:8
188:10
189:3
202:6

**risky**  202:4

**Rissler**  6:25
7:1 11:23
16:9,14
25:11
30:24
34:5,16
46:16 51:3
64:10 81:9
84:4 88:4,
13,16
93:23 94:1
95:11
96:14,17
102:7
103:1,24
128:5
129:23
132:18
135:3
145:10,15
148:5,8
165:24
166:2
174:19
182:3
183:5,16
187:16,23
188:25
190:12
209:19,22
216:7

**Roach**  211:10

**role**  20:16
57:9

**room**  6:18
9:6,22,25
10:5 58:4

**Ropes**  198:2,
4,7

**routinely**
119:16

**rule**  55:5
60:3
65:17,20

**ruled**  204:3,
5

**rules**  7:17
8:13 82:2

**run**  60:9

**running**
11:21

**rush**  64:15

**Ryan**  6:19

—————

S

**Safari**  11:17
26:4

**safe**  22:6
43:11
101:12,17,
22 168:4,
6,13,16,19
191:20

**safer**  121:5
127:8,15,
18,23
128:3,20
130:12,24
131:24
132:23
190:8,9

**safety**
109:22
130:7
132:2,12,
14,15
182:13
183:8
191:8

**sales**  172:7

**samples**
168:25
169:14

**satisfied**
152:21

**satisfy**
151:15
155:20

**save**  204:23
206:2

**saving**
81:15,18

**schedule**
78:17

**Science**
214:2,4

**scope**  54:23
128:5

**screen**  12:13
34:7,10,17
59:19 63:1
64:9 78:4
87:24
189:12

**screwed**  26:3

scripts
  182:14

scroll   12:19
  24:8 61:5

Scrutiny
  200:7

section   56:3
  62:12
  103:9
  165:4

sections
  103:12

secure   55:24

securing
  156:3

seeking   44:6
  54:3

seeks   205:3,
  7 206:6

selected
  26:1

self-
administer
  124:8

seminar
  173:9

Senate
  138:6,13,
  14,16,21

send   44:15
  78:25
  79:2,16
  80:11

81:12
172:25
173:10,16
174:13

sends   47:24

sense   127:15
  131:10
  153:18
  174:24

sentence
  32:14
  52:11
  131:22
  162:24

separate
  69:17,24
  70:8,20,22
  86:6,20
  126:18

September
  59:20
  60:14
  163:13
  198:17

served
  109:9,17
  110:1,19

service
  48:24
  62:12
  71:7,11,24
  72:3,7,14,
  17,19,21
  73:14,18
  74:15,17
  75:14,21

76:3,4
77:3,10,
16,18 79:5
83:3,23
84:10,15,
22 85:15,
24 90:12
98:18,19,
23 106:10,
20,21
107:10,25
108:12
118:17
125:4,18
126:20
133:6
141:12,18
151:4,5,6
153:1
174:22
177:1,14,
23 199:3

serviced
  124:24
  125:6,9
  189:25

services
  22:14
  30:16,17
  47:25
  48:24
  49:13,14
  50:17
  55:16,18
  56:3,5
  58:3 60:17
  61:14,16

62:6,8,18
64:23 65:2
66:20
68:9,14,19
69:16,22
70:9,13,25
71:4,5,9,
10,13,17,
22 72:12
74:9,20
75:7,17,20
76:14,18,
19 77:2,6,
7,12,14,15
83:11,16
84:23
85:15,19,
21,22 86:4
88:22
89:14
90:12
91:13,23,
25 93:2,
16,22
94:3,8,12,
14,18
95:1,2,4,
5,8,14,17,
20,22
97:1,20,24
98:8,11,
15,17,23
99:1,5,9,
18 100:3,
20 103:16
104:5,18
105:14
106:13

107:5,15,
19,20,24
108:9,10,
11,23
109:4
114:11
121:17
122:10,23,
25 123:3,
7,25
124:6,10,
15,19
126:2,5
131:8,14
133:5
135:11
139:17,21,
23,24
140:11,19,
23 141:2,
5,9,16,17,
24 142:1,
14,21,25
143:5,15,
19,21
144:2,7
155:25
156:2,7,
12,14,16,
18,24
157:5,12
159:4
162:14,25
163:3,7,
15,17,19
164:10,13,
18,19
170:13,15

172:5
175:22
182:20
186:15,20,
25 187:9,
12,13,21
188:1,11,
24 189:4
193:9,10,
12 195:5
196:23
198:24
199:4,16,
20 213:14

