IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* HENRY B. HELLER, | |
| *Plaintiff*, | Civil Action File No.: |
| v. | 1:18-cv-03728-SDG |
| GUARDIAN PHARMACY OF ATLANTA, LLC. | |
| *Defendant*. | |

**MEMORANDUM IN SUPPORT OF RELATOR'S
MOTION FOR PARTIAL SUMMARY JUDGMENT
<u>ON COUNT I OF THE AMENDED COMPLAINT</u>**

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................. i

TABLE OF AUTHORITIES ....................................................... iii

INTRODUCTION ................................................................. 1

I.    LEGAL FRAMEWORK ..................................................... 5

    A.    Summary Judgment Standard ....................................... 5

    B.    False Claims Act Liability ....................................... 5

    C.    Anti-Kickback Statute Liability ................................. 6

II.    UNCONTROVERTED MATERIAL FACTS ....................................... 8

    A.    Guardian Offered and Provided Free Services to Communities ...... 8

        1.    Free Quarterly Pharmacy Consulting Services ................ 8

        2.    Free and Discounted Classes, Skills Checks ................ 14

        3.    Free Medication Carts and Laptops ......................... 17

    B.    The Communities Referred, Arranged for, or Recommended Their Residents to Guardian ....... 18

    C.    One Purpose of Free Services Was To Induce Referrals. ........... 20

    D.    Guardian Knew Offering Free Services Was Unlawful .............. 23

    E.    Guardian's Kickback Scheme Was Successful in Growing Business 25

III.    LEGAL ARGUMENT ...................................................... 25

    A.    Guardian Violated the AKS ....................................... 26

        1.    Scienter Under the AKS .................................... 26

        2.    Remuneration Under the AKS ................................ 28

        3.    Inducement Under the AKS .................................. 30

i

B.     Guardian's Claims Resulted From AKS Violations ..........................31

C.     Guardian's Claims Are Materially False As A Matter of Law ..........34

D.     Guardian Presented False Claims.......................................................36

E.     Guardian's Knowing Submission of False Claims ............................37

F.     The Government Is Entitled to Damages, Trebled ............................38

IV.     CONCLUSION...............................................................................................40

## TABLE OF AUTHORITIES

**Statutes:**

28 U.S.C. § 2461…………………………………………………………………………39

31 U.S.C. § 3729…………………………………………………………………*passim*

31 U.S.C. § 3730(d)(2) ……………………………………………………………..40

42 U.S.C. § 1320a-7a…………………………………………………………………..28

42 U.S.C. § 1320a-7b…………………………………………………………….*passim*

**Regulations:**

28 C.F.R. § 85.3………………………………………………………………………39

28 C.F.R. § 85.5………………………………………………………………………39

42 C.F.R. § 423.505…………………………………………………………………27, 37

56 Fed. Reg. 35952 (July 29, 1991) ………………………………………………28

**Court Rules:**

Fed. R. Civ. P. 56 …………………………………………………………………..5

Fed. R. Evid. 1006……………………………………………………………………..4

**Cases:**

*Bingham v. HCA*, 783 F. App'x 868 (11th Cir. 2019) ……………………………5, 28

*Carrel v. AIDS Healthcare Found, Inc*., 898 F.3d 1267 (11th Cir. 2018) ………..7, 35

*Guilfoile v. Shields,* 913 F.3d 178 (1st Cir. 2019) ………………………………………35

*Heckler v. Community Health Services*, 467 U.S. 51 (1984) ……………………26, 28

*Kuzma v. N. Ariz. Healthcare Corp.*, No. CV-18-08041,

    2022 U.S. Dist. LEXIS 106969 (D. Ariz. June 15, 2022) …………………29, 32

*McNutt ex rel. United States. v. Haleyville Med. Supplies, Inc.,*

    423 F.3d 1256 (11th Cir. 2005) ………………………………………..…*passim*

*Person v. Tech. Educ. Servs.,* 542 F. Supp. 3d 1355 (N.D. Ga. 2021) …………………5

*Stop Ill. Health Care Fraud, LLC v. Sayeed*, 957 F.3d 743 (7th Cir. 2020) …………30

*Stop Ill. Health Care Fraud, LLC v. Sayeed*, No. 12-cv-09306,

    2020 U.S. Dist. LEXIS 220724 (N.D. Ill. Nov. 24, 2020) ……………………30

*United States ex rel. Cairns v. D.S. Medical LLC*, No. 20-2445,

    2022 U.S. App. LEXIS 20584 (8th Cir. July 26, 2022) ……………...……32, 33

*United States ex rel. Carrel v. AIDS Healthcare Found., Inc.*

    262 F. Supp. 3d 1353 (S.D. Fla. 2017) …………………………………...…35

*United States ex rel. Fitzer v. Allergan, Inc*., No. 1:17-cv-00668-SAG,

    2022 U.S. Dist. LEXIS 152099 (D. Md. Aug. 23, 2022) ……………………...33

*United States ex rel. Garbe v. Kmart Corp*., 824 F.3d 632 (7th Cir. 2016) …………37

*United States ex rel. Greenfield v. Medco Health Sols, Inc.*,

    880 F.3d 89 (3d Cir. 2018)..................................................................…..…32, 33

*United States ex rel. Keeler v. Eisai, Inc.*, 568 Fed. Appx. 783 (11th Cir. 2014) ……34

*United States ex rel. Kester v. Novartis Pharms. Corp.*,

    43 F. Supp. 3d 332 (S.D.N.Y. 2014) …………………………………35, 36

*United States ex rel. Lutz v. Mallory*, 988 F.3d 730 (4th Cir. 2021) …………………35

*United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*,

    591 F. App'x 693 (11th Cir. 2014) ……………………………………………7, 33

*United States ex rel. Phalp v. Lincare Holdings,* 857 F.3d 1148 (11th Cir. 2017) ……6

*United States ex rel. Walker v. R&F Props. of Lake Cty, Inc.*,

    433 F.3d 1349 (11th Cir. 2005) ……………………………………………….34

*United States ex rel. Walthour v. Middle Ga. Fam. Rehab, LLC*, No. 5:18-CV-00378,

    2022 U.S. Dist. LEXIS 72711 (M.D. Ga. Apr. 20, 2022) ………………….....38

*United States ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772 (S.D.N.Y. 2017)…30

*United States v. Biogen IDEC Inc.*, No.1:12-cv-10601,

    2022 U.S. Dist. LEXIS 117512 (D. Mass. July 5, 2022)………………………36

*United States v. Howard,* 28 F.4th 180 (11th Cir. 2022) ……………………………..7

*United States v. Man*, 891 F.3d 1253 (11th Cir. 2018) …………………………………26

*United States v. Patel*, 778 F.3d 607 (7th Cir. 2015) …………………………………8

*United States v. Reliance Med. Sys., LLC*, No. CV 14-06979,

    2022 U.S. Dist. LEXIS 31214 (C.D. Cal. Feb. 22, 2022) …………………36, 38

*United States v. Starks*, 157 F.3d 833 (11th Cir. 1998) ………………………………26

*United States v. Vernon*, 723 F.3d 1234 (11th Cir. 2013) ………………………27, 30

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176 (2016) ………6, 35

*Urquilla-Diaz v. Kaplan Univ.,* 780 F.3d 1039 (11th Cir. 2015) ……………………37

*Yates v. Pinellas Hematology & Oncology, P.A.*,

    21 F.4th 1288 (11th Cir. 2021)………………………………………………..38, 39

## INTRODUCTION

After a contentious discovery period, this case is fairly simple.

The Anti-Kickback Statute ("AKS") prohibits any person from <u>offering</u> or <u>providing</u> free or below fair market value services (*i.e.*, "remuneration") to induce someone to <u>refer</u>, <u>arrange for</u>, or <u>recommend</u> that a patient purchase an item or service covered by a federal health care program. 42 U.S.C. § 1320a-7b(b)(2)(A), (B). Remuneration is defined broadly to include anything of value, whether offered or paid directly or indirectly, overtly or covertly, in cash or in kind. 42 U.S.C. § 1320a-7b(b)(2); ECF 63 at 17. Seeking payment from Medicare or TRICARE for claims resulting from an unlawful kickback scheme constitutes a False Claims Act ("FCA") violation, as a matter of law. 31 U.S.C. § 3729; 42 U.S.C. § 1320a-7b(g).

