**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* HENRY B. HELLER, | |
| *Plaintiff,* | Civil Action File No.: |
| v. | |
| GUARDIAN PHARMACY OF ATLANTA, LLC, | 1:18-cv-03728-SDG |
| *Defendant.* | |

**DEFENDANT GUARDIAN PHARMACY OF ATLANTA LLC'S**
**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................ 1

II.    ARGUMENT AND CITATION OF AUTHORITY .............................. 4

    A.    Legal Standard .................................................................. 4

    B.    Guardian Is Entitled to Summary Judgment Because Relator Cannot Show that Guardian Violated the False Claims Act ..... 5

        1.    *Guardian did not violate the AKS.* ........................................ 6

            a.    Guardian did not give remuneration. ........................ 6

                i.    The eMAR services and loaned laptops were not remuneration, and there is no evidence they were priced below cost or FMV. ................................................................ 8

                ii.    The medication management services were not remuneration.......................................... 10

                iii.    The education classes and skills checks were at FMV and constituted neither remuneration nor inducement. ................. 21

            b.    Guardian did not give remuneration to induce referrals. .................................................................. 23

            c.    There is no evidence that Guardian knowingly and willfully violated the AKS or knowingly violated the FCA. .................................................................. 26

                i.    Guardian's belief that its industry-standard practices did not violate the AKS was objectively reasonable................................... 28

                ii.    Relator has not presented authoritative guidance warning Guardian away from its objectively reasonable conclusion. ............ 30

        2.    *Guardian did not submit any claims including any items or services resulting from an AKS violation.* ............................ 37

III.    CONCLUSION 39

## I.      **INTRODUCTION**

In this *qui tam* action alleging kickbacks from a long-term care pharmacy ("LTCP") to assisted living communities ("ALCs") and personal care homes ("PCHs") (collectively, "ALFs"), the Court will find no evidence of corrupt payments, bribes, or side deals, or that any ALF employee involved in the selection of a "preferred" LTCP received anything or profited unjustly from Defendant Guardian Pharmacy of Atlanta, LLC ("Guardian"). There is no evidence of distorted medical decision-making, or that Guardian's practices afforded any unfair competitive advantage over other LTCPs, or that they increased Federal healthcare program costs (to the contrary, they reduced them).

Instead, Relator alleges the illegality of routine services that are expected, and in some cases required, of LTCPs. These services—including electronic medication administration record ("eMAR") setup, medication management services ("MMS"), and medication administration training—promote patient and medication safety, reduce drug utilization, are integrally related to Guardian's products, and benefit Guardian's own patients and the Medicare program. While Relator now labels these services kickbacks, it is undisputed that he had a markedly different view when he had no bounty on the line. Indeed, Relator did not charge ALFs for these services while operating his own pharmacy or while

1

working with a competitor pharmacy after leaving Guardian.

Apart from a sheer lack of evidence on the essential elements of remuneration, inducement, and scienter, Relator's claims are based on at least two fundamental flaws. First, he uncritically applies regulatory guidance that pertains only to nursing homes, or skilled nursing facilities ("SNFs"), without accounting for the fact that ALFs are different. Whereas SNFs are federally-regulated healthcare providers that receive a daily reimbursement rate from the Medicare Part A program that covers MMS and drugs, ALFs are non-healthcare congregate residential homes that receive no government reimbursement. The incentives are plainly different, and the available guidance acknowledges as much. Relator's theories ignore these differences.

Second, Relator contends that ALFs benefit financially because if Guardian did not perform MMS for its patients, the ALFs would have to pay for it. But this contention is based on a misapprehension of the Georgia statute, which does not require that ALFs purchase or furnish MMS. There would be no reason for any such requirement, given that *LTCPs* have an independent obligation to provide MMS to their patients under their contracts with Medicare Part D plan sponsors (and receive higher dispensing fees than retail pharmacies for doing so). Testimony from ALF and LTCP operators (including Relator) was unanimous that

MMS is a patient safety benefit and that patients (or their insurance)—*not* the ALFs—should pay for it.

Furthermore, given that ALFs are private pay and for-profit, any charge they may front for a resident would ultimately get passed on to the residents through increased fees and charges. Thus, even if Guardian billed ALFs for MMS, the ultimate bearer of that financial burden would still be the residents. Nothing required Guardian to bill the ALFs in a false middle-man payment arrangement when the ultimate beneficiaries of these services are Guardian's patients.

With respect to eMAR, Guardian charged its patients a $10 monthly fee that was more than sufficient to offset its eMAR costs and produce a profit. Indeed, to the extent Guardian was required to charge "extra" for MMS (and nothing says it was), Guardian's margin from the $10 monthly fee was more than sufficient to cover the costs of MMS. Additionally, there is no evidence that Guardian's charges for medication administration training were below cost or fair market value ("FMV"), even taking into account two narrow exceptions, which Relator acknowledged were legitimate.

The Anti-Kickback Statute ("AKS") is a criminal statute that targets inherently immoral conduct by punishing kickbacks and bribes. It is not intended

3

to "ensnar[e] persons engaged in apparently innocent conduct."[1] To prevail, Relator must show that Guardian not only provided a financial benefit to ALFs in a *quid pro quo* exchange for Federal healthcare program referrals, but also that Guardian knew its conduct was illegal and intended to break the law. Far from knowingly violating the law, Guardian openly and transparently engages in the same practices as its competitors, with the objectively reasonable understanding that its conduct is compliant. Relator would have this Court punish activities that serve only to protect patients from harmful drug interactions and that pose no risk to the federal fisc. Summary judgment is appropriate.

## II.   ARGUMENT AND CITATION OF AUTHORITY

### A.   Legal Standard

Summary judgment is appropriate if the record shows "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[2] "A fact is 'material' only if it can affect the outcome of the lawsuit" and "[a] factual dispute is 'genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[3] "Summary judgment for the moving party is proper '[w]here the record taken as a whole could not lead a

---

[1] *U.S. v. Starks*, 157 F.3d 833, 838 (11th Cir. 1998).
[2] Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[3] *Hensley v. Westin Hotel*, No. 1:19-cv-03846-SDG, 2022 WL 953315, at *2 (N.D. Ga. Mar. 30, 2022) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

4

rational trier of fact to find for the non-moving party.'"[4]

A defendant seeking summary judgment satisfies its burden by demonstrating an absence of evidence to support at least one essential element of the plaintiff's case.[5] In opposing summary judgment, the plaintiff "may not rest upon the mere allegations . . . of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."[6] In other words, the plaintiff must identify sufficient evidence that would support a jury verdict in his favor.[7]

### B. Guardian Is Entitled to Summary Judgment Because Relator Cannot Show that Guardian Violated the False Claims Act

The False Claims Act ("FCA") prohibits the knowing submission of false claims to the United States for payment.[8] Relator alleges Guardian violated 31 U.S.C. § 3729(a)(1)(A)-(B) by falsely certifying compliance with the AKS.[9] He also alleges that Guardian is liable for "reverse" false claims by retaining payments tainted by AKS violations.[10] To establish either claim, Relator must present evidence—sufficient to support a jury verdict—that Guardian knowingly and

---

[4] *Id.* (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).

