IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA, *ex rel.*
HENRY B. HELLER,

   *Plaintiff,*

v.

GUARDIAN PHARMACY OF
ATLANTA, LLC,

   *Defendant.*

Civil Action File No.:

1:18-cv-03728-SDG

**DEFENDANT GUARDIAN PHARMACY OF ATLANTA LLC'S
OPPOSITION TO RELATOR'S MOTION FOR PARTIAL
<u>SUMMARY JUDGMENT ON COUNT I OF THE AMENDED COMPLAINT</u>**

1

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................. 1

II.    ARGUMENT AND CITATION OF AUTHORITY .............................. 7

    A.     Relator Has Not Shown That Guardian Gave ALFs
         Remuneration.......................................................................... 7

         1.     Guardian's Practices Simply Reflect What LTCPs Are
             Paid to Do, and They Are Not Remuneration ................ 7

             a.     MMS that LTCPs Provide to Their Own Patients
                 Is Not Remuneration.................................................. 8

             b.     The Licensure Obligations of ALCs Do Not
                 Transform LTCP Services into a Kickback .......... 13

             c.     Medication Carts Are Not Remuneration .......... 15

             d.     EMAR Laptops Are Not Remuneration ............. 16

             e.     Guardian's Training Allowances and Skills
                 Checks Were Not Remuneration. ......................... 17

         2.     Relator's Failure to Prove FMV Is Fatal to His Claims . 18

    B.     Relator Has Not Shown Inducement Under the AKS............. 20

         1.     Relator's version of the "one-purpose" rule is not
             supported by the case law.................................................. 20

         2.     Relator misstates record evidence to cast standard ALF-
             LTCP practices as evidence of kickbacks....................... 23

    C.     Relator Has No Evidence to Show That Guardian Knowingly
         and Willfully Violated the AKS or Knowingly Violated the
          FCA. ...................................................................................... 28

    D.     Relator Has Not Shown Claims Resulting from an AKS
         Violation............................................................................... 35

    E.     Relator Has Not Shown Government Loss. .............................. 38

III.   CONCLUSION ..................................................................................... 39

## I.     __INTRODUCTION__

This anti-kickback case is based on a long-term care pharmacy ("LTCP")

providing drugs and integrally related services to its own patients. The pharmacy

is reimbursed by the Medicare Part D program for the drugs, packaging, delivery,

medication management services ("MMS"), and other integrally related pharmacy

services that LTCPs are required to provide for their patients. Relator argues that

the MMS is "remuneration" because it has value to the assisted living facilities

("ALFs") in which the LTCP's patients live, and the ALFs do not pay for it. Yet

packaging and delivering drugs to the ALF also benefits the ALF, and ALFs do not

pay for those services either. Relator apparently recognizes the absurdity of

treating packaging and delivery as kickbacks, but MMS is no different. As shown

in Guardian's Brief in Support of Its Motion for Summary Judgment (which is

incorporated by reference herein),[1] MMS is a core LTCP service that Medicare pays

for through a dispensing fee, just like delivery and packaging. Relator has

admitted in a deposition that he had no understanding of dispensing fees,[2] and

Relator's brief reflects no understanding what LTCPs actually do or are supposed

to do in exchange for Part D reimbursement. This may explain why his claims

---

[1] Dkt. 154-1 ("Guardian's MSJ Brief").
[2] Guardian's Statement of Material Facts ("SMF"), Dkt. 154-2, ¶ 24.

spring from such a flawed starting point, painting perfectly legitimate practices as illegal. That same flawed starting point results in Relator casting Guardian communications in a nefarious light, including, for example, that there is "no charge" to the ALF for the services at issue (services that Medicare is already paying for), or that the LTCP will not provide services for ALF residents who are not its patients.

Relator harps on Guardian's $20 MMS charge for ALF residents who are not Guardian patients and a fee that some ALFs charge to residents who use a retail pharmacy instead of an LTCP.[3] Retail pharmacies (like Walgreens or CVS) do not provide LTCP-level services, such as MMS, ALF-compliant packaging, delivery, or entering medications into an electronic medication administration record ("eMAR") system and thus do not receive LTCP-level dispensing fees. As a result, residents who use retail pharmacies (typically because the copayments are lower) must purchase those services separately. Guardian is not paid a dispensing fee to provide MMS (or any other services) to residents who are not its patients. Accordingly, Guardian charges for services it provides them—hence the $20 fee. If the ALF itself pays for a resident's MMS (or any other services), it passes the cost to the resident through fees. Relator identifies one such a fee, saying it "[p]enalized

---

[3] Dkt. 139-2, at 2, 11, 20, 22, 29.

residents or charged additional fees at certain Communities for using a pharmacy other than Guardian"[4] in order "[t]o guarantee residents would choose Guardian."[5] Yet the actual purpose was to "cover[] the time needed to manually enter medications into [the ALF's] electronic medication administration system" where the resident uses a retail pharmacy.[6] These fees have nothing to do with penalizing anyone or guaranteeing any referrals. They simply reflect the reality that MMS and other LTCP services that are covered by the higher Medicare dispensing fees paid to LTCPs are not covered by the lower fees paid to retail pharmacies, meaning residents who use retail pharmacies must pay for those services another way.

Relator misstates the testimony of employees of Guardian's corporate parent (Guardian Pharmacy, LLC) to assert that Guardian sought to "conceal" its MMS practices from its parent company, stating these "witnesses claimed no knowledge of the conduct and conceded it would violate the AKS."[7] Here, Relator melds the testimony of two corporate employees and misrepresents both:

---

[4] Dkt. 139-2, at 2.
[5] Dkt. 139-2 at 20, 25.
[6] Guardian's Response to Relator's Statement of Material Facts ("Resp. SMF") ¶ 65; *see id.* (charging fee to cover "the manual entry it takes to enter orders into our software system") (punctuation omitted).
[7] Dkt. 139-2 at 27-28, 29-30.

3

- Daks Hamner, an accounting employee with no responsibility for clinical services[8] testified that he did not know *anything* about MMS, whether at Guardian or other pharmacies affiliated with Guardian Pharmacy, LLC, and he did not say *anything* about Guardian's MMS practices violating the AKS.[9]

- The other witness, Robert Weir, repeatedly differentiated between the Anti-Kickback Statute ("AKS") implications of charging ALFs and skilled nursing facilities ("SNFs") for MMS, and his testimony about charging for MMS related to *SNFs*, not ALFs.[10] Mr. Weir also testified that MMS in ALFs could be covered by the dispensing fee (or a fee paid directly by the patient).[11]

Neither witness testified that Guardian concealed its conduct or "conceded it would violate the AKS."

Relator's other efforts to fit legitimate pharmacy practices into an AKS framework also fail:

- Guardian placed laptops in ALFs exclusively for eMAR use, for which it charged a fee and made a profit. This is a common LTCP practice that Relator and others testified is AKS-compliant.[12]

- Guardian used training allowances to obtain space and advertising for its classes. The allowances were not offered in exchange for referrals or targeted to specific ALFs. Relator himself doubted these allowances violated the AKS, asking "what would there be to complain about?"[13]

---

[8] Resp. SMF ¶ 86.

[9] *Id.*

[10] *Id.* ¶ 82; *see id.* ("[W]e have to charge for consulting services in skilled nursing facilities because they are paid by Medicare because the OIG has provided compliance guidance. . . . Very different from ALF.")

[11] *Id.*

[12] SMF ¶¶ 8-10.

[13] SMF ¶ 31.

