# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA, *ex rel.*
HENRY B. HELLER,

   *Plaintiff,*

v.

GUARDIAN PHARMACY OF
ATLANTA, LLC,

   *Defendant.*

Civil Action File No.:

1:18-cv-03728-SDG

## DEFENDANT'S RESPONSE TO RELATOR'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF RELATOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**RELATOR'S FACT NO. 1:** Relator Henry Heller is a former consultant for Guardian. Relator began working for Guardian when it acquired Collier's Personal Care Pharmacy ("Collier's"), a long-term care pharmacy operating throughout north Georgia that Relator co-owned. (Jan. 19, 2022 Deposition of Matthew Hopp ("Hopp Dep."), Ex. 128 at ¶¶ 4–5.)

**RESPONSE:** Undisputed.

**RELATOR'S FACT NO. 2:** Defendant Guardian Pharmacy of Atlanta, LLC is a long-term care pharmacy that fills about 68,000 monthly prescription medication orders for over 4,000 patients, most of whom are Medicare beneficiaries who reside in approximately 130 assisted living communities ("ALCs") and personal care homes ("PCHs") (collectively, "Communities") throughout north Georgia. (Id. at ¶ 3; Feb. 4, 2022 Deposition of Scott Holloway ("Holloway Dep.") at 43:6–25, 117:23– 118:16, 153:21–155:5.)

**RESPONSE:** Undisputed.

**RELATOR'S FACT NO. 3:** From 2014 through June 30, 2019, Guardian offered and provided at least 80 Communities with (a) quarterly pharmacy and nursing consulting services, (b) certified medication aid ("CMA") training and proxy caregiver training, education classes, and skills checks, (c) and medication carts and laptops. (E.g., Hopp Dep., Ex. 129 at 8–27 (consulting, education/training classes, skills checks); Hopp Dep. at 132:13– 133:7 (medication carts and laptops).)

**RESPONSE:** Guardian disputes this Paragraph because it provided the "quarterly

pharmacy and nursing consulting services" (medication management services

("MMS") to its patients, not to the 80 Communities.[1]

> **RELATOR'S FACT NO. 4:** Guardian offered and provided Communities these services and goods either for free or at discounted (below fair market value) rates. (See, e.g., Hopp. Dep., Ex. 54.)

**RESPONSE:** Guardian disputes this Paragraph. First, Guardian incorporates its response to Paragraph No. 3 as to the recipients of MMS and associated medication carts. Second, Guardian did not provide services "for free or at discounted (below market value) rates." Mr. Hopp testified regarding Exhibit 54 that Guardian's patients or their payors paid for MMS.[2] Specifically, MMS was included within the bundle of services Guardian provided to its patients, for which Guardian received higher dispensing fees as a long term care pharmacy ("LTCP").[3]

---

[1] Hopp Dep. Ex. 129 at 8-9 (stating that MMS is not performed "for the Community" but is instead provided "for the benefit of the residents [Guardian] serves"); Hopp Dep. 20:20–21:8. *See also* Hoffman Dep. 67:18–68:1; Collier Dep. 88:5–89:9; Relator's Response to Guardian's RFA ¶ 21, attached hereto as Ex. A (admitting that Collier's billed *residents*, not Communities, for MMS); Boatman Dep. 153:5–154:25; Trentham Dep. 70:16-71:15, 72:24-74:6; Hunter Dep. 125:9–24. Whether called "audits" by Relator, "quarterly consulting services" by his counsel, or MMS by Guardian, they all refer to the same thing. (Newcomb Dep. 32:6–19, 117:25–118:15, 181:23–182:13, 236:9–15; McKenzie Dep. 18:18–19:4, 19:16–21:6; Heller Dep. 19:18–24; Zavalishin Report at 19.)

[2] Hopp Dep. 172:5–173:7.

[3] (*See* Zavalishin Report pp. 8, 14, 21-26, Dkt. No. 154-10 ("quarterly reviews provided by Guardian are reasonable and appropriate for the typical beneficiary" in the ALF setting and that MMS is thus included in the dispensing fee paid to Guardian, and discussing CMS LTCP guidance); Zavalishin Dep. 167:19–169:13 (same); Wooten Report ¶¶ 21–22, 44, 55, Dkt. No. 154-11 (same); Wooten Dep. 151:18–24 (same; Gay Decl., ¶ 10, Dkt. No. 154-8).

Guardian also charged Communities for CMA and proxy caregiver training, subject to allowances for Communities that: (i) hosted the training; and (ii) were new to Guardian or newly-licensed as ALCs.[4] Essentially, Guardian allowed some attendees to take the classes (along with paid attendees) without charge if they met Guardian's narrow exceptions, and the classes were not free to "host communities" for the additional reason that they paid for their employees' attendance in the form of providing space, refreshments, and other amenities.[5]

Guardian charged for skills checks, except those performed during the quarterly audits covered by dispensing or other fees, which was consistent with Relator's practices at Collier's.[6] Skills checks performed during quarterly MMS visit were included in the dispensing fee.[7]

Guardian's eMAR services (including integrally-related laptops) were covered by the $10 monthly fees,[8] and the laptops needed to perform eMAR

---

[4] (Guardian 30(b)(6) Dep. 37:11–38:6, 38:16–41:24, 42:5–8, 84:6–85:17 & Ex. 11 thereto; Guardian's Resp. to Rel.'s First Interrog. at No. 9, Dkt. No. 154-3; Boatman Dep. 40:18–41:15; McAnaney Report ¶ 119, Dkt. No. 154-15; McGimsey Report ¶ 52, Dkt. No. 154-4; Newcomb Dep. 25:9–22.)

[5] (Ex. 129 to Hopp Dep. ¶ 9; Guardian 30(b)(6) Dep. at 37:11–38:6, 40:25–41:11 & Ex. 11 thereto; Boatman Dep. 40:18–41:15.)

[6] (Guardian 30(b)(6) Dep. 176:10–18; Ex. 26 to Newcomb Dep. at GUARDIAN_0058307; (Heller Dep. 81:2–82:7.)

[7] Zavalishin Dep. 24:11-24; 78:3-17.

[8] (McKenzie Dep. 47:17–48:2; McGimsey Report ¶ 38; McGimsey Dep. 90:16–92:9.)

remained Guardian's property, and were exclusively dedicated to eMAR.[9]

Moreover, Relator and his business partner testified that Collier's placed laptops

in ALFs for eMAR use, that this was standard in the industry, and compliant under

the AKS.[10]

> **RELATOR'S FACT NO. 5:** The Communities that received the free/discounted services and goods designated Guardian as their "preferred pharmacy" (or "preferred provider") and referred, recommended, and arranged for their residents to fill their pharmacy prescriptions exclusively with Guardian. (E.g., Hopp Dep. at 214:17–217:16; Hopp Depp., Ex. 54; Dec. 13, 2021 Rule 30(b)(6) Deposition of Guardian Pharmacy of Atlanta, LLC ("Guardian 30(b)(6) Dep."), Ex. 6.)

**RESPONSE:** Guardian disputes this Paragraph, incorporating its response to

Paragraph No. 3 as to the recipients of MMS and the medication carts and its

response to Paragraph No. 4 as to the charges for its services.

Guardian disputes Paragraph No. 5 to the extent it implies any quid pro quo

arrangement as that mischaracterizes record evidence, which shows that Guardian

only provided services to and for its *own* patients, generally speaking. [11]

---

[9] (*See* Hopp Dep. 132:13–133:7; Guardian 30(b)(6) Dep. 58:17–25, 73:15–74:2; Sides Dep. 28:25–29:12; Boatman Dep. 163:15–165:4; Hunter Dep. 93:1–94:3; Magnolia Dep. 61:11–62:20; Wooten Dep. 145:22–146:24 (noting that carts and laptops are integrally related to Guardian's services and benefit the pharmacy because there are "efficiencies to performing a review.").)

[10] (*See* Heller Dep. 62:13–22, 85:2–16, 97:16–98:4; Collier Dep. 41:11–18, 44:13–45:21, 138:2–14; Sides Dep. 109:9–110:11; Boatman Dep. 166:14–25; Trentham Dep. 72:8–23; Relator's Resp. to RFA Nos. 41–43; McAnaney Report pp. 4–5, ¶¶ 134–142.)

[11] (Hopp. Dep. 216:1–5 & Ex. 54 thereto.)

Communities commonly used a preferred pharmacy because it promotes the safe and efficient administration of medicine.[12] Guardian's charging practices were not materially different from any other LTCP's practices, and no Community selected Guardian as a preferred pharmacy or referred patients to Guardian because of any of the practices Relator challenges in this lawsuit.[13]

> **RELATOR'S FACT NO. 6:** Guardian knew that offering free/discounted services to Communities to induce referrals violated the Anti-Kickback Statute and False Claims Act. (Guardian 30(b)(6) Dep., Ex. 6; Guardian 30(b)(6) Dep. at 147:20–148:14.)

**RESPONSE:** Guardian disputes that it offered "free/discounted services" for the reasons set forth in response to Paragraphs 3-5 above. Guardian disputes Paragraph No. 6, as stated. Guardian admits that it knew that offering free/discounted services to induce referrals can implicate the AKS and the FCA. Guardian, however, did not know and does not believe that the practices challenged here violate the AKS.[14] Guardian's practices were ubiquitous across the LTCP industry, and even Relator engaged in many of the same practices, including

---

[12] (Hunter Dep. 26:4–22; Heller Dep. 62:6–12, 86:16–87:8; Trish Dep. 136:13–140:5, 142:16–144:3, 151:11–152:8; Pflug Dep. 84:25–86:11; Boatman Dep. 155:1–20; Trentham Dep. 68:16–70:2; Sides Dep. 114:3–115:23.)

[13] (*See, e.g.*, March 3, 2022 Dearing Decl. ¶¶ 5–8.)

[14] (*See, e.g.*, Guardian 30(b)(6) Dep. 149:23–150:7; *see also* Hoffman Dep. 154:13–159:21 (discussing OIG Advisory Opinion 12-19 and acknowledging the OIG found remuneration to a potential referral source but indicated it would not exercise enforcement discretion).)

(1) not charging Communities for MMS;[15] (2) providing skills checks during quarterly audits at no additional charge;[16] (3) providing carts and laptops for eMAR services at no additional charge;[17] and (4) providing training to employees of ALFs who administer medications it dispenses at no charge.[18] Relator has not identified any guidance that these practices violate the AKS.

