## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA *ex rel.*
HENRY B. HELLER,

     Plaintiffs,

v.

GUARDIAN PHARMACY OF ATLANTA,
LLC,

     Defendant.

Civil Action No.
1:18-cv-03728-SDG

## <u>OPINION AND ORDER</u>

This matter is before the Court on Plaintiff-Relator Henry B. Heller's and

Guardian Pharmacy of Atlanta, LLC's cross-motions for summary judgment

[ECF 146; ECF 154]; motions to seal [ECF 137; ECF 143; ECF 147; ECF 156; ECF 167;

ECF 176]; motions to exclude expert testimony [ECF 144; ECF 145; ECF 149;

ECF 173]; motions to exclude other evidence and argument [ECF 150; ECF 168;

ECF 180]; motion for leave to file supplemental authority and strike corresponding

briefs [ECF 196; ECF 212; ECF 214; ECF 218; ECF 223]; as well as non-party Senior

Care Pharmacy Coalition's brief of *amicus curiae* [ECF 202] and non-party United

States of America's Statement of Interest [ECF 198].

After a review of the briefing, and with the benefit of oral argument

[ECF 211], this Order resolves all pending motions. The Court holds:

- Regarding the cross-motions for summary judgment:

- o Heller's motion for partial summary judgment is **DENIED** [ECF 146]; and

- o Guardian's motion for summary judgment is **DENIED** [ECF 154];

- Regarding the motions to seal, and subject to the caveats discussed in this Order:

  - o Heller's motions for leave to file matters provisionally under seal are **GRANTED** [ECFs 137, 147, 167]; and

  - o Guardian's motions for leave to file matters under seal are **GRANTED IN PART and DENIED IN PART** [ECF 143, 156], and **GRANTED** [ECF 176];

- Regarding the motions to exclude expert testimony:

  - o Heller's motion to exclude Kevin G. McAnaney's and Dr. Alyson L. Wooten's expert testimonies is **DENIED** [ECF 149]; and

  - o Guardian's motions to exclude Allison Hoffman's and Dr. Israel Shaked's expert testimonies are **DENIED** [ECFs 144, 173], and its motion to exclude the testimony of Gregory Kaupp is **GRANTED** [ECF 145];

- Regarding the motions to exclude other evidence and argument:

  - o Heller's motion to exclude documents and expert testimony based on those documents [ECF 150] is **DENIED**;

- o Guardian's motion to exclude Heller's medication cart allegation is **GRANTED** [ECF 168]; and

- o Guardian's motion to exclude Heller's summary exhibits is **DENIED WITHOUT PREJUDICE** [ECF 180]; and

- Regarding the motions for leave to file supplemental authority and strike corresponding briefs:

  - o Heller's motion to notify the Court of the United States' briefing in other cases is **DENIED** [ECF 196], and his motions to notify the Court of supplemental authorities are **GRANTED** [ECFs 218, 223]; and

  - o Guardian's motion to notify the Court of supplemental authority is **GRANTED** [ECF 212], and its motion to strike is **DENIED** [ECF 214].

## TABLE OF CONTENTS

I.    Background ...................................................................................... 9

A.    Facts ....................................................................................... 9

1.    The ALFs.................................................................. 11

2.    Dispensing Fees and the PBM Contracts ................... 12

3.    The Services and the Services Agreements ................ 13

i.    eMAR (Electronic Medication
Administration Record Services) and the
Laptop Computers ............................................ 14

ii.    MMS (Medication Management and
Consulting Services) ........................................ 15

iii.   Training............................................................ 18

4.    The Alleged False Claims ........................................ 19

B.    Procedural History ................................................................. 20

II.   Threshold Motions .......................................................................... 21

A.    Guardian's Motion to Exclude Heller's Medication Cart
Allegation [ECF 168] .............................................................. 21

B.    Heller's Motion to Exclude Documents Not Produced
During Discovery and to Bar Expert Testimony Based
on Those Documents [ECF 150] .............................................. 22

1.    The Discovery Rules ................................................ 23

2.    Analysis................................................................... 24

i.    The Compensation Information........................ 24

ii.    The Third-Party Declarations.......................... 26

C.    Guardian's Motion to Exclude Heller's Summary
Exhibits [ECF 180] ................................................................. 28

1.      Rule 1006...........................................................................29

2.      Analysis..........................................................................29

      *i.*      The Advocate-Witness Rule ...........................29

      *ii.*     The Exhibits.....................................................31

          *a.*     Exhibit A ..............................................31

          *b.*    Exhibit B ..............................................33

          *c.*     Exhibit C ..............................................35

          *d.*    Exhibit E ..............................................37

      *iii.*    The Damages Chart.........................................38

D.     The Motions to Exclude Expert Testimony [ECFs 144, 145, 149, 173]............................................................39

      1.      Rule 702............................................................................39

      2.      Guardian's Motion to Exclude the Expert Testimony of Dr. Israel Shaked [ECF 173]................................41

      3.      Heller's Motion to Exclude the Expert Testimony of Kevin G. McAnaney and Dr. Alyson L. Wooten [ECF 149]............................................................46

          *i.*      McAnaney .......................................................48

          *ii.*     Dr. Wooten .....................................................50

      4.      Guardian's Motion to Exclude the Expert Testimony of Gregory Kaupp [ECF 145] ...................................53

          *i.*      Opinion 1: Remuneration and Independent Value ...............................................................53

          *ii.*     Opinion 2: PBM Contracts and Dispensing Fees ...............................................................55

     5.     Guardian's Motion to Exclude the Expert Testimony of Allison Hoffman [ECF 144] .................................. 58

E.     The Motions to Seal [ECFs 137; 143; 147; 156; 167; 176] ..................... 60

     1.     Legal Standard ................................................................................. 60

     2.     Analysis ............................................................................................. 61

          i.     Non-Party-Designated Confidential Information [ECFs 137, 143, 156] ...................................... 61

          ii.     Party-Designated Confidential Information [ECFs 147, 167, 176] .................................................. 63

               a.     Guardian-Designated Confidential Information [ECFs 147, 167] .................................. 63

                    1.     ECF 147 ................................................ 63

                    2.     ECF 167 ................................................ 65

               b.     Heller-Designated Confidential Information [ECF 176] ............................................ 66

F.     The Motions to File Supplemental Authorities [ECFs 196, 212, 214, 218, 223] ............................................................. 67

     1.     Legal Standard ................................................................................. 67

     2.     Analysis ............................................................................................. 68

          i.     Heller's Motions [ECFs 196, 218, 223] ............................ 68

               a.     Heller's Motion to Notify the Court of Government Briefing in Unrelated Cases [ECF 196] ....................................................... 68

               b.     Heller's Motions to Notify the Court of *Schutte v. SuperValue, Inc.* [ECF 218] and *United States v. Teva Pharmaceuticals USA* [ECF 223] ............................. 69

          ii.     Guardian's Motions [ECF 212, 214] .................................. 69

|  |  | *a.* | Guardian's Motion to Notify the Court of *United States ex rel. Martin, et al. v. Hathaway, et al.* [ECF 212] ............................ 69 |
|  |  | *b.* | Guardian's Motion to Strike Heller's Opposition Brief [ECF 214] .................................. 70 |

III. Summary Judgment Motions [ECFs 146, 154].................................................. 71

A. Legal Frameworks ............................................................................. 71

    1. Summary Judgment .................................................................. 71

    2. The False Claims Act (FCA) and the Anti-Kickback Statute (AKS) ............................................ 72

        *i.* The FCA ......................................................... 72

        *ii.* The AKS ........................................................ 74

        *iii.* AKS Violation as a False Claim ....................... 76

            *a.* Remuneration ......................................... 77

                *1.* Defining Remuneration............................ 77

                *2.* Independent Value and Fair Market Value ................................ 78

            *b.* Inducement ............................................. 80

            *c.* Scienter.................................................... 82

            *d.* Materiality and Causation ..................... 86

B. Discussion......................................................................................... 89

    1. Medication Management and Consulting Services (MMS)........................................................................ 89

    2. Electronic Medication Administration Record (eMAR) and Laptops .............................................. 97

       *i.*     Whether eMAR and the Laptops Were
Integrally Related to Guardian's
Prescription Fulfillment ........................................................ 98

            *a.*    Georgia Law on ALF Licensure ............................ 99

            *b.*    MMS Efficiency ....................................................... 100

            *c.*    Monthly Fee and Fair Market Value
(FMV) ........................................................................ 101

            *d.*    OIG Guidance on eMAR and
Associated Technology .......................................... 102

       *ii.*    Whether the Laptops Were Loaned ............................. 103

    3.    Training ........................................................................................ 105

IV.    Conclusion ........................................................................................... 109

## I.   Background[1]

### A.   Facts

This is a *qui tam* action arising from an alleged kickback scheme implicating Guardian, a non-retail, long-term care pharmacy (LTCP) that fills about 68,000 prescriptions monthly for over 4,000 patients.[2] Heller, a former consultant whom Guardian retained after acquiring the LTCP he co-owned, Collier's Personal Care Pharmacy (Collier's), allegedly witnessed the scheme unfold.[3]

Heller does not assert any wrongdoing related to the care Guardian provided its patients. Nor does he argue that Guardian over-charged for prescription drugs, charged for prescriptions that were not medically necessary, or influenced anyone to over-distribute prescription drugs to its patients, for example. There is no allegation that one party offered another meals, vacations, gifts, or payments for services not actually performed or to influence medical decision-making, all of which are classic trappings of healthcare industry kickback schemes.

---

[1]  Many of the documents filed in this case have been placed under seal. The Court has determined that those portions of the record cited in this Order do not require the protection of a seal.

[2]  ECF 171-2, ¶ 1; ECF 179, at 2 (RELATOR'S FACT NO. 2).

[3]  ECF 171-2, ¶ 17; ECF 179, at 2 (RELATOR'S FACT NO. 1).

Rather, Heller propounds a relatively novel theory of liability: that Guardian induced assisted living communities (ALCs) and personal care homes (PCHs) (collectively, the ALCs and PCHs are called ALFs or Communities[4]) to select it as a "preferred" LTCP.[5] Heller alleges that Guardian provided inducements in the form of free or low-cost services to ALFs that the ALFs would otherwise have had to purchase (regardless of whether those services also benefitted the ALFs' residents), and, in exchange, the ALFs awarded Guardian lucrative "preferred" status.[6] In Heller's view this was a kickback scheme in violation of the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320, *et seq.* Every time Guardian dispensed a Government-reimbursable prescription drug to its patients residing at ALFs that "preferred" Guardian under such an arrangement, Heller contends that Guardian committed a fraud on the federal fisc under the False Claims Act (FCA), 31 U.S.C. § 3729, *et seq.*

---

[4]   Though the Court adopts "ALFs" as its preferred convention, Heller refers to ALFs as "Communities," and the terms are used by the parties interchangeably. ECF 179, at 2 (RELATOR'S FACT NO. 2).

[5]   ECF 171-2, ¶ 1. Heller does not appear to dispute that Guardian is a LTCP, but instead disputes that Guardian meets the Centers for Medicare and Medicaid Services' definition of a LTCP. *See also* ECF 179, at 3–6 (RELATOR'S FACT NO. 5) (discussing Heller's understanding of the "preferred" pharmacy arrangements implicated in this case, with Guardian conceding at least the existence of its "preferred" pharmacy relationships with ALFs).

[6]   *Id.* at 3 (RELATOR'S FACT NO. 4).

To better understand the complexity and tenuousness of Heller's theory, some additional detail is warranted.

### 1. The ALFs

From January 1, 2014 through June 30, 2019, Guardian served at least 80 ALFs and their residents.[7] Though they seem outwardly similar, ALFs operate differently from other long- and short-term care facilities: Unlike skilled nursing facilities (SNFs)—*i.e.*, "nursing homes," which are Medicaid- or Medicare-certified daily care centers—ALFs receive no direct Government reimbursement for pharmacy services.[8] Rather, ALFs are privately funded by their residents' payments.[9] While most of Guardian's patients are Medicare beneficiaries,[10] Medicare typically does not cover the cost of assisted living.[11] Residents pay ALFs for residential services and, when they wish, utilize the ALF's preferred pharmacy for pharmacy services.[12]

Like "community homes," which are other non-SNFs the parties referenced in this lawsuit, ALFs are not healthcare facilities. ALFs do not purchase drugs;

---

[7]   *Id.* at 8–9 (RELATOR'S FACT NO. 8; RELATOR'S FACT NO. 9).

[8]   ECF 171-2, ¶ 2; ECF 202, at 15.

[9]   ECF 171-2, ¶ 2.

[10]  ECF 179, at 1 (RELATOR'S FACT NO. 2).

[11]  ECF 202, at 15.

[12]  ECF 171-2, ¶¶ 4, 6.

cannot prescribe, influence, or control the prescription of any drugs; do not control or influence the decisions of the residents' physicians; do not have medical directors; and do not set drug formularies or otherwise limit the drugs that doctors can prescribe.[13] LTCPs like Guardian dispense prescription drugs to ALFs' residents (*i.e.*, LTCPs' patients).[14] ALFs in turn receive, store, and distribute the prescription drugs to their residents, dispose of them when necessary, and record their actions relating to those drugs.[15]

## 2.   Dispensing Fees and the PBM Contracts

LTCPs such as Guardian are paid through dispensing fees.[16] Dispensing fees are a product of bargained-for contracts. For example, Pharmacy Benefit Managers (PBMs) represent Medicare Part D insurance plans and negotiate contracts on their behalf with LTCPs.[17] The resulting "PBM contracts" between

---

[13]   *Id.* ¶ 43.

[14]   *Id.* ¶ 2.

[15]   *See id.* ¶ 11.

[16]   ECF 171-2, ¶ 12 ("[I]t is undisputed that Medicare Part D plans pay an ingredient cost and dispensing fee . . . .").

[17]   Medicare Part D is an optional prescription drug benefit for people with Medicare. It is offered through private insurance plans approved by the Government. *See How to Get Prescription Drug Coverage*, MEDICARE.GOV, https://www.medicare.gov/drug-coverage-part-d/how-to-get-prescription-drug-coverage (last visited Sept. 25, 2023).  *See also* ECF 211, at 86.

LTCPs and Medicare Part D insurance plans set the dispensing fees that are paid to LTCPs.

LTCPs are paid higher dispensing fees than retail pharmacies (*e.g.*, CVS, Wal-Mart, Walgreens, etc.) because of the additional regulatory hurdles they must surmount to dispense drugs to their patients.[18] Medicare Part D insurance plans seek reimbursement from the Government for a portion of the dispensing fees they pay to LTCPs.[19]

### 3.    The Services and the Services Agreements

Guardian allegedly offered and provided ALFs with certain enumerated services and goods (the Services)—either for free or at rates below their fair market value—in exchange for "preferred" pharmacy status.[20] The Services were memorialized in Pharmaceutical Products and Services Agreements (the Services Agreements) between Guardian and the ALFs.[21] The Services included electronic

---

[18]   *Id*.

[19]   *See, e.g., Medicare Part D—Direct and Indirect Remuneration (DIR)*, CMS.GOV, https://www.cms.gov/newsroom/fact-sheets/medicare-part-d-direct-and-indirect-remuneration-dir (last accessed Sept. 25, 2023); *Medicare Part D*, MEDICARE RIGHTS, https://www.medicareinteractive.org/get-answers/medicare-basics/medicare-coverage-overview/medicare-part-d (last accessed Sept. 25, 2023).

[20]   ECF 179, at 3 (RELATOR'S FACT NO. 4). *See also id.* at 5 (RELATOR'S FACT NO. 5).

[21]   *See id.* ¶¶ 83–84.

medication administration record (eMAR) setup, including laptops computers preloaded with Guardian's eMAR software; medication management services (MMS); and medication administration training and periodic skills checks (Training).[22]

To any ALF that selected Guardian as its "preferred" pharmacy, Guardian provided its standard "Welcome Packet" to share with the ALF's residents.[23] The Welcome Packet identified Guardian as the ALF's "preferred pharmacy."[24] ALFs that "preferred" Guardian typically shared the Welcome Packet with their residents and recommended Guardian.[25]

### i.   eMAR (Electronic Medication Administration Record Services) and the Laptop Computers

Guardian provided eMAR services to ALFs. ALFs are required to record medication administration information (times, doses, adverse events, and more) into a medication administration record (a "MAR"), which they may maintain in either paper or electronic form.[26] Though eMAR—the electronic variety—is not required, "[a]n eMAR integrates with Guardian's pharmacy software to populate

---

22   ECF 171-2, at 5.

23   ECF 179, at 33 (RELATOR'S FACT NO. 62).

24   *Id.* at 33 (RELATOR'S FACT NO. 63).

