IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| HENRY B. HELLER,<br>    Plaintiff,<br>              v.<br>GUARDIAN PHARMACY OF ATLANTA, LLC,<br>    Defendant. | Civil Action No.<br>1:18-cv-03728-SDG |

**OPINION AND ORDER**

This matter is before the Court on Intervenor Keating Muething & Klekamp PLL (KMK)'s motion for attorneys' fees [ECF 323-1].[1] For the following reasons, KMK's motion is **GRANTED** in the amount of $1,508,233.15.

**I.    BACKGROUND**

This motion relates to a dispute between two law firms over their respective share of the fee award from the settlement in this False Claims Act case. One of the law firms, Callow + Utter (C+U), was started by former partners at the other law firm, KMK, while this case was still being litigated.[2] When those partners—Joseph Callow and Greg Utter—left KMK to start C+U, Plaintiff Henry Heller fired KMK and retained C+U in its stead.[3] Heller subsequently settled the case ▮

---

[1]  KMK's motion and the parties' briefs have been filed under provisional seal, given the confidential nature of the settlement agreement. The parties' motions for leave to file under seal [ECFs 324, 326, 329, 332] are **GRANTED**.

[2]  ECF 328-2, ¶ 7.

[3]  *Id.* ¶ 8.

1

████████████████████████████████████████████████████████████████[4] KMK, having noticed its attorneys' lien[5] and been granted leave to intervene,[6] now asks the Court to award it almost $2.13 million—$2,128,857.17, to be exact—for the value of the services it performed on the case before being supplanted by C+U, under the terms of its engagement letter with Heller.[7]

### A.     The Court Has Supplemental Jurisdiction Over This Fee Dispute.

As a preliminary matter, the Court has jurisdiction over this fee dispute. The Court's jurisdictional analysis mirrors the Eleventh Circuit's in *Moreno Farms, Inc. v. Tomato Thyme Corp.*, 490 F. App'x 187 (11th Cir. 2012). Because the Court had original federal question jurisdiction over the underlying False Claims Act suit, 28 U.S.C. § 1331, it has supplemental jurisdiction over claims that are part of the same case or controversy as the underlying suit, including any resulting dispute over attorneys' fees. *Moreno Farms*, 490 F. App'x at 188 (citing *Broughten v. Voss*, 634 F.2d 880, 883 (5th Cir. Jan. 1981)).[8] And though the Court has discretion to "decline to exercise supplemental jurisdiction," 28 U.S.C. § 1367, the parties and all counsel

---

[4]   ECF 312, at 4; ECF 312-1, at 3. KMK is not seeking reimbursement of costs. ECF 323-1, at 17 n.7.

[5]   ECF 221.

[6]   ECF 303.

[7]   ECF 323-1, at 1.

[8]   Fifth Circuit cases decided before October 1, 1981, are binding precedent in the Eleventh. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

2

requested that the Court retain its jurisdiction to resolve this motion, and it agreed to do so.

### B.   The Engagement Letter Controls KMK's Fee Entitlement.

Moving to the merits: Though the attorneys on either side of this fee dispute have failed to find much common ground, they do agree that KMK's fee award is determined by the terms of Heller's engagement letter with KMK.[9] The relevant part of the engagement letter—under Paragraph 16, entitled "Termination of Representation and Quantum Meruit"—provides:

> If you terminate this engagement and subsequently settle, release or waive any of your claims without [KMK's] consent, [KMK] will be entitled, under the doctrine of quantum meruit, to receive compensation from you in an amount that reflects the value of the legal services [KMK] has furnished to you…. The value of [KMK]'s legal services is based upon, among other things, the *amount of any recovery* you may receive, the *number of hours* expended, and the billing attorney's regular *hourly rates*.[10]

The parties agree that this language in essence entitles KMK to "hours times rates and then potentially a kicker."[11]

---

[9]   ECF 323-1, at 3; ECF 328-1, at 2.