**servicing**
129:17,20
179:18
180:4,7
184:8
186:11

**serving**
105:18

**session**
78:11 80:5

**set** 9:2
11:24
23:24
108:8,21
113:20

**sets** 108:20
167:10

**settled**
193:16
215:2

**settlement**

22:19,20
161:22
192:23,25
193:5,14,
18 198:11,
13,23
199:15
200:7
201:5,18

**settlements**
22:23
43:13,14,
16 161:25

**shakes** 7:24

**Shalala**
149:17
150:1,12

**share** 8:25
9:3,11,12
10:8,11,22
88:5 90:6

**sharing**
158:15

**She'll** 7:20

**sheets** 80:18

**shortly** 13:3

**show** 9:8
148:1

**showed** 72:5
148:25

**showing**
24:22

**shown** 147:10

**shows** 54:22
170:23
187:5

**sic** 14:11
82:21 84:9

**side** 34:6,8

**sides** 128:25

**sign** 25:2,
4,5 91:3
98:24
109:4
115:13
130:25
133:16
134:3
181:21
183:9
187:22
190:25
191:11,15

**signature**
12:21
53:18

**signed** 25:5
47:16
80:11
113:12
125:20
187:20

**significance**
184:7

**significant**
190:20

**signing**
131:5

**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**
Kevin McAnaney on 06/14/2022        Index: signs..specializing

190:10

signs  107:3,
  6,10,13
117:15
167:8

signup  80:18

similar
  39:11
  74:22
  91:21
  104:22

simple
  128:15
  134:16
  152:7

simply  151:7

single
  128:18
  161:12
  162:2

sir  11:12
  26:5 33:19
  42:7 46:21
  56:19 58:9
  59:17 61:7
  63:5 64:3
  84:1 86:16
  87:23
  88:10,12
  96:3 99:15
  103:3
  118:3
  122:4
  143:4
  150:19

155:21
165:4
167:12
179:1
182:24
185:22
197:13,20
203:16
205:11
208:21
210:5
215:9
216:2

sitting
  147:25
  173:12

situation
  45:18
  48:19
  129:4

situations
  44:14
  51:15
  58:15
  70:18
  113:16
  208:21

size  118:24
  144:22

skilled
  39:5,13
  40:7,8,11,
  14,17,22
  63:22
  65:25
  66:3,4,5,

12 69:2,5
123:18
199:24
200:15,16
201:11

skills  68:6
  78:2,7,13
  79:3,12
  82:12,15,
  22 83:4,5
  84:9,20,21
  85:2,8
  97:16
  170:11,18
  171:4
  177:16,17,
  24

skipped
  185:24

slide  31:6
  37:22

small  37:2
  38:25

sole  203:9

solely  51:8
  197:3

solicit
  100:17
  195:3

someone's
  202:7

someplace
  133:18

sort  39:17

47:14 52:2
78:18
133:23,24
195:13

sought  44:24
  45:3 76:2

sounds  10:7
  32:5 52:2
  102:8
  155:1

source
  109:19
  110:13
  139:8
  148:16

sources
  62:10
  76:9,11

Southern
  110:4,9

space  80:1
  199:10

speak  193:3

speaker
  214:11,12

special
  41:18
  42:20
  56:20
  57:11,14
  58:18,23

specialize
  35:5

specializing

**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**
Kevin McAnaney on 06/14/2022          Index: specialty..statute

33:21

**specialty**
212:10

**specific**
27:9 36:5
44:5 57:17
62:16
68:12
69:15
73:11,23
100:13,14
109:6
123:4
133:6
135:25
137:3
147:13
163:7
168:3
169:24
174:7
201:5,8
213:15

**specifically**
17:13,20
23:24
27:14,25
39:16
51:11
73:7,17
92:1 93:12
94:5,13,
19,20 95:9
137:1
143:20
163:10,13
188:4

198:14

**speculate**
207:23

**speculation**
206:14

**split**  78:4

**spoke**  31:1

**spot**  145:10

**spread**
105:17

**staff**  82:1
190:3
191:10,15

**stamps**
179:4,6

**stand**  159:16

**standard**
51:23
67:17
68:1,3
69:3 79:7
90:9
91:21,25
203:8
207:21
213:14

**standards**
164:13
167:10
213:18

**Stark**  24:4
32:17
33:21
35:5,21

37:23
38:4,6,10,
19 40:7
41:2 43:24
45:8,15
48:13
210:25
212:20
213:21

**start**  8:5,7
69:11
99:14
188:20

**started**  7:18
79:10

**starts**  55:15
61:13
103:9
122:4
136:3
179:17
205:13

**state**  39:7
92:6 165:7
173:17
183:8

**stated**
199:15

**statement**
49:19,22,
24 52:10
61:22
73:25
106:25
107:1
109:15,19

137:9
140:9,14
142:12
159:23
183:24
187:4
188:12,15
195:7,9,
20,24
196:9,14,
15,17,19,
24 197:5,
7,9