Against this legal framework, it is undisputed in the record that Guardian Pharmacy of Atlanta, LLC ("Guardian") offered and provided free and discounted services to 80 Assisted Living Communities ("ALCs") and Personal Care Homes ("PCHs") (collectively, "Communities") to induce referrals, arrangements, and recommendations from those Communities. In particular:

(a) From 2014 through June 30, 2019,[1] Guardian offered and provided free quarterly pharmacy consulting services to 80 Communities. Guardian's contracts literally say "████████████████." Guardian offered and provided the quarterly consulting services so that the Communities could

---

[1] Relator seeks partial summary judgment on a subset of claims Guardian submitted to Medicare and TRICARE from January 1, 2014 to June 30, 2019 because that is the time frame of claims data provided by Guardian. Guardian's unlawful conduct has continued beyond June 30, 2019 and into the present. Relator reserves the right to pursue post- June 30, 2019 damages in future proceedings.

satisfy medication-management requirements for their state licenses.

(b) From 2014 through January of 2018, Guardian also offered and provided free/discounted Certified Medication Aid ("CMA") and Proxy Caregiver ("PC") training and education classes and skills checks to staff of at least 36 of those same Communities. Guardian provided these free classes to all new Communities signing a contract with Guardian and to existing Communities with new licensure. Guardian sent regular email invitations to Communities announcing the classes—the emails literally state that the Communities are "exempt" from charges and can attend at "no charge."

(c) From 2014 through June 30, 2019, Guardian offered and provided free medication carts and laptops to at least 33 of those same Communities. Guardian's contracts with Communities literally say "███████████ ███████." Guardian "loaned" the carts and computers for free, so the ALCs and PCHs did not have to purchase them.

Guardian's kickback scheme was brazen—and successful. At least 80 Communities received unlawful inducements, and they:

(a) Designated Guardian as their "preferred pharmacy" either orally or in writing and agreed to use their "███████████" to support Guardian servicing their residents.

(b) Told residents, in writing and orally, that Guardian was the "preferred pharmacy" at their Community, and often told them that it was unsafe to use other pharmacies.

(c) Provided all their existing and new residents with Guardian's standard "Resident Welcome Information" packet and brochures, and *exclusively* recommended Guardian to their residents—no other pharmacy.

(d) Penalized residents or charged additional fees at certain Communities for using a pharmacy other than Guardian.

The result: Communities over the years have referred, arranged for, and recommended *thousands* of residents to use *only* Guardian and no other pharmacy. Those residents followed their Communities' recommendations and signed

2

agreements with Guardian.

Guardian's consulting staff (internally referred to as the "sales team") monitored the number of residents who signed up with Guardian on a Community-by-Community basis and pressured the Communities to increase their referrals and recommendations. Guardian told the Communities that they needed to have a majority or super-majority of residents (typically 70-80%) sign up with Guardian to maintain free services. If this percentage—referred to by Guardian as its "penetration rate" or "adoption rate"—fell below a certain rate (*i.e.*, if not enough residents were successfully referred to Guardian), then Guardian withheld its free services and charged the Community the "full rate" for quarterly consulting and other services.

Even worse, Guardian knew its conduct was illegal. Guardian's *own* written agreements with the Communities ██████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ President Matthew Hopp nevertheless negotiated and signed these agreements dozens of times, offering quarterly consulting "████████████████████████████." Guardian's parent company even admitted that Guardian "should be charging" for these services and that providing these free services to Communities "[f]or the

purpose of inducing would be a kickback."[2]

This is a textbook kickback scheme in violation of the AKS and FCA. Guardian's violative conduct taints thousands of Medicare and TRICARE claims submitted by Guardian for prescription drugs provided to residents referred by these Communities. At this time, Relator seeks summary judgment only as to this small subset of 80 Communities. The single damages under a simple application of FCA and AKS case law exceed $16 million and are over $48 million when trebled. A penalty for each false claim is also mandatory.

In support of this Motion, Relator has submitted summary charts pursuant to Fed. R. Evid. 1006 to prove Guardian's unlawful inducements for all 80 Communities,[3] and to prove the damages that Medicare and TRICARE sustained because of Guardian's false claims for payment.[4] On these undisputed material facts, Relator is entitled to summary judgment on Count I of the Amended Complaint.

---

[2] The pharmacy industry has also known this conduct was illegal since at least 2009, when Guardian's competitor (Omnicare Inc.) paid a $98 million settlement to resolve AKS and FCA allegations, including using free pharmacy consulting services to induce referrals. After that settlement, Guardian's own legal counsel published a *Client Alert*, stating that the settlement "sends a signal to the industry that pricing for pharmacy consultant services will be subject to greater scrutiny under the anti-kickback statute[,]" and the case "should serve as a catalyst" for pharmacy providers to "to ensure that pharmacy consultant services are being provided on a fair market basis and without regard to the referrals generated by the nursing homes." Relator's Statement of Undisputed Material Facts ("SMF") at ¶¶ 91–92.

[3] SMF at ¶¶ 9–13, 35–39, 54 (citing Declaration of Joseph M. Callow, Jr.).

[4] SMF at ¶¶ 7, 97–98 (citing Declaration of Lynn M. Adam).

## I.   **LEGAL FRAMEWORK**

### A.   **Summary Judgment Standard**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Person v. Tech. Educ. Servs.,* 542 F. Supp. 3d 1355, 1362 (N.D. Ga. 2021) (Grimberg, J.).

### B.   **False Claims Act Liability**

As this Court observed, the FCA "is the primary law on which the federal Government relies to recover losses caused by fraud." ECF 63 at 12 (quoting *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.,* 423 F.3d 1256, 1259 (11th Cir. 2005)). Here, Guardian's claims for prescriptions submitted to Medicare and TRICARE for residents of Communities that received Guardian's kickbacks were false claims because they resulted from Guardian's violations of the AKS. "Since noncompliance with the AKS 'is a bar to the receipt of Medicare payments,' a violation 'can form the basis of liability under the [FCA] for past Medicare payments attributable to the violations.'" ECF 63 at 14 (quoting *Bingham v. HCA*, 783 F. App'x 868, 871 (11th Cir. 2019)).

Count I of the Amended Complaint asserts a presentment claim under 31 U.S.C. § 3729(a)(1)(A), which imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." A "relator must prove three elements: (1) a false or fraudulent claim, (2) which was presented, or caused to be presented, for payment or approval, (3) with

the knowledge that the claim was false." *United States ex rel. Phalp v. Lincare Holdings,* 857 F.3d 1148, 1154 (11th Cir. 2017). Additionally, materiality must be demonstrated when the complaint alleges that a claim was "false or fraudulent" because the defendant implicitly certified compliance with a material legal requirement and failed to disclose its noncompliance. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 189 (2016).

Thus, the elements of Relator's FCA cause of action under Count I are falsity, materiality, presentment of a claim for payment, and knowledge.

## C.    <u>Anti-Kickback Statute Liability</u>

The elements of falsity and materiality depend in this case upon evidence that Guardian submitted claims that included prescription drugs "resulting from" AKS violations. 42 U.S.C. § 1320a-7b(g) (a "claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]."). Thus, the elements of an AKS violation, and the link to false claims, are embedded in the issues of falsity and materiality under the FCA. The AKS makes it a felony offense for anyone who:

> *[K]nowingly and willfully* offers or pays any *remuneration* (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person *to induce such person*-
>
> (A) *to refer* an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) *to . . . arrange for or recommend purchasing* . . . any . . . service, or item for which payment may be made . . . under a Federal health care program[.]

42 U.S.C. § 1320a-7b(b)(2) (emphasis added). As applied here, the elements of an AKS violation are (1) scienter; (2) an offer or payment of "remuneration"; (3) "to induce" a person to either refer a patient for an item or service, arrange for an item or service, or recommend purchasing an item or service; and (4) the item or service is paid for in part by a federal health care program. *See id.; cf. United States ex rel. Mastej v. Health Mgmt. Assocs., Inc*., 591 F. App'x 693 (11th Cir. 2014).