[5] *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995); *Wright v. DISH Network, LLC*, No. 4:15-cv-0167, 2016 WL 10919655, at *3 (N.D. Ga. Dec. 1, 2016).

[6] *Anderson*, 477 U.S. at 248.

[7] *Id.* at 256.

[8] *See* 31 U.S.C. §§ 3729-3733.

[9] First Amended Complaint ("FAC") (Dkt. 24) ¶¶ 328-337.

[10] *Id.* ¶¶ 338-346 (alleging violation of 31 U.S.C. § 3729(a)(1)(G)).

willfully violated the AKS. Then he must show "claim[s] that include[] items or services resulting from" that violation.[11] He has done neither.

### 1. *Guardian did not violate the AKS.*

The AKS "does not criminalize *referrals;* rather, it criminalizes knowingly and willfully offering "remuneration in return for such referrals.'"[12] Anything short of a *quid pro quo* exchange (or an offer to make such an exchange) does not violate the statute.[13] For AKS liability to attach, there must be sufficient proof that the defendant: "(1) knowingly and willfully, (2) paid money [or remuneration], directly or indirectly, to [referral sources], (3) to induce [them] to refer individuals to [defendant] for the furnishing of [items or services], (4) paid for by [the government]."[14] Relator's claims fail because he cannot establish that Guardian: (1) provided "remuneration"; (2) offered its services to induce referrals; or (3) acted knowingly and willfully to violate the AKS.

### a. **Guardian did not give remuneration.**

To constitute an illegal kickback, the remuneration must be beyond the

---

[11] 42 U.S.C. § 1320a-7b(g).

[12] *U.S. ex rel. McDonough v. Symphony Diagnostic Servs., Inc.,* 36 F. Supp. 3d 773, 777 (S.D. Ohio 2014) (*quoting Klaczak,* 458 F. Supp. 2d at 678).

[13] *See, e.g., U.S. ex rel. Jamison v. McKesson Corp.,* 900 F. Supp. 2d 683, 699 (N.D. Miss. 2012); *U.S. ex rel. Osheroff v. Tenet Healthcare Corp.,* No. 09-22253-CIV, 2012 WL 2871264, at *8 (S.D. Fla. July 12, 2012).

[14] *U.S. v. Howard,* 28 F.4th 180, 189 (11th Cir. 2022) (*quoting U.S. v. Vernon*, 723 F.3d 1234, 1252 (11th Cir. 2013) (marks omitted)); 42 U.S.C. § 1320a-7b(b)(2)(A).

scope of, and not integral to, Guardian's services to its own patients. To determine whether product-related services constitute remuneration, courts "assess whether Relator has alleged that [defendant] offered services 'integrally related' to [its product] *in tandem with* another service or program that confers a benefit on a referring provider."[15] In answering the first inquiry, courts consider whether the defendant provides collateral benefits, such as "free meals or travel."[16] Courts hold that "OIG guidance provides that 'support services' a [defendant] offers 'in connection with the sale of its own products' … do not, on their own, 'implicate the anti-kickback statute.'"[17]

For services that are not integrally related, "the value of a benefit can only be quantified by reference to its [FMV]."[18] Thus, "the issue of [FMV] is . . . something Relator must address in order to show that [Guardian] offered or paid

---

[15] *United States ex rel. Suarez v. AbbVie Inc.*, Case No. 15-C-8928, 2019 WL 4749967, *7 (N.D. Ill. Sept. 30, 2019) (citations and quotation marks omitted).

[16] *Id.*

[17] *Id.* at *8 (quoting OIG May 2003 Notice, 68 Fed. Reg. 23731-01, 2003 WL 2010428, at *23735; citing *United States ex rel. Forney v. Medtronic, Inc.*, Civil Action No. 15-6264, 2017 WL 2653568, at *4 (E.D. Pa. June 19, 2017) (providing technical support with a pharmaceutical product "might induce physicians to purchase [defendant's] products, but only because they are better-supported products than competing products").

[18] *Bingham v. HCA, Inc.*, 783 F. App'x 868, 873 (11th Cir. 2019) (*citing Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 679 (N.D. Ill. 2006)).

remuneration to [ALFs]."[19] Therefore, to establish services as "remuneration," Relator must (1) show that they were a financial benefit to the ALFs, (2) present evidence to establish the FMV of these services, *and* then (3) prove these services were provided at prices outside FMV.[20]

        i.      **The eMAR services and loaned laptops were not remuneration, and there is no evidence they were priced below cost or FMV.**

Relator alleges that Guardian provided computers and software programs for eMARs without charge to ALFs.[21] The eMAR software integrated with Guardian's pharmacy software to populate the eMAR with medications administered to Guardian's patients and was used by Guardian when performing MMS.[22] The eMAR services and laptops are not remuneration for several reasons.

First, Guardian provides eMAR to its own patients because this service improves the safety of the drugs it is dispensing and makes MMS more efficient.[23] eMAR is integrally related to the drugs and services Guardian provides to its patients and, thus, is not remuneration. OIG guidance can be reasonably interpreted to allow an LTCP to provide eMAR software access at *no* charge,[24] and

---

[19] *Id.*

[20] *Id.*; *Klaczak*, 458 F. Supp. 2d at 626.

[21] FAC ¶ 9.

[22] SMF ¶ 8.

[23] SMF ¶¶ 8, 10.

[24] *Re: OIG Advisory Opinion No. 12-19* ("AO 12-29"), 2012 WL 7148095, at *8-9.

some of Guardian's competitors do just that.[25] Nevertheless, making Relator's kickback allegations even more far-fetched, Guardian charged its patients a monthly $10 fee that covered eMAR services.[26] There is no evidence that these monthly fees were below cost or FMV. To the contrary, the fee exceeded Guardian's eMAR costs (by more than double).[27] The amount and structure of Guardian's eMAR fees were typical of LTCPs that charge for eMAR.[28]

Second, the laptops remain the property of Guardian, are dedicated solely to eMAR use, and are integral to using the eMAR software.[29] Thus, consistent with OIG guidance, they could be placed in an ALF for eMAR use without charge.[30] Relator has not identified a single LTCP, including his own, that did not supply eMAR laptops, and he and others testified this practice was AKS-compliant.[31]

Accordingly, the eMAR services and laptops are not remuneration because they are integrally related to Guardian's services,[32] and Relator has not produced any evidence that eMAR services provided a financial benefit to any ALF, the FMV

---

[25] SMF ¶ 10.

[26] SMF ¶¶ 7, 10.

[27] SMF ¶ 10.

[28] SMF ¶ 7; *but see id.* ¶ 10 (some LTCPs do not charge for eMAR).

[29] SMF ¶ 9.

[30] SMF ¶ 44.

[31] SMF ¶ 9.