4

- Guardian provided MMS for its patients without charge to the ALF regardless of the number of patients in the ALF.[14] It encouraged ALFs to ensure that other pharmacies were similarly taking care of *their* patients (and not shifting that responsibility to Guardian).[15] It also avoided changes that would make its patients outliers in the ALF (*e.g.*, converting to "strip" packaging for Guardian patients when most residents were on "card" packaging, or to an *electronic* MAR system when most residents were on *paper* MARs), thereby confusing the (typically minimum wage) medication aide administering the drugs and causing medication errors.[16] Relator seizes on emails reflecting these legitimate concerns to create the false impression that Guardian withheld services as leverage for referrals. It did not.

While Relator vilifies preferred pharmacy arrangements, they benefit patients and are encouraged by the Centers for Medicare and Medicaid Services ("CMS").[17] The LTCP model depends on a critical mass of patients. While ALF residents may pick up drugs from a retail pharmacy, an LTCP must deliver them and provide services onsite at the ALF, sometimes at great distances from the pharmacy. And from the ALF's perspective, having multiple pharmacies using different delivery, packaging, and medication administration record ("MAR") systems increases medication errors.

Relator also seeks to introduce an entirely new claim, arguing for the first time that placing medication carts in ALFs violated the AKS. As further explained

---

[14] Resp. SMF ¶ 72.

[15] *Id.* ¶ 74.

[16] *Id.* ¶ 73.

[17] SMF ¶ 4.

in Guardian's Brief in Support of Motion to Exclude Relator's New Medication Cart Allegation, Relator has never pled this claim, and it is too late to raise it now. And even if this claim were considered, it lacks merit. Medication carts are integral to pharmacy services and MMS.[18] Placing them in ALFs without an additional charge is standard LTCP practice, and even Relator testified there is nothing improper about it.[19]

Relator characterizes Guardian's practices as "brazen." They were indeed brazen because Guardian had nothing to hide. Though these practices have been commonplace for decades, Relator offers no government guidance indicating that they violate the AKS. "Relators get little mileage—in terms of showing evidence of any putative knowing and willful violation"—out of "preferred-provider agreements" that are "the norm in the industry."[20]

Relator describes this case as presenting a "textbook kickback scheme."[21] Yet, the ALF-LTCP arrangements Relator challenges are ubiquitous and known to the Government and an untold number of potential whistleblowers. Relator is the first to call them kickbacks. None of the traditional AKS harms are implicated here.

---

[18] Resp. SMF ¶ 4.

[19] *Id.*

[20] *Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 683 (N.D. Ill. 2006); *see also U.S. ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 371 (5th Cir. 2016).

[21] Dkt. 139-2 at 10.

No one profits improperly. Far from offering corrupt payments, bribes, or side deals to gain referrals, Guardian simply promised to do what LTCPs are supposed to do. Its practices did not set it apart from other LTCPs, much less afford any unfair competitive advantage. Relator's novel theory is the opposite of a "textbook kickback scheme," and Relator's brief contains not a single case finding an AKS violation on remotely similar facts.

Finally, while a court may grant summary judgment to an AKS *defendant* based on insufficient evidence of scienter, granting summary judgment to a relator on scienter would be unprecedented. Relator's motion must be denied on this ground alone.

In short, Relator is not entitled to summary judgment. Guardian is.

## II.     ARGUMENT AND CITATION OF AUTHORITY

### A.     Relator Has Not Shown That Guardian Gave ALFs Remuneration.

As discussed in Guardian's MSJ Brief, Relator has not established remuneration because the services at issue are integrally related to medications that Guardian dispenses to its patients and were not provided below FMV.[22]

#### 1.     Guardian's Practices Simply Reflect What LTCPs Are Paid to Do, and They Are Not Remuneration

To establish the services that Guardian provides as "remuneration" to the

---

[22] Guardian's MSJ Brief at 6-23.

ALFs, Relator must show that Guardian "was required to ask for something [from the ALFs] in exchange for" them.[23] Relator asserts that ALFs received value from Guardian because they otherwise would have had to pay for goods and services that Guardian supplies. Yet Relator cites no evidence that ALFs would have paid for the services at issue had they chosen another LTCP. And he ignores evidence to the contrary.[24] Further, ALFs paid Guardian for training, and Relator has not shown that the aggregate amounts paid for that service were below FMV.[25]

### a.    MMS that LTCPs Provide to Their Own Patients Is Not Remuneration

MMS is the LTCP's responsibility to its patients, and—as Relator acknowledged in response to a request to admit—LTCPs should look solely to their patients or their payors, not ALFs, for payment.[26] The services covered by the Medicare dispensing fee lie at the heart of this dispute. Yet Relator dismisses them in a footnote as a "red herring."[27] His only argument on this point is that "Medicare regulations unequivocally state that dispensing fees cover only a pharmacy's costs to prepare and deliver a prescription . . . and the pharmacist must do a 'drug

---

[23] *Bingham v. HCA, Inc.*, 783 F. App'x 868, 874 (11th Cir. 2019).
[24] SMF ¶¶ 9, 16-18, 20, 22, 32; Resp. SMF ¶ 4.
[25] SMF ¶¶ 27, 35-36.
[26] Resp. SMF ¶ 3; Dkt. 154-1 at 10-19; SMF ¶¶ 11-12, 16, 18, 22.
[27] Dkt. 139-2 at 35, n.16.

utilization review' concurrently with filling the prescription."[28] Relator does not explain this statement, but apparently argues that only the one-and-done drug utilization review ("DUR") occurring at the time the prescription is filled, but not the DUR that subsequently occurs during quarterly medication reviews, is covered by the dispensing fee.[29]

Relator's position on the dispensing fee is not supported by the CMS regulations he cites. The definition of "dispensing fees" broadly includes

> pharmacy costs *associated with* ensuring that possession of the *appropriate* covered Part D drug is transferred to a *Part D enrollee*. Pharmacy costs *include*, but *are not limited to*, *any* reasonable costs *associated with* . . . performing quality assurance activities *consistent with* § 423.153(c)(2) . . . and salaries of *pharmacists* and *other pharmacy workers*. . . .[30]

MMS is a cost *associated with* ensuring that possession of the *appropriate* covered Part D drug is transferred to a *Part D enrollee* (that is, the individual ALF resident), and it is performed by "pharmacists and other pharmacy workers."[31]

CMS interpretive guidance that is relied upon by Part D Plan Sponsors and LTCPs confirms that MMS is included in the dispensing fee. CMS's *Prescription Drug Benefit Manual* includes "a summary of the costs that may be included in

---

[28] Dkt. 139-2 at 35, n.16 (citing 42 C.F.R. §§ 423.100, 423.153(c)(2)).

[29] DUR is another term for medication management. *See, e.g.*, Resp. SMF ¶ 3.

[30] 42 C.F.R. § 423.100, *Dispensing fees* (2) (emphasis added).

[31] *Id.*

dispensing fees" set by Part D sponsors.[32] These include all "[r]easonable pharmacy costs that are appropriate for the typical beneficiary *in that pharmacy setting.*"[33] A former PBM executive who negotiated LTCP contracts on behalf of Part D plans confirmed that the "quarterly reviews [*i.e.*, MMS] provided by Guardian are reasonable and appropriate for the typical beneficiary" in the ALF setting and that MMS is thus included in the dispensing fee.[34]

CMS has also issued direct guidance to Medicare Part D plans specifically addressing their contracts with LTCPs (the "CMS LTCP Guidance").[35] The CMS LTCP Guidance lists the minimum standard of practice for LTCPs, including:

> NLTCPs must provide services of a dispensing pharmacist to meet the requirements of pharmacy practice for dispensing prescription drugs to LTC residents, including but not limited to the performance of drug utilization review (DUR). In addition, the NLTCP pharmacist must conduct DUR to routinely screen for allergies and drug interactions, to identify potential adverse drug reactions, to identify inappropriate drug usage in the LTC population, and to promote cost effective therapy in the LTC setting.[36]

The first sentence refers to the one-and-done DUR performed by "a dispensing

---

[32] CMS, *Prescription Drug Benefit Manual*, Chap. 5, § 20.7.