> **RELATOR'S FACT NO. 7:** Guardian billed the Medicare and TRICARE plans for prescriptions for patients referred by the Communities receiving unlawful inducements. (Declaration of Lynn Adam ("Adam Decl."), ¶¶ 2, 7.)

**RESPONSE:** Guardian objects to the Damages Chart to the Adam Declaration because it is a Rule 1006 summary that was improperly prepared by a lawyer unavailable for cross-examination.[19] Guardian also disputes that any Community "receiv[ed] unlawful inducements," which is not supported by the cited evidence. Answering further, while Guardian billed Part D Sponsors and pharmacy benefit

---

[15] (Collier Dep. 29:23–30:10; Boatman Dep. 61:12–65:22, 112:12–13, 117:14–17, 166:14–25; Trentham Dep. 58:23–59:23; Sides Dep. 26:21–28:5, 73:10-74:6, 107:10–108:21)

[16] (Heller Dep. 81:8–82:7)

[17] (*see* Guardian Resp. to ¶ 4, *supra*)

[18] (Heller Dep. 78:6-19, 79:23-80:4; Declaration of Jon Martin at ¶ 6 & Ex. A thereto, Dkt. No. 154-7.)

[19] *See Fox v. Ritz-Carlton Hotel Co., LLC*, No. 17-CV-24284-COOKE, 2022 WL 2666450, at *5 (S.D. Fla. July 11, 2022) (citing *United States v. Grajales-Montoya*, 117 F.3d 356, 361 (8th Cir. 1997)) (holding that Rule 1006 "contemplates that any summary admitted will have been prepared by a witness available for cross-examination, not by the lawyers trying the case").

managers ("PBMs") for patient prescriptions and services, there is no evidence in Ms. Adam's Declaration or otherwise these patients (or which patients) were referred by Communities.

> **RELATOR'S FACT NO. 8:** From January 1, 2014 to June 30, 2019, Guardian's policy and practice was to offer and provide quarterly pharmacy consulting services to Communities for free or no charge. (Hopp Dep., Ex. 129 at 8–13; Dec. 17, 2021 Deposition of Lori Newcomb ("Newcomb Dep."), Ex. 15, Ex. 16, Ex. 17.)

**RESPONSE:** Guardian disputes that it provides services "to Communities for free or no charge" for the reasons set forth in response to Paragraph Nos. 3 and 4 above. Relator's expert, Gregory Kaupp, opined that MMS cannot be covered by the dispensing fee because it "does not cover activities beyond the point of sale."[20] However, Joseph Zavalishin opined that the CMS LTCP guidance on dispensing fees refers to DUR performed by NLTCP/consultant pharmacists, in addition to DUR performed by dispensing pharmacists and also refers to events that cannot be fully done at the time of dispensing, including "routinely" screening for allergies and drug interactions, "identify[ing] potential adverse drug reactions," "identify[ing] inappropriate drug usage in the LTC population," and "promot[ing] cost effective therapy in the LTC setting."[21]  In addition, at

---

[20] (Kaupp Report at 5–6, 14–15.)
[21] (Zavalishin Report at 14–15, 33–34.)

deposition, Mr. Kaupp conceded that dispensing fees for LTCPs cover services that cannot be provided until after the point of sale.[22] Mr. Zavalishin also opined that Guardian's Medicare contracts required Guardian to provide MMS.[23]

> **RELATOR'S FACT NO. 9:** During this time frame, Guardian offered and provided quarterly pharmacy consulting services to at least 80 Communities for free or at no charge. (Declaration of Joseph M. Callow, Jr. ("Callow Decl."), ¶¶ 3–4, Ex. A, Ex. B.)

**RESPONSE:** Guardian disputes that it provided MMS "to . . . Communities for free or at no charge" for the reasons set forth in response to Paragraph Nos. 3 and 4 above. In addition, Guardian objects to the extent Paragraph No. 9 relies on Exhibits A and B to the Callow Declaration because they are Rule 1006 summary exhibits improperly prepared by a lawyer.[24]

> **RELATOR'S FACT NO. 10:** For at least 39 of the 80 Communities, Guardian executed a Pharmaceutical Products and Services Agreement ("Services Agreement"). (Id. at Ex. A.)

**RESPONSE:** Guardian objects to the extent Paragraph No. 10 relies on Exhibit A to the Callow Declaration because it is a Rule 1006 summary exhibit improperly prepared by a lawyer.[25] Otherwise, undisputed.

> **RELATOR'S FACT NO. 11:** The Services Agreements generally contain "Confidential Pricing Terms," stating that Guardian's

---

[22] (Kaupp Dep. 150:18–153:17, 155:16–25; Zavalishin Report at 9, 21–28, 31–34.)

[23] (Zavalishin Report at 15–20.)

[24] (*See* Guardian Resp. to ¶ 7, *supra*.)

[25] (*See* Guardian Resp. to ¶ 7, *supra*.)

quarterly pharmacy consulting services to the Communities were provided "free of charge," at "no charge," or other similar language (or with no price term at all). (E.g., Hopp Dep., Ex. 132, Ex. 133, Ex. 134, Ex. 135.)

**RESPONSE:** Guardian disputes that it provided MMS "to the Communities" or that the MMS was for free or at no charge for the reasons set forth in response to Paragraph Nos. 3 and 4 above. The Court may otherwise consider this fact.

> **RELATOR'S FACT NO. 12:** In addition, for at least 41 Communities, Guardian provided quarterly pharmacy consulting services with no written agreement. (Callow Decl. ¶ 5, Ex. B.)

**RESPONSE:** Guardian disputes that it provided MMS "for . . . Communities" for the reasons set forth in response to Paragraph No. 3 above. Guardian objects to the extent Paragraph No. 12 relies on Exhibits B and C to the Callow Declaration because they are Rule 1006 summary exhibits improperly prepared by a lawyer.[26] The Court may otherwise consider this fact.

> **RELATOR'S FACT NO. 13:** Guardian never invoiced or billed any of the 80 Communities for the standard quarterly pharmacy consulting services it provided. (Id. at ¶¶ 4–5; Newcomb Dep., Ex. 17, Ex. 30, Ex. 33, Ex. 34; Newcomb Dep. at 34:15–35:19, 36:02–37:04; Jan. 14, 2022 Deposition of Lisa McKenzie ("McKenzie Dep.") at 31:17–35:6.)

**RESPONSE:** Guardian disputes this Paragraph to the extent it implies MMS was provided for the Communities or that Guardian should have billed them for MMS

---

[26] (*See* Guardian Resp. to ¶ 7, *supra.*)

Guardian provided to its patients for the reasons set forth in response to Paragraph

Nos. 3 and 4 above. The Court may otherwise consider this fact.

> **RELATOR'S FACT NO. 14:** At the same time, several communities
> paid Guardian for quarterly consulting services, and there are
> contracts, emails, and invoices related to payments for quarterly
> consulting services by those Communities—but not for the 80
> Communities identified herein. (See Holloway Dep. at 128:18–130:7.)

**RESPONSE:** Guardian disputes this Paragraph as stated. Only a few

Communities paid Guardian fees expressly for periodic consulting services.[27] Mr.

Holloway testified that some ALFs "requested a monthly consulting whereas we

normally do it quarterly."[28] Others were paying for value-added hourly services.[29]

While "there are occasions when there's a quarterly visit and [Guardian] will

invoice the community for the quarterly visit," Mr. Holloway had no information

about what services were performed on these "occasions."[30] Moreover, even when

Communities front the cost of patient-benefitting services like MMS, they still pass

those costs on to the patients in some form.[31]

> **RELATOR'S FACT NO. 15:** The provision of free quarterly
> consulting services was not a secret. Lori Newcomb, Guardian's Head
> Pharmacist Consultant, repeatedly told Communities and other third

---

[27] (Holloway Dep. 118:18–20 & Ex. 232 thereto.)

[28] (Holloway Dep. 127:16–23.)

[29] (*Id.* at 129:1–11.)

[30] (*Id.* at 130:8–18; *see also* Newcomb Dep. 113:2–116:11 (describing these arrangements as an exception applying to a handful of ALFs).)

[31] (Trish Dep. 46:10–47:4; Hoffman Dep. 74:25–77:21.)

parties about Guardian's free consulting services. (Newcomb Dep., Ex. 23, Ex. 28, Ex. 30, Ex. 32, Ex. 33, Ex. 34.)

**RESPONSE:** Guardian disputes that the MMS it provided for its patients was "free" for the reasons set forth in response to Paragraph Nos. 3 and 4 above. Guardian does not dispute that, like all other LTCPs, it did not conceal or keep secret the fact that it provided MMS to its patients and did not charge Communities, as discussed in Response to Paragraph Nos. 3 and 4.

> **RELATOR'S FACT NO. 16:** Guardian's President and Chief Executive Officer, Matt Hopp, testified that the fair market value of the quarterly pharmacy consulting services was approximately $9 to $11 per bed. (See Hopp Dep. at 281:3–25; Hopp Dep., Ex. 159; Ex. 160.)

**RESPONSE:** Guardian disputes this Paragraph because it mischaracterizes the evidence, particularly to the extent it asserts a pharmacy's cost of obtaining labor reflects a fair market value to a Community. Further, Mr. Hopp did not testify that the "fair market value" of quarterly consulting services was $9 to $11 per bed. Rather, he testified this was the cost of obtaining temporary labor—which was a "rush[ed]," "last-minute" decision where Guardian "didn't have a lot of time to shop around" because an employee had to get surgery "pretty quickly."[32] This single data point is not evidence of FMV to a pharmacy, let alone the Communities.

> **RELATOR'S FACT NO. 17:** Guardian's Vice President for Finance and Operations confirmed under oath that Community "residents are

---

[32] (Hopp Depp. 279:21–281:25.)

not billed for consulting services." (Holloway Dep. at 139:10–12.)

**RESPONSE:** Guardian disputes this Paragraph, which mischaracterizes record evidence. Specifically, Relator's counsel asked Mr. Holloway about a report showing Guardian's "ancillary" revenue, which Mr. Holloway explained meant revenue "other than for the medications," meaning revenue that *did not include dispensing fees*.[33] While Mr. Holloway noted there was no line item for consulting services on that report, he also said he "didn't do anything with billing."[34]

> **RELATOR'S FACT NO. 18:**  Ms. Newcomb and others charged $20 or more to review a single resident's charge during a quarterly consulting visit for non-Guardian patients. (Newcomb Dep. at 125:16–20; Newcomb Dep., Ex. 15; Hopp Dep., Ex. 160.)