25   *Id.*

26   ECF 171-2, ¶ 8. ECF 179, at 30–31 (RELATOR'S FACT NO. 57).

the medications Guardian has dispensed to its patients," and the parties agree eMAR streamlines dispensing and dosing.[27] eMAR requires computers to function.[28] To facilitate use of its eMAR service, Guardian "loaned" laptops to ALFs.[29]

Where ALFs used Guardian's eMAR (as opposed to paper records), Guardian charged its patients a $10 monthly fee—allegedly, in part, to cover eMAR services.[30] The parties dispute whether this fee covered eMAR.[31]

### ii. MMS (Medication Management and Consulting Services)

Guardian provided ALFs with a panoply of medication management and consulting services (called MMS), administered quarterly, or at other more frequent intervals depending on the ALF's preference.[32] Here, MMS generally refers to inspections of ALF documents and medication storage carts, the disposal of expired medication, an accounting of narcotics, and similar tasks, as well as the

---

[27]   ECF 171-2, ¶ 8.

[28]   *Id.* ¶ 9.

[29]   ECF 171-2, ¶ 8. Heller asserts that Guardian's "loan" of laptops to ALFs for the purposes of utilizing and administering its eMAR service was conditional and done, at least in part, to induce ALFs to refer their residents to Guardian. *Id.* ¶ 9.

[30]   *Id.* ¶ 7.

[31]   *Id.* ¶ 10.

[32]   *Id.* ¶ 11.

preparation of reports regarding the same.[33] As part of MMS, Guardian's consulting department reviewed and audited ALF residents' eMARs and consulted with ALFs' operators or staff about its findings.[34]

The parties dispute the extent to which Guardian's PBM contracts or Centers for Medicare and Medicaid Services (CMS) guidelines required Guardian to provide MMS to its patients, and whether Guardian's dispensing fees covered MMS.[35] Guardian avers that the dispensing fees it commands are higher than those retail pharmacies receive because (1) PBMs view MMS as reasonable pharmacy costs that are appropriate for Medicare Part D-insured ALF residents[36] and (2) retail pharmacies are not required to perform MMS.[37] Guardian further asserts that the difference between the cost of eMAR and the monthly fee it charged its patients covered its provision of MMS for those patients.[38] Heller insists

---

[33] *Id.* Though Heller "disputes Guardian's use of the term 'MMS' as defined by Guardian" [*id.* ¶ 12] — presumably because Heller believes Guardian's definition fails to include some of the services he avers must be performed by an LTCP under Georgia law — the Court will refer to the services that Guardian performed as "MMS" for purposes of this Order.

[34] ECF 179, at 15 (RELATOR'S FACT NO. 22; RELATOR'S FACT NO. 23).

[35] *See, e.g.*, ECF 178 (stating in response to Heller's summary judgment motion, "CMS interpretive guidance that is relied upon by Part D Plan Sponsors and LTCPs confirms that MMS is included in the dispensing fee").

[36] ECF 171-2, ¶ 13.

[37] *Id.* ¶ 12.

[38] *Id.* ¶¶ 20–21.

Guardian's PBM contracts (and therefore the dispensing fee) did not include MMS—some services of which (*e.g.*, drug utilization reviews) ALFs are required to provide under Georgia law—and Guardian never told its ALF clients or their residents that dispensing fees covered the costs of these services.[39] Heller further argues that, even if Guardian's PBM contracts included MMS, then those contracts prohibited charging for anything covered by the dispensing fees.[40]

Guardian concedes that the Services Agreements it executed with some ALFs provided that MMS (or at least "pharmacy consulting services" to the extent MMS is a broader term) would be administered "free of charge" or at "no charge," and did not include price terms for MMS. At least a few ALFs paid Guardian fees for MMS.[41] Roughly half of the time, Guardian provided MMS without a Services Agreements at all.[42]

---

[39]   *Id.* ¶¶ 10, 12.

[40]   *Id.* In that case, Guardian could not claim the overage for its $10 eMAR fee covered MMS or any service it asserts is paid for by the dispensing fees.

[41]   ECF 179, at 11 (RELATOR'S FACT NO. 14).

[42]   *Id.* (RELATOR'S FACT NO. 11; RELATOR'S FACT NO. 12).

### iii.    Training

Beginning sometime in 2013, Guardian provided Training to ALF employees, including medication administration education and skills checks.[43] Guardian dispenses drugs; Training "makes the drugs Guardian dispenses safer" for its patients by teaching ALF employees how to administer those drugs to ALF residents.[44]

Prior to late 2017 when Guardian completed construction of its own space to host and administer Training, Guardian looked to ALFs to host.[45] Though Training was open to multiple ALFs—not just the host ALF—for a per person charge, Guardian "gave some pricing allowances for [host ALF] employees."[46] For instance, Guardian concedes that "the allowances only applied to the first ten [host-ALF] employees and were for a limited time."[47] And, occasionally, Guardian "provided a volume discount [of its standard per-employee-per-day rate] if a

---

[43]   ECF 171-2, ¶ 24. The skills checks that Guardian provided "generally track the Georgia state requirements." ECF 179, at 25 (RELATOR'S FACT NO. 47). Guardian provided at least some skills checks while onsite performing quarterly MMS. *Id.* at 25–26 (RELATOR'S FACT NO. 48). Before January 2018, Guardian did not always separately invoice skills checks it performed during quarterly MMS visits. *Id.* at 26 (RELATOR'S FACT NO. 49).

[44]   ECF 171-2, ¶ 26.

[45]   *Id.* ¶ 28.

[46]   *Id.* ¶¶ 28–30.

[47]   ECF 179, at 22 (RELATOR'S FACT NO. 40).

[non-host] community had a large number of employees to train."[48] Guardian communicated these "pricing allowances" to ALFs via blast emails; however, the parties dispute whether Guardian targeted specific ALFs with offers of free or lower-cost Training.[49] Many communications from Guardian to ALFs discussed the provision of Training (and other services) alongside the percentage of an ALF's residents who were Guardian patients.

In January 2018, Guardian eliminated its "pricing allowances" for Training.[50] In Heller's view, the Training "pricing allowances" were aimed at inducing ALFs to give Guardian "preferred" pharmacy status.

### 4.    The Alleged False Claims

Heller alleges that, when Guardian billed Medicare and TRICARE[51] insurance plans for prescriptions it dispensed to an ALF's patients that were

---

[48]   *Id.* at 22–23 (RELATOR'S FACT NO. 41).

[49]   ECF 171-2, ¶ 30.

[50]   ECF 179, at 24–25 (RELATOR'S FACT NO. 45). The Court considers this fact for purposes of establishing the timeline of Heller's Training-related allegations only.

[51]   Although the parties almost exclusively discuss Medicare Part D in reference to Heller's claims, Heller's case also involves TRICARE. TRICARE is a federal health care program, like Medicare Part D, administered by the Defense Health Agency, an affiliate agency of the Department of Defense. Its purpose is to provide medical benefits for active duty and retired members of the uniformed services and their dependents. ECF 185, at 23. TRICARE includes a pharmacy benefits program to cover prescription drugs. *Id.*

referred to Guardian by virtue of its "preferred" status with the ALF, Guardian submitted false claims. In other words, Heller posits that each dispensing fee Guardian received that was linked in any way to its "preferred" status arrangements with ALFs was necessarily tainted.[52]

Heller brings three claims for violations of the False Claims Act. Count I asserts a claim under 31 U.S.C. § 3729(a)(1)(A), colloquially known as a 'false presentment' claim. Count II alleges a violation of 31 U.S.C. § 3729(a)(1)(B), referred to as a 'false use' claim. Count III contends Guardian violated 31 U.S.C. § 3729(a)(1)(G), referred to as a 'reverse' false claim.

### B.    Procedural History

Heller, as the Relator, initiated this action on August 3, 2018.[53] The United States declined to intervene on November 18, 2019.[54] On March 6, 2020, Heller filed the operative Amended Complaint.[55] On February 10, 2021, the Court entered an Order denying Guardian's motion to dismiss, dismissing its parent company (Guardian Pharmacy, LLC), and denying Guardian and its parent's motion for sanctions. [56]

---

[52]    ECF 146-1, at 14.

[53]    ECF 1.

[54]    ECF 15

[55]    ECF 24.

[56]    ECF 63.

Following the close of discovery, Heller moved for partial summary judgment, and Guardian cross-moved for summary judgment on all claims. The parties' cross-motions for summary judgment were buttressed by motions to exclude evidence and expert testimony, motions for leave to file supplemental authorities, and sealing motions. Contemporaneous with the parties' cross-motions for summary judgment, non-party Senior Care Pharmacy Coalition (the Coalition) moved for leave to file an *amicus curiae* brief.[57] The Court granted the Coalition leave to file its brief on February 6, 2023,[58] which the Clerk docketed the same day.[59] The United States also filed a Statement of Interest on January 17.[60] The Court has reviewed all of these filings, including all responses and replies related to them, and now resolves them.

## II.   Threshold Motions

### A.   Guardian's Motion to Exclude Heller's Medication Cart Allegation [ECF 168]

To expand the categories of Services Guardian purportedly offered and to extend the reach of his claims, Heller alleges for the first time in his summary judgment papers that Guardian's unlawful conduct included providing "free

---

[57]   ECF 159.

[58]   ECF 201.

[59]   ECF 202.

[60]   ECF 198.

medication carts" to ALFs for the storage and administration of residents' medications.[61] Guardian moves to exclude this new allegation.[62]

Because this allegation is not present in the operative complaint,[63] the Court deems waived any argument that Guardian's provision of medication carts to ALFs constituted a kickback. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004) (The liberal pleading standard "does not afford plaintiffs with an opportunity to raise new claims at the summary[-]judgment stage."). Guardian's motion [ECF 168] is **GRANTED**.[64]

### B. Heller's Motion to Exclude Documents Not Produced During Discovery and to Bar Expert Testimony Based on Those Documents [ECF 150]

Heller asks the Court to exclude evidence and preclude expert testimony based on two broad categories of documents he claims were requested but not produced during discovery: (1) salary and 401(k) information for employees in Guardian's Consulting Department, on which Guardian's accounting expert Charles McGimsey relies in his expert opinion (the Compensation Information); and (2) third-party declarations, on which McGimsey, Dr. Alyson Wooten, Dr. Erin

---

[61]   *Compare* ECF 139-2 *with* ECF 63 *and* ECF 24.

[62]   ECF 168.

[63]   *See generally* ECF 24 (mentioning medication carts, but never as an inducement for "preferred" status).

[64]   ECF 168.

Trish, and Mr. Kevin McAnaney relied to form their expert opinions (the Third-Party Declarations).[65]

Because Heller submitted this discovery dispute by motion—months after the disputed events and in derogation of Section III.f of undersigned's Standing Order[66]—the motion could have been denied on procedural grounds. Nevertheless the Court has undertaken consideration of the motion on its merits and it is **DENIED**.

### 1.   The Discovery Rules

The Federal Rules of Civil Procedure require a party to provide "all documents" that it "has in its possession, custody, or control and may use to support its claims or defenses"—even "without awaiting a discovery request." Fed. R. Civ. P. 26(a)(1)(A)(iii); *id.* 26(e)(1) (A party must supplement or amend its disclosures if it learns that the information disclosed is "incomplete or incorrect, and if the additional corrective information has not otherwise been made known to the other parties during the discovery process or in writing."). If a request is lodged, the Federal Rules allow for 30 days to respond and the opportunity to

---

[65]   ECF 150, at 1–2.

[66]   ECF 70, at 17–18. It is an understatement to point out that counsel in this case are well-versed with undersigned's Standing Order and its discovery dispute protocol. *See, e.g.*, D.E. 1/5/22; ECF 113; ECF 119; ECF 124; D.E. 2/17/22; ECF 125; D.E. 2/24/22; ECF 126; D.E. 3/1/22; ECF 127; ECF 128.

object. *Id.* 26(e)(1). If, however, a party fails to provide information as required by Rule 26, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." *Id.* 27(c).

The Court has "broad discretion in determining whether a party's failure to disclose discovery materials is either substantially justified or harmless" and "consider[s] the non-disclosing party's explanation for its failure to disclose, the importance of the information, and any prejudice to the opposing party if the information had been admitted." *Lips v. City of Hollywood*, 350 F. App'x 328, 340 (11th Cir. 2009).

### 2.    Analysis

#### i.    The Compensation Information

Heller argues that the Compensation Information was produced "[o]n June 8, 2022—over *one year* later, nearly *five months* after the January 21, 2022 close of fact discovery, and just *one week* before Mr. McGimsey's deposition."[67] According to Heller, Guardian only produced the Compensation Information because McGimsey requested it to perform his accounting analysis.[68] Guardian responds that it and Heller met and conferred regarding the breadth of Heller's requests for

---

[67]   ECF 150, at 4 (emphasis in original).

[68]   *Id.* at 4, 9.

compensation information generally, and Heller agreed to put a narrower request to Guardian, but Heller did not follow through.[69] In any event, Guardian insists that its nonproduction of the Compensation Information was harmless to Heller as he did not retain an accounting expert (in the first instance or in rebuttal to Guardian's accounting expert) to assess the profitability of Guardian's "Consulting Department."[70] Guardian also maintains that Heller received a one-page salary summary in advance of his deposition of McGimsey, which Heller was able to use for cross-examination.[71]

While Heller stresses that a strict application of the relevant Federal Rules controls the outcome of his motion, the Court notes that Heller sidesteps—but does not dispute—Guardian's explanation of events. Of particular importance to the Court's exercise of its discretion to deny Heller's motion is that he knew almost immediately that Guardian's production was missing the Compensation Information. In response to Guardian's objection and nonproduction, Heller assumed the onus to either narrow his request (as he apparently agreed to do) or seek recourse from the Court. The moment he decided to do neither, Heller forfeited the opportunity to cry foul. *Cf. League of Women Voters of Fla., Inc. v. Lee,*

---

[69]   ECF 169, at 2.

[70]   *Id.*

[71]   *Id.*

2022 WL 610400, at *7 (N.D. Fla. Jan. 4, 2022) (quoting *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 783 (6th Cir. 2003)) ("Defendants' recitation of the relevant timeline shows that Defendants knew that they were not receiving complete production. . . . Still, despite their knowledge, Defendants never moved to compel. Instead, Defendants have waited until the eve of trial to move to exclude the late disclosed documents. . . . [E]vidence that the movant 'knew of the lack of disclosures and . . . apparently did not [object or move to compel] may suggest that the[ ] violation[ ] should be considered substantially justified or harmless.'"). Thus, as to the Compensation Information, Heller's motion is denied.

### ii.     The Third-Party Declarations

The Third-Party Declarations include two declarations from senior employees of Gayco Healthcare (Gayco), Guardian's competitor, and one declaration from an employee of Canterfield of Kennesaw, an ALF that Guardian served.[72] Heller complains that Guardian produced these declarations on May 24, 2022, long after he asked Guardian to produce any such declarations on February 17 and after limited fact discovery closed on March 23, 2022.[73] The declarations are dated March 3, 13, and 15, and four of Guardian's experts rely on them.[74] Guardian

---

[72]   ECF 150, at 6–7.

[73]   *Id.* at 7.

[74]   *Id.*

argues that it had no obligation to furnish these declarations until it decided to use them in the case.[75] Even so, Guardian claims that Heller was aware of the identity of the declarants and could have contacted or deposed them instead of "[sitting] on his hands."[76]

Here again, Guardian's account of what transpired is uncontroverted. Guardian objected to an informal request for declarations propounded by Heller before the Third-Party Declarations were executed.[77] Heller threatened to raise the issue to the Court, but he never did.[78]

Heller maintains that Rule 26 functions as a catchall obligation on Guardian to produce the Third-Party Declarations with or without his request.[79] But that is not entirely accurate. As one court in this district explained (and Guardian argued to Heller), Rule 26 does "not require [the disclosing party] to produce [a witness's] testimony *itself* to [the opposition party] prior to filing it with the Court. Rather, [the disclosing party] is simply required to make [the witness's] existence and the general scope of her potential testimony known." *Lamb v. Clayton Cnty. Sch. Dist.*, 2020 WL 11884824, at *5 (N.D. Ga. June 23, 2020), *report and recommendation adopted*,

---

[75]   ECF 169, at 2.

[76]   *Id.*

[77]   *Id.* at 9–10.

[78]   *Id.*

[79]   ECF 188, at 5.

2020 WL 11884831 (Sept. 21, 2020). Heller does not contest that he was aware of the existence of these witnesses and their testimonies. In fact, at least one of the declarant witnesses provided testimony in support of Heller's own motion for partial summary judgment.[80] The Court finds that exclusion of the Third-Party Declarations is not warranted, and Heller's motion is denied in this regard, too.

Heller's Motion to Exclude Documents Not Produced During Discovery and to Bar Expert Testimony Based on Those Documents [ECF 150] is **DENIED**.

### C.   Guardian's Motion to Exclude Heller's Summary Exhibits [ECF 180]

Guardian moves to exclude several of Heller's summary exhibits, Exhibits A–C and E to the Declaration of Joseph M. Callow, Jr. (the Exhibits)[81] and the "Damages Chart" attached to the Declaration of Lynn M. Adam.[82] The motion is **DENIED WITHOUT PREJUDICE**.[83]

---

[80]   *See* ECF 146-1, at 19.