[10]  ECF 284-3, at 18 (emphasis supplied).

[11]  ECF 323-1, at 3; ECF 328-1, at 2.

3

Under Georgia law,[12] a discharged attorney's fee entitlement is determined, to the extent applicable, by relevant language in the attorney-client engagement letter. *McWay v. McKenney's, Inc.*, 359 Ga. App. 547, 550 (2021). Because paragraph 16 of the Heller-KMK engagement letter is clearly applicable here, its terms control. Under those terms, KMK is entitled to a fee that represents the value of the legal services it provided, which is in turn a function of (1) Heller's total recovery, (2) the hours KMK worked, (3) KMK's hourly rates, and (4) any relevant unenumerated factors.

The Court notes that paragraph 16's invocation of the "doctrine of quantum meruit" is somewhat confusing because breach of contract and quantum meruit are mutually exclusive remedies: The existence of a contractual right to recovery (like the one provided by paragraph 16) precludes an equitable claim for quantum meruit. *Kwickie/Flash Foods, Inc. v. Lakeside Petro., Inc.*, 246 Ga. App. 729, 730 (2000). Nevertheless, in an effort "to give effect to the parties' intentions," *First Data POS, Inc. v. Willis*, 273 Ga. 792, 794 (2001), the Court reads the "quantum meruit" language as bringing Georgia-law principles on the reasonableness and fairness of attorney fee awards to bear, as relevant and useful, on the application of paragraph 16. As it turns out, these principles are consistent with the language of the

---

[12] The Court adopts the parties' assumption that Georgia law governs this fee dispute. ECF 323-1, at 3; ECF 328-1, at 2.

engagement letter: Georgia courts require that fee awards be "reasonable," as evidenced by "hours, rates, or other indication of the value of the professional services actually rendered." *Ga. Dep't of Corr. v. Couch*, 295 Ga. 469, 484–85 (2014).[13] It is that value which the Court must calculate here.

### C. Under the Engagement Letter, KMK Is Entitled to $1,508,233.15.

To calculate KMK's reasonable fee, the Court begins with the three factors enumerated in paragraph 16: (1) total recovery, (2) hours, and (3) rates. The first two are easy. First, Heller's total recovery ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Second, KMK worked 2,314.15 hours.[14]

The third is more difficult. According to paragraph 16, the relevant figure is "the billing attorney's *regular* hourly rates."[15] The parties hotly contest what Callow's and Utter's "regular" rates are for purposes of paragraph 16. C+U argues

---

[13] Notably, Georgia courts are not required to adhere to the federal "lodestar" method for determining a reasonable attorneys' fee. *Cajun Contractors, Inc. v. Peachtree Prop. Sub, LLC*, 360 Ga. App. 390, 407 (2021).

[14] ECF 284-3, at 81, 91. There is a slight discrepancy as to the number of hours between the invoices submitted by KMK (2,314.15 hours), and the timesheets submitted by Callow and Utter from their time at KMK (2,307.60 hours). *Compare id.*, *with* ECF 328-4, at 78. The parties do not address this discrepancy, and the Court cannot compare the parties' math because C+U's timesheets are almost completely redacted. *See* ECF 328-4. KMK's invoices, by contrast, are fully unredacted, and itemize the date, the billing attorney, and the description of the legal services provided for all the hours KMK asserts it worked. *See* ECF 284-3. It is therefore the numbers in KMK's invoices that the Court relies on throughout this Order.

[15] ECF 284-3, at 18 (emphasis added).

that the regular rates are those listed on KMK's internal billing schedule and tracked on KMK's internal timesheets:[16] $545 per hour for Callow, and $600 per hour for Utter.[17] KMK argues that the regular rates are those that Callow and Utter publicly represented that they charged in False Claims Act cases like this one:[18] $875 per hour for Callow, and $895 per hour for Utter.[19] For 2,314.15 hours worked, the difference in value between the lower (or "standard") and higher (or "FCA") rates is over $650,000.