**statements**
140:15

**states**  6:8
104:22
203:18
213:25
214:1

**stating**
160:5
181:2,4

**status**
105:12

**statute**
19:18
22:25
29:5,8,12,
23 30:3,7,
9,13 32:18
35:6
37:21,23
38:4,10,19
41:3,21
43:24

45:8,15
48:6,13
49:1,17
50:3,14
55:23
58:22
62:12
65:16
68:20,24
69:4 84:5,
6 92:1,8
93:13
96:6,12
97:4,12
99:8 100:5
101:1,7,
12,17,22
130:21
132:13
134:15
136:12,22
137:17
138:1
150:22
151:11,12,
15,16,21,
24,25
152:13,16,
20 153:3,
7,11,22
154:1,2,4,
5,16,21,25
155:6,8
160:13,18,
23,25
161:4,10,
15,20
164:25

165:3,8,
13,18
166:12,20,
23 167:7
168:3,14,
23 169:10
174:2,25
184:5,16
188:17
195:1,16,
17,22
196:5,8,
11,20
199:18
201:20
202:1,3,8,
12,16
203:6
206:13

**statute's**
51:21

**statutes**
24:3 32:15
35:12,18
40:8 41:20
43:17
101:5

**statutory**
69:6
168:3,20

**steps** 31:17

**stick** 146:1

**stint** 204:23
206:2

**stipulated**
7:2

**stop** 118:8

**stricken**
209:2,4
211:6,8,21
212:22
213:7
214:16,22

**strike** 50:10

**strikes**
98:12
114:12

**stripped**
17:15
87:21

**strips** 190:8
191:1,16

**strive**
105:16

**strong** 56:1

**structure**
35:17
126:13

**structures**
200:12
203:10

**structuring**
38:5

**stuff** 32:11
36:1 157:3

**sub-bullet**
69:18,21

**sub-regulatory**
42:2 54:18

**stop** 59:6

**subject** 71:1
200:10
211:3

**submitted**
14:23

**subsequent**
150:13

**substance**
22:3
210:20
212:7
214:5

**substantial**
156:22

**sudden** 88:2

**sufficient**
105:16
149:16,25
150:12
208:4

**sufficiently**
139:6
208:11

**suggests**
200:8

**suite** 85:19

**summarized**
13:24
119:21,22

**summary**
13:13
69:11

super 191:3

supplemental
  60:18
  198:15
  199:1

supplies
  61:25
  199:5

support
  109:12,15
  115:25
  167:25

supported
  17:11
  138:20
  208:10

supposed
  139:11

supposedly
  157:3

surprise
  23:1
  116:9,12

surprised
  150:16,20

surprises
  116:10

suspect
  56:7,14
  91:8 164:7
  184:25
  199:6,11
  207:13

suspected

57:18,21
58:16

swapping
  22:11,12

swear 6:14
  7:4

switch
  131:10
  132:11
  182:12
  191:22

switching
  130:19

sworn 7:6

system 10:11
  25:22
  78:13
  127:16
  131:4
  210:8

systems
  128:10,24
  133:2

—————————
          T
—————————

tab 25:12
  34:17

table 9:7

tabs 34:19
  64:11

tail 37:7,
  10

tailing

37:6,8

takes 34:11
  174:4

taking
  159:16

talk 15:3,
  6,7,12
  18:1,4
  32:4 39:1
  41:12,24
  68:22
  69:17 78:1
  86:5 124:2
  126:23
  160:19
  184:21
  189:3
  194:9
  198:6
  206:9
  215:11

talked 15:14
  47:20
  58:19
  122:6
  143:6
  164:12
  199:9

talking 8:3
  16:10 33:8
  94:23
  104:13
  115:19
  121:14
  124:16
  143:10

161:8,9,17
165:14
182:16,25
189:4
198:10
199:25
200:5

talks 54:24
  65:21
  91:25
  105:11
  198:14

team 126:3,
  17

teaser-type
  168:25
  169:15

technical
  9:14

technology
  8:24 12:1

telling
  155:13
  159:12
  160:24
  174:16
  180:1,9,18
  183:10
  184:7

tells 90:25
  134:2

ten 23:21,
  22 31:12
  32:14 79:2
  80:12

USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.
Kevin McAnaney on 06/14/2022                    Index: tend..thousand