The AKS "broadly forbids kickbacks, bribes, and rebates in the administration of government healthcare programs." *Carrel v. AIDS Healthcare Found, Inc*., 898 F.3d 1267, 1272 (11th Cir. 2018). The statute exists to control federal costs and to protect federal program beneficiaries from conflicts of interest involving anyone who may influence a patient's choices about health care services. *See United States v. Howard,* 28 F.4th 180, 206 (11th Cir. 2022) (affirming convictions for paying for patient referrals). "Anti-kickback laws exist to prevent the perversion of incentives, to ensure that actors, such as those in the health field, act for the proper reasons, to avoid a conflict of interest when it comes to the exercise of medical judgment." *Id*. at 206. It does not matter whether the services provided are medically necessary or are appropriately provided. By prohibiting perverse financial incentives, the AKS protects patients from recommendations that "might be clouded by improper financial considerations." *United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015) (affirming criminal AKS conviction).

## II.   UNCONTROVERTED MATERIAL FACTS

Guardian is a long-term care pharmacy that fills about 68,000 prescription medication orders monthly for over 4,000 patients, most being Medicare beneficiaries, who reside in roughly 130 Communities throughout north Georgia. SMF at ¶ 2. Guardian generally does not market to the public for business; Guardian gains access to residents via the Communities themselves. *See id.* at ¶¶ 60–63.

As outlined more fully below, from 2014 through June 30, 2019, Guardian offered and provided to 80 Communities: (a) free quarterly pharmacy consulting services, (b) free and discounted CMA and PC training, education classes, and skills checks, and (c) free medication carts and laptops. *Id.* at ¶¶ 3, 8–59. The Communities designated Guardian as their "preferred pharmacy" (or "preferred provider") and, in fact, referred, arranged for, or recommended their residents to fill their prescriptions exclusively with Guardian. *Id.* at ¶¶ 5, 60–81. The undisputed facts prove that Guardian knew offering these free services to Communities to induce referrals was unlawful, but nevertheless continued its kickback scheme and knowingly billed the Government for the resulting prescriptions. *Id.* at ¶¶ 6–7, 82–98.

### A.   Guardian Offered and Provided Free Services to Communities

#### 1.   Free Quarterly Pharmacy Consulting Services

From January 1, 2014 to June 30, 2019, Guardian offered and provided free quarterly consulting services to 80 Communities. *Id.* at ¶ 8. Onsite consulting by a pharmacist or nurse is an essential service that assists a Community in satisfying its

duties under Georgia law to document drug administration, storage, and disposal.[5]
For at least 39 of the 80 Communities, Guardian executed a Pharmaceutical Products
and Services Agreement ("Services Agreement"). *Id.* at ¶ 10. The Services
Agreement contains ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████ *Id.* at ¶ 11. For example:

| Community Name | Dates of Service | Price for Consulting |
|----------------|------------------|----------------------|
| ███████████████ | ███████████████ | ██████████████ |
| ███████████████ | ███████████████ | ██████████████ |
| ███████████████ | ███████████████ | ████████████ |
| ███████████████ | ███████████████ | ██████████████ |
| ████████ | ██████████ | |
| ████ | | |
| ███████████████ | ███████████████ | ██████████████ |
| ██████████ | | ██████████ |
| | | ████████ |
| ███████████████ | ███████████████ | ██████████████ |
| ███████████████ | ███████████████ | ██████████████ |
| ██████████ | | ████████ |
| ███████████████ | ███████████████ | ██████████████ |
| ███████████████ | ███████████████ | ██████████████ |
| ███████████████ | ███████████████ | ██████████████ |
| ███████████████ | ███████████████ | ████████████████ |
| | | ████████ |
| ███████████████ | ███████████████ | ██████████████ |
| ███████████████ | ███████████████ | ██████████████ |
| ███████████████ | ███████████████ | ██████████ |
| | | ████████ |

---

[5] *See, e.g.,* Ga. Comp. R. & Regs. 111-8-63-.20(11)-(12) (assisted living
communities); Ga. Comp. R. & Regs. 111-8-62-.20(7)-(8) (personal care homes).



*Id.* at ¶¶ 10–11.[6] In addition, Guardian provided free consulting to 41 additional Communities and likewise produced no evidence that any of these Communities were charged for quarterly consulting services. *Id.* at ¶ 12. For example:

| Community Name | Dates of Service |
|---|---|
| ██████████████████████████████ | ██████████████ |
| ██████████████████████████████ | ██████████████ |
| ██████████████████████████████ | ██████████████ |
| ██████████████████████████████ | ██████████████ |
| ██████████████████████████████ | ██████████████ |
| ██████████████████████████████ | ██████████████ |
| ██████████████████████████████ | ██████████████ |
| ██████████████████████████████ | █████████ |
| ██████████████████████████████ | ████████ |
| ██████████████████████████████ | █████████████ |
| ██████████████████████████████ | ████████ |
| ██████████████████████████████ | ███████████ |
| ██████████████████████████████ | █████████████ |
| ██████████████████████████████ | █████████████ |
| ██████████████████████████████ | █████████████ |
| ██████████████████████████████ | █████████████ |
| ██████████████████████████████ | █████████████ |
| ██████████████████████████████ | █████████████ |
| ██████████████████████████████ | ███████████████ |

---

[6] This list of 20 is exemplary. The complete list of 39 Communities is contained in a Rule 1006 Summary. SMF at ¶¶ 9–10 (Callow Decl., Ex. A).

*Id*.[7] To be clear, several communities paid Guardian for quarterly consulting services, and there are documents reflecting payment for quarterly consulting services by those communities—but not for these 80 Communities. *Id*. at ¶¶ 13–14.

The provision of free quarterly consulting services was not a secret. Lori Newcomb, Guardian's Head Pharmacist Consultant, *repeatedly* told Communities and third parties about free quarterly consulting services:

- "We actually **do not charge for quarterly consulting** at this time." *Id*. at ¶ 15 (quoting Newcomb Dep., Ex. 15) (emphasis added);

- "Currently, **there is no charge for consulting.** I visit quarterly for both communities and provide a report of the review of residents, as required by Georgia [Assisted Living] regulations." *Id*. (quoting Newcomb Dep., Ex. 30) (emphasis added);

- "Marketing points to remember: **[Assisted Living] buildings get high quality consulting for free every quarter,** even though this is required by [Assisted Living] rules. . . . **[Personal Care Homes] buildings get high quality consulting for free every quarter**, even though not required by rules." *Id*. (quoting Newcomb Dep., Ex. 32) (emphasis added);

- "We provide a very comprehensive consulting visit, as required by [Assisted Living] regulations. **We do not charge for this service** and would like to continue to provide this as a service to our clients." *Id*. (quoting Newcomb Dep., Ex. 33) (emphasis added);

- "For AL licensed buildings, **we do a quarterly visit which is required by regs with medication review for each resident by the RPh.** If a resident does not use Guardian, **we charge $20 for a review.** At that visit, we do a cart audit and random medication observations. **All of that, with the**

---

[7] This list of 20 is exemplary. The complete list of 41 Communities is contained in a Rule 1006 Summary. SMF at ¶ 12 (Callow Decl., Ex. B.)

> exception of the non-guardian client reviews, is <u>at no charge</u>.**" *Id.* (quoting Newcomb Dep., Ex. 34) (emphasis added).

Guardian's President Hopp also testified that "there's no charge to the community" for the quarterly pharmacy consulting services. *Id.* at ¶ 20. For example, he confirmed in a letter to one Community (Magnolia Senior Living):

> Please note that for any of your residents who choose not to use Guardian Pharmacy of Atlanta for their pharmacy needs, they will not have access to all our services. These services include . . . **quarterly pharmacist/nurse review where we audit medications that are being stored, administered, and recorded properly. We do all of this and more <u>without charge</u>.** Please keep this in mind when a family or resident wants to discuss with you about switching from Guardian Pharmacy of Atlanta. **To discontinue service with us is to discontinue all that is included above.**

*Id.* (emphasis added). Guardian's Vice President for Finance and Operations also confirmed that the "residents are not billed for consulting services." *Id.* at ¶ 17.

These quarterly consulting services are critical to the Communities. Under Georgia law, ALCs must "secure" a licensed pharmacist to perform a quarterly medication review and then report any irregularities to the Community; ensure proper disposal of drugs that are expired, discontinued, or in deteriorated condition; and establish or review policies and procedures for safe and effective drug therapy, distribution, use, and control. *Id.* at ¶¶ 24–25.[8] Starting in July 2020, PCHs also had to "secure" a pharmacist to perform the same duties[9]; before then, Guardian generally assigned a licensed nurse to provide consulting for PCHs. *Id.* at ¶ 26.

---

[8] *See* O.C.G.A. § 31-7-12.2(g)(10).
[9] *See* O.C.G.A. § 31-7-12(h)(7).