[32] *Suarez*, 2019 WL 4749967, at *8; *Forney*, 2017 WL 2653568, at *4.

of these services, or that Guardian's charges were below FMV.[33]

> ii. **The medication management services were not remuneration.**

> > (a) **Guardian is not required to charge ALFs for a service that is already reimbursed by Medicare.**

Relator alleges that Guardian's provision of MMS to its own patients without charging ALFs constituted illegal remuneration. But contrary to Relator's assertion that Guardian provides MMS for "free," Guardian is *required* by its Medicare Part D contracts to perform MMS, and it is paid by Part D plan sponsors for doing so. Below is a side-by-side comparison of some of the Medicare Part D requirements against the MMS that Relator alleges to be kickbacks:

| MMS alleged to be kickbacks[34] | Medicare Part D requirements[35] |
|---|---|
| "disposes of expired or unnecessary medications" | "responsible for return for destruction and/or disposal of unused" drugs |
| "prepares a detailed electronic report for the facility addressing each resident's medication history, findings, and recommendations."<br><br>"visit each facility to consult…about drug management, record-keeping, storage, and disposal [and] inspect [MARs] to determine if the facility gave the correct drugs to residents at appropriate intervals, []review medication carts where drugs are centrally stored at the facility, and [] look for expired drugs…at the facility." | "provide reports…necessary for the delivery of quality pharmacy care… Such reports…may include, but [are not] limited to…monthly management reports to assist the LTC facility in managing orders [and] [MARs] …"<br><br>"performance of drug utilization review . . . to routinely screen for allergies and drug interactions, identify potential adverse drug reactions, identify inappropriate drug usage in the LTC population, and to promote cost effective therapy" |

---

[33] *Bingham*, 783 F. App'x at 873; *Klaczak*, 458 F. Supp. 2d at 626.

[34] FAC ¶¶ 160, 181.

[35] SMF ¶ 12.

In performing these services, Guardian is not providing ALFs a kickback; it is simply meeting its obligations to its patients and Part D sponsors and providing integrally-related support services that do not implicate the AKS.

Additionally, Guardian is paid to provide these services to its patients. Medicare Part D pays pharmacies (1) ingredient costs and (2) a dispensing fee.[36] Section 20.7 of the Centers for Medicare and Medicaid Services ("CMS") *Prescription Drug Benefit Manual* includes among the "costs that may be included in dispensing fees . . . [r]easonable pharmacy costs that are appropriate for the typical beneficiary *in that pharmacy setting*."[37] Joseph Zavalishin, who negotiated agreements with LTCPs on behalf of Medicare payors (and who personally signed one of the agreements pertinent here),[38] testified both as an industry expert and with personal knowledge that the pharmacy benefit managers ("PBMs") that contract with LTCPs on behalf of Part D plans view MMS as reasonable pharmacy costs that are appropriate for the typical Part D beneficiary in the ALF setting and thus are covered by the dispensing fee.[39] He also testified that Part D plans pay

---

[36] *Id.*

[37] CMS, *Prescription Drug Benefit Manual*, Ch. 5, § 20.7; CMS, *Long Term Care Guidance* (Mar. 16, 2005) at 1, *available at* https://tinyurl.com/4p5tyhjj (last accessed Sept. 1, 2022) (emphasis added).

[38] SMF ¶ 13.

[39] *Id.*

LTCPs a higher dispensing fee than retail pharmacies in part to compensate them for MMS.[40] For example, the Humana PBM dispensing fee is $4.00 per drug for LTCP versus $1.50 for retail.[41] Dr. Alyson Wooten, the only licensed pharmacist expert in the case, described MMS as "part of the services that are being reimbursed through the dispensing fees."[42] Their testimony was un-rebutted.[43]

Likewise, the CEO of Guardian's largest competitor "views [MMS] as included in the reimbursement that it receives as a [LTCP], and it does not charge an additional fee to residents or [ALFs]."[44] ALF representatives shared this understanding, with one stating "these services [MMS] are within the bundle of services typically provided by [LTCPs] and for which they are reimbursed by third-party payors";[45] another stating that MMS "are covered by the dispensing fees paid by Medicare Part D plans"; and many others testifying to the same effect.[46]

In short, the integrally-related MMS that Guardian provides to its patients to keep them safe is not remuneration. Guardian is required by contract to provide

---

[40] SMF ¶ 12.

[41] *Id.*

[42] SMF ¶ 13.

[43] *Id.*

[44] SMF ¶ 16.

[45] *Id.*

[46] SMF ¶¶ 16 & 18.

this service, and it is paid higher dispensing fees to do so. Guardian is not required by the AKS—or any other statute—to charge an ALF for something Medicare has already paid for. And, as discussed further below, even if Guardian's "interpretation [were] incorrect, [its] objectively reasonable conclusion" that these services are covered by the dispensing fee would negate any FCA liability.[47]

> **(b)** **ALCs need only "secure" medication management services.**

In arguing that MMS is remuneration, Relator casts MMS as a financial benefit to ALFs, rather than a benefit to Guardian's patients, even though Guardian provides this service *only* to its own patients for whom Guardian receives dispensing fees.[48] Guardian has no relationship to residents who are not its patients, and thus it does not provide them MMS unless they agree to the service and pay for it.[49]

Relator's argument is founded on a Georgia law requiring ALCs to "secure" a pharmacy for MMS.[50] As a threshold matter, this requirement applies only to ALCs, not PCHs.[51] Relator recognized this when operating his own pharmacy, flatly telling one PCH that medication management "[a]udits are not required in

---

[47] *Olhausen v. Arriva Medical, LLC*, 2022 WL 1203023, at *2 (11th Cir. Apr. 22, 2022).
[48] SMF ¶ 19.
[49] SMF ¶ 19.
[50] FAC ¶ 110; O.C.G.A. § 31-7-12.2(g)(10).
[51] *See* O.C.G.A. § 31-7-12.2(g)(10) (applying to "assisted living communit[ies]" with no mention of personal care homes).

PCHs,"[52] but he ignores this distinction now.

Relator also mischaracterizes the ALC's legal obligations. The licensure requirement that ALCs "secure" a pharmacy means only that ALCs must facilitate the provision of MMS (just as ALCs must arrange for emergency transport for a resident needing an ambulance to the hospital, among other services).[53] Nothing requires ALCs to *purchase* these services.[54] Nor should it. Unlike SNFs, ALCs provide no healthcare services and receive no government reimbursement for pharmacy services (or ambulance services, for that matter).[55] The pharmacy, like an ambulance provider, looks to its patients (or their payors) for payment, not the ALC.[56] Thus, an ALC satisfies its obligation to "secure" MMS by making available an LTCP that provides that service.[57] ALCs do this by entering into an arrangement with an LTCP (sometimes called a "preferred pharmacy" agreement) outlining the terms on which the LTCP will serve residents who choose to use that

---

[52] SMF ¶¶ 15 & 22.

[53] Ga. Rules & Regs., 111-8-63-.26.

[54] *Id.*

[55] SMF ¶ 2.

[56] SMF ¶ 2.

[57] The exception is for residents who choose a retail pharmacy (*e.g.*, Walgreen's or CVS), which do not perform MMS, in part because that service is not covered in lower retail dispensing fees. In that case, the ALC must "secure" another pharmacy to perform MMS for that resident for a fee charged to either the resident or the ALC (which passes the cost on to the resident). (SMF ¶¶ 2, 12.)