[33] *Id.* (emphasis added).

[34] Resp. SMF ¶ 4.

[35] *Id.* (quoting CMS Long-Term Care Guidance (Mar. 16, 2005) ("CMS LTCP Guidance") at 1 (available at: https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/downloads/LTCGuidance.pdf).)

[36] CMS LTCP Guidance at 1.

pharmacist" when filling the prescription. The second sentence addresses "addition[al]" DUR that is performed by an "NLTCP pharmacist," which includes consultant pharmacists, not just (as in the first sentence) a "dispensing pharmacist."[37] The remaining language confirms that this DUR occurs after the drug is dispensed, referring to "routinely" screening for allergies and drug interactions, "identify[ing] potential adverse drug reactions," "identify[ing] inappropriate drug usage in the LTC population," and "promot[ing] cost effective therapy in the LTC setting," none of which can be fully done at the time of dispensing.[38] Other MMS that Relator claims to be kickbacks are also specifically listed in the CMS LTCP Guidance as covered by the dispensing fee, including "provid[ing] reports . . . necessary for the delivery of quality pharmacy care"—such as "monthly management reports to assist the LTC facility in managing orders [and] [MARs]"—and being "responsible for return for destruction and/or disposal of unused" drugs.[39] These service requirements appear verbatim in Guardian's Medicare Part D contracts.[40] And the CMS LTCP Guidance *expressly* states that they "would all be legitimate costs to reflect in the dispensing fee."[41]

---

[37] Resp. SMF ¶ 8.

[38] *Id.*

[39] CMS LTCP Guidance, at 2-3.

[40] SMF ¶ 12

[41] CMS LTCP Guidance at 3.

Relator's assertion that there is no genuine issue of material fact as to Guardian's obligations to its patients as an LTCP ignores all of this evidence, as well as the absence of any evidence supporting his proffered understanding of what dispensing fees cover.[42]

Relator asserts that "several communities paid Guardian for quarterly consulting services,"[43] apparently suggesting that these "several communities" set a norm by which Guardian should be judged. Yet the only support cited is testimony in which the deponent (Scott Holloway) explained that some of these ALFs "requested a *monthly* consulting whereas we normally do it quarterly,"[44] while others were paying for value-added hourly services,[45] and that "there are occasions when there's a quarterly visit and [Guardian] will invoice the community for the quarterly visit," but he had no information about what services

---

[42] Resp. SMF ¶ 8; CMS LTCP Guidance, at 3. Relator's expert, Gregory Kaupp, offered the opinion that MMS cannot be covered by the dispensing fee because it "does not cover activities beyond the point of sale." (Resp. SMF ¶ 8.) However, this opinion is contrary to the language of the regulation, CMS's guidance interpreting it, and Guardian's contracts. And, at deposition, Mr. Kaupp conceded that dispensing fees for LTCPs actually cover a whole host of services that *cannot* be provided until *after* the point of sale. (*Id.*)

[43] Dkt. 139-2 at 11 (citing Relator's SMF ¶ 14, which cites the Holloway testimony).

[44] Resp. SMF ¶ 14 (emphasis added).

[45] *Id.*

were performed on these "occasions."[46] These "occasions" do not overcome the

mountain of evidence that patients and their payors (not ALFs) pay for MMS.

> **b.  The Licensure Obligations of ALCs Do Not Transform LTCP Services into a Kickback**

Relator states that the MMS provided by Guardian is "critical" to ALCs[47]

because under Georgia law, they

> must 'secure' a licensed pharmacist to perform a quarterly medication review and then report any irregularities to the [ALC]; ensure proper disposal of drugs that are expired, discontinued, or in deteriorated condition; and establish or review policies and procedures for safe and effective drug therapy, distribution, use, and control.[48]

As discussed above and in Guardian's MSJ Brief, these are the same services Plan

Sponsors pay LTCPs to provide, and the requirement that ALCs "secure" these

services means only that ALCs must facilitate MMS, not that they must pay for it.[49]

It is no coincidence that Guardian's MMS lines up with the licensure

obligations of ALFs. Those obligations reflect the pharmacy needs of ALF

---

[46] *Id.*; *see also id.* (Ms. Newcomb describing these arrangements as an exception applying to a handful of ALFs).

[47] Assisted living communities ("ALC") are one type of ALF in Georgia. Personal care homes ("PCHs") are the other type.

[48] Dkt. 139-2 at 12.

[49] Dkt. 154-1 at 14-15 (citing Ga. Rules & Regs., 111-8-63-.26).

residents, and Part D plans contract with LTCPs to meet those needs.[50] Moreover, Lori Newcomb (Guardian's lead consultant pharmacist) served on the workgroup that assisted in drafting the ALC and PCH licensure regulations.[51] Not surprisingly, her concept of good MMS in the ALF context is embedded in both the ALF regulations and in Guardian's own practice.[52]

Furthermore, Relator acknowledges that until 2020, quarterly MMS was only required in ALCs, not PCHs.[53] Yet Guardian performed medication reviews in both on a quarterly basis. Indeed, Relator quotes an email by Ms. Newcomb stating: "**[Personal Care Homes] buildings get high quality consulting <u>for free every quarter</u>**, even though not required by rules."[54] As Ms. Newcomb testified, Guardian does this "because we still take care of our residents no matter what."[55]

Finally, Relator's position that required LTCP services become "kickbacks" when there is an overlapping ALF obligation leads to absurd results that even Relator does not advocate. For example, Georgia ALC regulations provide that

---

[50] This overlap does not render the safety protections in the ALC regulations superfluous. As discussed, Part D *allows* ALF residents to use LTCPs, but they may choose a retail pharmacy instead. While the ALC regulations require residents to have MMS, they are agnostic as to how MMS is obtained.

[51] Resp. SMF ¶ 24.

[52] *Id.*

[53] Dkt. 139-2 at 12.

[54] Dkt. 139-2 at 17, quoting Newcomb Dep., Ex. 32 (emphasis in original).

[55] Resp. SMF ¶ 26.

"[m]edications must be properly labeled in separate unit or multi-unit dose packaging and handled in accordance with physician's instructions, and laws and regulations applicable to the medications."[56] Within those parameters, the ALC decides what kind of packaging it wants (*e.g.*, strip packaging, "medicine-on-time" packaging, etc.) and may choose a preferred LTCP based on the packaging that is available. Such packaging is included in the Medicare Part D dispensing fee paid to LTCPs,[57] and, as Relator acknowledged, the higher packaging costs of LTCPs is one reason patients pay higher copayments when selecting an LTCP over a retail pharmacy.[58] ALCs do not pay LTCPs for providing drugs in ALF-compliant packaging, even though ALC regulations provide that only properly packaged drugs may be administered in an ALC. As Relator testified, "you can't charge people for packaging."[59] An LTCP does not violate the AKS by providing the basic bundle of services that LTCPs are expected to provide for their patients, or by not charging the ALF for something their patients or payors are already paying for.