**RESPONSE:** Guardian disputes this Paragraph to the extent it states that Guardian charged *more* than $20 for MMS for non-Guardian patients, which is not supported by Relator's cited evidence. Further, what Guardian charged to provide MMS to residents who were *not* its patients (from whom it receives no dispensing fees or other fees and to whom it owes no duties) is irrelevant to its charging practices with respect to the MMS it provides to its own patients. As discussed in Response to Paragraphs 4, 6 and 8, LTCPs receive a dispensing fee to provide MMS to their own patients and, therefore, typically do not charge ALFs for this MMS.

---

[33] (Holloway Dep. 137:14–138:6 & Ex. 234 thereto.)
[34] (Holloway Dep. 140:2–11.)

**RELATOR'S FACT NO. 19:** This was valuable to the communities as a necessary service that the communities would otherwise have to provide and pay for to maintain under Georgia law. (Feb 2, 2022 Declaration of Lynn Dearing, Canterfield of Kennesaw ("Dearing Decl.") at ¶¶ 14–15.)

**RESPONSE:** Guardian disputes this Paragraph because it mischaracterizes the cited testimony of Lynn Dearing, the executive director of a single community (Canterfield of Kennesaw), which does not state that ALCs "would otherwise have to provide and pay for" such services under Georgia law. To the contrary, ALFs whose residents receive medications from any LTCP (not just Guardian) do *not* "otherwise have to provide and pay for" MMS because this service is commonly provided by all LTCPs to their patients, who pay for these services, without charge to the ALF, as discussed in Response to Paragraphs 4, 6, and 8 above. Indeed, Ms. Dearing testified that "Guardian charges the *residents* who choose Guardian as their pharmacy a fee of $10 per month for the services that it provides *them*," and "I do not have any understanding that [Guardian's] services are different from services typically offered by other long term care pharmacies."[35] Relator cites no evidence beyond Ms. Dearing's Declaration to support the extrapolation to

---

[35] (March 3, 2022 Dearing Decl. ¶¶ 7-8, Dkt. No. 154-14 (emphasis added).)

Communities generally.[36]

> **RELATOR'S FACT NO. 20:**  At all times, there was "no charge to the community" for the quarterly consulting services. This was confirmed in an internal fee scheduled created by Lori Newcomb and in a letter sent to at least one community (Magnolia Senior Living). (Newcomb Dep., Ex. 32; Hopp Dep. at 172:23–173:3; Hopp Dep., Ex. 54.)

**RESPONSE:** Undisputed that there was no charge to the *Community.*

> **RELATOR'S FACT NO. 21:**  During a quarterly pharmacy consulting review, a member of the Consulting Department reviews and audits the medication administration records and medication storage carts for the Communities' residents. (Hopp Dep., Ex. 129; Newcomb Dep. at 232:12–233:20; see also, e.g., Newcomb Dep., Ex. 48.)

**RESPONSE:** Guardian disputes this Paragraph to the extent it states Guardian

provides these services for the "Communities' residents" because Guardian

provides these services only to its own patients (not all residents) as discussed in

Paragraph Nos. 3 and 5 below. The Court may otherwise consider this fact.

> **RELATOR'S FACT NO. 22:** The Consulting Department consults with the Communities' operators or staff about their findings from the review. (Id.)

**RESPONSE:** Undisputed.

> **RELATOR'S FACT NO. 23:** Guardian's Consulting Department does not interact or communicate with Community residents directly during quarterly consulting reviews. (Newcomb Dep. at 211:19:24;

---

[36] Relator's attempted extrapolation to PCHs is improper because unlike ALCs, they had no licensure requirement to "secure" a pharmacy to perform MMS. (*See* Relator's Statement of Facts No. 26, Dkt. No. 146-2; O.C.G.A. § 31-7-12(h)(7).)

McKenzie Dep. at 17:19–18:11.)

**RESPONSE:** Guardian disputes this Paragraph to the extent the testimony cited is that the consulting pharmacists performing MMS typically or generally do not interact directly with the residents, not that they never do.[37]

> **RELATOR'S FACT NO. 24:** ALCs under Georgia law are required to secure a licensed pharmacist to perform quarterly medication-management review and report any irregularities to the Community; ensure proper disposal of drugs that are expired, discontinued, or in deteriorated condition; and establish or review policies and procedures for safe and effective drug therapy, distribution, use and control. (O.C.G.A. § 31-7-12.2(g)(10); E.g., Newcomb Dep., Ex. 30, Ex. 45, Ex. 46, Ex. 47, Ex. 48, Ex. 51; McKenzie Dep. at 38:20–23.)

**RESPONSE:** Undisputed. In addition, Lori Newcomb (Guardian's lead consultant pharmacist) served on the workgroup that assisted in drafting the ALC and PCH licensure requirements, and her concept of MMS influenced both ALF regulations and Guardian's own practices.[38]

> **RELATOR'S FACT NO. 25:** In addition, on a quarterly basis, Communities must arrange for a pharmacist or nurse to conduct random observations of aides administering medications to residents and report any issues to the Community. (O.C.G.A. § 31-7¬12.2(g)(11).)

**RESPONSE:** Undisputed.

> **RELATOR'S FACT NO. 26:** Starting in July 2020, Personal Care Homes also had to "secure" a pharmacist to perform the same duties;

---

[37] (*See* McKenzie Dep. 17:19-24 ("Sometimes yes, sometimes no.").)
[38] (Newcomb Dep. 206:20–208:20.)

before then, Guardian generally assigned a licensed nurse to provide
consulting for PCHs. (See O.C.G.A. § 31-7-12(h)(7); Newcomb Dep. at
68:16–19, 203:2–20, 236:16–24.)

**RESPONSE:** The fact is immaterial as to any issue on summary judgment.

Relator's Motion for Summary Judgment relates to claims submitted prior to this

date.[39] Otherwise undisputed. And even though not required by regulation,

Guardian still provided high quality consulting for PCHs *before* July 2020 "because

we still take care of our residents no matter what."[40]

> **RELATOR'S FACT NO. 27:** Guardian's staff gave detailed written
> reports of their findings to the Communities (not the residents) for
> each consulting visit. (E.g., Newcomb Dep., Ex. 44, Ex. 45, Ex. 46, Ex.
> 47, Ex. 48, Ex. 49.)

**RESPONSE:** Undisputed.

> **RELATOR'S FACT NO. 28:** The Communities rely upon the
> quarterly consulting services provided by Guardian so that the
> Communities can satisfy their medication management requirements
> for licensure. (E.g., Dearing Decl. at ¶ 15.)

**RESPONSE:** Guardian disputes this Paragraph because the cited evidence does

not support the statement. First, Relator cites a single declaration by the executive

director of a single community, and cites no evidence to support the extrapolation

to Communities generally. Second, the statement is not true as to PCHs, which had

---

[39] (*See* Relator's Br. in Supp. of Mot. for Summ. J. [Doc. 139-2] at 1-2, 39.)
[40] (Newcomb Dep. 203:8–11.)

no licensure requirement to "secure" the services of a consulting pharmacy to perform MMS.[41] Third, Guardian provided MMS only to its own patients (not all residents), as discussed in Paragraph 5 above, and the provision of MMS to a portion of the Community's residents does not satisfy the Community's licensure requirements.[42]

> **RELATOR'S FACT NO. 29:** The Consulting Department was doing so many consulting visits and reports with such limited staff that they were "frazzled" attempting to complete the mandated consulting. (Newcomb Dep. at 101:10–102:4; Newcomb Dep., Ex. 29, Ex. 31, Ex. 32, Ex. 33.)

**RESPONSE:** Guardian objects to Paragraph No. 29 as immaterial to Relator's motion for summary judgment. Moreover, other members of the Consulting Department disputed Ms. Newcomb's characterization.[43]

> **RELATOR'S FACT NO. 30:** During the relevant time periods, the Communities did not pay for the quarterly consulting services. (E.g., Mar. 31, 2022 Rule 30(b)(6) Deposition of Oaks Senior Living ("Oaks Dep.") at 33:7–15; Mar. 23, 2022 Rule 30(b)(6) Deposition of Trinity Lifestyles Management, LLC ("Trinity Dep.") at 35:15–36:2; Mar. 16, 2022 Rule 30(b)(6) Deposition of Magnolia Senior Living ("Magnolia Dep.") at 63:5–64:4; Mar. 21, 2022 Deposition of Christopher Sides

---

[41] (*See* Relator's Statement of Fact No. 26; O.C.G.A. § 31-7-12((h)(7).)

[42] Relator acknowledged that the higher packaging costs of LTCPs is one reason patients pay higher copayments when selecting an LTCP over a retail pharmacy. (Heller Dep. 140:17–23.) ALCs do not pay LTCPs for providing drugs in ALF-compliant packaging, even though ALC regulations provide that only properly packaged drugs may be administered in an ALC. As Relator testified, "[Y]ou can't charge people for packaging." (*Id.* at 148:18–19.)

[43] (Hasselbring Dep. 52:1–14; McKenzie Dep. 82:3–21.)

("Sides Dep.") at 26:21–27:7; Mar. 10, 2022 Deposition of Yolanda Doley Hunter ("Hunter Dep.") at 57:5–22.)

**RESPONSE:** Undisputed, but see response to Paragraphs 3 and 4 above, showing

Guardian's patients received and paid for these services.

> **RELATOR'S FACT NO. 31:** Guardian maintained a consulting team of two, full-time salaried pharmacists and two nurses, who did not otherwise work in Guardian's dispensing pharmacy, and who reported directly to President Matt Hopp. (Holloway Dep. at 21:21–22:18, 25:6–24; 37:7–12.)

**RESPONSE:** Undisputed but immaterial to summary judgment.

> **RELATOR'S FACT NO. 32:** Guardian has a team of approximately nine pharmacists that work in its main dispensing pharmacy, which is managed entirely separately from Guardian's consulting pharmacists and consulting department. (January 14, 2022 Deposition of Tim Williams ("Williams Dep.") at 15:23–17:16.)

**RESPONSE:** Undisputed, but immaterial to summary judgment.

> **RELATOR'S FACT NO. 33:** From 2014 through January 2018, Guardian's policy and practice was to offer and provide free and discounted CMA/PC training, education classes, and skills checks to staff of Communities. (Hopp Dep. at 28:18–29:20; Newcomb Dep. 31:4–10; see also, e.g., Newcomb Dep., Ex. 25.)