[81]   *See* ECF 139-4, at 7–55.

[82]   ECF 139-5, at 8–9.

[83]   The Court will construe the motion as pertaining only to whether it may consider the Exhibits and the Damages Chart for summary judgment purposes, not whether they are ultimately admissible at trial. For trial purposes the parties may file motions *in limine* seeking to admit or exclude these or any other items at the appropriate time. The Court's trial order will contain a deadline for such motions.

### 1. Rule 1006

Federal Rule of Evidence 1006 imposes five requirements for a summary chart to be admissible:

> (1) the underlying documents are so voluminous that they cannot be conveniently examined in court; (2) the proponent of the summary must have made the documents available for examination or copying at a reasonable time and place; (3) the underlying documents must be admissible in evidence; (4) the summary must be accurate and nonprejudicial; and (5) the summary must be properly introduced through the testimony of a witness who supervised its preparation.

*Loiseau v. Thompson, O'Brien, Kemp & Nasuti, P.C.*, 499 F. Supp. 3d 1212, 1221 (N.D. Ga. 2020) (citations omitted).

### 2. Analysis

### i. The Advocate-Witness Rule

As a threshold matter, Guardian takes exception to the fact that the Exhibits and the Damages Chart were prepared by Heller's counsel, not a witness.[84] Chiefly citing to out-of-circuit cases, Guardian argues that Rule 1006 "contemplates that any summary admitted will have been prepared by a witness available for cross-examination, not by the lawyers trying the case."[85] Guardian "anticipates

---

[84]   ECF 180-1, at 4.

[85]   *Id.* at 3–4 (quoting *Fox v. Ritz-Carlton Hotel Co., LLC*, 2022 WL 2666450, at *5 (S.D. Fla. July 11, 2022) (citing *United States v. Grajales-Montoya*, 117 F.3d 356, 361 (8th Cir. 1997), and collecting out-of-circuit cases).

thorough cross-examination to address the cherry-picked and misleading nature of [Heller's] Summary Exhibits" and maintains that cross-examination of counsel is prohibited by the advocate-witness rule.[86] *See* Ga. R. Prof'l Conduct R. 3.7 (generally prohibiting an attorney from acting as an advocate if he or she is likely to be a necessary witness at trial). Also citing out-of-circuit cases, Heller responds that courts have found that cross-examination of the proponent of a Rule 1006 summary exhibit is not a prerequisite to its admissibility,[87] and at least one court has permitted the cross-examination of an attorney who oversaw the preparation of a Rule 1006 summary.[88]

As Heller points out (and Guardian does not dispute), the Eleventh Circuit does not appear to have definitively addressed whether a Rule 1006 summary prepared by counsel is admissible.[89] And though the Eleventh Circuit has explained that, "where the defense has the opportunity to cross-examine a witness concerning the disputed issue [presented in a summary chart] and present its own summary case, the likelihood of any error in admitting summary evidence diminishes," *United States v. Richardson*, 233 F.3d 1285, 1294 (11th Cir. 2000)

---

[86]   *Id.* at 4–5.

[87]   ECF 183, at 22–23 (collecting cases).

[88]   *Id.* at 24 n.3 (citing *DL v. Dist. of Columbia*, 2015 U.S. Dist. LEXIS 144278, at *25–*27 (D.D.C. Oct. 23, 2015)).

[89]   *Id.* at 21.

(cleaned up), Rule 1006's plain text does not require cross-examination to authenticate or admit a summary exhibit.

Whether a summary exhibit is admissible in evidence, like most things, will depend on the context. Where, as here, the bulk of the Rule 1006 exhibit is a restatement of other admissible documents that might be tendered at trial through non-attorney witnesses, there is little cause for concern that a party's counsel prepared those summary exhibits. This is especially true considering that "the fact-finder is not required to accept the information presented on summary charts as true," and the Court can act in other more practical ways to reduce the risk of prejudice. *Richardson*, 233 F.3d at 1294 (reasoning that the defendant could not credibly argue prejudice considering that the trial court "issued numerous limiting instructions to the jury"). For summary judgment purposes, the advocate-witness rule does not preclude consideration of the Exhibits and the Damages Chart.

### *ii.* The Exhibits

Guardian avers that the Exhibits are inaccurate, unduly prejudicial, and should be excluded. The Court addresses Guardian's objections to each of the Exhibits in turn.

### *a.* Exhibit A

Exhibit A purports to be a Rule 1006 summary chart of 39 contracts between Guardian and various ALFs, as well as quarterly consulting reports prepared by

Guardian.[90] The contracts and reports appear to relate to the parties' averments regarding MMS.[91]

Guardian complains that the chart summarizes the "Applicable Contract Language" that pertains to MMS, which "does not accurately identify the contracts' numerous terms or the multiple charges that were paid in exchange for Guardian's services, some of which are reflected in the contracts Exhibit A purports to summarize."[92] Citing language from provisions of the contracts not summarized in the Exhibit, Guardian argues, for example, that "[t]his omitted language is relevant because [it] shows there is a distinction between services for which [ALFs] are expected to pay and those for which Guardian's patients pay. [The MMS] that Guardian provides for its own patients is the latter."[93] Heller responds that Exhibit A does not purport to summarize the entire contents of each contract and report, but rather it highlights specific ALFs that had "preferred-pharmacy" consulting agreements, received MMS from Guardian, and were not explicitly required to pay for MMS; that the excerpts of the contracts and reports

---

[90]   ECF 139-4, ¶ 3.

[91]   *Id.*

[92]   ECF 180-1, at 7.

[93]   *Id.* at 8.

are verbatim restatements of the cited language; and, tellingly, that Guardian does not dispute the admissibility of any of the documents summarized in Exhibit A.[94]

The important thing at summary judgment is that the disputed evidence is capable of being reduced to admissible form at trial, not that it will be admitted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) (citation omitted). Guardian does not dispute the admissibility of the documents Heller summarizes, and the Court finds that Exhibit A otherwise meets the requirements of Rule 1006.[95] For summary judgment purposes, Guardian's objection to Exhibit A is overruled.

### *b.*    **Exhibit B**

Exhibit B purports to be a Rule 1006 summary chart listing 41 ALFs for which Guardian did not produce a contract or evidence showing that the ALFs

---

[94]   ECF 183, at 11–12.

[95]   Guardian also cites to two cases in support of its position that Exhibit A is not a proper Rule 1006 summary. ECF 180-1, at 9–10. These cases are distinguishable on their facts, as Guardian does not challenge the admissibility of the underlying documents and Heller does not offer his counsel's declaration as the Rule 1006 summary. *Cf. Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1160 (remanding for a new trial because the district court admitted a Rule 1006 summary exhibit comprised of hearsay ***not admissible*** under any exception); *Fox v. Ritz-Carlton Hotel Co., LLC*, 2022 WL 2666450, at *5 (S.D. Fla. July 11, 2022) (finding ***declarations*** premised on counsel's "review of 'many thousands of receipts and hundreds of menus'" to be "replete with inferences, opinions, and arguments by counsel" with little-to-no summarization of the receipts and menus themselves).

paid for MMS.[96] Guardian avers that the referenced documents merely show it performed quarterly consulting services at the identified ALFs at certain points in time—not, as Heller's counsel says in his declaration, that ALFs (as opposed to Guardian's patients) *received* those services.[97] The objection is overruled for summary judgment purposes.

First, only the declaration from Heller's counsel describing Exhibit B, not Exhibit B itself, contains the alleged misrepresentation. Heller does not offer the declaration as evidence, nor could he. Second, to the extent that Heller's characterization of Exhibit B goes to the ultimate issue—whether ALFs as opposed to Guardian's patients benefitted from MMS—the Court disregards it. Since the information in Exhibit B is reducible to an admissible form, the Court will consider it at this summary-judgment stage.[98]

---

[96]   ECF 139-4, ¶ 4.

[97]   ECF 180-1, at 11.

[98]   The Court notes Guardian's additional objection that Exhibits A and B are misleading because they lump all ALFs relevant to Heller's case together and fail to distinguish between ALCs and PCHs. *Id.* at 12–13; ECF 195, at 5. Guardian's point is well taken, but for summary judgment purposes the Court is well-situated to consider Exhibits A and B without fear of undue prejudice to Guardian. At the appropriate time, Guardian may renew its objection on this or any other ground for trial purposes.

### c.       Exhibit C

Exhibit C purports to be a Rule 1006 summary chart of 39 email chains from Guardian in which it allegedly offered free Training (*i.e.*, classes or skills checks).[99] Guardian lodges several objections that can be grouped into three categories: (1) a March 2014 email thread excerpted in Exhibit C contains inadmissible hearsay (the Hearsay Objection); (2) the ten emails Heller references in his summary judgment brief are truncated and misleading (the "Misleading" Objections); and (3) the emails excerpted in Exhibit C are not sufficiently voluminous to warrant a summary exhibit (the Volume Objection).[100] Guardian's objections at this summary-judgment stage are overruled.

Regarding the Hearsay Objection, the outcome of the objection will depend on the witness and context in which it is tendered at trial. The email may fall under an exception to the hearsay rule, or it may not be hearsay at all. What's important for the Court to consider at this stage is whether the email is capable of being reduced to admissible form, and the answer to that is a resounding yes. Guardian's "Misleading" Objections fare no better. Citing to the same excerpted March 2014 email thread as an example, Guardian insists that its truncated form causes critical syntax and grammar to be omitted, which misleadingly changes the email thread's

---

[99]   ECF 139-4, ¶ 5.

[100]   ECF 180-1, at 13–17.

meaning. Perhaps so. But at this summary-judgment stage the Court has the entire record before it and will rely exclusively on undisputed material facts. Whether Exhibit C is so misleading as to warrant revisions or wholesale exclusion for trial purposes will be addressed at the appropriate time.

Lastly, Guardian's Volume Objection is without merit. Guardian argues that Exhibit C only summarizes 39 emails of "approximately 100 pages," and "[a]ny potential factfinder, whether judge or jury, likely reads more than 39 emails on a daily basis."[101] That is certainly true for undersigned, but that's not the litmus test for Rule 1006 admissibility. *See, e.g.*, *United States v. Ging-Hwang Tsoa*, 2013 WL 6145664, at *5 (E.D. Va. Nov. 20, 2013) (admitting a summary chart under Rule 1006 where the chart was drawn from "less than 100 pages" of loan applications and a handful of settlement statements, and noting "[t]here is no hard and fast rule and it is within this Court's discretion"); *Zaki Kulaibee Establishment v. McFlicker*, 2011 WL 1599631, at *1 (S.D. Fla. Apr. 27, 2011) (endorsing an exhibit under Rule 1006, which summarized "70 pages of sales entries, containing over 100 entries per page"). The Court finds that Exhibit C summarizes sufficiently voluminous material to employ Rule 1006. Exhibit C will accordingly be considered for summary judgment purposes.

---

[101]   ECF 180-1, at 21.

### d.    Exhibit E

Exhibit E purports to be a Rule 1006 summary chart of 33 contracts between Guardian and ALFs to which Guardian provided (a) laptops to manage eMAR or (b) medication carts.[102] The excerpts appear to show that Guardian did not charge for these products. Guardian argues, as above, that Heller omits relevant contract language indicating that the medication carts and laptops would remain Guardian's property, rendering Exhibit E misleading.[103]

Because the medicine cart allegations have been excluded, Exhibit E is at least partly irrelevant. But as to the laptops, omitting the contract language stating that Guardian would own or maintain the laptops is not *per se* misleading as to the issue of whether they constitute inducement for "preferred" pharmacy status. Guardian's objection goes to Exhibit E's weight, not its admissibility, and at this stage the Court will not—and must not—weigh evidence.

Guardian's motion to exclude Exhibit E is denied for summary judgment purposes. As with all potential trial exhibits, the parties are invited to renew motions concerning Exhibit E at the appropriate time.

---

[102]   ECF 139-4, ¶ 4.

[103]   ECF 180-1, at 19–21.

### iii.    The Damages Chart

The Damages Chart, prepared by Lynn M. Adam (Heller's counsel), appears to summarize information from two sources: (1) a damages analysis prepared by Heller's damages expert, Dr. Israel Shaked, based on claims and Medicare Part D and TRICARE health plan payments data that Guardian produced for the period of January 1, 2014 to June 30, 2019;[104] and (2) a list of 80 ALFs identified in Exhibits A–E to Callow's (Heller's counsel) declaration and Heller's motion for partial summary judgment.[105] In Guardian's assessment, the Damages Chart is a "summary of a summary" prepared without Adam's personal knowledge.[106] Because Adam did not prepare Dr. Shaked's expert report or Callow's declaration, Guardian insists the Damages Chart is inadmissible because Guardian would not be able to cross-examine Adam about its contents.[107]

Adam attested that she personally supervised the preparation of the Damages Chart.[108] This fact is sufficient to determine that it was "founded on

---

[104]  This excludes Dr. Shaked's additional damages calculation for claims submitted between July 1, 2019 and March 6, 2020 (the date Heller filed the Amended Complaint) and a daily damages rate to account for the time between March 6, 2020 and the present. ECF 139-5, at 7.

[105]  *See generally id.*

[106]  ECF 180-1, at 22–23.

[107]  ECF 195, at 8.

[108]  ECF 139-5, at 3.

personal observation." *Poitevint v. United Recovery Sys., LP*, 899 F. Supp. 2d 1230, 1235 (N.D. Fla. 2012) (quoting *U.S. v. Evans*, 484 F.2d 1178, 1181 (2nd Cir. 1973)). In any event, because the Damages Chart is a summary of Dr. Shaked's anticipated trial testimony, the Damages Chart is reducible to admissible form so long as Dr. Shaked's pertinent testimony is admitted. Guardian's objection is overruled, and the Damages Chart will be considered for summary judgment purposes.

Guardian's Motion to Exclude Heller's Summary Exhibits [ECF 180] is **DENIED WITHOUT PREJUDICE**. The parties are invited to file motions concerning the admissibility of summary exhibits for trial purposes at the appropriate time.

### D.   The Motions to Exclude Expert Testimony [ECFs 144, 145, 149, 173][109]

#### 1.   Rule 702

Federal Rule of Evidence 702 governs the admissibility of expert witness evidence. It requires "district courts to perform a 'gatekeeping' role concerning the admissibility of expert testimony." *Seamon v. Remington Arms Co., LLC*, 813 F.3d

---

[109] For summary judgment purposes the Court resolves these motions only insofar as they seek to preclude expert witnesses from testifying entirely. To the extent the parties object to portions of the expert witness's proffered opinions or certain lines of inquiry, those objections are **OVERRULED WITHOUT PREJUDICE**. For trial purposes the parties may renew such objections (or alternatively seek to admit same) through motions *in limine* at the appropriate time.

983, 988 (11th Cir. 2016) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (holding *Daubert's* "gatekeeping obligation" applies to all types of expert testimony described in Rule 702). The Court must remain mindful, however, to not "supplant the adversary system or the role of the jury: vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999) (quoting *Daubert*, 509 U.S. at 596).

The Eleventh Circuit applies a three-part inquiry to adjudicate a *Daubert* challenge:

> (1) whether the expert witness is qualified to testify competently regarding the matters he intends to address;
>
> (2) whether the methodology by which the expert witness reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
>
> (3) whether the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850–51 (11th Cir. 2021) (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The proponent

of the expert testimony shoulders the burden of establishing each element. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

The Court will address each motion to exclude expert testimony in turn.

### 2. Guardian's Motion to Exclude the Expert Testimony of Dr. Israel Shaked [ECF 173]

Guardian moves to exclude Dr. Shaked's testimony in its entirety. Of the three elements that comprise the Eleventh Circuit's *Daubert* inquiry, Guardian's motion only addresses the second: whether Dr. Shaked's analysis, which employed a ***national*** Government contribution percentage and relied on allegedly unfounded assumptions, is sufficiently reliable.[110] The motion to exclude is **DENIED**.[111]

Heller asked Dr. Shaked to analyze Guardian's prescription claims data to calculate the Government's damages resulting from the alleged false claims Guardian submitted to Medicare Part D and TRICARE for reimbursement.[112] Dr. Shaked's analysis comprises four calculations:

> (1) The Government's damages based on prescription claims Guardian submitted to Medicare Part D and TRICARE for patients in 164 ALFs between January 1, 2014 and June 30, 2019;[113]

---

[110] *See generally* 173-1.

[111] ECF 173.

[112] ECF 185, at 10.

[113] ECF 174, at 8–9.

(2)     An extrapolation of that calculation applied to Guardian's prescription claims from July 1, 2019 to March 6, 2020, the date Heller filed his Amended Complaint, to determine the Government's estimated damages during that time period;[114]

(3)     An estimated daily rate of damages for Guardian's prescription claims since March 6, 2020;[115] and

(4)     Treble damages and civil penalties for each of the above three time periods.[116]

From January 1, 2014 to March 6, 2020, Dr. Shaked estimates that the Government suffered approximately $26.8 million in false claims.