The Court finds, based on all the evidence in the record, that Callow's and Utter's "regular" rates for purposes of KMK's fee award are the FCA rates. The evidence shows that Callow and Utter bridged the gap between their standard and FCA rates by applying a "one-time upward adjustment" to their standard billing rates upon successful resolution of False Claims Act cases;[20] and that applying the upward adjustment at the end of the case (instead of tracking the higher FCA rate on internal timesheets) served in part to mitigate the negative impact of Callow and Utter's *un*billed time in *un*successful False Claims Act cases.[21] The evidence

---

[16]  ECF 328-1, at 7.

[17]  ECF 328-3, at 2.

[18]  ECF 323-1, at 12.

[19]  ECF 284-3, at 81, 91.

[20]  ECF 292-2, ¶ 5.

[21]  *Id.* ¶ 7.

further shows that Callow and Utter's practice of billing at higher FCA rates has been consistent and ongoing for at least a decade;[22] that Callow and Utter have submitted invoices in False Claims Act settlement negotiations billing their time at the FCA rates;[23] that Callow and Utter have collected "reasonable attorneys' fees" under 31 U.S.C. § 3730(d)(2) at their FCA rates;[24] that Callow and Utter have represented to other federal judges that their hourly rates in contingency cases are the FCA rates;[25] and that Callow *in this very case* prepared an invoice billing time at the FCA rates.[26] Finally, the evidence of Callow and Utter's systematic reliance on the FCA rates is undisputed: Callow and Utter do not deny that they regularly negotiated False Claims Act settlements, collected False Claims Act attorneys' fees, and invoiced their work on False Claims Act cases at the FCA rates. The Court therefore concludes based on the overwhelming weight of the evidence that Callow's and Utter's "regular" rates for this case are the FCA rates. At those rates, the provisional value of KMK's legal services for 2,314.15 hours is $1,508,233.15.

All that remains for the Court to decide is whether that value should be adjusted up or down in light of the total recovery and any other relevant factors.

---

[22] ECF 292-3, ¶ 3(a); ECF 292-2, ¶ 6.
[23] ECF 292-3, ¶¶ 3(a), (c).
[24] *Id.* ¶ 4; ECF 292-2, ¶ 6.
[25] ECF 292-3, ¶ 3(a); ECF 292-5, at 6.
[26] ECF 292-3, at 50.

The Court finds that no adjustment here is necessary. The FCA rates are consistent with the prevailing market rate in Atlanta for similar services by reasonably comparable professionals, and a $1.5 million fee award is not out of line with either the overall recovery or the fee awards collected by the other law firms in this case. KMK is commended for its role in litigating this long and difficult case, but the "particularly complex and specialized nature" of False Claims Act litigation and the "risk of non-recovery" in contingency cases are, as KMK well knows, already factored into the heightened FCA rates for which KMK so zealously advocated.[27] There is nothing in the record to support a finding that Heller's recovery was so rich or KMK's work so exceptional as to justify an additional performance-based "kicker." Likewise, there is no other factor that renders KMK's entitlement to the "FCA rates x hours" formula unreasonable.

KMK's motion for attorneys' fees [ECF 323-1] is therefore **GRANTED**. Under the terms of its engagement letter and applicable principles of Georgia law, the value of KMK's services to Heller is $1,508,233.15, which amount KMK is awarded as its reasonable attorneys' fees.

---

[27] ECF 323-1, at 13.

Moore Hall, LLC is **ORDERED** to disburse the settlement funds held in its IOLTA account to KMK and C+U in accordance with this Order within 10 days.

The Clerk is **DIRECTED** to permanently seal the documents filed under provisional seal at ECFs 323, 325, 328, and 331.[28]

**SO ORDERED** this 21st day of February, 2025.

                                                Steven D. Grimberg
                                          United States District Judge

---

[28] *See supra* note 1.