81:13,16
98:20
102:9
125:8
128:1
171:11,13,
17,22
172:11,22,
23,25
173:10,16,
20 174:13
215:10

tend  160:1

term  40:25
42:12 65:6
74:24
95:14

terminating
212:11

termination
43:22

terminology
65:10,11

terms  31:1
55:11
89:20,21,
23 90:9
92:9 93:2,
17 94:2,8
106:8
139:25
140:11
142:1,14
144:8
149:11
157:8,9

165:9,11,
17 167:8
170:14
174:5
214:9

test  10:8
48:18 49:8

testable
207:25

testified
75:15,20,
22 110:17
152:14
208:22
211:16
212:13
213:13
214:14

testify  21:8
74:16 75:1
142:24
204:11,14,
15 205:1,5
206:4
208:17

testifying
20:25 21:1
23:4 36:8,
21 130:20
147:25
184:6

testimony
35:22
70:15
75:5,18,23
76:4,16,

21,23
77:11,17
96:15
97:14
109:21
110:6
112:3,12,
18,21
113:7
115:20
116:23
125:15,25
127:22
128:23
133:14
135:25
142:19
143:20
144:5
145:8
152:18
156:6,10
157:11,14,
15 174:20
178:8
182:8,11
183:14,17,
18 185:11
190:23
208:12
210:16
213:11
214:6

thing  25:19
34:1
100:9,10
127:6
131:7

152:24
188:18,19,
21

things  9:13
17:10 19:5
26:22
31:25
32:3,5
41:25 55:4
64:8 108:8
136:16
137:1,3
199:19
202:14

thinking
65:13
203:22

thinks
131:10

thought  28:4
39:21
75:8,9
76:6,13
118:12
119:14
127:23
146:5,12
147:10
165:14
198:19

thousand
81:18,25
83:15
128:2
172:24
173:3,19

174:15

**three-page**
197:14

**threshold**
206:23

**throw**  136:19

**tie**  131:3

**till**  9:4

**time**  6:11
10:20  11:4
12:2,9
14:7  19:2
22:9
25:20,23
26:6  35:16
40:22
52:18,25
53:12
64:2,7
72:16
76:20
77:21
83:7,9
88:1,7
102:12,20
105:5
110:10,15
117:7,22
125:21
129:12
131:16
145:1,16,
23  157:16
167:15
174:7,18
177:8

186:13
191:25
192:8
197:24
206:22
209:18
215:18,25
216:4,9

**timeframe**
21:12
72:14
81:17
135:14

**times**  7:16
9:7  29:1
43:1,9
81:16
170:12

**title**  87:6

**today**  8:17
9:18  14:8
39:11
74:16  75:2
148:23
174:12
183:15
184:6
215:13
216:3

**Today's**  6:10

**told**  17:15,
18,21
113:5
154:23
166:4
168:12

190:4,9
193:17

**top**  25:14
59:22,23
86:16  89:7
195:1
209:3
210:6

**topic**  147:6
163:21
191:22
205:8
208:17
213:10

**topics**  31:21
205:3
206:6
208:15

**total**  170:21
175:8,12,
22

**track**  122:10
123:7,10
137:5

**train**  82:1

**training**
29:5,7,12,
15,18,24
30:6,14,
21,25
31:5,6
37:21,25
38:1  79:15
81:3,7,19
97:16

177:7

**transcribing**
7:20

**Traurig**
212:25

**treating**
183:3

**trial**  21:8
152:8

**trials**  21:9

**trigger**
48:12

**trouble**
11:16,17
116:2
165:22

**truck**  183:3

**true**  51:19
132:19,20
142:15

**truth**  211:19

**turn**  23:21
41:6  61:4
69:10
103:4
139:13

**turned**  6:4
12:5,8
52:21,24
102:15,18
145:19,22
192:3,6
215:21,24
216:11

turnover
 171:11
 172:9

two-day
 80:5,13
 173:9

two-page
 53:13

type  37:2,
 20 38:2
 167:19

types  41:24
 42:13
 201:15

typical
 96:20
 111:6
 175:17

typically
 59:1 121:5

———————

U

U.S.  211:9,
 24

uh-huh's
 7:25

ultimately
 171:12

unable  25:25

unbelievable
 116:21

undergo
 117:24

understand
 8:10 37:12
 47:24
 52:13
 68:5,8
 69:1,10
 72:19,24
 74:10 75:8
 78:6 85:1
 86:23
 101:3
 115:16
 121:3
 122:17
 127:1
 129:2
 135:22
 141:7
 145:4
 160:21
 178:1
 182:10
 190:23

understandable
 77:9

understanding
 51:14
 70:11,24
 71:8,15
 72:10,15
 77:24 78:9
 79:9 80:17
 82:13
 87:11
 94:23
 105:6
 117:20,21