Throughout the relevant period, PCHs had legal duties for proper documentation of medication administration, storage, and disposal.[10] Guardian's staff gave detailed written reports of their findings to the Community (not the residents) for each consulting visit. *Id*. at ¶¶ 27–28. Guardian provided the quarterly consulting services to help the Communities maintain their licensures under Georgia law. *Id*. If a Community did not perform quarterly consulting services, the Community risked losing its Georgia license. *See id*. at ¶ 28.

Guardian's free quarterly pharmacy consulting services also provided the Communities with economic benefit and savings. President Hopp testified that the fair market value of the quarterly pharmacy consulting services was between "$9 to $11 per bed." *Id*. at ¶ 16. Ms. Newcomb and others charged $20 or more to review a single chart during a quarterly consulting visit if the resident did not use Guardian as their pharmacy. *Id*. at ¶ 18. Guardian maintained an expensive consulting team of two, full-time salaried pharmacists and two nurses who did not even work in the dispensing pharmacy. *Id.* at ¶¶ 31–32. They reported directly to President Hopp, and their sole responsibility was to perform services onsite at Communities. *Id.* By receiving these services for free and not having to incur the cost of hiring their own consulting pharmacist or nurse, Communities received a significant benefit and savings from Guardian. *See id*. at ¶¶ 19–21, 28, 30–31. These services clearly had value to the Communities, and Guardian provided the services for free. *Id*.

---

[10] *See* Ga. Comp. R. & Regs. 111-8-62-.20.

### 2.    Free and Discounted Classes, Skills Checks

From 2014 through January 2018, Guardian's policy and practice was to offer and provide free and discounted CMA/PC training, education classes, and skills checks to staff of Communities. *Id.* at ¶ 33. Skills checks and observations were done for free by consulting staff during their quarterly visits. *Id.* at ¶ 49. Guardian sent at least 39 blast emails to Communities announcing new classes, stating "any new [C]ommunity to Guardian," "any existing Guardian [C]ommunites which had newly obtained licensure," and "all of Collier's clients" were "exempt" from charges for education and training. *Id.* at ¶¶ 39–40. For example:

| Email Date | Message |
|---|---|
| Mar. 26, 2014 | "Therefore, I would really like for you to see a demonstration from Guardian Pharmacy. **They offer a training program and several software/hardware options which are also provided to us at no charge.**" |
| Feb. 19, 2015 | "[F]or our new communities, **this training is complementary**." |
| Apr. 13, 2015 | "This is the training that is required for GA Certified Medication Aide Certification, and is class time only; Skills checks and testing are separate. The charge for the class is $50/day ($100/staff member), **with new clients and host community exempt from charges**." |
| Jan. 24, 2016 | "The charge for the class is $50 per day/ $100 per candidate. Our Host community is exempt from these charges, and **if you are a new community to Guardian Pharmacy, you also may send your candidates at no charge**. When you arrange for skills checks and CMA testing, the charge is $125 per CMA candidate. If you schedule skills checks with your consulting appointment, **we will exempt charges** for 1-2 staff for skills checks and testing as part of routine consulting." |
| June 9, 2016 | "The cost of the class is $50 per day, per attendee. Your community will be billed for the number of attendees you send. |

14

| | **Communities that are new to Guardian Pharmacy Atlanta and our host community are exempt from these charges**." |
|---|---|
| July 5, 2016 | "Finally, remember that we will complete training and skills for the first 10 CMA's **at no charge to you for a new customer discount**." |
| July 27, 2016 | ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ████████████████████████████ |
| May 10, 2017 | "The cost of the class is $50 per day, per staff member . . . . Those communities that are exempt from charges are our host community, any new community to Guardian pharmacy Atlanta (including all of Colliers clients), and any new start up AL community or conversion to AL. **You will receive CMA training at no cost for the first 10 employees**." |
| Sept. 12, 2017 | The charge for the class is $50 per day; however, **all of our new clients are exempt from charges, all of our transferred Collier's clients are exempt, and some of our corporate clients are also exempt.** If your community is charged, the charges will be billed to your community." |
| Dec. 11, 2017 | "The cost of the class is $50, and will be billed to your community. **All of our new clients, including Collier's transfers, are exempt from charges."** |

*Id.* at ¶ 39 (emphasis added).[11]

Guardian's discovery responses admit this policy:

Guardian states that, before January of 2018, Guardian would allow certain communities to send up to **ten (10) staff members to Education Classes at no charge**.

\* \* \*

_____

[11] This list of 10 is exemplary. The complete list of all 39 emails containing illegal offers is contained in a Rule 1006 Summary. SMF at ¶ 39 (Callow Decl., Ex. C).

Guardian states that it has always charged for Skills Checks, although **prior to January 2018, the Skills Checks were sometimes <u>included within the Charge for Education Classes</u>.**

\* \* \*

Guardian states that, before January 2018, it would sometimes perform up to **two (2) Skills Checks at a community during a routine mediation management audit and <u>would not generate an invoice</u> to the community for these Skills Checks.**

*Id.* at ¶¶ 38, 46 (emphasis added). Guardian's sign-in sheets from the classes confirm that staff members of 36 different Communities attended a free class, including:

| Community Name | Class Date(s) | Invoice |
|---|---|---|
| Azalea Estates | Mar. 26, 2015; Oct. 10, 2017; Jan. 18, 2017; Sept. 27, 2016 | None |
| Benton Manor | Sept. 26, 2017 | None |
| Benton House of Newnan | Jan. 25, 2017; Nov. 30, 2017; Sept. 26, 2017; Aug. 23, 2017; June 12, 2017 | None |
| Benton House | Aug. 23, 2017; July 19, 2017; Mar. 21, 2017; Jan. 25, 2017 | None |
| Benton House of Stockbridge | May 16, 2017; Nov. 19, 2014; June 12, 2017 | None |
| Benton House of Sugarhill | Aug. 23, 2017; July 19, 2017; May 16, 2017 | None |
| Benton House of Woodstock | July 19, 2017 | None |
| Heritage of Brookstone | Oct. 10, 2017 | None |
| Dogwood Forest of Dunwoody | Sept. 26, 2017; Aug. 23, 2017 | None |
| Mt. Vernon Towers | Mar. 10, 2016 | None |
| Oaks at Braselton | Jan. 25, 2017; Nov. 30, 2017 | None |
| Oaks at Hampton | Jan. 25, 2017; July 19, 2017; Nov. 30, 2017 | None |
| Oaks at Post Road | Jan. 25, 2017; Mar. 21, 2017; Nov. 30, 2017 | None |
| Oaks at Towne Lake | Jan. 25, 2017; June 12, 2017; Aug. 23, 2017; Nov. 30, 2017 | None |
| Somerby at Peachtree City | July 19, 2017 | None |

| Sterling Estates | Mar. 9, 2015 | None |
|---|---|---|
| Towne Club of Windermere | Jan. 25, 2017; May 16, 2017; Aug. 23, 2017 | None |
| Radiance/Thrive of East Cobb | Jan. 25, 2017; Nov. 30, 2017 | None |
| Waterford at Oakwood | May 16, 2017 | None |
| Windsor House | June 23, 2016; Aug. 16, 2016; Oct. 17, 2016 | None |

*See id.* at ¶ 35.[12] To be clear, several Communities paid for classes and skills checks—but not these 36 Communities. These 36 Communities also received free quarterly consulting services. *Id.* at ¶ 36. These free classes and skills checks helped the Communities satisfy their licensing requirements. *Id.* at ¶¶ 42–43, 50. Communities must arrange for such training as well as skills checks and random observations of aides administering medications to residents. *Id.*[13] These services clearly had value to the Communities. Guardian provided the services for free.

Finally, in January 2018, Ms. Newcomb announced: "We cannot continue to give everything away for free." *Id.* at ¶¶ 45, 52–53. She said President Hopp "gave the ok" for charging for education and skills checks, but quarterly consulting services remained free, as did carts and laptops. *Id.* at ¶ 53.

### 3. Free Medication Carts and Laptops

From January 1, 2014 through June 30, 2019, Guardian offered and provided free medication carts and laptops to Communities. *Id.* at ¶ 54. In Guardian's own Services Agreements with the Communities, ███████████████

---

[12] This list of 20 is exemplary. The complete list of all 36 Communities who received free classes is contained in a Rule 1006 Summary. SMF at ¶ 35 (Callow Dec., Ex. D).