14

LTCP.[58] This satisfies the requirement that the ALC "secure" these services. None of this involves kickbacks. ALCs and pharmacies are simply playing their respective roles in the healthcare delivery system.

      (c)    **Guardian gained no unfair competitive advantage with its MMS charging practices, which were not an inducement**

According to the OIG, the only real AKS concern with respect to arrangements between pharmacies and non-healthcare congregate living homes, such as ALFs, is "unfair competition," which arises if providing free or discounted services would give a pharmacy "a significant advantage over its competitors, who may not be in a position to offer a similar benefit but whose direct services to patients may be better."[59] Other AKS risks—distorted medical decision-making, overutilization, and increased federal healthcare program costs—are simply not present in the LTCP-ALF context.[60]

Unlike SNFs, which purchase drugs and pharmacy services that they are required to provide to their residents under their Medicare Part A reimbursement rate, ALFs do not purchase drugs or pharmacy services for their residents.[61] Relator identified no LTCP (including his own) that routinely charged ALFs for

---

[58] SMF ¶ 3.
[59] AO 12-19, 2012 WL 7148095, at *7, 9
[60] *Id.* at *7.
[61] SMF ¶ 2.

MMS. In fact, Relator himself *resisted* charging ALFs, believing that practice to be inappropriate.[62] Numerous witnesses—including Guardian's largest competitor (Gayco) and various ALF representatives (many of whom had also worked with LTCPs other than Guardian)—confirmed that MMS are simply part and parcel of what every LTCP does for its patients.[63] Guardian could not have gained an unfair competitive advantage by doing what is standard. Relator offers no evidence to the contrary.[64]

Relator's former pharmacy (Collier's) was an outlier in charging a medication management "audit" fee, but even Collier's did not charge ALCs. Rather, it charged this fee to *residents* of the ALC (consistent with the ALC's purely facilitative role regarding MMS).[65] Further, Relator's practice was only superficially different from Guardian's. He did *not* charge an MMS "audit" fee

---

[62] SMF ¶¶18, 22.

[63] SMF ¶ 16.

[64] Relator did not seek any discovery from any competing LTCPs. Guardian did, but was barred after one competitor (Lacey Drug Co.) objected based, in part, on concerns that responding might subject it to the same allegations. (Dkt. 107 at 10.) Relator did not weigh in on this dispute, stating that it had no "dog in this fight," even though Relator has the burden to prove FMV. (Dkt. 109 at 13:17-18.) But, a representative of an ALF served by Lacey Drugs testified that Lacey's practices were effectively the same as Guardian's. (SMF ¶¶ 16-17.) The evidence obtained directly from competing LTCPs shows no material difference in practice between Guardian and its competitors.

[65] SMF ¶¶ 18, 22.

when Collier's was already charging patients some other monthly service fee.[66] Thus, even according to Relator's charging practices and beliefs, no separate "audit" fee should have been charged. Yet Relator does not limit his claims to patients in ALCs who were not already paying Guardian's $10 monthly fee.

Relator's idiosyncratic position that an LTCP must charge for MMS is perhaps explained by his complete lack of knowledge about Medicare dispensing fees; he testified that he left such issues to his former business partner.[67] In fact, Relator did not know whether Collier's received *any* dispensing fees from Medicare.[68] (And, again, even where Relator did charge for MMS, the charge was to Collier's *patients*, not the ALF.)[69]

Separately, Guardian gained no unfair competitive advantage by providing MMS, it also gained no competitive advantage in not imposing a line-item charge for MMS. As noted, Guardian charged its patients a monthly fee (typically $10). Although the fee was not specifically labeled as covering MMS, the amount of this monthly fee was in line with the total fees charged by other LTCPs, including

---

[66] SMF ¶ 22.

[67] SMF ¶ 24.

[68] *Id*. Relator's partner also did not know whether it was necessary to charge for audits, who to charge for audits, or whether Collier's did charge for audits. *Id.*

[69] SMF ¶ 22.

17

Relator's.[70] Indeed, some LTCPs charged no monthly fee whatsoever, though they provided MMS and other services.[71] Guardian's margin on the monthly fee (after accounting for eMAR costs) was over $5 per month, which was more than enough to cover its MMS costs.[72] Had Guardian itemized its $10 monthly fee—with $5 earmarked for eMAR and $5 for MMS—the charge would have covered Guardian's cost for each line item.[73] The $5 *per month* allocated to MMS would have also greatly exceeded Relator's $5 to $8 *per quarter* audit fee,[74] which Relator testified was within FMV.[75]

As the only economics expert in the case testified (without rebuttal), Guardian gained no competitive advantage by charging a $10 monthly fee that did not specifically reference MMS, rather than, say, two $5 monthly fees (one for eMAR and one for MMS).[76] Any Guardian competitor could have charged the same monthly amount as Guardian, but explicitly labeled the fee as partly covering MMS, without hurting itself competitively. Relator identified no LTCP

---

[70] SMF ¶ 7.

[71] SMF ¶ 18.

[72] SMF ¶¶ 20-21 (this would have been true even if MMS took as much as 18 minutes per patient, which is well above anyone's estimate).

[73] SMF ¶¶ 20-21.

[74] SMF ¶ 23.

[75] *Id*.

[76] SMF ¶ 38.

(other than his own) that assigned such a label to its fees, but again, this is hardly surprising, since dispensing fees *already* reimburse LTCPs for MMS.

Given that Guardian's pricing practices did not give it any advantage over competitors who may not have been in a position to offer a similar benefit, these practices could not have served to induce ALFs to prefer Guardian over other pharmacies. The Eleventh Circuit has observed that "the term 'induce' is defined as '[t]o bring on or about, to affect, cause, to influence to an act or course of conduct.'"[77] Practices that do not stand out from the competition do not affect, cause, or influence anyone to do anything.

> **(d)** **Even if Guardian provided services below cost or FMV to its patients, this would not constitute remuneration to the ALF.**

The foregoing discussion about charges for MMS is somewhat academic because, as discussed, *ALFs do not purchase medications or pharmacy services for their residents.* LTCPs charge their patients or the patients' payors (not *ALFs*) for patient-specific services such as MMS and eMAR.[78] And, because ALFs are private-pay, even if the ALFs did front the fees, the cost would be passed on to the residents. Thus, any purported discounts on these services benefit only the patients who receive and pay for them, not the ALFs.[79] Accordingly, even if

---

[77] *Starks*, 157 F.3d at 842 (*quoting* Black's Law Dictionary at 775).
[78] SMF ¶ 2.
[79] SMF ¶ 25.

Relator could show that Guardian's charges for MMS and eMAR were below FMV (and he cannot), that would not confer a financial benefit to an ALF.

A scenario that Relator's experts paint as a kickback demonstrates the point. One ALF notified Guardian of resident complaints about pharmacy costs. Guardian sought to address the concerns directly with the residents, including potentially reducing *patients'* monthly fees from $10 to $5, as long as there was a critical mass of patients using Guardian (such that Guardian could maintain service levels at the reduced fee).[80] Relator engaged in this same pricing practice, and believes it was appropriate.[81] And indeed, it was.[82] Nevertheless, Relator's experts tried to cast this exchange as evidence that discounts were remuneration to the ALF to get referrals.[83] This argument ignores that the only beneficiaries of a reduced fee are the *patients*. The ALF gets no financial benefit from the reduction of a fee it does not pay.[84] Far from showing a kickback scheme, this scenario instead shows that Guardian viewed the *residents* as the ultimate decision-makers and sought to address *their* concerns, rather than offer remuneration to the ALF.