### c. Medication Carts Are Not Remuneration

Relator argues for the first time that Guardian violated the AKS by placing

---

[56] Ga. Rules & Regs. 111-8-63-.20(12)(c).

[57] CMS LTCP Guidance, at 2 (LTCPs must "provide specific drugs in Unit of Use Packaging, Bingo Cards, Cassettes, Unit Dose or other special packaging").

[58] Resp. SMF ¶ 28.

[59] *Id.*

medication carts in ALFs.[60] Yet his complaint makes no mention of medication carts.[61] And for good reason. As the only licensed pharmacist expert in the case testified, "medication carts are often provided for the benefit of the pharmacy themselves. As they are coming in to provide quarterly reviews, it is a cart that they are familiar with, it is—they know the organization of a cart and there are efficiencies to performing a review using a cart that is their property and that they have control over."[62] Relator and others testified this was industry-standard and AKS-compliant.[63] His brief does not identify any contrary testimony or guidance.

### d.    EMAR Laptops Are Not Remuneration

Guardian charged its patients a monthly $10 fee that covered eMAR and the laptops needed to run the eMAR.[64] Guardian's eMAR fees were typical of other LTCPs.[65] Consistent with OIG guidance, laptops may be placed in an ALF exclusively for eMAR use without an extra charge.[66] Relator and others testified this practice was AKS-compliant so long as the LTCP maintained ownership of the

---

[60] Dkt. 139-2 at 2, 8, 17-18.

[61] *See, generally*, FAC. As discussed in Guardian's Brief in Support of Motion to Exclude Relator's New Medication Cart Allegation, for this reason alone, the Court should not consider Relator's newly asserted theory.

[62] Resp. SMF ¶ 4.

[63] *Id.*

[64] SMF ¶¶ 7, 10.

[65] SMF ¶ 7; *but see id.* ¶ 10 (some LTCPs do not charge for eMAR).

[66] SMF ¶ 44.

laptops and limited their use to eMAR,[67] as Guardian did.[68] Relator's arguments directly contradict OIG guidance and his own sworn testimony.

> ### e. Guardian's Training Allowances and Skills Checks Were Not Remuneration.

Guardian charges ALFs $50 per employee per day for proxy caregiver and medication aide training, subject to two narrow allowances that were in place until about January 2018.[69] Relator did not view these allowances as improper when he worked at Guardian, and wondered in his deposition, "what would there be to complain about?"[70] Notwithstanding that testimony, Relator's brief does complain about them,[71] although he does not assert an FMV for training, let alone any evidence that Guardian's allowances pushed its charges below FMV; nor does he address the undisputed fact that Guardian's training was a stand-alone profit line.

In addition, the allowances were announced in what Relator's own brief calls "blast emails"—*i.e.*, emails not targeted to ALFs from which Guardian sought preferred status or additional referrals.[72] Relator's counsel purports to summarize

---

[67] SMF ¶ 9; Resp. SMF ¶ 4 (Relator's admission that Collier's loaned laptops for eMAR, that other LTCPs did the same, and that this did not violate the AKS).
[68] SMF ¶ 9.
[69] SMF ¶¶ 34-36. Guardian's MSJ Brief at 21-23, 25.
[70] SMF ¶ 31.
[71] Dkt. 139-2 at 14-17.
[72] *Id.* at 14.

these emails, and notably absent is any language requiring (or even suggesting) that any ALF must do *anything* to get the allowance.[73] Relator purports to identify 36 ALFs whose employees got "free" training.[74] But he does not assert—much less prove—that Guardian required these ALFs to make any referrals in exchange.

Relator also refers to ALF staff skills checks being "done for free by consulting staff during their quarterly visits."[75] Guardian charged ALFs for skills checks that were performed outside of quarterly visits.[76] The skills checks performed *during* quarterly MMS visits were included in the dispensing fee, as affirmed by Mr. Joseph Zavalishin (who testified as a PBM expert)[77] and the practice of other LTCPs, including Collier's.[78]

### 2. Relator's Failure to Prove FMV Is Fatal to His Claims

Relator did not attempt to establish an FMV benchmark or suggest that Guardian undercut other LTCPs on pricing, arguing that "[a] fair market value benchmark is not required to prove remuneration."[79] That position contradicts Relator's pleadings and controlling case law.

---

[73] *Id.* at 14-15.

[74] *Id.* at 16-17.

[75] *Id.* at 14.

[76] Resp. SMF ¶ 51.

[77] *Id.* ¶ 4.

[78] *Id.* ¶ 4.

[79] Dkt. 139-2.

Relator's Complaint alleged that Guardian's services were remuneration *because* they were provided below FMV; it mentions "fair market value" or "FMV" more than forty times.[80] Likewise, the second sentence in Relator's brief asserts that the AKS "prohibits any person from offering or providing free or *below fair market value* services (*i.e.*, 'remuneration')."[81] Also in his brief, just one page before declaring he need not prove an FMV benchmark, Relator defined "remuneration" to "include[] 'transfers of items or services for free or for *other than fair market value*.'"[82] Relator's newfound disinterest in FMV also contradicts the case law he relies on:

> [FMV] . . . is . . . something Relator must address in order to show that HCA offered or paid remuneration to physician tenants. Here, Relator argues that HCA passed remuneration to physician tenants through Tegra, so the critical question we must ask is *whether physician tenants received anything of value from Tegra* under or in connection with their leases *in excess of the [FMV] of their lease payments*.[83]

Thus, *Bingham* found that an FMV benchmark is necessary where, as here, services were alleged to be "remuneration" because recipients paid too little (below FMV)

---

[80] *See generally* FAC.

[81] Dkt. 139-2 at 1 (emphasis added).

[82] Dkt. 139-2 at 28 (quoting 42 U.S.C. § 1320a-7a(i)(6)) (emphasis added).

[83] *Bingham v. HCA, Inc.*, 783 F. App'x 868, 873 (11th Cir. 2019) (*citing Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 679 (N.D. Ill. 2006)) (emphasis added).

or nothing for them.[84] Thus, Relator's admitted failure to address FMV, including, importantly, whether Guardian "was required to ask for something in exchange for" its services,[85] is fatal to his claim that any services constituted "remuneration" or an "inducement."

**B.      Relator Has Not Shown Inducement Under the AKS.**

Relator proposes a false dichotomy where Guardian is either "an altruistic benefactor" or an AKS violator.[86] But there is another option—the only one that is supported by the evidence: Guardian provided LTCP-level services because it was paid by its patients and their payors to do so. And Guardian provided training allowances to get space for its classes and advertising for future paid classes. These are the *only* reasons supported by the evidence.[87] But rather than address these facts that spoil his case, Relator chooses to simply pretend they do not exist.

*1.*      **Relator's version of the "one-purpose" rule is not supported by the case law.**

Relator maintains that Guardian violated the AKS if "one purpose" of its

---

[84] In *Bingham*, the alleged remuneration included "'low-end' rents" and no-cost "restricted use waivers," which had nothing to do with services the hospital provided to its own patients. *Bingham*, 783 F. App'x at 873. That made *Bingham* a stronger AKS case than the one Relator is trying to bring here. Yet the Eleventh Circuit affirmed judgment in favor of the hospital.

[85] *Bingham*, 783 App'x at 874; *Klaczak,* 458 F. Supp. 2d at 678-80.

[86] Dkt. 139-2 at 30.