**RESPONSE:** Guardian disputes this Paragraph because Guardian did not have a

"policy" of providing free training, education classes, and skills checks to

Communities' staff, as discussed in response to Paragraph 4 above.

> **RELATOR'S FACT NO. 34:** During this time frame, Guardian offered and provided free ("at no charge") or discounted Certified Medication Aid ("CMA") or PC training and education classes to staff

and employees of at least 36 Communities. (Hopp. Dep., Ex. 128 at ¶ 26, Ex. 129 at 16–20.)

**RESPONSE:** Guardian disputes this Paragraph because Guardian did not offer "free" classes, as discussed in response to Paragraph 4 above. And Relator's cited evidence does not say otherwise.[44]

> **RELATOR'S FACT NO. 35:** Employees and staff from at least 36 Communities attended a free training or class offered by Guardian, as confirmed by Guardian's own sign-in sheets. (Callow Decl. at ¶ 6, Ex. D; see also Newcomb Dep. at 26:1–17.)

**RESPONSE:** Guardian objects to the extent Paragraph No. 35 relies on Exhibit D to the Callow Declaration because it is a Rule 1006 summary exhibit improperly prepared by a lawyer.[45] In addition, Guardian disputes this fact because Ms. Newcomb was clear in her deposition, even the portion cited by Relator, that Guardian did not offer "free training or classes."[46]

> **RELATOR'S FACT NO. 36:** These 36 Communities also received free quarterly consulting services. (See Callow Decl., Ex. A, Ex. B.)

**RESPONSE:** Guardian objects to the extent Paragraph No. 36 relies on Exhibits A and B to the Callow Declaration because they are Rule 1006 summary exhibits

---

[44] (*See, e.g.,* Ex. 129 to Hopp Dep. ¶ 8 (directing Relator to documents showing "numerous invoices," "report of charges to communities for education and training" and "report of payment received for these charges").)

[45] (*See* Guardian Resp. to ¶ 7, *supra*.)

[46] (*See* Newcomb Dep. 26:11–27:6; *see also* Guardian Resp. to ¶ 4, *supra*.)

improperly prepared by a lawyer.[47] Guardian also disputes that it provided "free quarterly consulting services" to "36 Communities" because it provided consulting to its patients, not the Communities, and that consulting was not free as discussed in response to Paragraphs 3 and 4 above.

> **RELATOR'S FACT NO. 37:** Guardian offered the free and discounted classes to all Communities "new to Guardian or newly licensed as ALCs" under Georgia law. (E.g., Hopp Dep., Ex. 128 at ¶ 26; Newcomb Dep. at 31:4–10; see also, e.g., Newcomb Dep., Ex. 5.)

**RESPONSE:** Guardian disputes this Paragraph to the extent that it misstates the training allowances discussed in response to Paragraph 4 above and to the extent it states the allowances were offered to "all Communities," rather than those Communities who received the "blast emails."

> **RELATOR'S FACT NO. 38:** Guardian allowed "up to ten (10) staff members to attend the Education Classes at no charge." (Hopp Dep., Ex. 129, Ex. 18; Newcomb Dep, Ex. 26.)

**RESPONSE:** Undisputed, but see response to Paragraph 4 above discussing training allowances.

> **RELATOR'S FACT NO. 39:** Between 2014 and 2018, Guardian sent at least 39 blast emails to Communities announcing when new classes and trainings were available. (Callow Decl., Ex. C.)

**RESPONSE:** Guardian objects to the extent Paragraph No. 39 relies on Exhibit C

---

[47] (*See* Guardian Resp. to ¶ 7, *supra*.)

to the Callow Declaration because it is a Rule 1006 summary exhibit improperly prepared by a lawyer.[48] In addition, even according to Relator's cited evidence, the blast emails stopped in 2017, not 2018. Moreover, by Relator's own admission, these emails were only sent to Communities that already had a relationship with Guardian, not to the general public.[49]

> **RELATOR'S FACT NO. 40:** Guardian told the Communities that while the cost for the class was $50 or $100 per day per attendee, "any new community to Guardian" as well as "all of Collier's clients" were "exempt" from charges, as well as the community that hosted the training class. (E.g., Newcomb Dep., Ex. 10, Ex. 11, Ex. 25, Ex. 26, Ex. 33.)

**RESPONSE:** Guardian disputes this Paragraph. The cost per attendee was $50 per day (not $100), and the allowances only applied to the first ten employees and were for a limited time.[50] Moreover, "Collier's clients" refers to Collier's *former* clients who were *Guardian's* clients because of Guardian's acquisition of Collier's.[51]

> **RELATOR'S FACT NO. 41:** Additionally, Guardian regularly provided a discounted rate for its "preferred pharmacy" communities for education and training classes. (E.g., Newcomb Dep. at 23:18–22, 58:25–59:11, 143:1–144:24, 164:6–8.)

---

[48] (*See* Guardian Resp. to ¶ 7, *supra*.)

[49] (Heller Dep. 173:21–174:13 & Ex. 47 thereto.)

[50] (*See, e.g.*, Ex. 10 to Newcomb Dep. at GUARDIAN_0062398; Ex. 129 to Hopp Dep. ¶ 9; Newcomb Dep. 72:7–15 (noting that Guardian billed new communities at the standard rate for classes once their initial training was complete); Guardian Resp. to ¶ 4.)

[51] (Ex. 10 to Guardian 30(b)(6) at GUARDIAN_0062398.)

**RESPONSE:** Guardian disputes this Paragraph. Guardian did not provide a "discounted rate" for preferred pharmacies. Subject to the allowances discussed in prior Paragraphs, Guardian typically charged Communities (including those where it was the preferred pharmacy) the $50 per employee per day rate reflected in the "blast emails" that Relator cites. This was Guardian's standard rate. Occasionally, Guardian provided a volume discount if a community had a large number of employees to train.[52] Regarding Five Star Senior Living Communities, there is no evidence that any of them actually received a different rate.[53]

> **RELATOR'S FACT NO. 42:** Communities' staff who assist residents with their medication "must receive training, certification, and period skills checks as a condition of ALC or PCH licensure." (Hopp Dep., Ex. 128 at ¶ 26; O.C.G.A. § 31-7-12.2(g) (ALCs); Ga. Comp. R. & Regs. R. 111-8-63-.20(7) (PCHs).)

**RESPONSE:** Undisputed.

> **RELATOR'S FACT NO. 43:** Guardian provided the classes to help the Communities' employees satisfy their Georgia state licensure requirements. (See Newcomb Dep. at 41:10–20; Hopp Dep. at 124:14–125:9; McKenzie Dep. at 14:4–12.)

**RESPONSE:** Guardian disputes this Paragraph to the extent it implies that the

---

[52] (*See, e.g.*, Newcomb Dep. 144:13–145:2 (noting that the recipient of the volume discount "had multiple other people that they ended up sending that they had to pay for").)

[53] (*See, e.g.*, Hopp Dep. 213:4–12 ("I can't recall that we ever implemented something like that").)

reason Guardian provided classes was to help Communities' employees satisfy

licensure requirements. Rather, Guardian provided classes to make the drugs

Guardian dispenses safer by, among other things, teaching attendees how to

administer medicine to patients and for the revenues these classes generated. [54]

> **RELATOR'S FACT NO. 44:** The former Vice President of Phoenix
> Senior Living—which managed several of Guardian's Communities
> including the Phoenix at Dunwoody, the Phoenix at Milton, the
> Phoenix at Roswell, and Addington Place and Alpharetta— admitted
> that Guardian is prohibited from providing free classes under the
> Anti-Kickback Statute. (Hunter Dep. at 14:13–16:12, 22:12–23:16, 76:8–
> 12.)

**RESPONSE:** Guardian objects to this Paragraph as an improper legal conclusion.[55]

Both expert and non-expert witnesses (like Ms. Hunter) are prohibited from

offering legal conclusions.[56] Notably, Relator testified that he had no concerns

about Guardian's training allowances.[57] Ms. Hunter also did not remember any of

her employees receiving free training, and testified free classes played no role in

Phoenix's selection of Guardian as a preferred pharmacy.[58]

> **RELATOR'S FACT NO. 45:** In January 2018, Guardian changed its
> policy and practice, and started charging for all education and

---

[54] (*See* Newcomb Dep. 12:21–13:8; McKenzie Dep. 58:4–16; Hasselbring Dep. 22:22–23:4; Hoffman Dep. 68:22–69:9; McGimsey Report, Dkt. No. 154-4, ¶¶ 28, 48-58.)

[55] *See* LR 56.1(B)(1), NDGa.

[56] *See, e.g., Huezo v. Los Angeles Community Colleage Dist.*, No. CV 0409772 MMM (JWJx), 2007 WL 7289347, at *6 (C.D. Cal. Feb. 27, 2007) (citing cases).

[57] (Heller Dep. 211:7–212:10.)

[58] (Hunter Dep. 69:20–21, 75:2–5.)

training classes. (Newcomb Dep. at 109:16–110:3; Newcomb Dep., Ex. 32, Ex. 33.)

**RESPONSE:** Guardian disputes Paragraph No. 45 because Guardian always charged for education and training classes, though it eliminated allowances in 2018, as discussed in response to Paragraph 4 above.

> **RELATOR'S FACT NO. 46:** Additionally, from at least 2015 through January 2018, Defendant's policy and practice was to offer and provide free skills checks to Communities' staff and employees. (Newcomb Dep. at 77:24–79:12, 117:11–24; Hopp Dep. at 121:20–122:17; Hopp Dep., Ex. 129 at 22–27.)

**RESPONSE:** Guardian disputes this Paragraph because, even before January 2018, Guardian charged for skills checks, including those performed as part of quarterly consulting, as discussed in response to Paragraph 4 above. Guardian did not have any "policy" of not charging for skills checks.[59]

> **RELATOR'S FACT NO. 47:** The skills checks that Guardian "provides generally track the Georgia state requirements[.]" (Hopp Dep., Ex. 129 at 22.)

**RESPONSE:** Undisputed.

> **RELATOR'S FACT NO. 48:** Guardian provided the skills checks while onsite at a Community performing the quarterly pharmacy consulting services or education classes. (Id.; Newcomb Dep., Ex. 19, Ex. 26.)

---

[59] (Hopp Dep. 122:12–19.)