As Guardian explains (and Heller does not dispute),

> The Part D program is overseen by [CMS]. CMS does not administer the program; instead it uses Plan Sponsors, which are private entities that compete for the opportunity to manage Part D beneficiaries' claim submissions and payment processes. . . . CMS pays Plan Sponsors fixed monthly payments according to certain benchmarks. At the end of each year, it conducts "reconciliation" with the sponsors [based on their Medicare Part D Prescription Drug Event (PDE) data].[117]

---

[114]   *Id.* at 15–16.

[115]   *Id.* at 19–20.

[116]   *Id.* at 17–18.

[117]   ECF 173-1 (quoting *U.S. ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 635 (7th Cir. 2016)).

Thus, Guardian argues, "if a private company Plan Sponsor paid claims it should not have and suffered a *private* loss, the existence or amount of *Government* loss cannot be calculated without the Plan Sponsor's PDE data," which Heller did not obtain during discovery.[118] This, Guardian avers, renders Dr. Shaked's analysis speculative and incapable of "determin[ing] whether the Government suffered any actual loss."[119]

Heller responds that Guardian misses the point: The measure of the Government's damages is not its disbursements reconciled against Medicare Part D plan sponsors' PDE, but rather it is the entire amount of money the Government disbursed because of any tainted false claim Guardian might have submitted.[120] Heller is correct.

While Heller's theory of liability is novel, his measure of damages for false Medicare reimbursement claims is not. The Eleventh Circuit has reasoned in cases involving the submission of such claims that "the proper measure of damages is the difference between what the United States paid and what it would have paid had the claims been truthful and accurate"—*i.e.*, "the full amount that the United States paid because, had the defendants truthfully admitted that they were non-

---

[118]  *Id.* at 9 (emphasis in original).

[119]  *Id.* at 2, 5, 12, 15.

[120]  ECF 185, at 7–9.

compliant [with the FCA], the United States would not have paid." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1305 (11th Cir. 2021) (collecting cases from other circuits). *Accord United States v. Teva Pharma. USA*, 2023 U.S. Dist. LEXIS 122272, at *14 (D. Mass. July 14, 2023) (citing *Yates*, 21 F.4th at 1304) ("The rationale here is that the government simply would not have paid those Medicare claims had it known they were submitted in violation of certain Medicare requirements such as the AKS or the Stark Law, 42 U.S.C. § 1395nn.").[121]

Indeed, "there is no set formula for determining the [G]overnment's actual damages" under the FCA; however, as long as the jury is presented with "relevant data" to calculate damages, damages "need not be calculated by mathematical precision." *United States v. Killough*, 848 F.2d 1523, 1531–52 (11th Cir. 1988) (affirming the jury's "just and reasonable estimate of damages" in an FCA case alleging violations of the AKS, "regardless of the different factors which may have been associated" with the set-ups of individual homes funded by the Federal Emergency Management Agency). By calculating "the percentage of plan payments [tied to Guardian's alleged false claims] that reflect federal money," which he refers to as the "Government Contribution Percentage," Dr. Shaked was

---

[121] Heller drew the Court's attention to the *Teva Pharmaceuticals* opinion in his July 27, 2023 Notice of Supplemental Authority. ECF 223-1.

able to calculate the Government's alleged damages emanating from Guardian's supposedly false Medicare Part D claims.

Guardian also takes issue with Dr. Shaked's calculation of damages emanating from TRICARE claims because Dr. Shaked "inexplicably assumed [the Government Contribution Percentage he calculated in the Medicare Part D context] would apply to TRICARE claims even though TRICARE has a completely different reimbursement scheme."[122] Though Dr. Shaked's analysis of the Government's alleged TRICARE damages is a closer call than his Medicare Part D damages analysis, the Court finds that it is sufficiently reliable. It rests on assumptions, to be sure, but proof of damages "may be indirect and it may include estimates based on assumptions, so long as the assumptions rest on adequate data." *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 668 (5th Cir. 1974).[123] Guardian does not credibly argue that Dr. Shaked's TRICARE damages analysis fails to rest on adequate data; it argues, as with Dr. Shaked's Medicare Part D analysis, that Dr. Shaked should have used a different analysis altogether. Guardian's protestations in this regard are more appropriate fodder for cross-examination but do not provide a sufficient basis to exclude Dr. Shaked's testimony.

---

[122]  ECF 173-1, at 10.

[123]  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (decisions issued by the Fifth Circuit prior to the close of business on September 30, 1981 are binding on the Eleventh Circuit).

Guardian's Motion to Exclude the Expert Testimony of Dr. Israel Shaked [ECF 173] is **DENIED**.

>    **3.    Heller's Motion to Exclude the Expert Testimony of Kevin G. McAnaney and Dr. Alyson L. Wooten [ECF 149]**

Heller moves to exclude the expert opinions of two of Guardian's experts, Kevin G. McAnaney and Dr. Alyson L. Wooten. Of the three elements of the Eleventh Circuit's *Daubert* inquiry, Heller primarily challenges McAnaney's and Dr. Wooten's qualifications to offer their respective expert opinions, and he contends that the opinions are speculative legal conclusions.[124] Heller advances a simple argument: "For the same reasons that [ ] other courts have excluded these experts' opinions in [four] other cases, . . . this Court should also exclude [them]."[125] Guardian responds that the Court's gatekeeping role requires independent, case-by-case evaluation of expert opinions, not "copying and pasting judicial reasoning" from different cases with different facts.[126] The Court agrees with Guardian; Heller's motion is **DENIED**.[127]

---

[124]   *See generally* ECF 148-1.

[125]   ECF 148-1, at 3. Heller's reply merely reiterates this argument, copying large swaths of his principal motion without meaningfully responding to Guardian's brief or the arguments it raises. *See generally* ECF 189.

[126]   ECF 170, at 7–8.

[127]   ECF 149.

The fact that other district courts have excluded portions of McAnaney's and Dr. Wooten's expert opinions in different cases with different facts does not control what this Court must decide about their instant opinions pertaining to the facts of this case. "Just as it would be improper to admit an expert opinion solely because the expert's testimony was admitted by another court in another case at another time, it is likewise improper to exclude an expert's opinion solely because the expert's opinion has been excluded in another context."[128] *Accord Modern Holdings, LLC v. Corning, Inc.*, 2022 WL 710174, at *12 n.9 (E.D. Ky. Mar. 9, 2022) ("[E]xclusion of an expert's opinions in one case does not mean that same expert's opinions must be excluded in another case, ***particularly in cases in district courts in other circuits***.") (emphasis added). Some courts have gone so far as to conclude that "[w]hether a particular expert was excluded in another case is not relevant to whether that expert is qualified or suited to testify in this case." *Fitzhenry-Russell v. Keurig Dr. Pepper Inc.*, 2018 WL 10476581, at *4 (N.D. Cal. Dec. 10, 2018). While this Court is not willing to go that far, the Court will independently evaluate the admissibility of McAnaney's and Dr. Wooten's proffered expert testimonies in this case on their own merits.

---

[128]  ECF 170, at 8.

### i.   McAnaney

As Guardian puts it, McAnaney specializes in federal healthcare fraud and abuse laws.[129] He is not a "healthcare *industry* expert"; he is a "healthcare *law* expert."[130] This specialization stems from a forty-year career in health law and AKS compliance, including, most prominently, as the Chief of the Industry Guidance Branch of the Office of Counsel to the Inspector General (OIG) of the United States Department of Health and Human Services (HHS).[131] In that role, McAnaney penned "many OIG advisory opinions, several AKS safe harbor regulations, several guidance letters on free goods, and the sections of numerous OIG program guides addressing AKS risk areas."[132] McAnaney's proffered opinions hinge on the "factors/indicia/hallmarks that Congress and the OIG and the DOJ consider" when assessing risk under the AKS and whether to prosecute an alleged violation.[133] These indicia include "(1) distorted medical decision-making; (2) overutilization of services; (3) increased Federal healthcare program costs; and (4) unfair competition," and they strive to balance "the risk of harms

---

[129]   *Id.* at 5.

[130]   *Id.* at 3.

[131]   *Id.* at 5.

[132]   *Id.*

[133]   *Id.*

that the AKS seeks to prevent" against the "probability of public good."[134] He offers several opinions rooted in these metrics; each deals with indicia of Guardian's intent, as well as industry custom.[135]

Relying on *United States ex rel. Organon v. Organon USA Inc.*, Heller argues that McAnaney is unqualified to render an opinion on LTCP industry custom and practice.[136] 2015 WL 10002943 (D. Mass. Aug. 17, 2015). And, citing *Organon* and *United States v. Blair*, 2021 WL 5040334 (D. Md. Oct. 29, 2021), Heller further argues that McAnaney should not be allowed to testify about what regulators would have considered in determining whether a defendant's conduct violated the AKS or to what extent Guardian's conduct exhibits indicia of unlawfulness.[137] McAnaney's opinions, according to Heller, amount to "pure speculation, and are vague and impermissible legal conclusions."[138]

In *Organon*, the court considered McAnaney's qualifications and demurred: "There can be little doubt that Mr. McAnaney is an experienced healthcare lawyer. But what is lacking from his background is ***direct experience in the pharmaceutical industry***." 2015 WL 10002943, at *3 (emphasis added) (cleaned up). True,

---

[134]  *Id.* at 6.

[135]  ECF 148-1, at 4.

[136]  *Id.* at 6–9.

[137]  *Id.* at 10.

[138]  *Id.*

McAnaney has neither worked for a pharmaceutical company, nor any healthcare industry company for a significant amount of time. But that is only one way McAnaney might have been qualified to opine in that case or, more importantly, in this one. Heller disputes neither the fact of McAnaney's experience developing and issuing formal guidance to the healthcare industry, including pharmacies and "regulated communit[ies]" (which the Court understands to include, *e.g.*, skilled nursing facilities (SNFs)), nor his principal authorship of several OIG advisory opinions, AKS safe harbor regulations, guidance letters, and compliance program guides.[139] Heller only relies on *Organon* to carry the day, but that is unconvincing.

The Court finds that McAnaney is not only a qualified healthcare lawyer, but also has direct experience with AKS risk and compliance. Because of his personal knowledge, specific background, and highly technical expertise, McAnaney is qualified and well suited to testify in this case.

### ii.    Dr. Wooten

Guardian describes Dr. Wooten as a pharmacy consultant, experienced pharmacist, Medical Information specialist, and legal advisor.[140] In her work, aided by her Doctor of Pharmacy and Juris Doctor degrees, she routinely assesses

---

[139] *See* ECF 170, at 16–18.

[140] *Id.* at 3.

pharmacy operations for compliance with PBM contracts.[141] Dr. Wooten offers multiple opinions in this case, including, most importantly that: (1) Guardian's services were routine in the LTCP industry; (2) Guardian's $10 monthly service fee to residents pays for eMAR; and (3) contrary to the testimony of Heller's expert Gregory Kaupp, Guardian was reasonable to conclude that it had been reimbursed for MMS through the dispensing fee it received under its PBM contracts.[142] Heller seeks to rebut Guardian's proffer by pointing to two inapposite cases in which Dr. Wooten's testimony was excluded.

In the first, *CZ Services, Inc. v. Express Scripts Holding Company*, 2020 WL 4518978 (N.D. Cal. Aug. 5, 2020), the district court excluded Dr. Wooten's testimony regarding whether the defendant's "practices were illegal or unlawful" and how retail pharmacies function. *Id.* at *3, *5–*7. The *Express Scripts* court reasoned that Dr. Wooten's opinions there were "more akin to percipient witness observations than to opinions arrived at through . . . expert analysis," and "just about any citizen who may serve on the jury in this case is familiar with what retail pharmacy businesses look like and how they function." *Id.* at *2. Notably, the court allowed Dr. Wooten to present her "opinions about pharmacy licensing standards and practices[—] . . . a specialized area where expert testimony might be

---

141  *Id.* at 4.

142  *Id.*

helpful"—as long as she steered clear of stating that any of CZ Pharmacy's practices were illegal or unlawful. *Id.*

To the extent *Express Scripts* is persuasive to the case at hand at all, it convinces the Court that Dr. Wooten's opinions would be helpful in this case, which deals with a complex regime of regulations and business considerations (including PBM contracts, dispensing fees, AKS risk, and more) concerning LTCPs—a segment of the pharmaceutical industry that is not familiar to most lay people. It also persuades the Court that Dr. Wooten is well-qualified to offer the opinions she proffers.

The second case that Heller cites, *Medacist Solutions Group, LLC v. Carefusion Solutions, LLC,* 2021 WL 293568 (S.D.N.Y. Jan. 28, 2021), is even more inapposite to the facts here than the first. The *Medacist* court excluded Dr. Wooten's opinion that it is "normal for companies . . . 'to communicate with existing and prospective customers'" through certain media (*e.g.*, over the phone, on social media, via email, etc.). *Id.* at *1. The court reasoned that Dr. Wooten's observation was capable of being understood without expert testimony. *Id.* The *Medacist* court's non-controversial reasoning in this regard is of no moment to Dr. Wooten providing expert testimony about the LTCP industry in this case.

Heller's Motion to Exclude the Expert Testimony of Kevin G. McAnaney and Dr. Alyson L. Wooten [ECF 149] is **DENIED**.

### 4.    Guardian's Motion to Exclude the Expert Testimony of Gregory Kaupp [ECF 145]

Heller offers the expert testimony of Gregory Kaupp to answer three interrelated questions: (1) "whether the [S]ervices were remuneration and had independent value for the Communities"; (2) "whether [Guardian's] PBM contracts required Guardian to perform the [S]ervices"; and (3) "whether the dispensing fees that Guardian was paid under its PBM contracts compensated Guardian for the [S]ervices."[143] In his expert report, Kaupp splits his answers to these questions between two opinions—"Opinion No. 1: Remuneration and Independent Value" and "Opinion No. 2: PBM Contracts and Dispensing Fees."[144] Guardian moves to exclude these opinions on four grounds: Kaupp is unqualified to offer his first opinion; his second opinion is irrelevant; his opinions are unreliable because they cannot be tested; and his opinions are rife with legal conclusions.[145] Guardian's points are well taken; the motion to exclude is **GRANTED.**

### i.    Opinion 1: Remuneration and Independent Value

Guardian first moves to exclude Kaupp's testimony as to Guardian's AKS compliance efforts. As an initial matter, the parties cannot seem to agree about

---

[143]  ECF 175, at 5 (quoting ECF 145-2, at 8).

[144]  ECF 145-2, at 3.

[145]  ECF 145, at 1–2.

whether Kaupp in fact has formed an opinion about Guardian's liability under the AKS. Guardian asserts that, "although [Heller] seeks to have Mr. Kaupp testify about [AKS] compliance, he does not have the necessary qualifications to opine on how the AKS applies, is interpreted, or might be implicated by Guardian's [LTCP] services in assisted living facilities [ALFs]."[146] Meanwhile, Heller says that "Kaupp does not purport to offer expertise on the AKS generally, on the issue of 'compliance' in particular, or on the ultimate issue of liability."[147]

To resolve the discrepancy, the Court looks to the evidence. In his expert report, Kaupp summarizes the content of his first opinion as follows: "Guardian [is] furnishing services for free or below fair market value," and this "constitutes remuneration for purposes of the Anti-Kickback Statute."[148] If any doubt remains that Kaupp intends to opine on the ultimate issue, Kaupp testified at his deposition that his "opinion is on two items, inducement under the Anti-Kickback Statute . . . and also what's covered under the dispensing fee."[149]

Kaupp's first opinion is inadmissible in its entirety for the reasons Heller claimed Dr. Wooten's and McAnaney's opinions were inadmissible—it addresses

---

[146] *Id.* at 1.

[147] ECF 175, at 5.

[148] ECF 145-2, at 8.

[149] ECF 186, at 4 n.3 (citations omitted).

how the jury should resolve the ultimate issue of AKS liability and reaches Guardian's subjective intent. Because this opinion is inadmissible, the Court need not rehash Kaupp's qualifications related to AKS compliance.

### ii. Opinion 2: PBM Contracts and Dispensing Fees

Guardian also argues that "Kaupp's opinion that the regulatory definition of 'dispensing fee,' which is based solely on his self-study for this case, does not cover Guardian's services[,] is irrelevant and not helpful to the factfinder."[150] Not only is Mr. Kaupp unqualified to render this opinion, Guardian avers, "it is a legal conclusion, and it is not probative of whether Guardian's view[ ] that the dispending fee covered its quarterly medication management services[ ] was objectively reasonable."[151] Heller responds that Kaupp's opinion regarding PBM contracts and dispensing fees is supported by his qualifications and the materials and evidence he reviewed, and will be helpful for the jury.[152] Guardian is correct.