119:24
 120:4
 125:24
 141:21
 143:16
 150:21,23,
 25 151:1
 185:9

understood
 8:15,16
 74:8 75:6
 95:21
 113:13
 137:13
 158:13
 171:8

undertaken
 23:25

undisputed
 116:3

unethical
 137:13
 146:5

unfair
 139:17
 159:4

United  6:7
 203:18
 213:25

unlawful
 66:21 70:1
 137:13
 146:5
 175:25

unlike  117:5

139:18

unsafe
 183:21
 190:19

unstable
 67:21

unusual
 106:3

upper  24:23

USA  203:19

usual  205:6

utilized
 139:20

———————

V

vague  73:1
 106:25
 107:1

Valley
 209:10
 210:18,23

valued  84:21
 85:6

varies  91:8

varieties
 22:8

variety
 48:17

vary
 107:19,24
 108:2,7,14

vast  167:2

**USA EX REL. HENRY B. HELLER vs GUARDIAN PHARMACY OF ATL, ET AL.**
Kevin McAnaney on 06/14/2022          Index: vendor..willingly

**vendor**   98:25
  99:7
  106:10
  182:25
  183:4,7

**vendors**
  106:1,3,7
  169:21
  182:19

**verbal**   7:24

**versus**   6:9
  36:15,21
  69:2,5
  130:18,23
  132:5
  203:18
  209:10
  211:10,24
  212:25
  213:20
  214:2

**video**   6:3
  8:4,23
  12:4,7
  52:20,23
  102:14,17
  145:18,21
  192:2,5
  215:20,23
  216:11

**view**   54:22
  56:6 58:21
  71:21
  190:19

**views**   207:1,
  5,7,8,9,

  11,13

**violate**
  68:19
  151:12
  152:16
  153:12,14
  154:1
  155:18
  160:13,18
  165:3

**violated**
  30:8,13
  49:18
  50:3,14
  51:21
  154:16
  196:5,8,10
  206:12

**violates**
  38:10
  151:11
  160:24
  161:4
  165:12
  188:16
  202:1,3,
  12,16

**violating**
  151:14
  153:13
  154:4,21
  155:17,19
  166:20
  167:7

**violation**
  50:21 52:3

  69:7 100:5
  151:23
  152:13,19
  153:7
  154:24
  155:5
  197:3
  212:19

**violations**
  35:21

**violative**
  153:22
  154:5
  155:7

**virtually**
  110:21
  208:24

**visit**   83:18

_____

         W
_____

**wait**   11:2,
  13,20 26:2

**walk**   11:23

**wanted**   27:20
  120:10
  126:7
  135:5,16

**wanting**
  122:3

**warned**   30:16

**warrant**
  199:6

**Waterford**
  179:13

  180:1,19
  186:3
  189:25
  190:3,24

**ways**   25:22
  170:18

**website**
  53:25

**weight**   55:10
  59:5

**wellness**
  180:18
  186:4

**whichever**
  111:9

**white**   34:10

**widespread**
  155:24

**willful**
  100:10
  152:21
  202:21
  203:3,7

**willfully**
  52:12
  56:13
  153:6
  154:9,14
  155:4
  159:24
  195:3
  202:18

**willingly**
  52:12

154:12,22

**withhold**
  186:25

**wondering**
  136:13

**words**  95:6

**work**  8:6
  9:9,15
  11:19 14:1
  18:22
  19:3,5,6,
  24 20:2,5,
  9,12,15
  23:2,9,12,
  13 29:3
  36:2,13,
  15,19
  38:22
  39:9,22
  40:1,6,14,
  18,22,24
  41:4,13
  46:15
  82:14 85:9
  116:15
  193:17

**worked**
  18:15,19
  135:18
  204:21
  205:25

**working**
  16:11
  161:11

**works**  10:9
  91:7 99:23

111:14

**worries**  88:8

**worth**  51:10
  120:14
  201:23

**write**  13:8
  139:16
  193:2
  194:13

**writing**
  110:13

**written**
  38:13
  49:20,22
  117:6,8,24
  196:16
  197:5

**wrong**  50:7
  154:24
  184:12
  190:16
  195:9

**wrote**  47:17
  56:8,9
  103:12
  110:15

—————————

**Y**

—————————

**year**  198:23

**years**  25:23
  35:15
  37:15
  40:20
  161:10,20

188:21
210:15

**Yvonne**
  191:10,15

—————————

**Z**

—————————

**Zavalishin**
  18:8,9,10
  28:19,24
  72:7