[13] *See* O.C.G.A. § 31-7-12.2(g) (assisted living communities); Ga. Comp. R. & Regs. 111-8-62-.20 (personal care homes).

██████ *Id.* at ¶ 55. Communities use the carts to store medications (from any pharmacy, not just Guardian) and to distribute them to residents. *Id.* at ¶ 56. They use laptops to maintain "medication administration records" which are required by Georgia law. *Id.* at ¶ 57. Guardian "loaned" the carts and laptops to the Communities for free so the Communities did not have to purchase them on their own. *Id.* at ¶ 58. Guardian also provided the laptop mount to attach the computer to the storage cart and provided limited technical support and expertise. *Id.* at ¶ 59.[14] These loaned medication carts and laptops clearly had value to the Communities. Guardian loaned these carts and laptops for free.

### B.     The Communities Referred, Arranged for, or Recommended Their Residents to Guardian

Offering free quarterly consulting, free classes, and free carts and computers was successful. Each Community designated Guardian as its "preferred pharmacy" or "preferred provider." *Id.* at ¶ 60. As such, the Communities ████████ ███████████████████████████████████████████. *Id.* at ¶ 61. Guardian was the only long-term care pharmacy referred to and recommended by the Communities to their new and existing residents. *Id.* at ¶ 64. In fact, Guardian provided Communities with its "Resident Welcome Information" and brochures (*i.e.*, "Welcome Packet") for the Communities to share with their residents. *Id.* at ¶ 62. The Welcome Packet identified Guardian as the Community's "preferred

---

[14] The complete list of all 33 Communities that received free carts and laptops is contained in a Rule 1006 Summary. SMF at ¶ 54 (citing Callow Decl., Ex. E).

pharmacy." *Id.* at ¶ 63. By delivering one to each resident, the Community referred residents to Guardian and provided the necessary authorization forms to choose Guardian. *See id.* at ¶¶ 63–64. No other long-term care pharmacy's name or information was included in the Welcome Packets or other materials provided by Communities to their residents. *Id.*

One Community, Canterfield of Kennesaw ("Canterfield"), provided detailed testimony about this referral process and how Guardian asked Canterfield to designate Guardian as the preferred pharmacy and "agreed to provide quarterly consulting services for no charge." *Id.* at ¶ 67. In exchange, Canterfield agreed "to inform residents that Guardian is the preferred pharmacy[,]" to distribute to its existing and new residents Guardian's Welcome Packet, and "to recommend[] that they fill their prescriptions at Guardian." *Id.* at ¶ 68. Canterfield then "gathered the completed forms from the resident and returned them to Guardian." *Id.* at ¶ 69. Over the years, Canterfield "provided Guardian's information to hundreds of residents" and "approximately 95% of the Community's residents chose Guardian as their pharmacy." *Id.* at ¶ 70. Canterfield testified:

> The Community relies on Guardian to perform the above services so the Community can satisfy its medication management requirements for licensure. Guardian does not bill the Community for these services. **Guardian's quarterly pharmacist services are <u>one reason</u> the Community has continued to use Guardian as the preferred pharmacy**.

*Id.* at ¶ 67 (emphasis added).

To guarantee residents would choose Guardian, several of the Communities



*Id.* (emphasis added). The Communities referred and recommended Guardian to their residents and did not refer or recommend any other long-term care pharmacy. Once Guardian was identified as the "preferred pharmacy," it was the only option provided by Communities to their current or new residents. *Id.* at ¶¶ 62–64.

### C.   One Purpose of Free Services Was To Induce Referrals.

Guardian used its leverage and freebies to secure as many referrals as possible. Its free services were contingent on the volume of patients that the Communities successfully referred to Guardian. Guardian required that Communities have a "majority" or "supermajority" of their residents (typically 70–80%) referred to and signed up with Guardian to maintain the free services. *Id.* at ¶ 73. If this percentage— referred to by Guardian as its "penetration rate" or "adoption rate" at a Community— fell below a certain rate (*i.e.*, if not enough residents were successfully referred to

Guardian), then Guardian withheld the free services and, instead, charged the Community the "full rate" for the services. *Id.* at ¶ 72. Guardian offered and provided the free services so that the Communities would designate Guardian as their "preferred pharmacy" or "preferred provider." *Id*. at ¶¶ 74–76.

President Hopp explained this "majority" requirement to one Community in a May 22, 2017, email, stating:

> [W]hat Lori is referring by preferred pharmacy is that we service the majority of the community. Currently we are only servicing 10 of the residents. . . . In our other Five Star buildings we are servicing typically around 95% of the residents—**when we are the primary pharmacy it's easy for us to do the quarterly consulting and certifications, <u>if we are not the primary we have to charge for our services</u>**[.]

*Id.* at ¶ 72 (quoting Hopp Dep., Ex. 15) (emphasis added). Ms. Newcomb explained that this has been Guardian's practice and policy from "September 2014 to present."

*Id*. Similarly, Ms. Newcomb told another Community in an email:

> **We must have at least half of the community in order to provide special services like training**. Please understand that at the majority of our communities, we maintain 85–95% of residents. **<u>For that commitment, we are able to provide training at a lower cost</u>**.

*Id*. (quoting Newcomb Dep., Ex. 22) (emphasis added). Similarly, ███████████

████████████████████████████████████████, Ms. Newcomb wrote:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████.

*Id.* at ¶ 73 (quoting Newcomb Dep., Ex. 44) (emphasis added). In ███████████ ███████████████████████, Ms. Newcomb stated:



*Id.* at ¶ 72 (quoting Newcomb Dep., Ex. 47) (emphasis added).

In a February 2018 email discussion about a new $20 fee for "consulting for non-guardian residents," Pharmacy Director Tim Williams expressed concern: "[T]hat takes away our leverage to increase penetration in the community." *Id.* at ¶ 76. Ms. Newcomb agreed that "penetration" might suffer, but her answer to that problem was to "keep pushing clients that have non-Guardian residents to convert them" to Guardian. *Id.* at ¶ 77.

With respect to providing free carts and computers, Mr. Hopp stated in a January 20 and February 6, 2015 email to one community:

> To break the contract down, it basically says **we will provide you with carts and computers—<u>in return we will be your primary pharmacy</u>** for a set amount of time. Meaning <u>**we're the only pharmacy in your admission packet**</u>[.]

* * *

I'm pretty straight and to the point so here's the bottom line of what the contract says—we will supply you with new equipment (carts/computers, etc.), **in exchange we will be your primary and preferred pharmacy** . . . . [B]asically this is saying **our admission packet is the only packet you will be handing out**[.]

*Id*. at ¶ 78. (emphasis added).

Scott Holloway, Guardian's Vice President of Finance and Operations, described the consulting department as the "sales team." *Id*. at ¶ 79. They typically worked onsite at Communities, not in the dispensing pharmacy. *Id*. at ¶¶ 31–32. Additionally, the consulting nurses are paid out of Guardian's "marketing" budget, and Guardian provided "incentive plan" compensation and bonuses to consultants, part of which was based on "maintaining patient count at [Guardian's] communities." *Id*. at ¶¶ 80–81. For instance, Lisa McKenzie testified that Guardian has targets and she is "incentivized on a bonus" to hit that "target goal." *Id*.

### D. <u>Guardian Knew Offering Free Services Was Unlawful</u>

The "███████████████" in Guardian's own Services Agreements with the Communities, which President Hopp personally neogiated and signed dozens of times over many years, █████████████████

██████████████████████████████
██████████████████████████████
███████████████████████

████████████████████████████
██████████████████

███████

██████████████████████████████
██████████████████████████████

23

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

*Id*. at ¶¶ 82–84 (emphasis added). Ignoring these prohibitions, President Hopp concealed his offer of free services by stating them on ████████████████████████

████████████████████████ *See id.* at ¶ 11. Witnesses for Guardian Pharmacy, LLC (Guardian's parent company) claimed they had no knowledge of the free consulting services, conceded that providing these free services to Communities "[f]or the purpose of inducing would be a kickback[,]" and affirmatively stated that Guardian "should be charging" for these services. *Id.* at ¶¶ 85–86.

Guardian's employees participate in annual compliance training, including fraud, waste, and abuse laws, including the AKS. *Id.* at ¶ 89. President Hopp and Holloway have decades of experience in the long-term care industry, and Guardian knows its Medicare claims must comply these laws and the AKS. *Id.* at ¶¶ 90–91.