---

[80] SMF ¶ 25.

[81] *Id*.

[82] Relator offered no testimony that Guardian's proposed, discounted fee in this instance was below FMV or below cost, nor any evidence that this discounted fee was ever even adopted at that facility.

[83] SMF ¶ 25.

[84] *Id*.

### iii. The education classes and skills checks were at FMV and constituted neither remuneration nor inducement.

Since about 2013, Guardian has offered training to ALF employees who administer the medications Guardian dispenses.[85] Guardian typically charges ALFs $50 per employee per day of classes, which are open to multiple ALFs.[86] Before Guardian had its own training space (built in 2017), it gave some pricing allowances for employees of "host communities"—that is, the ALFs that provided space, refreshments, and other amenities to attendees.[87] Most of the trainees were not employees of the host community.[88] Before 2018, Guardian also offered "try-before-you-buy" allowances to employees from ALFs that were new to Guardian or newly converted from PCHs to ALCs.[89]

These narrow allowances cannot be considered in isolation, ignoring what Guardian received in exchange. Relator offers no evidence these allowances were commercially unreasonable or below FMV in the full context of Guardian's broader charging practices. Adding a few extra seats to an existing class did not cost Guardian anything.[90] Moreover, the amount Guardian saved by using a host

---

[85] SMF ¶ 27.

[86] *Id.*

[87] SMF ¶ 28.

[88] *Id.*

[89] SMF ¶ 29.

[90] SMF ¶ 34.

21

community far exceeded any revenue it would have received by charging for the host community attendees.[91] Similarly, try-before-you-buy allowances gave Guardian free advertising for classes that are profitable for Guardian and that would soon be provided in significant quantity at standard rates.[92] As Relator testified, staff turnover drove high demand for classes: "you train ten and then five would quit. You train ten more and three would quit."[93] Asked about any personal concerns over these allowances or the way they were communicated, Relator asked, "what would there be to complain about?"[94]

Furthermore, there is no evidence that these allowances were offered to any ALF in exchange for referrals or preferred pharmacy status. Multiple ALF representatives testified that they were not.[95] The allowances were not targeted to specific ALFs, but rather communicated in blast emails to all ALFs that had an *existing* relationship with Guardian.[96] Thus, these limited allowances were not and could not have been an inducement to obtain preferred pharmacy status.

---

[91] SMF ¶ 35.

[92] SMF ¶ 36.

[93] *Id*.

[94] SMF ¶ 31. Relator indicated that his concern was not with the allowances, but that he thought that Guardian was not charging *anyone* for the classes. (*Id*.) However, the evidence is clear that Guardian did charge for these classes.

[95] SMF ¶ 33.

[96] SMF ¶ 30.

Because Relator has not established that Guardian's pricing allowances for classes were commercially unreasonable, below fair market value, or below cost, he has not shown that these allowances constituted remuneration.[97] Nor has he shown they gave Guardian any unfair competitive advantage or were offered as inducements for referrals.

### b.   Guardian did not give remuneration to induce referrals.

Relator maintains that Guardian committed a felony if "one purpose" of providing the services at issue was to convince ALFs to select it as the preferred pharmacy.[98] Yet healthcare providers do not commit felonies by simply promising to deliver services that they are supposed to provide. "[T]he mere hope or expectation of future referrals may not make an otherwise legitimate business relationship illegal under the [AKS]."[99] Preferred pharmacy arrangements are not *ipso facto* improper.[100] To the contrary, they are beneficial and encouraged by

---

[97]  *Bingham*, 783 App'x at 874 (giving "physicians tenants restricted use waivers" not remuneration without "evidence that the use waivers were anything other than a standard exercise of discretion under the relevant leases or that HCA was required to ask for something in exchange for the use waivers"); *U.S. ex rel. Ruscher v. Omnicare, Inc.*, 663 Fed. App'x 368, 374-75 (2016) (debt forgiveness not an inducement in absence of "evidence that they were designed to induce referrals"); *Klaczak*, 458 F. Supp. 2d at 678-80.

[98]  FAC ¶¶ 19, 25, 326.

[99]  *U.S. ex rel. Williams v. Health Mgmt. Assocs., Inc.*, No. 3:09-CV-130 CDL, 2014 WL 2866250, at *11 (M.D. Ga. June 24, 2014); *Ruscher*, 663 Fed. App'x at 374-75.

[100]  SMF ¶ 4; *Ruscher*, 663 Fed. App'x at 371 (granting summary judgment where "Omnicare and SNFs routinely entered into preferred provider agreements").

CMS.[101] LTCPs are free to compete to become a preferred pharmacy on the basis of service, and ALFs are free to prefer the pharmacy that it believes offers the best services for the safety of their residents.[102] Guardian's practices reflect this view.

As its name suggests, the Anti-Kickback Statute prohibits kickbacks, bribes, or the like. The AKS is not designed to "imped[e] legitimate and beneficial activities."[103] "Offering or receiving discounts in order to compete for business does not alone mean that the entity `knowingly and willfully' induced or arranged for referrals."[104] Thus, to avoid summary judgment, Relator bears the burden of presenting evidence that "tends to meaningfully exclude a legitimate (or negligent) explanation for [Guardian's] conduct—consistent with the heightened scienter requirement imposed by a `knowing and willfully' standard."[105] Not only is there no such evidence here, but the record affirmatively demonstrates several legitimate (and obvious) reasons for Guardian's practices:

- MMS is required by Guardian's Medicare contracts and expected by Part D

---

[101] SMF ¶ 4.

[102] SMF ¶¶ 3-4, 6.

[103] Medicare and Medicaid Programs: Fraud and Abuse OIG Anti-Kickback Provisions, 54 Fed. Reg. 308801, 3089, 3093 (Jan. 23, 1989); *see also U.S. v. Shaw,* 106 F. Supp. 2d 103, 115 (D. Mass. 2000) ("By allowing for suppliers and providers of health care service and goods to compete with one another in limited forms, the statute strikes a balance: on the one hand, it provides for some of the benefits of a market economy by encouraging limited forms of price competition . . ..").

[104] *Shaw,* 106 F. Supp. 2d at 120.

[105] *Klaczak,* 458 F. Supp. 2d at 677.

sponsors, in part because it reduces healthcare costs.[106]

- The AKS does not prohibit pharmacies from including services that make the drugs they sell safer. Longstanding "OIG guidance provides that 'support services' a [defendant] offers 'in connection with the sale of its own products' . . . do not, on their own, 'implicate the [AKS].'"[107] MMS and eMAR are precisely such "support services." Even if these services might also incidentally "reliev[e] the Community Homes of [an] administrative burden" (and, as discussed, the services at issue here do not), they are nonetheless integrally related to the pharmacy's own services and not subject to AKS enforcement.[108]

- Guardian's LTCP competitors all provide MMS and offer eMAR services to their ALF patients at no charge to the ALFs.[109]

As to staff education and training, the host community allowances saved Guardian the cost of renting space, and the try-before-you-buy allowances were low-cost marketing for future paid classes that were profitable to Guardian.[110] As with the eMAR services, the classes generated a stand-alone profit, independent of any revenues Guardian derived from dispensing prescription drugs.[111]

Against these legitimate reasons for Guardian's practices, there is no

---

[106] SMF ¶¶ 11-13.