[87] Guardian's MSJ Brief at 23-26.

services was to convince ALFs to select it as the preferred pharmacy.[88] He treats the "one purpose" test as a rigid statutory construct that punishes legitimate and standard activities if they result in anything at all positive for a referral source. It is not. Case law and OIG opinions are flush with circumstances where a provider's practices benefit a referral source (directly or indirectly), and courts or the OIG have found no AKS violation, even while sometimes acknowledging that the practice would result in more referrals.[89] The judicially-created "one-purpose" rule does not capture the practices alleged here.

The *Wood* case on which Relator relies was deemed inapplicable in *United States ex rel. Suarez v. AbbVie Inc.*, where the court distinguished between illegal remuneration and "product-related support services that OIG guidance characterizes as permissible."[90] *Suarez* noted that "OIG guidance provides that 'support services' a [defendant] offers 'in connection with the sale of its own

---

[88] Dkt. 139-2 at 30 (citing *Wood*, 246 F. Supp. 3d at 806).)

[89] *See* OIG Advisory Opinions 19-02, 2019 WL 497316 (Jan. 24, 2019); 12-20, 2012 WL 7148096 (Dec. 12, 2012); 11-07, 2011 WL 4526110 (June 1, 2011); 10-20, 2010 WL 3897164 (Sept. 21, 2010); 10-13, 2010 WL 3483531 (Aug. 24, 2010); 10-04, 2010 WL 1937992 (Apr. 30, 2010); 99-8, 1999 WL 34984732 (July 6, 1999); *Bingham v. HCA, Inc.*, 783 F. App'x 868, 874 (11th Cir. 2019); *U.S. ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368 (5th Cir. 2016); *U.S. ex rel. Suarez v. AbbVie Inc.*, Case No. 15-C-8928, 2019 WL 4749967 (N.D. Ill. Sept. 30, 2019); *U.S. ex rel. Forney v. Medtronic, Inc.*, Civil Action No. 15-6264, 2017 WL 2653568 (E.D. Pa. June 19, 2017); Resp. SMF ¶ 6.

[90] 2019 WL 4749967, at *9 (N.D. Ill. Sept. 30, 2019).

products' . . . do not, on their own, 'implicate the [AKS].'"[91] Another court bluntly observed, "Offering well-supported products might induce physicians to purchase Medtronic products, but only because they are better-supported products than competing products."[92] Relator avoids this line of cases, and he does not identify a single case where services integrally related to the provision of Part D-covered drugs and making them safer were deemed improper "inducements."

Relator bears the burden of presenting evidence that "tends to meaningfully exclude a legitimate (or negligent) explanation for [Guardian's] conduct—consistent with the heightened scienter requirement imposed by a `knowing and willfully' standard."[93] In *Ruscher*, the court found (after acknowledging the "one-purpose" rule) that an LTCP's debt forgiveness and prompt pay discounts to SNFs were not an "inducement" in the absence of "evidence that they were designed to induce referrals," despite the fact that these "benefits" to the SNF had nothing to do with drug safety, and notwithstanding evidence that the LTCP considered the impact of its debt collection practices on contract renewals.[94] Relator's expansive

---

[91] *Suarez*, 2019 WL 4749967, *8 (*quoting* OIG May 2003 Notice, 68 Fed. Reg. 23731-01, 2003 WL 2010428, at *23735).

[92] *U.S. ex rel. Forney v. Medtronic, Inc.*, No. 15-6264, 2017 WL 2653568, at *4 (E.D. Pa. June 19, 2017).

[93] *Klaczak*, 458 F. Supp. 2d at 677.

[94] *Ruscher*, 663 F. App'x at 374-75.

interpretation of the "one purpose" rule cannot and does not salvage his case.

### 2. Relator misstates record evidence to cast standard ALF-LTCP practices as evidence of kickbacks.

Relator does not simply ignore sworn testimony of industry participants (including Relator) that contradicts the story he wants to tell; he affirmatively misstates what little testimony he offers from ALF representatives. Even though Relator was personally engaged in Guardian's marketing efforts for nearly two years, he purports to offer direct evidence of contract negotiations for only one of the 80 ALFs at issue (Canterfield of Kennesaw), but he misstates even that testimony. Relator claims that Canterfield made referrals to Guardian "[i]n exchange" for Guardian's "agree[ment] to provide quarterly consulting services for no charge."[95] But the declarant cited by Relator was neither involved in selecting Guardian nor competent to testify about Canterfield's decision.[96] Moreover, her testimony simply indicates that Guardian provides LTCP-level services and that Canterfield recommended Guardian to its residents. Marrying these two innocuous facts—present in all ALF-LTCP arrangements—does not make an improper *quid pro quo* exchange. The Canterfield declarant made this clear in a follow-up declaration:

---

[95] Dkt. 139-2 at 19, 25.
[96] Resp. SMF ¶ 67.

- "The Community's designation of Guardian as a preferred pharmacy is not at all based on any perception that the pharmacy services provided by Guardian are provided below [FMV] or on terms any different from those offered by other [LTCPs]."

- "Guardian remains the preferred pharmacy because it provides good, reliable pharmacy services to the residents who choose to use Guardian. *I am not aware of any 'extra' services that Guardian provides to the Community as compared to . . . other long term care pharmacies*."

- "The Community prefers that its residents use the preferred pharmacy because this is safer, easier, and more efficient than having multiple pharmacies in the Community. . . ."[97]

Relator also quotes from an email chain regarding a proposed contract with an ALF (Caravita) that is not one of the 80 ALFs at issue in Relator's motion.[98] Though Relator twice deposed the author of the email, he did not ask him about it. While the email indicates that Guardian expects to be the preferred pharmacy, no illegal remuneration is being offered in exchange. The email simply reflects that Guardian will place medication carts and eMAR laptops in the ALF, which is a legitimate practice. The emails also say, "should [the residents] choose to go elsewhere that's their right"; and "It's pretty non-binding but we just ask it be signed so we can recoup the cost of our new equipment."[99]

This email and the Canterfield declaration are the only direct evidence

---

[97] Resp. SMF ¶ 60.
[98] Dkt. 139-2 at 22-23.
[99] Resp. SMF ¶ 60.

offered to show inducement. They reflect typical ALF-LTCP arrangements, and neither shows that Guardian presented the challenged practices as a reason to choose it over other LTCPs. Canterfield and all other ALFs that testified viewed these practices as simply representing the standard package of services that an LTCP would provide to its own patients.[100] They were not inducements to choose Guardian over any competing LTCP.

Relator's attempts to establish inducement circumstantially fare no better. Relator points to emails in which Guardian avoided providing pharmacy services for residents who were *not* its patients. Relator does not explain why Guardian should provide services to residents who are not its patients, or why those services should not be provided by those patients' own pharmacies. Instead, he proceeds to cobble together stray portions of documents involving three ALFs to assert that Guardian's "free services were contingent on the volume of patients that the [ALFs] successfully referred to Guardian"[101] and present the false impression that Guardian withheld services to its own patients when it did not have a majority of the ALF's residents.[102] Specifically, Relator points to an email chain involving Five Star Senior Living and two pharmacy reports to ALFs:

---

[100] Resp. SMF ¶ 5; SMF ¶¶ 9, 16-18, 20, 22, 32; Resp. SMF ¶ 4.
[101] Dkt. 139-2 at 20-23.
[102] Dkt. 139-2 at 3.