**RESPONSE:** Guardian did not perform skills checks during classes.[60] Otherwise undisputed that Guardian provided some skills checks while onsite performing quarterly MMS, as discussed in Paragraph 4 above.

> **RELATOR'S FACT NO. 49:** Guardian's practice and policy was to not invoice the Community for the skills checks that it performed while on site at a quarterly consulting visit or providing an education class. (Hopp Dep., Ex. 129 at 22–23; Newcomb Dep., Ex. 19, Ex. 30.)

**RESPONSE:** As discussed in response to Paragraph Nos. 4, 46, and 48 above, Guardian did not have a "policy" to perform free skills checks and did not perform skills checks during education classes. Otherwise, Guardian does not dispute that, before January 2018, Guardian's pharmacists occasionally did not separately invoice for skills checks performed during quarterly consulting visits.

> **RELATOR'S FACT NO. 50:** Guardian provided the skills checks to help the Communities satisfy their Georgia state licensure requirements for their staff and employees. (Hopp Dep. Ex. 129 at 22; Hopp Dep. at 124:21–125:15; McKenzie Dep. at 16:16–17:6; Guardian 30(b)(6) Dep. at 33:10–37:8; Oaks Dep. at 28:1–14; see also O.C.G.A. § 31-7-12.2(g)(5).)

**RESPONSE:** Guardian disputes Paragraph No. 50 because the cited evidence does not show that the reason Guardian provided skills checks (and related classes) was to help Communities' satisfy licensure requirements.[61]

> **RELATOR'S FACT NO. 51:** In 2017, Guardian's Consulting

---

[60] (Ex. 19 to Newcomb Dep. at GUARDIAN_0115667.)
[61] McKenzie Dep. 18:18–19:4; *see also* Guardian Resp. to ¶ 4.

Department was spending much of its time performing skill checks without charge—explained by Ms. Newcomb that this service was so popular with Communities because "other pharmacies don't do them, or don't do them as often or as frequently for free." (Newcomb Dep. Ex. 31.)

**RESPONSE:** Guardian disputes this Paragraph because Relator's cited evidence does not state that Guardian's Consulting Department spent "much of its time performing skills checks without charge." Ms. Newcomb merely stated that it was difficult to find time to perform skills checks (paid or not) because the Consulting Department was busy performing quarterly consulting services.[62]

Other LTCPs provided skills checks during quarterly audits at no additional charge, including Collier's.[63] And Guardian often charged for skills checks.[64] The Court may otherwise consider this fact for summary judgment.

> **RELATOR'S FACT NO. 52:** In 2018, Defendant changed its policy and practice, and began charging Communities for all education classes and skills checks—referred to by Ms. Newcomb as a "very hard decision" and a "difficult change to make," but necessary because "you cannot give away everything for free and be able to hire enough help to meet the clients' needs, and not kill your pharmacist." (Newcomb Dep., Ex. 15, Ex. 16, Ex. 32, Ex. 33, Ex. 34.)

**RESPONSE:** Guardian disputes this Paragraph because Guardian charged for classes and skills checks before 2018, subject to limited allowances for training and

---

[62] (Ex. 31 to Newcomb Dep.)
[63] (Heller Dep. 81:8–82:7.)
[64] (Hawley Dep. 30:17–24; Johnson Dep. 32:15–33:12; Hunter Dep. 58:10–23.)

skills checks performed during quarterly MMS visits discussed in response to Paragraphs 4 and 46 above. In January 2018, Guardian eliminated those allowances.[65] The Court may otherwise consider this fact for summary judgment.

> **RELATOR'S FACT NO. 53:** Accordingly, in January 2018, Ms. Newcomb announced that "[Guardian] cannot continue to give everything away for free[,]" and that Matt Hopp "gave the okay" for charging for education and skills checks, but quarterly consulting services remained free. (Newcomb Dep., Ex. 32.)

**RESPONSE:** Guardian disputes this Paragraph because Guardian's quarterly consulting services did not "remain[] free," as Guardian was compensated for its quarterly consulting services via dispensing fees and residents' $10 monthly fees, as discussed in response to Paragraph 4 above. Moreover, Ms. Newcomb's statement was hyperbolic and not indicative of Guardian's actual charging policies.[66] The Court may otherwise consider this fact for summary judgment purposes.

> **RELATOR'S FACT NO. 54:** From January 1, 2014 to June 30, 2019, Defendant's policy and practice was to offer and provide free medication carts, laptops, and other equipment to its Communities to incentivize Communities. (Callow Decl., Ex. E, Hopp Dep. at 132:13–133:7; Guardian 30(b)(6) Dep. at 73:15–74:2; see, e.g., Trinity Dep. at 35:3– 14, Ex. 364; Magnolia Dep. at 61:11–62:20; Sides Dep. at 28:25–29:12; Hunter Dep. at 93:1–94:3.)

---

[65] (Ex. 129 to Hopp Dep. at No. 9.)
[66] (Hopp Dep. 57:3–25; Williams Dep. 44:18–45:1.)

**RESPONSE:** Guardian objects to Paragraph 54 to the extent it relates to medication carts, which is not a part of Relator's claim. Guardian also objects to the extent Paragraph 54 relies on Exhibit E to the Callow Declaration because it is a Rule 1006 summary exhibit improperly prepared by a lawyer.[67]

Guardian further disputes this Paragraph to the extent it implies that Guardian had a "policy" of giving away equipment to the Communities. Rather, the cited evidence is clear that Guardian merely *loaned* the Communities the medication carts and equipment needed to perform eMAR, which is something that all LTCPs do, as discussed in response to Paragraph 4 above, and thus was not intended to (and could not) incentivize the Communities to do anything. Further, Guardian's eMAR services (as well as the integrally-related laptops, carts, and other equipment) were covered by the $10 monthly fees.[68]

> **RELATOR'S FACT NO. 55:** One of the terms in many of the Services Agreement that the Communities signed with Guardian confirmed that Guardian provided the carts and laptops without charge. (E.g., Hopp Dep., Ex. 132, Ex. 133, Ex. 134, Ex. 135; Magnolia Dep., Ex. 260.)

**RESPONSE:** Guardian objects to Paragraph 55 to the extent it relates to medication carts, which is not a part of Relator's claim. Answering further, Guardian does not dispute it supplied Guardian-owned carts and laptops without

---

[67] (*See* Guardian Resp. to ¶ 7, *supra*.)
[68] (*See* Guardian Resp. to ¶ 4, *supra*.)

charge to the ALFs. However, these standard services were covered by the fees paid by Guardian's patients, the carts and laptops were integrally related to the performance of eMAR services, and the practice is standard throughout the industry, as discussed in response to Paragraph 4 above.

> **RELATOR'S FACT NO. 56:** Communities use the medication carts to store medications (from any pharmacy, not just Guardian) and to distribute medications to residents, a process known as "med pass." (E.g., Magnolia Dep. at 61:22–62:9; Oaks Dep. at 90:11–21; Oaks Dep., Ex. 289.)

**RESPONSE:** Guardian objects to Paragraph 56 to the extent it relates to medication carts, which is not a part of Relator's claim. Guardian also disputes this Paragraph because the cited evidence does not support the statement. Relator cites testimony from only two facilities, and extrapolates to all Communities. Guardian does not dispute that medication carts are used to store and distribute medicines and that the distribution of medicines is sometimes called a "med pass."

> **RELATOR'S FACT NO. 57:** Communities used the laptops to electronically maintain medication administration records, which are required by Georgia law. (See Hunter Dep. at 93:1–94:3; see O.C.G.A. § 31-7-12.2(g)(8); Ga. Comp. R. & Regs. 111-8-62-.20.)

**RESPONSE:** Guardian disputes this Paragraph because it misstates Georgia law, which requires medication administration records, but not *electronic* medication

administration records or related laptops.[69] Guardian does not dispute that it

supplied laptops for the sole purpose of running eMAR, which integrated with

Guardian, and this only occurred when Guardian was providing eMAR to its

patients in exchange for a fee, as discussed in response to Paragraph 4 above.

> **RELATOR'S FACT NO. 58:** Guardian "loaned" carts and laptops to
> Communities without charge so the Communities did not have to
> purchase them on their own. (Hopp Dep. at 132:13– 133:7; Guardian
> 30(b)(6) Dep. at 73:15–74:2; Newcomb Dep. at 50:7–19.)

**RESPONSE:** Guardian objects to Paragraph 58 to the extent it relates to

medication carts, which is not a part of Relator's claim. Guardian disputes this

Paragraph because the cited evidence does not support the stated reason Guardian

provided carts and laptops. Guardian does not dispute that it supplied carts and

laptops for eMAR, as discussed in response to Paragraph 4 above.

> **RELATOR'S FACT NO. 59:** Guardian also provided the laptop
> mount to attach the computer to the storage cart and provided limited
> technical support and expertise. (Hopp. Dep. at 132–133; Guardian
> 30(b)(6) Dep. at 72–74.)

**RESPONSE:** Guardian objects to Paragraph 59 because the cited testimony does

not support the statement that Guardian "provided limited technical support and

expertise." Otherwise undisputed.

---

[69] (*See* O.C.G.A. § 31-7-12.2(g)(8); Ga. Comp. R. & Regs. 111-8-62-.20; *see also* FAC,
Dkt. No. 24, ¶¶ 233-34; Answer, Dkt. No. 64 ¶¶ 233-34; Hopp Dep. 105:18–21;
Hoffman Dep. 70:1–71:11.)

> **RELATOR'S FACT NO. 60:** Guardian offered and provided the free
> and discounted services to Communities so, in exchange, the
> Communities would designate Guardian as their "preferred
> pharmacy" or "preferred provider." (Hopp Dep. at 206:18–208:22;
> Hopp Dep, Ex. 14, Ex. 22, Ex. 23, Ex. 146; Newcomb Dep., Ex. 21, Ex.
> 39, Ex. 44, Ex. 46, Ex. 47, Ex. 48; Dearing Decl. at ¶ 15.)

**RESPONSE:** Guardian disputes this Paragraph because it mischaracterizes record evidence. Guardian did not offer "free or discounted services to the Communities," as discussed in response to Paragraph 4 above. Further, the cited evidence states that Guardian will provide what virtually every LTCP provides (carts and eMAR laptops), and the ALF will do what virtually all ALFs do: provide the preferred pharmacy's information to residents.[70] It does not describe the carts or laptops as "free" or suggest that any other service is provided "in exchange" for preferred pharmacy status; instead, it expressly discusses resident choice.[71]

In addition, Relator extrapolates from one email about one Community involving only carts and laptops[72] to 80 communities involving multiple services. The ALF representative on whose testimony Relator relies directly refuted an

---

[70] (Ex. 21 to Newcomb Dep.)