Kaupp has practiced law and worked as a lobbyist "on a variety of pharmacy issues."[153] He purportedly founded a PBM and was employed by another PBM, where he worked on pilot programs under TRICARE's predecessor

---

[150]   ECF 145, at 2.

[151]   *Id.*

[152]   ECF 170, at 21–22.

[153]   ECF 145-2, at 5.

insurance scheme.[154] Since 2019, he has consulted on "healthcare and PBM related issues, Medicare and Medicaid issues," and "Mergers and Acquisition activities."[155] During the past two decades, Kaupp has participated in the National Council for Prescription Drug Programs (NCPDP), a purported nonprofit "Standards Organization."[156] His participation included "regular quarterly work group meetings" on Medicare Part D and the "establishment of a Long-Term Care Work Group." He draws on his experience as a "consultant or as an executive in the PBM industry" and his "PBM and [long-term care] experiences" to form his "PBM Contracts and Dispensing Fees" opinion.[157]

Guardian complains that these qualifications are lacking because, for example, Kaupp does not claim to have any experience negotiating dispensing fees on either the PBM or LTCP side or engaging in any regulatory compliance work.[158] It is true that Kaupp's qualifications might be lacking in ways that make his testimony susceptible to cross-examination. His opinion might not even be correct. But the Court need not weigh his qualifications or correctness to conclude that Kaupp should be excluded from offering expert testimony. *Cf. Herman Miller, Inc.*

---

[154] *Id.*

[155] *Id.* at 6.

[156] *Id.*

[157] *Id.* at 7.

[158] ECF 149, at 21–22.

*v. Belnick LLC*, 2021 WL 2582534, at *1 (N.D. Ga. Jan. 4, 2021) ("An expert's opinion should not be excluded on the basis of its correctness, and it is not part of the Court's gatekeeping function to make ultimate conclusions as to the persuasiveness of the proffered evidence.") (cleaned up). That is because Kaupp makes no effort to "explain ***how*** [his] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion and ***how*** that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (emphasis in original).

As far as the Court can tell, Kaupp's opinions include: (1) Guardian's provision of MMS was remuneration because its PBM contracts did not require MMS, and MMS is valuable to ALFs; (2) Guardian's PBM contracts were garden-variety, and they did not require it to provide the Services; and (3) the dispensing fees Guardian received were intended to compensate Guardian for its overhead costs.[159] Kaupp's list of qualifications, knowledge, training, and experience is not connected—clearly or opaquely—to dispensing fees or PBM contracts, either in the LTCP industry or at large. It appears that Kaupp's primary experience is in government affairs. That itself is not disqualifying, but with only vague mention to participation in working groups (with no explanation of the working groups' business) and work on unidentified "issues," the Court is left wondering how

---

[159]  ECF 145-2, at 16–18.

Kaupp's experience relates to his opinions. Without the "how," the Court finds that Kaupp's testimony on these points is unreliable; unlike, for example, McAnaney's testimony. *See Frazier*, 387 F.3d at 1270 (quoting *United States v. Gaskell*, 985 F.2d 1056, 1063 (11th Cir. 1993)) (Although it is ordinarily an "abuse of discretion to exclude an otherwise *admissible* opinion of a party's expert on a critical issue, while allowing the opinion of his adversary's expert on the same issue," it is not an abuse of discretion where the expert's opinion is unreliable and therefore inadmissible.).

Unlike with the parties' other proffered experts, whose testimonies might be admissible at trial for some purposes but not others, Kaupp's testimony lacks the critical element of reliability for any of its stated purposes. This deficiency cannot be cured in any context that might arise at trial. Accordingly, Guardian's Motion to Exclude the Expert Testimony of Gregory Kaupp [ECF 145] is **GRANTED**.[160]

### 5.   Guardian's Motion to Exclude the Expert Testimony of Allison Hoffman [ECF 144]

Guardian moves to partially exclude the testimony of Allison Hoffman, whose opinion Heller offers to rebut McAnaney's testimony and the testimony of

---

[160] ECF 145. The Court finds, however, that Kaupp's testimony is not necessary to preclude summary judgment for Guardian—nor would it be sufficient to win summary judgment for Heller.

Greg Russo. In rebuttal to McAnaney, Hoffman opines that Guardian's business practices exhibited indicia of unlawfulness.[161] In response to Russo, Hoffman explains how, consistent with the Medicare Part D payment structure, claims for reimbursement linked to Guardian's provision of the Services were tainted and should not have been paid by the Government.[162] Guardian objects to this testimony on two grounds: (1) Hoffman concludes Guardian's practices violated the AKS without using the analysis recommended by the OIG for evaluating business arrangements with SNFs; and (2) Hoffman considered only materials and guidance related to SNFs, while ignoring certain materials related to community homes, which Guardian avers are functionally equivalent to ALFs.[163] Guardian also asserts that these opinions do not have the requisite "fit" to this case and are impermissible legal conclusions.[164] The motion is **DENIED**.

The Court finds that Hoffman's testimony is as much of a "fit" to the facts of this case as McAnaney's testimony is; her opinions do not invade the province of the Court for the reasons that McAnaney's do not. To the extent Guardian takes issue with the law and regulations on which Hoffman relies, whether she should

---

[161] ECF 144-2, at 1.

[162] *Id.* at 2.

[163] ECF 144, at 1–2.

[164] *Id.* at 2.

have conducted additional analysis pursuant to OIG-approved guidance, and whether she justifiably extrapolates SNF regulations to the ALF context, the solution is cross-examination, not exclusion.

Guardian's Motion to Exclude the Expert Testimony of Allison Hoffman [ECF 144] is **DENIED**.

### E.     The Motions to Seal [ECFs 137; 143; 147; 156; 167; 176]

#### 1.     Legal Standard

A party seeking to have confidential material sealed can overcome the common law right of access by a showing of good cause. *Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1313 (11th Cir. 2001). Essentially, good cause exists where "[a] party's privacy or proprietary interest in information . . . overcomes the interest of the public in accessing the information." *Romero v. Drummond Co.*, 480 F.3d 1234, 1246 (11th Cir. 2007); *see also* Fed. R. Civ. P. 26(c) (discussing the "good cause" standard for assessing whether a protective order is warranted). The decision of whether good cause exists rests within the sound discretion of the court. *Reid. v. Viacom Int'l Inc.*, 2016 WL 4157208, at *2 (N.D. Ga. Jan. 25, 2016). "[W]hether good cause exists . . . is . . . decided by the nature and character of the information in question." *Romero*, 480 F.3d at 1246 (quoting *Chi. Tribune*, 263 F.3d at 1309). Given the public's interest in disclosure,

good cause will generally only be established where the materials contain trade secrets, personal identifying information, or sensitive commercial information.

### 2.   Analysis

#### i.   Non-Party-Designated Confidential Information [ECFs 137, 143, 156]

In one of his motions to seal, Heller seeks to file portions of certain documents and materials that reflect protected health information (PHI) under provisional seal; however, Heller notes that non-parties Oaks Senior Living, LLC and Oaks at Braselton (collectively, the Oaks Parties), as well as non-party Quality Senior Services, LLC d/b/a The Rosewood at Fort Oglethorpe (Rosewood)—not Heller or Guardian—designated the subject information confidential.[165] Heller's motion to provisionally seal such information is **GRANTED**.[166]

Similarly, Guardian moves to permanently seal selected deposition transcripts, deposition exhibits, and pharmacy contracts filed provisionally under seal and designated as confidential by the Oaks Parties, Rosewood, and non-party Managed Health Solutions Pharmacy (MHS).[167] The motions, however, do not establish good cause to do so. *See Suell v. United States*, 32 F. Supp. 3d 1190, 1192 (S.D. Ala. 2014) (citing *Chicago Tribune*, 263 F.3d at 1307) ("The mere existence of a

---

[165]   ECF 137.

[166]   *Id.*

[167]   ECF 143; 156.

protective order does not automatically override the public's right of access. . . . This is especially so when the protective order . . . was agreed, since in such a case there has been no prior judicial determination of good cause."). Guardian's request is also overbroad because it seeks to seal entire documents, rather than select portions that contain sensitive information. *See Cooper Lighting, LLC v. Cordelia Lighting, Inc.*, 2018 WL 11350481, at *2 (N.D. Ga. Feb. 14, 2018) (finding a request to seal an entire brief containing excerpts of confidential discovery to be "overbroad," and allowing the defendants additional time to comply with the Local Rules). Accordingly, Guardian's motions are **GRANTED IN PART** to maintain the provisional seal. They are **DENIED IN PART** insofar as Guardian seeks a permanent seal.[168]

Because the Oaks Parties, Rosewood, and MHS designated the provisionally sealed information as confidential and are the only parties that possess an interest in maintaining the information's confidentiality, they bear the burden of demonstrating good cause for the information to be permanently sealed. Accordingly, **within five days of entry of this Order**, Heller is **ORDERED** to serve a copy of this Order and the Court's Standing Order on the Oaks Parties and Rosewood, and Guardian is **ORDERED** to serve the same documents on MHS.

---

[168]  ECFs 143; 156.

The Oaks Parties, Rosewood, and MHS are **GRANTED** leave to file motions demonstrating good cause to permanently seal the subject information **within 30 days of service**. If they do not, the Clerk of Court will be instructed to file the provisionally sealed items on the public record.

To the extent Guardian seeks to redact any provisionally sealed item and place it under permanent seal,[169] Guardian must redact the documents, move to place them permanently under seal, and make the proper showing of good cause. Guardian is **GRANTED** leave to do so **within 14 days of entry of this Order**; otherwise, the Clerk will be instructed to file the provisionally sealed items on the public record.

### ii. Party-Designated Confidential Information [ECFs 147, 167, 176]

### a. Guardian-Designated Confidential Information [ECFs 147, 167]

#### 1. ECF 147

Heller moves to provisionally seal (1) the Motion *in Limine* and Memorandum in Support to Exclude Expert Testimony of Kevin G. McAnaney and Alyson L. Wooten (and exhibits to the same) and (2) the Motion to Bar Documents Not Produced During Discovery and to Bar Expert Testimony Based

---

[169] *See generally* ECF 165 (responding to ECF 137 and stating certain documents "ought to be redacted, with unredacted versions remaining under permanent seal").

on Those Documents and Memorandum in Support (and exhibits to the same).[170]

These filings purportedly contain information Guardian marked as confidential.[171]

As far as a provisional seal of the information is concerned, the motion [ECF 147]

is **GRANTED**. But Heller opposes placing the information under permanent

seal.[172] Contrary to the Court's Standing Order, Heller does not indicate that he

conferred with Guardian or whether his motion is opposed.

For its part, Guardian does not seek to seal the documents in their

entirety.[173] Guardian points out, however, that portions of the subject documents

contain PHI and, in at least one instance, a Taxpayer Identification Number, and

argues those portions of the documents are deserving of special protection.[174]

Though it did not move separately to permanently seal the information of

its specific concern, Guardian demonstrates good cause for the partial permanent

sealing of documents as outlined in its response to Heller's motion.[175] But the

Court declines to redact the information itself as Guardian suggests. Instead,

**within 14 days of entry of this Order**, Guardian is **ORDERED** to redact the

---

[170]   ECF 147.

[171]   *See generally id.*

[172]   *Id.*

[173]   ECF 165.

[174]   *See id.* at 4–8.

[175]   *Id.* at 4–5.

documents as provided in its response brief and file the documents as attachments to a notice referencing Heller's motion. The documents will remain under provisional seal until the Court rules on the redactions provided by Guardian.

### 2.    ECF 167

Heller also moves to provisionally seal (1) his opposition to Guardian's motion for summary judgment and (2) his response to Guardian's Statement of Undisputed Material Facts and Statement of Additional Material Facts.[176] Again, Heller does not seek a permanent seal, but rather he merely seeks to comply with the parties' Consent Protective Order.[177] Guardian, the party with an interest in maintaining the confidentiality of the subject information, does not oppose Heller's motion or request that such information be placed under permanent seal. So, the motion [ECF 167] is **GRANTED**. **Within 14 days of entry of this Order**, Guardian may file a motion, supported by good cause, to permanently seal all or part of these documents; if Guardian does not move to seal these documents, they will be entered on the docket in an unsealed format.

---

[176]  ECF 167.

[177]  *Id.*

### b. Heller-Designated Confidential Information [ECF 176]

Guardian moves to provisionally seal the Expert Report of Dr. Israel Shaked, which Heller designated as confidential.[178] The motion to provisionally seal [ECF 176] is **GRANTED**. Heller opposes placing the document under permanent seal because its confidentiality designation was based, in part, on Guardian's prescription claims data, which Guardian designated as confidential.[179] The parties appear to disagree about which of them bears the burden to show good cause to seal the document.[180] **Within 14 days of entry of this Order**, either party may file a motion, supported by good cause, to permanently seal all or part of these documents; if none is filed, the documents will be entered on the docket in an unsealed format.

---

[178] ECF 176.

[179] ECF 182.

[180] *Compare* ECF 176-1, at 2 ("[Heller] must respond to the instant motion and establish good cause to maintain this document under permanent seal, if he so desires.") *with* ECF 182 ("Guardian—as the party that designated its prescription claims data as CONFIDENTIAL—has the burden of establishing "good cause" . . . .").

F. **The Motions to File Supplemental Authorities [ECFs 196, 212, 214, 218, 223]**

1. **Legal Standard**

Faced with the parties' multiple, heavily-litigated motions for leave to file supplemental authority, the Court acknowledges that neither the Federal Rules of Civil Procedure nor the Local Rules of this Court provide specifically for the filing of supplemental authorities. Functionally, however, motions for leave to file supplemental authority are considered surreplies. At the summary-judgment stage, the Local Rules mandate that, "[i]n accordance with LR 7.1(C), the parties shall not be permitted to file supplemental briefs and materials . . . except upon order of the Court." LR 56.1(A).

With no Federal Rule of Civil Procedure on point and only the Local Rules to guide it, the Court is left to exercise the discretion essential to its inherent authority to manage its docket "so as to achieve the orderly and expeditious disposition of cases." *Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*, 556 F.3d 1232, 1240 (11th Cir. 2009) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)). To that end, Guardian cites a host of persuasive cases that can be distilled into one prudent principle: Leave to file supplemental authority should be granted when its purpose is to inform the Court of pertinent and significant

case law ***not*** available at the time of original briefing.[181] *See Minus v. Miami-Dade Cnty.*, 2021 WL 1185683, at *1 (S.D. Fla. Mar. 26, 2021) (declining to strike a notice of supplemental authority because it was submitted "without . . . additional improper legal argument [and contained] supplemental relevant legal authority that was not available at the time of the briefing"). This principle persuades the Court.

### 2.   Analysis

#### i.   Heller's Motions [ECFs 196, 218, 223]

##### a.   Heller's Motion to Notify the Court of Government Briefing in Unrelated Cases [ECF 196]

Heller seeks leave to file two briefs the Government filed in cases pending before the Supreme Court because the arguments and analyses "directly address and further rebut several arguments and issues raised by" Guardian.[182] Guardian opposes Heller's request, noting that the submitted materials are (1) not authorities and (2) constitute an improper surreply.[183] The Court agrees.

The Government's briefs filed in other cases are not authority at all, but rather a "collation of legal arguments."[184] Those arguments are neither

---

[181]   ECF 197, at 3 (collecting cases).

[182]   ECF 196, at 2.

[183]   ECF 197, at 1–2.

[184]   *Id.* at 2.

authoritative nor entitled to deference. Accordingly, Heller's motion [ECF 196] is **DENIED**. The Court **DISREGARDS** the Government's briefs appended to Heller's motion, as well as the parties' arguments related to same.

> **b.** **Heller's Motions to Notify the Court of** *Schutte v. SuperValue, Inc.* **[ECF 218] and** *United States v. Teva Pharmaceuticals USA* **[ECF 223]**

Heller moves for leave to file the Supreme Court's June 1, 2023 opinion in *United States ex rel. Schutte v. SuperValue, Inc.*, 598 U.S. 739 (2023), and the District Court for the District of Massachusetts's order in *United States v. Teva Pharmaceuticals USA*, 2023 U.S. Dist. LEXIS 122272 (D. Mass. July 14, 2023). Guardian does not oppose the motions, but rather it only disputes the cases' applicability here.[185] For good cause shown and without objection, Heller's motions [ECFs 218, 223] are **GRANTED**. To the extent that the parties' briefs on the motions contain argument regarding the cases' applicability, the briefs are **DISREGARDED** as inappropriate surreplies.

> **ii.** **Guardian's Motions [ECF 212, 214]**

> **a.** **Guardian's Motion to Notify the Court of** *United States ex rel. Martin, et al. v. Hathaway, et al.* **[ECF 212]**

Guardian moves for leave to notify the Court of the Sixth Circuit's opinion in *United States ex rel. Martin, et al. v. Hathaway, et al.*, 63 F.4th 1043 (6th Cir. 2023).

---

[185]  ECF 219, at 1–2.