In addition, Guardian, like others within the long-term care pharmacy industry, has also known since 2009 that its competitor (Omnicare Inc.) paid a $98 million settlement to resolve FCA allegations, including that it provided free pharmacist consulting services to induce referrals. *Id.* at ¶¶ 92–93. Guardian's own legal counsel published a *Client Alert* about the case, advising the pharmacy industry that the case should "serve as a catalyst" for pharmacy providers to "reexamine their existing relationships to ensure that pharmacy consultant services are being provided on a fair market value and without regard to the referrals[.]" *Id.* at ¶ 93.

**E.    Guardian's Kickback Scheme Was Successful in Growing Business**

The illegal kickback strategy was successful. Guardian became the dominant long-term care pharmacy at ALCs and PCs in northern Georgia. *Id*. at ¶ 96. Guardian generally obtained referrals for a super-majority of residents at each of the 80 Communities. For instance, Canterfield of Kennesaw testified that "approximately 97% of the Community's residents chose Guardian as their pharmacy." *Id*. at ¶ 67.

██████████████████████████████████████████████████████

████████████████████████████████████████ *Id*. at ¶ 66.

Guardian has provided long-term care pharmacy services to thousands of residents at these 80 Communities, resulting in hundreds of thousands of claims submitted to Medicare and TRICARE. *See id.* at ¶ 97. Each of these claims, even if the drugs were medically necessary, are tainted by Guardian's illegal kickback scheme. Based on expert analysis of Guardian's claims data, the Government's single damages relating to these tainted claims for Medicare and TRICARE beneficiaries residing at these 80 Communities total $16,098,070. *See id.*

## III.   LEGAL ARGUMENT

Guardian knowingly and willfully violated the AKS by offering and furnishing free services to the 80 Communities identified in the Callow Declaration, for the purpose, at least in part, to induce patient referrals. Guardian then submitted claims for payment to Medicare Part D plans and Express Scripts (as the administrator of TRICARE pharmacy benefits) for prescription drugs for residents

who were referred to Guardian by the 80 Communities. Proof of Guardian's claims, the corresponding payments, and the damages sustained by Medicare and TRICARE relating to those claims are summarized in the Adam Declaration.

Guardian's claims were materially false claims because they included drugs resulting from its unlawful kickback scheme. 42 U.S.C. § 1320a-7b(g). Accordingly, Relator is entitled to partial summary judgment on Count I for the small subset of claims relating to the 80 Communities identified in this Motion.

## A.   Guardian Violated the AKS

Guardian violated the AKS as a matter of law. As noted, the elements of an AKS violation are (1) scienter; (2) an offer or payment of "remuneration"; (3) "to induce" a person to refer a patient for an item or service, to arrange for an item or service, or to recommend purchasing an item or service; and (4) the item or service is paid for in part by a federal health care program.[15] 42 U.S.C. § 1320a-7b(b)(2).

### 1.   Scienter Under the AKS

The AKS is violated when someone "knowingly and willfully" offers remuneration to induce referrals; however, "a person need not have actual knowledge of [the Anti-Kickback Statute] or specific intent to commit a violation of this section." 42 U.S.C. § 1320a-7b(b), (h). The Eleventh Circuit has long recognized that "the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal." *United States v. Starks*, 157 F.3d 833,

---

[15] Medicare Part D and TRICARE are federal health care programs under the AKS. *See* 42 U.S.C. § 1320a-7b(f).

838 (11th Cir. 1998). The evidence must show "only that [the] defendant knew that his conduct was generally unlawful, and not that he specifically knew that his actions violated the statute." *United States v. Man*, 891 F.3d 1253, 1268 (11th Cir. 2018).

By choosing to participate in federal health care programs, Guardian is expected to know the payment requirements. *Heckler v. Community Health Services*, 467 U.S. 51, 63–64 (1984) (provider "had a duty to familiarize itself with the legal requirements for cost reimbursement" under the Medicare Program). Guardian, as a subcontractor for Medicare Part D plan sponsors, is required to comply with all applicable laws, including the AKS. 42 C.F.R. § 423.505(i)(4)(iv).

Knowledge and disregard of the law may be inferred from circumstances, such as the presence of AKS requirements in a pharmacy's compliance program, and an individual's executive position in a specialty pharmacy. *See United States v. Vernon*, 723 F.3d 1234, 1254, 1267 (11th Cir. 2013) (jury could have inferred that CEO's position "required that he familiarize himself with significant statutes regulating the pharmaceutical industry, including the Anti-Kickback statute.").

As shown in Section II.D above, Guardian knew about and blatantly ignored ████████████████████████████████████████████████████████ that President Hopp personally negotiated and signed dozens of times over many years. Scienter is further proven by the undisputed evidence of: (a) a pattern of repeated violations involving dozens of Communities that were offered free consulting, free or discounted education, skills checks, medication carts, laptops, and other goodies to induce referrals; (b) Guardian's apparent effort to conceal the free services from

27

its parent company, Guardian Pharmacy, whose witnesses claimed no knowledge of the conduct and conceded it would violate the AKS; (c) decades of industry experience by Guardian's top leadership (*e.g.,* President Hopp, Vice President Holloway); (d) participation in annual compliance training, including the AKS; (e) widespread publicity of a similar kickback scheme involving consulting pharmacists for a competitor; (f) industry-wide publications about the prohibition of providing free consulting services to induce referrals (e.g., 2009 *Client Alert*); and (g) an expectation that Guardian, as a pharmacy whose revenues are derived mainly from the Medicare program, has a duty to be familiar with the conditions for payment of federal taxpayer funds, including compliance with the AKS. *See Heckler*, 467 U.S. at 63–64.

### 2.   Remuneration Under the AKS

Remuneration is anything of value offered or paid to induce a referral. It includes "any kickback, bribe, or rebate" and may be offered or paid "directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person" to refer patients. 42 U.S.C. § 1320a-7b(b)(2). As this Court found, remuneration "has been broadly interpreted 'to include anything of value in any form whatsoever.'" ECF 63 at 17 (citations omitted); *see also* 56 Fed. Reg. 35952, 35958 (July 29, 1991) ("Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever."); 42 U.S.C. § 1320a-7a(i)(6) ("remuneration" includes "transfers of items or services for free or for other than fair market value.").

28

A fair market value benchmark is not required to prove remuneration in this case because Guardian did not purchase goods or services from the Communities. *See* ECF 63 at 19, n.50. The fair market value of a transaction is relevant only when the complaint alleges the defendant overpaid for services or sweetened the deal in a commercial transaction to induce referrals. *See Bingham v. HCA, Inc.,* 783 F. App'x 868, 871 (11th Cir. 2019); *Kuzma v. N. Ariz. Healthcare Corp.*, No. CV-18-08041, 2022 U.S. Dist. LEXIS 106969, at *11–14 (D. Ariz. June 15, 2022).

The valuable goods and services that Guardian furnished to the 80 Communities identified in the Callow Declaration, as described in Section II.A, constitute remuneration under the AKS, as a matter of law. The free goods and services certainly had value to the Communities in alleviating the costs they otherwise would incur to comply with Georgia law requirements when they administer medications to residents. Value is further demonstrated by President Hopp's explanation of the per-bed rate for consulting services, Guardian's $20 fee to review charts for residents who did not select Guardian, and the significant cost of salaries and expenses for 4 full-time employees to staff a Consulting Department that worked entirely remotely providing free services for clients.[16]

---

[16] Guardian may claim that Medicare Part D plans require it to perform quarterly consulting services for communities and that "dispensing fees" cover the costs. But Medicare regulations unequivocally state that dispensing fees cover only a pharmacy's costs to prepare and deliver a prescription, *see* 42 C.F.R. § 423.100, and the pharmacist must do a "drug utilization review" concurrently with filling the prescription. *See* 42 C.F.R. § 423.153(c)(2). Onsite consulting at the patient's residence is not covered. Thus, Guardian's argument is a red herring.

### 3.     Inducement Under the AKS

Guardian was not merely an altruistic benefactor when it furnished free services at its own expense. Guardian sought to induce Communities to "refer" residents to Guardian, to "arrange" for residents to purchase drugs from Guardian, or to "recommend" that residents purchase drugs from Guardian. 42 U.S.C. § 1320a-7b(b)(2)(A), (B). In short, one purpose of Guardian's offering of free services was to induce Communities to choose and maintain Guardian as the preferred pharmacy.