[107] *Suarez*, 2019 WL 4749967, *3, *8 (*quoting* OIG May 2003 Notice, 68 Fed. Reg. 23731-01, 2003 WL 2010428, at *23735; *citing Forney*, 2017 WL 2653568, at *4 (providing technical support with a pharmaceutical product "might induce physicians to purchase [defendant's] products, but only because they are better-supported products than competing products")).

[108] *See* AO 12-19, 2012 WL 7148095, at *8.

[109] *See* SMF ¶ 7.

[110] SMF ¶¶ 35-36.

[111] *Id.*

evidence that "tends to meaningfully exclude a legitimate (or negligent) explanation for [Guardian's] conduct."[112] For example, there is no testimony from any ALF representatives, Guardian competitors, or current or former Guardian employees that Guardian's practices were unusual or offered Guardian an unfair competitive advantage, or that they were offered as a *quid pro quo*. To the contrary, the evidence uniformly shows that Guardian's practices were ubiquitous in the industry.[113] In fact, they were materially identical to Relator's own practices, and ALFs that transitioned from Collier's to Guardian testified that they were not offered or given any services other than what Collier's had already been providing.[114] Accordingly, Relator has not met his burden to convert Guardian's legitimate and industry-standard practices into improper inducements.

### c. There is no evidence that Guardian knowingly and willfully violated the AKS or knowingly violated the FCA.

To establish his FCA claim, Relator must meet the scienter standards of both the AKS and the FCA. To establish an AKS violation, he must prove that Guardian paid remuneration "with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law."[115] Likewise, the

---

[112] *Klaczak,* 458 F. Supp. 2d at 677.
[113] SMF ¶¶ 7, 10, 16, 32.
[114] SMF ¶ 17.
[115] *Vernon*, 723 F.3d at 1256 (internal quotation marks and citation omitted).

FCA "does not assess liability through ambush."[116] Courts "are tasked with 'strict enforcement' of the FCA's 'rigorous' scienter requirement."[117] Every circuit to have considered the issue has applied the Supreme Court's "two-step analysis for reckless disregard" to the FCA's scienter requirement, "first asking whether defendant's interpretation was objectively reasonable and then determining whether authoritative guidance might have warned defendant away from that reading."[118] Summary judgment is appropriate because Guardian's practices were objectively reasonable and not contrary to available guidance.[119] Indeed, the Eleventh Circuit recently applied *Safeco* in affirming dismissal at the *pleading* stage for failure to adequately allege scienter where the defendant's actions were based

---

[116] *U.S. ex rel. Sheldon v. Allergan Sales, LLC*, 24 F.4th 340, 356 (4th Cir. 2022).

[117] *Id.* at 347 (*quoting Escobar*, 136 S. Ct. at 2002).

[118] *Id.* (*citing Safeco Ins.* Co. v. *Burr*, 551 U.S. 47, 69–70 (2007)); *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281 (D.C. Cir. 2015) (overturning jury verdict because "the government has not pointed to sufficient record evidence that there was 'guidance from the court of appeals' or relevant agency 'that might have warned [MWI] away from the view it took") (*quoting Safeco*, 551 U.S. at 70).

[119] *See Klackzak*, 458 F. Supp. 2d at 680-81  (granting summary judgment for where relator's scienter evidence was insufficient to raise a triable inference of unlawful intent); *Ruscher*, 2015 WL 5178074, at *13-24 (granting summary judgment where the evidence was insufficient to raise a genuine question of material fact as to the intent to support an AKS violation); *U.S. ex rel. K&R Ltd. P'Ship v. Mass. Housing Fin. Agency*, 456 F. Supp. 2d 46, 61-62 (D.D.C. 2006) (granting summary judgment where plaintiff failed to present sufficient evidence of knowledge or intent*); U.S. ex rel. McDonough v. Symphony Diagnostic Servs., Inc.* 36 F. Supp. 3d 773, 781 (S.D. Ohio 2014) (granting summary judgment where relator's string of inferences as to intent to induce referrals was too strained).

on an objectively reasonable (even if potentially erroneous) understanding of its

Medicare obligations.[120]

### i. Guardian's belief that its industry-standard practices did not violate the AKS was objectively reasonable.

Guardian's MMS is: (i) integrally related to providing medications to its

patients,[121] (ii) industry standard,[122] and (iii) materially indistinguishable from

Relator's own practices.[123] OIG has indicated that, in arrangements between

LTCPs and ALFs, the only AKS concern that may be implicated is unfair

competition,[124] and as already discussed, there is no unfair competition here.[125]

Thus, it was objectively reasonable for Guardian to conclude that these industry-

standard practices are not illegal remuneration. Relator (or his counsel) may

disagree with Guardian's view (as well as Relator's own past practices) now that

he sees the mirage of a payday on the horizon. But a view that is shared by

Guardian's peers and supported by OIG guidance—with no evidence of any

dissenting view—is objectively reasonable. Guardian's employees had no reason

to suspect they were committing a felony that the Eleventh Circuit said covers only

---

[120] *Olhausen*, 2022 WL 1203023, at *2 (*citing Safeco*, 551 U.S. at 70, n.20).

[121] SMF ¶ 12.

[122] SMF ¶ 16.

[123] SMF ¶ 17.

[124] AO 12-19, 2012 WL 7148095, at * 7.

[125] SMF ¶ 16.

inherently immoral conduct[126] merely by providing MMS and eMAR services to its patients on the same terms that other LTCPs do. After all, these are not cash bonuses, all-inclusive trips, or Disney passes. Penalizing this conduct only serves to increase costs to ALF residents and make their medications less safe.

As for the training allowances, Guardian's prices, even taking into account the "host community" and try-before-you-buy allowances, more than covered its costs.[127] This supports Guardian's belief, which Relator has not contradicted with any expert testimony, that its overall charges reflected FMV and its allowances reflected legitimate marketing efforts for future paid classes. Even Relator testified there was nothing wrong with these allowances. A defendant who reasonably believed that a transaction was at FMV for legitimate items or services cannot be found to have "willfully" violated the law.[128]

Moreover, the services and pricing here were memorialized in written contracts and invoices and publicized in blast emails.[129] The fact that Guardian made no effort to hide its conduct strongly supports that it was not acting with knowledge that these services were illegal (because they were not). Such

---

[126] *Starks*, 157 F.3d at 838, n.7.
[127] SMF ¶¶ 35-36.
[128] *See U.S. ex rel. Barker v. Tidwell,* No. 4:12-CV-108, 2015 WL 3505554, at *4 (M.D. Ga. June 3, 2015).
[129] SMF ¶¶ 12, 30.

transparency belies any inference of illegal intent.