- In the Five Star email string, Relator omits that Guardian was being asked to perform MMS for *non-Guardian patients*, which is why Mr. Hopp says, "it's much more work to audit with *another pharmacy's* medications and records" and that Guardian would have to charge for this service.[103]

- Regarding the two ALF pharmacy reports, each reflects the view that Guardian will serve its patients, and other pharmacies should serve theirs.[104] Ms. Newcomb states: "I can review your *non-Guardian* pharmacy residents, however, there is a per-resident charge for *this service*."[105]

Neither the email chain nor the reports offer "free" services or indicate that Guardian's services to its own patients depends on an "adoption" rate. Declining to serve *another pharmacy's* patients for free is not a kickback.[106]

Relator also cites an internal Guardian discussion about providing MMS to

---

[103] Resp. SMF ¶ 74; *see also id.* ("[W]e were going to charge additional for any kind of audits because . . . we did not provide the medication carts or anything, and what was in them wasn't from our pharmacy. . . . So they're asking us to, you know, review things that we don't even know what we're reviewing when we go there.").

[104] Dkt. 139-2 at 21-22.

[105] Resp. SMF ¶ 72 (emphasis added).

[106] Relator also ignores direct evidence that Guardian did *not* condition services on adoption rates. For example, one ALF testified that the number of residents using Guardian decreased (from 40 to 12), and Guardian never threatened to remove or reduce services and continued to provide the same level of service it always had. (Resp. SMF ¶ 72.)

*non-Guardian* residents for a $20 fee, noting that a Guardian employee, Tim Williams, worried to his colleagues that performing this service "takes away our leverage to increase penetration in the community."[107] The concern was that if Guardian set the price for MMS to non-Guardian patients too low, residents might use Guardian only as a consulting service rather than as a dispensing pharmacy.[108] This is a logical consideration for a business engaged in an internal discussion about expanding services to a new patient population and setting an appropriate price for that service. Nothing about the discussion connotes a kickback.

Relator points to another email string involving Five Star that indicates training can be provided "at a lower cost" when Guardian is "the primary pharmacy."[109] Yet Guardian was simply making the legitimate point that it would charge more for training that was specifically tailored to Five Star than it would for standard, off-the-shelf training. As Mr. Hopp explained, this was

> a pretty unique situation in that . . . there was literally no agreement with the building and the pharmacy whatsoever. . . . I don't even know what training is being provided by other pharmacies. . . . I don't know what kind of dispensing methods you have in the building.[110]

Ms. Newcomb similarly explained that "it is going to take a lot more time, effort

---

[107] Dkt. 139-2 at 28.

[108] Resp. SMF ¶ 76.

[109] Dkt. 139-2 at 21 (quoting Newcomb Dep., Ex. 22).

[110] Resp. SMF ¶ 73.

to prepare for training because we don't service those buildings or we don't service very many residents in those buildings. So packaging is different."[111] Charging more for a customized service is not a kickback.

Relator's tortured interpretation of these documents is contradicted by the evidence. None of the documents that Relator excerpted in his brief show any AKS violation, or referrals resulting from an AKS violation, with respect to even the four ALFs involved in those documents, let alone all 80 ALFs as to which Relator seeks summary judgment.

### C. Relator Has No Evidence to Show That Guardian Knowingly and Willfully Violated the AKS or Knowingly Violated the FCA.

"[S]cienter is 'peculiarly' a jury issue . . . ."[112] While a court may award summary judgment to an AKS *defendant* based on the *absence* of evidence sufficient to get to a jury on scienter,[113] there appear to be no cases awarding summary judgment to a relator on the element of scienter in an AKS case. Relator certainly

---

[111] *Id.*

[112] *GIW Indus., Inc. v. JerPeg Contracting, Inc.*, 530 F. Supp. 2d 1323, 1336-37 (S.D. Ga. 2008).

[113] *See, e.g.*, *Klaczak*, 458 F. Supp. 2d at 680-81 (granting defense summary judgment where relator's evidence was insufficient to raise triable inference of unlawful intent); *Ruscher*, 2015 WL 5178074, at *13-24 (same); *U.S. ex rel. McDonough v. Symphony Diag. Servs., Inc.*, 36 F. Supp. 3d 773, 781 (S.D. Ohio 2014) (granting summary judgment to defendant where relator's string of inferences as to intent to induce referrals was too strained to present triable issue).

cites none.[114] And, yet he asks the Court to tread new ground and rule as a matter of law that Guardian knowingly and willfully violated the AKS. There is *no* record evidence supporting scienter, much less evidence sufficient to find scienter as a matter of law. On this ground alone, the Court should deny Relator's motion in its entirety.

Relator offers no direct evidence of scienter. His evidence is strictly circumstantial.[115] It consists of the following:

- Guardian's employees attend fraud, waste, and abuse training;[116]

- Guardian's President and Vice President of Finance and Operations have significant long-term care experience;[117]

- Guardian's Services Agreements provide that Guardian will *not*

---

[114] Relator cites two cases in which the AKS's scienter requirement was satisfied: *U.S. v. Starks*, 157 F.3d 833, 838 (11th Cir. 1998), and *U.S. v. Vernon*, 723 F.3d 1234, 1254, 1267 (11th Cir. 2013). (Dkt. No. 139-2 at 26-28.) Both involved jury trials, not summary dispositions. Moreover, both concerned textbook, surreptitious cash-for-referrals schemes, with overwhelming evidence of an illicit scheme and unlawful intent—ranging from secretive payments in bathrooms to exorbitant personal profiteering. Both cases are a far cry from the LTCP services provided here for the benefit of Guardian's own patients.

[115] Dkt. No. 139-2 at 27.

[116] *Id.* at 24, 28. Relator posits that scienter is also "proven" by a "pattern" of engaging in the allegedly illegal conduct with multiple ALFs over a number of years. (Dkt. No. 139-2 at 27.) That fact is not probative of scienter, however, as such a "pattern" is equally, if not more, consistent with the inference that Guardian believed its conduct was legal and mandated by its PBM contracts.

[117] *Id.* at 24, 28. Relator cites Scott Holloway's experience before joining Guardian, but that experience was with *SNFs*, not ALFs. (Resp. SMF ¶ 91).

violate the AKS;[118]

- Guardian's pricing sheets, which state that MMS would be provided at no charge to the ALF, were marked "Confidential";[119]

- The testimony of two employees of Guardian's parent company, one being that he did not have an understanding of the services Guardian provides, the other being that SNFs (*not* ALFs) should pay for pharmacy consulting;[120] and

- The 2009 Omnicare settlement.[121]

None of this proves Guardian had bad intent. And it is so far afield from the "robust" circumstantial evidence that might support a finding of scienter that it does not even present a genuine issue sufficient to reach a jury.[122]

As discussed above, Relator's arguments about the testimony of the parent-level employees are, at best, misleading. Guardian did not conceal the nature of its services. Mr. Hamner testified that he did not know how Guardian handles MMS because he had no reason to know based on his job function, which is accounting,

---

[118]  Dkt. No. 139-2 at 23-24.

[119]  *Id.* at 24 & Relator's SMF, Dkt. 139-3, ¶ 11.

[120]  Dkt. No. 139-2 at 24, 27-28.

[121]  *Id.* at 24, 28.

[122]  *Klackzak*, 458 F. Supp. 2d at 676-77 ("[A] defendant may be deemed to [have] acted 'willfully' through circumstantial evidence. However, in practice, this evidence tends to be robust, *e.g.*, proof that a defendant took several actions inconsistent with the good-faith belief that his conduct was legal. . . . Put somewhat differently, the circumstantial evidence in such instances tends to meaningfully exclude a legitimate (or negligent) explanation for the defendants' conduct—consistent with the heightened scienter requirement imposed by a 'knowing and willfully' standard.").

not clinical operations.[123] And Mr. Weir's testimony that an LTCP should charge for MMS specifically pertained to *SNFs*, not ALFs, which he consistently distinguished.[124] Relatedly, the Omnicare allegations arose from an LTCP arrangement with *SNFs*, which this Court has already noted are "not factually synonymous" with the ALFs at issue here. Plus, the Omnicare settlement involved different and far more egregious allegations, including the payment of kickbacks to push prescriptions of an anti-psychotic medication. Such distorted medical decision making is one of the precise ills the AKS is designed to thwart. And it is inapplicable here.