[71] (*Id.*) ("we all know that residents have choice in GA," "should [the residents] choose to go elsewhere that's their right," and "It's pretty non-binding but we just ask it be signed so we can recoup the cost of our new equipment.").

[72] (*Id.*)

improper quid pro quo exchange.[73]

> **RELATOR'S FACT NO. 61:** As the "preferred provider" for the Community, the Community "agree[d] to use its best efforts to support" Guardian providing pharmacy services to residents. (E.g., Hopp Dep., Ex. 135 at 4.)

**RESPONSE:** Guardian disputes this Paragraph because the cited "Efforts" Clause (§ 2.2) says nothing about referrals or residents.[74] And Relator has cited no evidence supporting his interpretation that this provision relates to referrals. By contrast, there is a completely different section (§ 2.1) stating that Guardian will be the "Preferred Provider." (*Id.* § 2.1.) This provision does not require the ALF to do anything with respect to referrals, but expressly requires the Community to "inform the residents" of their "freedom to choose a pharmacy provider."[75]

> **RELATOR'S FACT NO. 62:** Guardian provided Communities with its standard "Welcome Packet" for the Communities to share with their residents. (Hopp Dep. at 84:23–85:4, Ex. 141, Ex. 142, Ex. 143; Guardian 30(b)(6) Dep. at 80:3–23; McKenzie Dep. at 160:15–162:9; Jan. 18, 2022 Deposition of Adriana Hasselbring ("Hasselbring Dep.")

---

[73] (March 3, 2022 Dearing Decl., Dkt. No. 154-14, ¶ 5 ("Guardian remains the preferred pharmacy because it provides good, reliable pharmacy services to the residents who choose to use Guardian," not because of any "extra services."); *id.* ¶ 6 ("The Community prefers that its residents use the preferred pharmacy because this is safer, easier, and more efficient than having multiple pharmacies in the Community"); *id.* ¶ 8 ("The Community's designation of Guardian as a preferred pharmacy is not at all based on any perception that the pharmacy services provided by Guardian are provided below fair market value or on terms any different from those offered by other long term care pharmacies.").

[74] (Ex. 135 to Hopp Dep. § 2.2.)

[75] (*Id.* § 2.1)

at 34:4–8; Oaks Dep. at 40:20–41:7; Trinity Dep. at 55:18–56:10; Magnolia Dep. at 46:3–19; Apr. 6, 2022 Rule 30(b)(6) Deposition of Rosewood Senior Living ("Rosewood Dep.") at 55:23–57:3; Sides Dep. at 41:6–15; Dearing Decl. at ¶¶ 8–9.)

**RESPONSE:** Undisputed.

> **RELATOR'S FACT NO. 63:** The Welcome Packet identified Guardian as the Community's "preferred pharmacy," and referred, recommended, and arranged the residents to Guardian to fill their pharmacy prescription orders. (Hopp Dep., Ex. 7.)

**RESPONSE:** Undisputed that the Welcome Packet identified Guardian as the Community's "preferred pharmacy," and that Communities typically recommended the use of the preferred pharmacy by identifying Guardian. Guardian denies that the Welcome Packet referred or arranged residents to fill their pharmacy prescription orders, and there is no such language contained in the cited evidence. Guardian further disputes Relator's characterization of the presentation of Guardian as the preferred pharmacy, as Communities testified that residents are explicitly told they have a choice in selecting a pharmacy, while still other Communities offer information about multiple pharmacies from which residents can choose, and still others testified that they provided the Welcome Packet only if the resident chooses to have her prescriptions filled by Guardian.[76]

---

[76] (*See* Boatman Dep. at 54-55, 57-58 & Ex. 367 thereto; Hawley Dep. at 46-47 & Ex. 279 thereto; Johnson Dep. at 43-44, 47-48, 52-54; Sides Dep. at 36-37, 38-39, 115; Trentham Dep. at 9-10.)

**RELATOR'S FACT NO. 64:** No other pharmacy's name or information was included in the Welcome Packets or other materials provided by the Communities to their residents. (Newcomb Dep. at 51:5–18; Oaks Dep. at 40:17–41:7; Trinity Dep. at 56:7–10; Hunter Dep. at 90:15–20; Sides Dep. at 41:11–15.)

**RESPONSE:** Guardian disputes this Paragraph because it cites testimony from four Communities and extrapolates to all Communities, and certain Communities included the names of other pharmacies in the Welcome Packets.[77]

**RELATOR'S FACT NO. 65:** Some Communities imposed a fee on residents who used a pharmacy other than Guardian, such as the Oaks Senior Living communities (Oaks at Braselton, Oaks at Hampton, Oaks at Post Road, Oaks at Stockbridge, and Oaks at Alpharetta), which imposed a $150 per month charge. (See, e.g., Oaks Dep. at 52:18– 53:1, Ex. 279.)

**RESPONSE:** Guardian disputes this paragraph to only to the extent it extrapolates evidence at one group of Communities to other unidentified Communities. Guardian further states it had no input into this particular practice, and there is no evidence when this fee was implemented or that it was for Guardian's benefit. To the contrary, the Oaks Senior Living communities implemented the charge to cover the time and cost needed to manually enter medications into the electronic medication administration system where the resident uses a retail pharmacy.[78]

---

[77] (*See, e.g.*, Johnson Dep. 47:2–48:19, 52:15–54:20.)

[78] (Oaks 30(b)(6) Dep. [Hawley Dep.] 50:16–51:5; *id.* at 52:25–53:1 (charging fee to cover "the manual entry it takes to enter orders into our software system") (punctuation omitted).)

**RELATOR'S FACT NO. 66:** The corporate representative for the Oaks communities testified that she "can't think of anyone who does" not use Guardian at their communities. (Oaks Dep. at 53:2–54:23.)

**RESPONSE:** Undisputed.

**RELATOR'S FACT NO. 67:** By way of further example, one Community—the Canterfield of Kennesaw—testified that it designated Guardian as its preferred pharmacy in exchange for the free services, and subsequently referred "hundreds of residents" to Guardian. (See Dearing Decl. at ¶¶ 8–15.)

**RESPONSE:** Guardian disputes this Paragraph because the cited testimony does not support the stated reason for Canterfield's selection of Guardian, and declarant's testimony refutes it.[79] Guardian does not dispute that Ms. Dearing's first declaration states that Canterfield referred hundreds of residents to Guardian.

**RELATOR'S FACT NO. 68:** Canterfield of Kennesaw agreed, in exchange for Guardian's free services, "to inform residents that Guardian is the preferred pharmacy[,]" to distribute to its existing and new residents Guardian's Welcome Packet, and "recommended that they fill their prescriptions with Guardian." (Id. at ¶ 8.)

**RESPONSE:** Guardian disputes this Paragraph because the declarant's cited

---

[79] (See 3/3/22 Dearing Decl., Dkt. No. 154-14, at ¶ 4 (The declarant "had no involvement in negotiating the [a]greement" between Canterfield and Guardian, and she did not "know why Mr. Sizemore selected Guardian as the Community's preferred pharmacy."); id. ¶ 5 ("I am not aware of any 'extra' services that Guardian provides . . . as compared to the services that are routinely provided by other [LTCPs]."); id. ¶ 8 ("The Community's designation of Guardian as a preferred pharmacy is not at all based on any perception that the pharmacy services provided by Guardian are provided below fair market value or on terms any different from those offered by other long term care pharmacies.").

testimony does not support the claim that Canterfield agreed "in exchange for Guardian's free services," and other testimony from the declarant, discussed in response to Paragraphs 60 and 67 above refute it. In addition, Communities commonly use a single preferred pharmacy for safety reasons, as discussed in response to Paragraph 5 above.

> **RELATOR'S FACT NO. 69:** When the residents completed the Guardian forms provided to them by Canterfield of Kennesaw, Canterfield of Kennesaw "gathered the completed forms from the resident and returned them to Guardian." (Id. at ¶ 10.)

**RESPONSE:** Undisputed.

> **RELATOR'S FACT NO. 70:** Over the years, Canterfield of Kennesaw "provided Guardian's information to hundreds of residents" and "approximately 97% of the Community's residents chose Guardian as their pharmacy." (Id. at ¶ 9.)

**RESPONSE:** Guardian does not dispute that Ms. Dearing's first declaration states these figures.

> **RELATOR'S FACT NO. 71:** Guardian tracked the number residents at each Community that Guardian for prescription drug services—referred to as Guardian's "penetration rate" or "adoption rate" at the Community. (E.g., Hopp Dep., at 87:16–90:1, Ex. 39, Ex. 149; Guardian 30(b)(6) Dep. at 191:22–192:15, Ex. 15; Hasselbring Dep., Ex. 118; Newcomb Dep. at 126:13–19; 151:1–25.)

**RESPONSE:** Undisputed.

> **RELATOR'S FACT NO. 72:** Guardian told Communities that if their "penetration rate" or "adoption rate" fell below a certain percentage, then the Communities would not receive the free/discounted

services. (See Hopp Dep., Ex. 14, Ex. 15; Newcomb Dep. at 251:7– 19, 255:5–23, Ex. 22, Ex. 46, Ex. 47, Ex. 48; Williams Dep., Ex. 88.)

**RESPONSE:** Guardian disputes this Paragraph to the extent it claims that Guardian's services were "free/discounted" for the reasons stated in response to Paragraph 4 above. Also, Guardian provided MMS for its patients without charge to the ALF regardless of the number of patients in the ALF.[80] The cited evidence reflects Guardian's belief that other pharmacies should do the same for their patients and that Guardian sought to avoid providing pharmacy services for residents who were *not* its patients without charging a fee.[81] Moreover, Relator ignores direct evidence that Guardian did not condition services on adoption rates. For example, one ALF testified that the number of residents using Guardian decreased (from 40 to 12), and Guardian never threatened to remove or reduce services and continued to provide the same level of service it always had.[82]

> **RELATOR'S FACT NO. 73:** Guardian required that Communities have a majority or "super majority" of their residents fill their prescriptions at Guardian Defendant before the Community could receive free/discounted services and goods from Defendant. (Newcomb Dep. at 151:1–153:25; 158:19–164:8, Ex. 14, Ex. 22, Ex. 39, Ex. 44.)