Heller opposes Guardian's motion on the basis that "[g]ood cause does not exist for allowing Guardian to submit a non-binding, out-of-circuit decision that contradicts Eleventh Circuit law and is readily distinguishable on its facts."[186] Heller goes on to analyze and distinguish *Martin*, but the Court declines to consider his brief, which goes far beyond the call of Guardian's motion.

The Court finds that *Martin* is useful to consider. For good cause shown, and over Heller's objection, Guardian's motion [ECF 212] is **GRANTED**.

### b.     Guardian's Motion to Strike Heller's Opposition Brief [ECF 214]

Guardian moves to strike Heller's opposition to Guardian's notice concerning *Martin*, pointing out that Heller's opposition contains inappropriate argument and amounts to an unauthorized additional brief. As already indicated above, the Court declines to consider Heller's opposition. But striking the opposition brief, as Guardian moves, is not the correct remedy. *See* Fed. R. Civ. P. 12(f) (permitting the Court only to strike a *pleading*). For this reason, Guardian's motion [ECF 214] is **DENIED**.

---

[186]  ECF 213, at 1.

### III.   Summary Judgment Motions [ECFs 146, 154]

At long last, we reach the parties' respective summary judgment motions. Heller moves for partial summary judgment as to Count I of the Complaint, the presentment claim.[187] Guardian cross-moves on all claims.[188] For the reasons that follow, both motions are **DENIED**. In short, this case is headed to trial.

### A.   Legal Frameworks

#### 1.   Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex*, 477 U.S. at 322. In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

---

[187]   *See generally* ECF 146.

[188]   *See generally* ECF 154.

2. **The False Claims Act (FCA) and the Anti-Kickback Statute (AKS)**

The FCA permits private "relators" like Heller to bring suit to redress fraud against the Government and to seek a recovery on the Government's behalf.[189] Although the United States declined to intervene in this case,[190] it will be the principal beneficiary should Heller prevail. *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 930 (2009). The FCA is the Government's "principal tool to combat fraud and recover losses involving federal funds," and the Anti-Kickback Statute (AKS) is a means of proving a violation of the FCA.[191] *See also McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) ("The [FCA] is the primary law on which the federal government relies to recover losses caused by fraud.").

### *i.* **The FCA**

The FCA imposes civil liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" to the Government. 31 U.S.C. § 3729(a)(1)(A)–(B). To enforce its provisions, the FCA permits private citizens

---

[189]  ECF 198, at 1.

[190]  ECF 15.

[191]  ECF 198, at 2–3.

(identified as the relator or whistleblower) to pursue civil actions on behalf of the Government (such as the instant *qui tam* action) to recover money paid by the Government. *Id.* § 3730(b). To sweeten the pot for these whistleblowers, the FCA provides for them to recover a civil penalty for each false claim, plus the Government's damages trebled. *Id.* § 3729(a)(1).

Heller asserts three FCA claims arising under separate subsections of the statute. Although the elements of each are similar, they are not identical. For example, to establish a presentment claim under 31 U.S.C. § 3729(a)(1)(A), "a relator must prove three elements: (1) a false or fraudulent claim [(*i.e.*, materiality)], (2) which was presented, or caused to be presented, for payment or approval [(*i.e.*, causation)], (3) with the knowledge that the claim was false [(*i.e.*, scienter)]." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017). For a false use claim under Section 3729(a)(2)(B), "a relator must show that: (1) the defendant made (or caused to be made) a false statement [(*i.e.*, causation)], (2) the defendant knew it to be false [(*i.e.*, scienter)], and (3) the statement was material to a false claim [(*i.e.*, materiality)]." *Id.* Finally, for a Section 3729(a)(1)(G) "reverse" false claim,[192] liability attaches when the relator demonstrates that the defendant:

---

[192] Section 3729(a)(1)(G) "is known as the 'reverse false claim' provision of the FCA because liability results from avoiding the payment of money due to the

> [1] knowingly [(*i.e.*, scienter)] makes, uses, or causes to be made or used [(*i.e.*, causation)], a false record or statement material to an obligation to pay or transmit money or property to the Government [(*i.e.*, materiality)], or [2] knowingly conceals or knowingly and improperly avoids or decreases [(*i.e.*, scienter and causation)] an obligation to pay or transmit money or property to the Government [(*i.e.*, materiality)].

31 U.S.C. § 3729(a)(1)(G). In other words, though their elements differ slightly, Heller's claims each contain elements of causation, materiality, and scienter.

### ii.   The AKS

All of Heller's claims are rooted in Guardian's alleged violation of the AKS, 42 U.S.C. § 1320. The AKS is a criminal statute that "broadly forbids kickbacks, bribes, and rebates in the administration of government healthcare programs." *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1272 (11th Cir. 2018). The AKS states:

> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony.

---

government, as opposed to submitting to the government a false claim." *United States v. Fulton Cnty.*, 2016 WL 4158392, at *2 (N.D. Ga. Aug. 5, 2016) (citing *United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012)).

42 U.S.C. § 1320(b)(2). In other words, for AKS liability to attach, there must be evidence sufficient to prove three essential elements: (1) remuneration, (2) inducement and causation, and (3) scienter.

Since noncompliance with the AKS "is a bar to the receipt of Medicare payments," a violation "can form the basis of liability under the [FCA] for past Medicare payments attributable to the violations." *Bingham v. HCA, Inc.*, 783 F. App'x 868, 871 (11th Cir. 2019). *See also* 42 U.S.C. § 1320a–7b(g) ("[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim.").

Under this theory, the FCA permits a claim for submitting false certifications of records and statements to the Government. Put another way, a claim arises if a defendant "certif[ies] compliance with laws and regulations concerning proper practices for medical providers . . . when in fact those claims are for services that were provided in violation of those rules." *Barker ex rel. United States v. Columbus Reg'l Healthcare Sys., Inc.*, 977 F. Supp. 2d 1341, 1344 (M.D. Ga. 2013) (citing *McNutt*, 432 F.3d at 1259–60)). *See also United States v. AseraCare, Inc.*, 938 F.3d 1278, 1284 (11th Cir. 2019). Claims for government payment that make such assertions or implications are deemed false under the FCA. *See Carrel*, 898 F.3d at 1272.

### iii.    AKS Violation as a False Claim

Proof of the three AKS elements—remuneration, inducement, and scienter—establishes liability as discussed above; but to create a jury issue on a FCA claim premised on a violation of the AKS, proof of an AKS violation is not enough. In the Eleventh Circuit, violations of the AKS coupled with "the corresponding submission of claims for which payment is known by the claimant not to be owed make the claims false" under the FCA. *McNutt*, 423 F.3d at 1259. "The submission of a claim is . . . the *sine qua non* of a [FCA] violation." *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002). *See also Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) ("Liability under the [FCA] arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal policies."); *United States ex rel. Osheroff v. Tenet Healthcare Corp.*, 2012 WL 2871264, at *5 (S.D. Fla. July 12, 2012) ("The general rule is that a claim must actually be submitted to the government in order for there to be actionable damage. The purpose of this requirement is to ensure that the government has actually—not just likely—been paying claims to the Defendant from the public fisc.") (citation omitted).

### *a.* **Remuneration**

### *1.* **Defining Remuneration**

Remuneration is defined broadly to include anything of value, whether offered or paid directly or indirectly, overtly or covertly, in cash or in kind. 42 U.S.C. § 1320a-7b(b)(2). *See Bingham*, 783 F. App'x at 873 (noting that remuneration is not defined in the AKS and discussing the common usage for its meaning based on its dictionary definition and informed by an analogous statute). Remuneration has been broadly interpreted "to include anything of value in any form whatsoever." *United States ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 805 (S.D.N.Y. 2017), *rev'd on other grounds*, 899 F.3d 163 (2d Cir. 2018) (citing *United States ex rel. Fry v. The Health All. of Greater Cinn.*, No. 03-cv-0167, 2008 WL 5282139, at *7 (S.D. Ohio Dec. 18, 2008). *Accord* Dep't of Health & Hum. Res. Off. of Inspector Gen. Anti-Kickback Provisions, 56 Fed. Reg. 35952-01, 35958 (July 29, 1991) ("Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever."). *But see Martin*, 63 F.4th at 1051 (calling into question the broad definition of remuneration applied in most circuits as "lack[ing] a coherent endpoint," and holding that only payments and transfers of value, not any act that may be valuable to another, constitute remuneration).[193]

---

[193]  ECF 212-1, at 9–13.

### 2. Independent Value and Fair Market Value

The parties disagree whether Heller must show the Services' fair market value (FMV) and adduce evidence that they were provided at prices at least below the FMV.[194] Guardian argues that, "[t]o constitute an illegal kickback, the remuneration must be beyond the scope of, and not integral to, Guardian's services to its own patients," and "support services a [defendant] offers in connection with the sale of its own products . . . do not, on their own, implicate the [AKS]."[195] *See* Re: OIG Advisory Op. No. 12-19, 2012 WL 7148095, *8 (Nov. 30, 2012) (hereinafter OIG 12-19) ("[T]he OIG has distinguished between situations in which a provider offers free items and services that are integrally related to that provider's services, and those that are not."). Heller seems to acknowledge that a showing of FMV is appropriate in some cases, but insists that such a showing is not required here because "Guardian did not purchase goods or services from the Communities."[196] Heller also argues that the FMV is only relevant where "the

---

[194] *Compare* ECF 154-1, at 9–10 *with* ECF 139-2, at 28–29.

[195] ECF 154-1, at 8–9 (quoting *United States ex rel. Suarez v. AbbVie Inc.*, 2019 WL 4749967, at *7–*8 (N.D. Ill. Sept. 30, 2019) (cleaned up) (quoting OIG May 2003 Notice, 68 Fed. Reg. 23731-01, 2003 WL 2010428, at *23735)).

[196] ECF 139-2, at 35.

complaint alleges the defendant overpaid for services or sweetened the deal in a commercial transaction to induce referrals."[197]

On this point, the Court reminds the parties of its ruling at the motion-to-dismiss stage:

> Based on a close read of the case law, the Court notes that whether a relator is required to plead a benchmark in all FCA claims premised on a violation of the AKS through a below [FMV] exchange is an open question. There is no Eleventh Circuit opinion directly on point. And *Bingham* and *Osheroff* — Guardian['s] two primary cases — are distinguishable on their facts. . . . Nonetheless, even if alleging a fair market benchmark is a prerequisite, the Court believes Heller has satisfied his burden in this case.[198]

This logic holds true at the summary-judgment stage as well.[199]

So, while Guardian advances a reasonable position on the law — *i.e.*, "[f]or services that are not integrally related, 'the value of a benefit can only be quantified by reference to its [FMV]'" — the Court need not weigh in on whether proof of FMV

---

[197] *Id.* (citing *Bingham*, 783 F. App'x at 871; *Kuzma v. N. Ariz. Healthcare Corp.*, 2022 U.S. Dist. LEXIS 106969, at *11–*14 (D. Ariz. June 15, 2022)).

[198] ECF 63, at 19 n.50.

[199] Since the Court's motion-to-dismiss Order, only one court in this circuit has applied *Bingham* at the summary-judgment stage and concluded that "remuneration means the transfer[ ] of items or service[s] for free or for other than fair market value." *Livingston v. Digirad Corp.*, 2022 WL 4110897, at *17 (N.D. Ala. Sept. 8, 2022). In *Livingston*, the plaintiff had offered no affirmative evidence of FMV, but rather he evaded summary judgment by identifying a discrepancy in the defendant's witnesses' testimony related to the defendant's fees for a disputed service.

is required here.[200] This is especially true because the AKS neither defines remuneration nor references FMV. Besides, as the Court will discuss below, Heller has adduced evidence of FMV for each of the Services in any event.

### b.   Inducement

Courts are clear that "an AKS violation exists if one purpose of the remuneration was to induce Medicare purchases, even if other legitimate purposes for the remuneration existed." *United States ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*, 2021 WL 101193, at *8 (D. Minn. Jan. 12, 2021) (citing *United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011) (collecting cases from the Third, Fifth, Ninth, and Tenth Circuits)). *See also United States v. Regeneron Pharm., Inc.*, 2020 WL 7130004, at *8 (D. Mass. Dec. 4, 2020) ("A person or company who offers or pays remuneration to a healthcare provider violates the AKS so long as one purpose of the offer or payment is to induce Medicare or Medicaid patient referrals."). "[O]ne need not prove that the primary or sole purpose of the remuneration was to induce the referral of patients or the recommendation of items or services; it is enough if that was 'one purpose' of the remuneration." *Allergan*, 246 F. Supp. 3d at 806.

This "one-purpose" rule, if applicable, has a potent implication when considering Heller's theory of the case: If Heller has adduced evidence that one

---

[200]   ECF 154-1, at 9 (quoting *Bingham*, 783 F. App'x at 873 (citing *Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 679 (N.D. Ill. 2006)).

purpose of Guardian's offering of the Services was to induce ALFs to select and maintain Guardian as their "preferred" pharmacy, then Guardian is not entitled to summary judgment on inducement.[201]

Guardian balks at Heller's reliance on the one-purpose rule and argues it is not "a rigid statutory construct that punishes legitimate and standard activities if they result in anything at all positive for a referral source."[202] The reality is somewhere in the middle. True, "[t]here is no AKS violation . . . where the defendant merely hopes or expects referrals from benefits that were designed wholly for other purposes." *United States ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 374–75 (5th Cir. 2016) (citing *United States v. McClatchey*, 217 F.3d 823, 834 (10th Cir. 2000)) (LTCP's debt forgiveness and prompt pay discounts to SNFs were not inducements in the absence of "evidence that they were designed to induce referrals"). However, that proposition merely describes the cause-and-effect relationship of good customer service. It does not mean, as Guardian argues, that "[a]nything short of *quid pro quo* exchange (or offer to make such an exchange) does not violate [the AKS]."[203] On this point, the United States' Statement of

---

[201]   ECF 139-2, at 36.

[202]   ECF 178, at 23.

[203]   ECF 154-1, at 8 (citing *United States ex. rel. McDonough v. Symphony Diagnostic Servs., Inc.*, 36 F. Supp. 3d 773, 777 (S.D. Ohio 2014)).

Interest sets the record straight. *See* ECF 198, at 2–4 (citing *McDonough*, 36 F. Supp. at 781) (correctly explaining that the *McDonough* court did not grant summary judgment in the defendant's favor "because of the lack of evidence of an express *quid pro quo*, but rather because relator's circumstantial evidence of intent to induce referrals was 'simply too strained'").

Thus, where Heller has marshalled evidence of an improper purpose for Guardian's provision of one or more of the Services, Guardian's argument that its Services "promote patient and medication safety, reduce drug utilization, are integrally related to Guardian's products, and benefit Guardian's own patients and the Medicare program," even if true, do not entitle it to summary judgment.[204] For each of the Services, Heller has raised a material question as to inducement, and the evidence he has adduced is discussed below.

### c.   Scienter

Both the FCA and the AKS require a showing of scienter. To violate the AKS, the defendant must act "knowingly and willfully." 42 U.S.C. § 1320a-7b(b). Regarding knowledge, "a person need not have actual knowledge of [the AKS] or

---

[204] ECF 154-1, at 3. During oral argument, Heller's counsel did not challenge the alleged safety and efficiency benefits of the Services. ECF 211, at 102. This is because, under Heller's theory of the case and the one-purpose rule, Heller need not disprove those benefits to proceed to trial. For the same reason, the Court will not consider any of Guardian's arguments regarding safety and efficiency.

specific intent to commit a violation of [the AKS]." *Id.* § 1320a-7b(b), (h). However, though "willfully" is not defined in the AKS, it requires "the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v. Vernon*, 723 F.3d 1234, 1256 (11th Cir. 2013) (quoting 11th Cir. Pattern Jury Instr. 9.1) (affirming the district court's instruction charge of the same to the jury).

The FCA's scienter requirement is "rigorous." *Universal Health Servs., Inc. v. United States & Mass. ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016). The FCA itself defines "knowing" and "knowingly" to mean the defendant "has actual knowledge of the information"; "acts in deliberate ignorance of the truth or falsity of the information"; or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). A relator need not, however, prove "a specific intent to defraud." *Id.* § 3729(b)(1)(B). "Reckless disregard is the lowest scienter threshold under the FCA" and is "tantamount to gross negligence." *Yates*, 21 F.4th at 1303.