As this Court observed, "[c]ourts are clear that 'an AKS violation exists if *one* purpose of the remuneration was to induce Medicare purchases, even if other legitimate purposes for the remuneration existed.'" ECF 63 at 28 (quotations omitted). "[O]ne need not prove that the primary or sole purpose of the remuneration was to induce the referral of patients or the recommendation of items or services; it is enough if that was 'one purpose' of the remuneration." *United States ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 806 (S.D.N.Y. 2017). Every appellate court considering the "one purpose" test agrees. *Id.*

Moreover, what it means to induce a "referral" under the AKS "is broad, encapsulating both direct and indirect means of connecting a patient with a provider." *Stop Ill. Health Care Fraud, LLC v. Sayeed*, 957 F.3d 743, 750 (7th Cir. 2020); *see Sayeed*, No. 12-cv-09306, 2020 U.S. Dist. LEXIS 220724, at *12–13 (N.D. Ill. Nov. 24, 2020) (finding defendant sought to induce a referral by paying fees to gain access to contact information for Medicare beneficiaries). In *Vernon*, for instance, the Eleventh Circuit upheld the conviction of a defendant who paid a

patient advocate to refer hemophiliac patients to the defendant's pharmacy. 723 F.3d at 1254. The Court rejected the notion that only physicians can "refer" patients and held that the patient advocate was "the relevant decisionmaker" because of her "existing relationships with her clients." *Id.* at 1255.

Here, the Communities, like patient advocates, are the relevant decision makers, and one reason Guardian offered them remuneration was to influence their judgment. As shown in Section II.C above, Guardian used free services to incentivize and reward Communities who selected Guardian as the "preferred pharmacy" and delivered Welcome Packets, which exclusively identified Guardian as the preferred pharmacy, to their residents. Guardian monitored "penetration" rates and withheld services from Communities that did not refer enough residents. The Consulting Department was the de facto "sales team" that was partially paid from a marketing budget and was offered incentives to increase penetration. Even if Guardian had other motives for performing free consulting services and offering other remuneration to Communities, one purpose was to induce patient referrals.

## B. Guardian's Claims Resulted From AKS Violations

The foregoing evidence proves Guardian violated the AKS as a matter of law. Next, the Court should hold that any claim that Guardian submitted to Medicare Part D plans or TRICARE for prescriptions for residents of the 80 Communities in the Callow Declaration resulted from the kickback scheme, as a matter of law. In 2010, Congress amended the AKS to make it crystal clear that "a claim that includes items

or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g).

As this Court observed, "[r]ecent cases have required a relator to show 'causation, or some "link" between the payment of remuneration and the submission of false claims' to 'establish FCA liability based on an AKS violation.'" ECF 63 at 38 (quotations omitted). This Court discussed *United States ex rel. Greenfield v. Medco Health Sols, Inc.*, which established a patient-exposure standard: A "kickback does not morph into a false claim unless a particular patient is exposed to an illegal recommendation or referral and a provider submits a claim for reimbursement pertaining to that patient." 880 F.3d 89, 100 (3d Cir. 2018); *see, e.g., Kuzma*, 2022 U.S. Dist. LEXIS at *36 (collecting cases) (relator alleged "patients in this case were actually exposed to compromised professional judgment—the decisions of their doctors to use Defendants' facilities.").[17]

The Eleventh Circuit has not addressed the term "resulting from" in the 2010 amendment, but the Court has twice stated that a claim is false under the FCA when

---

[17] The Eighth Circuit recently created a circuit split by holding that "resulting from" is a "but for" causation standard, requiring the Government to prove "the defendants would not have included particular 'items and services' absent the illegal kickbacks." *United States ex rel. Cairns v. D.S. Medical LLC*, No. 20-2445, 2022 U.S. App. LEXIS 20584, at *13 (8th Cir. July 26, 2022). In *Cairns*, the Court rejected the Justice Department's reliance on *McNutt* and implied that the 2010 amendment legislatively overruled *McNutt*. *See id.* at *14–15. While the undisputed facts here establish "but for" causation, *Cairns* is inconsistent with binding Eleventh Circuit precedents and should not be applied.

it includes services for a specific patient who was referred by someone who received an unlawful inducement. First, in 2005, the Court found in *McNutt* the Government had stated a claim under the FCA where the complaint "identified specific claims submitted by the [defendants] to Medicare for reimbursement for services, which had been rendered to patients referred by the individuals receiving kickbacks." 423 F.3d at 1258. Second, in 2014, the Court in *United States ex rel. Mastej v. Health Management Associates*, considered whether an FCA complaint sufficiently identified hospital claims for patients who were referred by neurosurgeons who allegedly received excessive compensation and golf trips from the health system. 591 F. App'x at 705–06. The Eleventh Circuit's view was "claims were not false <u>unless</u> those claims submitted or presented were for Medicare patients who had been (1) <u>referred by one of the ten doctors</u> and (2) treated by the Defendants." *Id.*

Thus the patient-exposure standard established in *Greenfield* is consistent with *McNutt* and *Mastej*, it is supported by the majority of courts to consider it, and it honors Congress's objective "to make it easier, not harder, to bring (and ultimately prove) FCA claims predicated on violations of the AKS." *United States ex rel. Fitzer v. Allergan, Inc*., No. 1:17-cv-00668, 2022 U.S. Dist. LEXIS 152099, at *29–30 (D. Md. Aug. 23, 2022) (rejecting *Cairns* and relying on *Greenfield*).

As shown in Section II.B, C, and E, Guardian submitted claims for prescriptions for residents referred to Guardian by the 80 Communities that received Guardian's unlawful inducements. The Communities designated Guardian as the exclusive "preferred" pharmacy, ███████████████████████████████,

and delivered Welcome Packets and other documents facilitating referrals. This undisputed evidence proves these specific patients were "exposed" to tainted referrals. There is no evidence that residents found Guardian through any means other than referrals by their Communities. Thus, all of Guardian's claims for drugs for those residents resulted from the unlawful kickback violations.

## C.   Guardian's Claims Are Materially False As A Matter of Law

Because Guardian's claims included drugs resulting from its AKS violations, the elements of falsity and materiality for a cause of action under the FCA, 31 U.S.C. § 3729(a)(1)(A), are established as a matter of law. A claim is false if it seeks payment for services that are ineligible for payment by a federal health care program. *See, e.g.*, *United States ex rel. Walker v. R&F Props. of Lake Cty, Inc*., 433 F.3d 1349, 1356 (11th Cir. 2005). In *McNutt,* the Eleventh Circuit held that an underlying AKS violation establishes the falsity of a claim for payment. *See* 423 F.3d at 1257. There, the Government alleged the defendants paid "kickbacks camouflaged as rental payments and commissions to pharmacists" and others and submitted claims to Medicare for services referred by the recipients of the kickbacks. *Id.* at 1258. The Eleventh Circuit was blunt: "When a violator of government regulations [referring to the AKS] is ineligible to participate in a government program and that violator persists in presenting claims for payment that the violator knows the government does not owe, that violator is liable, under the [FCA], for its submission of those false claims." *Id.* at 1259. "The violation of the regulations and the corresponding submission of claims for which payment is known by the claimant not to be owed

make the claims false." *Id.*; *see United States ex rel. Keeler v. Eisai, Inc.*, 568 Fed. App'x. 783, 799 (11th Cir. 2014) (describing *McNutt* as an implied false-certification case).

The "resulting from" language in the 2010 AKS amendment removed any doubt that claims tainted by compromised referrals are *per se* materially false. *See* 42 U.S.C. § 1320a-7b(g). This statute means "reimbursement claims for services provided to patients referred through AKS violations are deemed 'false or fraudulent' as a matter of law." *United States ex rel. Carrel v. AIDS Healthcare Found.,* 262 F. Supp. 3d 1353, 1355 (S.D. Fla. 2017), *aff'd*, 898 F.3d 1267 (11th Cir. 2018). Stated another way, "[a]n AKS violation that results in a federal health care payment is a ***per se false claim*** under the FCA." *Guilfoile v. Shields,* 913 F.3d 178, 190 (1st Cir. 2019) (emphasis added). The falsity element of an FCA cause of action is "necessarily satisfied" when an AKS violation is proven, because the violation "automatically constitutes a false claim." *United States ex rel. Lutz v. Mallory*, 988 F.3d 730, 741 (4th Cir. 2021); *United States ex rel. Kester v. Novartis Pharms. Corp.*, 43 F. Supp. 3d 332, 364 (S.D.N.Y. 2014) ("the act of submitting a claim for reimbursement itself implies compliance with" the AKS) (citations omitted).