> ### ii. Relator has not presented authoritative guidance warning Guardian away from its objectively reasonable conclusion.

Relator must show that authoritative guidance contradicts Guardian's objectively reasonable view. As the Fourth Circuit explained:

> It is profoundly troubling to impose such massive liability on individuals or companies without any proper notice as to what is required. *Safeco* avoids this trouble by making the government 'provide a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents.' [cit.] Rightly so. As the Supreme Court has made clear, 'concerns about fair notice and open-ended liability can be effectively addressed through strict enforcement' of the FCA's 'rigorous' scienter requirement. [cit.][130]

"To function as a warning, authoritative guidance requires both the right source and sufficient specificity. When it comes to source, either circuit court precedent or guidance from the relevant agency is required."[131] "It does not suffice for agency guidance merely to be related to the question at hand; instead, 'authoritative guidance must have a high level of specificity to control an issue.'"[132]

The parties have identified only one guidance document—OIG Advisory Opinion 12-19—that addresses arrangements between LTCPs and congregate residential homes, but Relator disregards that guidance and instead points to (1)

---

[130] *Sheldon*, 24 F.4th at 350-51.

[131] *Id.* at 353.

[132] *Id.* (quoting *U.S. ex rel. Schutte v. Supervalu Inc.*, 9 F.4th 455, 471 (7th Cir. 2021)).

various OIG materials regarding SNFs and (2) a 2009 settlement between an LTCP serving SNFs (Omnicare) and the Government.[133] None of this comes close to the threshold of "authoritative guidance" in the context of ALF residents, in large part because these materials apply to SNFs—not ALFs. CMS describes ALFs as a "distinct pharmacy setting,"[134] and this Court has likewise recognized that ALFs are different from SNFs.[135]

The *OIG Supplemental Compliance Program Guidance for Nursing Facilities* identifies warning areas for SNFs.[136] It expressly states that "[i]dentifying a particular practice or activity in this section *is not intended to imply that the practice or activity is necessarily illegal in all circumstances* or that it may not have a valid or lawful purpose."[137] It identifies four risk factors that SNFs should consider to determine whether a practice or activity carries a risk of violating the AKS.[138] There is no allegation in the FAC, and no evidence in the record, that Guardian's practices implicated *any* of the AKS risk factors identified in the Guidance. Indeed,

---

[133] SMF ¶¶ 37-41.

[134] SMF ¶ 13.

[135] Opinion and Order, Dkt. 63 at 44 (declaring the 2008 OIG Guidance as "not factually synonymous because it concerned **nursing homes**, which differ greatly from the ALCs and PCHs at issue here").)

[136] 73 Fed. Reg. 56832-02 (Sept. 30, 2008).

[137] *Id.* at 56835-36 (emphasis added).

[138] *Id.* at 56836.

Relator's own experts were specifically asked about each risk factor and could not point to any of them as being implicated by Guardian's practices.[139]

These risk factors are absent due to the inherent differences between SNFs and ALFs, as recognized in OIG Advisory Opinion 12-19, which addressed whether pharmacy-community home arrangements "present[] a risk of any of the harms typically associated with kickbacks—namely, distorted medical decision making, overutilization, increased Federal health care program costs, and unfair competition."[140] The OIG concluded that these AKS risks are *not* present in the community home context, with the exception of unfair competition.[141] The ALFs here are, in all material respects, identical to community homes, as Relator's expert conceded.[142] They are not healthcare facilities. They do not purchase drugs. They cannot prescribe, influence, or control the prescription of, any medication. They do not control or influence the decisions of the resident's physicians. They do not have medical directors. And they do not set drug formularies or otherwise limit the drugs that doctors can prescribe.[143]

Further, ALFs do not receive federal healthcare program reimbursement. A

---

[139] SMF ¶ 37.

[140] AO 12-19, 2012 WL 7148095, at *6.

[141] *Id.* at *7.

[142] SMF ¶ 43.

[143] *Id.*

SNF, on the other hand, is reimbursed in its Medicare Part A rate for purchasing drugs from a pharmacy and providing (or engaging a pharmacy to provide) MMS.[144] Thus, in *SNFs,* a pharmacy's provision of free MMS would allow the facility to "obtain payouts from government health care programs for services that they did not provide."[145] That is not the case here.

The 2009 Omnicare settlement that Relator's expert cites as putting Guardian on notice[146] had nothing to do with pharmacy services in ALFs, and it merely highlights the AKS risks in *SNF*-LTCP arrangements that are not present in *ALFs.* Omnicare allegedly took kickbacks from drug manufacturers to push Risperdal on SNF patients and then used its trusted role as the SNF's pharmacy consultant to influence the Risperdal prescriptions.[147] The DOJ noted that Omnicare's gross abuse of its consultant role could "undermine the medical judgments of health care professionals, lead to patients being prescribed medications they do not need, and drive up the costs of health care."[148] As Relator's own experts conceded, these concerns are *not* implicated here.[149]

---

[144] SMF ¶ 42.

[145] *Suarez,* 2019 WL 4749967, at *9.

[146] SMF ¶ 41.

[147] *Id*.

[148] *Id*.

[149] *Id*.

33

Relator's AKS expert also conceded that she was not aware of *any* DOJ prosecutions that solely involved an LTCP providing "free" MMS to its own Part D patients to even a SNF, let alone an ALF.[150]

Relator's AKS expert testified that the materials she cited in her report were the best she could find.[151] Yet, there are substantial differences between those materials and this case, which she acknowledged.[152] In fact, Relator was not convinced by any of those same materials when he was running his own LTCP and not working as a litigant. Instead, he testified that he believed there was no need to charge patients in ALFs for MMS until he saw guidance that specifically mentioned "other *facilities*," but neither he nor his counsel nor his expert has ever identified any such guidance.[153] Given that Relator (and his experts) are still—after four years of litigation—unable to locate guidance applicable to *ALFs*, a reasonable jury could hardly fault Guardian for being unaware of any such guidance (and to be clear, Guardian does not believe this phantom guidance exists).

Indeed, to date—years after Relator's allegations were first presented to the Government—whether the Government agrees, disagrees, or has formed no

---

[150] *Id.*
[151] SMF ¶ 44.
[152] SMF ¶ 41.
[153] SMF ¶ 44.

opinion on the Relator's novel application of the AKS to ALF-LTCP arrangements remains a mystery. Relator did not take, or attempt to take, any discovery from CMS, or any PBM or Part D Plan sponsor, or any other entity to determine whether they viewed Guardian's practices as illegal. In contrast, Guardian presented its interpretation—that the Medicare Part D contracts require MMS—to both CMS and PBMs.[154] After walking through the PBM contracts in some detail in correspondence with CMS, Guardian observed that it "finds itself in the Kafkaesque situation of being sued in the name of the United States government for providing services to Medicare Part D Plan enrollees that are mandated in contracts with Part D sponsors and PBMs and for which Guardian is paid a premium dispensing fee."[155] Nevertheless, CMS declined to comment, quoting 45 C.F.R. § 2.1(b), which provides that "[t]he availability of Department employees to testify in litigation not involving federal parties is governed by the Department's policy to maintain strict impartiality with respect to private litigants and to minimize the disruption of official duties."[156] Notably, neither CMS nor the Part D Plans has suggested or directed that Guardian change its practices.[157]

---

[154] SMF ¶ 14.