Additionally, general industry experience, general knowledge of the AKS, and participation in compliance training do not suggest, much less show, unlawful intent. That is especially true here, where the allegedly illegal conduct is common in the industry and widely viewed as legal. If the mere fact of attending compliance training could constitute evidence of scienter, every healthcare provider would have the requisite wrongful intent. Under this logic, efforts to comply with the law are evidence of intent to break it. Second, general legal knowledge and awareness does not suggest that Guardian "knew *this* particular

---

[123] *See supra* pp. 3-4.
[124] *Id.*

course of conduct was unlawful."[125] Insofar as this is not a textbook case involving cash payments for referrals, Relator must show that Guardian knew that providing these particular services in this setting under these arrangements would violate the AKS and that it pressed forward anyway. Relator has not shown that.

Finally, Guardian's Service Agreements, which explicitly prohibit AKS violations, are not evidence that Guardian knowingly and willfully violated the law. Quite the opposite. The Service Agreements warn ALFs that Guardian will not violate the AKS, and thus support the inference that Guardian believes its LTCP services are AKS-compliant.[126] The fact that Guardian's pricing sheet is labeled "Confidential" is also not probative of unlawful intent. It simply reflects that Guardian, like many businesses, marks its deal terms confidential. If the record demonstrates anything, it is that Guardian has not concealed its business

---

[125] *United States ex rel. Hart v. McKesson Corp.*, No. 15-CV-0903, 2022 WL 1423476, at *14 (S.D.N.Y. May 5, 2022) (emphasis added) ("Allegations that McKesson knew remuneration to induce purchases was prohibited in general, however, cannot alone support a finding that McKesson *knew this particular course of conduct was unlawful*. . . . [I]dentifying a policy that plausibly violates the AKS and alleging that a defendant had a general awareness of the laws regulating the pharmaceutical industry is not enough to establish scienter. There must be facts from which the Court can infer that Defendants knew the conduct was unlawful and proceeded with the business practice regardless.").

[126] *Klaczak*, 458 F. Supp. 2d at 627, 683 (holding that notion there is a triable issue on scienter is undermined where conduct is also compatible with legitimate business purposes and testimony as to such purposes is not contradicted).

practices.[127] Guardian has forthrightly acknowledged the business practices at issue in communications and filings with the Government and the Court.[128] Relator likewise openly testified that he provided the same services on nearly the same terms at both Collier's and Gayco.[129] Gayco itself (Guardian's leading competitor) voluntarily declared that it did the same, including after Relator's departure.[130] Similarly, ALF representatives testified there was nothing unique in Guardian's practices as compared to other LTCPs. Guardian did not and had no reason to conceal the nature of these arrangements because they are common and ubiquitous in the LTCP industry in the ALF setting.

There being no probative evidence of Guardian's knowledge of illegality, Relator attempts to lower the AKS scienter standard to something akin to negligence. He cites *Heckler v. Community Health Services*[131] to argue that Guardian had a duty to be familiar with the conditions for payment of taxpayer funds. However, neither the AKS nor the FCA scienter standards were at issue in *Heckler*. In fact, Justice Rehnquist noted that *Heckler* had no applicability to a criminal

---

[127] *See, e.g.*, SMF ¶¶ 29-30.

[128] *See, e.g.*, SMF ¶ 14.

[129] *See* SMF ¶¶ 9-10, 16-18, 32.

[130] SMF ¶¶ 16, 32.

[131] 467 U.S. 51, 63-64 (1984).

scienter standard, which *is* at issue here.[132] Contrary to Relator's suggestion, the AKS does not punish inadvertent or negligent failure to comply with the law.

As for the FCA's scienter requirement, Relator relies on three cases to argue that Guardian acted with "reckless disregard."[133] The first—*Urquilla-Diaz v. Kaplan University*[134]—actually shows why Guardian did *not* act with reckless disregard. There, the Eleventh Circuit affirmed summary judgment for the defendant, holding that the FCA's "language makes plain that liability does not attach to innocent mistakes or simple negligence," as opposed to gross negligence.[135] Indeed, an FCA claim fails as a matter of law where the defendant's interpretation of its obligations is objectively reasonable, even if ultimately incorrect.[136]

As Guardian has shown, its view that its practices are lawful is objectively reasonable. The one OIG guidance opinion addressing ALF-LTCP arrangements

---

[132] *Id.* at 68 (Rehnquist, J., concurring) ("*Pennsylvania Industrial Chemical Corp.* was a criminal prosecution, and we held that 'to the extent that [Government regulators] deprived [the defendant] of fair warning as to what conduct the Government intended to make criminal, we think there can be no doubt that traditional notions of fairness inherent in our system of criminal justice prevent the Government from proceeding with the prosecution.'").

[133] Dkt. 139-2 at 37-38.

[134] 780 F.3d 1039 (11th Cir. 2015).

[135] *Id.* at 1058.

[136] *Olhausen v. Arriva Medical, LLC,* No. 21-10366, 2022 WL 1203023, at *2 (11th Cir. Apr. 22, 2022).

says that the only AKS concern in such arrangements is "unfair competition,"[137] which is not at issue here.[138] The *OIG Supplemental Compliance Program Guidance for Nursing Facilities* identified a number of risk factors arising from LTCP-*SNF* arrangements, but Relator's experts were unable connect any of those risk factors to Guardian's arrangements with ALFs.[139] Now, Relator relies exclusively on a DOJ press release about the Omnicare settlement, which is inapposite, as discussed above. This press release is hardly evidence that DOJ, or CMS or OIG, view LTCPs' provision of MMS to their own patients without charging the ALF—as LTCPs have openly done for decades—as an AKS violation.[140] There is no authority or guidance to suggest that Guardian's view is objectively unreasonable. And Guardian's view is shared by its peers and ALFs, consistent with it being objectively reasonable. In short, Relator has not shown and cannot show scienter under either the AKS or the FCA. Relator's Motion should therefore be denied, and Guardian's Motion should be granted.

### D.     Relator Has Not Shown Claims Resulting from an AKS Violation.

To prove causation, Relator must adduce evidence that an ALF's judgment

---

[137] AO 12-19, 2012 WL 7148095, at *7, 9.

[138] SMF ¶¶ 38-39.

[139] SMF ¶ 37.

[140] SMF ¶ 42.

was compromised and that it referred residents as a result of the inducement.[141]

Despite presenting no evidence that the Guardian practices at issue swayed any ALF to select Guardian over any other LTCP or to refer even a single patient to Guardian, Relator seeks to have this Court decide on summary judgment that every "claim that Guardian submitted to Medicare Part D plans or TRICARE for prescriptions for [every] resident[] of . . . 80 Communities . . . [over a five-and-a-half-year period] resulted from the kickback scheme, as a matter of law."[142]

The circuits are split over whether the relator must meet a "but-for" standard of causation. But this Court need not decide which standard applies because Relator has not shown *any* causal link. As this Court previously held:

> [A] relator must identify "a claim that includes items and services *resulting from* a violation of [the AKS] [which] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g) (emphasis added). Recent cases have required a relator to show "causation, or some 'link' between the payment of remuneration and the submission of false claims" to "establish FCA liability based on an

---

[141] *Cairns*, 42 F.4th at 835 (the "resulting from" language requires a causal link between the AKS violation and a claim for items or services and "[c]ausation is an 'essential element[]' that must be proven, not presumed"); *Osheroff*, 2012 WL 2871264, at *8 ("Since no facts suggest that any physician-tenants were induced by their rent to make referrals based on continued remuneration rather than concern for the health and well-being of each physician's patient, the Court has no basis upon which to reasonably infer that any alleged remuneration clouded the independent judgment of any physician-tenant.").