---

[80] (*See, e.g.,* Newcomb Dep. 251:15–19 (noting that Guardian still provides quarterly reviews to *all* its residents, even if off-site).)

[81] *See, e.g.,* Ex. 47 to Newcomb Dep. ("I can review *your non-Guardian* pharmacy residents, however, there is a per-resident charge for *this service*.") (emphasis added).)

[82] (Johnson Dep. 138:15–140:6.)

**RESPONSE:** Guardian disputes this Paragraph because Guardian did not provide "free/discounted" services or goods even to preferred Communities for the reasons stated in response to Paragraph 3, 4, and 5 above. Guardian further disputes this Paragraph for the reasons stated in response to Paragraph 72 above. Guardian required that its patients comprise more than a small percentage of a Community before changing their packaging or their records from *paper* MAR to *electronic* MAR because making its patients outliers in the Community was unsafe.[83] Moreover, none of the cited evidence demonstrates that Guardian provided services to Communities on any different pricing terms based on the number or percentage of patients at that Community. Guardian also did not provide training to Communities where it did not have any patients, in part, because "it is going to take a lot more time, effort to prepare for training because we don't service those buildings or we don't serve many residents in those buildings. So packaging is different."[84]

**RELATOR'S FACT NO. 74:** Guardian told Communities that if they

---

[83] (Newcomb Dep. 156:7–19, 158:19–159:16; McKenzie Dep. 49:5–18; Guardian 30(b)(6) Dep. 195:15–200:15.)

[84] (Newcomb Dep. 61:1–7; *see also* Hopp Dep. 206:18–207:13 (this was "a pretty unique situation in that . . . there was literally no agreement with the building and the pharmacy whatsoever. . . . I don't even know what training is being provided by other pharmacies. . . . I don't know what kind of dispensing methods you have in the building").)

did not refer a majority of their residents to Defendant, then Defendant "ha[s] to charge for [its] services[.]" (Newcomb Dep. at 161–162, Ex. 14.)

**RESPONSE:** Guardian disputes this Paragraph because the cited evidence does not support it. In a May 18, 2017 email, Ms. Newcomb wrote that she will provide skills checks for a charge (in the same amount Guardian charges for skills checks where it is the preferred pharmacy), but "your preferred provider should be doing these for you," reflecting the belief that this service is one that all LTCPs should provide in support of their patients.[85] In a May 22, 2017 email, Five Star was asking Guardian to review *non-Guardian patients*, which is something that Guardian does not do for free even where it is the preferred pharmacy and which is why Mr. Hopp says "it's much more work to audit with *another pharmacy's* medications and records at the community."[86]

> **RELATOR'S FACT NO. 75:** Guardian told Communities that if they are not the "preferred pharmacy" then Guardian must "charge the community the full rate of $125 per attendee." (Id. at Ex. 14, Ex. 23.)

**RESPONSE:** Guardian disputes this Paragraph because the quoted language

---

[85] (Ex. 14 to Newcomb Dep. at GUARDIAN_0073082.)

[86] (Ex. 14 to Newcomb Dep. at GUARDIAN_0073081 (emphasis added); Hopp Dep. 213–218; *see also* Guardian 30(b)(6) Dep. 104:19–106:5 ("[W]e were going to charge additional for any kind of audits because . . . we did not provide the medication carts or anything, and what was in them wasn't from our pharmacy . . . . So they're asking us to, you know, review things that we don't even know what we're reviewing when we go there.").)

appears nowhere in the cited evidence, which does not mention anything about a "full rate" and does not show a proposed charge "of $125 per attendee" for *classes*. Ms. Newcomb proposed a fee of $125 per *skills check*, which is the Guardian's standard rate for skills checks where Guardian is the preferred pharmacy.[87] Further, Relator improperly extrapolates a single email to a single community.

> **RELATOR'S FACT NO. 76:** Guardian viewed these free services as leverage to increase penetration rate in its Communities; in a February 2018 leadership discussion about a new fee for "consulting for non-guardian residents," Pharmacy Director Tim Williams expressed concern "that [the fee] takes away our leverage to increase penetration in the community." (Newcomb Dep., Ex. 15.)

**RESPONSE:** Guardian disputes this Paragraph because the cited evidence does not support it. Mr. Williams testified it was the *consulting for non-Guardian residents*—*i.e.*, offering MMS as a standalone service to residents to whom it has not dispensed—not the related fees, that he feared would take away Guardian's leverage.[88] Guardian was also concerned about the risks and costs of performing MMS for residents who were not its patients.[89]

> **RELATOR'S FACT NO. 77:** Ms. Newcomb responded to Mr. Williams, agreeing that "penetration" might suffer, but the solution was to "keep pushing clients that have non-Guardian residents to convert them" to Guardian. (Id.)

---

[87] (Exs. 14 and 23 to Newcomb Dep.)
[88] (Williams Dep. 57:9–65:20, 80:17–82:9; Ex. 15 to Newcomb Dep. at GUARDIAN_0055069.)
[89] (Hopp Dep. 95:24–97:8, 100:3–104:25.)

**RESPONSE:** Guardian disputes this Paragraph because, while Ms. Newcomb agreed that "penetration" might suffer if Guardian consulted for non-Guardian residents, she did not advise "pushing clients that have non-Guardian residents to convert them" as a "solution" to the "penetration issue."[90] Rather, she mentioned the importance of "pushing clients that have non-Guardian residents to convert them *for compliance*" reasons—in other words, convince residents to use Guardian because its services were better.[91]

> **RELATOR'S FACT NO. 78:** In a January 20 and February 6, 2015 email to one Community, President Hopp stated that under the Services Agreement Guardian will provide the community with new equipment (carts/computers, etc.), and "in exchange" Guardian will be the community's "primary and preferred pharmacy"—meaning that Guardian's admission packet "is the only packet [the community will be handing out[.]" (Newcomb Dep., Ex. 21.)

**RESPONSE:** Undisputed.

> **RELATOR'S FACT NO. 79:** Guardian internally described the Consulting Department as the "sales team." (Holloway Dep. at 21:18–22:16.)

**RESPONSE:** Undisputed, but immaterial to summary judgment.

> **RELATOR'S FACT NO. 80:** The consulting nurses are paid out of the Guardian "marketing" budget. (Id. at 164:16–165:20.)

---

[90] (Ex. 15 to Newcomb Dep. at GUARDIAN_0055068.)
[91] (*Id.*)

**RESPONSE:** Undisputed, but immaterial to summary judgment.

**RELATOR'S FACT NO. 81:** Guardian provided "incentive plan" compensation and bonuses to members of its Consulting Department, part of which was based on maintaining and increasing patient count in Guardian's Communities. (McKenzie Dep. at 166:24– 170:7, Ex. 117.)

**RESPONSE:** Guardian disputes this Paragraph because Relator's cited evidence only discusses an incentive plan for Ms. McKenzie, not any other members of the consulting team, as she was the only consulting employee who received any compensation related to patient count.[92] Ms. McKenzie testified that meeting targets was not something she was concerned about "at my level."[93]

**RELATOR'S FACT NO. 82:** Guardian knew that providing free quarterly pharmacy consulting services for the purpose of inducing Communities to refer their residents to Defendant was a kickback in violation of the Anti-Kickback Statute. (Dec. 21, 2021 Deposition of Bob Weir ("Weir Dep.") at 129:20–130:02.)

**RESPONSE:** Guardian disputes this Paragraph because it is not supported by the cited evidence. Guardian's denies that its MMS was provided for free and further denies that it was provided for the purpose of inducing referrals.[94]

Moreover, Robert Weir repeatedly differentiated between the Anti-Kickback Statute ("AKS") implications of charging ALFs and skilled nursing

---

[92] (Hopp Dep. 230:8–232:10.)
[93] (McKenzie Dep. 168:8–169:20.)
[94] (*See* Guardian Resp. to ¶ 4, *supra*; McAnaney Dep. 151:23–152:10, 156:4–12.)

facilities ("SNFs") for MMS, and his testimony about charging for MMS related to *SNFs*, not ALFs.[95] Mr. Weir also testified that MMS in ALFs could be covered by the dispensing fee (or a fee paid directly by the patient).[96]

> **RELATOR'S FACT NO. 83:** Guardian's own Services Agreements with the Communities prohibit Guardian from engaging in a kickback scheme, requiring that Guardian provide "consulting pharmacist services only on terms that account for [Guardian]'s costs to do so, and never below those costs" and that "[a]ll arrangements for consulting pharmacist services will be established without regard to any referrals." (Id.; see also, e.g., Guardian 30(b)(6) Dep., Ex. 5; Hopp Dep., Ex. 132–136.)

**RESPONSE:** Undisputed.

> **RELATOR'S FACT NO. 84:** The Services Agreements further state that "[n]either [Guardian] nor [the Community] will offer, solicit, pay, or receive any remuneration (anything of value) intended to induce referrals of any patient or the purchasing or ordering of any item or service that" may be payable by Medicare. (Id.)

**RESPONSE:** Undisputed.

> **RELATOR'S FACT NO. 85:** One witness for Guardian's parent company, Guardian Pharmacy LLC, conceded that providing these

---

[95] (*See, e.g.,* Weir Dep. at 131:1-8 ("[W]e have to charge for consulting services in skilled nursing facilities because they are paid by Medicare because the OIG has provided compliance guidance and because . . . a credentialed pharmacist is part of the care team in skilled nursing facilities. Very different from ALF.").) Much of the guidance on which Relator relied earlier in this case concerned SNFs, not ALFs, including the *OIG Supplemental Compliance Program Guidance for Nursing Facilities*. (*See, e.g.,* Kaupp Report at 7; Hoffman Report at 7–9 (citing 73 Fed. Reg. 56832-02 (Sept. 30, 2008).)

[96] (Weir Dep. at 70:19–71:6, 71:23–72:14, 73:6–15, 77:22–78:8, 79:7–17, 102:21–24, 106:16–19, 108:14–109:2, 123:14–20, 126:18–127:2, 131:2–8, 164:15–165:8, 168:9–23.)

free services to Communities "[for the purpose of inducing would be a kickback[,]" "recommend[ed] against" providing free quarterly consulting services, and believes Guardian "should be charging for it." (Weir Dep. at 129:20–130:2, 132:07–133:4.)