The parties spend a great deal of energy debating the import of OIG guidance and other regulations, and they disagree about how regulatory ambiguity affects scienter under the FCA. The United States' Statement of Interest is informative on this point:

> In the Eleventh Circuit, "[a]lthough ambiguity may be relevant to the scienter analysis, it does not foreclose a

finding of scienter." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017). "Instead, a court must determine whether the defendant actually knew or should have known that its conduct violated a regulation in light of any ambiguity *at the time* of the alleged violation." *Id.* (emphasis added).[205]

Consistent with *Phalp*, the Supreme Court in *Schutte*, 598 U.S. at 749, recently said much the same thing: "[A]mbiguity alone is not sufficient to preclude a finding that [defendants] knew their claims were false." In *Schutte*, faced with respondents who might have correctly understood the assertedly ambiguous regulation and nevertheless submitted false claims, the Supreme Court unanimously held that a defendant's subjective understanding of an ambiguous law, even if objectively reasonable, is relevant proof of scienter. *Id.* ("The FCA's scienter element refers to . . . knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed."). In so holding, the Supreme Court rejected the idea that a defendant's *post hoc* articulation of an objectively reasonable (even if erroneous) interpretation of ambiguous regulations could justify its otherwise unlawful conduct.[206] Thus, regardless of whether

---

[205]  ECF 198, at 4.

[206]  Clarifying the standard for scienter under the FCA, the Supreme Court rejected the application of *Safeco Insurance Company v. Burr,* 551 U.S. 47, 69–70 (2007) (setting out a purely objective *mens rea* standard in the context of Fair Credit Reporting Act claims), to cases like this one, and thereby mooted much of Guardian's scienter argument. *See* ECF 154-1, at 28–39 (arguing there is no

Guardian's interpretation of ambiguous regulations was objectively reasonable, what matters is what Guardian knew and subjectively believed about those regulations during the times relevant to Heller's claims.

The best evidence of Guardian's scienter is the "Standard Terms" contained in its own Services Agreements, which required Guardian to: (1) provide "consulting pharmacist services only on terms that account for [Guardian]'s costs to do so, and never below those costs"; (2) ensure that "[a]ll arrangements for consulting pharmacist services [would] be established without regard to any referrals"; and (3) avoid "offer[ing], solicit[ing], pay[ing], or receiv[ing] any remuneration (anything of value) intended to induce referrals of any patient or the purchasing or ordering of any item or service" which may be payable by Medicare.[207] On this evidence, and for the reasons discussed below regarding each of the Services, there is a dispute of material fact as to whether Guardian had the requisite intent for a violation of the AKS and FCA.

---

evidence Guardian knowingly and willfully violated the AKS or knowingly violated the FCA because of its alleged industry-standard practices, which it believed were objectively reasonable under the *Safeco* standard considering supposedly ambiguous regulations).

[207] ECF 179, ¶¶ 83–84.

### d.    Materiality and Causation

In *McNutt*, the Eleventh Circuit held that an AKS violation establishes the falsity of a claim for Government reimbursement. 423 F.3d at 1257–59 ("The violation of the regulations and the corresponding submission of claims for which payment is known by the claimant not to be owed make the claims false."). *Accord United States ex rel. Lutz v. Mallory*, 988 F.3d 730, 741 (4th Cir. 2021); *Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019) (holding that, after the 2010 AKS amendment, "[a]n AKS violation that results in a federal health care payment is a per se false claim under the FCA"). Thus, if Heller proves that any of the Services violated the AKS, he will have proved materiality as a matter of law. In other words, Heller is not precluded from proceeding under a so-called "implied certification" theory of liability.[208] *See United States ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783, 799 (11th Cir. 2014) ("[T]he FCA is violated where compliance with a law, rule, or regulation is a prerequisite to payment but a claim is made when a participant has engaged in a knowing violation [of the same].").

The parties also dispute the measure of causation.[209] As the Court noted in its Order on Guardian's motion to dismiss the Amended Complaint,

> [A] relator must identify "a claim that includes items and
> services ***resulting from*** a violation of [the AKS] [which]

---

[208]   *See* ECF 198, at 8–9.

[209]   *Compare* ECF 154-1, at 39–41 *with* ECF 139-2, at 37–40.

> constitutes a false or fraudulent claim for purposes of [the FCA]. 42 U.S.C. § 1320a-7b(g) (emphasis added). Recent cases have required a relator to show "causation, or some 'link' between the payment of remuneration and the submission of false claims" to "establish FCA liability based on an AKS violation."[210]

Regarding the standard this Court should apply to evaluate whether Guardian's claims "resulted from" a violation of the AKS, Guardian advises that the circuit courts are split between "but-for" and proximate standards of causation.[211] Citing the Eighth Circuit's recent decision in *United States ex rel. Cairns v. DS Medical, LLC*, 42 F.4th 828, 835 (8th Cir. 2022), Guardian cautions the Court to avoid selecting which standard to apply.

But *Cairns* did nothing to disturb *McNutt* and its progeny, which provide the governing standard in this Circuit and do not endorse the need for a direct, but-for causal link between the kickback and the subsequent claim.[212] The *Cairns* court reasoned that "*any* failure to disclose an [AKS] violation—regardless of the relationship between the illegal kickbacks and the items or services included—was sufficient." 42 F.4th at 835–36. *Cairns* has an understandable appeal: It stands to

---

[210] ECF 63, at 38 (quoting *U.S. ex rel. Wallace v. Exactech, Inc.*, 2020 WL 4500493, at *19 (N.D. Ala. Aug. 5, 2020)).

[211] ECF 178, at 38.

[212] The same is true of the Sixth Circuit's opinion in *Martin*, which adopted the *Cairns* court's holding that "resulting from" means but-for causation. 63 F.4th at 1053. *See also* ECF 212-1.

reason that, had Congress intended to set out a more inclusive causation standard, it might have used broader language (*e.g.*, "tainted by" instead of "resulting from") in its 2010 amendment to the AKS. *See id.* at 836. Nevertheless, the Court declines to adopt *Cairns*'s causation standard and instead follows *McNutt*, which has been tacitly—if not explicitly—reaffirmed in this Circuit since 2010. *See, e.g., Bingham*, 783 F. App'x at 871 (citing *McNutt* and noting that noncompliance with the AKS is a "bar to the receipt of Medicare payments, and therefore a violation of [the AKS] can form the basis of liability under the [FCA] for past Medicare payments attributable to the violation); *Keeler*, 568 F. App'x at 799 (citing *McNutt* and recognizing the continued applicability of the implied certification theory of FCA liability). *See also United States v. Choudhry*, 2017 WL 2604930, at *4 n.3 (M.D. Fla. June 14, 2017) (noting that the 2010 amendment to the AKS "did nothing to alter the false certification theory of claim 'falsity'") (citation omitted). Despite *Cairns*'s recent ripple, the current state of the law in this Circuit favors a less exacting standard.[213]

To recap, then, violations of the AKS, coupled with the corresponding submission of claims for which payment is known by the claimant not to be owed,

---

[213] On this point, the United States' Statement of Interest is again instructive. ECF 198, at 5–9 (collecting cases from district courts that have declined to follow *Cairns*).

make the claims false under the FCA. *McNutt*, 423 F.3d at 1259–60. Thus, this Court concludes that if Heller proves at trial that Guardian violated the AKS, he will have proved that Guardian caused materially false claims to be submitted to the Government in violation of the FCA.

## B.      Discussion

Heller's motion for partial summary judgment seeks a dispositive ruling only on his presentment claim in Count I, whereas Guardian seeks summary judgment on each of Heller's claims. Because the parties' motions each implicate the Services, the Court resolves the motions in tandem, one Service at a time.

### 1.      Medication Management and Consulting Services (MMS)

Heller moves for partial summary judgment on the MMS that Guardian offered and provided, allegedly for free, to 80 ALFs between January 1, 2014 and June 30, 2019.[214] Guardian cross-moves for summary judgment as to MMS provided to all of Guardian's ALF clients, arguing: (1) Guardian's PBM contracts covered MMS as part of the dispensing fee reimbursed by Medicare; (2) Georgia law requires assisted living communities (ALCs) to secure—not pay for—MMS; (3) Guardian's provision of MMS at no charge did not give it an unfair competitive

---

[214]  ECF 139-2, at 15.

advantage; and (4) even if Guardian provided MMS at below cost or FMV, it did not constitute remuneration.[215]

Guardian concedes that it does not charge ALFs for MMS. Rather, it argues that its provision of MMS is required under its PBM contracts and paid for by the dispensing fees it receives per those contracts, and that the CMS Manual endorses this position.[216] Heller does not challenge that Guardian's PBM contracts contain language mirroring the CMS Manual, but he argues that CMS "clearly defined 'dispensing fees' to mean only the costs of dispensing and delivery and explicitly excluding costs associated with *administering* drugs to patients."[217]

The parties agree that Medicare Part D plans pay an ingredient cost and dispensing fee for many medications LTCPs like Guardian might dispense.[218] Guardian's PBM contracts provide that, in exchange for its dispensing fee, it must: (1) ensure the "return and/or disposal of unused" drugs; (2) "provide reports . . . necessary for the delivery of quality pharmacy care [including, but not limited to] monthly management reports to assist the LTC facility in managing orders [and] [MARs]," and (3) "perform[ ] drug utilization review . . . to routinely screen for

---

[215]  ECF 154-1, at 12–22.

[216]  *Id.* at 12–15.

[217]  ECF 172, at 33.

[218]  ECF 172-1, ¶ 12.

allergies and drug interactions, to identify potential adverse drug reactions, to identify inappropriate drug usage in the LTC population, and to promote cost effective therapy."[219] Additionally, Section 20.7 of the CMS Prescription Drug Benefit Manual, which Guardian cites in support of its position,[220] includes among the "costs that may be included in dispensing fees . . . [r]easonable pharmacy costs that are appropriate for the typical beneficiary in that pharmacy setting."[221]

At first glance, the PBM contracts (and the pertinent CMS regulations) appear to require Guardian to provide MMS—or services like it. However, the evidence on whether the dispensing fees set by the PBM contracts cover MMS is divergent. For example, Guardian offers two experts whose testimonies indicate that Medicare Part D insurance plans (through PBMs) pay LTCPs for MMS.[222] While their testimonies are essentially unrefuted from the PBM contract perspective, Heller's expert opines that "[a]lthough the definition [of 'dispensing fee'] includes costs for quality assurance activities [under regulations governing

---

[219]  *See* ECF 154-21 (Exhibit F to the Humana Agreement).

[220]  ECF 154-1, at 13.

[221]  CMS, *Prescription Drug Benefit Manual*, Ch. 5, § 20.7; CMS, Long Term Care Guidance (Mar. 16, 2005) at 1, available at https://tinyurl.com/4p5tyhjj (last accessed Sept. 15, 2023).

[222]  *Id*. at 13–14 (discussing the testimonies of Guardian's experts: Joseph Zavalishin, who negotiated agreements with LTCPs on behalf of Medicare payors, and Dr. Alyson Wooten, a licensed pharmacist familiar with dispensing fees).

drug utilization,] it does not include consulting services."[223] Considering this disputed evidence, it will be up to the jury to weigh whether MMS is covered under the PBM contracts and CMS guidelines.

Even if Heller's expert testimony on this point were not enough to prevent summary judgment in Guardian's favor, he offers additional evidence that MMS is remuneration. By example, for 39 of the 80 ALFs for which he seeks summary judgment, Heller submits the Services Agreements that Guardian executed.[224] The Services Agreements detailed the services Guardian would provide to those ALFs, and they expressly listed MMS as "free of charge" or for "no charge."[225]

Considering the Services Agreements, which are aimed at what services Guardian would provide *to the ALFs*, compared against the PBM contracts, which address what Guardian would be paid for services *to its patients*, there is a dispute of material fact on MMS as remuneration. Heller adduced evidence that Guardian performed MMS at the remaining 41 ALFs (whether for the ALFs, Guardian's patients residing there, or both), but there is no indication these ALFs were charged.[226] For the 80 ALFs implicated by Heller's partial summary

---

[223]  ECF 172, at 34 (cleaned up).

[224]  ECF 139-2, at 15.

[225]  *See id*. at 15–16.

[226]  *Id*. at 16.

judgment motion, Guardian did not issue invoices or bills for MMS; but for some other ALFs, Guardian issued invoices and received payments.[227] From this evidence, a jury could conclude that MMS had some independent value to the ALFs.

Heller also relies heavily on marketing communications from Lori Newcomb, Guardian's top pharmacist consultant, to ALFs and third parties.[228] In them, Newcomb notes that Guardian "charge[s] $20 for a review" if an ALF resident does not "use Guardian"; otherwise, she repeatedly says Guardian "[does] not charge."[229] Though Guardian argues that the $20 charge for "ALF residents who are not Guardian patients and [the] fee that some ALFs charge to residents who use a retail pharmacy instead of an LTCP" are to accommodate the cost to Guardian for MMS that would otherwise be paid by the dispensing fee, that is merely one inference to take away from Newcomb's statement. In either case,

---

[227] ECF 179, ¶¶ 13–14. Guardian disputes these facts to the extent they imply MMS was provided **to the ALFs** or that Guardian should have billed them, and it maintains that "[o]nly a few [ALFs] paid Guardian fees expressly for periodic consulting services." *Id.*

[228] ECF 139-2, at 17–18.

[229] *Id.*

the $20 charge for Guardian's provision of MMS to nonpatients is at least circumstantial evidence of the FMV for MMS.[230]

> Likewise, Matt Hopp, the chief executive at Guardian, wrote to an ALF:

>> [Guardian's] services include . . . quarterly pharmacist/ nurse review where we audit medications that are being stored, administered, and recorded properly. We do all of this and more *without charge. Please keep this in mind when a family or resident wants to discuss with you about switching from Guardian Pharmacy of Atlanta. To discontinue with us is to discontinue all that is included above*.[231]

Depending on the context of Guardian's marketing communications, those assertions could be construed in Heller's favor or Guardian's on the questions of remuneration and inducement under the AKS. But the Court cannot decide one way or the other as a matter of law.

Perhaps one piece of evidence, more than any other, exemplifies the dispute of material fact on all elements—remuneration, inducement, and scienter (and therefore materiality and causation as well). On January 12, 2018, in an email

---

[230] Guardian's president also testified that MMS could cost between $9 and $11 per bed. ECF 179, ¶ 16. While Guardian disputes that this testimony is evidence of MMS's FMV, Guardian's position is merely a gloss on the facts. Indeed, while he said "Guardian would not have actually paid [$11]," Guardian's president also said, "from just prior experience anywhere in the 9, 10, $11 range has been pretty fair from what I've seen." ECF 140-8 (Hopp Dep.), at 281:12–25. The Court accepts this, too, as circumstantial evidence of MMS's FMV.

[231] ECF 139-2, at 18 (cleaned up).

attaching Guardian's new "Pharmacy Consulting Fee Schedule," Newcomb

wrote:

> Matt [Hopp] gave the okay for charging for ALL education and ALL skills checks. ***This, of course, may be revised based on some of our large corporate clients' feedback***.
>
> . . . . I am attaching the fee schedule for you, and the REVISED consulting duties. . . .
>
> Marketing points to remember: ***AL[C] buildings get high quality consulting for free every quarter, even though this is required by AL[C] rules***; we are only charging for class room training and skills checks, which take so much of the consultants' time. ***PCH buildings get high quality consulting for free every quarter, even though not required by rules***. Again, we are charging for classroom training and skills for them only.
>
> We are willing to negotiate a premium package if clients wish to participate. They would pay a monthly fee ($300–$500 per month). This monthly fee would cover them for all education, training, skills checks, premium consulting services, etc. They also would get priority on scheduling if they are paying this fee.
>
> . . . . It is an important, but difficult change to make. We will most likely get some negative feedback from our clients. However, with the rules as they are in GA for AL[C] and PCH, ***we can no longer afford to give everything away for free***. . . . We provide the best consulting in the state as far as I am concerned. Matt has to pay us to do our jobs. We cannot continue to give everything away for free. Plus, the consulting team is worn out. We need more help. Matt can't get us more help unless we generate some income. . . .
>
> . . . . Don't make a big deal about the changes. Just make them aware of consultant changes and charges when

they ask. ***Immediately give feedback to Matt if you get resistance or threats to leave.***[232]

From this email, it is reasonable to infer that the MMS (and Training, discussed below) had an independent value for ALFs and therefore could constitute remuneration under the AKS. Indeed, it is reasonable to infer from this email that Guardian expected backlash from LTCPs for charging for some of the Services for the first time in 2018. A jury considering this email could find that MMS was offered for free with at least one purpose in mind—to induce ALFs to sign with Guardian. And, based on how a jury weighs the Newcomb email, it could be considered either salesman's zeal or evidence that Guardian knowingly and willfully targeted ALFs with no-cost MMS for a competitive purpose—and possibly to get "preferred" status.

Guardian may call these reasonable inferences into question on cross-examination or draw out its own inferences, but it is not entitled to summary judgment. Neither is Heller, considering the PBM contracts, Guardian's expert testimony, and other industry evidence that may be offered into evidence. None of Guardian's or Heller's other arguments tilt the balance definitively toward

---

[232]   ECF 146-23, at 2 (emphasis added) (Exhibit 4P to Heller's motion for partial summary judgment).

summary judgment in either direction. Heller's claims regarding MMS must proceed to trial.