Compliance with the AKS is also undoubtedly *material* to the payment of claims by federal health care programs. *See Escobar*, 579 U.S. at 189. This Court previously recognized that "many federal courts have concluded that AKS violations are material as a matter of law." ECF 63 at 46; *see Guilfoile*, 913 F.3d at 190. Indeed the "overwhelming weight of authority" is that compliance with the AKS was a

condition of payment "even before the 2010 amendment." *Kester*, 43 F. Supp. 3d at 363 (citing *McNutt* and numerous similar holdings).

"If a Relator must plead and prove that compliance with the AKS was 'material' to a claim 'resulting from' an AKS violation, § 1320a-7b(g) would not represent the strengthening of whistleblower actions that Congress intended." *United States v. Biogen IDEC Inc*., No. 1:12-cv-10601, 2022 U.S. Dist. LEXIS 117512, at *9 (D. Mass. July 5, 2022); *see also United States v. Reliance Med. Sys.*, No. 14-06979, 2022 U.S. Dist. LEXIS 31214, at *10 (C.D. Cal. Feb. 22, 2022) (granting the Government's motion for partial summary judgment, holding that compliance with the AKS "is necessarily material to the Government's decision to pay Medicare claims").

### D.   <u>Guardian Presented False Claims</u>

Next, the Court should hold that Guardian presented false claims to Medicare Part D sponsors and TRICARE's pharmacy benefit administrator, Express Scripts. The FCA defines a "claim" to include any request or demand for payment made directly to the Government or to a federal contractor administering a federal benefits program involving federal funds. 31 U.S.C. § 3729(2)(A)(ii).

Here, Guardian presented claims for reimbursement to Medicare Part D plans and Express Scripts for prescriptions for residents referred to Guardian by the 80 Communities. The plans are Government contractors, the money is used to advance federal health care benefit programs, and the Government provides a portion of the money. *See United States ex rel. Garbe v. Kmart Corp*., 824 F.3d 632, 638 (7th Cir.

2016). As a subcontractor of Part D plan sponsors, Guardian must "acknowledge" in its contracts "that the claims data will be used *for the purposes of obtaining Federal reimbursement*." 42 C.F.R. § 423.505(k)(3) (emphasis added).

As summarized in the Adam Declaration, Guardian produced claims data in discovery. *See* SMF at ¶¶ 7, 96. Relator's damages expert analyzed Guardian's Medicare and TRICARE claims data and produced a damages report. *See id.* at ¶¶ 96–97. The claims data is conclusive evidence of claims for payment that Guardian presented to Medicare and TRICARE contractors. *See Garbe*, 824 F.3d at 638.

### E.   Guardian's Knowing Submission of False Claims

Finally, the remaining element of the FCA cause of action is proof that the defendant "knowingly" presented false claims. 31 U.S.C. § 3729(a)(1)(A). A defendant acts "knowingly" when it has "actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." *Id.* at § 3729(b)(1). Further, "no proof of specific intent to defraud" is required to establish liability. *Id.*

The concept of "reckless disregard" was specifically added to the FCA in 1986 to capture "the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 (11th Cir. 2015). "Reckless disregard is the lowest scienter threshold under the FCA" and is "tantamount to gross negligence." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1303 (11th Cir. 2021); *see also United States ex rel.*

*Walthour v. Middle Ga. Fam. Rehab, LLC*, No. 5:18-CV-00378, 2022 U.S. Dist. LEXIS 72711, at *34 (M.D. Ga. Apr. 20, 2022) (finding defendant's conduct "epitomizes" reckless disregard and granting partial summary judgment).

Based on the undisputed facts relevant to scienter under the AKS, the Court also should hold that Guardian evinced "reckless disregard" when it submitted claims for prescriptions for residents referred to Guardian by the 80 Communities. Guardian's President personally negotiated the preferred-pharmacy arrangements with Communities, directed the kickback scheme through the Consulting Department, and closely monitored billing, revenue, and penetration rates for each Community. Most of Guardian's revenues come from Medicare, and Guardian clearly knew it was submitting claims for residents exposed to improper referrals.

### F.   <u>The Government Is Entitled to Damages, Trebled</u>

A defendant who violates the False Claims Act is liable for a civil penalty for each false claim plus three times the amount of damages the Government sustains. *See* 31 U.S.C. § 3729(a)(1). Based on the undisputed evidence, the Court should grant summary judgment as to the Government's single and treble damages in this case. *See, e.g., Walthour*, 2022 U.S. Dist. LEXIS 72711 at *40 (granting partial summary judgment on penalties and damages); *Reliance Med. Sys.*, 2022 U.S. Dist. LEXIS 31214, at *10–11 (granting partial summary judgment in an AKS case "with

respect to the number of surgeries performed by [the physicians] and the number and dollar amount of Medicare claims related thereto").[18]

The appropriate measure of damages is the entire amount of the Government's share of payments to Guardian for claims resulting from its kickback scheme, "as a kickback renders a subsequent claim ineligible for payment." ECF 63 at 39; *see Yates*, 21 F.4th at 1304 ("[H]ad the defendant truthfully admitted that it was non-compliant, the United States would not have paid" anything on the claims).

Relator's expert calculated that the Government sustained single damages of $16,098,070 relating to Guardian's submission of claims from January 1, 2014 through June 30, 2019 for prescription drugs for Medicare and TRICARE beneficiaries who were residents of the 80 Communities. *See* SMF at ¶¶ 96–97. Specifically, this loss amount reflects the Government's share of the payments made by Medicare Part D plans and Express Scripts for TRICARE to Guardian for the relevant prescription claims. *Id.* As mandated by the FCA, the United States is entitled to treble damages equal to $48,294,210 for the small subset of false claims

---

[18] Relator requests an opportunity to submit evidence supporting per-claim penalties. *See* 31 U.S.C. § 3729. Relator's damages expert identified hundreds of thousands of claims for patients referred by the 80 Communities in this Motion. For violations on or before November 2, 2015, the penalty range is $5,500 to $11,000 for each false claim. 28 C.F.R. § 85.3. For violations after November 2, 2015, the range is $12,537 to $25,076. *See* 28 U.S.C. § 2461 note; 28 C.F.R. § 85.5.

that Relator seeks summary judgment on at this time. *See* 31 U.S.C. § 3729(a)(l).[19] This is not the entire extent of damages sustained by the Government due to Guardian's conduct, and represents only the damages for a subset of 80 Communities during a limited time frame. *See supra* n. 1.

## IV.   **CONCLUSION**

For the foregoing reasons, Relator respectfully requests that the Court enter summary judgment in Relator's favor on Count I with respect to Guardian's claims for residents of the 80 Communities, and award treble damages for the United States in the amount $48,294,210, plus penalties to be determined at a later date.

---

[19] Relator shall receive a percentage of the proceeds of the action from the United States, plus reasonable attorneys' fees and costs, which shall be awarded against Guardian. *See* 31 U.S.C. § 3730(d)(2).

Dated: September 9, 2022          Respectfully Submitted,

*/s/ Joseph M. Callow, Jr.*
Gregory M. Utter*
Joseph M. Callow, Jr.*
Collin L. Ryan*
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, OH 45202
Phone: (513) 579-6400
gmutter@kmklaw.com
jcallow@kmklaw.com
cryan@kmklaw.com

Michael J. Moore (GA Bar No. 520109)
Aimee J. Hall (GA Bar No. 318048)
MOORE HALL LLC
3630 Peachtree Road, NE, Suite 1025
Atlanta, GA 30326
Phone: (404) 882-2960
mjmoore@moorehall.com
ajhall@moorehall.com

Lynn M. Adam (GA Bar No. 002319)
ADAM LAW LLC
One Decatur Town Center
150 E. Ponce de Leon Ave., Ste. 225
Decatur, GA 30030
Phone: (404) 324-3582
ladam@lynnadamlaw.com

*Attorneys for Relator*
*\* Admitted pro hac vice*

41

## <u>CERTIFICATE OF SERVICE AND COMPLIANCE</u>

I hereby certify that on September 9, 2022, I electronically filed the foregoing document, which was prepared in accordance with L.R. 7.1 using Times New Roman, 14-point font, with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel of record.

*/s/ Joseph M. Callow, Jr.*
Joseph M. Callow, Jr.