[155] *Id.*

[156] *Id.*

[157] *Id.*

As the Fourth Circuit explained, there are reasons an agency may want to preserve regulatory ambiguity and flexibility. Nevertheless, regulated entities are entitled to clear rules before they can be saddled with crippling liability.[158] LTCPs and ALFs have interpreted the available guidance as allowing LTCPs to provide MMS to their patients at no charge to ALFs without running afoul of the AKS.[159] They have done so openly and in full view of the Government. Guardian has never denied that it does not charge ALFs for MMS or eMAR services or that it provided commercially reasonable allowances for medication administration training before 2018.[160]

If the Government wants to remove ambiguity and change practices in the industry, it should do so prospectively, ideally with advance notice and opportunity for comment. For now, it is enough that none of the materials cited by Relator warned Guardian from its objectively reasonable view—shared by its peers (and, in many respects, Relator himself)—that its practices were legitimate.

Relator, his experts, and his counsel proffer their own abstract views about how ALF-LTCP arrangements should work. But they have not identified a single example of any LTCP that charges ALFs for MMS (unless specifically requested

---

[158] *Sheldon*, 24 F.4th at 356.
[159] SMF ¶ 45.
[160] *See generally* Answer, Dkt. 64.

by the ALF) or for laptops dedicated to eMAR use. Relator's testimony was also contrary to those abstract views—he stated that LTCPs must charge its patients (rather than the ALF) for MMS, that LTCPs need not impose a specifically labeled MMS fee if they are already charging some other fee, and that LTCPs need not charge ALFs for laptops dedicated to eMAR use.[161]

Guardian reasonably believed, and acted consistently with its belief, that its practices fulfilled obligations it owed as an LTCP, were at FMV, were consistent with existing agency guidance, and therefore that its arrangements with ALFs complied with the AKS. In the absence of authoritative guidance that the industry-standard practices in which Guardian engaged are prohibited by the AKS, Guardian could not have acted with the knowledge that these practices were unlawful. Further, because Guardian did not knowingly and willfully violate the AKS, it could not have knowingly violated the FCA when it submitted claims for the drugs and services that it provided pursuant to physician prescriptions.

> 2.   ***Guardian did not submit any claims including any items or services resulting from an AKS violation.***

As this Court previously held:

> [A] relator must identify "a claim that includes items and services ***resulting from*** a violation of [the AKS] [which] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g) (emphasis added). Recent cases have required a relator to show

---

[161] SMF ¶ 9.

"causation, or some 'link' between the payment of remuneration and the submission of false claims" to "establish FCA liability based on an AKS violation."[162]

Relator has not shown a sufficient nexus between any alleged AKS violation and any claims submitted by Guardian. To survive summary judgment, Relator must adduce evidence that an ALF's judgment was compromised and that it referred residents as a result of the inducement.[163] Even if Guardian's eMAR, MMS, and trainings violated the AKS (they did not), there is no evidence that any ALF chose Guardian as its preferred pharmacy because of them. To the contrary, the ALFs testified that these practices played no role in their selection of Guardian as their preferred pharmacy.[164] Guardian's eMAR and MMS practices were far from unique and could not have caused any ALF to select Guardian over any other LTCP.[165] And the ALF representatives only learned at their depositions of the

---

[162] Dkt. 63 at 38 (*quoting U.S. ex rel. Wallace v. Exactech, Inc.*, Case No. 2:18-cv-01010-LSC, 2020 WL 4500493, at *19 (N.D. Ala. Aug. 5, 2020)).

[163] *U.S. ex rel. Cairns v. D.S. Medical, LLC*, -- F.4th --, 2022 WL 2930946, *5 (8th Cir. July 26, 2022) (the "resulting from" language requires a causal link between the AKS violation and a claim for items or services and "[c]ausation is an 'essential element[]' that must be proven, not presumed"); *Osheroff*, 2012 WL 2871264, at *8 ("Since no facts suggest that any physician-tenants were induced by their rent to make referrals based on continued remuneration rather than concern for the health and well-being of each physician's patient, the Court has no basis upon which to reasonably infer that any alleged remuneration clouded the independent judgment of any physician-tenant.").

[164] SMF ¶ 17.

[165] SMF ¶¶ 10, 16.

training allowances, did not know if they received any allowances, and testified that these allowances played no role in their decision.[166] Indeed, most of the ALFs at issue joined Guardian as a result of its acquisition of Relator's pharmacy.[167] Those ALFs testified they simply wanted to maintain the *status quo* and that Guardian did not offer them anything beyond what they were already receiving from Collier's.[168] As Relator testified, the ALFs formerly served by Collier's viewed Guardian as simply stepping into Collier's shoes, and Relator—*not* Guardian—persuaded them to follow him to Guardian.[169]

Relator has no evidence that any ALF selected Guardian as a preferred pharmacy or convinced any resident to choose Guardian because of any kickback. And, in fact, the testimony from the ALF representatives whom Relator chose to depose was entirely to the contrary.[170] Without causation, Relator cannot tie any alleged kickback to any claims submitted by Guardian for any items or services.

## III.  <u>CONCLUSION</u>

For the foregoing reasons, Guardian respectfully requests that its motion for

---

[166] SMF ¶ 33. Of course, this is not surprising since the allowances were only announced in blast emails that went out to ALFs that already had a relationship with Guardian. SMF ¶ 30.

[167] SMF ¶ 17.

[168] *Id.*

[169] *Id.*

[170] *Id.*

summary judgment as to each of Relator's claims be granted.

Respectfully submitted this 9th day of September, 2022.

ARNALL GOLDEN GREGORY LLP

 /s/ Glenn P. Hendrix
Glenn P. Hendrix, Esq.
Georgia Bar No. 346590
glenn.hendrix@agg.com
W. Jerad Rissler, Esq.
Georgia Bar No. 142024
jerad.rissler@agg.com
David L. Hobson, Esq.
Georgia Bar No. 358425
david.hobson@agg.com

171 17th Street, Suite 2100
Atlanta, Georgia 30363-1031
404.873.8500

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this pleading was prepared using Book

Antiqua 13-point font in accordance with Local Rule 5.1(C).

*/s/  Glenn P. Hendrix*
Glenn P. Hendrix
Georgia Bar No. 346590

This 9th day of September, 2022.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 9, 2022, I electronically filed the foregoing

**DEFENDANT'S BRIEF IN SUPPORT OF MOTION SUMMARY JUDGMENT**

with the Clerk of Court using the CM/ECF system which will automatically send

email notification of such filing to all Counsel of Record.


<u>*/s/  Glenn P. Hendrix*</u>
Glenn P. Hendrix
Georgia Bar No. 346590

ARNALL GOLDEN GREGORY LLP

171 17th Street NW
Suite 2100
Atlanta, Georgia 30363-1031
Telephone: 404.873.8500
Facsimile: 404.873.8501

42