[142] Dkt. 139-2 at 31.

AKS violation."[143]

At a minimum, the required "link" is between "the payment of remuneration" and "the submission of false claims." Instead of adducing evidence to establish such a link, Relator baldly declares that Guardian's "[o]ffering free quarterly consulting, free classes, and free carts and computers was successful" simply because "[e]ach Community designated Guardian as its 'preferred pharmacy' or 'preferred provider,'"[144] resulting in referrals, and Guardian then submitted claims to Part D Plan Sponsors.[145] This is classic *post hoc ergo propter hoc* fallacy.[146] What Relator fails to do is provide any link—"but for" or otherwise—between the so-called "remuneration" and the *decision* of any ALF (let alone all 80 of them) to choose Guardian as a preferred pharmacy or refer patients. Indeed, the evidence is uniformly to the contrary for much the same reason that the alleged "remuneration" is not an "inducement"—doing the same things as every other

---

[143] Dkt. 63 at 38 (*quoting U.S. ex rel. Wallace v. Exactech, Inc.*, Case No. 2:18-cv-01010-LSC, 2020 WL 4500493, at *19 (N.D. Ala. Aug. 5, 2020)).

[144] Dkt. 139-2 at 18 (citing Relator's SMF ¶ 60); *id.* at 25.

[145] Dkt. 139-2 at 33-34.

[146] As discussed, virtually all LTCPs provide MMS, carts, and eMAR laptops at no charge to ALFs, and Guardian did not mention training allowances to ALFs with whom it did not *already* have a relationship. Relator's own testimony shows that these practices did not set Guardian apart from the competition and are not understood within the industry to violate the AKS. SMF ¶¶ 9, 16-18, 20, 22, 32; Resp. SMF ¶ 4.

LTCP could not and did not sway any ALF's decision.[147] Once again, Relator is not entitled to summary judgment on causation; Guardian is.

### E.    Relator Has Not Shown Government Loss.

Relator claims "that the Government sustained single damages of $16,098,070 relating to Guardian's submission of claims from January 1, 2014 through June 30, 2019 for prescription drugs for Medicare and TRICARE beneficiaries who were residents of the 80 Communities."[148] That claim rests on several flawed assumptions, including that every single claim that Guardian submitted for every single patient at every single ALF at all times from January 1, 2014 through June 30, 2019, was for items or services "resulting from" an AKS violation. Relator has made no such showing. Relator even includes in his damage calculation 16 ALFs formerly served by Collier's (the pharmacy that he sold to Guardian) that *he* was responsible for transitioning to Guardian.[149] There were no claims "resulting from" any remuneration when all that happened was the continuation of the status quo, with Guardian stepping into Collier's shoes as its successor.[150]

---

[147] Dkt. 154-1 at 24-26, 38-39.

[148] Dkt. 139-2 at 39-40.

[149] SMF ¶ 17.

[150] SMF ¶ 17.

Further, Relator has not shown Government loss. Relator relies on the Declaration of Lynn Adam, which is a counsel summary of the expert report of Israel Shaked. As explained in Guardian's Motion to Exclude Israel Shaked, the Government "does not directly pay or reimburse any individual prescriptions."[151] Rather, claims are paid by private insurance companies, known as Part D Plan Sponsors. Whether claims paid by these insurance companies have *any* effect on the Government fisc, and the amount of that effect, if any, can only be determined by a "reconciliation process [that] determines, based on Plan Sponsor records and a complex subsidy system, whether individual Plan Sponsors should receive additional funds" from the Government.[152] Mr. Shaked did not perform this reconciliation process and did not have the prescription drug event ("PDE") data necessary to perform a reconciliation.[153] As a result, Relator has not shown the existence or amount of any Government loss.[154] Accordingly, Relator is not entitled to summary judgment on damages.

## III.   <u>CONCLUSION</u>

A plaintiff cannot *avoid* summary judgment, let alone obtain it, with snippets

---

[151] *U.S. ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 635 (7th Cir. 2016).

[152] *Id.*; *see also* Resp. SMF ¶ 98.

[153] *Id.*

[154] *Id.*

of evidence that support his position "only because they have been presented without any factual or legal context."[155] The evidence as a whole points against a showing that Guardian knowingly and willfully paid remuneration to induce or reward patient referrals or that any false claims resulted from such remuneration. Notably, Relator's *brief* tells a different story from Relator's own *sworn testimony*, which is mentioned nowhere in Relator's brief, even though Relator was a part of the pharmacy industry for decades, including as a Guardian insider. Relator studied the AKS and claimed to be knowledgeable about it. With this knowledge and experience, Relator testified under oath that the same practices employed by Guardian with respect to eMAR laptops, training allowances, and medication carts were compliant, and that his own pharmacy provided MMS to its patients and did not charge ALFs, as this is a patient responsibility.[156] This is not a record that compels a jury to find a violation of the AKS and FCA. Indeed, on this record, no reasonable jury could conclude that Guardian violated the AKS, much less that it *knowingly and willfully* did so. Accordingly, Relator's motion for partial summary judgment should be denied, and Guardian's motion should be granted.

---

[155] *Urquilla-Diaz,* 780 F.3d at 1060; *Todd v. Fayette Cty. Sch. Dist.*, 998 F.3d 1203, 1215 (11th Cir. 2021) ("[T]his argument invites us to pluck a single line from Dr. Barrow's testimony, to read that line in isolation, and to divorce that line from its context. But the whole of Dr. Barrow's testimony yields a different conclusion.").
[156] SMF ¶¶ 4, 8-10, 16, 18, 22, 31; Resp. SMF ¶ 4. ¶¶ 8-10.

Respectfully submitted this 1st day of November, 2022.

ARNALL GOLDEN GREGORY LLP

 _/s/ Glenn P. Hendrix_
Glenn P. Hendrix, Esq.
Georgia Bar No. 346590
glenn.hendrix@agg.com
W. Jerad Rissler, Esq.
Georgia Bar No. 142024
jerad.rissler@agg.com
David L. Hobson, Esq.
Georgia Bar No. 358425
david.hobson@agg.com

171 17th Street, Suite 2100
Atlanta, Georgia 30363-1031
404.873.8500

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that this pleading was prepared using Book Antiqua 13-point font in accordance with Local Rule 5.1(C).

<u>/s/  Glenn P. Hendrix</u>
Glenn P. Hendrix
Georgia Bar No. 346590

This 1st day of November, 2022.

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2022, I electronically filed the foregoing **DEFENDANT GUARDIAN PHARMACY OF ATLANTA LLC'S OPPOSITION TO RELATOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF THE AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all Counsel of Record.

_/s/ Glenn P. Hendrix_
Glenn P. Hendrix
Georgia Bar No. 346590

ARNALL GOLDEN GREGORY LLP

171 17th Street NW
Suite 2100
Atlanta, Georgia 30363-1031
Telephone: 404.873.8500
Facsimile: 404.873.8501

43