**RESPONSE:** Guardian disputes this Paragraph for the reasons stated in its response to Paragraph No. 82. Also, Mr. Weir testified that it would be a good pharmacy practice to charge for MMS to ensure that good pharmacy services were provided to patients, but he disputed that the recommendation was based on a legal interpretation of the requirements of the AKS.[97] He further testified that the requirement to charge for MMS is in skilled nursing facilities, which is very different from an ALF.[98]

> **RELATOR'S FACT NO. 86:** Another witness for Guardian Pharmacy LLC testified he was without knowledge that Guardian provided quarterly consulting services to Communities. (Jan. 13, 2022 Deposition of Daks Hamner ("Hamner Dep.") at 59:14–17.)

**RESPONSE:** Guardian disputes that MMS is provided "to Communities" for the reasons stated in response to Paragraph 3 above. Guardian does not dispute that Mr. Hamner, an accounting employee whose job does not involve pharmacy operations or clinical practices, did not know that Guardian provided MMS, but he also did not know what MMS was or the difference between an ALC and a

---

[97] (Weir Dep. at 131:10-133:20.)
[98] (*Id.* at 130:23-131:18; *see also id.* at 108:14-109:2.)

PCH.[99] He did not say anything about Guardian's practices violating the AKS.

> **RELATOR'S FACT NO. 87:** Guardian, as a subcontractor for Medicare Part D plan sponsors, is required to comply with all applicable laws, including the Anti-Kickback Statute. (42 C.F.R. § 423.505(i)(4)(iv).)

**RESPONSE:** Undisputed.

> **RELATOR'S FACT NO. 88:** Mr. Hopp is responsible for compliance efforts at Guardian. (Holloway Dep. at 31:15–19.)

**RESPONSE:** Undisputed.

> **RELATOR'S FACT NO. 89:** Guardian employees were required to take annual fraud, waste, and abuse training, including the Anti-Kickback Statute. (Newcomb Dep. at 69:8–13; Guardian 30(b)(6) Dep. at 147:17–22; Holloway Dep. at 28:15–30:25.)

**RESPONSE:** Undisputed.

> **RELATOR'S FACT NO. 90:** Guardian knows that their Medicare claims must comply with fraud, waste, and abuse laws. (Holloway Dep. at 116:17–117:5.)

**RESPONSE:** Undisputed.

> **RELATOR'S FACT NO. 91:** Mr. Hopp and Mr. Holloway have decades of experience in the long-term care industry. (Holloway Dep. at 14:1–18:3; Guardian 30(b)(6) Dep. at 14:13– 18:18.)

**RESPONSE:** Guardian disputes this Paragraph only to the extent that Mr.

Holloway's experience before joining Guardian in 2018 was in skilled nursing

---

[99] (Hamner Dep. at 8:19-17:22, 13:7-10, 65:22-67:3.)

facilities or nursing homes, not ALFs or LTCPs.[100]

> **RELATOR'S FACT NO. 92:** In November 2009, one of Guardian's competitors in the long-term pharmacy industry, Omnicare, Inc., paid $98 million to settle False Claims Act allegations that it, among other things, supplied unlawful inducements in the form of free pharmacist consulting services to skilled nursing facilities in violation of the Anti-Kickback Statute. (Weir Dep., Ex. 58.)

**RESPONSE:** Guardian disputes this Paragraph because the cited evidence does not support the claim that the $98 million settlement (or any portion of it) was based on Omnicare providing "free pharmacist consulting services to skilled nursing facilities," and the press release detailed allegations far different and more egregious than an LTCP providing MMS to its own patients in an ALF. Relator's AKS expert conceded that she was not aware of *any* DOJ prosecutions that solely involved an LTCP providing "free" MMS to its own Part D patients in SNFs or ALFs.[101] There is no evidence the allegations of Omnicare's provision of consulting service, separate from the overall scheme to push Risperdal on SNF residents, played any role in the government's prosecution or Omnicare's settlement.

> **RELATOR'S FACT NO. 93:** Numerous law firms, including Guardian's own counsel, published articles regarding the Omnicare settlement advising that "[t]he government's pharmacy consultant allegations in [the] Omnicare case should serve as a catalyst for both pharmacy providers and nursing homes to reexamine their existing relationships to ensure that pharmacy consultant services are being

---

[100] (*See* Holloway Dep. at 14:7–15:15.)
[101] (Hoffman Dep. 184:2–187:20, 189:8–191:15.)

provided on a fair market basis and without regard to the referrals generated by nursing homes." (Weir Dep., Ex. 59; June 14, 2022 Deposition of Kevin McAnaney ("McAnaney Dep."), Ex. 394.)

**RESPONSE:** Undisputed, but immaterial to summary judgment.

**RELATOR'S FACT NO. 94:** Guardian knew that providing quarterly pharmacy consulting services to the Communities "free of charge" or "at no change" was below the actual $9–11 fair market value for the services. (Hopp Dep. at 270–281, Ex. 159–60.)

**RESPONSE:** Guardian disputes this Paragraph because the cited evidence does not support it. As discussed in response to Paragraphs 3 and 4 above, Guardian provided MMS to its patients (not the Communities), and it did not provide MMS "free of charge" or "at no charge." Further, the cited evidence does not support the claim that $9-11 was fair market value for the services, as discussed in response to Paragraph 16 above.

**RELATOR'S FACT NO. 95:** Guardian knew that it could stop providing free quarterly pharmacy consulting services, free classes and training, and free skills checks to the Communities, as other pharmacies were not providing those services to communities. (Newcomb Dep., Ex 31.)

**RESPONSE:** Guardian disputes this Paragraph because the evidence cited is incomplete and does not support the statement as to the practices of other unidentified pharmacies. Additionally, the cited email does not support the statement of "free" consulting services, classes and training, and skills checks.

Ms. Newcomb testified that she was thinking about Collier's and the

quarterly audit it performed as not being up to her standards of the type of quarterly audit that Guardian provided.[102] She also testified that residents who used retail pharmacies did not get quarterly reviews, but she discussed this in the abstract, and would have no way of knowing what services non-Guardian patients received.[103] There is no evidence in the record of any long term care pharmacy routinely charging Communities for MMS, and other services and charges Guardian provided were industry standard.[104] As such, this email does not establish that "Guardian knew" something that the evidence shows is incorrect.

> **RELATOR'S FACT NO. 96:** Guardian's business has continued to grow as a result of referrals from Communities. (Holloway Dep. at 153:3–155:5; Oaks Dep. at 53:2–54:23; Dearing Decl. at ¶ 9.)

**RESPONSE:** Guardian disputes this Paragraph because, while the cited evidence supports that Guardian's business and census has grown over the years, it does not reflect that this growth is the "result of referrals from Communities."

> **RELATOR'S FACT NO. 97:** Guardian has provided long-term care pharmacy services to thousands of residents at the 80 identified Communities, resulting in tens of thousands of claims submitted to Medicare and TRICARE. (Adam Decl. at ¶¶ 2–4, 8, 13–14, Attached Summary Report.)

**RESPONSE:** Guardian objects to the extent Paragraph No. 97 relies on the

---

[102] (Newcomb Dep. at 103:11-104:11.)

[103] (*Id.* at 104:19-106:2.)

[104] (*See* Guardian Resp. to ¶ 6, *supra.*)

Damages Chart/Attached Summary Report to the Adam Declaration because it is an improper Rule 1006 summary exhibit.[105]

Further, Guardian disputes that claims were submitted to Medicare and TRICARE. Rather, claims were submitted to Guardian's Plan Sponsors and PBMs.[106] There is no evidence of claims, or prescription drug events (PDEs), submitted by the Plan Sponsors or PBMs to Medicare or TRICARE.

> **RELATOR'S FACT NO. 98:** These thousands of claims have resulted in an aggregate loss to the Government for Medicare and TRICARE claims of $16,098,070, reflecting the Government's share of the payments; this amount does not include statutory treble damages and penalties. (Id.)

**RESPONSE:** Guardian disputes Paragraph No. 98 for the reasons set forth in its response to Paragraph No. 97. Guardian also disputes that Relator has presented admissible evidence showing that any claims were submitted to the Government or that the Government has sustained any "loss" because of Guardian's claims or actions. Guardian disputes that Relator is entitled to statutory treble damages or penalties.

Indeed, contrary to Paragraph No. 98, Relator's expert, Ms. Hoffman, conceded that the only way to show the Government's loss would be to determine

---

[105] (*See* Guardian Resp. to ¶ 7, *supra*.)
[106] (*See, e.g.*, Expert Report of Gregory Russo at 9–10.)

(a) what Medicare paid to each Part D Plan for a given year in the reconciliation based on the PDE data; then (b) remove any improper claims and determine what Medicare should have paid to each Part D Plan for that same year in reconciliation; then (c) the difference between (a) and (b) would be the Government loss.[107] Mr. Shaked did not perform this reconciliation process and did not have the PDE data necessary to perform a reconciliation.[108] As a result, Guardian disputes that Relator has shown the existence or amount of any government loss.[109]

Respectfully submitted this 1st day of November, 2022.

ARNALL GOLDEN GREGORY LLP

*/s/ Glenn P. Hendrix*
Glenn P. Hendrix
Georgia Bar No. 346590
glenn.hendrix@agg.com
W. Jerad Rissler
Georgia Bar No. 142024
jerad.rissler@agg.com
David L. Hobson
Georgia Bar No. 358425
david.hobson@agg.com

171 17th Street, Suite 2100
Atlanta, Georgia 30363-1031
404.873.8500

---

[107] (Hoffman Dep. 194:22–196:1, 197:2–10, 199:16–22.)
[108] (*Id.* at 194:22–196:1.)
[109] (*Id.* 197:2–10, 199:16–22.)

<u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that the foregoing was prepared using Book

Antiqua 13-point font in accordance with Local Rule 5.1(C).

<u>*/s/ Glenn P. Hendrix*</u>
Glenn P. Hendrix
Georgia Bar No. 346590

This 1st day of November, 2022.

## CERTIFICATE OF SERVICE

I hereby certify that on November 1st, 2022, I electronically filed the foregoing **DEFENDANT'S RESPONSE TO RELATOR'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF RELATOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all Counsel of Record.

_/s/ Glenn P. Hendrix_
Glenn P. Hendrix
Georgia Bar No. 346590

ARNALL GOLDEN GREGORY LLP
171 17th Street NW
Suite 2100
Atlanta, Georgia 30363-1031
Telephone: 404.873.8500
Facsimile: 404.873.8501