### 2.      Electronic Medication Administration Record (eMAR) and Laptops

The parties also cross-move for summary judgment as to Guardian's provision of eMAR and laptops to 33 ALFs.[233] Because the laptops are pre-loaded with Guardian's eMAR software, the parties often collapse the eMAR and laptops into one category.[234] Indeed, Heller and Guardian appear to agree that the laptops' sole use was for eMAR administration,[235] and Heller concedes that eMAR is "peripheral to the primary kickbacks Guardian offered, *i.e.*, . . . laptops."[236] Though Heller referred to eMAR and the laptops during oral argument as separate alleged kickbacks, that position is not clear from Heller's briefs. The Court discusses them together.

---

[233]   ECF 139-2, at 24 n.14 (noting that the complete list of all 33 ALFs that received laptops is contained in the Rule 1006 summary supporting Heller's motion for summary judgment).

[234]   *See, e.g.*, *id.* at 23–34; ECF 172, at 32. In his motion for partial summary judgment, Heller mentions eMAR only once and focuses almost entirely on the laptops.

[235]   ECF 179, ¶ 57.

[236]   ECF 172, at 8 n.3.

Guardian argues that eMAR and the laptops were not remuneration, and there is no evidence that they were priced below cost or FMV.[237] Specifically, Guardian avers: (1) eMAR is provided to its patients, not the ALFs, and is integrally related to its drug dispensing function;[238] and (2) the laptops are dedicated solely for eMAR and remain Guardian's property (*i.e.*, the laptops are loaned, not given, to ALFs).[239] Heller maintains that eMAR and the laptops were not integrally related to Guardian's prescription fulfilment service and had independent value, and he asserts Guardian offered the laptops as a *quid pro quo* for "preferred" status.[240]

### i.   Whether eMAR and the Laptops Were Integrally Related to Guardian's Prescription Fulfillment

To bolster its position that eMAR is integrally related to its fulfillment of prescriptions and therefore not remuneration, Guardian avers that its provision of eMAR and the laptops makes MMS more efficient, is billed to its patients at a $10 monthly rate, and is supported by a commonsense read of the OIG guidance.[241] Heller primarily argues that, to maintain licensure, Georgia law requires ALFs to

---

[237]  ECF 154-1, at 10.

[238]  ECF 145-1, at 10.

[239]  ECF 154-1, at 10–12.

[240]  ECF 139-2, at 23–24.

[241]  ECF 154-1, at 10–11.

keep medication administration records, so eMAR and the laptops were independently valuable to ALFs and constituted remuneration. None of the parties' arguments is entirely availing.

### a.  Georgia Law on ALF Licensure

Georgia law requires ALFs (through "medication aide[s]") to "record in the medication administration record all medications that such medication aide has personally administered to a resident of an assisted living community and any refusal of a resident to take a medication." O.C.G.A. § 31-7-12.2(g)(8) (ALCs). *See also* Ga. Comp. R. & Regs. R. 111-8-62-.20 (PCHs). Georgia law says nothing about whether LTCPs—or retail pharmacies for that matter—are required to offer or administer eMAR. Instead, it places the onus *on ALFs* to keep medication administration records. This, coupled with the fact that Guardian provides eMAR with corresponding laptops (over and above the standard paper medication administration records ALFs would otherwise use[242]) at least allows for the reasonable inference that Guardian provided ALFs with something of value— even if that value is merely the ALFs' convenience.

---

[242] ECF 211, at 64 ("[I]f the resident's not paying for eMAR then what's happening is the non-Guardian residents are using paper MARs or paper Medication Administration Records.").

### b.    MMS Efficiency

Citing *Suarez* and *United States ex rel. Forney v. Medtronic, Inc.*, 2017 WL 2653568, at *4 (E.D. Pa. June 19, 2017)—cases that evaluated the plaintiffs' pleadings for particularity under Fed. R. Civ. P. 9(b)[243]—Guardian argues that eMAR and the laptops make MMS more efficient and are therefore integrally related.[244]

The inapposite posture of those cases notwithstanding, Guardian's argument has two pitfalls. First, by couching eMAR and the laptops in terms of MMS efficiency, Guardian links them to a suspect Service. Second, as Guardian explains, to evaluate whether a service is remuneration, courts "assess whether [the] [r]elator has alleged that [the defendant] offered services 'integrally related' to [its product] in tandem with another service or program that confers a benefit on a referring provider."[245] Here again, as at the motion-to-dismiss stage, this begs the question that permeates much of the briefing: Are Guardian's "customers" the residents whose prescriptions it fills or the ALFs (*i.e.*, the referring providers)? Guardian's position seems to be that its customers are the patients, and its

---

[243]  The Court detailed the holdings of *Suarez* and *Forney* in its February 2021 motion to dismiss Order and incorporates that discussion by reference. *See* ECF 63, at 24–26.

[244]  ECF 154-1, at 10.

[245]  *Id*. at 9 (quoting *Suarez*, 2019 WL 4749967, at *7) (cleaned up).

principal product is the medication it dispenses to those patients. If that is so, then linking eMAR and the laptops to MMS suggests that ALFs—not just patients—receive a benefit: efficiency. This benefit to the ALFs is not clearly connected to Guardian's product (*i.e.*, prescription fulfilment), allowing a jury to infer that the benefit has a value independent from the product.

### c.    Monthly Fee and Fair Market Value (FMV)

Regarding the $10 monthly fee Guardian charges its patients for eMAR, the evidence is inconclusive. Guardian offers evidence from which a jury could infer that the fee exceeded Guardian's eMAR costs (allegedly $4.50 per patient monthly) by more than double and was consistent with the fees other LTCPs charged their patients.[246] Heller offers contrary evidence: Scott Holloway, Guardian's Vice President of Finance and Operations, testified that Guardian is "billed close to $9," so its margin on eMAR is "less than a dollar."[247] Holloway's testimony also bears on the potential FMV of eMAR to the extent that it is a helpful data point in evaluating whether eMAR constituted remuneration, separate and apart from the laptops. Thus, jurors could diverge on whether Guardian charged its patients approximately double the cost of eMAR, or nearly at cost.

---

[246]   ECF 171-2, ¶¶ 7, 10.

[247]   ECF 136-6 (Holloway Dep.), at 142:2–8.

Setting that dispute of fact aside, the Services Agreements between Guardian and ALFs required Guardian to provide eMAR *to the ALFs*.[248] The agreements also provided: "[Guardian] will bill the *facility or residents* at the rate of $10.00 per resident enrolled in QuickMar [(*i.e.*, eMAR)] monthly."[249] Because the Services Agreement is unclear on its face regarding who would pay for eMAR, there is a dispute of material fact as to whether the ALFs received the benefit of eMAR cost-free.

### d.  OIG Guidance on eMAR and Associated Technology

Guardian argues that OIG 12-19, a 2012 OIG advisory opinion, can "reasonably be interpreted to allow an LTCP to provide eMAR software access at *no* charge."[250] OIG 12-19 answered a hypothetical question posed by an anonymous party—*i.e.*, the Requestor, who "provides pharmacy services to more than 3,400 individuals . . . who reside in community homes"—that gave community homes of its patients free, limited access to certain electronic software. OIG 12-19, at *8. OIG advised:

> While it remains the OIG's position . . . that free or below-market items and services are suspect, . . . [w]hen the item or service offered can be used only as part of the underlying service being provided, it appears that the

---

[248]  ECF 139-7, at 19.

[249]  *Id.*

[250]  ECF 154-1, at 10 (citing OIG 12-19, at *8).

> free items or services have no independent value apart
> from the underlying service. Upon review[,] . . . we
> conclude that [the software] would be integrally related
> to the Requestor's services, such that they would have no
> independent value to the Community Homes apart from
> the services Requestor provides . . . . [T]he particular
> circumstances presented here . . . would be unlikely to
> result in fraud or abuse under the [AKS], and we would
> not seek to impose administrative sanctions.

*Id.*

While OIG 12-19 is certainly helpful to Guardian's position, it is not precedent-setting, binding, or dispositive. In other words, that OIG would not likely have sought to impose sanctions on the Requestor does not mean that eMAR under the facts here is not remuneration as a matter of law. Indeed, the parties offer dueling experts on this disputed point. Furthermore, under *Schutte*, Guardian's *post hoc* interpretation of OIG 12-19 is not enough to disprove scienter in light of Guardian's conduct surrounding the laptops. Accordingly, neither Guardian nor Heller is entitled to summary judgment as to whether eMAR and laptops constituted remuneration.

### ii.    Whether the Laptops Were Loaned

Guardian argues that the laptops preloaded with its eMAR software were not remuneration because they: (1) remained Guardian's property at all times (*i.e.*, were a "loan"), were "dedicated solely to eMAR use," and were "integral to eMAR software"; (2) were allowed to be placed in ALFs at no charge under OIG

12-19; and (3) were provided by all other LTCPs identified in this case.[251] Heller maintains that the Services Agreements contained the same "no charge" language with respect to laptops as with other Services, and that Guardian's "loan" of laptops was merely so ALFs would not have to purchase them.[252]

That the laptops might have been integrally related to eMAR, which, in turn, might have been integrally related to MMS, is not dispositive as to whether the laptops constituted remuneration. Neither is OIG 12-19, for the reasons stated above. Likewise, the semantic distinction between "loaning the laptops at no cost" versus "giving" the ALFs the laptops is a distinction without a difference for purposes of this case.

To be sure, that (1) Heller has not identified an LTCP that did not provide laptops and (2) Heller testified that he believed this practice to be AKS compliant are relevant (and persuasive) facts on the issue of Guardian's scienter.[253] However, Heller's subjective belief regarding AKS compliance cannot be substituted for Guardian's, and Heller has marshalled other evidence to support his argument that the laptops were a kickback. For example, an email from Hopp to an ALF-client supports Heller's theory. In it, Hopp wrote,

---

[251]  ECF 154-1, at 11.

[252]  ECF 139-2, at 23–24; ECF 172, at 18.

[253]  ECF 154-1, at 11.

> To break the contract down, basically it says we will provide you with carts and computers—in return we will be your primary pharmacy for a set amount of time. Meaning we're the only pharmacy in your admission packet (I understand the residents have choice, if they choose to switch or has [sic] mail order we can't force them to use us). It's pretty non-binding but we just ask it be signed so we can recoup the cost of our new equipment.[254]

From this writing, a jury could infer that Guardian offered the laptops as an inducement with the intent of garnering referrals. It is also reasonable to infer from this email that the laptops constituted remuneration.

Thus, summary judgment as to eMAR and the laptops is inappropriate.

### 3. Training

Finally, the parties cross-move for summary judgment on Training (including the education classes and skills checks Guardian administered).

As a threshold matter, Guardian admits that, before it built its own training space, it offered "some pricing allowances for employees of 'host communities'—that is, the ALFs that provided space, refreshments, and other amenities to attendees."[255] Guardian acknowledges that, before 2018, it offered "try-before-you-buy" allowances to employees from ALFs that were "new to Guardian" or

---

[254]   ECF 139-18, at 2.

[255]   ECF 154-1, at 23.

newly converted from PCHs to ALCs.[256] The parties also agree that Guardian typically charged ALFs at least $50 per employee per day for Training.[257] Notably, Guardian does not argue that Training is integrally related to its drug fulfilment service or any of the suspect Services.

Guardian's arguments boil down to two points: (1) there is no evidence that Guardian's "pricing allowances" were commercially unreasonable, below FMV, or below cost; and (2) there is no evidence that those allowances gave Guardian any unfair competitive advantage or were offered as inducements for referrals.[258] Heller shows more than he tells, compiling snippets of Guardian correspondence to ALFs to illustrate that Guardian offered Training at no cost to induce referrals.

Rather than reproduce the relevant excerpts in full, it is sufficient to observe that Guardian (1) advertised Training (including classes and skills checks) as complimentary for new clients, "AL licensure clients," Collier's clients, some "corporate clients," and the host ALF; (2) offered Training together with eMAR software and hardware at no charge; and (3) marketed Training as required for "GA Certified Medication Aide Certification."[259] Perhaps, for some of Guardian's

---

[256] *Id.*

[257] *See, e.g., id.*; ECF 172, at 17.

[258] ECF 154-1, at 25.

[259] ECF 139-2, at 21–20 (citations omitted).

clients, these advertisements evidence a "barter arrangement" or an offer to "try-before-you-buy," as Guardian suggested during oral argument.[260] To the extent that this evidence demonstrates a practice different from a *quid pro quo*, it might persuade a jury that Guardian did not offer Training as remuneration or inducement. Viewed differently, and because Training was typically billed at $50 per person per day, the evidence might also be construed as showing that Training had independent value and, prior to 2018, was offered for free and below its FMV to several ALFs for competitive advantage.

Heller also maintains that free Training (as with the provision of all of the Services) was intended to induce referrals. In support of this proposition, he again excerpts *en masse* Guardian's communications to ALFs. For example, Hopp explained to one ALF, "[i]n our other . . . buildings we are servicing typically around 95% of the residents—when we are the primary pharmacy it's easy for us to do the quarterly consulting and certifications, if we are not the primary pharmacy we have to charge for our services."[261] Among other examples, Newcomb likewise advised another ALF, "[p]lease realize that Guardian . . . could provide [Training] for you when we are preferred pharmacy. However, now that [a competing pharmacy] has a good number of your residents they should be able

---

[260]  ECF 211, at 51:8, 54:10.

[261]  ECF 139-2, at 27 (emphasis removed).

to help . . . ."[262] From these communications, a jury could infer that Guardian was leveraging Training as an inducement to obtain "preferred pharmacy" status at ALFs.

During oral argument, Guardian's counsel emphasized that Training was "a profitable service line," and it was "not a loss leader."[263] Counsel stressed that "you have to look at the entire commercial relationship" and "bundle of services," and emphasized that "[t]he fact that maybe there were a few, a handful [of services] that weren't charged for" is immaterial if Guardian made profit from the aggregate.[264] However, Guardian has not offered a case to support its position that "the aggregate amounts paid"[265] by ALFs for Guardian's services is the definitive measure—for Training alone, or for the Services. Guardian conflates profit with FMV, but the two are not equivalent. That Training was profitable for Guardian does not necessarily mean it was offered at or above FMV.

Substantial jury questions remain on the elements of Heller's claims as they relate to Training. Neither party is entitled to summary judgment on this issue.

* * * *

---

[262] *Id.* at 21 (emphasis removed).

[263] ECF 211, at 54:12.

[264] *Id.* at 55:8–22.

[265] ECF 178, at 8.

Heller's Motion for Partial Summary Judgment [ECF 146] and Guardian's

Motion for Summary Judgment [ECF 154] are **DENIED**.

## IV.    Conclusion

Regarding the cross-motions for summary judgment:

- Heller's motion for partial summary judgment is **DENIED** [ECF 146]; and

- Guardian's motion for summary judgment is **DENIED** [ECF 154].

Regarding the motions to seal:

- Heller's motions for leave to file matters provisionally under seal are **GRANTED** [ECFs 137, 147, 167]; and

- Guardian's motions for leave to file matters under seal are **GRANTED IN PART and DENIED IN PART** [ECF 143, 156], and **GRANTED** [ECF 176].

Regarding the motions to exclude expert testimony:

- Heller's motion to exclude Kevin G. McAnaney's and Dr. Alyson L. Wooten's expert testimonies is **DENIED** [ECF 149]; and

- Guardian's motions to exclude Allison Hoffman's and Dr. Israel Shaked's expert testimonies are **DENIED** [ECFs 144, 173], and its motion to exclude the testimony of Gregory Kaupp is **GRANTED** [ECF 145].

Regarding the motions to exclude other evidence and argument:

- Heller's motion to exclude documents and expert testimony based on those documents is **DENIED** [ECF 150];

- Guardian's motion to exclude Heller's medication cart allegation is **GRANTED** [ECF 168]; and

- Guardian's motion to exclude Heller's summary exhibits is **DENIED WITHOUT PREJUDICE** [ECF 180].

Regarding the motions for leave to file supplemental authority and strike corresponding briefs:

- Heller's motion to notify the Court of the Government's briefing in other cases is **DENIED** [ECF 196], and his motions to notify the Court of supplemental authorities are **GRANTED** [ECFs 218, 223]; and

- Guardian's motion to notify the Court of supplemental authority is **GRANTED** [ECF 212], and its motion to strike is **DENIED** [ECF 214].

The Court **ORDERS** as follows:

- The parties are reminded to follow the instructions set forth in this Order concerning the sealing motions;

- **Within 5 days**, the parties are instructed to file updated leaves of absence, if any, for each counsel who intends to meaningfully participate in the trial, as well as for Heller and for Guardian's designated corporate representative; and

- **Within 30 days**, the Parties are **ORDERED** to file a Joint Proposed Pretrial Order in compliance with the Federal Rules and Local Rules of this Court.

**Trial will be scheduled without further notice.**

**SO ORDERED** this 30th day of September, 2023.

_____
Steven D. Grimberg
United States District Judge